# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE HON. PAULINE NEWMAN,
Circuit Judge
United States Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC 20005,

*Plaintiff*,

v.

THE HON. KIMBERLY A. MOORE,
in her official capacities as
Chief Judge of the U.S. Court of Appeals for the Federal Circuit,
Chair of the Judicial Council of the Federal Circuit, and
Chair of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

THE HON. SHARON PROST,
in her official capacity as
Member of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

THE HON. RICHARD G. TARANTO,
in his official capacity as
Member of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

and

THE JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT,
717 Madison Place, NW
Washington, DC 20005,

*Defendants*.

NO. 1:23-CV-01334-CRC

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................II

MEMORANDUM................................................................................................. 1

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS.................................................................................. 7

I.   Judge Newman's Service on the Federal Circuit ..................................... 7

II.  Federal Circuit Judicial Council and Case Management ........................ 9

III. The Statute and Rules Governing Investigations into Judicial Conduct and Disability ........ 11

IV. The Allegations Against and Investigation into Judge Newman........................................... 15

LEGAL STANDARD ......................................................................................... 26

ARGUMENT ........................................................................................................ 27

I.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS ................................. 27

A. This Court Has Jurisdiction to Enjoin Judge Newman's Suspension Which Was Imposed Prior to Any Finding of Misconduct.................................................................28

B. This Court Has Jurisdiction over Both Facial and As-Applied Challenges to Judicial Disability Act ..............................................................................................29

II.  JUDGE NEWMAN'S SUSPENSION FROM DUTIES ABSENT ANY FINDINGS OF MISCONDUCT IS UNCONSTITUTIONAL AND CONTRARY TO STATUTE ......................................... 30

A. Neither the Disability Act nor Conduct Rules Permit Suspension of Judges Prior to a Finding of Misconduct ...............................................................................31

B. Section 332(d)(1) Does Not Authorize Indefinite Suspensions ...........................34

C. The June 5 Order Was Unlawfully Promulgated ...............................................37

D. To the Extent that 28 U.S.C. § 332(d)(1) Authorizes Indefinite Suspension of an Article III Judge, It Is Unconstitutional ...............................................................39

III. THE DISABILITY ACT'S PROVISION AUTHORIZING SUSPENSION OF JUDGES BY THEIR COLLEAGUES IS UNCONSTITUTIONAL ........................................................... 39

IV. The Disability Act Is Unconstitutional as Applied to Judge Newman Because It Denies Her Due Process of Law ................................................................................ 45

V. Judge Newman Will Suffer Irreparable Harm Absent a Preliminary Injunction, and the Balance of Equities Weighs Heavily in Plaintiff's Favor ...................... 52

VI. Granting the Preliminary Injunction Serves the Public Interest ...................... 53

CONCLUSION ................................................................................................................ 54

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Pursuant to Rules 65(a) and (b) of the Federal Rules of Civil Procedure, Plaintiff, the Honorable Pauline Newman, United States Circuit Judge for the Federal Circuit, seeks a preliminary injunction to prevent Defendants from executing an unlawful and ongoing suspension, currently being carried out jointly and severally by all the named defendants, of said Pauline Newman from the duties and functions of her judicial office.  Due to the ongoing infringement of Plaintiff's rights and obligation to exercise functions of the office to which she was duly confirmed and appointed and which she is entitled to hold "during good behaviour," U.S. Const. art. III, § 1, as well as ongoing injury to every Federal Circuit litigant, all of whom have a right to have their cases heard by a fair draw from the full complement of judges confirmed and appointed to hold judicial office, Plaintiff respectfully requests a temporary order restraining Defendants from continuing their unlawful suspension of Judge Newman and an expedited briefing schedule and a hearing on the motion for the preliminary injunction.

Plaintiff Pauline Newman is a Presidentially-appointed, Senate-confirmed federal Circuit Judge of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") and has been holding judicial office since 1984.  First Amended Complaint ("FAC") ¶ 10.  The court to which Judge Newman was confirmed and the office which she continues to hold was created pursuant to Article III of the United States Constitution.  *See* 28 U.S.C. § 44; *Elgin v. Dep't of Treasury*, 567 U.S. 1, 17 (2012).  Both as a matter of constitutional law and the statute creating the Federal Circuit, judges appointed to that court continue to hold office "during good behaviour."  U.S. Const. art. III, § 1; U.S.C. § 44 (b).

It is well-settled that involuntary removal of an Article III judge can only be accomplished through a constitutionally prescribed impeachment process, which in turn requires a majority vote in

the United States House of Representatives approving articles of impeachment, and a two-thirds vote in the United States Senate to convict the impeached individual.  U.S. Const. art. I, § 2, cl. 5; § 3, cl. 6-7; *see also U.S. ex rel. Toth v. Quarles*, 350 U.S. 11, 15-16 (1955) ("Article III provides for the establishment of a court system as one of the separate but coordinate branches of the National Government. … These courts are presided over by judges appointed for life, subject only to removal by impeachment.").  Furthermore, continuing in office involves more than merely receiving the salary that is statutorily due to the officeholder.  Indeed, Judge Newman's judicial commission specifically authorizes her, during the period of her good behavior, to "execute and fulfil the duties of [her judicial] Office" with "all the powers, privileges and emoluments" appertaining to that office.  Yet, by virtue of an informal, pre-investigatory decision[1] of the Judicial Council of the Federal Circuit ("Judicial Council")[2] Judge Newman has been removed from hearing cases for an indefinite period.  FAC ¶¶ 24, 58.  Additionally, in an order issued on June 1, 2023, Defendants have indicated that they contemplate continued suspension of Judge Newman from "the duties of [her judicial] Office."  FAC, Exh. N.  Furthermore, in an order issued on June 5, 2023, Defendants indicated that they believe they have authority to and may continue suspension of Judge Newman *even in the absence of any finding of misconduct*.  FAC ¶ 71; Exh. O.  Neither the initial (and ongoing) suspension nor the threatened continuing suspension is constitutional, and therefore this Court should enjoin them.

---

[1] To the best of Plaintiff's knowledge, no formal order was entered prior to the suspension, and no notice of such action being on the Judicial Council's agenda was ever provided.  As discussed further below, the Judicial Council finally issued a formal order on June 5, 2023, but even that order was issued without any notice to Judge Newman or any opportunity to be heard.  Furthermore, the order which was purportedly issued on behalf of the Judicial Council of the Federal Circuit was itself unlawful as Judge Newman, who is a member of the Judicial Council was neither present nor invited to participate in the deliberations.  *See infra* n.6 and Part Argument. II.C.

[2] Only where referencing the Judicial Council of the Federal Circuit are the words "Judicial Council" capitalized.

First, the Constitution prescribes one mechanism and one mechanism only for removing Article III judges from office or otherwise precluding them from exercising the functions of the office to which they were appointed—impeachment by the House of Representatives and a conviction on the submitted articles of impeachment by the United States Senate.  There is a reason that "the Judiciary … w[as] not chosen to have any role in impeachment" and removal of judges from office. *Nixon v. United States*, 506 U.S. 224, 234 (1993).  As the Supreme Court explained, to repose such power in the Judiciary "would be inconsistent with the Framers' insistence that our system be one of checks and balances.  In our constitutional system, impeachment was designed to be the *only* check on the Judicial Branch …."  *Id.* at 234-35 (emphasis in original).  Much as it would be improper for the Judiciary to interfere with a Congressional decision to impeach and remove an Article III judge, *see generally Nixon*, *supra*, so too it is improper for the Judiciary itself to engage in quasi-impeachment.  The *sole* power to try impeachments (and upon conviction remove judges from office) rests with the United States Senate.  U.S. Const. art. III, § 3, cl. 6; *Nixon*, 506 U.S. at 229-35.  Thus, to the extent that any Act of Congress (including the Judicial Disability Act of 1980) authorizes the Judiciary to remove Article III judges from office, whether in form or in substance, it is unconstitutional.  *Cf. McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 67 (D.C. Cir. 2001) ("[T]he claim of implied negation from the impeachment power works well for removal or disqualification."); *id.* at 67, n.5 (noting that "a long-term disqualification from cases could, by its practical effect, [e]ffect an unconstitutional 'removal.'").

Second, even assuming *arguendo* (and *dubitante*) that the provisions of the Disability Act that authorize the Judicial Council to "order[] that on a temporary basis for a time certain, no further cases be assigned to the judge whose conduct is the subject of a complaint" were constitutional as a general matter, application of these provisions to an individual judge is not free from the requirements and constraints of the Due Process Clause of the Fifth Amendment.  And a fundamental and irreducible

minimum of due process is the requirement that any dispute be arbitrated by an independent, unbiased, and disinterested decisionmaker. *See, e.g.*, *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 617 (1993) ("due process requires a 'neutral and detached judge in the first instance.'").  "[A]n unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case," which is why "due process guarantee[s] that 'no man can be a judge in his own case.'" *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). *See also Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009).  In recognition of these due process constraints, federal law requires that "*[a]ny* justice, judge, or magistrate judge of the United States shall disqualify himself in *any* proceeding … [w]here he has … personal knowledge of disputed evidentiary facts concerning the proceeding."  28 U.S.C. § 455(a), (b)(1).  In circumstances where the alleged judicial misconduct or disability is such that witness statements from the judge's own colleagues are necessary to evaluate allegations, it necessarily follows that those very same colleagues cannot also serve as adjudicators of the veracity and weight of their own statements or the underlying allegation of disability.  Permitting such an arrangement violates the basic notions of due process, and thus renders the Disability Act and the Conduct Rules unconstitutional as applied to Plaintiff.  Accordingly, this Court should enjoin further attempts to suspend Judge Newman from the powers and duties of her office by those of her colleagues who are necessarily witnesses to the underlying allegation of disability.

Finally, entirely aside from the facial and as-applied constitutional concerns, actions by the Judicial Council (in an informal decision) to suspend Judge Newman from the functions and duties of her office "pending the results of the investigation into potential disability/misconduct" and to bar Judge Newman from being "assigned any new cases until the[] [disciplinary] proceedings are resolved" are not authorized by either the Disability Act or the Conduct Rules.  The Disability Act (assuming it is constitutional) permits the Judicial Council to "order[] that on a temporary basis for a time certain, no further cases be assigned to the judge whose conduct is the subject of a complaint;" however, such

4

an order can issue *only as a sanction*, *only upon a finding of misconduct*, and *only following "an opportunity to present argument, personally or through counsel, written or oral, as determined by the judicial council."*  *See* Conduct Rules, R. 20(a), (b)(1)(D).  Not one of these requirements was met.  At the time the Judicial Council allegedly voted "not to assign [Judge Newman] to sit on any new cases pending the results of the investigation into potential disability/misconduct," no "report of a special committee" had been filed, no finding of misconduct had been made, and most certainly, Judge Newman was not afforded "an opportunity to present argument, personally or through counsel, written or oral, as determined by the judicial council."  Thus, the action allegedly taken by the Judicial Council and announced in Chief Judge Moore's email of April 5, 2023, *see* FAC, ¶ 24, Exh. B at 4, was *ultra vires* as unauthorized by, and indeed, directly contrary to the text of the Disability Act and the Conduct Rules.  Because this violation is ongoing and visits irreparable harm on Judge Newman and Federal Circuit litigants, a temporary restraining order and/or an early date preliminary injunction are warranted.

The Judicial Council's attempt to fix its own error (on June 5, 2023, and months after Judge Newman, in several letters, identified it to the Council) also fails to rectify the problem.  *See* FAC ¶¶ 54-70, Exh. O.  First, the Judicial Council June 5 Order was issued unlawfully, as Judge Newman, who is a member of the Judicial Council, was not even notified of any meeting of the Judicial Council, much less invited to participate.  (The same is true about the alleged meeting of the Judicial Council on March 8, 2023).  Second, the statements in the Order alleging that Judge Newman's case backlog exceeded the circuit-wide agreed upon deadlines are verifiably false.  FAC ¶¶ 60-65.  Third, the ostensible justifications for the suspension in the June 5 Order are directly contradicted by Chief Judge Moore's email of April 5, 2023, which explained that the suspension is being imposed not as a result of any delays, but "pending the results of the investigation into potential disability/misconduct."  *Compare* FAC, Exh. B at 4 *with* Exh. O.  This rationale is confirmed by the email's ultimate sentence

that ties assignment of new cases to the resolution of the disciplinary proceedings.  FAC, Exh. B at 4.

Thus, Defendants' belated attempt to retrofit a legal justification for its unlawful actions also fails.

At bottom, the federal judiciary is not only not free from constitutional due process curbs and structural limits on its own powers, but it should be the most mindful of all governmental branches of these constraints.  Defendants' actions, jointly and individually, have ignored and violated both constitutional and statutory requirements, and they have undermined the protections that Article III of the Constitution affords to federal judges and litigants.  Defendants' actions have already prevented and are continuing to prevent Judge Newman from exercising the functions of her office.  They have already violated and are continuing to violate the right of all Federal Circuit litigants to have their cases adjudicated by a fair draw from the full complement of judges confirmed and appointed to the Federal Circuit.  *See* 28 U.S.C. § 46(b) ("The United States Court of Appeals for the Federal Circuit shall determine by rule a procedure for the rotation of judges from panel to panel to ensure that *all of the judges* sit on a representative cross section of the cases heard ….") (emphasis added).

For these reasons, as well as those set forth below, Plaintiff asks the Court to 1) declare provisions of the Disability Act and Conduct Rules that purport to authorize suspension of judges from their office to be facially unconstitutional; 2) declare that the Disability Act and the Conduct Rules as applied to Judge Newman are unconstitutional because the investigation and disciplinary actions taken against Judge Newman by the Judicial Council of the Federal Circuit do not comport with constitutional and statutory due process requirements; 3) declare that the ongoing suspension of Judge Newman from the functions and duties of her judicial office "pending the results of the investigation into potential disability/misconduct" or for any other reason that is not applied equally to other judges of the Federal Circuit, is not authorized by and is contrary to the Disability Act and the Conduct Rules, to the extent that they are not unconstitutional; and 4) to immediately issue an

appropriate order halting unconstitutional or otherwise unlawful conduct by the Judicial Council, and having an effect of immediately restoring Judge Newman's ability and authority to hear cases.

## STATEMENT OF FACTS[3]

### I.   JUDGE NEWMAN'S SERVICE ON THE FEDERAL CIRCUIT

Plaintiff, Pauline Newman, is a United States Circuit Judge for the Federal Circuit and has held office since 1984, following her unanimous confirmation by the United States Senate and formal appointment by President Ronald Reagan.  FAC ¶ 10.  At all relevant times, Judge Newman has been and is in sound physical and mental health, has been willing and able to fully participate in the work of the Court and, consistent with the Court's internal practice and procedures for active-status judges, has requested to be assigned to the regular panel sittings of the Court.  FAC ¶ 12.  She has authored majority and dissenting opinions in the whole range of cases before her Court, has voted on petitions for rehearing *en banc*, and has joined in the *en banc* decisions of the Court.  FAC ¶ 13.  During her time on the bench, Judge Newman has authored hundreds of majority, concurring, and dissenting opinions. She is noted for her frequent, incisive dissents and has been referred to as the Federal Circuit's Great Dissenter.  As Chief Judge Moore herself noted, "[a]mong patent practitioners, Judge Newman is particularly well-known for her insightful dissents, which have often been vindicated by the Supreme Court."  On more than one occasion the Supreme Court "adopt[ed] essentially the reasoning of Judge Newman's dissent." Kimberly Moore, *Anniversaries and Observations*, 50 AIPLA Q. J. 521, 524-25 (2022).

In part because Judge Newman frequently writes separate opinions, and in part because she takes extraordinary pains to ensure that her opinions fully reflect her views and remain consistent from case to case and year to year, Judge Newman is and has been well-known for being "slow" to issue her decisions.  Though often slow in coming, Judge Newman's decisions over the last thirty-

---

[3] A more detailed statement of facts is laid out in the First Amended Complaint ¶¶ 10-80.  A succinct version of those facts most pertinent to the request for a preliminary injunction is offered here.

nine-plus years have never been criticized for being poorly argued or written, and indeed, have been universally praised for their clarity and insight.

However, data shows that Judge Newman's overall speed of disposition is not significantly different from her colleagues. Thus, from October 1, 2021 to December 31, 2022, when counted from the time of filing of the appeal to its disposition, cases in which Judge Newman authored the majority opinion were pending, on average, for 486 days. At the same time, cases assigned to Judge Sharon Prost were pending for 509 days, Judge Todd M. Hughes for 543 days, and Judge Raymond T. Chen for 549 days. *See* Ron D. Katznelson, Ph.D., *Is There a Campaign to Silence Dissent at the Federal Circuit?* at 18, *available at* https://ssrn.com/abstract=4489143 (cited in FAC ¶ 76). Furthermore, Judge Newman's productivity does not significantly differ from her colleagues. Data shows that during the above-referenced period, Judge Newman authored 25 opinions (including majority, concurring, and dissenting ones), whereas in the same time period, Judge Chen authored only 20 opinions.[4] *Id.*

Judge Newman has continued writing opinions through the present day. Thus, on March 22, 2023, Judge Newman issued an eighteen-page opinion for the Court in *Military-Veterans Advocacy, Inc. v. Sec'y of Veterans Affairs*, 63 F.4th 935 (Fed. Cir. 2023). On March 6, 2023, Judge Newman delivered a seven-page dissenting opinion in *May v. McDonough*, 61 F.4th 963 (Fed. Cir. 2023). On March 31, 2023, Judge Newman filed a four-page dissenting opinion from the Court's opinion in *Roku Inc. v. Univ. Elecs., Inc.*, 63 F.4th 1319 (Fed. Cir. 2023), and on April 6, 2023, Judge Newman filed a fifteen-page dissenting opinion in *SAS Inst. v. World Programming Ltd.*, 64 F.4th 1319 (Fed. Cir. 2023). Finally,

---

[4] In any event, it is far from certain that the number of opinions authored is a proper measure of a Federal Circuit judge's workload. *See, e.g.*, Kimberly Moore, *Are District Court Judges Equipped to Resolve Patent Cases?*, 15 Harv. J. L. & Tech. 1, 38 n. 40. (2001) ("My own experience with the Federal Circuit, having clerked for two years for the Honorable Glenn L. Archer, is that the judges of the Court are extremely hard-working and the complexity of the patent cases that are appealed makes quantifying the Court's workload based on number of cases an inappropriate measure of workload.")

on June 6, 2023, Judge Newman filed a twelve-page dissenting opinion in *Dep't of Transport. v. Eagle Peak Rock & Paving, Inc.*, No. 21-1837, ___ F.4th ___, 2023 WL 3829625 (Fed. Cir. 2023). These opinions have been praised by various members of the bar, and nothing therein even hints at any mental disability. Andrew Michaels, *Judge Newman's Recent Dissents Show She Is Fit For Service*, Law360.com (June 6, 2023). These opinions were produced despite the inordinate amount of time and resources expended, as well as significant stress and distraction, fighting the ongoing and unlawful investigation into Judge Newman, and despite the fact that over the last several months, Judge Newman's chambers have been short-staffed due to Chief Judge Moore's actions reassigning various personnel previously employed by Judge Newman to other chambers.

## II.   FEDERAL CIRCUIT JUDICIAL COUNCIL AND CASE MANAGEMENT

Congress created, within each circuit, a judicial council—a body that is empowered to "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." 28 U.S.C. § 332(d)(1). Most judicial councils consist "of the chief judge of the circuit, who … preside[s], and an equal number of circuit judges and district judges of the circuit." *Id.* § 332(a)(1). However, because the Federal Circuit's jurisdiction is defined not geographically, but based on the subject matter, *see* 28 U.S.C. § 1295, it has no "district judges of the circuit." As a result, the Judicial Council of the Federal Circuit consists of all active-duty judges of that Court. *See* U.S. Court of Appeals for the Federal Circuit, *Judges*, https://tinyurl.com/36ndcfsb ("For purpose of implementing 28. U.S.C. § 332, the Judicial Council of the Federal Circuit consists of all circuit judges in regular active service…."). By virtue of being a judge "in regular active service," Judge Newman is a member of the Federal Circuit's Judicial Council. *See* FAC ¶¶ 55, 59, 68.

The statute creating judicial councils requires that "[a]ny general order relating to practice and procedure [to] be made or amended only after giving appropriate public notice and an opportunity for comment." 28 U.S.C. § 332(d)(1). The statute also requires that "[c]opies of such orders be furnished

9

to the Judicial Conference and the Administrative Office of the United States Courts and be made available to the public." *Id.* The Federal Circuit Judicial Council's ability to "make all necessary and appropriate orders for the effective and expeditious administration of justice," *id.*, is constrained by a statutory requirement that that Court "shall determine by rule a procedure for the rotation of judges from panel to panel to ensure that all of the judges sit on a representative cross section of the cases heard," 28 U.S.C. § 46(b).[5]

Pursuant to the powers granted it under § 332(d)(1), the Judicial Council adopted both local rules (supplementing Federal Rules of Appellate Procedure) and Internal Operating Procedures ("IOP"). Both of these documents are publicly available on the Court's website. According to the IOP 3.1 ¶ 2, "[c]ases are generally scheduled for a calendar approximately six weeks after the last brief and the appendix are filed." *See also* Practice Notes to Fed. Cir. R. 34.

However, these are not the only documents governing "practice and procedure" within the Federal Circuit. In addition to these two enactments, the Judicial Council adopted "Clerical Procedures" which are explicitly denominated as "Internal Use Only – Not for Public Distribution," yet govern assignment of judges to panels. Specifically, Clerical Procedure #3, ¶ 15 specifies that "[a]ny judge who has (1) four or more opinion assignments over six months old, or (2) two or more opinion assignments over a year old (*i.e.*, in which a draft has not been circulated to the panel for more than six months in four or more cases, or in more than one year in two or more cases after submission) will not be assigned to hear additional cases until the judge has reduced" the backlog below these benchmarks. However, "the requirements of CP #3 paragraph 15 do not apply" when a panel chooses to "hold or stay a case pending *en banc* or Supreme Court disposition of another matter." *Id.* at n.*.

---

[5] This requirement is uniquely applicable to the Federal Circuit, though other circuit courts do attempt to accomplish the same result by means of internal operating procedures. The Federal Circuit Local rules mirror the statutory requirements. *See* Fed. Cir. R. 47.2(b).

Contrary to the requirements of § 332(d)(1), this rule (and other "clerical procedures" which have been adopted pursuant to the § 332's grant of authority) have not been "made available to the public." Nor does it appear that these procedures were ever subject to an "appropriate public notice and an opportunity for comment."

Furthermore, on June 5, 2023, the Judicial Council announced that it has the authority under § 332(d)(1), notwithstanding provisions of any formally adopted rules, to bar Judge Newman "from the assignment of new cases" on the basis of her alleged "backlog of cases and her delays."  FAC ¶ 58, Exh. O.  The Judicial Council made this decision without notifying Judge Newman, much less consulting her or asking for her vote, even though she is a member of the Judicial Council,[6] and did not set any benchmarks for what constituted a sufficient resolution of the backlog that would permit cases to again be assigned to Judge Newman.  FAC ¶ 69, Exh. O.  No precedent for such an action being taken with respect to any other Federal Circuit judge over the last 41 years of the Court's existence has been cited.

## III.   THE STATUTE AND RULES GOVERNING INVESTIGATIONS INTO JUDICIAL CONDUCT AND DISABILITY

In 1980, following years of debate, *see generally* Walter F. Pratt, *Judicial Disability and the Good Behavior Clause*, 85 Yale. L.J. 706, 706-07 (1976), Congress enacted the Disability Act.  Pub. L. 96-458, 94 Stat. 2036-41 (96th Cong. 1980), *codified in* 28 U.S.C. §§ 351-64.  The Act authorizes the Judicial Council of the relevant circuit to conduct investigations into alleged misconduct or disability of circuit and district judges within that circuit's jurisdiction.  *See* 28 U.S.C. §§ 353, 354, 356, 363.  Pursuant to the requirements of Section 363, which direct "the Court of Appeals for the Federal Circuit [to] prescribe rules … establishing procedures for the filing of complaints with respect to the conduct of

---

[6] Despite having a complaint lodged against her, Judge Newman remained a full member of the Judicial Council except as to matters involving adjudication of the complaint itself.  *See* R. 25(e), cmt.

any judge of such court and for the investigation and resolution of such complaints," the Federal

Circuit did so.  *See* U.S. Court of Appeals for the Federal Circuit, *Rules for Judicial Conduct and Judicial*

*Disability Proceedings*, *available at* https://tinyurl.com/yrswbemn.[7]

      Under the Conduct Rules, the Chief Judge of the Federal Circuit is charged with processing

complaints lodged against other judges within that circuit.[8]  However, the Rules also authorize the

chief judge to "identify a complaint" whenever "a chief judge has information constituting reasonable

grounds for inquiry into whether a covered judge has engaged in misconduct or has a disability …

even if no related complaint has been filed."  R. 5.  If the chief judge "identifies a complaint" pursuant

to Rule 5, she must conduct a review and either dismiss the complaint or refer it to a "special

committee" of the Judicial Council.  R. 11(a).[9]  If a matter is referred to a special committee, the

committee is charged with "determin[ing] the appropriate extent and methods of its investigation in

light of the allegations in the complaint and the committee's preliminary inquiry."  R. 13(a).  The

Conduct Rules authorize "the special committee [to] obtain material, nonredundant evidence in the

form it considers appropriate."  R. 14(a).  The Conduct Rules also purport to authorize a special

committee to "request the judge to undergo a medical or psychological examination," and "to review

existing records, including medical records."  R. 13(a), cmt.  At the same time, the Conduct Rules

---

[7] The rules adopted by the Federal Circuit are not unique and are identical to the rules appearing in Volume 2, Part E of the Guide to Judiciary Policy.

[8] In all other circuits, the chief circuit judge's authority also extends to processing complaints against district judges within that circuit; however, the Judicial Council of the Federal Circuit does not process complaints against district judges.  *See, e.g.*, *In re Complaint No.* FC-22-90001 (Fed. Cir. 2021) (noting that "a complaint against a district court judge 'must be filed with the circuit clerk in the jurisdiction in which the subject judge holds office," and concluding that a district judge "'holds office' in the jurisdiction of the" regional Court of Appeals.

[9] Although the rules adopted by the Federal Circuit state that the special committee "must consist of the chief judge and equal numbers of circuit and district judges," R. 12(a), because no district court judges "hold office" in the jurisdiction of the Federal Circuit, *see supra* n.8, the special committee appointed in this case consists solely of circuit judges, *see In re Complaint No.* 23-90015 (Fed. Cir., March 24, 2023) (appointing Defendants Chief Judge Moore, Circuit Judge Prost, and Circuit Judge Taranto as members of the special committee).

contemplate that the special committee and the subject judge "enter into an agreement with the subject judge as to the scope and use that may be made of the examination results." *Id.*

A judge whose conduct is being investigated has a right to be represented by counsel, to receive notice of investigation and all hearings, to suggest her own witnesses to the committee, to present evidence in and attend any hearing, to present legal argument to the committee whether or not a hearing is held, and to receive a copy of the special committee's report when it is filed with the judicial council. *See generally* R. 15.

Once the special committee concludes its investigation, "[t]he special committee must file with the judicial council a comprehensive report of its investigation, including findings and recommendations for council action." R. 17; *see also* 28 U.S.C. § 353 (c). Such a report (together with "any accompanying statements and documents") must be "sent the subject judge [and] must be sent to the Committee on Judicial Conduct and Disability." R. 17. "Within 21 days after the filing of the report of a special committee, the subject judge may send a written response to the members of the judicial council. The subject judge must also be given an opportunity to present argument, personally or through counsel, written or oral, as determined by the judicial council." R. 20(a).

Only after the receipt of a special committee report and the subject judge's response, can the Judicial Council "take remedial action." R. 20(b)(1)(D). One such "remedial action" that the Disability Act and the Conduct Rules purport to authorize, is an issuance of an "order[] that no new cases be assigned to the subject judge for a limited, fixed period." R. 20(b)(1)(D)(ii). *See also* 28 U.S.C. § 354 (a)(2)(A)(i). Neither the Disability Act nor the Conduct Rules authorize the Chief Judge acting alone, or the Judicial Council acting jointly, to impose any penalties on any judge prior to the conclusion of the steps described by Rules 17 and 20. *See also* 28 U.S.C. § 354(a) (stating that the Judicial Council may act only "upon receipt of a report filed" by the special committee).

Any decision by the Judicial Council is appealable to the Committee on Judicial Conduct and Disability and potentially, the Judicial Conference of the United States.  R. 20.  Finally, in order to deal with situations "where there are multiple disqualifications among the original judicial council, [or] where the issues are highly visible and a local disposition may weaken public confidence in the process," the Conduct Rules authorize the "chief judge or [the] judicial council [to] ask the Chief Justice to transfer a proceeding based on a complaint identified under Rule 5 … to the judicial council of another circuit."  R. 26 and cmt.  If such transfer is made, "the transferee judicial council shall determine the proper stage at which to begin consideration of the complaint."  R. 26 cmt.

Although the rules governing the processing of complaints in the Federal Circuit are identical to the rules processing complaints in other circuits, there is one practical difference of note.  In all circuits, including the Federal Circuit, the ultimate intra-circuit body vested with the authority to adjudicate the merits of the complaint and impose appropriate discipline is the judicial council of the relevant circuit.  However, the composition of the Federal Circuit's judicial council fundamentally differs from the composition of regional circuits' judicial councils.  In all other circuits, a judicial council consists of some subset of circuit judges and an equal number of district court judges.  *See* 28 U.S.C. § 332.  This means that the adjudicating body is not entirely composed of the subject judge's colleagues.  (Indeed, in the case of district judges, it is possible that *none* of the judges serving in the subject judge's district would be serving on that circuit's judicial council).  When it comes to the Federal Circuit, however, *all* judges of that Court and *only* judges of that Court serve on that Court's judicial council.  *See* U.S. Court of Appeals for the Federal Circuit, *Judges*, *available at* https://tinyurl.com/4cspfwtd; FAC ¶¶ 7-8.  The composition of the Federal Circuit's Judicial Council is unique in that it includes only (and all) circuit judges of that Court.  FAC ¶ 8.

## IV.   THE ALLEGATIONS AGAINST AND INVESTIGATION INTO JUDGE NEWMAN

On March 24, 2023,[10] Chief Judge Moore issued an order in which she "identified a complaint" against Judge Newman pursuant to Rule 5.  FAC ¶¶ 18-19, Exh. A.  The complaint alleged that "there is probable cause to believe that Judge Newman's health has left her without the capacity to perform the work of an active judge."  FAC, Exh. A at 1.  As a predicate for this conclusion the Order alleged (though it provided no basis or source for this allegation) that "in the summer of 2021, Judge Newman, at the age of 94, was hospitalized after suffering a heart attack and having to undergo coronary stent surgery."  Id.  Additionally, the Order alleged (again without providing any evidence or source for the allegation) that "on May 3, 2022, Judge Newman fainted following an argument and was unable to walk without assistance."  Id.  The March 24 Order also, and in passing, mentioned "allegations that Judge Newman has inappropriate behavior in managing staff by permitting one of her law clerks to exhibit unprofessional and inappropriate behavior which has been reported to Judge Newman."  Id. at 5.  Ultimately, the Order concluded Judge Newman's alleged health issues and allegations of delay in the disposition of her cases sufficed to begin a full investigation.[11]  Id. at 6.

On the same day, by a different order, Chief Judge Moore appointed a Special Committee pursuant to Rule 11(a) consisting of herself and Circuit Judges Prost and Taranto.  FAC ¶ 23.  In rapid succession, Chief Judge Moore and the Special Committee issued five additional orders.  See FAC, Exhs. B-F.  On April 6, 2023, Chief Judge Moore issued a new and virtually unprecedented order expanding the scope of the Special Committee's investigation into Judge Newman's alleged "disability" and "misconduct" to include questions about internal operations of Judge Newman's chambers.  FAC, Exh. B.  The April 6 Order contained no allegations of harassment or other similar

---

[10] According to the text of the order, it was drafted and provided to Judge Newman on March 17, 2023, but was not docketed until March 24.  FAC ¶ 19, Exh. A at 4-5.

[11] The Order averred that Chief Judge Moore attempted to reach an "informal resolution" of the complaint, which consisted of pressuring Judge Newman into retiring, and that Judge Newman declined to do so.  FAC ¶ 19, Exh. A at 4-5.

conduct.  Rather, the order alleged that Judge Newman failed to maintain confidentiality of an employment dispute between herself and a (now former) staff member.  The alleged breach of confidentiality stemmed from Judge Newman using the "All Judges" email list—which includes all judges, chambers staff, and other judicial employees (95 individuals in all)," rather than replying by using each judge's individual email address.  *Id.* at 5-6.  No one alleged that the "All Judges" email list was used with any malice or purpose of disclosing confidential information, rather than as an honest mistake.  Nevertheless, Chief Judge Moore concluded that "there is sufficient cause to believe that Judge Newman's disclosure of a confidential employment dispute matter and statements made in regard to that matter may constitute additional misconduct," and expanded the Special Committee's investigation accordingly.  *Id.* at 7.

On April 7, 2023, the Special Committee issued an order directing Judge Newman to undergo neurological and neuropsychological examinations.  FAC, Exh. C.  At this point Judge Newman was still unrepresented by counsel, a fact of which the Special Committee was aware.  Despite this lack of representation, the committee directed Judge Newman to respond to the request "by 3:00 pm on April 11, 2023," (*i.e.*, within *four days* of the issuance of the order) and further threatened that "[r]efusal to comply … may result in the Committee seeking to expand the scope of the investigation to include an inquiry into whether the subject judge's non-cooperation constitutes misconduct …."  *Id.* at 2-3.

The April 7 Order provided no explanation as to the basis for requesting the examinations, the scope or means of the proposed testing, the use of the test results, the basis on which the various medical providers were chosen by the Special Committee, or the qualification of these providers.  On April 13, 2023, the Special Committee made good on its threat, and Chief Judge Moore expanded the investigation into Judge Newman on the basis "that Judge Newman['s] [] fail[ure] to cooperate constitute[d] additional misconduct."  FAC, Exh. D.

16

On April 17, 2023, the Special Committee issued another order, this time directing Judge Newman to "provide hospital records, medical, psychiatric or psychological, and other health-professional records that relate to the" alleged heart attack, cardiac stent placement, and fainting episodes that were "described in the second paragraph of the Order dated March 24, 2023." FAC, Exh. E at 1. As was true with the March 24 Order, the April 17 Order did not state a basis for even believing that the alleged episodes even took place (much less that medical records related to these alleged episodes existed). Nor was any explanation offered for the relevance of these records (assuming their existence) to Judge Newman's (or any other judge's) ability to perform judicial functions. In the same order the Special Committee also "require[d] production of hospital records and medical, psychiatric or psychological, or other health-professional records of any treatment or consultation in the last two years regarding attention, focus, confusion, memory loss, fatigue or stamina." *Id.* at 2. Again, no explanation for why a particular timeframe was chosen, what use of this records would be made, or who would be examining them was provided. Finally, the Special Committee "request[ed] that Judge Newman sit down with the Committee for a video-taped interview." *Id.* The Order directed a response to the outlined requirements by "[b]y 9:00 am Friday, April 21, 2023," (*i.e.*, within *three days* of the issuance of the Order) and again threatened that "[r]efusal to comply with this Order without good cause shown may result in the Committee seeking to expand the scope of the investigation." *Id.*

On April 20, 2023, Chief Judge Moore issued yet another order, again expanding the scope of the investigation listing "new matters." FAC, Exh. F. The first matter centered on "Judge Newman's alleged conduct toward her chambers staff member." *Id.* at 1. The Order alleged that Judge Newman "retaliated" against one of her employees because following that employee's complaints to Chief Judge Moore, Judge Newman chose not to include this employee "in chambers' communications, including work-related emails." *Id.* at 2. The second matter "relate[d] to Judge Newman's alleged conduct

17

toward one of her law clerks." *Id.* at 7.  In essence, Chief Judge Moore found that "there is probable cause to believe that Judge Newman's [*sic*] has engaged in conduct prejudicial to the effective and expeditious [*sic*] administration of the business of the courts" because she demanded that her law clerk either engage in assignments given to him or resign. *Id.* at 8.  With respect to either of these two matters, no explanation of the legal basis for limiting a judge's complete discretion to decide how work is distributed inside the chambers was provided.

The third matter "relate[d] to Judge Newman's alleged conduct towards the Court's IT Department." *Id.* The Order alleged that in conversation with the IT department "Judge Newman sounded annoyed, agitated, paranoid and upset," and that a phone call with Judge Newman was "bizarre and unnecessarily hostile toward Judge Newman's chambers staff member." *Id.* at 8-9.  Even assuming the veracity of these perceptions by IT staff, it should be pointed out that both incidents referred to occurred *after* the investigation into Judge Newman began, and *after* a number of confrontational emails from Chief Judge Moore, thus fully explaining why Judge Newman would sound "annoyed, agitated, … and upset."

The April 20 Order recounted that Chief Judge Moore permitted two employees of Judge Newman's to be reassigned to other chambers. *Id.* at 4.  With respect to at least one member of Judge Newman's staff, Judge Newman's consent was neither sought nor received.  Of particular note is the fact that once these individuals were reassigned, Judge Newman requested that they be replaced by new staff members, so as to permit her to have a full complement of staff consistent with her status as an active-duty Circuit Judge.  In an email of April 20, 2023, Chief Judge Moore advised Judge Newman that "[t]he Judicial Council has unanimously voted not to permit hiring to fill the positions recently vacated by your two staff members during the pendency of the Judicial Conduct and Disability proceedings."  FAC ¶ 30, Exh. V.  No authority for such an action was cited in the April 20 email or at any point thereafter.

18

On April 21, 2023, Judge Newman, finally represented by counsel, responded to the committee's prior orders.  FAC, Exh. Q.  In the letter addressed to Chief Judge Moore and copied to all other members of the Special Committee, Judge Newman raised several objections to the process that had unfolded to that point.  Most importantly, Judge Newman pointed out that neither Chief Judge Moore nor the Judicial Council had authority to order an interim suspension of Judge Newman from participating in the work of the Court and on that basis requested her immediate reinstatement to the argument calendar.  Judge Newman also requested that Chief Judge Moore invite the Chief Justice to transfer the matter to a judicial council of a different circuit as contemplated by Rule 26.

On May 3, 2023, the Special Committee issued two separate orders.  FAC, Exhs. G, H.  One order was in effect a gag order threatening Judge Newman and her counsel with sanctions should any of them publicize the ongoing investigation.  FAC, Exh. G.  The second order acknowledged that Judge Newman was finally represented by counsel, and so "reissu[ed] its orders regarding medical evaluation and testing and medical records and establish[ed] new deadlines for compliance."[12]  FAC, Exh. H at 2.  The Order repeated the various allegations previously described, but again failed to explain the relevance of the medical records requested, the scope or means of the proposed testing, the use of the test results or medical records, the basis on which the various medical providers were chosen by the Special Committee, or the qualification of these providers.  Furthermore, the Order rejected Judge Newman's suggestion that she and the Special Committee "engage in negotiation as to the scope of the requests as provided by the Commentary to Rule 13."  *Id.* at 7-8.  Finally, the Order denied Judge Newman's request for a transfer "without prejudice to refiling after Judge Newman has complied with the Committee's orders concerning medical evaluation and testing and medical

---

[12] The May 3 Order did not clarify whether resetting the deadlines for compliance also meant that the April 13 Order expanding the investigation into Judge Newman on the basis "that Judge Newman['s] [] fail[ure] to cooperate constitute[d] additional misconduct" was vacated.  The Order also omitted a request for a video-taped interview.

records." *Id.* at 9. The Special Committee did not explain why or how the provision of medical records or submission to medical testing would affect analysis under Rules 26.[13] None of the orders acknowledged, much less addressed, Judge Newman's argument that her interim suspension from judicial office was illegal nor her request to be immediately restored to the argument calendar. The Order set a May 10, 2023, 9:00 a.m. deadline for Judge Newman to reply to its demands. *Id.* at 13-14.

On May 9, 2023, Judge Newman responded to the Special Committee.[14] FAC, Exh. R. The May 9 Letter objected to the Special Committee's gag order on First Amendment grounds and as an alternative, formally requested the public release of various orders and letters pursuant to Rule 23(b)(7) of the Conduct Rules. The letter also objected to the request for medical records on the basis that the committee did not (and is unlikely to be able to) explain the relevance of the requested records or the scope of their use. *Id.* at 3-4. On similar grounds, Judge Newman objected to the request for medical testing. *Id.* at 4-5. At the same time, Judge Newman indicated that she may be willing to discuss the request with the Special Committee in a cooperative manner as contemplated by the commentary to Rule 13(a) which instructs "the [S]pecial [C]ommittee [to] enter into an agreement with the subject judge as to the scope and use that may be made of the examination results." *Id.* at 4-5. The May 9 Letter renewed the request for the matter be transferred to the judicial council of another circuit, once again explaining that since Chief Judge Moore was in effect a complainant in this matter and that since all of Judge Newman's colleagues are potential witnesses to her ability to competently carry out her judicial duties, it is inappropriate for any of them to also serve as adjudicators. *Id.* at 5-6. Finally, the

---

[13] On the same date, a third order, in the name of the Judicial Council, also denied, without any explanation, Judge Newman's request to transfer the matter to another judicial council without prejudice to re-filing after Judge Newman has complied with the Special Committee's requests for medical records and the evaluation and testing ordered by the Special Committee. FAC, Exh. I.

[14] Due to a glitch in the email system, the letter was not delivered to the Federal Circuit until the morning of May 10, 2023.

May 9 Letter reiterated Judge Newman's demand to be immediately restored to the case assignment calendar.  *Id.* at 6.

In response to the May 9 Letter, on May 16, 2023, the Special Committee issued two new orders.  FAC, Exhs. J, K.  In the first order, though it rejected Judge Newman's First Amendment arguments, the Special Committee agreed to grant Judge Newman's request made under Rule 23(b)(7), to disclose (with appropriate redactions) all prior orders entered in this matter.[15]  FAC, Exh. J.  Additionally, the Order clarified that the prior gag order "imposed no restriction on discussion of those orders or other aspects of the proceeding that were already public, as long as no other confidential information is disclosed in such a discussion" and that "[t]o the extent Judge Newman and her counsel wish to publicly discuss aspects of this proceeding that have already been made public, the [May 3] Confidentiality Order placed no restriction on them."  *Id.* at 3.  Nevertheless, the Special Committee instructed "Judge Newman and her counsel [that they] remain bound by Rule 23 and the [May 3] Confidentiality Order with regard to information not publicly disclosed by the Court such as future orders and filings."  *Id.* at 12.  In the second order issued the same day, the Special Committee reiterated the request for medical records, medical testing, and a video-taped interview, and for the first time explained the relevance and the scope of its demands.  FAC, Exh. K.  Nevertheless, the Special Committee again rejected Judge Newman's requests to at the very least participate in the selection of providers or negotiations as to the type and scope of testing.  *Id.* at 20-21.  The Special Committee also did not explain on what basis the selected medical providers were chosen or their qualifications to evaluate Judge Newman's mental health.  The Special Committee once again denied the request for a transfer and once again entirely ignored Judge Newman's objection to the Judicial

---

[15] The redacted orders were subsequently published on the Federal Circuit's website.

Council's suspension of her pending the outcome of the investigation.  *Id.* at 26.  The Special Committee set a deadline of 9:00 am on May 23, 2023, to respond to its requests.  *Id.* at 25.

On May 20, 2023, Judge Newman responded to the May 16 Orders seeking an extension of time until June 8, 2023.  FAC, Exh. S.  In support of the request, lead counsel for Judge Newman explained that he was out of the country and visiting Israel until June 1, 2023, in order to attend to family and religious obligations.  *Id.*  On May 22, the Special Committee denied the requested extension of time, and instead reset the deadline to 9:00am on May 26, 2023.[16]  FAC, Exh. T.  On May 25, Judge Newman responded to the Special Committee's May 16 Order, declining the requests but offering

> to undergo necessary testing, provide necessary records, and meet with a [S]pecial [C]ommittee *provided that she is immediately restored to her rights and duties as a judge and further provided that this matter is promptly transferred to a judicial council of another circuit*, which is unmarred by the prior unlawful decisions and which is willing to 'work[] or operat[e] *together*' with Judge Newman, including on selecting medical providers and setting the appropriate parameters of any examination.

*Id.* at 3 (emphasis in original).

The following day, "the Committee … requested that the scope of the investigation be expanded to investigate whether Judge Newman has failed to cooperate in violation of the Rules and whether her failure to cooperate constitutes misconduct."  FAC, Exh. M.  In an order issued the same day, Chief Judge Moore granted the Committee's request and once again ordered the expansion of the investigation.  *Id.*

However, less than a week later, on June 1, 2023, the Committee issued a new order apparently *narrowing* the scope of its investigation.  FAC, Exh. N.  The new order stated that "[i]n light of the practical constraints that Judge Newman's [alleged] refusal to cooperate places on the Committee's

---

[16] May 26, 2023, fell on a major Jewish festival of Shavuot ("Feast of Weeks").  In order to avoid a conflict with counsel's religious obligations, Judge Newman filed a response on May 25, 2023.

ability to proceed" it will not, "at this time" pursue the allegations regarding Judge Newman's mental or physical disability. *Id.* at 2, 4. Instead, the Committee announced that its "investigation will focus on the question whether Judge Newman's refusal to cooperate with the Committee's investigation constitutes misconduct," *id.* at 3, and accordingly directed Judge Newman to, by July 5, 2023, "submit a brief limited to addressing the question whether Judge Newman's refusal to undergo examinations, to provide medical records, and to sit for an interview with the Committee … constitute [*sic*] misconduct and the appropriate remedy if the Committee were to make a finding of misconduct ….," *id.* at 6. The Committee scheduled oral argument on the matter for July 13, 2023.

Finally, after repeated attempts by Judge Newman to get restored to the regular rotation of judges assigned to hear cases, and several letters pointing out that neither the Disability Act nor the Conduct Rules (to the extent that they are constitutional) authorize a suspension of a judge *prior* to the completion of all of the procedures outlined in these documents, the Judicial Council, on June 5, 2023, issued an order reaffirming its decision to keep Judge Newman from hearing cases. FAC, Exh. O. The June 5 Order is noteworthy in several aspects. First, it claims that the initial decision to suspend Judge Newman from hearing cases was made on March 8, 2023 or *more than two weeks prior to* the docketing of the first complaint against Judge Newman (and more than a week prior to Chief Judge Moore advising Judge Newman that she intended to take this course of action).[17] *Compare* FAC, Exh. A at 6, *with* FAC, Exh. O at 1. Second, the order avers that "the Judicial Council *met* to consider concerns raised about Judge Newman's mental fitness by court staff and Judge Newman's abnormally large backlog in cases and her apparent inability to issue opinions in a timely fashion." FAC, Exh. O

---

[17] This March 8 decision was apparently never memorialized in any contemporaneous document that has been made available to Judge Newman, which seems to be a rather odd approach for a binding decision affecting the rights of an Article III judge and an untold number of litigants.

at 1(emphasis added).  However, no notice of such a meeting was ever provided to Judge Newman, who is a member of the Judicial Council.[18]  FAC ¶ 59.

Third, the June 5 Order alleged that Judge Newman was precluded from sitting during the April 2023 session of the Court because at the time of case assignments (which occurred on February 6, 2023), Judge Newman's "backlog had placed her in violation of Federal Circuit Clerical Procedures #3, ¶ 15."  FAC, Exh. O at 2.  In fact, on February 6, 2023, Judge Newman had *zero* cases that were subject to the rule.  FAC ¶ 60.  Two cases on Judge Newman's docket were pending for over one year. However, *Military-Veterans Advocacy, Inc. v. Sec'y of Veterans Affairs*, No. 20-1537, which at that point had been pending for 424 days, was stayed pending Congress's consideration of the Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics Act of 2022, Pub. L. 117-168, 136 Stat. 1759 (codified at 38 U.S.C. §§ 1116 and 1710) (signed Aug. 10, 2022 and effective Oct. 1, 2022).[19]  FAC ¶ 63.  Because the case was stayed pending further developments in the law, it was not subject to Clerical Procedures #3, ¶ 15.  FAC ¶¶ 61-63.  The second case that had been pending for more than a year was *SAS Inst. v. World Programming Ltd.*, No. 21-1542.  FAC ¶ 64.  However, Judge Newman was a *dissenting* judge on that case and thus had to wait for the panel to circulate the majority opinion prior to being able to draft her dissent.  *Id.*  The majority opinion by Judge Reyna circulated on October 14, 2022, and the opinion was published on April 6, 2023, *see* 64 F.4th 1319, *i.e.*, within six months.  *Id.*  In other words, Judge Newman took *three fewer* months to draft her dissent than Judge Reyna took to draft his opinion.  *Id.*  No other cases that were over a year old remained with Judge

---

[18] Even if the Conduct Rules authorized a wholesale suspension of a judge being investigated from her position on a judicial council (and they do not, *see post*), this meeting took place *before* any complaint was filed or identified.  Thus, no plausible legal basis existed for excluding Judge Newman from the work of the Judicial Council.

[19] Indeed, the Court requested additional briefing on the impact the newly enacted statute had on the litigation.  *See* 63 F.4th at 943.  The supplemental briefs were filed on September 14, 2022.  The case was resolved on March 22, 2023, roughly six months after the filing of supplemental briefs.

Newman, and only one case that was over six months old was among the cases assigned to her.  FAC ¶ 65.  Thus, despite the false assertions contained in the June 5 Order, Judge Newman was *not* "in violation of Federal Circuit Clerical Procedures #3, ¶ 15," and she therefore should not have been precluded from sitting during the April 2023 session of the Court.

Finally, the June 5 Order stated that it "conclude[d] upon *de novo* consideration that Judge Newman is not expeditiously carrying out the work of the Court, that assigning her new cases will only further interfere with expeditious execution of the work of the Court, and that an order precluding Judge Newman from new case assignments is warranted."  FAC, Exh. O at 4.  The Judicial Council asserted that Judge Newman has a "continued backlog of cases, and [an] inability to clear th[at] backlog."  *Id.* at 1.  At the time the order was issued, Judge Newman remained responsible for only nine cases, only one of which was over six months old, and some of which were or are expected to be separate opinions (concurrences and/or dissents).[20]  This number is lower than that of several other judges on the Court, yet Judge Newman remains the only judge suspended from the Court's work.  As before, Judge Newman, though a member of the Judicial Council, was not notified of its meeting (if one ever took place) or the proposal, nor was she given an opportunity to speak or vote on this matter.  No end date for this suspension is listed in the Order.  FAC ¶ 69.  The Judicial Council asserted that 28 U.S.C. § 332(d)(1) authorizes it to impose such a restriction on Judge Newman's duties and further maintained that the order is "is not a censure but rather a decision made for the effective and expeditious administration of the business of the court."  FAC, Exh. O at 5.  This assurance stands in sharp contrast to Chief Judge Moore's email of April 5, 2023, which stated unequivocally that Judge Newman was being suspended "pending the results of the investigation into potential

---

[20] In order to protect the confidentiality of the Federal Circuit's deliberative processes, the brief does not list the cases which have not yet issued by name, number, or author of the majority or dissenting opinion.

disability/misconduct" and that Judge Newman "will not be assigned any new cases until the[]
[disciplinary] proceedings are resolved." FAC, Exh. B at 4.

1.  As explicated in greater detail in the First Amended Complaint, and contrary to the various
    unsupported allegations made in the various orders—allegations that were never subject to cross-
    examination and which were made by individuals whose continued employment depends entirely
    on the good graces of Chief Judge Moore—throughout the relevant time period Judge Newman
    remained healthy, able, and willing to continue her work as a Circuit Judge. *See* FAC ¶¶ 12, 14-16.
    Nothing in her medical records indicates any history of a heart attack or a coronary stent. FAC ¶
    21. There is no evidence in the medical history of any psychological, psychiatric, or neurologic
    dysfunction. FAC ¶ 15. And a recent examination by Ted L. Rothstein, M.D.—a full Professor
    of Neurology and Rehabilitation Medicine at the George Washington University School of
    Medicine & Health Sciences— revealed no significant cognitive deficits and led that expert to
    conclude that Judge Newman's "cognitive function is sufficient to continue her participation in
    her court's proceedings." Exh. Y (filed under seal).

## LEGAL STANDARD

Rule 65(a) of the Federal Rules of Civil Procedure allows a court to issue a preliminary
injunction after notice has been provided to an adverse party. A preliminary injunction is appropriate
if the Plaintiff demonstrates: (1) a substantial likelihood of success on the merits; (2) the necessity of
the injunction to prevent irreparable injury; (3) that the threatened injury outweighs the harm the
preliminary injunction would cause the other litigant; and (4) that the preliminary injunction is in the
public's interest. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Winter v. Nat. Res. Def. Council, Inc.*, 555
U.S. 7, 20 (2008); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

An irreparable injury is "beyond remediation," such that no "adequate compensatory or other
corrective relief will be available at a later date." *Id.* This Court has recognized that the loss of a

government official's "statutory right to function" in her role is an irreparable injury. *Berry v. Reagan*, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983); *see also Mackie v. Bush*, 809 F. Supp. 144, 147 (D.D.C. 1993), *vacated as moot sub nom. Mackie v. Clinton*, 10 F.3d 13 (D.C. Cir. 1993) (issuing temporary restraining order prohibiting President from removing plaintiffs from federal office and noting that "neither a damages remedy nor a declaratory judgment would provide an adequate remedy" after the fact of their removal); *English v. Trump*, 279 F. Supp. 3d 307, 335 (D.D.C. 2018) (noting that unlike mere federal employees seeking to alter *status quo*, Presidentially-appointed, Senate-confirmed officials seeking to maintain *status quo* are able to show irreparable harm when they are removed from functions of their office).

The public always has an interest in ensuring enforcement of duly enacted statutes. *See Doe v. Trump*, 284 F. Supp. 3d 1172, 1179 (W.D. Wash. 2018) ("Where the [defendant]'s actions … undermine Congressionally-enacted statutes, the public interest is best served by curtailing those actions."). Thus, to the extent that Defendants' actions violate either the Constitution or 28 U.S.C. § 46(b), which requires a "rotation of [Federal Circuit] judges from panel to panel to ensure that *all of the judges* sit on a representative cross section of the cases heard," an injunction against such actions is necessarily in the public interest.

## ARGUMENT

### I.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS

As acknowledged by the June 5 Order, Defendants have proceeded against Judge Newman on two tracks. With respect to the ongoing suspension of Judge Newman from her duties—suspension which was imposed *prior to* any finding, or for that matter, allegations of misconduct—Defendants ground their actions in authority supposedly granted them by 28 U.S.C. § 332(b)(1). *See* FAC, Exh. O at 5. With respect to orders to undergo medical and psychological examinations, turn over medical records, sit for interviews, and the like, Defendants rely on the Disability Act, 28 U.S.C.

27

§§ 351-64 and the Conduct Rules, promulgated pursuant to that Act.  *See, e.g.*, FAC, Exh. K at 4-5 and

20-21.   As Judge Newman challenges both asserted bases of authority, these will be discussed

separately and in turn.

A.   This Court Has Jurisdiction to Enjoin Judge Newman's Suspension Which Was Imposed Prior
to Any Finding of Misconduct

Section 1331 provides that "district courts shall have original jurisdiction of all civil actions

arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  The statute

is clear.  "Not *may* have jurisdiction, but *shall*. Not *some* civil actions arising under federal law, but *all*."

*Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 911 (2023) (Gorsuch, J., concurring).  It is "Congress, and not

the Judiciary, [that] defines the scope of federal jurisdiction."  *New Orleans Public Service, Inc. v. Council

of City of New Orleans*, 491 U.S. 350, 359 (1989).  Federal courts "have no more right to decline the

exercise of jurisdiction which is given, than to usurp that which is not given."  *Cohens v. Virginia*, 19

U.S. (6 Wheat.) 264, 404 (1821) (Marshall, C. J., for the Court).

When Congress wishes to make exceptions to this broad grant of jurisdiction, it knows how

to do so.  *See, e.g.*, 42 U.S.C. § 405(h) ("No action against the United States, the Commissioner of

Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of title

28 to recover on any claim arising under this subchapter.").  Because Congress did not prohibit review

of any judicial council's actions taken in reliance on whatever authority is granted by § 332(d)(1), it

necessarily follows that this Court is vested with jurisdiction *and* that it must exercise it.

When a judicial council acts pursuant to § 332, it acts not as a court, but as "an administrative

body functioning in a very limited area in a narrow sense as a 'board of directors' for the circuit."

*Chandler v. Jud. Council of Tenth Cir. of U.S.*, 398 U.S. 74, 86 n.7 (1970).  When Congress "vest[ed] in the

Circuit Judicial Councils … authority to make 'all necessary orders for the effective and expeditious

administration of the business of the courts within (each) circuit,'" it neither "intended to [n]or did

28

vest traditional judicial powers in the Councils."  And because when acting under § 332, the Judicial Council was acting in an administrative rather than judicial capacity, *see, e.g.*, *In re McBryde*, 117 F.3d 208, 220 (5th Cir. 1997), this Court can review its actions in the same way as it would review an action of any other agency.

B.  This Court Has Jurisdiction over Both Facial and As-Applied Challenges to Judicial Disability Act

This Court plainly has authority to hear facial challenges to the provisions of the Judicial Disability Act and/or Conduct Rules.  *See* 28 U.S.C. § 1331.  Admittedly, "[a] facial challenge to a legislative Act is ... the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *Metro. Washington Chapter, Associated Builders & Contractors, Inc. v. D.C.*, 62 F.4th 567, 577 (D.C. Cir. 2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  However, Judge Newman's allegations meet that test, for there are no set of circumstances where a judicial council—itself merely an administrative body, *see Chandler*, 398 U.S. at 86 n.7—can usurp the role of both the United States House of Representatives and the United States Senate, and suspend a Presidentially-appointed, Senate-confirmed Article III judge from office.

For the same reason, this Court can review Judge Newman's claims regarding the Special Committee's and Judicial Council's *ultra vires* orders.  In cases where an agency's action is challenged as being beyond the scope of its authority, "the determination of whether the court has jurisdiction is intertwined with the question of whether the agency has authority for the challenged action, and the court must address the merits to the extent necessary to determine whether the challenged agency action falls within the scope of the preclusion on judicial review."  *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004).  The Court thus must address Judge Newman's claims about the *ultra vires* orders.

The Court also possesses jurisdiction to hear Judge Newman's "as applied" challenge to the Act.  Indeed, Congress expressly contemplated such challenges.  *See* 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, Div. C, Title I, Subtitle C, § 11044, 116 Stat. 1758, 1856 (Nov. 2, 2002) (codified as Note to 28 U.S.C. § 351).  That Act enacted a "savings clause" to the Disability Act and provides that if any portion of the Disability Act "*or the application of such provision* … to any person or circumstance is held to be unconstitutional, the remainder of [the Disability Act] and the application of [its] provisions of such to any person or circumstance shall not be affected thereby."  *Id.* (emphasis added).  The only circumstance where an *application* of a provision of the Disability Act could be held unconstitutional is in a proceeding before a district court (and any subsequent appeals).  Judicial councils, though staffed by Article III judges, are not empowered to declare statutes unconstitutional.  Congress conferred jurisdiction on this Court to do so not once, but twice, *see* 28 U.S.C. § 1331 and 116 Stat. 1856.  This Court is now required to exercise it.

## II.   JUDGE NEWMAN'S SUSPENSION FROM DUTIES ABSENT ANY FINDINGS OF MISCONDUCT IS UNCONSTITUTIONAL AND CONTRARY TO STATUTE

Early on, when the investigation into Judge Newman was beginning, Chief Judge Moore took the position that the Judicial Council voted to suspend Judge Newman from the duties of her office "pending the results of the investigation into potential disability/misconduct" and that Judge Newman "will not be assigned any new cases until the[] [disciplinary] proceedings are resolved."  *See* FAC ¶ 24, Exh. B at 4.  The Defendants were not responsive to Plaintiff's multiple attempts to point out that the Disability Act and the Conduct Rules (to the extent that they are constitutional) permit suspension only *following* a finding of a misconduct, which itself necessitates compliance with several procedural requirements.  *See* 28 U.S.C. §§ 353(c), 354(a)(2)(A)(i), Conduct Rules, R. 20(a), (b)(1)(D).  Finally, after Plaintiff's attorneys conferred with attorneys representing the Defendants, the Judicial Council issued its June 5 Order claiming that Judge Newman's suspension had nothing to do with an alleged

disability, but instead was levied pursuant to authority granted the Judicial Council under 28 U.S.C. § 332(d)(1).  FAC ¶ 54, Exh. O.  The June 5 Order asserted that Judge Newman's suspension is "not a censure but rather a decision made for the effective and expeditious administration of the business of the court."  FAC, Exh. O at 5.  Whether as a "censure" or as a "decision made for the effective and expeditious administration of the business of the court" (apparently invoking § 332(d)(1) as an independent suspension authority, though the language of that statute refers to "justice" not "the business of the court"), the Judicial Council's decision to suspend Judge Newman from hearing cases is unconstitutional, contrary to statute, and *ultra vires*.

A.  Neither the Disability Act nor Conduct Rules Permit Suspension of Judges Prior to a Finding of Misconduct

It is beyond peradventure that (leaving constitutional concerns aside for the time being), the Disability Act and the Conduct Rules permit suspending judges from service only upon the finding of misconduct and not as a "preventative" or "efficient" measure.  The Disability Act requires that whenever a special committee is appointed to investigate a judicial complaint, such a committee "shall expeditiously file a comprehensive written report thereon with the judicial council of the circuit … present[ing] both the findings of the investigation and the committee's recommendations for necessary and appropriate action by the judicial council of the circuit."  28 U.S.C. § 353(c).  "Upon the receipt of the report," the judicial council may choose to impose sanctions including "ordering that, on a temporary basis for a time certain, no further cases be assigned to the judge whose conduct is the subject of a complaint."  *Id.* 354(a)(2)(A)(i).  The Conduct Rules place yet further procedural limitations on the imposition of sanctions.  Specifically, the Conduct Rules afford the accused judge "21 days after the filing of the report of a special committee [to] send a written response to the members of the judicial council."  R. 20(a).  Furthermore, the accused judge "must also be given an opportunity to present argument, personally or through counsel" to the judicial council.  *Id.*  It is not

disputed that none of these steps occurred prior to Judge Newman's suspension from duties. Accordingly, an action suspending her as a disciplinary matter was *ultra vires* as contrary to both the Disability Act and the Conduct Rules.

The Judicial Council's belated attempt to retrofit the suspension to being merely an administrative action rather than a disciplinary one is grasping at straws and cannot be credited. First, the June 5 Order is inconsistent with the position taken by the Defendants prior to the beginning of this litigation. Thus, in an email sent on April 5, 2023, Chief Judge Moore explicitly stated that Judge Newman will remain suspended "pending the results of the investigation into potential disability/misconduct" and that Judge Newman "will not be assigned any new cases until the[] [disciplinary] proceedings are resolved." FAC ¶ 24, Exh. B at 4. Nothing in that email even hinted at the possibility that the suspension operated, and will continue to operate, entirely independently of the results of the investigation. Indeed, the Committee on Judicial Conduct and Disability, which was made aware of Judge Newman's suspension on an interlocutory basis, treated it as an interim *disciplinary* order rather than a mere administrative one. *See* FAC ¶¶ 48-49, Exhs. U, P.

In contrast, the June 5 Order disclaims functioning as a "censure." FAC, Exh. O at 5. This latter claim is impossible to reconcile with the former one and looks more like a pretext to justify and rehabilitate prior unlawful orders. The timing of the June 5 Order further diminishes its weight, as does the fact that it was issued after the beginning of this litigation and shortly following a conference between Plaintiff's and Defendants' attorneys where the illegality of Judge Newman's pre-investigatory suspension was raised.

"[C]ourts tend to give less weight to a[] [litigant's] position adopted in the course of litigation." *United States v. Lombera-Camorlinga*, 206 F.3d 882, 887 (9th Cir. 2000). *See also Washington Square Sec., Inc. v. Aune*, 385 F.3d 432, 439 (4th Cir. 2004) ("[D]eclarations made … during the course of litigation are much less reliable evidence of … intent than contemporaneous statements, reports, or minutes …");

*cf. Covalt v. Carey Canada Inc.*, 860 F.2d 1434, 1438–39 (7th Cir. 1988) ("Legislative history generated in the course of litigation … may be designed to mislead, to put an advocate's slant on things."). Courts ordinarily do not credit litigants' claims that are "newly minted … and inconsistent with prior agency actions." *Defs. Of Wildlife v. Norton*, 258 F.3d 1136, 1146 n.11 (9th Cir. 2001). The skepticism of agency positions adopted during litigation, especially when they are inconsistent with the positions taken prior to litigation is warranted because "a position adopted in the course of litigation lacks the indicia of … regularity [or] rigorous consideration." *Catskill Mtns. Chapter of Trout Unltd. V. City of New York*, 273 F.3d 481, 491 (2d Cir.2001). Though this issue arises most often in the context of judicial deference to executive branch agencies, the same principles apply here, especially given the fact that the Judicial Council acts not in a judicial, but in an administrative capacity. *See Chandler*, 398 U.S. at 86 n.7.

This Court should be particularly leery of giving much credence to the June 5 Order given that several assertions therein are demonstrably false. As discussed *ante*, the assertion that Judge Newman was removed from the April 2023 sitting of the Court because she was in violation of the Federal Circuit's Clerical Procedure #3, ¶ 15 is contrary to easily verifiable facts. Neither at the time that panel assignments for the April sitting were created (*i.e.*, in early February 2023) nor at any point thereafter, did Judge Newman have more than two cases over one year old or four cases over six months old, subjecting her to the rule. That a formal order of any judicial council would make such insupportable, bald assertions is ground for serious concern; at the very least, it should stop this Court from crediting the ostensible explanations provided in that order.

If this Court were to discount the Judicial Council's "newly minted, it seems, for this lawsuit," *Norton*, 258 F.3d at 1146 n.11, explanations for Judge Newman's suspension, and instead credit what Defendants had been saying for the preceding few months, then it would have no choice but to conclude that—contrary to the assertions in the June 5 Order—the suspension was and is indeed a

"censure," and because it was imposed without complying with the requirements of either the Disability Act or the Conduct Rules, is unlawful. *See McBryde*, 117 F.3d at 227-28 (noting that a judicial council lacks authority to impose any discipline without first complying with the procedural requirements of the Disability Act).

B. Section 332(d)(1) Does Not Authorize Indefinite Suspensions

Even if the Court were to take the June 5 Order on its own terms, the conclusion remains the same—the suspension of Judge Newman from her duties as a Circuit Judge is substantively unlawful. The June 5 Order relies on the First Circuit's decision in *United States v. Colón-Muñoz*, 318 F.3d 348 (1st Cir. 2003) to support its asserted authority to suspend Judge Newman. That reliance is misplaced, because neither *Colón-Muñoz* nor any cases cited therein stand for the proposition that a judicial council of any circuit can indefinitely suspend a judge from the exercise of her judicial functions. In *Colón-Muñoz*, the Judicial Council of the First Circuit became "concern[ed] with the backlog of cases that had developed in the docket of the district court judge who presided over the Colón-Muñoz trial," and in response authorized a committee of three district judges "for *a limited period* to transfer criminal cases that had been pending before the district judge in question for more than two years, and civil cases pending for more than three years, *where the committee determined that this transfer would expedite resolution*." 318 F.3d at 351–52 (emphasis added). The italicized limitations are of note, because the order itself was time-limited, and it only authorized a transfer of particularly old cases where the transfer would expedite the resolution of the case. In other words, Judge Carmen Cerezo (who was the target of the order) was not precluded from exercising her judicial function in *all* cases for an *indefinite* period of time, but instead was *temporarily* relieved of handling *some* cases that could be handled more expeditiously elsewhere.[21] In contrast, the June 5 Order sets *no* time or any other limit on its

---

[21] Furthermore, the First Circuit order was issued after consulting with Judge Cerezo and taking her views into account. No similar courtesy was extended to Judge Newman. There is also no indication that Judge Cerezo (unlike Judge Newman) objected to this order.

operation (*e.g.*, by stating that Judge Newman would be restored to hearing cases once her backlog is reduced below a certain number) and unlike in *Colón-Muñoz*, the order applies prospectively, *i.e.*, not to "old" cases that have been pending for "too long," but to "new" cases that have not yet even been considered by the Federal Circuit or Judge Newman.

Other cases cited in *Colón-Muñoz* also offer no help to Defendants. For example, *In re McBryde* approved of "a judicial council's exercise of its power under § 332 … involv[ing] judicial council rules promulgated to alleviate judicial delay or prevent 'chaos.'" 117 F.3d at 227. But as the cases cited in support of the above proposition indicate, the *McBryde* Court was referring to neutral, generally-applicable rules for case assignments, not purpose-built orders targeting specific judges. For example, *McBryde* cited *Hilbert v. Dooling*, 476 F.2d 355 (2d Cir. 1973) (*en banc*) and *White Motor Corp. v. Citibank, N.A.*, 704 F.2d 254, 261 (6th Cir. 1983) in support of its conclusion that a judicial council can promulgate rules to effectively manage the business of the courts within a circuit. But these cases concerned rules of general applicability. In *Hilbert*, the Second Circuit affirmed the power of its judicial council to enact a rule requiring a dismissal with prejudice of any criminal case where the government was not ready to proceed within six months. 476 F.2d at 359. The rule was neutral, affected all cases equally, and did not tread on any judge's authority to carry out any of the functions assigned to him by law. Similarly, in *White Motor Corp.*, the Sixth Circuit upheld an interim rule in bankruptcy proceedings which was adopted after the Supreme Court in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) invalidated in part § 241(a) of the 1978 Bankruptcy Reform Act. This "interim rule" "basically revive[d] the old system under which federal district courts referred bankruptcy cases to the bankruptcy courts or referees." 704 F.2d at 256. Again, the rule was a generic

case-processing rule, rather than essentially an adjudication of a particular judge's ability to carry on the business of the Court.

The closest analogue to these neutral case-processing rules adopted by other judicial councils is the Federal Circuit's Clerical Procedure #3, ¶ 15 which prohibits "[a]ny judge" who has a certain number of long-pending cases from being "assigned to hear additional cases until the judge has reduced" the backlog.[22]  *See* FAC, Exh. W.  Had Judge Newman been forced to skip the Court's sittings because she was, in any given month, subject to this rule, there would be little to complain about.  But the existing case-law provides no authority whatever for the proposition that a judicial council can, in an *ad hoc* manner, target a particular judge for an indefinite suspension from duties simply by claiming that such a suspension is a "decision made for the effective and expeditious administration of business of the court." FAC, Exh. O at 5.[23]

In contrast, the June 5 Order Second, was a "non-general" order specifically targeting Judge Newman.  It has no basis in neutral Local Rules or Internal Operating Procedures of the Federal Circuit and for that reason also violates the substantive requirement that "*all* of the [Federal Circuit] judges sit on a representative cross section of the cases heard."  28 U.S.C. § 46(b) (emphasis added). In other words, a properly promulgated order under § 332(d)(1) that is equally applicable to "all of the judges" is within the Judicial Council's power.  On the other hand, an *ad hoc* order, issued without notice, and excluding a member of the Judicial Council[24] violates the law.

---

[22] Clerical Procedure #3, ¶ 15 may suffer from its own procedural problems insofar as it is not, contrary to the requirements of § 332(d)(1), "made available to the public."  However, substantively, this rule appears to be a legitimate exercise of the Judicial Council's power.  This is in contrast to the power that the Judicial Council claims in its June 5 Order.

[23] It bears repeating that the June 5 Order does not even apply the correct statutory standard.  *Compare* FAC, Exh. O at 5 (discussing "expeditious administration of business of the court"), *with* 28 U.S.C. § 332(d)(1) (authorizing judicial councils to "make all necessary and appropriate orders for the effective and expeditious *administration of justice* within its circuit.") (emphasis added).

[24] *See* Part II.C, *post*.

Even assuming that the June 5 Order could be viewed as an exercise of authority under § 332(d)(1), it nevertheless exceeded the scope of that authority because it has no stated end point. Plainly, no judicial council has the authority, under the guise of "mak[ing] all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit" to suspend a judge within the circuit for an indefinite duration and with no stated benchmarks. Were it otherwise, the decision of who should exercise judicial functions would pass from the President and the United States Senate to judicial councils of relevant circuits. That is not the system the Constitution devised. To avoid constitutional difficulties, *see Lucas v. Alexander*, 279 U.S. 573, 577 (1929) (a statute "must be construed with an eye to possible constitutional limitations so as to avoid doubts as to its validity"), this Court should not construe § 332(d)(1) as authorizing the June 5 Order's indefinite suspension. Because the June 5 Order cannot be a lawful exercise of the Judicial Council's power under § 332(d)(1), this Court should view the Order, its internal reassurances notwithstanding, for what it is—a pre-investigatory "censure," and accordingly, hold it unlawful. *See McBryde*, 117 F.3d at 227-28.

C.   The June 5 Order Was Unlawfully Promulgated

Aside from the substantive concerns with the June 5 Order, it was unlawfully promulgated because Judge Newman—who, by the Federal Circuit's own rule is, and continues to be, a member of the Judicial Council—was not given notice, much less invited to participate in the Judicial Council's deliberations regarding "mak[ing] all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." The mere fact that allegations of misconduct remain pending against Judge Newman does not oust or suspend her from the work of the Judicial Council that is not related to the investigation of the misconduct.

Without question, the Conduct Rules disqualify a judge against whom a disciplinary complaint was lodged from considering the complaint. *See* R. 25(b),(e). This rule makes eminent sense as it "reflects the maxim that '[n]o man is allowed to be a judge in his own cause; because his interest would

certainly bias his judgment, and, not improbably, corrupt his integrity.'" *Caperton*, 556 U.S. at 876

(quoting The Federalist No. 10, p. 59 (J. Cooke ed.1961) (J. Madison)).  At the same time, the Conduct

Rules are equally clear that the disqualification "relates only to the subject judge's participation in any

proceeding arising under the Act or the[] [Conduct] Rules."  R. 25(e), cmt.  As explained by the

commentary to Rule 25(e), the exclusion of the subject judge from all Judicial Council decisions while

a complaint against that judge is pending "is undoubtedly not the intent of the [Disability] Act."

Indeed, "such a disqualification would be anomalous in light of the [Disability] Act's allowing a subject

judge to continue to decide cases and to continue to exercise the powers of chief circuit or district

judge." *Id.*  Because Judge Newman was not automatically suspended from her position on the Judicial

Council by the mere filing of the complaint, it follows that Judge Newman must, at a minimum, be

notified of any deliberations and decisions of the Council that do not relate to the adjudication of the

disability complaint against her.  Yet, no such notification was provided to Judge Newman and she

was not a participant in any meetings of the Judicial Council which allegedly promulgated orders "for

the effective and expeditious administration of justice."  This exclusion came despite the requirement

that "*[e]ach member* of the council *shall* attend *each council meeting* unless excused by the chief judge of the

circuit."  28 U.S.C. § 332(a)(6) (emphasis added).[25]  Thus, a meeting of the Judicial Council without

Judge Newman was itself unlawful.[26]

     A usual remedy for a rule promulgated by an improperly constituted body is a vacatur of a

decision made by that body, even where there were otherwise sufficient votes to render that decision.

*See, e.g.*, *Nguyen v. United States*, 539 U.S. 69, 73 (2003) (vacating decisions of improperly constituted

---

[25] Needless to say, Judge Newman did not seek to be "excused" from attending the meetings of the Judicial Council, and this language does not permit a chief judge to excuse someone *sua sponte*.

[26] There are also significant doubts whether any "meeting" actually took place, or whether the June 5 Order (and the decision allegedly reached on March 8) were the outcomes of *seriatim* conversations between the Chief Judge and other members of the Judicial Council.  *See* FAC ¶¶ 58, 77-78.

three-judge panels of the Court of Appeals for the Ninth Circuit, even though those opinions were issued without dissent); *Dilley v. Alexander*, 603 F.2d 914, 924 (D.C. Cir. 1979), *decision clarified by* 627 F.2d 407 (D.C. Cir. 1980) (holding that denial of promotion by an improperly constituted promotion selection boards had to be set aside, and plaintiffs had to be reinstated to service).  The Court should take the same approach here.  The June 5 Order, even leaving aside its substance, was promulgated by an improperly constituted Judicial Council of the Federal Circuit.  For that reason alone, it should be set aside.

    D.   To the Extent that 28 U.S.C. § 332(d)(1) Authorizes Indefinite Suspension of an Article III Judge, It Is Unconstitutional

In light of the statutory and procedural problems outlined above, the Court need not reach the question of the constitutionality of Section 332(d)(1) insofar as it permits a judicial council to suspend judges from office.  *See, e.g.*, *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.").  Nevertheless, if the Court decides to reach the constitutional issues, it should hold—for the same reasons as discussed in Part III, *post*—§ 332(d)(1) unconstitutional to the extent it authorizes indefinite suspension of Article III judges from service.

**III.    THE DISABILITY ACT'S PROVISION AUTHORIZING SUSPENSION OF JUDGES BY THEIR COLLEAGUES IS UNCONSTITUTIONAL BECAUSE IT AUTHORIZES DEPRIVATION OF JUDICIAL OFFICE**

The judicial office to which every Article III judge is appointed consists of more than just an ability to draw life-time salary from the United States Treasury.  The appointment to office carries with it the power to exercise the functions of that office.  Indeed, the National Commission on Judicial Discipline and Removal, in its 1993 Report recognized that "[u]nder Article III, federal judicial office has two consequences.  First, a judge is legally eligible to exercise judicial power, because the judicial

power of the United States is vested in courts made up of judges.  Second, a judge is entitled to receive undiminished compensation." National Commission on Judicial Discipline and Removal, Report, 152 F.R.D. 265, 287 (1993).[27]  *See also United States v. United Steelworkers of Am.*, 271 F.2d 676, 680 n.1 (3d Cir.), *aff'd*, 361 U.S. 39 (1959) (distinguishing between "hold[ing] office" and receiving compensation).  If the ability to "exercise judicial power" means anything, it must mean the ability to perform routine judicial functions such as hearing cases, and ruling on the controversies brought before the court.

Both historical and modern practice confirm the consistent understanding that, absent impeachment process, judges cannot be suspended from office either as a result of misconduct or disability.  Congress dealt with the issue of judicial disability early on.  The very first Congress considered the effect of a judge's infirmity on that judge's ability and power to continue to exercise the duties of office.  The view was uniform that even when a judge is afflicted with "madness" it is insufficient reason to "remove him," "because madness is no treason, crime or misdemeanor." 1 Annals of Congress 507 (statement of Rep. James Jackson).  Congress first formally addressed the issue of disability with the passage of the (now-infamous, and quickly repealed) Judiciary Act of 1801.  *See* 2 Stat. 89 (Feb. 13, 1801), *repealed by* Judiciary Act of 1802, 2 Stat. 156 (April 29, 1802).  Section 25 of that Act permitted a circuit court to appoint one of its own judges "to perform the duties of [a disabled] district judge … for and during the period the inability of the district judge shall continue." 2 Stat. 97.  The Act, however, did not *suspend* the allegedly disabled district judge, but rather permitted circuit courts to provide additional help to district courts where such help was needed.  When the

---

[27] The Committee concluded that any suspension of a judge's salary or benefits in the absence of impeachment would violate the Constitution.  152 F.R.D. at 354 ("[T]ermination of salary would violate the Constitution absent resignation or removal.").  At the same time, despite recognizing that "federal judicial office has two consequences," *id.* at 287, the Committee incongruously concluded that Congress can tread (or authorize judicial councils to tread) on the first of those consequences— ability to "exercise judicial power."  The two conclusions are inconsistent with each other and only the former one is correct.

provision was utilized to deal with the mental deterioration of District Judge John Pickering, and assign First Circuit Judge Jeremiah Smith to sit in his stead, it was done because Judge Pickering (due to his mental health issues) simply did not hold court.[28]  *See* History of the New Hampshire Federal Courts ("NH Courts History") at 33, *available at* https://tinyurl.com/bdzhs2vx.  However, when Judge Pickering chose to show up, he retained his powers to adjudicate matters pending before his court. *Id.* at 33.[29]  In short, as Professor Walter Pratt concludes, "[t]he entire history of good behavior tenure, both in England and in America, denies the possibility of removal for disability."  Pratt, *supra* at 718. And while Congress is entitled to change its mind as to what constitutes an *impeachable* (and thus removable offense), *see, e.g.*, 116 Cong. Rec. 11913 (1970) (statement of Rep. Gerald Ford) (arguing that "an impeachable offense is whatever a majority of the House of Representatives considers it to be at a given moment in history."); *Nixon*, *supra* (holding that the entire process of impeachment is a political question).  Congress is not free to effect a removal of a judge through means *other than* impeachment.

Congress also always understood that if it wishes to remove constitutional officers (such as judges or the President of the United States) by means other than impeachment, it needed to enact a constitutional amendment.  Once Congress realized the problems that could arise were the President to become disabled, it proposed, and the States ratified, the Twenty-Fifth Amendment.  *See* S. Rep. 88-1017 at 6-7 (1964).  The original Constitution does not differentiate between methods of removing a President and an Article III judge, leaving the impeachment mechanism as a sole option to accomplish either.  *See* U.S. Const. art. II, § 4; Federalist 79; Joseph Story, 2 Commentaries on the

---

[28] Judge Pickering was not the first judge who was either unable or unwilling to hold court.  As it happens, both his predecessor and successor were unable to sit as judges *for years*.  The result was that no cases were heard in the District of New Hampshire.  *See* NH Courts History at 32-34.

[29] Indeed, at the time, the view of Congress was that disability was not a reason even for impeachment; indeed, Judge Pickering's disability was used as an (ultimately unsuccessful) *defense* to the impeachment charges leveled against the Judge.  *See id.* at 34; Pratt, *supra* at 717.

41

Constitution of the United States § 790 at 258 (Hilliard, Gray 1833) (Fred B. Rothman & Co reprint ed. 1991) (stating that judicial officers are civil officers within the meaning of Article II). It therefore stands to reason that if Congress could not, by mere statute, create a mechanism that would divest a President from any of his powers even in the face of obvious disability, it equally could not, by mere statute, divest an Article III judge of any of *her* powers, even in the face of disability.

The understanding that judges cannot be removed from their judicial duties has continued to the present day and is supported by the contemporaneous practices of various judicial councils. As the report of the committee chaired by Associate Justice Stephen Breyer stated, since 1980, when the Disability Act became law, and until 2006, when the report was filed, the committee found "*no instances* in which the council ordered a suspension in the assignment of new cases." Implementation of the Judicial Conduct and Disability Act of 1980, Report to the Chief Justice of the Judicial Conduct and Disability Act Study Committee, 239 F.R.D. 116, 143 (Sept. 2006) ("Breyer Report").[30] The fact that in twenty-six years not a single federal judge was involuntarily suspended from her judicial functions as punishment for any misconduct strongly suggests that judicial councils uniformly view this option as constitutionally suspect.

The Breyer Report finding is consistent with the understanding of constitutional limitations on judicial discipline that prevailed in Congress prior to the enactment of the Disability Act. For example, when the Judicial Council for the Tenth Circuit reassigned cases from District Judge Stephen S. Chandler and prohibited assignments of new cases to him, the House Judiciary Committee set out to investigate the matter. In considering whether the Tenth Circuit acted appropriately, the House

---

[30] The Breyer Committee identified a single case of misconduct where an accused judge, as part of a "settlement" "*agreed* to go on administrative leave for at least six months, during which he would undergo behavioral counseling, and to waive any doctor–patient privilege so that his doctor could consult with the special committee's expert." 239 F.R.D. at 196. The Breyer Committee noted that this was a "voluntary corrective action."

Judiciary Committee concluded that it did not, writing that the Tenth Circuit's attempt to bar Judge Chandler from exercising judicial functions was "completely beyond the legal authority of the Council. Such an action is forbidden by the Constitution.  Congress has never authorized circuit judges to inquire into the fitness of a district judge to hold his office and to remove him if they so determine." U.S. House of Rep., Comm. on Judiciary, *Report on Investigation of Judicial Behavior in the Tenth Circuit United States Court of Appeals* 72 (1968) (quoted in Lee R. West, *Biographical Sketch for the Historical Society of the Tenth Circuit on Judge Stephen S. Chandler, Jr.*, *available at* https://tinyurl.com/398u8tss).  Although the Supreme Court later on upheld the Tenth Circuit's action, it did so because it concluded that in his various communications with the judicial council, Judge Chandler "acquiesced" in the newly established regime for the division of cases in his Court.  The Court did not hold that judicial councils possessed any sort of authority to strip Article III judges of their duties.  Indeed, the Court specifically "d[id] not find it necessary to answer," *id.* at 86, the question of "[w]hether the action taken by the Council with respect to the division of business in Judge Chandler's district falls to one side or the other of the line defining the maximum permissible intervention consistent with the constitutional requirement of judicial independence," *id.* at 84.

Since publication of the Breyer Report, there have been at least two instances of Judicial Council suspension or attempted suspension of Article III judges.  Neither, however, undermines Plaintiff's argument that 28 U.S.C. § 354 (a)(2)(A)(i) is facially unconstitutional.

The first is the case of former District Judge G. Thomas Porteous, Jr., who was investigated for various allegations of misconduct including perjury including in bankruptcy proceedings.  Upon concluding that Judge Porteous did commit the violations complained of, the Judicial Council of the Fifth Circuit ordered that "no bankruptcy cases or appeals or criminal or civil cases to which the United States is a party" were to be assigned to Judge Porteous, but that he could "continue his civil docket and administrative duties until it is determined that he must devote his time primarily to his

defense." *In re Complaint of Judicial Misconduct Against United States District Judge G. Thomas Porteous, Jr.*, No. 07-05-351-0085 (5th Cir. Dec. 20, 2007) at 6. When the matter was referred to the Judicial Conference of the United States for it to consider whether impeachment proceedings should be recommended to the House of Representatives, the Judicial Conference did so recommend. In response, the House quickly began considering impeaching Judge Porteous. As the impeachment process began, the Judicial Council of the Fifth Circuit amended its prior order and precluded Judge Porteous from hearing any cases "for two years … or until Congress takes final action on the impeachment proceedings, *whichever occurs earlier*." *Id.* (Sept. 10, 2008) at 4 (emphasis added). There is no indication that Judge Porteous objected to the imposition of this limitation. *See, e.g.*, *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011) (noting that "Judge Porteous, … did not seek review of the Council's order by the Judicial Conference of the United States through the mechanism provided by statute."). This lack of objection is understandable given that, as was predicted in the prior order, Judge Porteous had to focus on his defense in his impeachment proceedings and had little time to devote to his judicial duties. The length of the suspension which was tied to the length of the impeachment proceedings confirms this view. Thus, the Porteous example doesn't stand for the proposition that judicial councils can suspend from duties Article III judges who are *unwilling* to step aside. Rather, it stands for the proposition that judicial councils and individual judges can come to agreements regarding individual judges' exercise of judicial functions during and following investigations. *See also* Breyer Report, 239 F.R.D. at 196.

The second case where a judicial council attempted to suspend an Article III judge from the exercise of his office was that of District Judge John R. Adams who was alleged to have "a mental or emotional disability that renders him unable to discharge the duties of his office." *In re Complaint of Judicial Misconduct*, No. 06-13-90009 (6th Cir. Feb. 22, 2016) at 1. After Judge Adams refused the investigating committee's request for psychological testing, the Judicial Council of the Sixth Circuit

ordered that no cases be assigned to him for two years.  *Id.* at 29.  However, this sanction was vacated

by the Committee on Judicial Conduct and Disability of the Judicial Conference.  *See In re Complaint of*

*Judicial Misconduct*, No. 17-01 (C.C.D. April 14, 2021).  On remand, the Sixth Circuit receded from the

decision to impose this sanction (or for that matter from the requirement that Judge Adams undergo

psychiatric evaluation).  *See In re Complaint of Judicial Misconduct*, No. 06-13-90009 (6th Cir. June 27,

2018); *Adams v. Jud. Council of Sixth Cir.*, 2020 WL 5409142, at *5 (D.D.C. Sept. 9, 2020).  Ultimately

then, Judge Adams was not suspended from his judicial duties despite an attempt to do so.  Nor was

he required to undergo any medical testing with professionals selected by the investigative committee.

The history of Section 354 (a)(2)(A)(i) thus shows that it has *never* been utilized without, at the

very least, acquiescence of the subject judge.  There is a good reason that judicial councils have abjured

actually using this provision—they recognize, much like the House Judiciary Committee did when it

investigated Judge Chandler, that what that section permits is unconstitutional.

## IV.   THE DISABILITY ACT IS UNCONSTITUTIONAL AS APPLIED TO JUDGE NEWMAN BECAUSE IT DENIES HER DUE PROCESS OF LAW

Leaving aside the type of sanctions that could be imposed on Judge Newman, the very

investigation into her by the people who are material witnesses to her fitness to continue to serve

violates the basic notions of due process and is therefore unconstitutional.

It is well settled that due process requires, at a minimum, a "neutral decisionmaker."  *See Hamdi*

*v. Rumsfeld*, 542 U.S. 507, 509 (2004).  This requirement is so fundamental that it applies even to enemy

combatants.  *Id.  A fortiori*, it applies to federal judges suspected of misconduct or disability.  It is also

well known that individuals process new information through the lens of their pre-existing knowledge

and biases—a phenomena known as "confirmation bias" and "anchoring bias."  *See, e.g.*, *Duncan v.*

*Bonta*, 19 F.4th 1087, 1122 (9th Cir. 2021) (*en banc*) (Berzon, J., concurring), *vacated on other grounds by*

142 S. Ct. 2895 (2022) ("Cognitive biases ranging from confirmation bias to anchoring bias, can cloud a judge's analysis.").

In the present case, in the very first order, Chief Judge Moore stated that one of the reasons for launching an investigation into Judge Newman is that "judges … have brought to my attention concerns about Judge Newman's inability to perform the work of an active judge based on their personal experience" and that "[i]t has been stated that Judge Newman routinely makes statements … during deliberative proceedings that demonstrate a clear lack of awareness over the issues in the cases." FAC, Exh. A at 2. The March 24 Order also recited a number of demonstrably erroneous "facts," all of which (according to the order itself) served as a basis for triggering the investigation. *See* FAC ¶¶ 20-21. Specifically, the order stated that Judge Newman had a heart attack and had a coronary stent placed in the Summer of 2021. FAC, Exh. A at 1. Neither of those allegations is correct. Judge Newman never suffered a heart attack, nor did she have a coronary stent placed. FAC ¶ 21. The order further alleged that, as a result of these medical problems, Judge Newman's "sittings were reduced compared to her colleagues." FAC, Exh. A at 1. Again, that is demonstrably false, as Judge Newman sat on ten panels in the Summer of 2021, more than any of her colleagues save two. Subsequent orders were likewise full of factual errors. FAC ¶ 22.

In and of itself, there is nothing remarkable about erroneous accusations being leveled at anyone, including federal judges. Witnesses may mishear things, or have faulty memories, or misunderstand certain information. Our justice system deals with such possibilities by subjecting witnesses to cross-examination in front of a neutral decisionmaker. See *California v. Green*, 399 U.S. 149, 158 (1970) ("[C]ross-examination [is] the 'greatest legal engine ever invented for the discovery of truth.'") (quoting 5 J. Wigmore, Evidence § 1367 (3d ed. 1940)). It is through the process of cross-examination and comparing different testimonies and documents that a neutral decisionmaker, unburdened with prior knowledge of the matter, discerns the truth and reaches a proper result in

which both the litigants and the public can have confidence.  In contrast, when the decisionmaker has prior knowledge of some facts giving rise to a dispute, he is likely to filter any new facts (including cross-examination) through that pre-existing knowledge.  *See Duncan*, 19 F.4th at 1122.  The problem is especially acute when the decisionmaker himself has to be subject to cross-examination.  Instead of seeing weaknesses and shades of grey in the testimony, in such a situation, the decisionmaker can actually become more entrenched in the initial position.  *See, e.g.*, Enide Maegherman, *et al.*, *Law and Order Effects: On Cognitive Dissonance and Belief Perseverance*, 29 Psychiatry, Psychology and L. 33, 34 (2022) ("[J]udges who had been given more incriminating information prior to trial were more likely to convict the defendant than judges who were given the same case file, but less incriminating prior information.  Therefore, judges also appear to be prone to belief perseverance despite the need for impartiality."); *id.* ("One way in which people try to escape cognitive dissonance is to adopt, and adhere to, one of the beliefs, while refuting or downplaying the other.").  It is for this reason that that federal law requires that a judge "shall … disqualify himself … [w]here he has … personal knowledge of disputed evidentiary facts concerning the proceeding."  28 U.S.C. § 455(b)(1).

Furthermore, some of the Federal Circuit's judges are not mere witnesses in these matters, they are also accusers.  In this matter, Chief Judge Moore "identified a complaint" on the basis of informal complaints by, *inter alia*, other judges—judges who have apparently complained about working with Judge Newman.  FAC, Exh. A at 2.  It is hard to imagine that if these judges found it difficult to work with Judge Newman that they will have an open mind regarding any complaint against her.  However, "under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case."  *Williams*, 579 U.S. at 8.  Because some of Judge Newman's colleagues (first and foremost among them being Chief Judge Moore) are responsible for bringing forth the complaint against her, they cannot, consistent with due process of law, also adjudicate their complaint.

Other judicial councils have recognized this inherent risk.  For example, in the *Adams* case, when fellow District Judges complained about Judge Adams's behavior, none of his colleagues from the same district participated either at the "special committee" stage or in the final deliberations of the judicial council.  *See In re Complaint of Judicial Misconduct*, No. 06-13-90009 (6th Cir. June 27, 2018) at 1 and 3 n.3.  Additionally, since the publication of the Breyer Report, *supra*, *every single* complaint of misconduct against a circuit judge that was not summarily dismissed has been transferred to another circuit's judicial council for investigation.[31]  *See, e.g., In re Charges of Judicial Misconduct*, No. 21-90142-JM (resolution of the complaint against Circuit Judge William Pryor of the U.S. Court of Appeals for the Eleventh Circuit by the Judicial Council of the Second Circuit); *In re Complaints under the Judicial Conduct and Disability Act*, Nos. 10-18-90038-67, 10-90069-107, 10-90109–122 (resolution of the complaint against Circuit Judge (by then-Justice) Brett M. Kavanaugh of the U.S. Court of Appeals for the District of Columbia Circuit by the Judicial Council of the Tenth Circuit); *In re Complaint of Judicial Misconduct*, Nos. 18-90204-jm, 18-90205-jm, 18-90206-jm, 18-90210-jm (resolution of the complaint against Circuit Judge Maryann Trump Barry of the U.S. Court of Appeals for the Third Circuit by the Judicial Council of the Second Circuit); *In re Charges of Judicial Misconduct*, No. DC-13-90021 (resolution of the complaint against Circuit Judge Edith Jones of the U.S. Court of Appeals for the Fifth Circuit by the Judicial Council of the District of Columbia Circuit); *In re Charges of Judicial Misconduct*, No. 12-90069-JM (resolution of the complaint against Circuit Judge Boyce F. Martin of the U.S. Court of Appeals for the Sixth Circuit by the Judicial Council of the Second Circuit); *In re Complaint of Judicial Misconduct*, 575 F.3d 279 (2009) (resolution of the complaint against Chief Circuit Judge Alex Kozinski

---

[31] The Conduct Rules were adopted in response to the Breyer Report.  Prior to the Breyer Report there was no formal mechanism to request a transfer, though Illustrative Rules did suggest that such a transfer, as well as "intercircuit assignment procedures under 28 U.S.C. § 291(a)" may be available. *See Illustrative Rules Governing Complaints of Judicial Misconduct and Disability*, R. 18(g) (Admin. Office of the Courts, 2000).

of the U.S. Court of Appeals for the Ninth Circuit by the Judicial Council of the Third Circuit). As Professor Arthur Hellman noted, "over the last few years, chief judges have *consistently* followed the practice of requesting a transfer when serious allegations have been raised about a judge of the court of appeals." Arthur D. Hellman, *An Unfinished Dialogue: Congress, the Judiciary, and the Rules for Federal Judicial Misconduct Proceedings*, 32 Geo. J. Legal Ethics 341, 404 (2019) (emphasis added). In refusing to seek a transfer of this matter, the Judicial Council for the Federal Circuit stands alone amongst its brethren, and it stands athwart Congressional intent in crafting the Disability Act.

Furthermore, empirical data shows that Judge Newman's high rate of dissent results, on average, in more work for her colleagues who are then forced to respond to these dissents. Conversely, according to the study, removing Judge Newman from the bench and replacing her with a less dissent-prone judge would reduce the average workload of her colleagues by over 5%. *See* Katznelson, *supra* at 34-35; FAC ¶ 78. This suggests that Judge Newman's colleagues have a particular stake in the outcome of the proceedings against her.

When Congress passed the Disability Act, one concern was "the possibility of one group of federal judges arbitrarily 'ganging up' or 'hazing' another judge…." H. Rep. No. 96-1313 at 14 (1980) (quoting *Chandler*, 398 U.S. at 140 (Douglas, J., dissenting)). This concern is particularly acute with the Judicial Council for the Federal Circuit because unlike judicial councils of other courts, the affinities and animosities of its members are not tempered by the presence of judges from other courts. Instead, because this Judicial Council consists solely of Federal Circuit judges, all working alliances, rivalries, and feuds have a high risk of being transferred to disciplinary proceedings. It appears that this is exactly what has happened in this matter. The orders issued by Chief Judge Moore and the Special Committee appear to be rife with factual errors. *See* FAC ¶¶ 20-22; 60-65. The Special Committee has refused to request a transfer of this matter to another circuit by erroneously claiming

that such transfers are "exceptional," *see* FAC, Exh. H at 11,[32] refused reasonable extension requests (including making filings due on religious holidays), *see* FAC ¶ 50, Exhs. S, L, adopted unreasonable schedules (with deadlines to respond set at three and four days, even while Judge Newman did not have legal representation), *see* FAC ¶ 27, Exh. C; ¶ 29, Exh. E, refused to cooperatively engage with Judge Newman and negotiate with her on issues such as medical testing, *see* FAC ¶ 47, Exh. K, and even cited as authority for such actions Congressional committee reports to bills that were rejected by Congress, *see* FAC ¶ 41, Exhs. K, L.[33] Thus, the very "risk of actual bias" that the Supreme Court warned about in *Williams* appears to have come to pass in this case.[34]

There is yet another reason why proceedings against Judge Newman in the confines of the Federal Circuit run contrary to the requirements of due process. This Court is one of nationwide jurisdiction. All patent, government contract, veterans appeal, trade, and certain other types of cases are resolved in that Court. *See* 28 U.S.C. § 1295. The Court has developed a specialized bar. *See*

---

[32] The May 3 Order claimed that "[i]n the twelve-month period ending September 30, 2022, there were 375 complaints involving circuit judges, but only 2 complaints involving judges at any level were transferred from one circuit to another." FAC, Exh. H at 5. However, out of those "375 complaints" inly *three* proceeded to the "special committee" stage, and out of those *three*, two were transferred. *See* Judicial Complaints— Complaints Commenced, Terminated, and Pending with Allegations and Actions Taken Under Authority of 28 U.S.C. 351-364 During the 12-Month Period Ending Sept. 30, 2022, *available at* https://tinyurl.com/47jkz6t2.

[33] For example, the orders of May 16 and May 22 cite to S. Rep. No. 96-362 for the proposition that judicial complaints should be resolved within 90 days. The problem is that this report accompanied the Senate bill that eventually was replaced by the House version which did not set similar deadlines or even expectations. *See* H. Rep. 96-1313 at 4. Perhaps it is for that reason that, as far as Plaintiff can tell, *none* of the disciplinary complaints that survived summary dismissal were resolved within 90 days. The complaint against Judge Adams, which the Special Committee cited on several occasions took *three years* from the date of the complaint. The resolution of the complaint against Judge Edith Jones took fourteen months. The Special Committee's attempt to shoehorn its investigation into an arbitrary 90-day period and its imposition of unreasonable deadlines to accomplish this goal, are more indicative of a misunderstanding of applicable law, or an attempt to bias the process against Judge Newman, rather than an effort to "expeditiously" resolve the matter.

[34] Furthermore, the intramural continuation of this case has contributed to a deterioration of relationships between judges and judicial staff, thus impacting rights not only of Judge Newman, but also of various litigants before the Federal Circuit.

Daniel R. Cahoy & Lynda J. Oswald, *Complexity and Idiosyncrasy at the Federal Circuit*, 19 Colum. Sci. & Tech. L. Rev. 216, 226 (2018).  The members of the bar may well be loath to take any action that might displease the judges before whom they routinely appear.  Thus, if members of the bar know that Chief Judge Moore has taken a position that Judge Newman suffers from disability, even if they disagree with that assessment, they may be unwilling to offer up those views given that they will likely be spending years, if not decades, litigating before Chief Judge Moore.  Indeed, this dynamic has already been evident when a number of law firms with robust patent practices declined to represent Judge Newman citing "conflict of interest."  In contrast, if this matter were transferred to a judicial council of a different circuit, and given that witness statements are confidential, members of the Federal Circuit bar would be freer to share their true opinions of Judge Newman's abilities.  As things stand, however, Judge Newman is effectively being denied the ability to marshal evidence in support of her position.

In short, the complainants against Judge Newman are her fellow Federal Circuit judges.[35]  The witnesses against Judge Newman are her fellow Federal Circuit judges.  And so long as the matter is being processed by the Judicial Council of the Federal Circuit, the decisionmakers are *also* Judge Newman's fellow Federal Circuit judges.  And if this weren't enough conflict of interest, many of the witnesses supporting Judge Newman may be reluctant to come forth due to concerns over their clients' cases.  Our legal principles and even rudimentary knowledge of human psychology tells us that no objective decision is possible in such circumstances.  *See Williams*, 579 U.S. at 8.

---

[35] In an order dated May 16, 2023, the special committee averred that "Chief Judge Moore did not file a complaint nor is she a complainant.  Instead, Chief Judge Moore identified a complaint pursuant to Rule 5, which allows a Chief Judge to initiate the complaint when others have presented allegations establishing probable cause to believe a disability exists."  That is a distinction without a difference.  The relevant point is that there were *no complaints lodged* against Judge Newman *by anyone*.  Instead, Chief Judge Moore took it upon herself to convert various grumblings and petty grievances of some of the Court's staff into a *Complaint*.  Though the Conduct Rules permit the Chief Judge to do so, *see* R. 5, such a process does make the Chief Judge, in effect, if not in name, the complainant.

V.   Judge Newman Is Suffering And Will To Suffer Irreparable Harm Absent a Preliminary Injunction, and the Balance of Equities Weighs Heavily in Plaintiff's Favor

Every day that Judge Newman is prevented from exercising her judicial functions, she suffers from irreparable harm.  The harm cannot be remediated by restoring her to the bench months or years from now because her right and ability to participate in deciding cases currently pending will remain impaired to the point of non-existence.  See *Berry v. Reagan*, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983) (holding that terminating Presidentially-appointed, Senate-confirmed commissioners is irreparable harm); *Yager v. Carey*, 1993 WL 816627, at *11 (D.D.C. Nov. 16, 1993) (concluding that suspension from union office which would preclude a plaintiff from running in an election is irreparable harm, even if an election could be set aside at the conclusion of trial, but denying injunctive relief after conducting the balance of interest analysis); *Jackson v. Nat'l Football League*, 802 F. Supp. 226, 231 (D. Minn. 1992) (holding that players suspensions from games is irreparable harm).

Furthermore, being subjected to disciplinary procedures that do not comport with basic notions of due process constitutes its own irreparable harm.  The Supreme Court has held that, as a matter of law, the deprivation of a constitutional right "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Because Judge Newman, like everyone else, has a right to have her case heard by a properly constituted tribunal—one that excludes her accusers and witnesses for or against her—depriving her of that right constitutes irreparable harm.

In contrast, there is *no* harm to Defendants or the public from the grant of injunctive relief. First, Defendants have *no* legally cognizable interest in Judge Newman's participating or not participating in any cases, nor do they have any valid interest in being the ones who pass on her fitness to serve or adjudge the propriety of her conduct.  Whatever interest exists in these matters belongs to the American public and not to the Judicial Council of the Federal Circuit or the individual judges of that Court.  With respect to an investigation and any discipline of Judge Newman, that interest can be

vindicated by any other judicial council.  To the extent that Judge Newman's colleagues have an interest in speedy disposition of the Court's business, that interest does not outweigh Judge Newman's interest and second, it can be addressed by how opinions are assigned rather than by preventing Judge Newman from sitting on cases at all.[36]

## VI.   GRANTING THE PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST

Both statutory language, *see* 28 U.S.C. § 46(b), and the Federal Circuit's own rules, *see* Fed. Cir. R. 47.2(b), require that cases be assigned in such a way as to "ensure that all of the judges sit on a representative cross section of the cases heard."  The purpose of this section was to allay fears that the court and its members "would be unduly specialized or would soon be captured by specialized interests." H. Rept. 97-312 at 31.  Congress purposefully made this provision apply only to the Federal Circuit because only the Federal Circuit's jurisdiction is defined in terms of subject matter.  While Congress worried that "judges with a patent law expertise [would sit] on a disproportionate number of patent cases," *id.*, thus skewing the law of patents in a particular direction, the same concern applies in reverse, *i.e.*, precluding judges with patent law expertise from sitting on patent (or other matters) can and does skew the development of the law in another direction.  The public is thus deprived of a robust consideration of legal issues brought to the court.  This has a particularly devastating effect on the Federal Circuit.  Because the Federal Circuit's jurisdiction in certain matters (including patents, government contracting, veterans claims, etc.) is both nationwide and exclusive, there is never a possibility of a "circuit split" on important legal issues.  Instead, robust dissenting opinions serve the function of "circuit splits" when it comes to matters within the Federal Circuit's exclusive jurisdiction. *See* Katznelson, *supra* at 36.  As Chief Judge Moore herself has recognized, it is often Judge Newman's

---

[36] Judge Newman's current case backlog does not exceed that of other judges, and therefore, under the Court's own rules, she is entitled to sit on cases even if she is the slowest writer on the Court.  In any event, the Court remains free to apply the same rules to Judge Newman's participation in future cases as it does to other judges, and when those rules apply, limit her sittings. *See, e.g.*, Clerical Procedure #3, ¶ 15.

"vigorous dissents" that have led the Supreme Court to grant *certiorari* and ultimately reverse the Federal Circuit's erroneous decisions (often through the wholesale adoption of Judge Newman's reasoning). *See* Moore, *Anniversaries and Observations*, 50 AIPLA Q. J. at 524-25. So, suspending Judge Newman from participating in the Federal Circuit's work greatly diminishes the likelihood of a dissenting opinion, which in turn diminishes the likelihood of the Supreme Court ever correcting an erroneous decision. Given that cases before the Federal Circuit often have significant nationwide economic consequences, reducing the odds for the correction of an erroneous opinion harms the public interest. Conversely, increasing those odds is in the public interest. Restoring Judge Newman to the exercise of her judicial functions increases the odds of a dissenting opinion being written—and by Chief Judge Moore's own admission, the odds of the Supreme Court's correcting the Federal Circuit's errors. Accordingly, the public interest is served by the issuance of a preliminary injunction.

Furthermore, because the public always has an interest in ensuring enforcement of duly enacted statutes, and because as discussed in Parts II-III, *ante*, the Judicial Council's actions suspending Judge Newman are unlawful, an injunction against such actions is necessarily in the public interest.

Finally, the public has an interest in having confidence that disciplinary procedures against federal judges are conducted in a fair fashion and not infected with personal animosity or other "impermissible risk of actual bias." *Williams*, 579 U.S. at 8. Thus, an injunction against continued disciplinary process that violates Judge Newman's due process rights is in the public interest.

## CONCLUSION

For the reasons set out above, the Court should immediately enjoin the Defendants from continuing their suspension of Judge Newman from her judicial functions, and further enjoin them from proceeding with any disciplinary proceedings against Judge Newman unless and until the matter is transferred to a judicial council of another circuit.

A form of order is attached as an exhibit to the preliminary injunction motion.

June 27, 2023                              Respectfully submitted,

                                           /s/ *John J. Vecchione*
                                           _____
                                           JOHN J. VECCHIONE (DC Bar No. 431764)
                                           Senior Litigation Counsel

                                           /s/ *Gregory Dolin**
                                           _____
                                           GREGORY DOLIN, MD
                                           Senior Litigation Counsel

                                           NEW CIVIL LIBERTIES ALLIANCE
                                           1225 19th Street NW, Suite 450
                                           Washington, DC 20036
                                           Telephone: (202) 869-5210
                                           Facsimile: (202) 869-5238
                                           john.vecchione@ncla.legal

                                           *Admission Application Pending*

                                           *Counsel for Plaintiff*