# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HON. PAULINE NEWMAN,

               Plaintiff,

       v.

HON. KIMBERLY A. MOORE, *et al.*,

           Defendants.

Case No. 1:23-cv-01334-CRC

**DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS AND OPPOSITION TO PLAINTIFF'S PRELIMINARY-INJUNCTION MOTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 4

I.      Judge Newman displays a pattern of concerning behavior. ...................................... 4

II.     Congress established self-policing mechanisms for the Judiciary. ............................ 8

III.    Judge Newman is suspended from hearing new cases and refuses to cooperate
        with the Special Committee's investigation. ......................................................... 12

IV.     Judge Newman asks this Court to review the decisions of 11 other federal judges
        on the Federal Circuit's Special Committee and Judicial Council. ......................... 17

LEGAL STANDARDS ........................................................................................... 17

ARGUMENT ......................................................................................................... 18

I.      All of Plaintiff's claims are barred from judicial review. ........................................ 19

        A.      The Judicial Conduct & Disability Act bars judicial review of Plaintiff's
                challenges to actions taken or contemplated under the Act. .......................... 19

        B.      This Court lacks appellate jurisdiction to review judicial actions by a
                judicial council. ....................................................................................... 24

II.     Plaintiff cannot succeed on the merits of the challenges raised in her preliminary-
        injunction motion and, if the merits are reached, they should be dismissed. ........... 28

        A.      Plaintiff's Act-related constitutional challenges are meritless and
                foreclosed by binding precedent. ................................................................ 28

                1.      The Constitution allows intrabranch discipline short of removal
                        from office and disqualification to hold office. ................................... 29

                2.      As binding precedent makes clear, there is no due process problem
                        with judges administering the Act. .................................................... 33

        B.      Plaintiff's challenge to the Judicial Council's June 5 Order suspending
                new case assignments is unavailing. ........................................................... 37

                1.      The Judicial Council has full statutory authority to craft an
                        appropriate remedy for a judge's backlog of cases. ............................. 37

                2.      The June 5 Order was lawfully issued. ............................................... 42

3.      Only the Judicial Council's June 5 Order—which may soon be superseded—is at issue. ................................................................. 45

III.    Comity, exhaustion, and related concerns weigh in favor of dismissing the complaint or denying the preliminary-injunction motion........................................ 46

IV.    The remaining injunction factors weigh heavily against an injunction. .................. 49

    A.    Plaintiff will not suffer irreparable harm absent an injunction...................... 49

    B.    An injunction would harm the Federal Circuit, its judges, its litigants, and the public............................................................................................. 51

CONCLUSION ........................................................................................... 54

# TABLE OF AUTHORITIES

## Cases

*Adams v. Comm. on Jud. Conduct & Disability*,
   165 F. Supp. 3d 911 (N.D. Cal. 2016) ...................................................................... 24

*Adams v. Jud. Council of Sixth Cir.*,
   2020 WL 5409142 (D.D.C. Sept. 9, 2020) ............................................................. 46

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
   840 F. Supp. 2d 327 (D.D.C. 2012) ....................................................................... 51

*Allegheny Def. Project v. FERC*,
   964 F.3d 1 (D.C. Cir. 2020) .............................................................................. 42, 52

*Am. Portland Cement All. v. EPA*,
   101 F.3d 772 (D.C. Cir. 1996) ............................................................................... 27

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,
   281 F. Supp. 3d 88 (D.D.C. 2017), , *aff'd*, 897 F.3d 314 (D.C. Cir. 2018) ...................... 49

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ................................................................................ 46

*A.S. ex rel. Miller v. SmithKline Beecham Corp.*,
   769 F.3d 204 (3d Cir. 2014) .................................................................................. 49

*Bolin v. Story*,
   225 F.3d 1234 (11th Cir. 2000) ............................................................................. 33

*Bradley v. Fisher*,
   80 U.S. (13 Wall.) 335 (1871) ............................................................................... 24

*Chandler v. Judicial Council of the Tenth Circuit*,
   398 U.S. 74 (1970) ..................................................................................... *passim*

*Cobell v. Norton*,
   391 F.3d 251 (D.C. Cir. 2004) ............................................................................... 18

*Coley v. Bagley*,
   706 F.3d 741 (6th Cir. 2013) ................................................................................ 49

*Committee v. John Carroll Univ.*,
   2019 WL 2295347 (N.D. Ohio May 30, 2019) ........................................................ 36

*Cunningham v. Becker,*
    96 F. Supp. 2d 369 (D. Del. 2000), *aff'd,* 275 F.3d 34 (3d Cir. 2001) ............................ 19

*D.C. Ct. of Appeals v. Feldman,*
    460 U.S. 462 (1983) ........................................................................................................ 24

*Dallas Safari Club v. Bernhardt,*
    453 F. Supp. 3d 391 (D.D.C. 2020) ............................................................................50, 51

*Doe v. Rogers,*
    139 F. Supp. 3d 120 (D.D.C. 2015) .............................................................................. 34

*Ellerbe v. Jud. Council for the Third Cir.,*
    2023 WL 2163900 n.3 (E.D. Pa. Feb. 22, 2023) .......................................................... 26

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,*
    544 U.S. 280 (2005) ........................................................................................................ 26

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010) ........................................................................................................ 30

*Friends of Animals v. U.S. Bureau of Land Mgmt.,*
    232 F. Supp. 3d 53 (D.D.C. 2017) ..............................................................................51, 54

*Full Value Advisors, LLC v. SEC,*
    633 F.3d 1101 (D.C. Cir. 2011) ..................................................................................47, 48

*Fund for Animals v. Frizzell,*
    530 F.2d 982 (D.C. Cir. 1975) ....................................................................................... 51

*Giliana v. Blinken,*
    596 F. Supp. 3d 13 (D.D.C. 2022) ..............................................................................17, 34

*Grell v. Trump,*
    330 F. Supp. 3d 311 (D.D.C. 2018) .............................................................................. 17

*Hampton v. City of Chicago,*
    643 F.2d 478 (7th Cir. 1981) ......................................................................................... 49

*Harbour v. Univ. Club of Washington,*
    610 F. Supp. 3d 123 (D.D.C. 2022) .............................................................................. 18

*Hastings v. Jud. Conf. of U.S.,* ("*Hastings I*"),
    770 F.2d 1093 (D.C. Cir. 1985) ............................................................................27, 46, 47, 48

*Hastings v. Jud. Conf. of the U.S.*,
  593 F. Supp. 1371 (D.D.C. 1984)......................................................................... 35

*Hastings v. Jud. Conf. of U.S.*, ("*Hastings II*")
  829 F.2d 91 (D.C. Cir. 1987) ......................................................3, 34, 35, 47

*Hilbert v. Dooling*,
  476 F.2d 355 (2d Cir. 1973) ............................................................40, 41

*Hill v. Traxler*,
  2013 WL 4580456 (D.D.C. July 9, 2013), *aff'd,* 550 F. App'x 1 (D.C. Cir. 2013) ......... 33

*Hohn v. United States*,
  524 U.S. 236 (1998)................................................................................... 28

*In re Cement Antitrust Litig.*,
  673 F.2d 1020 (9th Cir. 1981) ................................................................. 49

*In re Imperial "400" Nat'l, Inc.*,
  481 F.2d 41 (3d Cir. 1973) ......................................................27, 28, 39, 42

*In re Jaritz Indus., Ltd.*,
  151 F.3d 93 (3d Cir. 1998) ......................................................................39, 40

*In re Complaint Against District Judge Jon Phipps McCalla*,
  Nos. 99-6-372-48, 00-6-372-66 (6th Cir. Jud. Council Nov. 2, 2001)............................ 31

*In re Complaint Against District Judge Walter S. Smith, Jr.*,
  No. 05-14-90120 (5th Cir. Jud. Council Dec. 3. 2015)................................................ 30

*In re Complaint Against District Judge John R. Adams*,
  C.C.D. No. 17-01 (U.S. Jud. Conf. Comm. on Jud. Conduct &
  Disability Aug. 14, 2017) ........................................................................... 21

*In re Complaints Against District Judge Colin S. Bruce*,
  Nos. 07-18-90053, 07-18-90067 (7th Cir. Jud. Council May 14, 2019) ........................ 30

*In re Jaritz Indus., Ltd.*,
  151 F.3d 93 (3d Cir. 1998) ......................................................................39, 40

*In re McBryde*,
  117 F.3d 208 (5th Cir. 1997) ..............................................................*passim*

*In re United States*,
  791 F.3d 945 (9th Cir. 2015) ...................................................................... 41

*Intel Corp. Inv. Pol'y Comm. v. Sulyma,*
   140 S. Ct. 768 (2020) ........................................................................... 42

*Kingdomware Techs., Inc. v. United States,*
   579 U.S. 162 (2016) ........................................................................ 38, 39

*Kline v. Burke Constr. Co.,*
   260 U.S. 226 (1922) ............................................................................. 32

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
   511 U.S. 375 (1994) ............................................................................. 17

*LaNave v. Minnesota Sup. Ct.,*
   915 F.2d 386 (8th Cir. 1990) ............................................................... 25

*Marbury v. Madison,*
   5 U.S. (1 Cranch) 137 (1803) .............................................................. 26

*Maryland v. King,*
   567 U.S. 1301 (2012) ........................................................................... 53

*McBryde v. Comm. to Rev. Cir. Council Conduct & Disability of Jud. Conf.,*
   83 F. Supp. 2d 135 (D.D.C. 1999) ...................................................... 30

*McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.,*
   264 F.3d 52 (D.C. Cir. 2001) .......................................................*passim*

*McCarthy v. Madigan,*
   503 U.S. 140 (1992) ............................................................................. 47

*Mullis v. U.S. Bankr. Ct. for Dist. of Nevada,*
   828 F.2d 1385 (9th Cir. 1987) ............................................................. 26

*Munaf v. Geren,*
   553 U.S. 674 (2008) ............................................................................. 47

*Mylan Pharms., Inc. v. Shalala,*
   81 F. Supp. 2d 30 (D.D.C. 2000) ........................................................ 51

*Newdow v. Bush,*
   355 F. Supp. 2d 265 (D.D.C. 2005) .................................................... 50

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC,*
   48 F. Supp. 3d 87 (D.D.C. 2014) ........................................................ 51

*Overton v. Torruella*,
   183 F. Supp. 2d 295 (D. Mass. 2001) ................................................................... 19, 24

*Parker v. Levy*,
   417 U.S. 733 (1974) .................................................................................................. 22

*Partington v. Gedan*,
   961 F.2d 852 (9th Cir. 1992) ................................................................................... 24

*Patchak v. Jewell*,
   109 F. Supp. 3d 152 (D.D.C. 2015) ........................................................................ 32

*Pitch v. United States*,
   953 F.3d 1226 (11th Cir. 2020) ......................................................................... 24, 25

*Postal Police Officers Ass'n v. U.S. Postal Serv.*,
   502 F. Supp. 3d 411 (D.D.C. 2020) .................................................................. 17, 18

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
   831 F.3d 500 (D.C. Cir. 2016) .......................................................................... 18, 51

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) ................................................................................ 33

*Ramsingh v. Transportation Sec. Admin.*,
   40 F.4th 625 (D.C. Cir. 2022) ................................................................................. 22

*Rivera-Torres v. Rey-Hernandez*,
   502 F.3d 7 (1st Cir. 2007) ....................................................................................... 49

*Rooker v. Fidelity Trust Co.*,
   263 U.S. 413 (1923) ................................................................................................. 26

*Rostker v. Goldberg*,
   453 U.S. 57 (1981) ................................................................................................... 52

*Roth v. King*,
   449 F.3d 1272 (D.C. Cir. 2006) .............................................................................. 34

*S. Utah Wilderness All. v. Bernhardt*,
   512 F. Supp. 3d 13 (D.D.C. 2021) .......................................................................... 49

*Sanai v. Kozinski*,
   2021 WL 1339072 (N.D. Cal. Apr. 9, 2021) ....................................................19, 21, 24, 25

*Santos-Zacaria v. Garland*,
    143 S. Ct. 1103 (2023) ................................................................. 47

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    140 S. Ct. 2183 (2020) ................................................................. 30

*Sparks v. Character & Fitness Comm.*,
    859 F.2d 428 (6th Cir. 1988) ....................................................... 24

*Town of E. Haven v. E. Airlines, Inc.*,
    293 F. Supp. 184 (D. Conn. 1968) ................................................ 49

*Truesdale v. Moore*,
    142 F. 3d 749 (4th Cir. 1998) ...................................................... 39

*United States v. Colon-Munoz*,
    292 F.3d 18 (1st Cir. 2002) .......................................................... 40

*United States v. Colon-Munoz*,
    318 F.3d 348 (1st Cir. 2003) ........................................................ 41

*United States v. Kelly*,
    519 F. Supp. 1029 (D. Mass. 1981) .............................................. 49

*United States v. Maloid*,
    71 F.4th 795 (10th Cir. 2023) ...................................................... 43

*United States v. Pearson*,
    203 F.3d 1243 (10th Cir. 2000) .................................................... 49

*United States v. Washington*,
    98 F.3d 1159 (9th Cir. 1996) ....................................................... 19

*United States v. Winstead*,
    890 F.3d 1082 (D.C. Cir. 2018) .................................................... 43

*UtahAmerican Energy, Inc. v. Dep't of Lab.*,
    685 F.3d 1118 (D.C. Cir. 2012) .................................................... 47

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ..................................................................... 22

*Walters v. Nat'l Ass'n of Radiation Survivors*,
    468 U.S. 1323 (1984) ................................................................... 53

*Withrow v. Larkin*,
    421 U.S. 35 (1975)...................................................................34, 36

*Zarei v. Blinken*,
    2021 WL 9146060 (D.D.C. Sept. 30, 2021) .................................. 51

**Constitutional Provisions**

U.S. Const. amend. V ............................................................... 35

U.S. Const. art. I, § 3, cl. 7 ...................................................... 29

U.S. Const. art. I, , § 8 ............................................................ 32

U.S. Const. art. III, § 1 ............................................................ 8

**Statutes**

28 U.S.C. § 331 *et seq.* .......................................................... 8

28 U.S.C. § 331 .................................................................... 11

28 U.S.C. § 332 .............................................................*passim*

28 U.S.C. § 351 .............................................................*passim*

28 U.S.C. § 352 ...............................................10, 19, 24, 35

28 U.S.C. § 353 ................................................... 10, 11, 35

28 U.S.C. § 354 .................................................3, 11, 20, 29

28 U.S.C. § 355 .................................................................... 20

28 U.S.C. § 357 .............................................................*passim*

28 U.S.C. § 358 .................................................................... 43

28 U.S.C. § 359 .................................................................... 43

28 U.S.C. § 362 ...............................................................10, 41

28 U.S.C. § 372 (2000)........................................................... 19

28 U.S.C. § 2071 .................................................................. 43

62 Stat. 869 (1948) .................................................................................. 8

Pub. L. No. 67-298, 42 Stat. 837 (1922) ..................................................... 8

Pub. L. No. 76-299, 53 Stat. 1223 (1939) ............................................... 9, 38

Pub. L. No. 96-458, 94 Stat. 2035 (1980) ................................................... 9

Pub. L. No. 107-273, 116 Stat. 1758 (2002) .............................................. 20

**Rules**

U.S. Courts, *Judicial Conduct & Disability* ("JC&D Rules"),
    available here ................................................................................ 10, 43

JC&D Rule 2 ............................................................................................ 14

JC&D Rule 4 ............................................................................................ 44

JC&D Rule 13 .......................................................................................... 13

JC&D Rule 13 cmt. .................................................................................. 35

JC&D Rule 15 .......................................................................................... 36

JC&D Rule 20 ..................................................................................... 11, 20

JC&D Rule 21 ..................................................................................... 11, 20

JC&D Rule 25 ..................................................................................... 43, 44

JC&D Rule 25 cmt. .................................................................................. 44

**Other Authorities**

Amanda Frost, *Judicial Ethics and Supreme Court Exceptionalism*,
    26 Geo. J. Legal Ethics 443 (2013) .................................................... 32

Comment, *The Authority of the Circuit Judicial Councils: Separation of Powers in the
    Courts of Appeal*, 5 Seton Hall L. Rev. 815 (1974) ............................. 41

*Excuse*, Merriam-Webster Dictionary,
    available here ................................................................................... 44

Harlington Wood, Jr., *Judiciary Reform: Recent Improvements in Federal Judicial
    Administration*, 44 Am. U. L. Rev. 1557 (1995) .................................. 9

H.R. Rep. No. 96-1313, 96th Cong., 2d Sess. 10 (1980) .......................................... 9, 10, 41

*Implementation of the Judicial Conduct and Disability Act of 1980:*
   *A Report to the Chief Justice*, 239 F.R.D. 116 (Sept. 2006) ("Breyer Report").................. 31

Irving R. Kaufman, *Chilling Judicial Independence*,
   88 Yale L.J. 681 (1979)................................................................................................ 41

J. Clifford Wallace, *Must We Have the Nunn Bill?*,
   51 Ind. L.J. 297 (1976)........................................................................................... 28, 41

Judicial Conference of the United States, *Report on the Powers and Responsibilities*
   *of the Judicial Councils* (July 5, 1961) ("JCUS Report") .................................9, 38, 39, 40

Peter Graham Fish, *The Circuit Councils: Rusty Hinges of Federal Judicial Administration*,
   37 U. Chi. L. Rev. 203 (1970) ...................................................................................... 39

## INTRODUCTION

Rather than be subjected to the invasive oversight of the Political Branches, the federal judiciary has long enjoyed a "statutory framework and power whereby [it] might 'put [its] own house in order.'" *Chandler v. Judicial Council of the Tenth Circuit*, 398 U.S. 74, 85 (1970). That statutory process works. And this case shows how.

Months ago, 96-year-old Judge Pauline Newman of the Federal Circuit showed concerning signs that a possible disability is impeding her ability to perform the duties of an active circuit judge. She amassed a troubling backlog of cases and lagged far behind her colleagues in both number of opinions and the time it takes to issue them. Even more troubling, multiple court personnel have reported her memory loss, lack of focus, confusion over simple matters, uncharacteristic paranoia, and inability to perform simple tasks. At one point, Judge Newman threatened to have a member of her own chambers staff forcibly removed from the building and arrested. At various other points, she berated the Federal Circuit's IT personnel and accused the court of hacking her computer.

Recognizing this type of sensitive scenario, Congress enacted legislation by which the federal judiciary can police itself. At two different times, 11 circuit judges on the Federal Circuit's Judicial Council unanimously voted to suspend the assignment of new cases to Judge Newman due to her substantial case backlog and her delays in issuing decisions. *See* 28 U.S.C § 332(d)(1) ("Each judicial council shall make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit."). On a separate track, the Chief Judge invoked the Judicial Conduct and Disability Act of 1980 and its implementing rules (JC&D Rules) promulgated by the Judicial Conference of the United States, which lay out a reticulated process for certain federal judges to investigate and sanction their colleagues with layer upon layer of review by numerous Article III judges. *Id.* §§ 351–64. Under the Act and JC&D Rules, the Chief Judge identified a complaint against Judge Newman and appointed a special committee of three circuit judges to investigate her potential disability. The Special Committee then conducted over 20 witness interviews, examined case-

related statistics from the Clerk's Office, and consulted with an expert physician, ultimately developing significant evidence that Judge Newman is unable to continue as an active judge.

Unfortunately, the Committee was unable to reach a conclusion about Judge Newman's disability because she repeatedly refused to comply with the Committee's common-sense requests that she undergo specified cognitive testing, provide specified medical records, or even participate in an interview with the Committee. For that reason, in a 111-page Report & Recommendation, the Committee found that Judge Newman had committed misconduct; it recommended that she be suspended from hearing new cases for one year or until she co-operates with the Special Committee. That recommendation is now before 11 circuit judges on the Judicial Council; a decision from that body is anticipated soon. And that decision will then be reviewed by the Judicial Conference through its Committee on Judicial Conduct and Disability (JC&D Committee), composed of seven federal judges from across the country.

Judge Newman now asks this Court to intervene in decisions that Congress intended numerous other federal judges to make. Worse yet, she attempts to do so by challenging two statutes that have long enabled the judiciary to effectively govern itself. While no one questions Judge Newman's many contributions to the law, her legal claims here are jurisdictionally deficient and meritless. The Court should dismiss her case and deny her preliminary-injunction motion.

At the outset, Plaintiff's case suffers from fatal jurisdictional flaws. First, all of Plaintiff's claims are precluded by the Act's judicial-review bar: "all orders and determinations . . . shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." 28 U.S.C. § 357(c). While it is true that the Act does not bar judicial review of judicial council determinations *outside* the Act, all of Plaintiff's claims (as currently pled) entail as-applied challenges that the D.C. Circuit has found precluded. *See McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52 (D.C. Cir. 2001). Second, Plaintiff's suit is, at bottom, no more than collateral litigation over issues that should be reviewed elsewhere. This Court has no original jurisdiction to review the actions of its own circuit's judicial

council, let alone the Federal Circuit's.  If Plaintiff desires judicial review of judicial council orders outside the Act's review procedures, she must seek review in a court with appellate jurisdiction over the Federal Circuit.  That's how Judge Chandler proceeded in his seminal case: he sought review of a Tenth Circuit judicial council order directly in the Supreme Court.  *See Chandler*, 398 U.S. at 79.  There, the Supreme Court found it unnecessary to determine whether such review was available.  Likewise, this Court need not definitively resolve that question; it need only recognize that her suit here is misplaced.

If this Court nonetheless reviews the merits of Plaintiff's preliminary-injunction motion, relief is still unavailable.  There is no merit to Plaintiff's contentions that the Act is unconstitutional because it authorizes suspension of case assignments—which the Special Committee has recommended to the Judicial Council as a sanction here—and allows judges to perform both investigative and adjudicatory roles.  *See* 28 U.S.C. § 354(a)(2)(A)(i).  On the former, the D.C. Circuit has already rejected Plaintiff's argument; judicial discipline short of impeachment does not constitute an improper removal from office.  *McBryde*, 264 F.3d 52.  The latter is likewise foreclosed by precedent.  Decades ago, the D.C. Circuit found no "unconstitutional risk of bias" or "risk of actual bias" through the combination of investigative and adjudicative functions in the Act.  *Hastings v. Jud. Conf. of U.S.*, 829 F.2d 91, 104 (D.C. Cir. 1987) ("*Hastings II*").  Plaintiff also challenges the Judicial Council's currently operative order, issued under 28 U.S.C. § 332(d), suspending new case assignments to Judge Newman because of her substantial case backlog and delays in issuing opinions.  But the text, history, purpose, and case law of § 332(d) make clear that it has always allowed a judicial council to suspend case assignments to a particular judge.  So the Court should either dismiss the challenges raised in Plaintiff's preliminary-injunction motion or find no likelihood of success and deny the motion.  Indeed, given fundamental principles of comity and exhaustion, this Court should, at a minimum, decline to hear this case and dismiss the entire suit.

If this case is not dismissed, the remaining equitable factors also weigh heavily against an injunction.  Plaintiff seeks to enjoin (a) the currently operative order suspending new case

assignments, and/or (b) the proceedings under the Act that might lead to a similar suspension. But Judge Newman's claim of irreparable harm is undermined by her nearly three-month delay in first moving for "emergency" relief. In any event, no judge has a right to hear particular cases, and she still has old cases to work through. The public interest, moreover, would be ill-served by this Court overriding the judgment of the Judicial Council and restoring Judge Newman to the bench during the temporary suspension currently in place. Such an order would only further interfere with the Federal Circuit's work, causing that court's judges, litigants, and counsel to suffer. Nor would it serve the public interest to interrupt proceedings under the Act, especially because those proceedings are quite far along and the (imminent) decision by the Judicial Council will be reviewed by the JC&D Committee. If Plaintiff's preliminary-injunction motion can be heard at all, it should be denied.

## BACKGROUND

### I.   Judge Newman displays a pattern of concerning behavior.

Everyone agrees that, with 39 years of judicial service, Judge Newman has had a long, distinguished career on the federal bench. Over the last two years, however, she has repeatedly exhibited troubling behavior, both interpersonally and in producing the work demanded by her job.

On the interpersonal side, multiple court personnel have reported behavior that has called into question Judge Newman's ability to perform her duties as an active Federal Circuit judge. Those reports included information indicative of memory loss, a lack of focus, confusion over simple matters, uncharacteristic paranoia, and an inability to perform simple tasks. Ex. K, May 16 Order at 7.[1] For example, Judge Newman has in the past year repeatedly told court staff that her telephones are bugged and her computers have been hacked, despite the IT staff finding no such evidence. *Id.* at 7–8. Instead, "[s]taff indicated that her claims about hackers usually stemmed from her having forgotten where she saved a file or email, and even

---

[1] Lettered exhibits refer to Plaintiff's exhibits attached to her amended complaint (ECF No. 15-1); numbered exhibits refer to Defendants' exhibits attached hereto.

after the IT staff would locate the file or email" she would "continue to allege that hackers were responsible for hiding the file." *Id.* at 8.  Staff have also reported that Plaintiff's ability to perform basic tasks—such as logging into her computer, bringing case materials to court, or recalling just-occurred information or events—has markedly declined. *Id.* at 7–9.  There have been various reports that staff must "assist her repeatedly with the same tasks, as she seems unable to remember how to perform them from one day to the next." *Id.* at 9.  Judge Newman has even refused to comply with a court rule that requires circulation of opinion votes within five days—a rule adopted unanimously in 2018 by the Federal Circuit, including a vote from Judge Newman—instead telling her staff that she had the supposed permission of a prior chief judge who has been dead for almost 17 years and had not been on the court for 32 years. *Id.* at 9.

In the past several months, Judge Newman has also had an escalating series of disputes with her own chambers staff, which resulted in multiple Employment Dispute Resolution matters (EDR) and the resignation of two employees, both of whom requested no further contact with the judge. *Id.* at 9–10; *see also* Ex. F, April 20 Order at 1–6.  During those disputes, Judge Newman refused to participate in the EDR process and improperly disclosed a confidential personnel matter to virtually the entire court staff of the Federal Circuit.  Ex. K, May 16 Order at 9.  Her concerning did not end there: Judge Newman retaliated against a staff member who sought to raise employment concerns by "instruct[ing] her staff to no longer include [the staff member] in chambers' communications, including work-related emails" and by altering the scope of the staff member's duties.  Ex. F, April 20 Order at 2.  After Chief Judge Moore and the court's Director of Workplace Relations allowed the staff member to move outside Judge Newman's chambers, Judge Newman nonetheless directed the staff member to return to chambers or face immediate termination. *Id.* at 6.  She also stated her intention to have the staff member "removed from the building and arrested" and "threaten[ed] litigation at the Supreme Court and suggest[ed] that all of this would be on the

front page of the Washington Post." *Id.* After he resigned due to claimed abusive and retaliatory treatment by Judge Newman, and requested no further contact from her, Judge Newman emailed all judges indicating, "I have not released my paralegal [] from my chambers staff." Ex. K, May 16 Order at 10–11.

Judge Newman also attempted to compel a law clerk to work on the Act-related proceedings in this matter. Ex. F, April 20 Order at 8. And when that law clerk asked for reassignment to a different judge, Judge Newman "informed Law Clerk that his only options were to stay or resign." *Id.* He resigned, requesting no further contact with Judge Newman. Ex. K, May 16 Order at 10. But even after Judge Newman agreed that his resignation should be processed, she sent an email to all judges saying his reassignment was inappropriate and she had not "released" him from his service to her. *Id.* Later, in response to questions seeking basic information about her duties and her perceptions of Judge Newman's mental fitness, Judge Newman's career clerk—on advice of counsel—invoked her Fifth Amendment right to remain silent and avoid incriminating herself. *Id.* at 11.

Troubling interactions with Judge Newman have not been limited to her chambers staff. Court staff from the Office of General Counsel, Human Resources, the Clerk's Office, and the IT Department have all submitted sworn testimony detailing troubling and inappropriate interactions with Judge Newman. Ex. 1, Special Committee Report at 33–50.[2] Staff have variously described Judge Newman in their interactions as "aggressive, angry, combative, and intimidating"; "bizarre and unnecessarily hostile"; making "personal accusations"; "agitated, belligerent, and demonstratively angry"; and "ranting, rambling, and paranoid." *Id.* at 6. Interactions with Judge Newman have become so dysfunctional that the Clerk of the Court has advised staff to avoid interacting with her in person or, if such interaction is unavoidable, to bring a co-worker with them. *Id.*

---

[2] The voluminous exhibits to the Special Committee Report are omitted from Defendants' exhibit but are available online here.

As the Special Committee detailed in its Report & Recommendation, Judge New-man's troubling interactions with staff have not abated and are continuing to create workplace conduct concerns. *Id.* at 106–09.  In a single two-day period from July 6 to July 7, more than two dozen emails passed between Judge Newman and the Director of IT, the IT Help Desk Manager, and the Clerk of Court. *Id.* at 107–08.  She alleged that they stole her computer and files, despite their repeated explanation that her files are on her chambers' shared drive and that no files or computers were stolen. *Id.*  After dozens of emails explaining to Judge New-man over and over where her files can be found, and repeated offers to show her where the files are on her own computer, the Clerk of Court stated, "I am at a loss for how different a way I can again explain what I have explained to you repeatedly for months.  Your files are on your network drive.  You have access to everything." *Id.* at 108.  Judge Newman then accused the staff of "clever dissembling," being "shameful," and engaging in "trickery." Ex. 1, Special Committee Report at 107.  Judge Newman's interactions with court staff con-tinue to create concerns, as various employees have said that their recent encounters with Judge Newman have caused them serious anxiety, stress, and discomfort. *Id.* at 7, 48–49.

On the productivity side, Judge Newman has displayed an "apparent inability to issue opinions in a timely fashion" while amassing an "abnormally large backlog in cases." Ex. O, June 5 Order at 1.  Not only has she issued far fewer opinions than her active-judge colleagues, but she has taken far longer to issue those opinions.  For example, in the 18-month period between October 2021 and March 2023, Judge Newman issued 10 majority opinions while the other active judges each averaged 58 majority opinions. *Id.* at 4 (citing Ex. K, May 16 Order at 13).  Even accounting for Judge Newman's greater rate of dissenting opinions, she issued only 28 total opinions compared to an average of 61 for the other active judges. *Id.* Beyond the lower productivity rate, Judge Newman's time to issue opinions was more than three times longer than her active-judge colleagues—they averaged 58 days, while Judge Newman took 199 days. *Id.*  By March 2023, "Judge Newman had nine opinions pending, four of which were over 120 days old and one of which was 454 days old." *Id.* at 2.  And by

7

June 2023, Judge Newman still had a backlog of "seven opinions, three of which have been pending for over 200 days and all of which have been pending for over 100 days." *Id.* at 3.

Despite forgoing significant portions of judicial work, Judge Newman has struggled to perform the work of her office. For example, in January 2021, Judge Newman agreed to no longer sit on motions panels, "which are a routine responsibility of all active judges." Ex. A, March 24 Order at 1; Ex. O, June 5 Order at 4. She participated in only 60 cases between June 2022 and March 2023 while the other active Federal Circuit judges averaged almost double that number. Ex. A, March 24 Order at 1; Ex. O, June 5 Order at 3. Against that backdrop, Judge Newman was still "unable to make any significant progress on addressing her opinion backlog despite having three law clerks" and "having no new cases assigned for April, May, June, or July" 2023. Ex. O, June 5 Order at 3–4. This backlog "would have been even larger if there had not been several interventions over the previous 18 months in which cases had been reassigned from her to another judge following unnecessary delay and the circulation of draft opinions that no other member of the panels would join." *Id.* at 2. Put simply, Judge Newman "took four times as long to write half the opinions while sitting on half the number of cases as her colleagues." Ex. 1, Special Committee Report at 3.

## II.  Congress established self-policing mechanisms for the Judiciary.

Congress established mechanisms for the Judiciary to address problems exactly like those raised by Judge Newman's situation. At the outset, the Constitution protects judicial independence through its guarantees of life tenure and undiminished salary during good behavior. *See* U.S. Const. art. III, § 1. While those measures undoubtedly preclude removal or diminution of pay outside the constitutional impeachment process, they have never been understood to preclude all other measures of managing the Judiciary.

With minor legislation in 1922 and then major legislation in 1939, Congress formalized lower-court governance. First, Congress created the Conference of Senior Circuit Judges, now the Judicial Conference of the United States. *See* Pub. L. No. 67-298, 42 Stat.

837, 838, *codified as amended* at 28 U.S.C. § 331 *et seq.* But more changes were deemed appropriate to ensure Article III independence. Those changes came in 1939 when Congress established the Administrative Office of the U.S. Courts and separate judicial councils in each circuit. *See* Administrative Office Act of 1939, Pub. L. No. 76-299, 53 Stat. 1223; Harlington Wood, Jr., *Judiciary Reform: Recent Improvements in Federal Judicial Administration*, 44 Am. U. L. Rev. 1557, 1562 (1995). Overall, the Conference, the councils, and the Administrative Office advanced the Judiciary as a fully independent Branch in charge of its own policies, operations, and resources.

A key part of the Judiciary's independence is embodied in 28 U.S.C. § 332, which created and empowered judicial councils. "The language of [that section] was recommended to the Congress in 1939 by the judges themselves and was deliberately worded in broad terms in order to confer broad responsibility and authority on the judicial councils." Judicial Conference of the United States, *Report on the Powers and Responsibilities of the Judicial Councils* at VI (July 5, 1961) ["JCUS Report"] (Foreword by Hon. Emanuel Celler), attached as Ex. 2. As later modified, § 332 provides: "Each judicial council shall make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." 28 U.S.C. § 332(d)(1). When § 332 came before the Supreme Court in 1970, it noted that the provision gave "judges a statutory framework and power whereby they might 'put their own house in order.'" *Chandler*, 398 U.S. at 85. And although the Court disposed of the case on other grounds, it recognized that court rules refusing to assign "more cases until opinions and orders issue on [a judge's] backlog" are "reasonable, proper, and necessary rules, and the need for [their] enforcement cannot reasonably be doubted." *Id.* To give further definition to the judicial council's authority, however, the Supreme Court noted that some "[l]egislative clarification" would be helpful. *Id.* at 85 n.6.

Congress responded 10 years later with the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980. Pub. L. No. 96-458, § 3, 94 Stat. 2035, 2036–40; *see* H.R. Rep. No. 96-1313, at 7, 96th Cong., 2d Sess. 10 (1980) (citing *Chandler*, 398 U.S. at 85). The

Act was meant as an overlay on the judicial councils' "broad" § 332 authority by "essentially recodif[ying] the existing language that the courts have worked with over the last forty years." H.R. Rep. No. 96-1313, at 9.  Under § 332's "broad mandate," judicial councils were still empowered to take actions like "ordering [judges] to decide cases long held under advisement" or "requiring a judge to forego his summer vacation in order to clear his congested docket."  *Id.*  So the Act "preserve[d] the breadth and flexibility of the original legislation," which places no "restraint on the council at all."  *Id.* at 9 & n.27; *see* 28 U.S.C. § 362.  ("Except as expressly provided in this chapter [28 U.S.C. §§ 351–64], nothing in this chapter shall be construed to affect any other provision of this title . . . .").

But the Act also importantly "create[d] a mechanism and procedures within the judicial branch of government to consider and respond to complaints against Federal judges" in order to "improve judicial accountability and ethics" and the "appearance of justice" while "maintain[ing] the independence and autonomy of the judicial branch of government."  H.R. Rep. No. 96-1313, at 1.  To that end, the Act permits any person to file a complaint with the clerk of a court of appeals alleging that a federal judge in the circuit "has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts" or "is unable to discharge all the duties of office by reason of mental or physical disability."[3]  28 U.S.C. § 351(a). Alternatively, the chief judge of the circuit may "identify a complaint" on the basis of available information. *Id.* § 351(b). Any complaint must be transmitted to the subject judge, *id.* § 351(c), and be "expeditiously review[ed]" by the chief judge, *id.* § 352(a).

After reviewing a complaint, the chief judge has two options: (1) dismiss the complaint; or (2) appoint a "special committee," including herself, to "investigate the facts and allegations contained in the complaint."  *Id.* §§ 353(a), 352(b)(2) (allowing the chief judge to conclude the proceeding where there are no issues of fact, where corrective action has been

---

[3] The Act's procedures are supplemented by the JC&D Rules.  *See* U.S. Courts, *Judicial Conduct & Disability* (last visited September 1, 2023), *available* here.

taken, or where intervening events make further action unnecessary); *id.* § 353(a). The chief judge must provide notice of her action to the complainant and the subject judge. *See id.* §§ 352(b), 353(a)(3). If the chief judge takes the second course—concluding that additional factfinding is necessary—she must appoint a special committee to "conduct an investigation as extensive as it considers necessary." *Id.* § 353(c). The special committee then investigates and "shall expeditiously file a comprehensive written report thereon with the judicial council of the circuit," setting forth the committee's findings and recommendations for "necessary and appropriate action" by the judicial council. *Id.*

Upon receiving the special committee's report, the judicial council "may conduct any additional investigation which it considers to be necessary," *id.* § 354(a)(1)(A), and either dismiss the complaint, *id.* § 354(a)(1)(B), or "take such action as is appropriate to assure the effective and expeditious administration of the business of the courts within the circuit," *id.* § 354(a)(1)(C). That action may include censuring or reprimanding the subject judge, *id.* § 354(a)(2)(A)(ii)–(iii), or ordering that no further cases be assigned to the subject judge "on a temporary basis for a time certain," *id.* § 354(a)(2)(A)(i). The judicial council may request that the subject judge voluntarily take early retirement, *id.* § 354(a)(2)(B)(ii), but may not order an Article III judge removed from office, *id.* § 354(a)(3)(A).

When a judicial council acts on a complaint that was identified by a chief judge, it is automatically reviewed by the Judicial Conference of the United States through its JC&D Committee. *See* JC&D Rule 20(f). In all other cases, once a judicial council has ruled, the Act authorizes a complainant or a subject judge to file a petition for review with the JC&D Committee. 28 U.S.C. §§ 331, 357(a). The Judicial Conference, in its discretion, may itself review a decision of the JC&D Committee. *See* JC&D Rule 21(a). Regardless, Congress was unequivocal that the Conference's review should be the end of the line for proceedings under the Act: "Except as expressly provided in this section and section 352(c), all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." *Id.* § 357(c).

### III.   Judge Newman is suspended from hearing new cases and refuses to cooperate with the Special Committee's investigation.

On March 8, 2023, the Federal Circuit Judicial Council voted to suspend the assignment of new cases to Judge Newman.  *See* Ex. O, June 5 Order at 1.  Judge Newman not only had a significant backlog of cases, but "had already been foreclosed from assignment to any panel for the April sitting because, when cases were being assigned for April in February, her backlog had placed her in violation of Federal Circuit Clerical Procedures."  *Id.* at 2.  So the Judicial Council exercised its authority under 28 U.S.C. § 332(d) to order that Judge Newman should not receive any new case assignments.  *Id.* at 2–3.  The Judicial Council did not take away any of Judge Newman's existing cases or preclude her from participating in en banc cases, petitions for rehearing, or petitions for rehearing en banc.  *Id.*

About two weeks later, Chief Judge Moore identified a complaint of judicial misconduct or disability against Judge Newman in light of her "extensive delays in the processing and resolution of cases" and the many reported concerns "that Judge Newman may suffer from impairment of cognitive abilities (i.e., attention, focus, confusion and memory) that render Judge Newman unable to function effectively in discharging case-related and administrative duties."  Ex. A, March 24 Order at 2.  In doing so, the Chief Judge found "probable cause to believe that Judge Newman's health has left her without the capacity to perform the work of an active judge and that her habitual delays are prejudicial to the efficient administration of justice."  *Id.* at 5.  The Chief Judge gave Judge Newman an opportunity to review the complaint prior to initiating it, and the Chief Judge and other Federal Circuit judges "attempted to see whether a satisfactory informal resolution could be reached to resolve these concerns."  *Id.*  Yet Judge Newman refused attempts at informal resolution.  Chief Judge Moore then appointed a Special Committee under the Act to investigate the allegations.

Following its appointment, the Special Committee moved expeditiously to investigate the complaint against Judge Newman.[4]  But it was frustrated from the outset by her refusal to cooperate with its orders that she undergo neurological and neuropsychological examinations, provide relevant medical records, and participate in an interview.  *See* Ex. K, May 16 Order at 1–2.  The Special Committee's investigation included more than 20 interviews with court staff, review of case-processing records, and discussions with a consulting physician (who has experience in judicial-disability matters), which provided "a reasonable basis for the required neuropsychological testing and neurological evaluation" to "determine whether Judge Newman has a disability that renders her unable to perform the functions and duties of her office."  *Id.* at 6–7.  Similarly, the Special Committee ordered medical records from "any treatment provider in the last two years regarding mental acuity, attention, focus, confusion, memory loss, fatigue, or stamina."  *Id.* at 4.  Those records are "obviously relevant to the Committee's inquiry into whether Judge Newman has a disability."  *Id.*  The Special Committee also requested "medical records related to a cardiac event and a fainting episode," which are "standard practice for a treating neurologist to consider" in "evaluating impairment issues like those presented here."  *Id.* at 5–6.  Finally, the Special Committee twice requested an interview with Judge Newman.  *Id.* at 23–24.

Despite addressing confidentiality concerns by having Judge Newman provide her records directly to the examining neurologist rather than the Committee itself, she refused to undergo any testing or provide any medical records.  *See* Ex. N, June 1 Order at 1–2.  And despite Judge Newman alleging that the orders in this matter are "riddled with errors," *see,*

---

[4] While the Special Committee's work began by investigating concerns over Plaintiff's backlog, delay, and fitness to perform her duties, Chief Judge Moore, at the recommendation of the Committee, has on three occasions expanded the scope of the investigation.  *See* JC&D Rule 13(a) (authorizing a special committee to expand an investigation to new matters).  These include Judge Newman's court-wide disclosure of confidential details regarding an employment dispute and her potential abusive and retaliatory acts against court staff.  *See* Ex. B, April 6 Order at 4–6; Ex. F, April 20 Order at 6; Ex. M, May 26 Order at 3.

*e.g.*, Am. Compl. ¶ 20, ECF No. 10, she has also refused to participate in an interview with the Committee to explain any supposed errors. *See* Ex. T, May 25 Letter at 3 (Judge Newman refusing to participate in an interview).

Given "the practical constraints that Judge Newman's refusal to cooperate places on the Committee's ability to proceed," the Special Committee issued a June 1, 2023 order "narrowing its investigation . . . to whether the failure to cooperate constitutes misconduct."[5] Ex. N, June 1 Order at 2, 4.  The Committee then focused solely on "whether Judge Newman's responses to the Committee's orders constitute 'refusing, without good cause shown, to cooperate in the investigation.'" *Id.* at 4 (quoting JC&D Rule 4(a)(5)).  Following briefing from Judge Newman's counsel, the Committee heard oral argument on July 13, 2023.

In parallel, "Judge Newman requested that she immediately be restored to the rotation of new case assignments."  Ex. O, June 5 Order at 1.  The Special Committee referred that request to the Judicial Council, which "constru[ed] it as a request for reconsideration of the Council's prior decision [of March 8, 2023]." *Id.* at 1–2.  As the Council explained, however, its concerns about Judge Newman's "abnormally large backlog of cases and her apparent inability to issue opinions in a timely fashion" had not abated but had increased since March. *Id.* at 3.  As noted above, by June 2023 Judge Newman had issued only two of the nine opinions comprising her March backlog, despite having no new cases assigned for four months and no motions assignments.  Each of the seven remaining opinions—all of which Judge Newman had assigned to herself—had been pending for over 100 days, and three had been pending for over 200 days. *Id.* at 3–4.  So, after *de novo* reconsideration, the Judicial Council concluded that Judge Newman "is not expeditiously carrying out the work of the Court" and that "assigning her new cases will only further interfere with expeditious execution of the work of the Court." *Id.* at 4.  Exercising its authority under § 332, the Judicial Council ordered

---

[5] The Special Committee concurrently released to Judge Newman "all affidavits and deposition transcripts that the Committee has gathered to date," which included the case-processing records considered by the Committee.  Ex. N, June 1 Order at 4–5.

that Judge Newman "be excluded in the rotation for new case assignments at this time . . . pending further order of the Judicial Council." *Id.* at 6.[6]  Again, the Judicial Council did not take away any of Judge Newman's existing cases or preclude her from participating in en banc cases, petitions for rehearing, or petitions for rehearing en banc.  *Id.*  Despite six months of no new case assignments and over two years of no motions panels, Judge Newman still has a backlog of three opinions that have been pending an average of 257 days, the longest of which is the oldest pending Federal Circuit opinion at 332 days.  *See* Declaration of Jarrett B. Perlow ("Perlow Decl.") ¶ 11.

On July 31, 2023, the Special Committee issued its Report & Recommendation to the Federal Circuit's Judicial Council.  In its 111-page Report, the Committee first concluded that the evidence developed during its investigation "clearly established that there is, at a minimum, a reasonable basis for concluding that Judge Newman may suffer from a disability that renders her unable to perform the duties of her office."  Ex. 1, Special Committee Report at 31.  This was based on, among other things, (1) the reports "of memory loss, confusion, agitation, paranoia, and an increasing inability at times to perform simple, routine tasks necessary to carry out her duties as an active judge"; (2) "Judge Newman's backlog and delays in the processing of cases compared to her colleagues"; and (3) the recommendation of the Committee's consulting expert.  *Id.* at 59–60.  The Committee further concluded that "Judge Newman's failure to cooperate with the Committee's orders constitutes misconduct" under the Act because that refusal "seriously undermined the Committee's ability to carry out its

---

[6] Although not necessary to its opinion, the Judicial Council observed that the publicly available orders of the Special Committee included information "rais[ing], at a minimum, a reasonable concern that Judge Newman may suffer from a disability that renders her incapable of carrying out the duties of her office and thus incapable of issuing her opinions more promptly."  Ex. O, June 5 Order at 5.

duties under the Act" and "prevented [the Committee] from making its disability determination on the soundest basis, which includes the medical examinations and records at issue." *Id.* at 60–61.

The Special Committee also performed an extensive analysis of Judge Newman's objections and concluded that she had not shown good cause that would excuse her refusal to cooperate.  *Id.* at 64–108.  In doing so, the Special Committee carefully considered and rejected Judge Newman's arguments that (1) the Special Committee's and Judicial Council's proceedings violated her due process rights, *id.* at 64–76; (2) the Committee and the Judicial Council are biased against her, *id.* at 76–86; (3) the Chief Judge or Judicial Council should have asked the Chief Justice to transfer the matter to a different circuit council, *id.* at 86–92; (4) Judge Newman had actually cooperated with the Committee's orders, *id.* at 92–98; (5) a brief examination by Judge Newman's self-selected neurologist obviated the need for the ordered examinations, *id.* at 98–104;[7] and (6) the Committee's evidence was inadequate to support its orders, *id.* at 104–09.

Based on its finding of misconduct and "the extensive evidence establishing, at a minimum, a reasonable basis for concern that Judge Newman suffers from a disability," the Special Committee unanimously recommended to the Judicial Council that she not be permitted to hear any new cases "for the fixed period of one year or at least until she ceases her misconduct and cooperates such that the Committee can complete its investigation, whichever comes

---

[7] Plaintiff has insisted that a "recent examination by Ted L. Rothstein, M.D." demonstrated Judge Newman's "cognitive function" as "sufficient to continue her participation in her court's proceedings."  Mem. of Law in Supp. of Pl's Mot. for Prelim. Inj. (Pl.'s Br.) at 26, ECF No. 13-1 (quoting Ex. Y).  But as the Committee explained, Dr. Rothstein's one-and-a-half-page report—produced after administering part of a 10-minute test—not only "shows internal inconsistencies on critical points," but itself states "that Judge Newman missed four of the five points on the memory section of the test."  Ex. 1, Special Committee Report at 98–104.  Judge Newman also refused to detail what, if any, medical records (or other materials) Dr. Rothstein considered in forming his opinion.  *Id.* at 98.  The Committee gave "no weight" to Dr. Rothstein's report.  *Id.*

sooner." *Id.* at 110–11. The "self-policing mechanism Congress created" in the Act, the Special Committee reasoned, "would be a nullity" if a subject judge could bring the process "to a grinding halt simply by flouting the rules and refusing to cooperate." *Id.* at 110. Judge Newman's refusal to comply with the Committee's orders was "a serious matter" that stymied the Committee's fulfillment of its responsibilities under the Act, a role that "is essential for the proper functioning of the judiciary." *Id.* at 109.

Judge Newman filed her response to the Special Committee's Report with the Judicial Council on August 31, 2023. The matter is currently pending before that tribunal.

**IV.   Judge Newman asks this Court to review the decisions of 11 other federal judges on the Federal Circuit's Special Committee and Judicial Council.**

During the Special Committee's ongoing investigation, Judge Newman originally filed this action on May 10, 2023, and later filed her first-amended complaint on June 27, 2023. Compl., ECF No. 1; Am. Compl., ECF No. 10. In her amended complaint, Plaintiff asserts eleven counts of constitutional claims challenging the Judicial Council's June 5 Order suspending new case assignments and various events in the proceedings under the Act. *See generally* Am. Compl. ¶¶ 80–134. *See id.* Plaintiff also moved for a preliminary injunction in conjunction with her first amended complaint, pressing only her arguments that she has been (or will be) improperly removed from office and that the Act proceedings deprive her of due process. *See* Pl.'s Mot. for Prelim Inj., ECF No. 12; Mem. of Law in Supp. of Pl's Mot. for Prelim. Inj. (Pl.'s Br.) at 26, ECF No. 13-1. Defendants now move to dismiss Plaintiff's complaint and oppose Plaintiff's preliminary-injunction motion.

## LEGAL STANDARDS

For both Rule 12(b)(1) and 12(b)(6) motions to dismiss, "a complaint must plead facts that, if accepted as true, state a plausible claim to relief." *Grell v. Trump*, 330 F. Supp. 3d 311, 316 (D.D.C. 2018) (Cooper, J.); *Giliana v. Blinken*, 596 F. Supp. 3d 13, 17 (D.D.C. 2022) (Cooper, J.). On the 12(b)(1) side, "[f]ederal courts are courts of limited jurisdiction and the law presumes that a cause lies outside this limited jurisdiction." *Grell*, 330 F. Supp. 3d at 316

(quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  So "[t]he plaintiff bears the burden of establishing jurisdiction." *Postal Police Officers Ass'n v. U.S. Postal Serv.*, 502 F. Supp. 3d 411, 417 (D.D.C. 2020) (Cooper, J.).  And on the 12(b)(6) side, a claim is only "plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Harbour v. Univ. Club of Washington*, 610 F. Supp. 3d 123, 130 (D.D.C. 2022) (Cooper, J.).

Granting Defendants' motion to dismiss would obviate any need to consider Plaintiff's preliminary-injunction motion.  But even if Defendants' motion is denied, a preliminary injunction "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Postal Police Officers*, 502 F. Supp. 3d at 418 (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).  In making that "clear showing," a plaintiff must demonstrate: "(1) that it is likely to succeed on the merits of its claim; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that a preliminary injunction is in the public interest." *Id.*  Where the federal government opposes the motion, the final two factors partly merge because "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  But a failure to meet either of the first two factors—likelihood of success and irreparable harm—is always "fatal" to a plaintiff's motion. *Postal Police Officers*, 502 F. Supp. 3d at 418.

## ARGUMENT

All of Plaintiff's claims are barred from judicial review; they should be dismissed, and her preliminary-injunction motion should be denied as moot.  But even if the Court reached the merits of Plaintiff's motion, her challenges should be rejected.

I.     **All of Plaintiff's claims are barred from judicial review.**

A.     **The Judicial Conduct & Disability Act bars judicial review of Plaintiff's challenges to actions taken or contemplated under the Act.**

At the outset, all of Plaintiff's claims must be dismissed because the Act expressly precludes collateral judicial review of all orders and determinations under the Act. Section 357(c)—entitled "No judicial review"—could hardly be clearer: "Except as expressly provided in this section and section 352(c), all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise." 28 U.S.C. § 357(c). The exception in the first clause of § 357(c) authorizes judicial review only *within* the Act's framework; the Judicial Council may review certain orders of the Circuit's chief judge, *see id.* § 352(c), and the Judicial Conference or its standing committee may review orders of the Judicial Council, *see id.* § 357(a). But the Act does not permit any *outside* court to review decisions of the Special Committee or the Judicial Council.

That's what courts, including the D.C. Circuit, have repeatedly held. *McBryde*, 264 F.3d at 58–64; *In re McBryde*, 117 F.3d 208, 220 n.7 (5th Cir. 1997) ("Congress has made crystal clear its intent that the federal courts as such exercise no appellate jurisdiction" over judicial-conduct-and-disability proceedings.); *United States v. Washington*, 98 F.3d 1159, 1165 n.2 (9th Cir. 1996) (Kozinski, J., concurring) ("The decision of the judicial council is not reviewed by any court; appeal is to the Judicial Conference of the United States."); *Sanai v. Kozinski*, 2021 WL 1339072, at *7 (N.D. Cal. Apr. 9, 2021) ("In Section 357(c), Congress expressly precluded a plaintiff from attempting to relitigate orders and determinations issued by a judicial council."); *Overton v. Torruella*, 183 F. Supp. 2d 295, 306 (D. Mass. 2001) (same); *Cunningham v. Becker*, 96 F. Supp. 2d 369, 373 (D. Del. 2000) (same), *aff'd,* 275 F.3d 34 (3d Cir. 2001). And that makes sense. This is not a jurisdiction-stripping statute that eliminates the involvement of federal judges. Quite the opposite: the Act places the entire process "exclusively in the hands of Article III judges, providing for initial action by one group of such judges" and then "for review by another group." *McBryde*, 264 F.3d at 60. "Having done so,

Congress clearly meant to be understood quite literally when it said" that "orders of the Judicial Conference or relevant standing committee 'shall not be judicially reviewable on appeal.'" *Id.* (quoting 28 U.S.C. § 372(c)(10) (2000)).[8]

Although this judicial-review bar appears categorical on its face, the D.C. Circuit in *McBryde* construed the Act to allow one and only one narrow category of claims: those challenging the *facial* constitutionality of the Act itself.  *McBryde*, 264 F.3d at 58–59.  Such facial challenges, the court reasoned, are to Congress's handiwork, not to particular "orders" or "determinations" made in a judicial-conduct-and-disability proceeding.  *See id.* at 58–64.  But an as-applied constitutional challenge, or a challenge to the statutory authority for a particular decision, falls squarely within the broad preclusive language of § 357(c).  *See id.*

Nothing in the 2002 statutory recodification changes that result.  *See* Pl.'s Br. at 30. Shortly after the D.C. Circuit's decision in *McBryde*, Congress reorganized the Act and provided that "[i]f any provision of this subtitle, an amendment made by this subtitle, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional," the remainder of the statute or "the application of the provisions [ ] to any person or circumstance shall not be affected thereby."  21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273, Div. C, Title I, Subtitle C, § 11044, 116 Stat. 1758, 1856 (2002); *see* Note 8, *supra* (explaining recodification).  That is fully in line with the Act's preexisting no-judicial-review provision, which allows judicial review of "all orders and determinations" only by Article III judges *within* the Act's framework.  28 U.S.C. § 357(c).  Special committees investigate and make recommendations, judicial councils review those recommendations and make decisions, and the JC&D Committee reviews those

---

[8] At the time of *McBryde*, the Act's judicial-review provisions were codified in another section of the Act.  *See* 28 U.S.C. § 372(c)(10) (2000). Congress recodified the statute in 2002, redistributing the substance of old § 372, without material changes, between current § 352 (concerning judicial-council review of final orders of chief circuit judges) and current § 357 (concerning Judicial Conference review of actions by judicial councils).

decisions.  28 U.S.C. §§ 354, 355; *see* JC&D Rules 20–22.  Federal judges in that process may, in the language of the 2002 amendment, hold a statute "to be unconstitutional" on its face or as applied to specific circumstances.  The D.C. Circuit in *McBryde* expressly made that point. *See* 264 F.3d at 62 (admonishing that "the statutory mandate" appears "to contain no language justifying a decision [by the JC&D Committee] to disregard claims that a circuit judicial council has violated a judge's constitutional rights in application of the Act").  And in the wake of *McBryde*, the judges on the JC&D Committee have exercised exactly that authority. *See, e.g.*, *In re Complaint of Judicial Misconduct*, C.C.D. No. 17-01 at 38 (U.S. Jud. Conf. Comm. on Jud. Conduct & Disability Aug. 14, 2017) (noting that the JC&D Committee analyzed and "reject[ed] Judge Adams's constitutional and statutory challenges"), *available* here.  Not surprisingly, other courts have continued to enforce the Act's judicial-review bar without change since 2002.  *See* Pl.'s Br. at 30.  As one court recently explained, "[a]ny challenge to an 'order' or 'determination' in a judicial conduct [proceeding], even when framed in terms of constitutional or statutory authority, cannot proceed."  *Sanai*, 2021 WL 1339072, at *7.

Section 357(c) and *McBryde* therefore compel dismissal of all counts of Plaintiff's amended complaint.  It is true that the Act does not bar review of facial constitutional challenges to the Act itself, nor does it bar review of judicial council determinations outside the Act, like the suspension of case assignments under § 332.  But Plaintiff does not assert a standalone claim challenging the Judicial Council's June 5 Order under § 332; instead, she appears to treat the case-assignment suspension as functionally taken under the Act. And the lone claim that could conceivably raise a facial challenge to the Act necessarily entails an as-applied challenge, which § 357(c) bars.  All of Plaintiff's other claims focus on particular orders or determinations under the Act that are squarely precluded by § 357(c).  Each of these Counts is discussed below.

**Count I.**  This count specifically challenges "Defendants' orders and threats" as "an attempt to remove Plaintiff from office unlawfully."  Am. Compl. ¶¶ 80–84.  Because this

count challenges only Defendants' "orders and determinations"—not the Act itself—judicial review is barred. *McBryde*, 264 F.3d at 62–64.

**Counts II & III.**  To the extent these counts challenge orders and determinations under the Act, they are also barred.  Am. Compl. ¶¶ 85–94.  For example, much like Count I, Count II alleges that "[n]either the Act nor the Conduct Rules authorize" Defendants "to issue any orders or directives which preclude an active Article III judge from being assigned cases in regular order while an investigation is still underway."  *Id.* ¶ 86.  Likewise, while Count III references 28 U.S.C. § 332, it takes issue with Defendants "ordering Plaintiff to undergo an involuntary mental health examination" and "ordering that the scope of the investigation into Plaintiff's conduct be expanded."  *Id.* ¶¶ 91–92.  So while a pure challenge to the Judicial Council's authority under § 332 would not be precluded, Plaintiff's challenge appears to include "orders and determinations" under the Act for which judicial review is barred.  *McBryde*, 264 F.3d at 62–64.

**Counts IV, X, & XI.**  Plaintiff candidly identifies all three of these counts as presenting as-applied constitutional claims to Defendants' "orders and determinations" under the Act.  *See* Am. Compl. ¶¶ 95–99 ("Count IV: Fifth Amendment – As Applied Due Process of Law Violation"); *id.* ¶¶ 127–30 ("Count X: Fourth Amendment – As Applied Challenge"); *id.* ¶¶ 131–34 ("Count XI: Fourth Amendment – As Applied Challenge").  All three are therefore jurisdictionally barred.  *See McBryde*, 264 F.3d at 62–64.

**Count V.**  In Count V, Plaintiff claims that the Act's disability provision is unconstitutionally vague.  Am. Compl. ¶ 103.[9]  But as the Supreme Court has explained, a plaintiff "to whose conduct a statute clearly applies may not successfully challenge it for vagueness."  *Parker v. Levy*, 417 U.S. 733, 756 (1974); *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.,*

---

[9] Although Plaintiff cites no specific provision of the Act that is supposedly unconstitutionally vague, Defendants assume she is referencing the provision that authorizes the filing of a complaint if a "judge is unable to discharge all the duties of office by reason of mental or physical disability."  28 U.S.C. § 351(a).

*Inc.*, 455 U.S. 489, 495 (1982). "A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." *Hoffman Ests.*, 455 U.S. at 495. For this Court to undertake that task, however, would be to perform the very inquiry— deciding an as-applied challenge to the Act—that Congress placed off limits in § 357(c). *See* 28 U.S.C. § 357(c); *see, e.g.*, *Ramsingh v. Transportation Sec. Admin.*, 40 F.4th 625, 636 (D.C. Cir. 2022) ("Because Ramsingh's conduct is 'clearly proscribed' by the regulation, his as-applied vagueness challenge fails."). Plaintiff's attempt to mount a facial challenge to the Act's disability provision is therefore precluded from judicial review.

**Count VI, VII, VIII, & IX.** In each of these four counts, Plaintiff attacks the Special Committee's orders that she undergo a cognitive examination and provide medical records.[10] Because these claims each challenge the Defendants' use of specific investigatory tools to address the allegations in this particular case, they necessarily challenge an "order" or "determination" that are barred by § 357(c). As the D.C. Circuit's decision in *McBryde* makes clear, a constitutional challenge and an *ultra vires* challenge to a special committee's order or chief judge's determination are equally barred by § 357(c).

In sum, all claims of the amended complaint (as currently drafted) are barred from judicial review by § 357(c) and should be dismissed for lack of jurisdiction.

---

[10] *See* Am. Compl. ¶ 108 (asserting in Count VI that requiring "Plaintiff to undergo an involuntary medical or psychiatric examination, or to compel Plaintiff to surrender her private medical records" is "*ultra vires* and unconstitutional"); *id.* ¶ 113 (asserting in Count VII that Plaintiff is harmed by Defendants' "requiring Plaintiff to undergo a compelled medical or psychiatric examination and/or surrendering private medical records and from disciplining Plaintiff for objecting in good faith to these demands"); *id.* ¶ 118 (asserting in Count VIII that the Act violates the Fourth Amendment only "to the extent it authorizes a compelled medical or psychiatric examination of an Article III judge without a warrant based on probable cause and issued by a neutral judicial official or a demonstration of constitutional reasonableness"); *id.* ¶ 124 (asserting in Count IX that the Act violates the Fourth Amendment "to the extent it authorizes a compelled surrender of medical records belonging to an Article III judge without a warrant based on probable cause and issued by a neutral judicial official or a demonstration of constitutional reasonableness").

**B.    This Court lacks appellate jurisdiction to review judicial actions by a judicial council.**

Judge Newman asks for a single district judge to review a unanimous order by 11 Article III circuit judges *and* to prevent these judges from exercising their powers under the Act. Am. Compl. ¶¶ 80–134.  But because the Judicial Council's June 5 Order suspending new case assignments and Plaintiff's Act-related proceedings are judicial in nature, she must seek review in a court with appellate jurisdiction—not a court of original jurisdiction like one.

Any determinations under the Act, by the Judicial Council or its members, are judicial in nature.  "[U]nder the Act, review of judicial misconduct complaints is an act that must be performed by a judge."  *Sanai*, 2021 WL 1339072, at *8.  "The statute creating the Council requires that all members be federal judges, and that the judges, in their capacity as Council members, pass judgment on various complaints."  *Overton v. Torruella*, 183 F. Supp. 2d 295, 305 (D. Mass. 2001).  Because a "judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts," *In re McBryde*, 117 F.3d at 221, "[t]he Judicial Council and the actions it takes are necessarily judicial," *Overton*, 183 F. Supp. 2d at 304–05; *see Adams v. Comm. on Jud. Conduct & Disability*, 165 F. Supp. 3d 911, 922 n.5 (N.D. Cal. 2016).  As a majority of the en banc Eleventh Circuit concluded: "The ordinary meaning of 'judicial proceeding' plainly include[s] the process required by the Judicial Conduct and Disability Act." *Pitch v. United States*, 953 F.3d 1226, 1245 (11th Cir. 2020) (en banc) (Pryor, J., joined by six other judges of 12-judge en banc court, concurring).  The Act itself even recognizes that its proceedings involve "judicial[] review[]," both by the Council and the JC&D Committee, all of whom are Article III judges.  28 U.S.C. § 357(c); *see id.* §§ 352(c); *id.* § 357(a).

Viewed another way, Act-related inquiries are akin to attorney-disciplinary proceedings and bar admissions that have long been considered "judicial" in nature.  *See D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 477, 479 (1983) (waiving an attorney bar-admission requirement, for which a court was "called upon to investigate, declare, and enforce liabilities," is "judicial in nature"); *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1871) (attorney-disbarment

order is a "judicial act" performed "in the exercise of . . . judicial functions"); *Partington v. Gedan*, 961 F.2d 852, 866–67 (9th Cir. 1992) (interpreting and enforcing state bar disciplinary rules are "judicial" functions); *Sparks v. Character & Fitness Comm.*, 859 F.2d 428, 434 (6th Cir. 1988) (denying admission to a state bar is "judicial" in nature); *LaNave v. Minnesota Sup. Ct.*, 915 F.2d 386, 387 (8th Cir. 1990) (same); *Sanai*, 2021 WL 1339072, at *8 ("[C]ourts have [ ] found that [judges] considering disciplinary measures for attorneys qualify for absolute immunity" because they are performing "judicial" functions.). As the Eleventh Circuit put it, "there is no reason to distinguish judicial disciplinary proceedings from those of attorney disciplinary proceedings or from [the Fifth Circuit's] decision in *McBryde* calling these proceedings 'judicial in nature.'" *Pitch*, 953 F.3d at 1247 (Pryor, J., joined by six other judges of 12-judge en banc court, concurring) (quoting *In re McBryde*, 117 F.3d at 221).

The same is true for the kind of workload-related judicial council determination at issue here. The judicial council "was designed as an actual participant in the management of the judicial work of the circuit." *Chandler*, 398 U.S. at 98 (Harlan, J., concurring). It is "authorized to hold hearings, to take sworn testimony, and to issue subpoenas and subpoenas duces tecum." 28 U.S.C. § 332(d)(1). Importantly, judicial councils also have broad authority to "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." *Id.* § 332(d)(1). And when a judicial council uses that authority to suspend new case assignments (as here), it is rooted in particular "factual circumstances"— that is, "the business of a particular judge or judges and the status of a particular case or cases." *Chandler*, 398 U.S. at 107–08 (Harlan, J., concurring). Like a suspension order issued under the Act, it has the "nature and effect" of determining a judge's "present right" to hear cases by evaluating "present or past facts" under current laws and policies.[11] *Feldman*, 460 U.S. at 477, 481 (explaining that the adjudication of a "present right" is "the essence of a

---

[11] That's why Plaintiff has standing to sue. But any effect on Judge Newman's "present right[s]" is unrelated to specific cases and is hardly irreparable. *See* Argument § IV.A., *infra*.

judicial proceeding"); *Pitch*, 953 F.3d at 1246 (Pryor, J., joined by six other judges of 12-judge en banc court, concurring) (applying this standard and noting that "temporarily ordering that no other cases be assigned" affects a judge's "present right[s]"); *In re McBryde*, 117 F.3d at 221 (applying this standard to case-reassignment orders and finding those decisions are judicial in nature); *Ellerbe v. Jud. Council for the Third Cir.*, 2023 WL 2163900, at *2 n.3 (E.D. Pa. Feb. 22, 2023) (noting that judicial immunity would apply to "acts taken by the Judicial Council" because they "are judicial in nature").  So when "performing its central responsibilities under 28 U.S.C. § 332" to direct case assignments, a judicial council "exercises judicial power granted under Article III."  *Chandler*, 398 U.S. at 110 (Harlan, J., concurring); *id.* at 135 (Douglas, J., dissenting) (When a Judicial Council "moves to disqualify a judge from sitting" it is "an inferior judicial tribunal over which [the Supreme Court] ha[s] appellate jurisdiction"); *In re McBryde*, 117 F.3d at 221.

Because all the actions at issue are judicial in nature, they would be reviewable only in a tribunal with appellate jurisdiction over those actions, not a court of original jurisdiction like this one.  *Chandler*, 398 U.S. at 86; *id.* at 96 (Harlan, J., concurring); *id.* at 135 (Douglas, J., dissenting); *In re McBryde*, 117 F.3d at 219–21; *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 175 (1803) (Marshall, C.J.).  Federal courts have "only the jurisdiction that Congress grants [ ] by statute."  *In re McBryde*, 117 F.3d at 220.  Yet, crucially, Plaintiff "identifies no statute granting a right of review of Judicial Council action to this court, and we have found none."  *Id.*  That's not surprising: as the Supreme Court has emphasized, district courts "are empowered to exercise original, not appellate, jurisdiction."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005); *see Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923) ("The jurisdiction possessed by the District Courts is strictly original.").

If the Fifth Circuit had no jurisdiction to review orders of its *own* judicial council, certainly a district court has no jurisdiction to enjoin the judicial council of an entirely *different circuit*.  *Id.* at 220–21 (noting that the Fifth Circuit "lack[s] direct appellate jurisdiction" over its judicial council just as it "lack[s] jurisdiction over district courts outside of this circuit").

"Needless to say, a district court has no [ ] authority to 'review' any ruling of a court of appeals." *Mullis v. U.S. Bankr. Ct. for Dist. of Nevada*, 828 F.2d 1385, 1393 (9th Cir. 1987). So "direct review by a district judge of the actions of circuit judges would present serious incongruities and practical problems certainly not contemplated" by Congress. *Chandler*, 398 U.S. at 93–94 (Harlan, J., concurring); *id.* ("[T]here is no indication that" Congress "empower[ed] the District Courts to issue mandamus" or similar orders "to other judicial tribunals.").[12] That's why the Act only authorizes judicial review by the councils themselves and the Judicial Conference *within* the Act's framework; it bars any other judicial review. 28 U.S.C. § 357(c).

When that bar does not apply, the appropriate tribunal to review a judicial council's orders would be one with appellate jurisdiction over them. In *Chandler*, the Supreme Court found it unnecessary to resolve whether it possessed such jurisdiction. *See Chandler*, 398 U.S. at 88–89 (referring to the "knotty jurisdictional problem" presented and concluding that "whether [the Judicial Council's action] is reviewable here, plainly petitioner has not made a case for the extraordinary relief of mandamus or prohibition"). Similarly, this Court need not determine whether review of the Judicial Council's action is available in the Supreme Court (by mandamus or otherwise). Instead, it is sufficient to recognize that the judicial actions of 11 circuit judges here render those actions unsuitable for review by a district court. *See In re Imperial "400" Nat'l, Inc.*, 481 F.2d 41, 50 (3d Cir. 1973) (Lumbard, J., dissenting) (opining

---

[12] The D.C. Circuit has previously considered the merits of Act-related claims on appeal from cases originally filed in district court. *See McBryde*, 264 F.3d at 64–68; *Hastings v. Jud. Conf. of U.S.*, 770 F.2d 1093, 1103–04 (D.C. Cir. 1985) ("*Hastings I*"). But the D.C. Circuit never considered whether it or the district court lacked jurisdiction for the reason Defendants now raise. So those cases have no bearing on the jurisdictional issue here. *See, e.g., Am. Portland Cement All. v. EPA*, 101 F.3d 772, 776 (D.C. Cir. 1996) ("That the court has taken jurisdiction in the past does not affect the analysis because jurisdictional issues that were assumed but never expressly decided in prior opinions do not thereby become precedents.").

that review of judicial council action is available only by way of "a petition to the circuit council to review its action or a petition for mandamus to the Supreme Court").[13]

Plaintiff's claims against her colleagues should thus be dismissed.  To hold otherwise would raise grave "constitutional questions" that "should [be] avoid[ed]."  *See Hohn v. United States*, 524 U.S. 236, 245–46 (1998) (recognizing the risk in holding that actions are nonjudicial because it "would suggest an entity not wielding judicial power might review" them).

## II.   Plaintiff cannot succeed on the merits of the challenges raised in her preliminary-injunction motion and, if the merits are reached, they should be dismissed.

In her preliminary-injunction motion, Plaintiff argues that (a) the Act has been (or may be) unconstitutionally applied to her, and (b) the Judicial Council lacked authority to suspend her case assignments.  *See* Pl.'s Br. at 30–54.  For the reasons discussed above, the Court should dismiss this case without reaching the merits of *any* claims, let alone the challenges raised in her motion.  But if the Court reaches those issues, it should reject them as meritless and dismiss.  The Court may therefore deny Plaintiff's preliminary-injunction motion as moot, or find no likelihood of success on the challenges in her motion and simply deny it.

### A.   Plaintiff's Act-related constitutional challenges are meritless and fore-closed by binding precedent.

In her preliminary-injunction motion, Plaintiff raises certain aspects of her constitutional challenges to the Act.  First, she seems to argue that the Act's authority to suspend case assignments—which the Special Committee has recommended to the Judicial Council as a sanction—constitutes an improper removal from office without impeachment.  *See* Pl.'s Br. at 39–45; Am. Compl. ¶ 86; 28 U.S.C. § 354(a)(2)(A).  Second, she seems to contend that the

---

[13] Although the panel majority in *Imperial "400"* found jurisdiction, it was only because there was "a district court order capable of being reviewed" that happened to "dr[a]w its substance from the [Judicial] Council's resolution."  *In re Imperial "400" Nat., Inc.*, 481 F.2d 41, 42 (3d Cir. 1973).  The Third Circuit apparently wished to the reconsider that opinion en banc, but the judges were "impelled to recuse [them]selves" and therefore "hope[d] that the Supreme Court w[ould] see fit to review this important matter."  J. Clifford Wallace, *Must We Have the Nunn Bill?*, 51 Ind. L.J. 297, 322 (1976).  It declined.  *Id.*

Act unconstitutionally provides for the combination of investigative and adjudicatory roles. Pl.'s Br. at 45–52; Am. Compl. ¶ 96.  Both arguments are unavailing.

**1.**     **The Constitution allows intrabranch discipline short of removal from office and disqualification to hold office.**

As to Plaintiff's so-called constructive-impeachment claim, Judge Newman has not been removed from office.  As a factual matter, it is undisputed that she both continues to serve as an Article III circuit judge (with its life tenure and undiminished salary) *and* continues to "perform routine judicial functions" like "ruling on the controversies brought before the court." Pl.'s Br. at 39–40.  Judge Newman is currently allowed—indeed, she is encouraged—to work on her *current* case assignments, including her three outstanding cases that have been pending an average of 257 days.  Perlow Decl. ¶ 11.  The only reason she cannot currently hear *new* cases is because the Judicial Council properly exercised its § 332 authority, not any authority under the Act.  *See* Ex. 1, Special Committee Report at 77 (explaining that the Judicial Council "suspend[ed] new case assignments based only on its authority under § 332(d)"); Argument § II.B., *infra*.  The Act-related proceedings, in contrast, are still progressing.  Plaintiff's speculation about the outcome of those proceedings—including whether she will be suspended from hearing cases—is premature.

In any event, the D.C. Circuit has already ruled that the Act does not unconstitutionally encroach on Congress's impeachment power.   In the D.C. Circuit's words, "[t]he Constitution limits judgments for impeachment to removal from office and disqualification to hold office" but "[i]t makes no mention of discipline generally."  *McBryde*, 264 F.3d at 65 (citing U.S. Const. art. I, § 3, cl. 7).  It even explicitly preserves other forms of discipline like criminal prosecution, which can precede impeachment and would obviously prevent a judge from exercising her "routine judicial functions" while imprisoned.  *Compare id.* (citing U.S. Const. art. I, § 3, cl. 7) *with* Pl.'s Br. at 39.  "In short, the claim of implied negation from the impeachment power works well for removal or disqualification," but "it works not at all for" for other forms of discipline.  *McBryde*, 264 F.3d at 67; *see McBryde v. Comm. to Rev. Cir. Council*

29

*Conduct & Disability of Jud. Conf.*, 83 F. Supp. 2d 135, 164–65 & n.18 (D.D.C. 1999) (holding that a judicial council order suspending the assignment of new cases to a judge for one year, in addition to other sanctions, "does not approximate removal").

Plaintiff cannot undermine the D.C. Circuit's conclusion with Executive Branch parallels. *See* Pl.'s Br. at 41–42. Setting aside whether Congress could have provided for presidential disability by statute rather than constitutional amendment, *id.*, there are numerous executive officials who are presidentially appointed and Senate confirmed (like Article III judges) who are removable from office without impeachment. As the D.C. Circuit noted in *McBryde*, "the President ha[s] power to remove civil officers, excluding judges, even though Congress would have been able to remove some of the same officers only through impeachment." *McBryde*, 264 F.3d at 67. In many cases since *McBryde*, the Supreme Court has only expanded this power. *See, e.g., Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010). But if Plaintiff were correct, Congress's impeachment power would imply that cabinet secretaries like the Attorney General could be removed from office only by impeachment. As the D.C. Circuit explained, that's incorrect: "the impeachment power does not exclude all intrabranch discipline." *McBryde*, 264 F.3d at 67.

Nor can Plaintiff draw support from past practice. *See* Pl.'s Br. at 42–45. Contrary to Plaintiff's contentions, it is not uncommon for federal judges to be suspended under the Act from hearing cases.[14] *See, e.g., In re Complaints Against District Judge Colin S. Bruce*, Nos. 07-18-90053, 07-18-90067 (7th Cir. Jud. Council May 14, 2019) (ordering that a district judge "shall remain unassigned to any matters involving the U.S. Attorney's Office in the Central District of Illinois" for almost four months due to improper ex parte communications); *In re: Complaint Against District Judge Walter S. Smith, Jr.*, No. 05-14-90120 (5th Cir. Jud. Council Dec. 3. 2015)

---

[14] Judicial council orders under the Act are available here.

(suspending case assignments to a district judge for one year due to inappropriate sexual advances toward a court employee); Ex. 3, *In re Complaint Against District Judge Jon Phipps McCalla*, Nos. 99-6-372-48, 00-6-372-66 (6th Cir. Jud. Council Nov. 2, 2001) (suspending a district judge for six months due to "intemperate and abusive" treatment of lawyers, barring the judge for three years from hearing any cases involving specified lawyers, and permanently barring the judge from hearing any case involving one particular lawyer); *McBryde*, 264 F.3d at 55–56 (noting a judicial council order "that no new cases be assigned to [a district judge] for a year" and "that he not be allowed for three years to preside over cases involving any of 23 lawyers who had participated in the investigation"). It is simply not true that "judicial councils have abjured actually using" the Act to suspend case assignments. Pl.'s Br. at 45. And there is certainly nothing to suggest that "they recognize . . . that what [the Act] permits is unconstitutional." *Id.*

This is reinforced by the Breyer Report, which Plaintiff misleadingly cites for the proposition that "in twenty-six years not a single federal judge was involuntarily suspended from her judicial functions as punishment for any misconduct." Pl.'s Br. at 42. The Breyer Report's *very next sentence* identified "one instance of public censure" where "the council also imposed a minimum of six months leave of absence, which would have suspended the assignment of new cases." *Implementation of the Judicial Conduct and Disability Act of 1980: A Report to the Chief Justice*, 239 F.R.D. 116, 143 (Sept. 2006) ("Breyer Report"). And the only reason the Report included these statistics was to express a "concern[] about the apparent underreporting of matters not dismissed by the chief judge." *Id.* at 142; *id.* at 219 (noting that "data reported to the AO for 2001–2003 show one [special committee] appointment, while in fact there were apparently at least five"). Far from proving that "judicial councils uniformly view" suspension of case assignments "as constitutionally suspect," Pl.'s Br. at 42, the Breyer Report's key point was that "[c]ircuits must improve the accuracy and precision of [Act-related] information so the AO can provide to Congress, the courts, and the public generally an accurate picture of activity under the Act." 239 F.R.D. at 219.

31

But even if there were no prior instances of suspensions under the Act, Congress had full authority to authorize that sanction. The Constitution gives Congress the power to (among other things) define lower-court jurisdiction and "make all Laws which shall be necessary and proper for carrying into Execution" the judicial power. U.S. Const. art. I, § 8; *see Kline v. Burke Constr. Co.*, 260 U.S. 226, 234 (1922); *Patchak v. Jewell*, 109 F. Supp. 3d 152, 162 (D.D.C. 2015) ("Congress [ ] has plenary power to define and limit the jurisdiction of the inferior courts of the United States."), *aff'd*, 828 F.3d 995 (D.C. Cir. 2016), *aff'd,* 138 S. Ct. 897 (2018). It makes little sense to say that the Act implicitly infringes on Congress's impeachment power when Congress has *explicit* powers to control the lower federal courts and enact all necessary-and-proper laws, and it has used those powers to pass the Act against the backdrop of its own impeachment power.

In short, the authority to suspend case assignments—granted to bodies consisting entirely of Article III judges—falls comfortably within Congress's powers. Nothing in the Constitution prohibits Congress from allowing lower courts to "keep [their] own house in order by conducting [their] own investigations of misconduct" and disability. *McBryde*, 264 F.3d at 61. As the D.C. Circuit recognized, that's a good thing: the "judiciary can only gain from being able to limit the occasions" for disability and misconduct. *Id.* at 66. "If the only method of regulating judicial misconduct were impeachment, Congress might resort to this ultimate sanction more often than the Framers intended, and more often than would be healthy for judicial independence." Amanda Frost, *Judicial Ethics and Supreme Court Exceptionalism*, 26 Geo. J. Legal Ethics 443, 467–68 (2013). "Alternatively, Congress might refrain from taking any action, leaving judges free to engage in serious, but not impeachment-worthy, offenses without fear of consequences." *Id.* "Either way, the result would diminish the courts' legitimacy in the eyes of the public—a result at odds with the Framers' goals." *Id.* Plaintiff's claim is meritless.

## 2.    As binding precedent makes clear, there is no due process problem with judges administering the Act.

The Due Process Clause of the Fifth Amendment prohibits the government from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014). "If the plaintiff has been deprived of a protected interest, we then consider whether the procedures used by the Government in effecting the deprivation comport with due process." *Id.* Here, Plaintiff claims that "the very investigation into her by the people who are material witnesses" violates "the basic notions of due process and is therefore unconstitutional." Pl.'s Br. at 45. But in addition to being nonjusticiable[15] and factually incorrect, this claim is foreclosed by D.C. Circuit precedent.

To begin, it is simply untrue that "the complainants against Judge Newman are her fellow Federal Circuit judges" and "[t]he witnesses against Judge Newman are her fellow Federal Circuit judges." Pl.'s Br. at 51. Nobody is serving as both "accuser" and "prosecutor." *Id.* at 47. That's for two reasons. First, Plaintiff's "concern plainly does not apply to the proceeding *now*—that is, the narrow proceeding to determine whether Judge Newman's refusal to cooperate constituted misconduct." Ex.1, Special Committee Report at 68. Everyone agrees that "whether Judge Newman's responses to the Committee's orders constitute

---

[15] As explained above, Plaintiff cannot make an as-applied due process challenge, including that her Act-related proceedings should have been transferred to another circuit. *See* Argument § I.A., *supra*. And if Plaintiff were to assert, for example, that the Defendant judges had deliberately sought to violate her constitutional rights by initiating misconduct or disability proceedings against her—*i.e.*, present claims in the nature of a *Bivens* action—such a claim would be barred by (among other things) absolute judicial immunity. *See, e.g., Bolin v. Story*, 225 F.3d 1234, 1241-42 (11th Cir. 2000) (affirming district court's dismissal of *Bivens* action against federal judges on grounds of absolute judicial immunity); *Hill v. Traxler*, 2013 WL 4580456, at *1 (D.D.C. July 9, 2013) (same), *aff'd*, 550 F. App'x 1 (D.C. Cir. 2013). Although Plaintiff does not at this time appear to characterize her claims in a manner that would trigger judicial immunity, Defendants expressly preserve this argument should it apply at a later stage of this case. *Cf.* Pl.'s Br. at 49–50.

misconduct can be determined on the paper record and there are no relevant witnesses." *Id.*
Second, even considering the broader Act-related proceedings, Chief Judge Moore simply
identified a complaint—a function that *must* be performed by the chief judge, 28 U.S.C.
§ 351(b)—and noted that "judges and staff" stated their "personal experience" that "Judge
Newman routinely makes statements in open court and during deliberative proceedings that
demonstrate a clear lack of awareness over the issues in the cases." Ex. A, March 24 Order
at 2. But as the Special Committee later clarified, the "Committee quickly determined that
testimony from judges about interactions with Judge Newman—particularly interactions re-
lated to the process of deciding cases—should be excluded from the Committee's inquiry be-
cause that information was unnecessary." Ex. 1, Special Committee Report at 70. "As a
result, from a very early stage, there was no prospect that the inquiry framed by the Commit-
tee would result in judges becoming witnesses." *Id.*; *id.* at 32–33 (explaining that "no testi-
mony from judges, formal or informal, was included in the scope of the Committee's
inquiry"). So the entire premise of Plaintiff's due process claim is incorrect.

    And even if Plaintiff could show that she was deprived of a protected interest,[16] her
due process claim is foreclosed by binding precedent. In *Hastings II*, the D.C. Circuit consid-
ered and rejected an identical due process claim "that the Act has authorized an improper
combination of investigative and adjudicative functions." 829 F.2d at 104. Citing Supreme
Court precedent, the court found no "unconstitutional risk of bias" or "risk of actual bias" to
be "inherent in the procedures established by the Act." *Id.* at 104–05 (citation omitted); *see*
*Withrow v. Larkin*, 421 U.S. 35, 39–41 (1975) (upholding a licensing scheme that permitted
the licensing board to both investigate a physician's misconduct and later hold a contested

---

[16] Plaintiff makes no attempt to show that she has any protected liberty or property
interest implicated by the proceedings under the Act. Nor could she. *See Roth v. King*, 449
F.3d 1272, 1284–85 (D.C. Cir. 2006) (no due process violation where plaintiff "cited no
source of law creating any entitlement that qualifies as property under the Due Process
Clause"); *Doe v. Rogers*, 139 F. Supp. 3d 120, 164 (D.D.C. 2015) ("[O]ne simply cannot have
been denied h[er] liberty to pursue a particular occupation when [s]he admittedly continues
to hold a job in that very occupation.").

hearing to adjudicate the matter).  While Plaintiff contends that the judges' control over these proceedings exacerbates the due process concerns, Pl.'s Br. at 47, the D.C. Circuit found just the opposite.  "The fact that federal judges administer the mechanism described by the Act contributes in no small measure to" its validity.  *Hastings II,* 829 F.2d at 105.  "They are called upon every day to put aside considerations not legally relevant to their decisions."  *Id.*  And a "judge who can decide a case one way, notwithstanding inadmissible evidence of which he is aware indicating a different result, is not likely to prejudge a fellow judge's cause."  *Id.*

Plaintiff's suggestions about the potential biases of her colleagues makes no difference to the analysis.  It is "inevitable that in any peer-review mechanism as established here, members of judicial councils occasionally may have prior knowledge of allegations of misbehavior before they are asked to sit in judgment on such charges.  But prior knowledge of some of the facts of a case does not by itself establish bias."  *Hastings v. Jud. Conf. of the U.S.*, 593 F. Supp. 1371, 1384 (D.D.C. 1984).  And Plaintiff's invocation of nebulous "affinities and animosities" within any circuit (or the Federal Circuit) ignores the fact that any determination by the Judicial Council can be reviewed by the JC&D Committee, composed of judges from across the country.[17]  *See id.*  This specifically "protect[s] against the possibility of actual bias from prior knowledge or personal animosities within a circuit."  *Id.*

The remainder of Plaintiff's argument is both irrelevant and speculative.  For example, Plaintiff nowhere explains the relevance of the supposed "factual errors" she identifies in the

---

[17] Plaintiff argues her concerns are "particularly acute" because, unlike other circuits, the Federal Circuit's Judicial Council does not include judges from district courts.  Pl.'s Br. at 49.  But the constitutional infirmity Plaintiff asserts—namely, the combination of investigative and adjudicative functions in the same individuals—is not unique to the Federal Circuit.  Congress purposefully created a statutory rubric in which the chief judge of *every circuit court* would initiate a complaint, investigate and make recommendations as part of a special committee, and ultimately participate in the decision as part of a judicial council.  *See* 28 U.S.C. §§ 332(a)(1), 351(b), 352(a), 353(a)–(c); JC&D Rule 13 cmt. (explaining that the Act and the Rules deliberately combine investigative and adjudicatory functions as part of the goal of creating an entirely in-house, self-policing mechanism for the Judiciary).

March 24 Order, and indeed admits that "there is nothing remarkable about erroneous accusations being leveled at anyone, including federal judges."[18]  Pl.'s Br. at 46; *cf. Committee v. John Carroll Univ.*, 2019 WL 2295347, at *2 (N.D. Ohio May 30, 2019) ("[M]istakes by a judge of fact and law, alone, are insufficient to demonstrate personal bias requiring recusal.").  But she also neglects to mention that when she previously noted possible factual discrepancies, the Special Committee invited her to explain those discrepancies in a recorded interview, which Judge Newman repeatedly refused.  *See* Ex. 1, Special Committee Report at 97.  Plaintiff also advances the fanciful theory that her Federal Circuit colleagues are retaliating against her propensity to dissent because they want to do less work.  Pl.'s Br. at 49.  Not only is this risible—responding to dissents is a routine part of judging that Judge Newman's colleagues have been handling for nearly 40 years—it is also speculation that assumes the bad faith of 11 federal judges.  Unsurprisingly, the Supreme Court has said the opposite: there is a "presumption of honesty and integrity in those serving as adjudicators," who "are persons of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances."  *Withrow*, 421 U.S. at 47, 55.

Plaintiff's due process claim is jurisdictionally barred and meritless.[19]  It should be dismissed.

---

[18] Similarly, Plaintiff complains that "members of the bar" know about these proceedings and "may be unwilling to offer up" support for Judge Newman "given that they will likely be spending years, if not decades, litigating before Chief Judge Moore."  Pl.'s Br. at 51.  But Plaintiff quickly concedes that "witness statements are confidential," so it's unclear how "Judge Newman is effectively being denied the ability to marshal evidence in support of her position."  *Id.*  And Plaintiff could use compulsory process to obtain any critical testimony.  *See* JC&D Rule 15(c).  But all of this is irrelevant.  The Act-related proceedings to date have been narrowed to only Judge Newman's misconduct.  *See* Ex. 1, Special Committee Report at 68.  And Plaintiff's only due process claim hinges on the purported bias of Federal Circuit Judges, not the availability of specific evidence—a point that Plaintiff does not even attempt to support.  *See* Pl.'s Br. at 45–51; Am. Compl. ¶¶ 95–99.

[19] Although irrelevant here, Plaintiff is likely wrong to claim that "*every single* complaint of misconduct against a circuit judge that was not summarily dismissed has been transferred

**B.    Plaintiff's challenge to the Judicial Council's June 5 Order suspending new case assignments is unavailing.**

In Plaintiff's preliminary-injunction motion, she also takes issue with her current suspension from hearing new cases as a result of the Judicial Council's June 5 Order.  Pl.'s Br. at 30–39.  That Order was an exercise of the Judicial Council's § 332 authority to "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit."  28 U.S.C § 332(d)(1).  The text, history, purpose, and case law of § 332 are all clear that a judicial council may suspend a judge from hearing new cases.  So Plaintiff's challenges are meritless.  In any event, the Special Committee recently recommended a case suspension under the Act.  *See* Ex. 1, Special Committee Report at 109–11.  If the Judicial Council adopts that recommendation, its action may supersede the June 5 Order and Plaintiff's related challenges.

**1.    The Judicial Council has full statutory authority to craft an appropriate remedy for a judge's backlog of cases.**

Plaintiff's statutory objections to the June 5 Order should be rejected.  That Order rested exclusively on the Judicial Council's broad authority under 28 U.S.C. § 332(d)(1).  *See* Ex. O, June 5 Order at 4–5; *see also* Ex. 1, Special Committee Report at 77.  And the text, history, purpose, and case law of § 332 are unmistakably clear that a judicial council may suspend a judge from hearing new cases until her backlog is cleared.[20]

---

to another circuit's judicial council for investigation."  Pl.'s Br. at 48–49.  As the Special Committee details, Judge Newman's "statistics do not establish the asserted uniformity of practice" and in "the most relevant precedent for this matter," the Sixth Circuit twice denied transfer motions.  Ex. 1, Special Committee Report at 89–91 & n.27–28.

[20] Plaintiff complains that the June 5 Order has "an indefinite duration" and "no stated benchmarks."  Pl.'s Br. at 37.  But Judge Newman was "excluded in the rotation for new case assignments" only "at this time" and only "based on the facts described [in the June 5 Order] pending further order of the Judicial Council."  Ex. O, June 5 Order at 5–6.  The "facts described" in the June 5 Order were, of course, about Judge Newman's "backlog of seven opinions, three of which [were] pending for over 200 days and all of which [were] pending for over 100 days."  *Id.* at 3; *compare* Ex. 1, Special Committee Report at 55 (noting that "at the end of July," Judge Newman had "not issued majority opinions in seven outstanding cases," placing

On its face, § 332's text places no limit on the Judicial Council's ability to "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." 28 U.S.C. § 332(d)(1). A judicial council may issue generally applicable rules it deems "necessary and appropriate" for courts "within its circuit" to "effective[ly] and expeditious[ly] adminis[ter] [ ] justice." *Id.* A judicial council may also monitor developments "within its circuit" and issue "necessary and appropriate orders" to specific judges if they are not "effective[ly] and expeditious[ly] adminis[tering] [ ] justice." *Id.* In fact, the imperative "shall" indicates that a judicial council has a duty to see to the efficient administration of justice; where a judge has a substantial backlog, a council must act. *Compare id. with Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").

This is repeatedly reinforced by § 332's history, purpose, and surrounding case law. Section 332 was first enacted in 1939 and assumed its near-present form after a 1948 amendment. *See* 53 Stat. 1223, 1224 (1939); 62 Stat. 869, 902 (1948). As the Senate Report on the 1948 bill explained, its statutory text was intended to make clear that "whatever is wrong in the administration of justice, from whatever source it may arise," may be "brought to the attention of the judicial council, that it may be corrected by the courts themselves." Ex. 2, JCUS Report at 6. Then-Judge Warren Burger wrote that the terms of § 332 "are all-embracing and confer almost unlimited power." *Id.* "Any problem—whatever it may be—relating to the expeditious and effective administration of justice within the circuit is within the power of the circuit judicial council." *Id.* Other judges echoed this sentiment: "As this language [of § 332] is about as broad as it could possibly be, there is no doubt that the Congress meant to give to the councils the power to do whatever might be necessary more efficiently to manage

---

"her again in violation of Federal Circuit Clerical Procedure # 3 ¶ 15") *with* Pl.'s Br. at 36 (saying "there would be little to complain about" if Judge Newman could not hear new cases because of Federal Circuit Clerical Procedure # 3). If and when Judge Newman clears her backlog, she can seek relief from the Judicial Council.

the courts and administer justice." *Id.* Judge Parker—a member of the Conference Commit-tee that drafted § 332—testified that the provision places no "restraint on the council at all." *Id.* at 5. The statute gave full discretion to the judicial councils, constrained only "by the inherent limitations of the situation." *Id.*

Over the 84-year life of § 332, courts have duly recognized its "broad and emphatic language" as well as the "considerable discretion" it grants to "courts and circuit Judicial Councils to choose how to regulate court business." *Truesdale v. Moore*, 142 F. 3d 749, 759–60 (4th Cir. 1998); *see also, e.g.*, *In re Jaritz Indus., Ltd.*, 151 F.3d 93, 101 (3d Cir. 1998) (recog-nizing that "[t]he authority conferred was neither restricted nor discretionary"); *Imperial "400"*, 481 F.2d at 45 (language in § 332(d)(1) "is to be broadly construed"). One chief circuit judge went so far as saying that a judicial council could use its § 332 authority to punish a problem judge "by temporarily assigning him to 'a nonexistent place' where court was never held." Peter Graham Fish, *The Circuit Councils: Rusty Hinges of Federal Judicial Administration*, 37 U. Chi. L. Rev. 203, 230 (1970).

Within § 332's broad grant of authority resides its main purpose: to combat judicial delay. Chief Justice Groner of the Court of Appeals for the District of Columbia—who was Chairman of the Conference Committee that drafted § 332—explained that the only "sub-stantial criticism of the work of the courts" was "that the length of time which ensues between the commencement of a suit and its conclusion is too long." Ex. 2, JCUS Report at 5. As the Supreme Court later made clear in *Chandler*, court rules refusing to assign "more cases until opinions and orders issue on [a judge's] backlog" are "reasonable, proper, and necessary rules, and the need for [their] enforcement cannot reasonably be doubted." 398 U.S. at 85. "[T]he extraordinary machinery of impeachment," the Court continued, cannot be "the only recourse" if a judge refuses to abide by those internal policies. *Id.* In his concurrence, Justice Harlan also canvassed the history of § 332 and explained that while "the Councils were de-liberately given broad responsibilities to meet [ ] problems as they arose," the "abatement of delays in disposition of cases was a principal purpose for creation of the Councils." *Id.* at 123.

39

Later courts agreed.  *See, e.g.*, *United States v. Colon-Munoz*, 292 F.3d 18, 21 (1st Cir. 2002) ("One of the intended purposes [of § 332] was to address judicial delay."); *Hilbert v. Dooling*, 476 F.2d 355, 360 (2d Cir. 1973) (en banc) (recognizing that the primary intent behind § 332, "as manifested by both the language and history of the act, was to give the Councils broad powers to deal with the evil of judicial delay").  In fact, the interest in combating judicial delay is so strong that § 332 has been used to, for example, temporarily transfer a judge "to the Virgin Islands to assist with the bankruptcy workload there."  *Jaritz*, 151 F.3d at 102.

Despite Plaintiff's protestations, § 332 is not just for circuit-wide rules.  *See* Pl.'s Br. at 35–36.  It never has been.  From the beginning, Chief Justice Groner explained that § 332 gave judicial councils the power to require a specific judge to "speed up his work or to admonish him that he is not bearing the full and fair burden that he is expected to bear," or to take any other action "for which he may be responsible."  Ex. 2, JCUS Report at 5.  That's why the Supreme Court's decision in *Chandler* concerned the suspension of cases assignments to a *particular* judge.  *See Chandler*, 398 U.S. at 80.  No Justice questioned whether such a sanction was permissible under § 332.  As Justice Harlan recognized, "the power entrusted to the Councils by § 332 . . . necessarily involves a large amount of discretion."  *Id.* at 108.  And as part of that discretion, a judicial council may require a judge to "clear up his docket" or may "channel cases to other judges when a situation existed with respect to one judge that was inimical to the effective administration of justice."  *Id.* at 120–21.  Judge Friendly echoed this sentiment, saying "that § 332 gives the judicial council a plenitude of powers," not only "over the work of individual judges but over the courts themselves."  *Hilbert*, 476 F.2d at 362 (Friendly, J., dissenting).[21]

---

[21] *See also* Irving R. Kaufman, *Chilling Judicial Independence*, 88 Yale L.J. 681, 708 (1979) (Judicial councils "may reassign recalcitrant judges and may order them to eliminate their backlogs before taking on any new cases."); J. Clifford Wallace, *Must We Have the Nunn Bill?*, 51 Ind. L.J. 297, 322 (1976) (observing that a judicial council's power to issue orders includes the "issuance of specific orders, directed to individual judges, and limited to the correction of a specific situation for which that judge can be held directly responsible"); Comment, *The*

That same authority exists today.  When the Act was passed in 1980, for example, Congress explicitly mandated that the new statute should not "be construed to affect any other provision of this title," including the councils' § 332 authority.  28 U.S.C. § 362.  As the Act's legislative history explains, Congress "essentially recodif[ied] the existing language [of § 332(d)] that the courts have worked with over the last forty years."  H.R. Rep. 96-1313, at 9; *see id.* at 8 (noting that the statutory recodification "broaden[ed] that found in existing law").  In doing so, it preserved the councils' ability to take any actions needed "for the effective and expeditious administration of justice."  *Id.*  This included many actions concerning specific judges, like "assigning judges to congested districts and to particular kinds of cases," directing judges "to assist infirm judges," ordering "them to decide cases long held under advisement," and requiring "a judge to forego his summer vacation in order to clear his congested docket." *Id.*  Given the "principal purpose" of § 332(d) to address judicial delay and the breadth of its authority, courts have uniformly concluded that "[a]n order of the Judicial Council reassigning cases (or providing an impartial mechanism for doing so) to address judicial delay falls within the broad mandate of section 332(d)."  *United States v. Colon-Munoz*, 318 F.3d 348, 354–55 (1st Cir. 2003); *In re McBryde*, 117 F.3d at 228 (recognizing a judicial council's ability "to reassign cases for administrative reasons"); *accord In re United States*, 791 F.3d 945, 963 (9th Cir. 2015) (Wallace, J., concurring).  Defendants are aware of no court holding that a judicial council cannot, under § 332, address concerns over judicial backlog or delay by suspending new case assignments to a particular judge.  This Court should not be the first.

Section 332 gives the Judicial Council full authority to do exactly what it did: suspend Judge Newman from hearing new cases at least until she clears her backlog.  And for reasons that are both self-explanatory and elaborated above, no constitutional problem arises when

---

*Authority of the Circuit Judicial Councils: Separation of Powers in the Courts of Appeal*, 5 Seton Hall L. Rev. 815, 830 (1974) (same).

federal judges temporarily suspend one of their colleagues from hearing new cases. *See Imperial "400"*, 481 F.2d at 45 (analyzing § 332 and holding that "[i]t cannot be unconstitutional to authorize the courts to manage their own business"); Argument § II.A.1., *supra*. Plaintiff's claims challenging § 332 should be dismissed. If Judge Newman's circumstances change and she clears her backlog, the proper process is for her to request reconsideration from her own Judicial Council, not to ask a district judge to enjoin her own court.

### 2.    The June 5 Order was lawfully issued.

Plaintiff argues that the June 5 Order "was unlawfully promulgated because Judge Newman . . . was not given notice, much less invited to participate in the Judicial Council's deliberations." Pl.'s Br. at 37–39. But there is no sound argument that she was denied an opportunity to present her views. Judge Newman was given notice of her backlog and the workload-related statistics at issue, which became the basis for the June 5 Order. *See* Ex. K, May 16 Order at 13–18. And the June 5 Order itself was issued in response to Judge Newman's own request for reconsideration of her previous suspension. *See* Ex. O, June 5 Order at 2. So Plaintiff had every opportunity to address the issue decided by the June 5 Order.

That should end her challenge. Judge Newman identifies no constitutional or statutory basis for any a right to participate in the discussion and vote of the Judicial Council. Quite the opposite: the Act mandates Judge Newman's recusal from the Judicial Council and, regardless, Judge Newman would be recused from any decision about suspending herself from hearing new cases.

"[C]ourts must take statutory language at its word." *Allegheny Def. Project v. FERC*, 964 F.3d 1, 18 (D.C. Cir. 2020); *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020) (Courts "must enforce plain and unambiguous statutory language . . . according to its terms."). And the Act makes clear that "[n]o judge whose conduct is the subject of an investigation under this chapter shall serve" upon "a judicial council" until "all proceedings under this chapter relating to such investigation have been finally terminated." 28 U.S.C. § 359(a). It makes no exception for a judge to participate on a judicial council for matters *other than* the

complaint leveled against them.  And that makes sense: if a judge's misconduct or disability is serious enough to warrant a special-committee investigation into whether the judge has "engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts" or is "unable to discharge all the duties of office," *id.* § 351(a), then the judge should not be serving on a judicial council (or other judicial body) and potentially deciding other matters concerning, for example, "the effective and expeditious administration of justice within [the] circuit," *id.* § 332(d)(1).

The text of JC&D Rule 25(e) is not to the contrary.  It likewise explains that, after a special committee is appointed, "the subject judge is disqualified from participating in the identification or consideration of any complaint, related or unrelated to the pending matter, under the Act or these Rules."  JC&D Rule 25(e).  Nothing in that Rule speaks to a subject judge's participation in various judicial bodies for matters *outside* the Act.  Nor would it; the JC&D Rules were promulgated only "to establish standards and procedures for addressing complaints . . . under the Judicial Conduct and Disability Act."  JC&D Rules at 2, Preface; *see* 28 U.S.C. § 358(a).  Although Plaintiff places much emphasis on JC&D Rule 25's *commentary* to argue that Judge Newman may participate in the Judicial Council's work "not related to the investigation of the misconduct," Pl.'s Br. at 37–38, that commentary contradicts the plain text of the Act itself. *Cf. United States v. Maloid*, 71 F.4th 795, 810 (10th Cir. 2023) (noting that courts "will often interpret the commentary for" themselves and "strike down commentary when it conflicts with the plain text of" a statute); *United States v. Winstead*, 890 F.3d 1082, 1090 (D.C. Cir. 2018) (refusing to follow the commentary of the Sentencing Guidelines where it contravened the plain text); *see* 28 U.S.C. § 2071(a) (mandating that federal court rules "shall be consistent with Acts of Congress").  Because the statute plainly excludes Judge Newman

from sitting on the Judicial Council while her investigation is pending, and her investigation was pending at the time of the June 5 Order, Judge Newman was properly excluded.[22]

Statutory text aside, there was nothing improper about the Judicial Council's decision, in exercising its § 332 authority, to proceed "without Judge Newman when Judge Newman and her delays in issuing opinions were the very issue that the Judicial Council was meeting to address." Special Committee Report at 79. Again, Judge Newman had notice and opportunity to submit arguments. Her lone quibble is that she did not participate in the deliberations and vote. But as the circuit judges of the Special Committee explained, "[t]he Judicial Council properly operated on the view that Judge Newman would be recused in any decision on that matter." *Id.* This parallels even the narrowest Act-related recusal under JC&D Rule 25: "when a judge is the subject of a misconduct or disability complaint under the Act and the Rules, the judge is expressly disqualified from participating in the Judicial Council on that matter." *Id.* After all, as Plaintiff herself recognizes, "no man can be a judge in his own case." *Id.* at 80; Pl.'s Br. at 3, 37; Am. Compl. ¶ 97. For that reason, Judge Newman was properly "excused" from the statutory requirement that "[e]ach member of the council shall attend each council meeting."[23] 28 U.S.C. § 332(a)(6); Pl.'s Br. at 38. That statutory provision simply "imposes an obligation on individual judges to attend Judicial Council meetings" absent excusal by the chief judge. Special Committee Report at 80. "It does not set a super-

---

[22] For the reasons discussed below, Judge Newman's exclusion from any decision about suspending herself from hearing new cases would in any event be an "exceptional circumstance[] render[ing] application of" JC&D Rule 25 and its commentary "manifestly unjust." JC&D Rule 2(b).

[23] This provision says that "member[s] of the council" may be "excused by the chief judge of the circuit" from attending any meetings. While Plaintiff argues that "this language does not permit a chief judge to excuse someone *sua sponte*," Pl.'s Br. at 38 n.25, she cites nothing for support. That's unsurprising because a key definition of the verb "excuse" is "to grant exemption or release to" or "to allow to leave." *See Excuse*, Merriam-Webster Dictionary, *available* here (last visited September 1, 2023). Just as someone may be "excused from jury duty" despite their earnest desire to serve on a jury, *id.*, Judge Newman need not request excusal to be "excused" within the meaning of the statute.

quorum requirement disabling the Judicial Council from acting if some members are not present," as would be true whenever a judicial council member is "excused by the chief judge of the circuit" from attending a meeting.  *Id.*; 28 U.S.C. § 332(a)(6).  Plaintiff's argument that the June 5 Order should be "set aside" because it "was promulgated by an improperly constituted Judicial Council of the Federal Circuit" is baseless.  Pl.'s Br. at 39.

### 3. Only the Judicial Council's June 5 Order—which may soon be superseded—is at issue.

Plaintiff spends much of her brief attacking the Judicial Council's March 8 Order, but that was superseded by the June 5 Order at issue here.  The Judicial Council explained that "[w]hen the Council met on March 8, significant concerns had been raised about Judge Newman's backlog of cases and her apparent inability to issue opinions in a timely fashion," and about "her mental fitness to continue to perform the work of an active judge."  Ex. O, June 5 Order at 2; *see* Special Committee Report at 77 (acknowledging that the "March 8 decision was not memorialized in a written order, but it readily stands on the basis of Judge Newman's indisputable backlog of cases").  The Judicial Council then "considered *de novo* whether there are grounds to preclude Judge Newman from receiving new case assignments," ultimately concluding that "Judge Newman is not expeditiously carrying out the work of the Court" because of her "continued backlog of cases, and her inability to clear the backlog despite the absence of new cases assignments demanding her attention."[24]  Ex. O, June 5 Order at 3–5.

Because the Judicial Council considered Judge Newman's suspension *de novo* on June 5, that order alone is the reason for her suspension currently before this Court.  *See* Ex. 1, Special Committee Report at 77 ("[T]he Judicial Council considered the matter *de novo* and

---

[24] Judge Newman quibbles with her backlog of opinions that resulted in her being "removed from the April 2023 sitting" and argues that "[t]his Court should be particularly leery of giving much credence to the June 5 Order given that several assertions therein are demonstrably false."  Pl.'s Br. at 33.  Although Judge Newman's February backlog is irrelevant here, the Special Committee explains in detail that it is actually Judge Newman, and not Defendants, who "has the facts wrong."  *See* Ex. 1, Special Committee Report at 78–79.

made clear that it was suspending new case assignments based only on its authority under § 332(d) and solely to address Judge Newman's delay in issuing opinions."). The March 8 Order has no relevance here given Plaintiff's request for an injunction. To seek "prospective declaratory and injunctive relief," Plaintiff "may not rest on past injury"; she "must establish an ongoing or future injury" from the challenged action. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). So Plaintiff's objections to the March 8 Order were mooted by the June 5 Order, which is the only operative order suspending Judge Newman from hearing new cases. *See Adams v. Jud. Council of Sixth Cir.*, 2020 WL 5409142, at *6 (D.D.C. Sept. 9, 2020) (mootness where "events outrun the controversy such that the court can grant no meaningful relief"); *see generally* Am. Compl. ¶¶ 55–71 (complaining about the June 5 Order).

The June 5 Order itself may soon be superseded. The Special Committee investigated Judge Newman and recommended that she be suspended from hearing new cases for one year, subject to "modification or rescission" if she chooses to cooperate with the Committee. *See* Ex. 1, Special Committee Report at 109–11. If the Judicial Council adopts that recommendation, then the Judicial Council's June 5 Order may very well be superseded by that sanction. Judge Newman filed her response to the Special Committee's recommendation on August 31, and the matter is now ripe for Judicial Council consideration.

## III.   Comity, exhaustion, and related concerns weigh in favor of dismissing the complaint or denying the preliminary-injunction motion.

"[T]he [C]ouncils and Conference are entitled to a measure of comity sufficient to preclude disruptive injunctive relief by federal courts absent a showing that serious and irremediable injury will otherwise result." *Hastings I*, 770 F.2d at 1102. Here, there is no "serious and irremediable injury" due to the hypothetical threat of a proceeding that may encourage Judge Newman to change her conduct. *Id.* Instead, Judge Newman is amid an "actual, initiated proceeding" under the Act—which is very close to a Judicial Council decision—and is subject to a separate Judicial Council order due to her backlog. *Id.*; *see* Argument § II.B.,

*supra*.  This Court should allow the Council and "the authorities charged with administration of the [JC&D] Act" to complete their statutorily defined tasks.  *Hastings II*, 829 F.2d at 103.

Because all of Plaintiff's claims in this case are "governed by equitable principles," there are "prudential concerns such as comity and the orderly administration of" justice that "may require a federal court to forgo the exercise of its" equitable power.  *Munaf v. Geren*, 553 U.S. 674, 693 (2008) (discussing habeas corpus).  Even when "two courts of *equal* authority" may decide a case, "considerations of comity and orderly administration of justice dictate that" they should not do so "simultaneously."  *UtahAmerican Energy, Inc. v. Dep't of Lab.*, 685 F.3d 1118, 1124 (D.C. Cir. 2012) (emphasis added) (discussing the first-to-file rule).  "Sound judicial administration counsels against separate proceedings, and the wasteful expenditure of energy and money incidental to separate litigation of identical issues should be avoided."  *Id.* (citation omitted).  This is true for Plaintiff's challenges to the Judicial Council's June 5 Order suspending new case assignments: if Judge Newman thinks that workload-related circumstances have changed since that order, she should return to the Judicial Council.  It is also true for Plaintiff's attempt to enjoin her Act-related proceedings, which must still undergo review by the Judicial Council and the JC&D Committee.

In that sense, principles of exhaustion are also implicated.  Exhaustion "is one among related doctrines—including abstention, finality, and ripeness—that govern the timing of federal-court decisionmaking."  *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992); *see also Santos-Zacaria v. Garland*, 143 S. Ct. 1103, 1113 (2023) ("[E]xhaustion promotes efficiency, including by encouraging parties to resolve their disputes without litigation.").  While these doctrines may be "analytically distinct," they are also "complementary" and may "blend together" in certain contexts.  *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1107–08 (D.C. Cir. 2011).  This is one of those contexts.  Although "certain informal fact-gathering powers have been exercised by the [Special] Committee," there is a strong policy against "rendering judgment on the constitutionality of proceedings *while* the proceedings themselves are going on."  *Id.* at

1102.  "[A] court should be loath to interfere, by means of injunction, with ongoing proceedings by a particular council."  *Id.*

The Supreme Court and D.C. Circuit have held as much in closely related matters.  In *Chandler*, the Supreme Court declined to rule on a judge's claims because, "except for the effort to seek the aid of this Court," he never sought relief from the judicial council.  *Chandler*, 398 U.S. at 87.  In circumstances similar to this case, the D.C. Circuit ruled essentially the same way in *Hastings I*.  "[A] complaint had been filed against [Plaintiff]; the chief judge of the circuit in which the complaint was filed had formed an investigative committee of judges; and the investigation had begun."  *Hastings I*, 770 F.2d at 1100.  But neither the judicial council nor the JC&D Committee had yet ruled because the special committee "had not yet issued a report of its conclusions and recommendations to the Council for any further action deemed proper."  *Id.*  Deciding constitutional claims in such circumstances, the D.C. Circuit concluded, would "contravene the principle of constitutional avoidance" and "the principle that the quarrel must be with the official and not the statute book."  *Id.* at 1101.  "Anything might happen in the proceedings initiated against [plaintiff], from early dismissal to a recommendation of impeachment."  *Id.* at 1100.  So this Court should do what the D.C. Circuit instructed: refuse to address Plaintiff's claims because she can "interpose h[er] constitutional arguments" to the Federal Circuit's Judicial Council or "as a ground for review by the Conference of a Council determination."  *Id.* at 1102; *see McBryde*, 264 F.3d at 62 (recognizing that review under the Act should include review of constitutional claims).

A similar declination of jurisdiction is warranted here.  Given the current posture of the Act-related proceedings, the Judicial Council and JC&D Committee could (a) moot Plaintiff's Act-related claims entirely by finding in her favor, or (b) supersede the June 5 Order by adopting the Special Committee's recommendation.  At the very least, to await final resolution, these circumstances favor dismissing Plaintiff's complaint or denying her motion.

**IV.    The remaining injunction factors weigh heavily against an injunction.**

Because Plaintiff cannot succeed on the merits (and her case should be dismissed), there is no reason for the Court to decide whether Judge Newman would satisfy the remaining injunction factors. *See S. Utah Wilderness All. v. Bernhardt*, 512 F. Supp. 3d 13, 21 (D.D.C. 2021); *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 99 (D.D.C. 2017), *aff'd*, 897 F.3d 314 (D.C. Cir. 2018). In any event, Plaintiff can neither prove that she will suffer irreparable harm absent an injunction, nor that an injunction would be in the public interest.

**A.    Plaintiff will not suffer irreparable harm absent an injunction.**

Plaintiff cannot meet her burden to show irreparable harm here. She is currently allowed, if not encouraged, to work on her *current* case assignments, including her three opinions that have been pending an average of 257 days, the longest of which is the oldest pending Federal Circuit opinion at 332 days. Perlow Decl. ¶ 11. And if Judge Newman eventually prevailed on all her claims in this litigation, she could resume hearing new cases then.

But in the meantime, Judge Newman has no interest in hearing the *specific cases* that may be heard by the Federal Circuit. It is axiomatic that "litigants do not have a right to have their case heard by a particular judge." *A.S. ex rel. Miller v. SmithKline Beecham Corp.*, 769 F.3d 204, 212 (3d Cir. 2014); *Rivera-Torres v. Rey-Hernandez*, 502 F.3d 7, 12 (1st Cir. 2007) (same); *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) (same); *United States v. Pearson*, 203 F.3d 1243, 1256 (10th Cir. 2000) (same); *Hampton v. City of Chicago*, 643 F.2d 478, 479 (7th Cir. 1981) (same); *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1024 (9th Cir. 1981) (same). And it follows that judges have no cognizable interest in hearing specific cases. *See Town of E. Haven v. E. Airlines, Inc.*, 293 F. Supp. 184, 189 (D. Conn. 1968) ("Clearly, a judge has no interest in trying a particular case."). So "judges do not choose their cases, and litigants do not choose their judges." *United States v. Kelly*, 519 F. Supp. 1029, 1031 (D. Mass. 1981). Because Judge Newman has no interest in hearing the *specific cases* to which, but for the June 5 Order, she might have been assigned, she suffers no irreparable harm from a lack of new assignments.

Plaintiff is also incorrect to assert that Defendants have curtailed her "ability to partic-
ipate in deciding cases currently pending." Pl.'s Br. at 52. For many months, Judge Newman
has had—and continues to have—a backlog of unresolved cases to work on. And despite
having no new cases for six months and no motions panels for more than two years, Judge
Newman still has three self-assigned majority opinions that remained unissued, all of which
have been pending for over 200 days. Perlow Decl. ¶ 11. As explained above, Judge Newman
is also still participating in en banc cases, petitions for rehearing en banc, and petitions for
panel rehearing. *See* Background § III, *supra*. So it is indisputable that Judge Newman has
judicial functions to discharge; Defendants are not the ones "prevent[ing] [her] from exercis-
ing her judicial functions" in this regard. Pl.'s Br. at 52. While Defendants hope that her
backlog will continue to dwindle with the passage of time, if and when that backlog is cleared,
Plaintiff's proper recourse would be to seek relief from the Judicial Council—not this Court.[25]

Plaintiff's delay in filing her preliminary-injunction motion also cuts against equitable
relief. "Courts in this jurisdiction have found that an unexcused delay in seeking extraordi-
nary injunctive relief may be grounds for denial because such delay implies a lack of urgency
and irreparable harm." *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 403 (D.D.C. 2020)
(quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)). Yet Judge Newman was
aware of the Judicial Council's unanimous initial decision to preclude new case assignments
at least as early as April 5, 2023. *See* Ex. O, June 5 Order at 1; Am. Compl. ¶ 23. That's a
full 83 days before her preliminary-injunction motion. This goes far beyond delays that were
too long for injunctive relief. For example, "[t]he D.C. Circuit has found that a delay of forty-
four days before bringing action for injunctive relief was 'inexcusable,' and 'bolstered' the

---

[25] To the extent Plaintiff asserts irreparable harm based on the Judicial Council's
June 5 Order, those assertions may soon be superseded. *See* Argument § II.B.3., *supra*. And
to the extent her allegations of irreparable harm are tied to the merits of her claims, Pl.'s Br.
at 52, those claims have no merit. S*ee* Argument § II.B., *supra*.

'conclusion that an injunction should not issue,' particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm." *Dallas Safari Club*, 453 F. Supp. 3d at 403 (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)).  Judges in this District have recognized that irreparable harm is fatally undermined by similar delays.[26]  So this Court could deny Plaintiff's motion based on her delay alone.

Regardless, Judge Newman will suffer no irreparable harm while she litigates this case. And this litigation may not be pending for long: if Plaintiff's complaint survives Defendants' motion to dismiss, it would present purely legal issues that could be briefed expeditiously through cross-motions for summary judgment.  *See* Argument § IV.B., *infra*.  For all these reasons, Plaintiff has not carried her burden of proving irreparable harm.

### B.  An injunction would harm the Federal Circuit, its judges, its litigants, and the public.

The remaining injunction factors—the balance of the equities and the public interest— also weigh heavily against an order from this Court that forces the Judicial Council to assign Judge Newman more cases or that affects the proceedings under the Act.  *See Pursuing Am.'s Greatness*, 831 F.3d at 511 (recognizing that "the government's interest *is* the public interest.").

First, such an injunction would burden the Federal Circuit and the public with further delays of important work.  Judge Newman has had an "abnormally large backlog of cases" that "would have been even larger if there had not been several interventions over the previous

---

[26] *See, e.g.*, *Zarei v. Blinken*, 2021 WL 9146060, at *2 (D.D.C. Sept. 30, 2021) (holding that a delay of 51 days in seeking injunctive relief is an "extensive delay" that "weighs heavily against a finding of irreparable harm"); *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90–91 (D.D.C. 2014) (finding no irreparable harm where "plaintiffs delayed thirty-six days before filing for preliminary injunctive relief" and then later moved for an extension); *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 340 (D.D.C. 2012) (holding that, among other reasons, plaintiffs delay of at least 47 days "dictates against the granting of injunctive relief"); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (noting that delay of two months in bringing action for injunctive relief "militates against a finding of irreparable harm"); *see also Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 67 n.7 (D.D.C. 2017) (Cooper, J.) (this Court noting that it was "troubled" by a seven-week delay in seeking an injunction).

18 months in which cases had been reassigned from her to another judge following unnecessary delay and the circulation of draft opinions that no other member of the panels would join." Ex. O, June 5 Order at 1–2. The June 5 Order explained that this is "particularly concern[ing]" because "Judge Newman has been unable to make any significant progress on addressing her opinion backlog despite having three law clerks, having no new cases assigned for April, May, June, or July, and not sitting on motions panels since January 2021." *Id.* at 3–4. It would be the Federal Circuit, its judges, its litigants, and the public who will suffer if this Court overrides the judgment of 11 circuit judges who have unanimously determined "that assigning [Judge Newman] new cases will only further interfere with expeditious execution of the work of the Court." *Id.* at 4–5.

Second, given the substantial question about Judge Newman's fitness—a question that persists because she refuses to comply with Special Committee's reasonable requests for a medical examination and medical records—issuing an injunction would only invite more public concern. For example, one litigant has already petitioned the Supreme Court to overturn a Federal Circuit decision, arguing that he was deprived of due process "because of the inclusion of Judge Pauline Newman on his appeal panel, who struggled with the[] disability issues outlined by" the Special Committee. *Wakefield v. Blackboard, Inc.*, Petition for Rehearing at 10, No. 22-819 (May 31, 2023). If Judge Newman is reinstated through a preliminary injunction, surely more litigants will raise questions about her participation in their cases.

Third, there is a strong public interest in honoring Congress's statutory scheme and allowing the Judiciary to fulfill its self-policing function. "Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States." *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981). So "[t]he presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of [the government] in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324

(1984) (Rehnquist, J., in chambers). Congress enacted the statutes at issue to ensure the "effective and expeditious administration of justice," 28 U.S.C. § 332(d)(1), and to "create[] a mechanism . . . to address the unfortunate reality that some judges may no longer be fit to perform the duties of their office," Ex. 1, Special Committee Report at 8. And the government "suffers a form of irreparable injury" whenever it "is enjoined by a court from effectuating [a] statute[] enacted by representatives of its people." *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). The public certainly has an interest in seeing both that § 332 is honored and that the Act's procedures are carried out. But these interests do not exist in a vacuum: numerous Federal Circuit staff have expressed significant concerns about their workplace interactions with Judge Newman. Enjoining proceedings midstream under the Act would disserve those employees' legitimate concerns, and cast doubt for those employees, and by extension the public, on the Judiciary's ability to meet its statutory duty to self-police.

For these same reasons, this Court should not intervene to stay the Act-related proceedings. There were over four months of investigation, over 20 staff interviews, and consultation with an expert physician. There were more than a dozen orders issued; multiple requests for examinations, records and interviews; extensive briefing; and an oral argument. The investigation resulted in a Special Committee Report that was 111 pages long with more than 300 pages of supporting evidence. Judge Newman filed her response to the Special Committee's Report on August 31, 2023 and the complete matter is now awaiting decision by the Federal Circuit Judicial Council. After the Judicial Council's decision, it will then be reviewed by the JC&D Committee of the Judicial Conference. It would surely be against the public interest to enjoin a proceeding before that time.

Plaintiff asserts no interest that could outweigh these grave consequences of an injunction. She largely just rehashes her (incorrect) merits positions. *See* Pl.'s Br. at 52 (arguing that "being subjected to disciplinary procedures that do not comport with basic notions of due process constitutes its own irreparable harm"). And she argues that "precluding judges with patent law expertise from sitting on patent (or other matters)" would "deprive[]" the public

"of a robust consideration of legal issues brought to the court." *Id.* at 53. But this argument proves too much; any Article III judge could say the same. After all, each has been deemed qualified enough to be appointed by the President and confirmed by the Senate, and each brings their own experience to bear on the legal issues before them. Yet it cannot be that any single judge's abilities—perceived or actual—provide a public-interest reason that outweighs the Judicial Council's and the public's interest here.

One final reason favors denying injunctive relief: this litigation might be over (or nearly over) before Judge Newman could conceivably begin to hear new cases. As the Clerk of the Court explains in his sworn declaration, the panel-assignment process begins about two months prior to the week in which the court sits. Perlow Decl. ¶¶ 2–10. And panel assignments are finalized no later than the 21st of the month—for example, November 21 for the January sitting. *Id.* ¶¶ 7–8. So even if Plaintiff defeated Defendants' motion to dismiss and prevailed on her preliminary-injunction motion, the earliest sitting to which she could be assigned is January 2024. *Id.* ¶¶ 9–10; Order at 1, ECF No. 22 (setting briefing schedule, with the final brief due by October 30, 2023 at the earliest). And if this case is not dismissed, whatever remains would present purely legal issues that would require the Court simply to apply substantive law to undisputed facts. *See generally* Am. Compl. ¶¶ 80–134. In those circumstances, Defendants could proceed to cross motions for summary judgment expeditiously, with briefing possibly completed before Judge Newman's next potential sitting.

## CONCLUSION

For the reasons explained above, the Court should dismiss Plaintiff's complaint and deny Plaintiffs' preliminary-injunction motion as moot.

DATED:  September 1, 2023                Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         CHRISTOPHER R. HALL
                                         Assistant Director, Federal Programs Branch

                                         /s/ Stephen Ehrlich
                                         STEPHEN EHRLICH
                                         M. ANDREW ZEE
                                         Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         Peter W. Rodino, Jr. Federal Building
                                         970 Broad Street, 7th Floor
                                         Newark, NJ 07102
                                         Phone:  (202) 305-9803
                                         Email:   stephen.ehrlich@usdoj.gov

                                         Attorneys for Defendants