# Exhibit 1

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

## ~~UNDER SEAL (NON-PUBLIC ORDER)~~

_____

### IN RE COMPLAINT NO. 23-90015

_____

## REPORT AND RECOMMENDATION OF THE SPECIAL COMMITTEE*

## July 31, 2023

_____

\* Because this is a redacted version of the Committee's Report and Recommendation, internal citations to page numbers may not be precise.

# TABLE OF CONTENTS

## REPORT AND RECOMMENDATION

**I.    PROCEDURAL BACKGROUND AND COURSE OF THE INVESTIGATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**II.   RECOMMENDED FINDINGS AND CONCLUSIONS** . . . . . . .25

   **A. The Committee Had Authority To Enter the Orders At Issue.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . 26

   **B. The Committee Had a Reasonable Basis for Requiring Medical Examinations and the Production of Medical Records.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      1. Concerns About Judge Newman's Cognitive State Raised by Judge Newman's Interactions with Court Staff. . . . . . . . . . 33
      2. Judge Newman's Significant Delays in Resolving Cases. . . . 50
      3. Recommendation of the Committee's Expert Consultant. . . .58
      4. Committee Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

   **C. Judge Newman's Refusal To Cooperate with the Committee's Orders Is Not Justified By Any Good Cause and Constitutes Misconduct.** . . . . . . . . . . . . . . . . . . . . . . . . . .60

      1. Judge Newman's Refusal To Cooperate with the Committee's Orders Qualifies as Misconduct. . . . . . . . . . . . . . . . . . . . . . . 60
      2. Judge Newman Has Not Shown Good Cause To Excuse Her Refusal To Cooperate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
         a. Proceedings Before the Committee (and the Judicial Council) Do Not Violate Due Process or the Judicial Recusal Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64
         b. The Actions of the Judicial Council and the Committee Do Not Indicate Bias. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

        i.  The Judicial Council's Actions Suspending New Case Assignments Do Not Show Bias. . . . . . . . . . . . . . . . . .76

       ii.  The Committee's Prior Actions Do Not Show Bias. . .80

     iii.  The Judicial Council Has Not Deprived Judge Newman of Equipment or Necessary Staff . . . . . . . . .83

  c.  Judge Newman's Requests for Transfer Lack Merit. . . . . 86

  d.  There Is No Merit To Judge Newman's Assertion that She Has Cooperated with the Committee's Orders or That Defects in the Orders Justify Her Responses. . . . . . . . . .92

  e.  The Neurologist's Report Submitted by Judge Newman Provides No Justification for Her Refusal To Undergo Medical Examinations with Independent Professionals Chosen by the Committee. . . . . . . . . . . . . . . . . . . . . . . . . 98

  f.  Judge Newman's Assertion that the Committee Lacked a Reasonable Basis for Its Orders Is Meritless. . . . . . . . . 104

**III.   RECOMMENDED SANCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . 109

# United States Court of Appeals
# for the Federal Circuit

## UNDER SEAL (NON-PUBLIC ORDER)

———————————

## IN RE COMPLAINT NO. 23-90015

———————————

Before MOORE, *Chief Judge*, PROST and TARANTO, *Circuit Judges.*

PER CURIAM.

### REPORT AND RECOMMENDATION

On March 24, 2023, this Special Committee (Committee) was appointed to investigate, and to report its findings and recommendations with respect to, a complaint identified against Judge Newman raising concerns that she may suffer from a mental or physical disability that renders her unable to discharge the duties of her office. Judge Newman is 96 years old and has served with distinction as an active judge on this Court for 39 years. She has been a valued and respected colleague, and her many contributions to the Court, to the patent system, and to the law cannot be denied. The question presented to this Committee, however, is not whether Judge Newman has had an extraordinary career or whether she has made important contributions to the law. Instead, this Committee is charged with the unenviable task of investigating—in light of her extraordinary delays in issuing opinions and concerns about her mental fitness raised by numerous interactions with court staff—whether Judge Newman now suffers from a disability that renders her no longer capable of performing her job as a judge.

IN RE COMPLAINT NO 23-90015

This difficult inquiry, which it is the Committee's duty to conduct under the governing statute and rules, has been frustrated from the outset by Judge Newman's consistent refusal to cooperate. The Committee repeatedly ordered Judge Newman to undergo a neurological evaluation and neuropsychological testing ("medical examinations") by professionals selected by the Committee and to provide certain medical records, and also requested that she sit for an interview with the Committee. Even when the Committee recounted extensive evidence (described below) raising reasonable concerns that Judge Newman might suffer from a cognitive or physical impairment and reiterated (in some instances for the *third time*) the need for medical examinations and medical records, and the advisability of an interview, Judge Newman still refused to cooperate on all fronts.

As a result, this investigation was amended to include the question whether Judge Newman's refusal to cooperate constituted misconduct. The Committee determined that Judge Newman's refusal to cooperate "significantly impair[ed] the Committee's ability to make a fully informed assessment of whether Judge Newman suffers from a disability." June 1 Order at 2. Under the Judicial Conduct and Disability Act (Act), the Committee is charged with providing the Federal Circuit Judicial Council ("Judicial Council") with a "comprehensive written report" including "findings" on the ultimate question of disability. 28 U.S.C. § 353(c). Because the Committee determined Judge Newman's non-cooperation significantly impaired its ability to make a fully informed assessment of the disability at issue, it *narrowed* the focus of its investigation (at least at this time) to address *solely* the question whether Judge Newman's failure to cooperate constitutes misconduct under the rules adopted by the Judicial Conference to implement the Act. June 1 Order at 2–3. Rule 4(a)(5) of the Rules for Judicial-Conduct and Judicial-Disability Proceedings

2

(Rules) expressly provides that "[c]ognizable misconduct includes refusing, without good cause shown, to cooperate in the investigation of a complaint."

For the reasons explained below, the Committee finds that Judge Newman has not shown good cause for refusing to cooperate with the Committee's orders and that her failure to cooperate constitutes misconduct under Rule 4(a)(5).

One basis for the concern about disability that justifies the orders for medical examinations and records is incontrovertible data from the Clerk's Office establishing that Judge Newman (despite having a significantly reduced workload) is unable to complete her work in a timely fashion. From October 2021 through March 2023, Judge Newman authored (including her dissents) less than half the opinions of an average active judge (28 compared to 61 for an average judge) and her opinions took approximately four times as long to issue (199 days compared to 53 days for an average active judge). And from May 2022 through April 2023, Judge Newman sat on half as many cases as her colleagues (65 compared to 129 for an average active judge). She took four times as long to write half the opinions while sitting on half the number of cases as her colleagues. Moreover, despite having no new cases assigned for what is now six months (April through September 2023), not sitting on motions panels, and having three law clerks and a judicial assistant, Judge Newman still has a backlog of seven opinions that have not issued, and they now average 230 days old.

A second basis for the disability concerns justifying the orders at issue is the extensive evidence gathered from more than 20 interviews with court staff. These affidavits detail staff reports of deeply troubling interactions with Judge Newman that sadly suggest significant mental deterioration including memory loss, confusion, lack of comprehension, paranoia, anger, hostility, and severe agitation.

IN RE COMPLAINT NO 23-90015

These affidavits were provided to Judge Neman on June 1 and the details in them have not been disputed by Judge Newman. Instead, Judge Newman dismissively characterizes the concerns raised by staff as "minutia[e]" and "petty grievances." July 5 Brief at 15. We strongly disagree. The events staff have described raise concerns about serious dysfunction on Judge Newman's part that amply warrant the orders of medical examinations, records, and requests for an interview.

The staff have reported that Judge Newman has been unable to remember from day to day how to perform simple tasks, such as bringing the standard materials (*e.g.*, briefs and bench memos) to court, logging onto the computer network, and locating files. The staff also report that, when help has been offered on these matters, she has appeared "paranoid" and insisted that her devices are hacked and bugged, sometimes by the Court itself. She has appeared unable to comprehend or recall explanations that are given to her, and staff have had to address the same matters over and over with her. Staff across the Court have reported exchanges with Judge Newman in which they have had to answer the same questions from her repeatedly in the same or subsequent days (many recorded in email exchanges), because she has not remembered or understood the answers.

Staff have also raised serious concerns about Judge Newman's ability to manage her chambers. One of Judge Newman's clerks apparently has been assigned personal tasks such as grocery shopping and driving Judge Newman to her medical appointments. That clerk has felt empowered to call Judge Newman's judicial assistant in the middle of the night to demand personal services for herself, such as wake-up calls. When this practice became intolerable and was raised in the Court's Employment Dispute Resolution (EDR) process, the clerk in question refused to agree to halt her midnight calls *even temporarily*. Judge

4

Newman not only failed to take any steps to rectify the matter as supervisor of the employee; she sent an email to roughly 95 court staff exposing details of the confidential EDR matter. When the same clerk, represented by counsel, was asked in this investigation about exactly what work she did in Judge Newman's chambers, she invoked the Fifth Amendment to avoid incriminating herself.

When Judge Newman's judicial assistant felt that Judge Newman was retaliating against him for raising matters in the EDR process (including the conduct of the clerk noted above) and, as part of the EDR process, secured an alternative work arrangement that allowed him to use a work-station outside her chambers, she ignored that temporary resolution. She threatened to have him forcibly removed from the building and arrested and then gave him an ultimatum: return to chambers immediately or she would accept his resignation—*i.e.,* he would lose his job.

When the judicial assistant decided he could take no more, he left her chambers permanently and took on a new assignment within the Court, and his computer was moved with him—which is standard practice, computers being assigned to and moving with individuals within the Court. Judge Newman became convinced that his computer had been stolen along with information from her chambers. No matter how many times the situation has been explained to her by IT staff and the Clerk of the Court (all her chambers information always was stored and remains stored on her network shared drive, not on the hard drive of that computer), she has repeatedly made accusations about a stolen computer with her chambers' information. In one recent interaction, IT staff reported, an "angry" Judge Newman "was pacing back and forth" and "mumbling about how her computer and phone had been taken away from her" and insisted in an "angry voice" that she wanted her "twenty-year-old computer and phone back."

Staff have variously described Judge Newman in their interactions with her as "aggressive, angry, combative, and intimidating"; "bizarre and unnecessarily hostile"; making "personal accusations"; "agitated, belligerent, and demonstratively angry"; and "ranting, rambling, and paranoid." Interactions with Judge Newman have become so dysfunctional that the Clerk of the Court has advised staff to avoid interacting with her in person or, if such interaction is unavoidable, to bring a co-worker with them. The evidence cannot be dismissed as involving only "minutia[e]" or "petty grievance," and it does not evince merely bad behavior; it raises serious concerns about Judge Newman's cognitive functioning.

For these reasons, the Committee was amply justified in issuing its orders demanding medical examinations and medical records, and requesting an interview. And Judge Newman's failure to cooperate with the Committee's orders for medical examinations, medical records, and an interview has prevented the Committee from completing its central task—namely, reaching a conclusion about whether Judge Newman suffers from a disability. She has offered no adequate justification for this failure to cooperate. Her conduct, we conclude, is "prejudicial to the effective and expeditious administration of the business of the courts." 28 U.S.C. § 351(a).

Our conclusion is supported by the holding of the Committee on Judicial Conduct and Disability of the Judicial Conference of the United States (the "JC&D Committee") in the *Adams* case. *See In re Complaint of Judicial Misconduct*, C.C.D. No. 17-01 (U.S. Jud. Conf. 2017) ("*Adams*"). There, a judge subject to an investigation for a possible disability refused to comply with an order to undergo a mental health examination by a medical professional of the special committee's choosing. The JC&D Committee of the Judicial Conference held that the judge's "failure to cooperate through his repeated refusals to

undergo the mental health examination impeded the Judicial Council's ability to conduct a thorough and conclusive investigation," and "[a]s such, it was conduct 'prejudicial to the effective and expeditious administration of the business of the courts.'" *Id.* at 29–30 (quoting 28 U.S.C. § 351(a)).  We find the same here.

Judge Newman has no sound defense of her refusal of the medical examinations and records.  In particular, she has not remotely shown the bases for the Committee's demands for medical examinations and records to be insufficient.  The statistics concerning Judge Newman's case handling unmistakably show Judge Newman's recent inability to keep up with the work required of an active judge on our Court.  And the concerns about disability raised by the staff accounts are not answered by the dismissive characterization of those accounts as involving only "minutia[e]" and "petty grievances."  July 5 Brief at 15.  That response just ignores how those accounts directly evince cognitive problems on Judge Newman's part.  It also treats as beneath notice the considerable toll on staff reflected in the accounts: Judge Newman's actions wore on her judicial assistant's mental and physical health to the extent that he sought help from medical professionals; one of her law clerks reported that working in her chambers "was taking a toll on my mental health"; the Clerk of the Court has reported that Judge Newman's repeated accusations have caused him "emotional stress and discomfort, including loss of sleep and heightened anxiety"; and IT staff have reported being left "shaken and upset" by the interactions with an "angry" Judge Newman.  That Judge Newman has chosen to respond to the staff reports in the way she has, in the Committee's view, only underscores that there are reasonable grounds to have concerns about her cognitive state.

For the reasons set out in detail below, we reject the various arguments Judge Newman has offered to justify

IN RE COMPLAINT NO 23-90015

her refusal to cooperate.  Among other things, Judge New-
man has argued that this proceeding violates due process
because the Chief Judge both initiated the proceeding and
serves as a decisionmaker and because judges on the Judi-
cial Council may be witnesses, and she has claimed that
the actions of the Judicial Council and the Committee show
bias against her.  She has also submitted a report from her
own neurologist, which she claims obviates the need for
any further medical examinations.  None of these argu-
ments has merit.  Some amount to challenges to the funda-
mental choices that Congress and the Judicial Conference
built into the statute and governing rules.  And as for
Judge Newman's neurologist's report, it is settled law that
the Committee may insist on an examination by independ-
ent professionals chosen by the Committee.  In any event
the report Judge Newman offers relied upon the admin-
istration of a partial ten minute test in which the doctor
reported that Judge Newman failed 80% of the memory re-
lated questions and Judge Newman refuses to disclose the
materials which were provided to the doctor in forming his
opinion.  Finally, the scoring of the test has inconsistencies
on its face making it clear that it cannot be relied upon.

We conclude that Judge Newman's action constitutes a
refusal to cooperate that is serious misconduct.  Judge
Newman has prevented the Committee from completing its
assigned task under the Act.  Thwarting the process Con-
gress created for determining whether a life-tenured judge
suffers from a disability is a serious matter.

The Committee's role under the Act is essential for the
proper functioning of the judiciary.  As relevant here, the
Act creates a mechanism, important in a system that pro-
vides judges life tenure to ensure independence, to address
the unfortunate reality that some judges may no longer be
fit to perform the duties of their office.  The Act gives the
judiciary the responsibility for regulating itself in that re-
gard through investigations such as this.  The obligation is

IN RE COMPLAINT NO 23-90015

owed to the litigants and attorneys who come before the Court, the employees who work for the Court, and the general public who must have justified confidence in the competence of the judiciary.

Just as this Committee has a duty to carry out its responsibilities under the Act, all judges have an obligation to cooperate with proceedings under the Act to ensure that self-policing by the judiciary can function properly. Here, to carry out its responsibilities, given the ample bases for concern about disability, the Committee demanded medical examinations and records to address the serious disability issue. Judge Newman, as a member of the judiciary, had a duty to undergo the examinations and provide the records to make the self-policing mechanism work. To refuse to do so here without adequate justification, as Judge Newman has done, is to bring the statutory mechanism for addressing disability to a grinding halt and thus to undermine the interests of litigants, employees, and the public in having that mechanism work.

Under the circumstances, therefore, the Committee believes that Judge Newman's actions thwarting this investigation constitute a serious form of misconduct. That misconduct, which is continuing, cannot be met with a minor sanction that a life-tenured judge might ignore. Instead, the Committee believes that the only sanction that would appropriately address this serious matter is the suspension of all case assignments for a fixed time period of one year, subject to consideration of renewal if the refusal continues after that time and to consideration of modification or rescission if justified by an end of the refusal or by other changes. This sanction is supported by *Adams*, where the JC&D Committee explained that, if the subject judge continued to "refuse to submit to the mental health examination" that had been ordered, "sanctions for [his] continued failure to cooperate—including the prohibition of the assignment of new cases on a temporary basis for a

IN RE COMPLAINT NO 23-90015

time certain—may be warranted." *Adams*, C.C.D. No. 17-01, at 39.

Accordingly, as a sanction for Judge Newman's misconduct in refusing to cooperate with the investigation, the Committee recommends that the Judicial Council preclude Judge Newman from sitting on any new cases (panel or en banc)[1] for one year or until she complies with the Committee's outstanding orders such that the inquiry into whether she suffers from a disability may be completed.

## I. PROCEDURAL BACKGROUND AND COURSE OF THE INVESTIGATION

On March 24, 2023, Chief Judge Moore entered an order pursuant to Rule 5(a) of the Rules identifying a complaint concerning Judge Newman based on information providing probable cause to believe that Judge Newman "'has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts' and/or 'is unable to discharge all the duties of office by reason of mental or physical disability.'" March 24 Order at 1 (quoting 28 U.S.C. § 351(a)). The order explained that the Chief Judge's decision to identify a complaint was based on information provided by judges and court staff raising concerns (i) that Judge Newman was responsible for extensive delays in resolving cases and appeared unable to complete her opinions in a timely fashion, and (ii) that Judge Newman appeared to suffer from "impairment of cognitive abilities (i.e., attention, focus, confusion and memory)." *Id.* at 2. The order noted that, after suffering a heart attack in June 2021, Judge Newman had her workload reduced by being taken off motion panels and having her sittings reduced. *Id.* at 1. In May 2022, she suffered a fainting spell and was unable to walk unassisted, after which her

---

[1] This includes en banc matters in which oral argument has yet to occur.

workload was further reduced. Yet, despite the reduced caseload, Judge Newman experienced extraordinary delays in issuing opinions.

The order further recounted that, as permitted under Rule 5, after receiving such information about Judge Newman, the Chief Judge had conducted a limited inquiry. *See id.* at 2.[2] That inquiry provided substantial additional information concerning Judge Newman's exceptional delays in resolving cases and information from staff describing alleged behavior by Judge Newman in her interactions with staff that raised concerns about Judge Newman's cognitive state. *See id.* at 2–5. Again, acting pursuant to Rule 5, prior to identifying a complaint, the Chief Judge sought to pursue an "informal resolution"[3] with Judge Newman. The Chief Judge met with Judge Newman and explained the concerns that had been raised about Judge Newman's delays in resolving cases and her mental fitness. On March 17, the Chief Judge provided Judge Newman a copy of the order identifying a complaint that would be issued if an informal resolution of the concerns that had been raised could not be reached. Judge Newman refused to reach any informal resolution. Accordingly, the Chief Judge issued the order identifying a complaint on March 24, 2023.

---

[2] *See* Rule 5(a) ("When a chief judge has information constituting reasonable grounds for inquiry into whether a covered judge has engaged in misconduct or has a disability, the chief judge may conduct an inquiry, as he or she deems appropriate, into the accuracy of the information . . . .").

[3] *See* Rule 5(a) ("A chief judge who finds probable cause to believe that misconduct has occurred or that a disability exists may seek an informal resolution that he or she finds satisfactory.").

In a separate order entered on March 24, 2023, pursuant to Rule 11, Chief Judge Moore appointed a Special Committee to investigate the complaint and prepare a report and recommendation for the Judicial Council. Pursuant to Rule 12(a) and 28 U.S.C. §§ 353(a)(1) & 363, Chief Judge Moore was required to make herself a member of the Committee. In addition, she appointed Judges Prost and Taranto. Notice of the order appointing the Committee was provided to Judge Newman as required under Rule 11(g).[4]

The Committee immediately undertook interviews with court staff to gather relevant information concerning both Judge Newman's delays in resolving cases and her interactions with court staff. In addition, in April 2023, pursuant to Rule 13(a) & (c), the Committee retained the services of Dr. ████████████ to serve as an expert consultant to the Committee. Dr. ████████████ professor of psychiatry at the University of Colorado and a board-certified psychiatrist, was recommended to the Committee by the Administrative Office of the United States Courts.

On April 6, an order was entered pursuant to Rule 5 expanding the scope of the Committee's investigation based on a referral from the Committee pursuant to Rule

---

[4] Separate notice to Judge Newman pursuant to Rule 11(f) *before* the appointment of the Committee was not required because, as noted above, Judge Newman had already been provided a copy of the order identifying the complaint on March 17 during the limited inquiry conducted by the Chief Judge. *See* Rule 11(f) ("Before appointing a special committee, the chief judge must invite the subject judge to respond to the complaint either orally or in writing *if the judge was not given an opportunity during the limited inquiry*." (emphasis added)).

13(a) presenting new information. As recounted in the April 6 Order, the information involved a situation in which one of Judge Newman's clerks had been contacting Judge Newman's judicial assistant in the middle of the night on both work matters and personal matters, and the judicial assistant sought informal resolution through the Court's EDR plan. When the Chief Judge emailed Judge Newman about the situation as the supervisor of the employees involved, Judge Newman responded with an email copying the "All Judges" list, thereby disclosing the nature of the confidential employment dispute and the identities of the employees involved not only to all judges on the Court, but also to chambers staff and other employees (95 individuals in all). April 6 Order at 5. Disclosing the EDR matter in that fashion was a clear violation of the confidentiality provisions governing the EDR process. Based on a finding that there was probable cause to believe that Judge Newman's disclosure of a confidential employment dispute matter constituted misconduct, the April 6 Order expanded the scope of the investigation to include this newly identified matter.

On April 7, after the Committee had conducted multiple interviews with court staff and consulted with Dr. ███ ███ concerning the testimony gathered in these interviews, the Committee issued an order determining that it was necessary for the Committee's investigation to have Judge Newman undergo a neurological examination and full neuropsychological testing to determine whether she suffered from a disability. The Committee had consulted with Dr. ███ and described to him some of the information about Judge Newman's delays in issuing opinions and about her interactions with staff, and Dr. ███ provided his view that these medical examinations were necessary to ascertain with a reasonable certainty whether a disability existed. As the April 7 Order recounted, Dr. ███ had identified a qualified neurologist and a qualified

13

neuropsychologist to perform the examinations on an expedited basis in the Washington, DC area. April 7 Order at 2. The order provided the names of these specialists. *Id.* It also noted that "Dr. ▇▇▇ is also available to speak to Judge Newman to answer any questions about the nature of the examination and testing" and provided Dr. ▇▇▇'s telephone number so that Judge Newman or someone acting on her behalf could contact Dr. ▇▇▇ directly. *Id.* The order expressly cautioned that refusal to comply without good cause shown could result in the investigation being expanded to consider whether failure to cooperate constituted misconduct under Rule 4(a)(5). *Id.* at 2–3.

Judge Newman failed to respond to the April 7 Order (or to request an extension of time to respond) by the April 11, 2023 deadline set by the Committee.

On April 13, pursuant to Rule 13(a) at the Committee's request, the scope of the investigation was expanded to include whether Judge Newman's failure to cooperate concerning the ordered medical examinations constituted misconduct. April 13 Order at 2. Judge Newman had also refused to accept service of orders issued by the Committee and instructed the mailroom at her residence to refuse to accept the orders. At the Committee's request, the scope of the investigation was also expanded to include whether failure to cooperate with the investigation in that respect constituted misconduct. *Id.*

On April 17, the Committee issued an order seeking certain medical records and an interview with Judge Newman. Dr. ▇▇▇ had advised the Committee that Judge Newman's medical records related to an alleged cardiac incident and episodes of fainting could shed light on a condition relevant to assessing her cognitive state. Accordingly, the order required Judge Newman to provide medical records related to the health incidents described in the March 24 Order (*i.e.*, what the March 24 Order described as a

14

heart attack and an incident of fainting). April 17 Order at 1. Second, the order required Judge Newman to provide records "of any treatment or consultation in the last two years regarding attention, focus, confusion, memory loss, fatigue or stamina." *Id.* at 2. Third, the order requested that Judge Newman sit with the Committee for a videotaped interview. *Id.* The order proposed that Judge Newman should provide the medical records by May 5, 2023 and required Judge Newman by April 11 to inform the Committee whether she would supply the medical records and sit for an interview or to "provide good cause why an extension of time is needed to respond to this [o]rder." *Id.*

On April 20, pursuant to a request from the Committee under Rule 13(a), an order was entered expanding the scope of the investigation to include whether three additional incidents constituted misconduct by Judge Newman. Because, as described below, the focus of this Report and Recommendation has been narrowed to address whether Judge Newman's refusal to cooperate with the Committee's orders for medical examinations and records and an interview constitutes misconduct, these three incidents are not described in detail here. To the extent the facts are relevant to the Committee's findings, they are described below. *See infra* pp. 34–36, 39–46. In brief, the first matter involved Judge Newman's allegedly abusive and retaliatory conduct towards her judicial assistant                        ,[5] after he had raised concerns about Judge Newman disclosing confidential information and after he had sought resolution through the Court's EDR program of his concerns about his treatment by another member of Judge Newman's staff and retaliatory actions by Judge Newman. The series of events included                        [Judicial Assistant's]

_____

[5]                        was a paralegal performing the functions of what we typically refer to as a judicial assistant. He will be referred to here as a judicial assistant throughout.

15

IN RE COMPLAINT NO 23-90015

workstation being temporarily moved outside Judge New-
man's chambers (at his request) as interim relief pursuant
to his EDR complaints; Judge Newman informing other
staff that she intended to have ▮▮▮▮▮ [Judicial Assis-
tant] arrested or removed from the building; and then
Judge Newman refusing to respect that interim resolution
and ordering ▮▮▮▮▮▮ [Judicial Assistant] to return to
chambers or be deemed to have resigned (thereby termi-
nating his employment). *See* April 20 Order at 2–6. The
second matter involves concerns raised by one of Judge
Newman's law clerks who told Judge Newman that he was
not comfortable working on her personal defense in this
matter; that working in her chambers was taking a toll on
his mental health; and that he wished to be loaned out to
another chambers. Judge Newman's response was an ulti-
matum to him to stay or resign. *Id.* at 6–7. The third mat-
ter involved Judge Newman's interactions with the Court's
IT Department in which she accused the Court of deleting
her emails and files and hacking her computer and
sounded "agitated, paranoid and upset." *Id.* at 8.

On April 21, 2023, counsel for Judge Newman filed a
letter brief ("April 21 Letter"). This was the first time
Judge Newman responded, in any way, to the Committee's
multiple prior orders. In the April 21 Letter, Judge New-
man indicated that she might be willing to cooperate with
the Committee's orders regarding medical examinations,
medical records, and an interview, but insisted that the
Committee first address a request by Judge Newman seek-
ing to have this proceeding transferred to another circuit.
Judge Newman argued primarily that members of the
Committee and of the Judicial Council would likely be

16

witnesses at any evidentiary hearing in this matter and thus could not also act as adjudicators. April 21 Letter at 3.[6]

On May 3, the Committee issued an order responding to the April 21 Letter. Because only the Chief Judge or the Judicial Council may request that the Chief Justice transfer a matter to another circuit pursuant to Rule 26, the Committee's order reflected the Chief Judge's action on the transfer request. *See* May 3 Order at 9 n.1. The order explained that, under the Rules, a discretionary transfer may be considered only in "exceptional circumstances," *id.* at 10 (quoting Rule 26), and that the factors contemplated by that standard were not present in this matter as things stood. With respect to Judge Newman's assertion that judges on the Committee and the Judicial Council "likely" would be called as witnesses at any evidentiary hearing, the order concluded that concern was premature. The Committee explained that it was proceeding in a deliberate, stepwise fashion, and that the most important next stage in the proceeding would be receiving the results of the medical examinations and the medical records, which would likely determine the future course of the proceeding. *Id.* at 12–13. The Committee had determined that the medical examinations and medical records were a vital next step based on (i) data from the Clerk's Office related to Judge Newman's caseload and delays; (ii) the growing body of evidence from staff about their concerning interactions with Judge Newman; and (iii) the recommendation of the Committee's consulting expert, Dr. ████████—*i.e.*, without relying on any information gathered from judges.

---

[6] The April 21 Letter also raised a matter outside the purview of the Committee. On March 8, 2023, the Judicial Council had voted unanimously to preclude the assignment of new cases to Judge Newman. In her April 21 Letter, Judge Newman challenged that action as unlawful.

Indeed, the Committee noted that the extensive evidence the Committee had already gathered (and continued to receive) related to Judge Newman's increasingly confused, erratic, and abusive interactions with staff meant that the interview, medical examinations, and records would "serve an important gating function in determining" what if any further evidence would be needed. *Id.* at 13. Judge Newman's assertion that she would insist on calling judges as witnesses anyway raised a possible future issue that the Committee did not need to anticipate at this fact-gathering stage of the investigation. Accordingly, the order denied the request for a transfer without prejudice to renewing the request after Judge Newman had complied with the Committee's order regarding medical examinations and medical records. *Id.* at 14.

In the same order, the Committee also reissued its orders regarding medical examinations and medical records. *Id.* at 13–14. The May 3 Order described additional information that the Committee had gathered establishing a reasonable basis for requiring the medical examinations and the production of medical records. It also established a new deadline of May 10 for Judge Newman to inform the Committee whether she would comply with the Committee's orders. *Id.*

The Committee had also referred Judge Newman's request for a transfer to the Judicial Council. On May 3, the Judicial Council issued its own order denying the transfer request "without prejudice to re-filing after Judge Newman has complied with the Special Committee requests for medical records and the evaluation and testing ordered by the Special Committee." May 3 Judicial Council Order.

On May 10, 2023, Judge Newman submitted a letter brief ("May 10 Letter") objecting to the Committee's May 3

Order.[7] With respect to the medical examinations, Judge Newman raised three concerns. First, she suggested that she should be permitted to choose the professionals who would conduct any examinations. Second, although the Committee had provided Judge Newman with Dr. ████'s contact information more than a month earlier on April 7 and had explained that "Dr. ████ is ... available to speak to Judge Newman to answer any questions about the nature of the examination and testing," April 7 Order at 2, Judge Newman—without ever contacting Dr. ████— complained that the proposed testing was of "unknown duration and scope." May 10 Letter at 4. Third, Judge Newman objected to the lack of any defined limitation on the use of the examination results. *Id.* As for the medical records, Judge Newman argued that they were irrelevant and that the Committee had not adequately explained how they could be relevant to its inquiry. *Id.* at 3–4. She did not assert that the records sought by the Committee did not exist. Judge Newman did not raise any specific objection to the Committee's request for an interview. The May 10 Letter also reiterated Judge Newman's request that the proceeding be transferred to another circuit.[8] *Id.* at 5–6.

On May 16, 2023, the Committee issued an order responding to Judge Newman's objections. With respect to the medical examinations, the order clarified that the examinations would be entirely non-invasive and would consist of an in-person examination by a neurologist lasting

---

[7] Judge Newman also filed a complaint in federal district court against the members of the Committee in their official capacity and the entire Judicial Council. *See Newman v. Moore*, No. 1:23-cv-01334-CRC, Dkt. 1 (D.D.C. May 10, 2023).

[8] It also repeated her request that the Judicial Council immediately restore her to the rotation for new case assignments. *See supra* n.6.

19

30–45 minutes and a full battery of neuropsychological testing with a neuropsychologist, which would involve an interview and a series of tests involving answering questions and performing tasks "designed to test all major areas of neurocognitive functioning." May 16 Order at 21–22. That testing could take up to six hours. The Committee agreed that, if the neurologist believed that any additional tests (such as blood work or imaging studies) were required, "such testing can be the subject of further discussion between the Committee and Judge Newman after th[e] initial examination has taken place." *Id.* at 22. In response to Judge Newman's concerns about the use that would be made of the examination results, the Committee explained that the results would be used solely to aid the Committee in its determination of whether Judge Newman has a disability and for the preparation of its report and recommendation to the Judicial Council. *Id.* at 23.

With respect to medical records, the May 16 Order "more clearly define[d] [the] requests for medical records." *Id.* at 2. In addition to records related to any treatment concerning "mental acuity, attention, focus, confusion, memory loss, fatigue, or stamina," the Committee explained that it sought records "that relate to Judge Newman's alleged cardiac issues and fainting episode." *Id.* at 4; *see also id.* at 5 (seeking records "concerning her apparent cardiac event and a fainting episode"). The order explained that the Committee's consultant, Dr. ██████, had advised that "medical records related to a cardiac event and a fainting episode . . . may very well shed light on the observed changes in Judge Newman's behavior" that raised concerns about her cognitive capacity. *Id.* at 5.

To address Judge Newman's concerns about privacy related to the medical records, the Committee clarified that the medical records should be provided solely to the neurologist the Committee had selected to evaluate Judge Newman and not to the Committee itself. *Id.* at 6.

In addition, because the Committee had continued to gather additional information since its May 3 Order, the Committee once again summarized the still growing body of information providing a reasonable basis for concern about Judge Newman's cognitive state and supporting the Committee's orders. By the time of the May 16 Order, the Committee had conducted more than 20 interviews with staff members at the Court.

Significantly, because staff members provided extensive evidence raising concerns about Judge Newman's mental state, and because their continuing interactions with her provided additional evidence on an almost daily basis, the Committee had no need to conduct—and never did conduct—any interviews with judges on the Court. The course of the Committee's inquiry indicated that grave concerns about Judge Newman's possibly deteriorating mental state were being demonstrated on an ongoing basis in her interactions with court staff. Accordingly, the Committee's May 16 Order was based solely on (i) data from the Clerk's Office concerning Judge Newman's caseload and delays in issuing opinions; (ii) interviews, affidavits, and one deposition provided by court staff members; and (iii) consultations with Dr.

The Committee concluded the May 16 Order by: (i) once again requiring (for the third time) that Judge Newman undergo the required medical examinations; (ii) once again requiring (for the third time) that she produce the medical records; and (iii) once again requesting (for the second time) that she sit for an interview with the Committee. May 16 Order at 25. The order did not address Judge Newman's request that she be restored to the rotation of sittings because the Committee had no authority to provide that relief, which could be granted only by the Judicial Council.

21

On May 25, 2023, Judge Newman responded stating that she would not comply with the May 16 Order ("May 25 Letter"). Judge Newman indicated that she would comply with the Committee's orders only if (i) the Judicial Council immediately restored her to the rotation of assignments for new cases *and* (ii) if "this matter is promptly transferred to a judicial council of another circuit." May 25 Letter at 3 (emphasis removed). In addition, Judge Newman objected for the first time that the "level of expertise" of the physicians chosen by the Committee to conduct the medical examinations was unknown to her and that the "expertise of these physicians has not been subject to *voir dire* nor to the analysis required by *Daubert v. Merrell Dow Pharma.*, 509 U.S. 579 (1993)." *Id.* at 2.

On May 26, at the request of the Committee pursuant to Rule 13(a), an order was entered expanding the scope of the investigation to include the question whether Judge Newman's refusal to cooperate with the Committee's May 16 Order constituted misconduct.

On June 1, the Committee determined that Judge Newman's refusal to comply with the Committee's orders concerning the medical examinations, medical records, and an interview significantly impaired the Committee's ability to make an informed assessment of whether Judge Newman suffers from a disability and to make a recommendation to the Judicial Council on that issue. *See* June 1 Order at 2–3. Accordingly, the Committee decided to narrow the focus of its investigation to address solely the question whether Judge Newman's refusal to cooperate with the Committee's orders constituted misconduct. *Id.* at 3–4; *see also* Rule 4(a)(5) ("Cognizable misconduct includes refusing, without good cause shown, to cooperate in the investigation of a complaint or enforcement of a decision rendered under these Rules."). Given that narrowed focus, the Committee determined, and Judge Newman agreed, that no evidentiary hearing under Rule 14 would be required because

the misconduct issue could be determined based on the paper record showing Judge Newman's responses to the Committee's orders and because there were no percipient fact witnesses with relevant evidence on that issue. *See* June 1 Order at 4–5; June 15 Letter at 3 ("We agree with this assessment.").9

The Committee ordered Judge Newman to submit a brief, limited to the misconduct issue, by July 5, and it set oral argument to address the same issue to occur on July 13. June 1 Order at 6. Recognizing that Judge Newman might seek to argue that the Committee lacked a reasonable basis for concern about Judge Newman's alleged disability, the Committee also provided Judge Newman all of the witness affidavits and the single deposition transcript that the Committee had gathered by June 1. *Id.* at 5. Because witnesses continued to come forward to volunteer information to the Committee after it issued its May 16 Order, the material provided to Judge Newman included affidavits dated after May 16.

---

9 On June 5, the Judicial Council, treating Judge Newman's requests that she be restored to the rotation of new case assignments*, see supra* nn. 6, 8, as a request for reconsideration of the Council's March 8 order, issued an order considering *de novo* whether Judge Newman should be suspended from new case assignments. The Judicial Council explained that, under its authority under 28 U.S.C. § 332(d), it was suspending Judge Newman from the rotation for new case assignments based on her lengthy delays in issuing opinions. June 5 Judicial Order at 4–5. As the Council explained, it was "concerned that assigning additional cases to Judge Newman now will only interfere with her ability to clear her current backlog and exacerbate delays in her already long-delayed opinions." *Id.* at 4.

The Committee has determined that it is appropriate to consider these post-May 16 materials in assessing whether Judge Newman's failure to comply with the May 16 Order constitutes misconduct.  First, nearly all of the information contained within them had been communicated to the Committee prior to May 16.  Second, it was only on June 1 that the Committee ordered Judge Newman to explain why her actions did not constitute misconduct and Judge Newman was given notice that "[t]hese materials . . . provided the basis for the Committee's conclusion that Judge Newman should be ordered to undergo the examinations and to provide medical records." *Id.*  Additionally, the Committee expressly told Judge Newman the materials could be relevant to any argument she may wish to make in her brief or at oral argument about whether the Committee had a reasonable basis to order the medical examinations and records.  *Id.*  And as of June 1, when the Committee provided Judge Newman with the affidavits and deposition transcript, she still could have changed course and cooperated with the orders.  Judge Newman thereby had notice and the opportunity either to reconsider her position based on the evidence available to the Committee, or to respond to all the material the Committee had in its possession supporting the requirements it was imposing on Judge Newman.  Judge Newman has done neither.  Instead, Judge Newman continues to refuse to cooperate with the Committee's investigation and has dismissed the allegations in these affidavits as "petty grievances" and "minutia[e]."  July 5 Brief at 15.  Moreover, because Judge Newman has an ongoing obligation to cooperate with the Committee's investigation, her ongoing conduct is relevant to the Committee's basis to continue to require medical examinations and records and for assessing Judge Newman's

arguments for good cause as to why she has not, to date, cooperated with the investigation.[10]

Judge Newman submitted her brief on July 5, and on July 13 the Committee heard argument.[11]

This Report and Recommendation follows.

## II. RECOMMENDED FINDINGS AND CONCLUSIONS

Despite the lengthy procedural history that brought the Committee's investigation to this point, the issue currently before the Committee is quite narrow. This Report and Recommendation focuses solely on the question whether Judge Newman's failure to comply with the Committee's orders (i) requiring her to undergo medical examinations with professionals chosen by the Committee; (ii) requiring her to produce certain medical records to those same professionals; and (iii) requesting that she sit with

---

[10] Though we see no error in considering all the evidence provided to Judge Newman on June 1, as she had notice and multiple opportunities to respond to it, even if the Committee excluded the staff-reported interactions that occurred between May 16 and June 1, the Committee would reach the same conclusion: that it had a reasonable basis for requiring the medical examinations and medical records based on the very large amount of other evidence.

[11] Judge Newman had requested that the oral argument be open to the public. June 15 Letter at 1, 3; *see also* July 5 Brief at 1. The Committee denied that request by order dated June 20, 2023, and explained that the Committee would consider publicly releasing a transcript of the argument, with appropriate redactions to protect any confidential information discussed during argument. June 20 Order at 5–8.

IN RE COMPLAINT NO 23-90015

the Committee for a videotaped interview constitutes misconduct.

Our discussion proceeds in three parts.

First, we set out our conclusion that, where there is a reasonable basis to believe that a judge suffers from a disability that impairs his or her capacity to perform the duties of judicial office, the Committee had the authority to enter the orders at issue here.

Second, we explain in some detail that evidence provided to the Committee established a reasonable basis for the Committee to enter the orders at issue, including particularly the order requiring medical examinations with professionals chosen by the Committee. In fact, the evidence provided a clear, strong, and convincing basis for concluding that there are reasonable concerns that Judge Newman suffers from a cognitive impairment that prevents her from performing the duties of her office.

Third, we conclude that Judge Newman's refusal to cooperate with the Committee's orders constitutes misconduct. Judge Newman's refusal to undergo the ordered medical examinations, to provide medical records, and to sit for an interview thwarted the ability of the Committee to reach a final conclusion as to whether Judge Newman suffers from a cognitive impairment. None of the arguments Judge Newman offers to justify her conduct establishes good cause for her failure to cooperate with the Committee's orders with respect to these matters.

## A. The Committee Had Authority To Enter the Orders At Issue.

The Committee concludes that it had authority to enter the orders at issue. The Act and the Rules give the Committee broad authority to gather information in conducting an investigation, and that authority fully encompasses the orders here. Section 353(c) authorizes the Committee to

"conduct an investigation as extensive as it considers necessary." 28 U.S.C. § 353(c). The Rules similarly authorize the Committee to "determine the appropriate extent and methods of its investigation in light of the allegations." Rule 13(a). That authority surely encompasses the Committee's request that Judge Newman sit for an interview. Interviewing the subject is one of the most elementary steps in any investigation.

The Committee's authority is broad enough to empower the Committee—where a reasonable basis exists for believing that a judge may suffer from a disability—to order medical examinations and the production of medical records. The Commentary to Rule 13 expressly recognizes that authority. It explains that, if "the special committee has cause to believe that the subject judge may be unable to discharge all of the duties of office by reason of mental or physical disability, the committee could . . . request the judge to undergo a medical or psychological examination." Rule 13 cmt. And it provides that "[i]n addition or in the alternative, the special committee may ask to review existing records, including medical records." *Id.*

The Committee's authority to demand the examinations and records at issue is confirmed by the JC&D Committee's decision in the *Adams* case arising from the Sixth Circuit. *See In re Complaint of Judicial Misconduct*, C.C.D. No. 17-01 (U.S. Jud. Conf. 2017) (*Adams*). There, a special committee was appointed to investigate a complaint against district judge John R. Adams based on behavior towards his colleagues in the Northern District of Ohio suggesting that he might suffer from a mental or emotional disability that prevented him from fulfilling the duties of his office. *Id.* at 10. The special committee ordered Judge Adams to undergo a mental health evaluation by a psychiatrist selected by the committee and to produce medical records, and Judge Adams refused. *Id.* at 11. The judicial

council of the Sixth Circuit held that his refusal to undergo the examination constituted misconduct. *Id.* at 14.

On review, the JC&D Committee squarely held: "If a judicial council or its special committee has a reasonable basis for concluding that a judicial colleague might suffer from a disability rendering him or her unable to perform the duties and responsibilities of the judicial office, the judicial council and its special committee necessarily possess the authority to request the subject judge undergo a mental health examination." *Id.* at 29; *see also id.* at 36 (holding there was "no error in [judicial council's] determination that Judge Adams should be required to undergo a mental health examination"). The JC&D Committee reached that conclusion even *before* the Rules had been amended to provide specific approval (as quoted above) for a special committee ordering medical health examinations. *See id.* at 30 n.15 (noting that the September 2015 amendments to the Rules were "immaterial to the outcome of this case"). *Adams* determined that the special committee's authority arose directly from "the Judiciary's inherent authority to regulate its affairs, 28 U.S.C. § 332(d)(1), including the conduct and fitness for duty of federal judges, and from its broad investigatory powers and decisional discretion under the Act and the Rules." *Id.* at 29 (citing 28 U.S.C. §§ 353(c), 354(a)(1)(A), and Rule 13(a)). If anything, given the intervening amendment to the Rules, the authority of the Committee in this case is now even more clearly established.

Moreover, the JC&D Committee made clear that a special committee could insist—over the subject judge's objections—that medical evaluations be carried out by independent professionals chosen by the special committee. Part of the central dispute in *Adams* was Judge Adams's insistence that he should be allowed to choose the medical provider to conduct any examination and to circumscribe the nature of the examination. As the JC&D Committee explained: "While Judge Adams has expressed

a preference for being evaluated by an expert of his choosing and an opportunity to direct to some extent the nature of the examination, we conclude that the Special Committee and the Judicial Council appropriately exercised their discretion in determining that an examination by an independent expert is necessary to ensure accuracy and reliability of the procedures and examination results." *Id.* at 32; *see also id.* at 36 ("We share the Judicial Council's view that input from an independent medical expert is necessary to fully and fairly assess Judge Adams's mental condition and fitness to continue to serve as a judge.").

As *Adams* makes clear, the objections Judge Newman has made insisting that she must be permitted some say in selecting the medical providers to conduct any examination and some ability to restrict the scope of any examination, *see, e.g.*, May 10 Letter at 4, are misplaced. *Adams* rejected precisely the same objections in favor of the special committee's authority to require an examination by an independent professional chosen by the special committee to ensure the "reliability" of the examination results. As in *Adams*, the Committee here has determined that it was essential to have independent providers chosen by the Committee perform evaluations of Judge Newman in order to provide the Committee a reliable and independent assessment. Judge Newman is also incorrect in arguing that, under the commentary to Rule 13, "a judge being investigated may, as an alternative to being seen by physicians handpicked by the special committee, instead choose to be seen by another qualified provider and submit those records." May 10 Letter at 4. That is not what the commentary says. To the contrary, after noting that a special committee may require a medical examination, it states that "[i]n addition or in the alternative, the special committee may ask to review *existing* records, including medical records." Rule 13 cmt. (emphasis added). That comment does not give the subject judge any ability to create *new* records and insist

that the special committee must accept them in lieu of an examination by the committee's providers. Instead, it gives the special committee full discretion to require the production of existing records, either in addition to or instead of an examination.

Judge Newman also argues that *Adams* lacks value as a precedent because the order requiring Judge Adams to undergo a mental health examination was never actually enforced. *See* July 5 Brief at 13. It is true that, when the special committee recommended on remand that Judge Adams be sanctioned for continuing to refuse the examination, the Sixth Circuit Judicial Council decided to impose no sanction and did not further insist on the examination. *See* Order & Memorandum, *In re Complaint of Judicial Misconduct*, No. 06-13-90009, at 4 (6th Cir. Judicial Council June 27, 2018). But it reached that decision expressly on the basis that the judges of the Northern District of Ohio (four of whom had been the original complainants) took the position that "Judge Adams's behavior had improved and stabilized" and that there "had been no recurrence of the sort of behavior that occasioned the misconduct finding." *Id.* In other words, Judge Adams changed his behavior and resolved the problem. The fact that, after losing his appeal, Judge Adams changed his behavior and thereby obviated the need for enforcing the order for a medical examination does nothing to undermine the force of the JC&D Committee's decision in *Adams* establishing the legal point that a special committee has the authority to order a judge to undergo a medical examination by independent professionals of the special committee's choosing. Moreover, no change in behavior or lessening of the concerns which necessitated the ordered testing has occurred in this case. If anything, the contrary is true—both the delays in resolving cases, *see infra* pp. 54–56, and the troubling behaviors have continued since Judge Newman's refusal to cooperate. *See infra* pp. 45–50, 105–06.

As discussed more fully below, the JC&D Committee in *Adams* also expressly concluded that Judge Adams's refusal to undergo the mental health examination by the professional chosen by the special committee in that case constituted misconduct. It explained that his "failure to cooperate through his repeated refusals to undergo the mental health examination [ordered by the special committee] impeded the Judicial Council's ability to conduct a thorough and conclusive investigation," and therefore "it was conduct 'prejudicial to the effective and expeditious administration of the business of the courts.'" *Id.* at 29–30 (quoting 28 U.S.C. § 351(a)).

Accordingly, the Committee concludes that it had authority—where there was a reasonable basis to conclude that Judge Newman may suffer from a disability that makes her unable to perform the duties of her office—to issue orders requiring the medical examinations by providers of the Committee's choosing and the production of medical records to those providers. We turn next to describing the evidence that provided a reasonable basis for the Committee's orders.

## B. The Committee Had a Reasonable Basis for Requiring Medical Examinations and the Production of Medical Records.

The evidence gathered by the Committee clearly established that there is, at a minimum, a reasonable basis for concluding that Judge Newman may suffer from a disability that renders her unable to perform the duties of her office. To date, the Committee's investigation has included review of court information on case handling and more than twenty interviews with court staff, one deposition of a staff member, a number of affidavits, and discussions with the Committee's consulting expert, Dr. ████████. These formed the basis for the Committee's conclusion that there was a reasonable basis for requiring the medical

IN RE COMPLAINT NO 23-90015

examinations and medical records in order to determine whether Judge Newman suffers from a relevant disability. All of the affidavits and the deposition transcript were provided to Judge Newman on June 1.

The Committee emphasizes at the outset that its investigation did not include any interviews with judges of the Court. As the March 24 Order identifying the complaint that started this proceeding notes, the initial information provided to the Chief Judge included some information from judges. *See* March 24 Order at 2. As soon as the Committee began its investigation, however, the Committee determined that, compared to pursuing other sources of information, interviewing or otherwise gathering testimony from judges would less likely and less readily produce the desired objective, reliable evidence necessary to resolve the issue before the Committee.

To the extent concerns had been raised about Judge Newman's delays in her work, the Committee determined that data from the Clerk's Office was the most objective, authoritative, and reliable source of information available to the Committee about Judge Newman's caseload and the time she takes to issue opinions. From the very start of its work, the Committee also received a large volume of information from staff members describing concerns about their interactions with Judge Newman. The staff members themselves were the best source of information about whether such interactions created a reasonable basis to suspect a disability problem relevant to fulfilling the duties of an active judge. Those two sources of information, the Committee concluded, would be the best bases on which to make the determination, in particular, whether a demand for medical examinations and medical records was warranted. Interviewing judges was unnecessary and would have presented an additional challenge of steering clear of anything subject to being characterized (accurately or not)

as a disagreement about the merits of cases.¹² Thus, no testimony from judges, formal or informal, was included in the scope of the Committee's inquiry.

In this section of the Report, we address, in sequence, the information about Judge Newman's interactions with staff, the information about Judge Newman's delays in resolving cases even with a reduced workload, and the recommendations of the Committee's expert consultant. We then state the Committee's conclusion that there is an ample basis for requiring the medical examinations and records at issue. Thereafter, in Section II.C of this Report, we address why Judge Newman's refusal to comply with that requirement is misconduct and why she has not shown good cause justifying the refusal.

## 1. Concerns About Judge Newman's Cognitive State Raised by Judge Newman's Interactions with Court Staff.

Court staff from the Clerk's Office, the Information Technology (IT) and Human Resources (HR) offices, and Judge Newman's own chambers have reported that, in their interactions with Judge Newman over the course of the last one to two years, Judge Newman has exhibited behavior that indicates significant mental deterioration, including memory loss, lack of focus, confusion, uncharacteristic paranoia, severe agitation, and the

---

¹² *Cf.* 28 U.S.C. § 352(b)(1)(A)(ii) (authorizing chief judge to dismiss a complaint "directly related to the merits of a decision"); Rule 4(b) (excluding allegations related to the merits of a decision from the scope of cognizable misconduct); *In re Complaint of Judicial Misconduct*, 37 F.3d 1511, 1515 (U.S. Jud. Conf., Committee to Review Circuit Council Conduct & Disability Orders 1994) (noting that allegations directly related to the merits of a decision "are not cognizable under the Act").

IN RE COMPLAINT NO 23-90015

inability to remember and execute simple tasks she was once capable of completing. Some of the concerns raised by staff are detailed below.

Several court staff members reported that over the last year Judge Newman frequently claimed that her email and computer were being hacked—also, at times, that her phones were being bugged—and that her complaints have increased from once or twice a week to almost daily or every other day. *See* ████████ Aff. [1] ¶¶ 3, 7–10; ████ Aff. [2] ¶ 14; ████ Aff. [3] ¶¶ 2–4, 6; ████ Aff. [4] ¶ 4. They describe her demeanor when making these complaints in some instances as "agitated" and "paranoid" and the conversations as sometimes "bizarre" and "nonsensical." ████ Aff. [4] ¶ 8 ("I would describe Judge Newman's response as nonsensical because there was no reason to believe any of that was happening."); *see* ████ Aff. [1] ¶ 8 ("She seems agitated and paranoid, and we frequently have to calm her down in order to help her with her problem."); *see also* ████ Aff. [5] ¶ 5 ("I found Judge Newman's behavior during this whole event to be very bizarre and confusing.").

Staff reported that, in the past, Judge Newman claimed that the culprits who were hacking and bugging her devices were bloggers and the media who were out to get her and bring her down. ████ Aff. [2] ¶ 14. More recently, staff reported that she claimed that it is the Court itself hacking and bugging her devices. ████ Aff. [1] ¶ 3; ████ Aff. [4] ¶¶ 4, 8. She has claimed that things were disappearing from her computer and that the Court itself was responsible. ████ Aff. [6] ¶¶ 3, 5; ████ Aff. [4] ¶¶ 4, 8. At one point, she suggested that the Court was interfering with mail at her residence as well. ████ Aff. [4] ¶ 8.

In each instance, IT staff scanned her devices and found no evidence to justify or support Judge Newman's

concerns. ▮▮▮▮ Aff. [2] ¶ 14 ("ITO would inform me that there were no concerns or IT issues."); ▮▮▮▮ Aff. [3] ¶ 3 (describing that IT would "scan for malware and viruses, [and] there would be nothing that would suggest any malicious interference with her computer"). Staff indicated that her claims about hackers usually stemmed from her having forgotten where she saved a file or email, and even after the IT staff located the file or email for her (on her desktop or in one of her folders) she sometimes would continue to allege that hackers were responsible for hiding the file. ▮▮▮▮ Aff. [3] ¶ 3 ("Judge Newman routinely blamed her inability to find a file or email on someone 'hacking' her computer…I would usually be able to find the file she was looking for on a desktop folder or other location where she had forgot she saved it to. Rather than take responsibility for the errors, she would blame hackers or the computer."); ▮▮▮▮ Aff. [2] ¶ 14 ("She seemed constantly paranoid about this despite no actual basis for her to be concerned."); ▮▮▮▮ Aff. [1] ¶ 8 (stating Judge Newman's concerns "seem to be easily explained by . . . forgetting what she was doing or not realizing that the network disconnected her based on inactivity"). Judge Newman's paranoia about hacking and her consistent inability to comprehend that she merely misplaced files (despite the explanations given to her by court staff) support the Committee's determination that there was a reasonable basis for the ordered medical examinations and records.

The IT Director reported that the last time Judge Newman participated in the Court's mandatory security awareness training she was unable to complete it. ▮▮▮▮ Aff. [3] ¶ 5. The training consists of watching a 10–20 minute video and answering some multiple choice questions about the video. *Id.* The IT Director indicated that Judge Newman repeatedly failed the test. *Id.* She was unable to get the multiple-choice questions correct even after watching the short video several times—even though retesting

involves presentation of the same multiple-choice questions each time. *Id.* Ultimately, the IT Director watched the video with her, after which she was still unable to answer the same questions. *Id.* He reported having to feed her the answers in order for her to pass and that she was simply unable to retain the information she had just been presented multiple times. *Id.* This staff member indicated that he has worked with Judge Newman for many years and that, in the past, he was amazed at how quickly and easily she picked things up when she was in her 80s. *Id.* ¶ 2. Over the last few years, however, he noticed a change. He recounted that she now gets easily confused, has trouble retaining information, and forgets how to perform basic tasks that used to be routine for her. *Id.* ("However, particularly over the last few years, I've noticed a significant increase in Judge Newman forgetting how to perform basic tasks that used to be routine for her."). This information from staff suggests that Judge Newman has difficulty retaining information and forming new short-term memories and supported the Committee's concern about possible cognitive impairment which necessitated securing medical examinations and records.

Other staff reported similar instances in which Judge Newman forgot how to do simple tasks that she previously had no difficulty performing, such as logging into our Court system or network, remembering where she put court materials, and bringing her briefs and case materials to court on oral-argument days. ▮ Aff. [2] ¶ 23 ("She used to have everything prepared for oral argument. However, for the last three months, she would show up on argument days without case materials she would typically bring with her . . . ."); ▮ Aff. [1] ¶ 9 ("She never used to have a problem with these routine tasks" for "processes [that] have not changed" "but now seems to repeatedly forget how to do them."). These instances did not involve new tasks or new technologies, but familiar ones.

Staff reported that Judge Newman has recently been having trouble recalling events, conversations, and information just days old and trouble comprehending basic information that court staff communicate to her. ▮▮▮ Aff. [2] ¶ 10 ("I have on multiple occasion[s] seen Judge Newman have trouble recalling events and information."); *id.* ¶ 11–12 (chambers staff member describing Judge Newman forgetting recent conversations and that "Judge Newman did not recall the opinion that was issued a day earlier"); ▮▮▮ Aff. [1] ¶¶ 7–11; ▮▮▮ Aff. [7] ¶ 4 (reporting that Judge Newman asked her the same question related to compensation for a temporary employee four separate times in an approximately 24-hour period); ▮▮▮ Aff. [8] ¶ 37–39 (reporting Judge Newman could not comprehend location of documents after five separate attempts to explain).

Her judicial assistant, who spoke to her by phone every workday and was present in chambers every workday between approximately December 2021 (when he started in that role) and April 2023, explained that Judge Newman's "memory loss and confusion has increased significantly since [he] started at the court." ▮▮▮ Aff. [2] ¶¶ 1, 4–5, 10. He added that in daily telephone calls he would have to repeat information about the status of cases over and over to her and that she would forget whether she had voted on cases or had circulated opinions to the panel for vote. *See id.* ¶¶ 12–13. He also recounted how Judge Newman selected pictures of herself from her personal collection for use in a display the library was preparing—yet when these pictures were shown to Judge Newman the next month, she had no idea where they had come from and even stated that she had never seen them before. *Id.* ¶ 11 ("She seemed to have entirely forgotten about our prior recent meetings."). And he reported that, in her last three oral argument sittings, she showed up to court without any

IN RE COMPLAINT NO 23-90015

of the materials she would typically bring to court (such as briefs and bench memos). *Id.* ¶ 23.

Judge Newman's judicial assistant further related a recent episode in which Judge Newman indicated that she was not required to comply with a Court rule that required circulating votes on opinions within 5 days. *See id.* ¶ 22. This rule was unanimously adopted by the Court (including Judge Newman) in March 2018. The staffer recounted that Judge Newman said that she did not have to comply with this rule because Chief Judge Markey told her she could take 30 days to vote. *Id.* Chief Judge Markey has been dead for 17 years and has not been a member of the Court for 32 years.

Other staff reported similar evidence of cognitive problems in various contexts—such as inability to perform simple tasks from one day to the next, even though she performed them independently for years without difficulty. ▉ Aff. [1] ¶¶ 7–9, 10 ("Judge Newman was simply not comprehending the simple process for using the application that she used to have no problem handling on her own."); ▉ Aff. [3] ¶ 2 ("However, particularly over the last few years, I've noticed a significant increase in Judge Newman forgetting how to perform basic tasks that used to be routine for her."); ▉ Aff. [2] ¶ 23. One staff member stated, "Though it is difficult to say this, I believe Judge Newman is simply losing it mentally." ▉ ▉ Aff. [1] ¶ 12.

Many court staff reported that during conversations or email exchanges Judge Newman would ask the same questions, requiring provision of the same answer over and over in short periods of time. ▉ Aff. [8] ¶¶ 5, 7–16 (describing multiple instances reminding Judge Newman that he had not interfered with her chambers staff or computer); ▉ Aff. [7] ¶ 3; *see also* ▉ Aff. [2] ¶¶ 10–11. Staff indicated that at times she seems confused and

suspicious and to be struggling to comprehend or remember what she is being told. ▆▆▆ Aff. [7] ¶ 3 ("I had to answer the same questions repeatedly and then wait for answers on those same issues to move forward."); ▆▆▆ Aff. [8] ¶5 ("[I]t appeared to me that from one email to the next Judge Newman either did not read or did not recall the lengthy prior explanations I provided to her."); ▆▆▆ Aff. [9] ¶ 3 ("She was suspicious and confused and struggled to comprehend how the [calendaring] error occurred."); ▆▆▆ Aff. [1] ¶ 9 ("We have to walk her through the same steps over and over and she does not seem to remember them from day to day.").

Another Clerk's Office staff member reported an incident in which he had to assist Judge Newman to the courtroom and where she had to stop and sit outside the robing room to "gather the energy to stand." ▆▆▆ Aff. [9] ¶ 5. He said that "[s]he seemed lost and confused, like she wasn't fully there." *Id.* He also, like other employees, reported having to answer the same questions from her over and over in the same conversation. *Id.* ¶ 3. He indicated that Judge Newman was "suspicious and confused and struggled to comprehend" how an error in calendaring had occurred. *Id.* He explained it to her repeatedly, but she acted "distrustful." *Id.*

In addition, recent events surrounding the departure of one of Judge Newman's law clerks and her judicial assistant from her chambers have raised concerns on multiple fronts, including (1) Judge Newman's apparent inability to manage staff in her chambers, (2) her inability to remember (or unwillingness to comply with) either the confidentiality requirements of the Court's EDR process or outcomes established in that process, (3) her inability to remember or comprehend repeated explanations given to her about simple staffing and IT matters related to the departure of these employees from her chambers, and (4) her hostile and

accusatory interactions with staff based on perceived wrongs that have never actually occurred.

Judge Newman's judicial assistant recently raised a matter concerning events in Judge Newman's chambers pursuant to the confidential EDR process. The judicial assistant alleged that Judge Newman's ████████ law clerk was calling him in the middle of the night to assign both professional and personal tasks. ████ Aff. [2] ¶ 35. For example, it was alleged that the ████████ law clerk called the judicial assistant at 3:00 am to tell him to give her a wakeup call at 6:00 am. *Id.*; ████████ Aff. [10] ¶ 1. The judicial assistant asked Judge Newman to ensure that phone calls and text messages during the middle of the night would be stopped, but Judge Newman did nothing, based on the view that "people hav[e] different schedules." ████████ Aff. [2] ¶ 35; *see also id.* ("Despite my requests to stop, the clerk continued to contact me outside of regular working hours after bringing the matter to Judge Newman's attention."); ████████ Aff. [10] ¶¶ 1, 4.

Judge Newman not only failed to take any steps to rectify the situation (even after she was approached as part of the EDR process), *see* ████ Aff. [2] ¶ 35 ("Judge Newman attributed these inappropriate communications to people having different schedules and did nothing about it."); ████ ████ Aff. [10] ¶¶1–4, she sent an email to 95 individuals at the Court (nearly the entire court staff) disclosing the confidential EDR matter (including the identity of the employees). *See* April 6 Order at 2–6 (quoting Judge Newman's April 5 emails). And she suggested in the email that the middle-of-the-night contacts and her judicial assistant's concerns were not "significant." *Id.* at 6; ████████ Aff. [10] ¶¶ 1, 3–4. The EDR process and its confidentiality are hallmarks of the judiciary's workplace conduct program. EDR Plan for the Federal Circuit § IV.B.1 ("All individuals involved in the processes under this Plan must protect the confidentiality of the allegations of wrongful conduct . . .

Information will be shared only to the extent necessary and only with those whose involvement is necessary to address the situation."). Judge Newman's conduct raises questions about her ability to remember or understand or appreciate important confidentiality requirements and to manage the administration of her chambers. Her refusal to participate in the EDR proceedings when they involved her chambers staff—and even when they involved complaints about her—raises concerns about Judge Newman's ability to follow rules and manage staff, which may be related to a potential cognitive impairment.

Further concerns, potentially extending to Judge Newman's case handling and functioning more generally, were raised when the Committee sought information from Judge Newman's ████████ clerk. In response to questions seeking basic information about her duties, the clerk—on advice of counsel—invoked her Fifth Amendment right to remain silent to avoid incriminating herself. For example, when asked, "Q. We understand that you are her █████ clerk. Can you tell us about that role and what your responsibilities are? A. I am going to invoke my right under the Fifth Amendment to avoid self-incrimination." █████ Deposition at 4:5–9. She likewise asserted the Fifth Amendment in response to questions about estimating how many bench memos she has prepared in the last year, whether she's ever prepared draft opinions, and whether she is currently working on any pending cases at the Court. *Id.* at 8:13–21, 32:10–20. She further invoked the Fifth Amendment when asked about her perceptions of Judge Newman's ability to carry out her job. *Id.* at 30:4–9. And other information suggests that this clerk has taken on tasks such as doing Judge Newman's grocery shopping. *See* █████ Aff. [2] ¶ 23 ("It is my understanding that this law clerk would also drive Judge Newman to medical appointments and for special events and do her grocery shopping.").

41

IN RE COMPLAINT NO 23-90015

A number of the communications already cited grew out of two separate but contemporaneous departures from Judge Newman's chambers—by her judicial assistant, and by one of her law clerks.  In April 2023, the judicial assistant raised concerns that Judge Newman had become "hostile" to him and was retaliating against him for a report he made to the Chief Judge in March stating that Judge Newman had improperly disclosed certain confidential information.  ████ Aff. [2] ¶¶ 24–31.  Through the EDR process, the judicial assistant was given an alternative workstation outside Judge Newman's chambers.  *Id.* ¶¶ 31–32.  Judge Newman told other members of her chambers staff that her judicial assistant could no longer be trusted.  ████ Aff. [11] ¶ 4 (law clerk stating he was informed by Judge Newman to no longer include ████ ████ [Judicial Assistant] on chambers communications "because he could not be trusted").  One of her law clerks reported, on April 18, "Judge Newman asked her law clerks if we could handle ████ [Judicial Assistant's] responsibilities without him.  We all agreed that the clerks could handle those responsibilities."  *Id.* ¶ 13.  Multiple other staff members reported the same day that Judge Newman stated her intention to have her judicial assistant forcibly removed from the building or arrested.  *See* April 20 Order at 5–6; ████ Aff. [1] ¶ 6 ("Judge Newman then said that she was going to have ████ [Judicial Assistant] 'removed from the court' or 'arrested.'"); ████ Aff. [4] ¶ 19 ("Judge Newman stated that she would have ████ [Judicial Assistant] removed from the court or arrested.").  Although Judge Newman had been informed that her judicial assistant was temporarily provided an alternative workplace under the Court's EDR plan, she refused to accept that special accommodation (or could not remember it), and on April 19 she gave the judicial assistant an ultimatum: return to chambers immediately or she would accept his resignation (*i.e.*, he would lose his job).  April 20 Order at 5; ████ Aff. [2] ¶ 34 ("I

42

understood Judge Newman as saying that she was going to terminate me immediately unless I dropped my request for an alternative work arrangement under the court's Employment Dispute Resolution Plan . . . .");      Aff. [10] ¶ 8.

In light of these events, the judicial assistant successfully sought employment at the Court outside Judge Newman's chambers, and an email was sent to Judge Newman and her chambers staff on April 19, 2023, informing them that the judicial assistant was no longer a member of the Newman chambers and that he wished for there to be no further communication to him by any member of the Newman chambers including the Judge herself. *See* Ex. 1; Aff. [10] ¶ 9.

On the same day, one of Judge Newman's law clerks also sought to and did remove himself from Judge Newman's chambers. He alleged that Judge Newman was utilizing her clerks to do research projects related to her disability defense rather than court-related work. *See* Aff. [11] ¶ 8. He informed Judge Newman that he was uncomfortable performing personal work for her rather than court-related work. *Id.* ¶ 6. He also indicated that he was uncomfortable in chambers after Judge Newman told him that her judicial assistant could not be trusted and should be excluded from all chambers communications. *Id.* ¶¶ 2–4, 7, 9–16. He testified that he started teleworking to avoid the "drama, politics, and stress" in chambers. *Id.* ¶ 7. He requested to be transferred to another chambers. *Id.* ¶¶ 11, 14. Judge Newman refused to let him work for another judge, indicating that the optics would not be good for her and that he had two choices: stay in chambers or resign. *Id.* ¶ 14. The law clerk resigned, and he was taken on as a law clerk by another judge of the Court; he requested no further contact with Judge Newman, and Judge Newman received an email to that effect on April 19, 2023. *Id.* ¶ 17; *see* Ex. 2.

The circumstances surrounding the departure of these two employees from Judge Newman's chambers themselves raised several concerns about her management of employees and use of government employee time, her refusal to respect (or remember) the availability of an alternative work arrangement that had been established in the EDR process, and her wholly inappropriate threats about having employees fired or arrested. And her further reactions in the aftermath of these events raised additional concerns as they suggested an inability to remember events, an inability to understand or remember basic explanations that were given to her, and a tendency to make hostile and irrational accusations against staff members.

For example, on April 19, 2023, Judge Newman and her staff were sent emails indicating both (i) that one of her law clerks resigned effective that day and did not wish to be contacted by any member of the chambers, including the Judge, and (ii) the judicial assistant was no longer a member of the Newman chambers and that he similarly wished there to be no further communication with him. *See* Exs. 1–2;          Aff. [10] ¶ 9. Judge Newman expressly acknowledged receiving the email about her law clerk, indicated that her clerk's resignation was "appropriate," and stated that the clerk's separation from her chambers should be expeditiously processed. *See* Ex. 2. Yet eight days later, on April 27, 2023, Judge Newman sent an email to all judges on the Court indicating that she had not "released" the law clerk and that his continued service at the Court in another chambers was "in violation of my right to law clerk services." Ex. 3. Similarly, Judge Newman was fully informed that her judicial assistant had resigned on April 19. Yet on April 27, 2023 (again just 8 days later), she sent an email to all judges stating: "I never released my judicial assistant [] from my chambers staff. His

movement to your staff,[13] without consultation with me, violates his confidentiality and other obligations to me." *Id.* Despite being repeatedly told that the judicial assistant chose to leave her chambers because of her alleged abusive treatment of him, Judge Newman has accused the Court, various judges, the Chief Judge, and our Clerk of Court on multiple occasions of having improperly taken her judicial assistant away and/or depriving her of secretarial services. *See* Exs. 4–6; *see*         Aff. [8] ¶¶ 4, 10–11, 13 and attached exhibits (quoting Newman May 17 email stating that he "deprived [her] of secretarial services" (alteration in original)).

These facts raise concerns about Judge Newman's confusion, memory, ability to properly manage her chambers staff, and ability to interact with court staff—all of which contribute to our concerns that she may have a disability which renders her unfit to continue as an active judge.

Still further events following the judicial assistant's departure from Judge Newman's chambers add to the grounds for concern about her inability to remember or understand basic explanations. Our        Human Resources (HR) [Employee] tried for weeks to work with Judge Newman to replace her judicial assistant. As emails from HR indicate, Judge Newman was informed on April 24, 2023, that she could rehire her *former* judicial assistant on a temporary basis (as Judge Newman had requested). Then, on April 27, 2023, Judge Newman was informed that she could advertise to hire a new permanent judicial assistant.[14] *See*       Aff. [7] ¶¶ 3–5 and attached exhibits;

---

[13] The former judicial assistant now works in the Clerk's Office and as a courtroom deputy.

[14] For multiple reasons, including the pending EDR proceeding concerning Judge Newman's treatment of her judicial assistant, the Judicial Council had initially placed

IN RE COMPLAINT NO 23-90015

Ex. 4.  From that point, HR tried repeatedly to work with Judge Newman both to bring back her requested temporary judicial assistant and to post an opening for a new permanent person. ▓▓▓▓ Aff. [7] ¶ 2; *id.* ¶ 3 ("I had over 20 email and phone call exchanges with Judge Newman over this time trying to get her approval [for temporary and permanent hiring]."). HR reported exchanges in which Judge Newman asked the same questions over and over, requiring the same answer to be given repeatedly. For example, Judge Newman asked HR whether her former judicial assistant (a retired annuitant) would face a salary offset to her pension if she returned. *Id.* ¶ 4. HR informed her in writing that her assistant would receive both her full pension *and* salary for hours worked at the Court. *Id.* Judge Newman responded 30 minutes later, "To be clear: Are you saying she would receive no additional pay for working at the court?" *Id.* In the same 24-hour period, HR reported having to answer this same question *four* separate times. *Id.* There was a subsequent email to Judge Newman explaining that any delays in acquiring the approved support services were entirely due to her not giving permission to move forward to fulfill her own request. *See id.* ¶ 5; *see also* Ex. 4 at 1. Judge Newman's communications and interactions regarding the process of replacing her assistant and her repeated claims that her assistant had been taken away from her and that she was denied secretarial services raise further concern about possible memory loss and confusion.

---

a pause on hiring new personnel for Judge Newman's chambers on April 20, 2023. Four days later, on April 24, 2023, Judge Newman's request to bring back, on a temporary basis, the person who had served as her judicial assistant until a year and a half earlier was approved.

Judge Newman also has become convinced that, when her judicial assistant's computer was moved out of her chambers along with him (as is standard practice), *see* ⬛ ⬛ Aff. [8] ¶ 28, information from her chambers was removed with it. Multiple staff members from the IT Department and the Clerk's Office have explained to her that all chambers information was stored on her chambers' shared network drive, not the hard drive on that computer; that the hard drive on that computer had specifically been checked multiple times and contained none of her chambers' information; and that IT could help her locate whatever information she needs. *See* Ex. 6 at 9 ("We have checked, double checked and tripled checked and there is no data on any local computer or drive that belongs to you. All of your data is on the Newman share. There is absolutely nothing to give you."); ⬛ Aff. [8] ¶¶ 27–40 and attached exhibits; ⬛ Aff. [6] ¶¶ 2–6. Judge Newman, however, either was unable to understand or refused to accept these explanations. Instead, she repeatedly accused various staff members of involvement in stealing her computer and files.

Our Clerk of Court[15] has detailed Judge Newman's repeated email accusations that he was involved in "illicit removal" of equipment from her chambers and that he participated in the theft or removal of chambers records including her financial disclosure information—along with accusations that he was acting as Chief Judge Moore's lawyer, that he was Judge Newman's "adversary," and that he repeatedly withheld secretarial services from her. ⬛ ⬛ Aff. [8] ¶ 4 and attached exhibits. He has reported how he had to explain to Judge Newman *five* separate times that no one had stolen her computer or her records and that he verified that fact and had our IT Department

---

[15] Before July 1, our current Clerk of Court was Deputy Clerk and at times Acting Clerk of Court.

verify it on multiple occasions. *Id.* ¶¶ 25–40. He has described Judge Newman's behavior toward staff as "agitated, belligerent and demonstratively angry." *Id.* ¶ 37 and attached exhibits. And he has stated that "the hostile nature of Judge Newman's personal accusations against me stands in sharp contrast to how I have interacted with any of the other 50-or-so federal judges with whom I have worked both in the Federal Circuit and in other federal courts since I began working in the federal judiciary in 2004." *Id.* ¶ 5.

IT Staff, for their part, have reported that, after Judge Newman had once again accused the Clerk's Office employees of stealing her computer and files, on May 16, 2023, IT was sent to her chambers to assist her. ███████ Aff. [6] ¶ 2; *see also* ███ Aff. [5] ¶¶ 1–5. The IT staff told Judge Newman that they knew exactly where her financial disclosure information was located on her desktop and offered to show her. ███████ Aff. [6] ¶¶ 3–5. They reported that she angrily refused to let them touch her computer. *Id.* ¶ 3. They offered to show her law clerk where the file was located if she preferred. *Id.* ¶ 6. She refused that assistance as well. *Id.* It was reported that she was "clearly upset and frustrated and was walking back and forth mumbling about how her computer and phone had been taken away from her when that was not the case." *Id.* ¶ 8; *see also* ███ Aff. [5] ¶¶ 3, 5 ("Judge Newman was pacing back and forth and visibly angry and frustrated . . . . I found Judge Newman's behavior during this whole event to be very bizarre and confusing."). The staff reported that Judge Newman became angry and accused her judicial assistant of having stolen her computer, phone, and files and demanded "that she wanted her 'twenty-year-old computer' back." ███████ Aff. [6] ¶ 4. The staff reported that she was so angry they feared she might collapse. *Id.* ¶ 7 ("I got worried that Judge Newman was getting so angry that she might collapse or have

a heart attack if the conversation continued."). The staff was left shaken by the exchange. *Id.* ¶ 8.

Various employees have described the toll that recent encounters with Judge Newman has taken on them causing them serious anxiety, stress, and discomfort.

Aff. [8] ¶¶ 5, 36 (" [Help Desk Manager] was audibly upset and bothered and he said it was due to how Judge Newman behaved and treated him . . . ."); *id.* ¶ 6 (stating interactions with Judge Newman caused "emotional stress and discomfort, including loss of sleep and heightened anxiety"); Aff. [6] ¶ 8 ("I was left shaken and upset from this experience."); Aff. [2] ¶ 37 ("The past few months have been extremely stressful and have caused severe anxiety and emotional distress brought on by Judge Newman's recent behavior towards me . . . ."); Aff. [11] ¶ 14 ("[W]orking in [Judge Newman's] chambers was hurting my ability to complete my work, taking a toll on my mental health, and harming my relationships at the court."); Aff. [10] ¶¶ 9, 10 (describing [Judicial Assistant] as "visibly emotional" due to Judge Newman's behavior and having confided "the toll that this entire experience was taking on his physical and mental well-being, including seeking help from medical professionals"). Court staff have reported that because of the difficulties they are experiencing with Judge Newman, they now bring a second employee with them if they are required to go to the Newman chambers.

Aff. [5] ¶ 1; Aff. [6] ¶ 1; Aff. [8] ¶ 6 ("I requested that staff attempt to engage in conversations with Judge Newman only by email or to bring a second person along if required to go to her chambers.").

These reports from staff paint a consistent and disturbing picture that established a reasonable basis for concern that Judge Newman may suffer from a cognitive impairment that renders her unable to perform the duties of her

IN RE COMPLAINT NO 23-90015

office. They describe a judge who cannot remember how to accomplish simple, routine tasks such as logging onto the computer network or finding files—but who diverts blame with paranoid assertions about hackers (or the Court) deleting her files. They describe a judge who cannot manage staff within her chambers and who permits wholly unreasonable treatment of some staff members by others (such as 3:00 am telephone calls), who refuses to respect the Court's EDR process, discloses confidential information from that process, and threatens the employment of staffers who avail themselves of remedies under that process. They also describe a judge who cannot be reasoned with and who cannot understand that the hard drive on a computer that was moved from her chambers along with a departing employee did not contain any of her chambers' information on it—and who, as a result, repeatedly lashes out at innocent staff members with irrational accusations that they are serving as counsel opposed to her or were involved in the "illicit removal" of her computer. In short, consistent reports from so many different staff members describing memory loss, confusion, paranoia, and angry rants directed toward staff raise concerns that Judge Newman may have a disability that renders her unable to perform the duties of her office. They amply establish that the Committee had a reasonable basis for ordering medical examinations and the production of medical records.

## 2. Judge Newman's Significant Delays in Resolving Cases.

Judge Newman's significant delays in resolving cases also reasonably support the conclusion that she may suffer from a disability that prevents her from effectively and expeditiously carrying out the duties of her office.

| Time Period | # of Maj. Op. PN | Assign-ment to Issuance Average for PN Opinions | # of Maj. Op. Average for Other Ac-tive Judges | Assign-ment to Issuance Average for Other Active Judges |
|---|---|---|---|---|
| 10/20-9/21 | 9<br><br>25<br><br>(including separate opinions) | 249 days | 42<br><br>44<br><br>(including separate opinions) | 61 days |
| 10/21-3/23 | 10<br><br>28<br><br>(including separate opinions) | 199 days | 58<br><br>61<br><br>(including separate opinions) | 53 days |

Between October 1, 2021 and March 24, 2023, Judge Newman authored only 10 majority opinions compared to an average of approximately 58 for the other active judges on the Court.                    Aff. [12] ¶¶ 17–18. Even accounting for dissents and concurrences, during this time period, the average active judge authored 61 opinions, whereas Judge Newman authored 28. *Id.* At the same time, Judge Newman took more than three times as long to issue her opinions. Other active judges averaged approximately 53 days to issue an opinion after assignment. In contrast, Judge Newman's average time to issuance was approximately 199 days.                  Aff. [13] ¶¶ 15, 17; Aff. [12] ¶ 13. The next closest judge authored 55 opinions (43 majority opinions and 12

51

IN RE COMPLAINT NO 23-90015

dissents/concurrences) and had an average time from as-
signment to issuance of 106 days. ███████████████
Aff. [12] ¶ 19. The next closest judge thus wrote approxi-
mately twice as many opinions in approximately half the
time.

Similarly, between October 1, 2020 and September 30,
2021, Judge Newman authored only 9 majority opinions
while the other active judges authored on average 42. ████
████████ Aff. [13] ¶¶ 10, 12. Even accounting for dissents
and concurrences, during this time period, the average ac-
tive judge authored 44 opinions, whereas Judge Newman
authored 25. ██████████████████ Aff. [12] ¶¶ 14–15.
The other active judges averaged 61 days from assignment
to issuance, whereas Judge Newman's average time to is-
suance was 249 days—more than four times the average.
███████████ Aff. [13] ¶¶ 11, 13.

Judge Newman's extended delays relative to her col-
leagues, coupled with her considerably lower productivity
during the same period, is strong cause for concern that she
suffers from a disability impairing her ability to carry out
the responsibilities of her office.

In addition, there have also been a number of recent
instances in which cases have been reassigned from Judge
Newman to another judge following abnormally lengthy
delays. *See* March 24, 2023 Order at 4–5. To reiterate just
a few examples: (1) ████████████, a pro se case submit-
ted on the briefs without oral argument, was reassigned af-
ter it had been pending 374 days and was resolved within
3 days of reassignment; (2) ██████████, also a pro se
submitted case, was reassigned after it had been pending
624 days and was resolved within a month of reassign-
ment; and (3) ███████████████, also a pro se submit-
ted case, was reassigned after it had been pending 302 days
and was resolved within a couple of weeks of reassignment.
*See* ███████████ Aff. [13] ¶¶ 19–25.

52

These statistics raise serious cause for concern regarding Judge Newman's ability to carry out her duties. Considered together with the other evidence described above, this data confirms that there is a reasonable basis to believe that Judge Newman may suffer from a disability preventing her from efficiently or expeditiously performing her duties as a judge.

Judge Newman's only response to the evidence of abnormal delay despite strikingly lower productivity is that during the summer of 2021, Judge Newman sat on 10 panels. The focus on that particular period is too narrowly selective. But in any event our research demonstrates that during this time period, when arguments were conducted by telephone because of COVID, these 10 panels considered 51 cases. Judge Newman presided over 9 of the 10 panels and assigned herself just one opinion. (She also had 5 dissents, full or partial, during that period.) This compares to 33 opinions that were assigned to the other members of those panels for cases heard during that period. (The remainder were summarily affirmed under Federal Circuit Rule 36.) The one opinion she assigned to herself took her 234 days from the date of oral argument to issue. Thus, while Judge Newman still sat on a number of cases similar to her active colleagues during the summer of 2021, her productivity as measured by opinions and timeliness was much lower.

The results of the Committee investigation demonstrate that Judge Newman's lower productivity is indicated in three ways: (1) she does not assign herself a comparable share of opinions (even considering her higher rate of dissenting) and takes unreasonable lengths of time to complete opinions she does assign herself (as detailed above); (2) she does not participate in motions panels, an important

IN RE COMPLAINT NO 23-90015

and time-consuming task required of active judges;[16] and, (3) Judge Newman's participation in cases has substantially slowed over the last year: May 2022–April 2023. From May 2022 through April 2023, the average active Federal Circuit judge participated in deciding 129 cases; Judge Newman in contrast participated in deciding only 65 cases.[17] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Aff. [12] ¶¶ 21–22.

Finally, Judge Newman has not been paneled for any new cases in the months of April, May, June, July, August, or September 2023 and has not sat on motions panels since January 2021. *See id.* ¶ 23. Despite having six months with no new cases and no motions panels for more than two years, Judge Newman continues to be unable to reduce her backlog. On March 8, 2023, when the Judicial Council unanimously voted not to allow new case assignments to Judge Newman, she had 9 majority opinions in her chambers that had been pending for an average of approximately 126 days. When on May 25 Judge Newman asked

---

[16] In recent years, each active judge generally has acted as Lead Motions judge one month per year and participated in motions panels 4 months a year. In 2023 to date, there have been an average of 69 motions resolved by written opinions each month. In 2022, there were an average of 63 motions resolved by written opinion each month. Judge Newman has, voluntarily, not participated in motions panels since January 2021.

[17] The March 24 complaint suggested that in 2021 Judge Newman agreed to be taken off motions panels and that her sittings were reduced compared to her colleagues. The Committee's investigation, in reliance on Clerk's Office data, has determined that it is correct that Judge Newman ceased to participate in motions panels after January 2021, but that her sittings were not reduced compared to her colleagues until approximately May 2022.

the Judicial Council to reconsider paneling her for new cases, the Judicial Council found she still had 7 of those 9 opinions in her chambers. As of that date, those seven opinions had been pending for an average of approximately 163 days. The Judicial Council explained it was "particularly concerned that Judge Newman has been unable to make any significant progress on addressing her opinion backlog despite having three law clerks, having no new cases assigned for April, May, June, or July, and not sitting on motions panels since January 2021." June 5 Judicial Council Order at 3–4.

We are now at the end of July, and Judge Newman still has not issued majority opinions in seven outstanding cases, six of which have now been pending in excess of 180 days, placing her again in violation of Federal Circuit Clerical Procedure # 3 ¶ 15 (CP #3). The seventh case has been pending 171 days. The average pendency of Judge Newman's outstanding cases is now more than 230 days.[18]

---

[18] We note that Judge Newman has circulated draft opinions in three of these seven cases to the relevant panels. But in all three, panel members promptly conveyed serious concerns and questions about the drafts, requiring Judge Newman to withdraw them to make revisions—putting them back in the status where time is charged to her. And in two of those three, to date, no revised opinion has been circulated to the panel. For example, with regard to the oldest case in the Court, the panel did not receive the draft until approximately 270 days after Judge Newman assigned this pro se case to herself. Four days after the opinion was circulated to the panel on June 7, 2023, the panel responded on June 12 with an extensive memo outlining questions and concerns that required addressing. Judge Newman responded on June 13 that she would

IN RE COMPLAINT NO 23-90015

The Committee is aware that analyses based on pub-licly available data have been presented elsewhere pur-porting to show that Judge Newman's productivity does not deviate significantly from that of other judges. The Com-mittee notes that public data regarding the resolution of cases is materially incomplete in ways that significantly obscure the exact information the Committee must ana-lyze. For example, public data does not (and cannot) reflect which judges authored per curiam opinions. This omission is significant because 31.6% of opinions issued by the Court are per curiam. *See* ▮▮▮▮▮▮▮▮▮▮▮▮▮ Aff. [12] ¶ 20. From October 1, 2021 through March 24, 2023, 616 opinions were issued and 195 (or 31.6%) were per curiam. *Id.* Only 1 of the 195 per curiam opinions was authored by Judge Newman. *Id.* Data that neglects authorship of per curiam opinions therefore materially distorts conclusions about a judge's productivity and delay. The Court's inter-nal data maintained by the Clerk's Office, from which the above statistics have been derived, accounts for authorship of every opinion.

Similarly, public data reflecting the time between an appeal being docketed and terminated does not indicate the time between when a judge is assigned an opinion and when the opinion issues—the relevant metric for assessing delay attributable to the authoring judge. The Court's in-ternal data accounts for when authorship is actually as-signed, providing an accurate picture of the fraction of an appeal's pendency that is attributable to delay by a judge in producing an opinion.

The Court's internal data also accounts for delays in authorship attributed to stays or reassignments. Again, the public data looking only at the time between docketing and termination does not account for delays for

---

prepare a revision. Judge Newman has not to date circu-lated a revision.

administrative reasons and delays in authorship.  Nor does public data reflect when cases have been reassigned to another judge.  For example, in ██████████████, Judge Newman did not circulate a draft opinion until 624 days after argument.  The case was reassigned to another panel member and the opinions issued within a month.  Publicly available data would attribute the entire period of 650+ days from argument to issuance to the judge ultimately listed as the author of the majority—when in fact Judge Newman was responsible for 624 of those days and the authoring judge was responsible only for about a month.  Only data from the Clerk's Office, which takes into account such reassignments, can accurately attribute delay to the proper judge.  Public databases cannot do so.

Finally, statistics that attribute the time between docketing and termination to all three judges on a panel will also obscure delays attributable to any individual judge.  Again using ██████████████ as an example, Judge Newman failed to produce an opinion for 624 days before the case was reassigned to another judge.  After reassignment, the case was resolved within a month.  Panel-based statistics will inaccurately attribute the 624-day delay to all three judges on the panel, despite the fact that this delay was entirely attributable to Judge Newman.  Conversely, panel-based statistics will also artificially decrease a non-authoring judge's average time for resolution when he or she sits on a panel with an expeditious author.[19]  This

---

[19] Not surprisingly, panel-based data often results in roughly comparable statistics for every judge.  Because panels are randomly assigned, each active judge sits with every other active judge with roughly equal frequency.  This will necessarily result in panel-based statistics appearing similar for every judge because fluctuations above or below the mean will average out.

IN RE COMPLAINT NO 23-90015

metric provides no basis at all for ascertaining delay attributable to individual judges.[20]

### 3. Recommendation of the Committee's Expert Consultant.

The Committee's consultant, Dr. ███████████, has recommended that Judge Newman undergo a neurological evaluation and a complete neuropsychological battery of tests to determine whether she suffers from a disability impairing her functioning, and if so, its nature and extent.

The Committee retained the services of Dr. ███████ ███████ to serve as an expert consultant to the Committee. Dr. ██████ was recommended to the Committee by the Administrative Office of the United States Courts. He has served as a consultant on proceedings involving the suspected disability of federal judges by other circuits and has been relied upon in the ██████████████ Court's attorney

---

[20] Judge Newman's brief suggests that "the speed of Judge Newman's opinion writing is a matter of some dispute" and cites an article by Ron Katznelson. July 5 Brief at 14 (citing Ron D. Katznelson, Ph.D., *Is There a Campaign to Silence Dissent at the Federal Circuit?*, available at https://ssrn.com/abstract=4489143 (last visited July 31, 2023)). We do not agree. This article suffers many of the same flaws already discussed herein: It does not accurately account for per curiams (of which Judge Newman authored only 1 of the 195 between October 1, 2021, and March 24, 2023); it measures the time from docketing of a case in the court (not from assignment to a judge); and it cannot account for cases reassigned during pendency. Finally, it focuses on different time periods. *See* Katznelson (comparing Judge Newman's performance over two 2 ¼ year time periods and ending in December 2022). This data is simply not as accurate or reliable as our Clerk's Office and therefore does not create a dispute of fact.

IN RE COMPLAINT NO 23-90015

disciplinary body as a medical expert. *See* Order,



(stating Dr. ▮ is the ▮ Circuit's ▮ for judicial disability proceedings); ▮ . He is a ▮ professor of psychiatry at the University of Colorado and a board-certified psychiatrist.

Dr. ▮ has reviewed the materials discussed above regarding the staff's interactions with Judge Newman and her delays in issuing opinions and informed the Committee that he believes that the ordered medical examinations are necessary to determine if Judge Newman has a disability that affects her ability to perform the functions of a judge. He indicated to the Committee that the tests he recommended are the appropriate tests under the circumstances to ascertain the nature and scope of any potential disability. He also indicated that the recommended tests are the same tests ordered in other courts when there are disability concerns regarding a judge. He has further indicated that the medical records specified by the Committee are important for a neurologist to have for a determination of the kind of impairments at issue here. *See* May 16 Order at 5–6. Judge Newman has not materially challenged Dr. ▮ 's qualifications to consult with the Committee on these matters.

### 4. Committee Conclusion.

The reports to the Committee of memory loss, confusion, agitation, paranoia, and an increasing inability at times to perform simple, routine tasks necessary to carry out her duties as an active judge, combined with Judge

IN RE COMPLAINT NO 23-90015

Newman's backlog and delays in the processing of cases
compared to her colleagues and Dr. █████'s recommenda-
tion, provide more than a sufficient basis for the Commit-
tee's conclusion that there was a reasonable basis for
requiring Judge Newman to undergo the medical examina-
tions and to produce the requested medical records.

## C. Judge Newman's Refusal To Cooperate with the Committee's Orders Is Not Justified By Any Good Cause and Constitutes Misconduct.

The Committee also concludes that Judge Newman's
failure to cooperate with the Committee's orders consti-
tutes misconduct.  As explained below, Judge Newman's
refusal to cooperate with the Committee's orders has seri-
ously undermined the Committee's ability to carry out its
duties under the Act.  It has impeded the Committee's abil-
ity to fulfill its central task of reaching a recommended
finding as to whether Judge Newman suffers from a disa-
bility that renders her unable to perform the duties of her
office.  Impeding the Committee's investigation qualifies as
conduct "prejudicial to the effective and expeditious admin-
istration of the business of the courts."  *See* 28 U.S.C.
§ 351(a).  In addition, Judge Newman has not shown any
good cause for her refusal to cooperate.

### 1. Judge Newman's Refusal To Cooperate with the Committee's Orders Qualifies as Misconduct.

The Act broadly defines misconduct as "conduct preju-
dicial to the effective and expeditious administration of the
business of the courts."  28 U.S.C. § 351(a).  Rule 4(a)(5)
more specifically defines misconduct within that broad cat-
egory to include "refusing, without good cause shown, to
cooperate in the investigation of a complaint."  Rule 4(a)(5).
Under the Act and the Rules, Judge Newman has a duty to
cooperate with the Committee's investigation.  Indeed, as
the commentary to Rule 13 explains, a judge's duty to

IN RE COMPLAINT NO 23-90015

cooperate is "rooted not only in the Act's definition of misconduct but also in the Code of Conduct for United States Judges, which emphasizes the need to maintain public confidence in the judiciary and requires judges to 'facilitate the performance of the administrative responsibilities of other judges and court personnel.'" Rule 13 cmt. (citations omitted); *see also* Code of Conduct for United States Judges, Canon 2(A), Canon 3(B)(1).

Here, Judge Newman has plainly refused to cooperate in the Committee's investigation.  Over the course of the last three months, the Committee repeatedly ordered Judge Newman to undergo medical examinations to ascertain the nature and extent of a possible disability, repeatedly ordered the production of medical records to assist the professionals performing the examinations in determining whether there was a disability, and repeatedly asked Judge Newman to interview with the Committee.  Judge Newman has refused to cooperate with the Committee's amply justified demands, including as clarified in the May 16 Order.

Her refusal, moreover, has impeded the Committee's investigation.  Her actions undermine the Committee's ability to fulfill its statutory duty to investigate whether Judge Newman suffers from a disability and thwart the aims of the Act.  Without regard to what Judge Newman's intent may be, the effect of her failure to cooperate is that the Committee has been prevented from making its disability determination on the soundest basis, which includes the medical examinations and records at issue.[21]  As

---

[21] We make no findings regarding Judge Newman's intent or motive for refusing to cooperate.  The refusal is an unjustified, substantial impairment of the Committee's ability to make a disability determination on the soundest basis, and that is so regardless of intent or motive.  To be

IN RE COMPLAINT NO 23-90015

explained above, the Committee believes that, to reach a conclusion on that point, it is important that the Committee have the specified input of independent medical professionals who had examined Judge Newman.  *Cf. Adams*, C.C.D. No. 17-01, at 36 ("We share the Judicial Council's view that input from an independent medical expert is necessary to fully and fairly assess Judge Adams' mental condition and fitness to continue to serve as a judge.").  Indeed, the Committee's consulting expert, Dr. ███, advised that, while the evidence before the Committee plainly raised concerns about Judge Newman's cognitive state, he could not come to an opinion with a reasonable degree of medical certainty about Judge Newman's mental fitness without the medical examinations and medical records that only she could provide.  Particularly given its practical effect in impeding the investigation, Judge Newman's refusal to cooperate amounts to "conduct prejudicial to the effective and expeditious administration of the business of the courts."  28 U.S.C. § 351(a).

---

sure, the Rules permit the Committee to reach findings regarding disability even if a judge impedes an investigation by refusing to cooperate with medical examinations.  Rule 13 cmt. ("If, for example, the subject judge impedes reasonable efforts to confirm or disconfirm the presence of a disability, the special committee may still consider whether the conduct alleged in the complaint and confirmed in the investigation constitutes disability.").  But taking that course here is inadvisable compared to proceeding on the issue of misconduct for refusal to cooperate—to which the Committee has accordingly limited its findings and recommendations.  The Committee recommends that the Judicial Council retain jurisdiction of this matter so that it may further adjudicate the disability complaint in the event circumstances change.

The decision of the JC&D Committee in *Adams* strongly confirms that Judge Newman's actions constitute misconduct. As explained above, the JC&D Committee in *Adams* had before it a situation effectively on all fours with this case in which a judge refused to undergo a mental health examination as ordered by a special committee investigating whether that judge suffered from a disability. The JC&D Committee determined that the judge's refusal to undergo the examination constituted misconduct. It explained that the judge's "failure to cooperate through his repeated refusals to undergo the mental health examination [ordered by the special committee] impeded the Judicial Council's ability to conduct a thorough and conclusive investigation," and "[a]s such, it was conduct 'prejudicial to the effective and expeditious administration of the business of the courts.'" *Adams*, C.C.D. No. 17-01, at 29–30 (quoting 28 U.S.C. § 351(a)). The JC&D Committee explained that it "affirmed the Judicial Council's finding of misconduct based on Judge Adams's refusal to cooperate with the Special Committee's request that he undergo a mental health examination with a psychiatrist selected by the Special Committee." *Id.* at 38. In addition, the JC&D Committee made clear that continued refusal to comply with the order for an examination on remand would warrant sanctions: "[S]hould Judge Adams refuse to submit to the mental health examination ordered by the Judicial Council and affirmed by this Committee, sanctions for Judge Adams's continued failure to cooperate . . . may be warranted." *Id.* at 39. The same analysis applies here.

Thwarting the Committee's execution of the process established by Congress for determining whether a life-tenured judge suffers from a disability is a serious matter. The litigants whose rights are at stake in the cases before this Court deserve to have confidence that none of the judges ruling on their cases suffers from a cognitive problem impairing the ability to decide their cases. They also deserve

IN RE COMPLAINT NO 23-90015

to have confidence that the mechanisms Congress estab-
lished for addressing judicial disability function properly
and that a judge with such an impairment cannot simply
stymie the process. In addition, the court staff deserve to
work in an environment free from abuse or anger directed
at them by a judge whose behavior and interactions in the
workplace are distorted by a mental disability. The Com-
mittee and the Judicial Council have an overriding duty to
ensure that the judges on this Court are able-minded and
capable of performing their jobs. When serious concerns
are raised about a judge's fitness, they must be taken seri-
ously and addressed expeditiously, and all judges must rec-
ognize their duty to facilitate that process. Under the
circumstances, therefore, the Committee believes that
Judge Newman's refusal to cooperate by undergoing the
necessary medical examinations, providing medical rec-
ords, or even participating in an interview constitutes a se-
rious form of misconduct.

### 2. Judge Newman Has Not Shown Good Cause To Excuse Her Refusal To Cooperate.

As noted above, Rule 4(a)(5) defines misconduct to in-
clude "refusing, *without good cause shown*, to cooperate in
the investigation of a complaint." Rule 4(a)(5) (emphasis
added). The Committee accepts that a showing of good
cause could potentially excuse or justify Judge Newman's
refusal to cooperate with the Committee's orders and thus
could preclude any ultimate finding of misconduct. Judge
Newman has offered various arguments to justify her re-
fusal to cooperate. None, however, is convincing, and none
constitutes good cause foreclosing a finding of misconduct.

### a. Proceedings Before the Committee (and the Judicial Council) Do Not Violate Due Process or the Judicial Recusal Statute.

Judge Newman makes several arguments to advance
the core assertion, repeated throughout her submissions

IN RE COMPLAINT NO 23-90015

and summarized in the conclusion to her July 5 Brief, that "neither the Judicial Council of the Federal Circuit nor this Committee is an appropriate bo[d]y to investigate these (meritless) allegations" due to a "risk of bias" that is "too high to be constitutionally tolerable." July 5 Brief at 16. Judge Newman relies on these theories to argue repeatedly that this proceeding should have been transferred to the judicial council of another circuit. For the reasons explained below, the Committee concludes that none of these arguments has merit.

First, Judge Newman argues that this proceeding violates due process because the Chief Judge identified the complaint against Judge Newman and thus is the "complainant." July 5 Brief at 4. According to Judge Newman, that means that the Chief Judge cannot be a "neutral decisionmaker" and that serving in the role of decisionmaker would violate the principle that "no man can be a judge in his own case." *Id.* at 4–5 (quoting *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016)).

That argument misunderstands the role of the Chief Judge in identifying a complaint under Rule 5. Judge Newman's argument treats the Chief Judge as if identifying a complaint gives the Chief Judge a *personal* stake in the case giving rise to an inference of bias—as if the Chief Judge were a private party bringing a complaint of misconduct. That is incorrect. Rule 5, implementing 28 U.S.C. § 351(b), merely provides a mechanism for the court to protect institutional interests in the functioning of the judiciary by ensuring that, when information comes to light that may indicate judicial misconduct or a disability, it is not simply ignored just because no private party pursues a complaint. The Rules thus charge the Chief Judge with the institutional responsibility of determining whether the information made available to her warrants an investigation. *See also* Rule 3 cmt. ("The process relies on chief judges

considering known information and triggering the process
when appropriate.").

What Judge Newman is really challenging with her
charge that the Chief Judge is a "complainant" is the com-
bination of investigative and adjudicatory roles in the Chief
Judge as the person who (i) determines whether an inves-
tigation is warranted; (ii) participates in conducting the in-
vestigation as a member of the special committee; and then
(iii) acts as a decisionmaker—both as a member of the spe-
cial committee and as a member of the judicial council. *See*
28 U.S.C. §§ 351–354; Rules 5, 11, 12, 18, 20. It is well
settled, however, that the mere combination of those roles
is not foreclosed by the Due Process Clause. As the Su-
preme Court held in *Withrow v. Larkin*, 421 U.S. 35 (1975),
"the combination of investigative and adjudicative func-
tions does not, without more, constitute a due process vio-
lation," *id.* at 58. In *Withrow*, a state medical board was
responsible for both investigating charges of misconduct
against physicians and also determining whether to impose
disciplinary sanctions. *See id.* at 46. The Supreme Court
held that there was no due process violation in combining
those roles and explained that "a challenge to this combi-
nation of functions 'assumes too much and would bring
down too many procedures designed, and working well, for
a governmental structure of great and growing complex-
ity.'" *Id.* at 49–50 (quoting *Richardson v. Perales*, 402 U.S.
389, 410 (1971)). The Court even noted that "[t]he case law,
both federal and state, generally rejects the idea that the
combination (of) judging (and) investigating functions is a
denial of due process." *Id.* at 52 (quoting 2 K. Davis, Ad-
ministrative Law Treatise s 13.02, p. 175 (1958)). As the
Court explained, pointing to the mere combination of roles
is not sufficient, because establishing a due process defect
requires "overcom[ing] a presumption of honesty and integ-
rity of those serving as adjudicators." *Id.* at 47. *Withrow*
establishes that nothing in the combination of roles in itself

creates an unacceptable risk of bias. *See Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1029 (Fed. Cir. 2016) (discussing *Withrow* and other Supreme Court cases and quoting treatise statement that "[t]he Supreme Court has never held a system of combined functions to be a violation of due process, and it has upheld several such systems" (citing 2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.9, p. 892 (5th ed. 2010)); *cf. Bakalis v. Golembeski*, 35 F.3d 318, 326 (7th Cir. 1994) ("Partiality will not be presumed simply because the same tribunal investigates and adjudicates [an] employment decision.").

Moreover, as the D.C. Circuit has pointed out in rejecting a different challenge to the combination of investigating and adjudicating roles in judicial conduct and disability proceedings, there is a particularly high hurdle for overcoming the presumption that decisionmakers can properly separate those roles where the decisionmakers are federal judges who "are called upon every day to put aside considerations not legally relevant to their decisions." *Hastings v. Judicial Conference of the U.S.*, 829 F.2d 91, 105 (D.C. Cir. 1987). As the D.C. Circuit put it, "[a] judge who can decide a case one way, notwithstanding inadmissible evidence of which he is aware indicating a different result, is not likely to prejudge a fellow judge's cause." *Id.*

Our analysis is buttressed by the fact that Congress plainly intended the Chief Judge (and the Committee) to play both investigatory and adjudicatory roles. The Act requires the Chief Judge to conduct preliminary inquiries, to identify complaints, and to serve on the special committees he or she appoints. *See* 28 U.S.C. §§ 351(b), 352(a), 353(a). The special committee is statutorily charged with both investigating and recommending a decision. *See id.* § 353(c). And the commentary to the Rules explains that the Act and the Rules deliberately combine investigative and adjudicatory functions as part of the goal of creating an entirely in-house, self-policing mechanism for the judiciary. Rule 13

IN RE COMPLAINT NO 23-90015

cmt.  Congress also requires that the Chief Judge serve on the circuit's judicial council.  28 U.S.C. § 332(a)(1) ("The chief judge of each judicial circuit shall call, at least twice in each year and at such places as he or she may designate, a meeting of the judicial council of the circuit, *consisting of the chief judge of the circuit, who shall preside* . . . ." (emphasis added)).  Thus, Congress purposefully and knowingly created a statutory rubric in which every chief judge of every circuit court would initiate a complaint, investigate and make recommendations, and ultimately participate in the decision.  This is not unique to the Federal Circuit.  And had this been transferred to another circuit, that circuit's chief judge would be required by statute to preside over the investigation and participate in the judicial council's adjudication as well.

For all these reasons, we see no due process violation in the combination of roles assigned to the Chief Judge (or to the Committee) under the Rules.

Second, Judge Newman complains that members of the Committee and members of the Judicial Council are potential witnesses and thus cannot serve as decisionmakers.  *See* July 5 Brief at 5–6; *see also* May 10 Letter at 5 ("[E]very member of the Federal Circuit Judicial Council is expected to be a *witness* in this process, [and] it is difficult to understand how these individuals would not be disqualified from serving as *adjudicators* in the same process." (emphases in original)).  As a threshold matter, that concern plainly does not apply to the proceeding *now*—that is, the narrow proceeding to determine whether Judge Newman's refusal to cooperate constituted misconduct.  As the Committee has explained, whether Judge Newman's responses to the Committee's orders constitute misconduct can be determined on the paper record and there are no relevant witnesses.  *See* June 1 Order at 4–5.  And Judge Newman has expressly agreed with that assessment.  *See* June 15 Letter at 3.  Thus, Judge Newman has no claim that judges are

IN RE COMPLAINT NO 23-90015

witnesses in this misconduct proceeding as it is currently framed.

Judge Newman's argument, therefore, must be that *earlier* in this proceeding when it was *possible* that the proceeding would go to a decision on whether Judge Newman suffered from a disability, it was *possible* that judges could be witnesses, and *that* justified her refusal to cooperate. That argument is not persuasive. The mere possibility that some judges on the Judicial Council might become witnesses provided no justification for a blanket refusal to cooperate. To the extent that any judges became witnesses, they could, if necessary, be recused from the Judicial Council's role in this proceeding and the Judicial Council could continue to function without them. Indeed, the Rules contemplate that any member of the Judicial Council who becomes a witness may be disqualified, *see* Rule 25(a), but the Judicial Council would not be precluded from acting on the Committee's report and any petition for review filed by Judge Newman. *See* Rule 20(d) ("Judicial-council action must be taken by a majority of those members of the council who are not disqualified.").

Judge Newman insists that it was not merely *possible* that some judges would become witnesses. Instead, she appears to take the view that—when it looked as if this proceeding might go to a hearing to determine whether she suffers from a disability—it was inevitable that *all* of the judges on the Judicial Council would become witnesses. *See* May 10 Letter at 5 ("[E]ach and every member of the Federal Circuit Judicial Council is expected to be a *witness* in this matter." (emphasis in original)). She has asserted different rationales for that proposition, but none is persuasive.

In her July 5 Brief, Judge Newman asserts that the March 24 Order identifying a complaint relies in part on statements about Judge Newman's behavior "during

IN RE COMPLAINT NO 23-90015

deliberative proceedings" and that judges would be the "sole witnesses" who could prove those "allegations." July 5 Brief at 5.  That argument proceeds on the mistaken premise that the information described in the March 24 Order functions as some sort of indictment or list of elements that must be proven in the subsequent proceeding.  That is incorrect.  Once a special committee is appointed, it is up to the Committee to determine the best way to frame an investigation to address the concerns raised in the complaint.  And as explained above, in this case the Committee quickly determined that testimony from judges about interactions with Judge Newman—particularly interactions related to the process of deciding cases—should be *excluded* from the Committee's inquiry because that information was unnecessary and because information regarding delays in case processing would be more objective if obtained from the Clerk's Office data.  *See supra* pp. 21, 32–33.  As a result, from a very early stage, there was no prospect that the inquiry framed by the Committee would result in judges becoming witnesses.

Elsewhere, Judge Newman has argued that all members of the Judicial Council were certain to become witnesses because she herself intended to call them.  *See, e.g.*, May 10 Letter at 5.  That argument, however, misunderstands Judge Newman's ability to determine the scope of this proceeding.  The Committee has authority to control the scope of the investigation as it deems appropriate.  *See* Rule 13.  Given the importance that the *Adams* case placed on the need for an independent medical evaluation to reach a determination on mental disability, it was apparent to the Committee from the outset that the proper approach to this inquiry was to gather objective data from the Clerk's Office on Judge Newman's delays and information from Judge Newman's interactions with court staff to determine whether that information provided a reasonable basis for seeking medical examinations.

70

Given that approach, there was no realistic basis on which Judge Newman could ever insist on making *all* members of the Judicial Council witnesses. Under Rule 15(a)(2), Judge Newman has the right merely to *suggest* witnesses to the Committee during the investigation, not an unconstrained right to determine who is a witness. And even if the proceeding had gone to a hearing under Rule 14, Judge Newman's right to compel witnesses, *see* Rule 15(c), would necessarily be limited by principles of relevance and cumulativeness. Even if it arguably would have been relevant for Judge Newman to call one or two judges to testify about their impressions of her mental state (which is itself doubtful given that evidence gathered by the Committee concerning interactions with staff would not have put her interactions with judges at issue), she could not have insisted on calling *all* judges as witnesses. The Committee could reject that gambit as unnecessarily cumulative. *Cf. Adams,* C.C.D. No. 17-01, at 12 n.5 (noting that the special committee rejected the subject judge's effort to call some witnesses at the hearing as "unnecessary and overly broad"). And the Committee could especially reject the effort to call all judges where, as here, it would be transparent that Judge Newman was simply attempting to force recusals in order to hobble the ability of the Committee or the Judicial Council to decide this matter. The Rules themselves address a similar issue when a complainant names multiple judges in a complaint with the apparent purpose of disqualifying judges. Rule 25 permits judges so named to participate in consideration of the complaint in order to prevent gaming the system. *See* Rule 25(g)(1); *cf. also In re Allied-Signal Inc.*, 891 F.2d 967, 970 (1st Cir. 1989) (noting the "need to prevent parties from too easily obtaining the disqualification of a judge, *thereby potentially manipulating the system for strategic reasons*" (emphasis added)).

Thus, given the way the Committee framed its inquiry, there was never a realistic prospect that Judge Newman

IN RE COMPLAINT NO 23-90015

could have a legitimate basis for calling *every* judge on the Judicial Council as a witness.  It was never inexorably the case that all—or even many—members of the Judicial Council would be witnesses in this proceeding.  As a result, Judge Newman had no justification for her blanket refusal to cooperate at the outset based on the theory that members of the Judicial Council would be witnesses.

To the extent Judge Newman intends to argue that judges on this Court necessarily have some personal knowledge about her current mental state simply because they interact with her and that such knowledge alone raises a due process issue for judges sitting on this proceeding, that argument would prove too much.  Due process does not require that a decisionmaker be totally ignorant concerning background information involving parties.  As this Circuit has explained in cases in the employment context, there is nothing inherently wrong with a deciding official having "background knowledge" about a situation or even the "facts of the case," as long as the official can decide the matter based on the record.  *Norris v. SEC*, 675 F.3d 1349, 1354 (Fed. Cir. 2012); *cf.* Charles Gardner Geyh & Kris Markarian, *Judicial Disqualification: An Analysis of Federal Law*, 2020 WL 13401932 (3d ed., 2020) ("Judges often cannot avoid some acquaintance with the underlying parties or events that give rise to litigation, particularly in smaller communities.  Acquaintance, by itself, will not require disqualification.").  As explained further below, moreover, the Rules implicitly reject any such due process argument, because they are plainly structured to allow circuit judges—who will necessarily have some interaction with their colleagues in the same circuit—to sit on disability proceedings concerning those colleagues.

Judge Newman's arguments fare no better when viewed under the lens of the judicial recusal statute, 28 U.S.C. § 455.  Assuming, *arguendo*, that statute applies in this context, it does not disable either this Committee or

IN RE COMPLAINT NO 23-90015

the Judicial Council from proceeding in this matter. Each judge on this Committee carefully considered whether recusal was required under § 455 and determined that it was not. To the extent Judge Newman intends to argue that personal interactions with her necessarily give every judge on this Court "personal knowledge of disputed evidentiary facts concerning the proceeding," 28 U.S.C. § 455(b)(1), we conclude that is incorrect. It would present a different question if a particular interaction between judges provided the core evidence of suspected disability and that interaction was likely to be a subject of dispute at a hearing. Judges involved in that interaction would likely need to recuse.[22] But that is not this case. There were no personal interactions between Judge Newman and other judges that would come up as disputed facts. And whatever general knowledge each judge might have about Judge Newman based on personal interactions certainly would not be a "disputed evidentiary fact" in the proceeding.

In analyzing how § 455 should apply in this context, we think it is also instructive that the Judicial Conference and Congress plainly contemplated that judges with some personal knowledge of their colleagues would sit on disability proceedings concerning those colleagues. Rule 25 specifies

---

[22] Judge Newman has made much of the fact that, in *Adams*, no district judges from Judge Adams's district sat on the special committee or Sixth Circuit judicial council deciding that case. *See, e.g.*, July 5 Brief at 8. In that case, however, the complaint against Judge Adams had been filed *by four district judges* in his district and the entire matter arose from interpersonal disputes among the judges and magistrate judges in that district. Contrary to Judge Newman's suggestion, that case provides no support for the general proposition that judges on a given court may not sit on a disability proceeding involving another judge on the same court.

IN RE COMPLAINT NO 23-90015

particular standards for disqualification.  And the commentary to that rule makes it express that "a judge is not disqualified simply because the subject judge is on the same court" and that bias or prejudice warranting disqualification must be "created by circumstances other than an association with the subject judge as a colleague."  Rule 25 cmt.  By design, the statute and rules anticipate that judges will institute, investigate, and ultimately decide disability proceedings about their colleagues.  *See, e.g.*, 28 U.S.C. §§ 351–353 (requiring chief judge to receive and review complaint and form special committee); Rule 11(a) (requiring chief judge to review complaint), 12(a) (requiring the special committee to consist of chief judge that identifies complaint).  Congress and the Judicial Conference were certainly aware of § 455, and also of the reality that "[j]udges at every level of the system interact with each other frequently and in many ways."  Irving R. Kaufman, Chilling Judicial Independence, 88 Yale L.J. 681, 711–12 (1979) (describing how circuit and district judges, especially within a single circuit, commonly get to know each other).[23]  The way Congress structured the Act and the Judicial Conference structured the Rules suggests that both bodies concluded that § 455 posed no barrier to judges deciding disability proceedings about their fellow judges, including those on the same court.

If Judge Newman were correct, no circuit judge could ever sit on a disability proceeding concerning another circuit judge—and likely many district judges—in the same circuit, because they would have "personal knowledge" about that judge.  Under that view, the Rules as written

---

[23] Then-Chief Judge Kaufman, of the Second Circuit, testified before the House committee responsible for what became the 1980 Act, and the committee report cited the article quoted in text.  *See* H.R. Rep. 96-1313 at 3, 6 (1980).

IN RE COMPLAINT NO 23-90015

would violate § 455. We do not see any basis for reading § 455 that broadly.

Third, Judge Newman argues that Court employees will not give candid testimony in a proceeding run by the Judicial Council because they will feel pressure to curry favor with their employers. July 5 Brief at 7. This argument is wholly insubstantial. Judge Newman cannot simply assert a likelihood of biased testimony without providing some evidence to demonstrate circumstances that would likely overcome a witness's obligation to testify truthfully. The mere fact that court staff are employed by the Circuit is not sufficient, and Judge Newman cites no authority whatsoever supporting the novel presumption of bias she asserts. And as a practical matter, if employees were presumed to give biased testimony in tribunals run by their employers, the judiciary's EDR system and other government employment dispute-resolution systems would be called into question. We reject this argument.

Fourth, Judge Newman argues that keeping this proceeding in the Federal Circuit violates due process because this Court has a specialized bar, and members of that bar will not want to come forward as witnesses attesting to Judge Newman's competence because they fear repercussions from the Judicial Council. According to Judge Newman, that limits Judge Newman's ability to mount a defense. *See* July 5 Brief at 8. This argument is meritless. To start, of course, there are no witnesses needed in this proceeding as it has been narrowed. In addition, litigants face myriad reasons why potential witnesses may be reluctant to participate in a proceeding voluntarily, and that does not raise a due process issue. Moreover, if this proceeding had gone to a hearing at which Judge Newman could present witnesses, she would have had the benefit of compulsory process to obtain any critical testimony. *See* Rule 15(c). Even if members of the bar of this Court were

IN RE COMPLAINT NO 23-90015

reluctant to be witnesses, that would raise no inherent unfairness in this proceeding.

### b. The Actions of the Judicial Council and the Committee Do Not Indicate Bias.

Judge Newman next argues that the actions of the Judicial Council and the Committee have shown bias against her and that this evidence of bias justified her refusal to cooperate. *See* July 5 Brief at 9–12; May 25 Letter at 2. We note at the outset that the Judicial Council orders Judge Newman cites are not a part of this proceeding and were issued by the Council under its authority independent of this particular proceeding. Nevertheless, because Judge Newman points to alleged bias supposedly revealed in those orders as justification for her actions, we address her arguments here. For the reasons below, we reject Judge Newman's assertions.

### i. The Judicial Council's Actions Suspending New Case Assignments Do Not Show Bias.

First, Judge Newman claims that the Judicial Council's actions on March 8 and June 5 excluding her from the rotation for assigning new cases were improper and necessarily show bias. In Judge Newman's view, halting new case assignments can be understood only as a form of sanction that would arise from this misconduct and disability proceeding and halting case assignments before any conclusions were reached in this proceeding reflects a form of verdict before trial. *See* July 5 Brief at 9–10.

That is incorrect because Judge Newman is ignoring the Judicial Council's independent authority under 28 U.S.C. § 332(d) to make "all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." That authority necessarily includes the power to suspend new case assignments where a judge

76

has a backlog of cases interfering with the efficient administration of the court's business. *See* June 5 Order at 5; *see also U.S. v. Colon-Munoz*, 318 F.3d 348, 354-55 (1st Cir. 2008) ("An order of the Judicial Council reassigning cases . . . to address judicial delay falls within the broad mandate of section 332(d)."); *see* Kaufman, 88 Yale L.J. at 708 & n.153 (asserting availability of this section to preclude new assignments to a judge with undue backlog). The Council's March 8 decision was not memorialized in a written order, but it readily stands on the basis of Judge Newman's indisputable backlog of cases. And even if the Council had concerns about disability, it is not bias to recognize that such concerns bear on whether Judge Newman's backlog was likely to get worse if she continued to take on new cases.

The Council, in response to Judge Newman's complaints, issued an entirely new order on June 5 addressing the issue of case assignments for Judge Newman. Treating Judge Newman's complaints as a request for reconsideration, the Judicial Council considered the matter *de novo* and made clear that it was suspending new case assignments based only on its authority under § 332(d) and solely to address Judge Newman's delay in issuing opinions. June 5 Order at 5. Not satisfied by that result, Judge Newman now claims that the very act of issuing a new order and providing a full explanation for the Council's action grounded in § 332(d) is evidence of bias. Contrary to Judge Newman's assertions, however, we do not think that entertaining Judge Newman's assertions of error, reconsidering *de novo* the Council's prior actions, and issuing an order explaining the Council's decision and pinpointing a particular legal basis can somehow be evidence of bias.

Judge Newman also asserts that the June 5 Order includes factual errors. In particular, she claims that, when panel assignments were made (in February 2023) for the Court's April 2023 sitting, she was not actually in violation of an internal circuit rule precluding case assignments to a

judge with a backlog of cases crossing certain limits. *See* July 5 Brief at 11. Under CP #3 ¶ 15, a judge may not be assigned new cases if (among other triggers) he or she has two opinions pending that are over 365 days old. But even if the June 5 Order had made a factual mistake concerning the application of CP #3, a factual error is not evidence of bias. *See, e.g., Anderson v. Williamson*, 47 F. App'x 333, 335 (6th Cir. 2002); *Committee v. John Carroll Univ.*, No. 1:18CV01372, 2019 WL 2295347, at *2 (N.D. Ohio May 30, 2019) ("[M]istakes by a judge of fact and law, alone, are insufficient to demonstrate personal bias requiring recusal."). Indeed, here, on January 31, 2023, Judge Newman's judicial assistant emailed the Chief Judge's chambers concerning eligibility for the April 2023 sitting and stated that "Judge Newman advised me our panels may be limited until our back log of older cases is reduced." Ex. 7.

In any event, Judge Newman, in now alleging error, has the facts wrong. As April panels were being prepared in early February, Judge Newman had two cases that were over 365 days old. One was ███████████████████████ ██████████████████████████████, in which the opinion had been assigned to Judge Newman on December █, 2021. Contrary to Judge Newman's assertions, that case was not stayed after being assigned to her for authorship, and as Judge Newman acknowledges, it had been pending for over 420 days when ████ paneling was occurring. The panel in ██████████████ did order supplemental briefing (without staying the case), but even if the entire 30-day period for that briefing is excluded from the calculation, the case had still been pending for well over 365 days. The second case was ████████████████████████████, in which the opinion had been assigned to Judge Newman on

February ▮, 2022.[24] The Clerk's Office conflicts screening emails with tentative panel assignments for the April 2023 sitting were circulated on February ▮, 2023, and thus ▮ hit the 365 day mark the next day—before the process of assigning panels was complete. There is no bright line date on which the time periods in CP #3 are applied, and the Chief Judge's chambers appropriately relied on the email from Judge Newman's chambers in concluding that Judge Newman did not anticipate issuing the ▮ opinion before paneling was finalized and that she was subject to CP #3. Especially given the contemporaneous email from her own chambers acknowledging that her case assignments would be restricted due to her backlog, application of CP #3 to the April 2023 sitting in no way supports Judge Newman's allegation that "the Judicial Council cannot be trusted to act neutrally." July 5 Brief at 11.

Judge Newman also argues that the Judicial Council's actions are *ultra vires* because she is a member of the Judicial Council but was neither given notice of the meetings before the March 8 and June 5 Orders nor permitted to participate in the Council's deliberations. *See* July 5 Brief at 10. There was nothing improper, however, in proceeding without Judge Newman when Judge Newman and her delays in issuing opinions were the very issue that the Judicial Council was meeting to address. The Judicial Council properly operated on the view that Judge Newman would be recused in any decision on that matter. Indeed, in the analogous situation when a judge is the subject of a misconduct or disability complaint under the Act and the Rules, the judge is expressly disqualified from participating in the Judicial Council on that matter. *See* Rule 25(b).

---

[24] Judge Newman addresses the timing of her opinion in a different case, ▮▮▮▮▮▮▮▮▮▮▮. That case, however, did not place her in violation of CP #3.

The Judicial Council properly proceeded on the understanding that a similar principle requiring her disqualification would apply here. This is a case in which the maxim that "no man can be a judge in his own case," *Williams*, 579 at 8, appropriately applied.

Judge Newman points to language in 28 U.S.C. § 332(a)(6) stating that "[e]ach member of the council shall attend each council meeting unless excused by the chief judge." That statute, however, imposes an obligation on individual judges to attend Judicial Council meetings. It does not set a super-quorum requirement disabling the Judicial Council from acting if some members are not present.

The Committee concludes that, where the issue before the Judicial Council involved Judge Newman's extraordinary delays in issuing opinions and an appropriate response to ensure the efficient administration of the Court's business, it was proper for the Judicial Council to act without Judge Newman's participation. Its decision to do so was not unlawful and provides no evidence of bias.

### ii. The Committee's Prior Actions Do Not Show Bias.

Judge Newman has also argued that various actions by the Chief Judge and/or the Committee show bias. *See* July 5 Brief at 12 n.11. None of her arguments is persuasive.

To start, Judge Newman has repeatedly charged that prior orders of the Chief Judge or the Committee contain factual errors. As noted above, even if there were factual errors in prior orders, that would not show bias. *See, e.g.*, *Anderson*, 47 F. App'x at 335. And as explained below, none of Judge Newman's particular allegations of error involves any circumstances to suggest bias.

Judge Newman argues that the March 24 Order was wrong in suggesting that Judge Newman's caseload was reduced immediately following a cardiac event in the

IN RE COMPLAINT NO 23-90015

summer of 2021.  *See* April 21 Letter at 1.  After reviewing data from the Clerk's Office, the Committee concludes that Judge Newman is correct that her caseload was not significantly reduced compared to her colleagues until May 2022. That error, however, provides no evidence of bias and certainly does not justify Judge Newman's refusal to cooperate in this entire proceeding.  The March 24 Order did not purport to set out any final findings.  The purpose of that order was merely to note some initial information to determine *whether* an investigation was warranted.  It should not be surprising that some information in such an initial document might later be found to be inaccurate.  That is what investigations are for.  Moreover, especially given the preliminary nature of the March 24 Order, an error in identifying the exact time at which Judge Newman began taking a reduced case load was immaterial.  The fact remains that by the time the March 24 Order was entered, Judge Newman had had a reduced caseload for nearly a year (and had not been sitting on motions panels since January 2021), and yet still had an extraordinary backlog of opinions.  At least with respect to cases, the central point in the March 24 Order was that Judge Newman had an extraordinary backlog, especially for a judge with a reduced caseload. And that point was entirely accurate.  An error as to when the reduced caseload began was immaterial to the decision in the March 24 Order to identify a complaint and provides no evidence of bias.

Next, Judge Newman has argued that the March 24 Order was wrong in suggesting—in identifying a complaint—that Judge Newman suffered a "heart attack" in the summer of 2021 and insists that she never suffered a "heart attack." July 5 Brief at 3.  On that basis, she even accuses the Committee, when referring back to the March 24 order concerning "the incidents of 2021 and 2022" in its initial order concerning medical records (April 17 Medical Records Order at 1), of "completely fabricat[ing] ideas

about her prior medical history." *Id.* In its May 16 Order, however, the Committee made clear that "heart attack" may not have been the correct term to use in the Committee's request for medical records and clarified that it sought medical records broadly about any "cardiac event" that Judge Newman had suffered in the summer of 2021. May 16 Order at 4–5. Although Judge Newman continues to insist that she did not have a "heart attack" and continues to berate the Committee for suggesting that she did, she has pointedly refused to say whether she suffered any "cardiac event" in the same time period. *See* Oral Arg. Tr. 17:23–18:5; 18:22–19:4; 20:11–19. Notably, Judge Newman has now submitted a physician's report acknowledging that she has a pacemaker and suffers from ███████ ██████ [a cardiac condition], a cardiac condition which Judge Newman's counsel agreed includes among its symptoms: confusion, chest pain, fainting, and dizziness.[25] *See* Ex. 8 ("Rothstein Report") at 1; *see also* Oral Arg. Tr. at 19: 9–19. Judge Newman's carefully calibrated focus on the term "heart attack" suggests that her protests may well be a matter of parsing terminology rather than relevant substance. In any event, the initial suggestion that Judge Newman suffered a "heart attack" plainly provides no indication of bias. Judge Newman's refusal to provide the ordered medical records and undergo the ordered medical examinations has thwarted the ability of the Committee to ascertain the exact nature of the cardiac condition that Judge Newman does have and the impact it may have on her ability to serve as an active judge.

Judge Newman also complains that short deadlines imposed by the Committee during the early stages of this proceeding are evidence of bias. *See* July 5 Brief at 12 n.11.

---

[25]   Judge Newman's counsel stated that Judge Newman has had a personal relationship with Dr. Rothstein for "some time." Oral Arg. Tr. at 38:18–24.

That is also unpersuasive. The deadlines she identifies merely required Judge Newman to indicate whether or not she would *agree* to medical examinations and to produce medical records. They did not require her to actually complete her cooperation on those points in the specified time frame. In any event, the initial deadlines became irrelevant long ago as the Committee repeatedly extended deadlines, issued further explanations for its orders, and allowed Judge Newman more time to respond. Judge Newman cannot continue to point to short deadlines that were never enforced as supposed evidence of bias when the reality is that, since the time it first ordered medical examinations, the Committee effectively allowed Judge Newman 48 days (from April 7 until May 25) to provide a final response as to whether or not she would agree to cooperate.

Judge Newman's further complaints about the proper interpretation of statistics in judicial conduct and disability cases, *see* July 5 Brief at 12, are insubstantial. Disputes about the proper interpretation or relevance of statistics do not evidence bias.

### iii. The Judicial Council Has Not Deprived Judge Newman of Equipment or Necessary Staff.

Judge Newman has also complained at various points in her submissions that the Judicial Council allegedly deprived her of staff or office equipment necessary for her to do her job. *See, e.g.*, April 21 Letter at 2; July 5 Brief at 2 n.2. To the extent Judge Newman intends these allegations to support her claims of bias or to explain or justify her significant delays in deciding cases, the Committee addresses them here. All of these claims are incorrect.

With respect to Judge Newman's chambers staff, as explained above, on April 19, 2023, one of Judge Newman's clerks and her judicial assistant resigned from her chambers and requested no further contact with her chambers.

*See supra* pp. 43–45. As the Committee explained in its May 16 Order, because of the pending EDR matter related to her judicial assistant, on April 20, the Judicial Council initially placed a hold on hiring staff for Judge Newman's chambers. Within four days, by April 24, the Council lifted that hold to permit Judge Newman to bring back (at her request) a judicial assistant who had previously worked for her and had retired. Further, on April 27, Judge Newman was informed that she could advertise to hire a permanent replacement. May 16 Order at 12 & n.3; *see also* ███ Aff. [7] ¶ 2; Ex. 4 at 2. After that point, any lapse in time that occurred in moving the hiring process forward was attributable to Judge Newman. As staff have recounted, they repeatedly explained to Judge Newman the terms on which her retired judicial assistant could be rehired, but Judge Newman seemed unable to understand or remember repeated explanations, and her inaction delayed the hiring process. *See* Ex. 4; ███ Aff. [7] ¶¶ 1–5; *id.* ¶ 3 (describing having "over 20 email and phone call exchanges with Judge Newman . . . trying to get her approval," Judge Newman taking a "long time" and having to "answer the same questions repeatedly"). As of June 14, Judge Newman's prior judicial assistant had been brought back temporarily, and while Judge Newman's permanent judicial assistant position was advertised in early May and Judge Newman has been given multiple applications received by the Court, Judge Newman has not moved forward to hire a permanent judicial assistant. Contrary to Judge Newman's claims, the Court approved her temporary judicial assistant 5 days after her judicial assistant resigned, and any delays in her acquisition of secretarial services were due to Judge Newman's inaction or confusion.

Judge Newman has not been permitted to hire an additional clerk to replace the one who resigned in April because she has three full-time clerks, which is more than sufficient for the needs of her chambers given her reduced

case load. Contrary to the apparent assumption underpinning her complaint, Judge Newman is not automatically entitled to four law clerks. Instead, by statute circuit judges "may appoint *necessary* clerks and secretaries." 28 U.S.C. § 712 (emphasis added). Put simply, Judge Newman has no need for more than three full-time law clerks and a judicial assistant. Despite having no new cases assigned in April, May, June, July, August, or September, and while having three full-time clerks, Judge Newman still currently has a backlog of the same 7 opinions she has had for months. It is plainly not a lack of clerk assistance that is preventing Judge Newman from completing her opinions.

Judge Newman's complaint about equipment appears to relate to the computer used by the judicial assistant who left her chambers in April. Affidavits from staff members recount Judge Newman's repeated accusations that this computer was "illicit[ly]" removed,        Aff. [8] ¶ 30, or "stolen,"        Aff. [6] ¶ 4, with her chambers' information on it. *See also*        Aff. [6] ¶ 5 (describing Judge Newman "walking back and forth mumbling about how her computer and phone had been taken away from her" even though "that was not the case");     Aff. [5] ¶¶ 3, 5 ("Judge Newman was pacing back and forth and visibly angry and frustrated . . . I found Judge Newman's behavior during this whole event to be very bizarre and confusing."). They also recount staff's repeated efforts to explain to Judge Newman, over and over again, that no information from her chambers was stored on that computer and instead that it was all on her chambers' shared drive. *See*        Aff. [8] ¶¶ 27–31;     18 Aff. [6] ¶ 5.

At bottom, Judge Newman's complaints about this computer are a product solely of her apparent inability to understand that no information from her chambers was

85

IN RE COMPLAINT NO 23-90015

stored on the hard drive (C: drive) on that computer. Instead, all information related to her chambers was transferred to—and is still available on—her chambers' shared drive. Judge Newman has not been deprived of any equipment (or any data stored on any equipment) needed for her work. In fact, Judge Newman and her four chambers' employees collectively have eight Federal Circuit computers, all with access to her shared drive. And IT and Clerk's Office staff have repeatedly offered to help Judge Newman locate any of the files on her shared drive that she misplaced. *See*         Aff. [6] ¶¶ 2–6;    Aff. [5] ¶¶ 2–4;        Aff. [8] ¶¶ 35–36; Ex. 6 at 15 (Clerk of Court explaining "we have offered repeatedly to assist you with locating any files you cannot find or access. However, through our many conversations, we have yet to learn of any file or record of your chambers that is actually missing or unavailable.").

Finally, Judge Newman has vaguely claimed that her "use of the Court's communication systems" has been "restricted." April 21 Letter at 2. The vague accusation is unsubstantiated. And as the affidavits from IT personnel extensively explain, Judge Newman frequently forgets how to log on to the Court's systems and forgets how the telephone system works, including the volume control on her telephone. *See, e.g.,*        Aff. [1] ¶¶ 2–6;    Aff. [4] ¶¶ 2–19. As far as the Committee can tell, user error is the most likely explanation for any difficulties Judge Newman experiences with the Court's communications equipment.

### c. Judge Newman's Requests for Transfer Lack Merit.

As noted above, Judge Newman advanced her due process arguments and related claims of bias largely to support the assertion that "neither the Judicial Council of the Federal Circuit nor this Committee is an appropriate

IN RE COMPLAINT NO 23-90015

bo[d]y to investigate these (meritless) allegations," July 5
Brief at 16, and to support a transfer of this matter to an-
other circuit.  Those arguments lack merit for the reasons
explained above.  Her requests for transfer also lack merit
for additional reasons, especially at this stage in the pro-
ceedings.  The Committee has been able to conduct this in-
vestigation more efficiently than would have been possible
if the matter had been transferred to another circuit.  And
now that this investigation is investigation has been com-
pleted on all that the Committee believes needs to be
reached given its findings and recommendation, transfer-
ring the case at this point would be grossly inefficient and
counterproductive.[26]

   We note at the outset that transfer of a matter involv-
ing an investigation into judicial misconduct or disability
is possible only in "exceptional circumstances."  Rule 26.
As the Committee explained in its May 3 Order, this case
involves many of the factors that the Breyer Committee Re-
port found to counsel *against* transfer.  *See* May 3 Order at
10–11; Implementation of the Judicial Conduct and Disa-
bility Act of 1980, Report to the Chief Justice of the Judicial
Conduct and Disability Act Study Committee, 239 F.R.D.
116, 215 (Sept. 2006) ("Breyer Committee Report").  In an
investigation involving alleged disability, the Committee
believes that knowledge of "local circumstances and per-
sonalities" is an advantage for an investigating committee.
Breyer Committee Report, 239 F.R.D. at 215.  Proximity to
court staff—particularly because the judges and staff in
this circuit all work in the same building—has allowed the

---

   [26] To the extent Judge Newman's July 5 Brief consti-
tutes a renewal of her request that the Chief Judge or the
Judicial Council request a transfer of this matter, the Chief
Judge denies the request under Rule 26 in her capacity as
Chief Judge as part of this Report.  The Committee recom-
mends that the Judicial Council similarly deny the request.

IN RE COMPLAINT NO 23-90015

Committee to operate efficiently and expeditiously in investigating this matter. The Rules and Breyer Committee Report make clear that likely delays caused by transfer are a factor weighing *against* transfer. Indeed, "transfers may increase time and expense if there is the need to ship files, arrange witnesses, and handle other matters from a distance." *Id.* Delays undoubtedly would have been the result of transfer here.

In addition, the Committee believes that the easy accessibility of the Committee to court staff has allowed witnesses to volunteer information in a fashion that simply could not have happened if the matter had been transferred to another circuit. On more than one occasion, court staff have reported incidents with Judge Newman to the Committee in almost real time. *See* ███████ Aff. [6] ¶¶ 1–2, 5–8; ███████ Aff. [8] ¶ 36. The staff immediately reported the information to the Clerk of Court who forwarded this information to the Committee which was able to speak to the employee on the same day. ███ ███ Aff. [8] ¶ 36.

When Judge Newman effectively threatened to terminate the employment of her judicial assistant for staying at his assigned workstation outside her chambers (which had been created as an alternative work arrangement under the Court's EDR procedures), he came to the Committee immediately, visibly upset. *See* ███ Aff. [2] ¶ 34; ███ Aff. [10] ¶¶ 8–9. When one of Judge Newman's clerks, ███████, declined to work on Judge Newman's defense in this matter (which is not court work) and found that he could no longer tolerate the atmosphere in her chambers, he came to the Committee to explain his concerns and ask for help. *See* ███ Aff. [11] ¶¶ 6–8, 17. Our Clerk of Court has come to the Committee on several occasions to report troubling interactions with and accusations by Judge Newman detailed in his affidavits. *See generally* ███████ Aff. [8] & ███████ Aff [14]. None of

IN RE COMPLAINT NO 23-90015

these meetings were scheduled and none were requested by the Committee.  In each of these instances, the employees came to the Committee to report concerns.  And for some of these employees, not only was the Committee able to receive their testimony, but where possible, alternative work arrangements were made to lessen the impact of these disturbing exchanges.  None of these measures undertaken to support and protect employees would have been possible had this case been transferred to another circuit.

At times, throughout this investigation, incidents such as these between staff members and Judge Newman were occurring weekly or even more frequently.  The Committee believes that witnesses would have been chilled from participating in the process in a similar manner if they were required to contact federal judges in another circuit who were not known to them in order to report information.

Put simply, another court could not, from afar, create an environment in which this Court's staff could raise concerns based on their interactions with Judge Newman in an almost real-time fashion.  And without that ready ability to report incidents, the Committee believes that important information in this investigation might have been lost.  Particularly in this case, placing distance between the individuals who witness and experience a subject judge's behavior and the investigating body would have inhibited, not promoted, the aims of the Act.  And of course, another circuit would not have been able to intervene promptly to protect or relocate these employees.

Judge Newman claims that "since the publication of the Breyer Report, *supra, every single* complaint of misconduct against a circuit judge that was not summarily dismissed has been transferred to another circuit's judicial council for investigation."  July 5 Brief at 6.  As support, she cites a small number of examples over the last decade.

IN RE COMPLAINT NO 23-90015

As an initial matter, transfer can only be sought in "exceptional circumstances." Rule 26. Her examples and statistics do not establish the asserted uniformity of practice.[27] And none of the cited cases seems to have involved disability as the core subject of the proceeding or refusal to cooperate as misconduct in thwarting the disability determination.[28] A case-specific assessment of transfer is

---

[27] Statistics from the Administrative Office indicate that in 2021 for example, four complaints were referred to special committees for investigation and zero cases were transferred. These same statistics show that 18 of the complaints were resolved through voluntary corrective action or intervening events (such as a judge taking senior status). It is unclear whether these were proceedings against district court or circuit judges. *See* Table S22, Judicial Complaints—Complaints Commenced, Terminated, and Pending with Allegations and Actions Taken Under Authority of 28 U.S.C. 351–364 During the 12-Month Period Ending Sept. 30, 2021. In 2018, the statistics show that only 1 case was transferred, while 8 complaints were referred to special committees. In 2017, 18 cases were referred to special committees and 0 were transferred. In 2016, 4 were referred to special committees and 0 transferred. *See* Table S22, Judicial Complaints—Complaints Commenced, Terminated, and Pending with Allegations and Actions Taken Under Authority of 28 U.S.C. 351–364 During the 12-Month Period Ending Sept. 30, 2018, 2017, 2016 (all available at https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables (last visited July 31, 2023)).

[28] The most relevant precedent for this matter appears to be the proceeding conducted by the Sixth Circuit concerning District Judge John R. Adams and an investigation into whether he suffered from a mental or emotional

required, with transfer being the exception, as made clear by the Act and Rules designed for proceedings that involve circuit and district judges alike. For the reasons stated, based on considerations set forth in the Breyer Report, we think it was proper in this matter not to request transfer.

Finally, transferring this matter at this point would be enormously wasteful and counterproductive. The Committee has conducted more than twenty interviews with court staff. It has entertained extensive briefing from Judge Newman, entered multiple orders explaining its requests for cooperation from Judge Newman, and heard oral argument. Transfer at this stage could potentially render all of this effort wasted, because a transferee circuit could choose to start the entire process over. *See* Rule 26 cmt. ("Upon receipt of a transferred proceeding, the transferee judicial council shall determine the proper stage at which to begin consideration of the complaint. . . ."). Indeed, as Judge Newman has made clear, securing a complete do-over is her objective. She has pointedly reminded the Committee that the "effect" of a transfer is that "the transferee council is not bound by any evidence, reports, or decisions made by the transferor council" and expressly "reserve[d] the right to request that the transferee council restart the entire process." May 10 Letter at 5. Even putting aside the inefficiency in such a result, and the burden on a transferee council, it would be unfair to the witnesses who have already been interviewed by the Committee and submitted

---

disability in which the Sixth Circuit twice denied motions from Judge Adams requesting a transfer of the proceeding to another circuit. See Order & Memorandum, *In re Complaint of Judicial Misconduct*, No. 06-13-90009 (Judicial Council of the Sixth Circuit Feb. 22, 2016), at 4 (recounting that Chief Judge Cole of the Sixth Circuit twice rejected requests to transfer because the case did not raise any "exceptional circumstances" warranting such action).

IN RE COMPLAINT NO 23-90015

affidavits to be subjected now to a duplicative investigative proceeding.

For all these reasons, Judge Newman's requests for transfer lacked merit when they were originally made, *see* May 3 Order at 10–12, and they particularly lack merit now.

> ### d. There Is No Merit To Judge Newman's Assertion that She Has Cooperated with the Committee's Orders or That Defects in the Orders Justify Her Responses.

Judge Newman has offered various arguments to suggest that she *has* cooperated with the Committee's orders (at least under her definition of the term) or that particular defects in the orders justify her responses. None of these arguments has merit.

To the extent Judge Newman claims that the Committee cannot require her to undergo medical examinations with independent professionals chosen by the Committee and that such an order is "unprecedented," July 5 Brief at 13, we have addressed those arguments and rejected them above. *See supra* Section II.A.

Next, Judge Newman's assertions that she *has* cooperated depend entirely on distorting the meaning of "cooperate" in this context. According to Judge Newman, to "cooperate" means to "work together," and that means that the Committee must work *with her* to reach a compromise when she objects to requests from the Committee. May 10 Letter at 4–5 (seeking to "negotiat[e] the matter" and seeking a "negotiated solution"); May 25 Letter at 1, July 5 Brief at 2. That is incorrect. Standard dictionary definitions make clear that "cooperate" means to "act together *or in compliance*." *Cooperate*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/cooperate (last visited July 31, 2023) (emphasis added);

*see also Cooperate,* Cambridge English Dictionary, available at https://dictionary.cambridge.org/us/dictionary/english/cooperate (last visited July 31, 2023) ("to act or work together for a particular purpose, *or to be helpful by doing what someone asks you to do*" (emphasis added)). Especially in the context of an investigation, it is acting in compliance with requests from the investigator that constitutes cooperation. That conclusion is buttressed by the fact that nothing in the Rules requires the Committee to negotiate with Judge Newman to reach a compromise solution on every investigative request the Committee makes. To the contrary, Rule 13 unequivocally states that "[a] special committee should determine the appropriate extent and methods of its investigation." Particularly with respect to medical examinations, moreover, *Adams* makes clear that the Committee may insist on examinations by independent professionals *over a subject judge's objections* and that failure to comply with such a request is a failure to cooperate.

In her May 25 Letter, Judge Newman objected for the first time to the qualifications of the independent professionals the Committee chose to conduct medical examinations, May 25 Letter at 2, and she now asserts that these professionals are of "unknown qualifications and provenance," July 5 Brief at 14. This objection is dilatory. In its April 7 Order, the Committee not only provided the names of these professionals and made clear that Dr. ▮ had recommended them (thus explaining their "provenance"),[29]

---

[29] Dr. ▮ consulted with Dr. ▮ Professor of Psychiatry at Georgetown University School of Medicine, to determine the professionals he would recommend, in part given her familiarity with suitable medical professionals in the local area where the examinations would take place. For an examining neurologist, he

93

IN RE COMPLAINT NO 23-90015

it also provided Dr. ███'s telephone number so that
Judge Newman or her counsel could discuss with him the
medical examinations and the professionals who would
conduct them. April 7 Order at 2. At argument, counsel
for Judge Newman acknowledged that Judge Newman
never contacted Dr. ███ and took no steps to investigate
the credentials of the professionals he had recommended
beyond looking at their websites. *See* Oral Arg. Tr. at 37:4–
9. Having been offered the opportunity to discuss the pro-
fessionals recommended by Dr. ███, Judge Newman
cannot sit on her hands, do nothing more than look at their
websites,[30] and at the eleventh hour simply claim that their

---

recommended Dr. ███████, a board-certified neurol-
ogist. *See* ███████ (last
visited July 31, 2023). For a neuropsychologist, he recom-
mended Dr. ████████, who is board certified in
clinical neuropsychology and who is an approved forensic
evaluator for the Commonwealth of Virginia, which allows
him to be a court-appointed evaluator in proceedings to de-
termine competency to stand trial and sanity. *See*
███████████████ (last
visited July 31, 2023). All of this information about the
selected doctors was readily obtainable through an internet
search.

[30] If Judge Newman had done an internet search with
the names of the doctors who were provided to her as far
back as April 7, she would have found their credentials. Dr.
████████ is a board-certified neurologist, and Dr.
███ is board certified in clinical neuropsy-
chology and is an approved forensic evaluator for the Com-
monwealth of Virginia, which allows him to be a court-
appointed evaluator in proceedings to determine compe-
tency     to     stand     trial     and     sanity.     *See*
████████████████ (last     visited

qualifications are unknown to her.  She must, at a mini-
mum, interpose some more substantive objection raising a
reason to doubt the qualifications of these professionals.  It
is certainly not the duty of the Committee to *sua sponte*
schedule a *Daubert* hearing before ordering Judge New-
man to undergo standard medical examinations with pro-
fessionals recommended by an expert.

With respect to the Committee's requests for medical
records, Judge Newman variously asserts that records do
not exist or are not relevant, July 5 Brief at 2–3, but her
objections do not stand up to scrutiny.  As an initial matter,
records that the Committee sought relating to treatment
regarding "mental acuity, attention, focus, confusion,
memory loss, fatigue or stamina," May 16 Order at 4, are
plainly relevant.  Judge Newman, however, has refused to
state squarely whether such records exist or not.

Next, Judge Newman insists that she has never had a
"heart attack" and that records related to a "heart attack"
do not exist.  As explained above, *see supra* pp. 81–82,
Judge Newman appears to be focusing narrowly on the def-
inition of "heart attack" to avoid answering the Commit-
tee's request for records.  The Committee long ago clarified
its request to make clear that it broadly sought records re-
lated to a "cardiac event," May 16 Order at 5, and at oral
argument counsel for Judge Newman refused to state
whether or not she had suffered a cardiac event in the time
period at issue.  Oral Arg. Tr. 17:23–18:5; 18:22–19:4;
20:11–19.  In addition, the Committee explained to Judge
Newman that Dr. ████ informed the Committee that
medical records related to a cardiac event may very well
shed light on the observed changes in Judge Newman's be-
havior and the issues of impairment of cognitive function-
ing the Committee is investigating.  He informed the

---

July   31,   2023);   ████████████████████
████████████   (last visited July 31, 2023).

95

Committee that it would be standard practice for a treating neurologist to consider such records in evaluating impairment issues like those presented here.  Judge Newman has never offered a response on those points.

Judge Newman has also submitted her own medical report noting that she suffers from ▮▮▮▮▮▮▮▮ [a cardiac condition] and has a pacemaker.  *See* Rothstein Report.  Records related to treatment for that condition are obviously relevant.  According to the Penn Medicine website of the University of Pennsylvania, one of the symptoms of ▮▮▮▮▮▮▮ [the cardiac condition] is "confusion or other changes in mental status." ▮▮▮▮▮▮▮▮▮▮▮, Penn Medicine, available at https://www.pennmedi-cine.org/for-patients-and-visitors/patient-information/con-ditions-treated-a-to-z/▮▮▮▮▮▮ (last visited July 31, 2023).  The Mayo Clinic similarly explains that [the cardiac condition] ▮▮▮▮▮▮▮▮▮ can result in "confusion" and "dizziness or lightheadedness." ▮▮▮▮▮ ▮▮▮▮▮, Mayo Clinic, available at https://www.mayo-clinic.org/diseases-conditions/▮▮▮▮▮▮▮▮▮▮ (last visited July 31, 2023).  And Johns Hopkins advises on its website that one of the complications of [the cardiac condition] ▮▮▮▮▮▮▮▮ can be impaired blood flow "leading to other organ damage such as brain and kidney function." ▮▮▮▮▮▮▮▮▮, Johns Hopkins, available at https://www.hopkinsmedicine.org/health/conditions-and-diseases/▮ (last visited July 31, 2023).  At oral argument, counsel for Judge Newman acknowledged that symptoms such as "confusion" "might" show the relevance of Judge Newman's heart condition to the Committee's inquiry.  Oral Arg. Tr. at 19:25–20:3.  He also acknowledged that these were the symptoms of ▮▮▮ ▮▮▮▮▮▮▮ [the cardiac condition], a condition Judge Newman acknowledges she has.  *Id.* at 19:9–19.  The medical records at issue thus are plainly relevant, and Judge

IN RE COMPLAINT NO 23-90015

Newman's assertions that she cannot understand their relevance has no merit.

Finally, Judge Newman asserts that the Committee's request for an interview with her is "peculia[r] and opa[que]" and she professes to be at a loss to understand the request because—according to her—the Committee asserted that it was "intimately familiar with Judge Newman" and thus should have no need to interview her. July 5 Brief at 3. That distorts what the Committee has said. In denying Judge Newman's request for a transfer, the Committee agreed that, in this case, as the Breyer Committee Report had observed, the "'relative ignorance' of judges in another circuit of 'local circumstances and personalities'" might make them less well suited to resolve this matter. May 3 Order at 10 (quoting Breyer Committee Report, 239 F.R.D. at 215). The Committee never suggested that it had no need to interview Judge Newman. To the contrary, the Committee's May 16 Order noted that Judge Newman had accused the Committee of making factual errors without identifying specifics and explained that an interview would allow her to point out any errors. May 16 Order at 23–24. And far from being a "peculia[r]" request, interviewing the subject of an investigation is an elementary, often essential, step. Indeed, if the Committee had attempted to complete its investigation *without* interviewing Judge Newman, she might have claimed that omission violated her due process rights. *Cf.* Dani Kass, *Judge Newman Not Sure the Federal Circuit Can Be Salvaged*, available at https://www.law360.com/ip/articles/1698074?nl_pk =1c077ab08b844b7ca04b9be890c8db77&utm_source=new sletter&utm_medium=email&utm_cam- paign=ip&utm_content=2023-07-13&nlsidx=0&nlaidx=0 (last visited July 31, 2023) (Judge Newman asserting that "she has never been given an opportunity to discuss the claims against her with the chief judge or others involved in the Judicial Conduct and Disability Act investigation").

Judge Newman's asserted grounds for refusing to sit for an interview with the Committee are frivolous.

> ### e. The Neurologist's Report Submitted by Judge Newman Provides No Justification for Her Refusal To Undergo Medical Examinations with Independent Professionals Chosen by the Committee.

Along with her July 5 Brief, Judge Newman submitted a one-and-a-half-page report from a neurologist, Dr. Ted L. Rothstein, who had examined her and reported that his "findings would support her having cognitive function sufficient to continue her participation in the court's proceedings" (while also noting that "she could have a more detailed neuropsychological evaluation as part of her neurological assessment"). Rothstein Report at 2. Judge Newman argued in her brief that this report should "obviate the need for any further testing" and end these proceedings. July 5 Brief at 2. At oral argument, when pressed about problems with the Committee's relying on the report, Judge Newman's counsel seemed to back away from a request that the Committee rely on it, suggesting that he supplied it only as background. Oral Arg. at 26:15–18 ("What we have submitted from Dr. Rothstein is—mostly was a point of information that the Committee could choose to credit or not credit as it wishes."). As explained below, the Committee finds that no weight can be given to Dr. Rothstein's report on the issue of demanding the medical examinations and records at issue, at least because, on its face, it shows internal inconsistencies on critical points and Judge Newman has refused to provide the Committee the

IN RE COMPLAINT NO 23-90015

cognitive test described in the report and the information submitted to Dr. Rothstein and on which he relied.[31]

The most critical aspect of the Rothstein Report is its description of a cognitive test administered to Judge Newman. The Report notes that a "partial MoCA examination" was performed with Judge Newman. Rothstein Report at 2. A MOCA examination refers to the Montreal Cognitive Assessment, which is a one-page test, the current version of which is attached as Exhibit 11 to this Report and

---

[31] From the report itself, it appears that Dr. Rothstein was only provided an article written by Judge Newman's former law clerk, Andrew Michaels, *Judge Newman's Recent Dissents Show She Is Fit For Service* (June 6, 2023), available at https://ssrn.com/abstract=4472679 (last visited July 31, 2023) (claiming that he "did not perceive a significant drop in the quality or thoroughness of her opinions over the previous decade") and a Washington Post article about this case. It is unclear, and counsel refused to tell the Committee what materials, including medical records and materials from this proceeding detailing Judge Newman's interactions with staff and the deficiencies in her case-handling, were part of what Dr. Rothstein received and considered, even while counsel acknowledged that it is relevant to assessing such an expert's opinion to know what materials he had before him. Oral. Arg. Tr. at 21:13–22:6 (medical records); 24:25–25:2 (relevance); 29:1–24 (materials from this proceeding). The importance of knowing the bases for an expert's opinion is recognized in the Federal Rules of Civil Procedure, *see, e.g.*, Rule 26(a)(2) (requiring an expert report specifying "the facts or data considered by the witness"), and in the Rule 702 of the Federal Rules of Evidence as understood in *Daubert* and related cases, which focus on the methodology of reasoning from a sufficient factual foundation.

IN RE COMPLAINT NO 23-90015

Recommendation and is reproduced below.  According to the MOCA website, the test takes about 10 minutes to administer.  *See* MoCA News, *Improving Outcomes in Cancer Patients and the Role of Screening for Cognitive Impairment*, available at https://mocacognition.com/moca-news/ (last visited July 31, 2023) ("MoCA takes just 10 minutes to administer . . . .").  The test has several subparts and typically requires the person administering the test to check boxes and tally up points on each sub-part.  The full test is scored out of a total of 30 points and (as noted at the bottom of the test sheet) a score of 26 or higher is considered normal.

IN RE COMPLAINT NO 23-90015



**MONTREAL COGNITIVE ASSESSMENT (MOCA®)**
Version 8.1 English

Name:
Education:
Sex:
Date of birth:
DATE:

| VISUOSPATIAL/EXECUTIVE | Copy cube | Draw CLOCK ( Ten past eleven )  ( 3 points ) | POINTS |
|---|---|---|---|
| | [ ]   [ ]   [ ] | [ ] Contour   [ ] Numbers   [ ] Hands | __/5 |

**NAMING**    [ ]   [ ]   [ ]    __/3

| MEMORY | Read list of words, subject must repeat them. Do 2 trials, even if 1st trial is successful. Do a recall after 5 minutes. | | FACE | VELVET | CHURCH | DAISY | RED | NO POINTS |
|---|---|---|---|---|---|---|---|---|
| | | 1ST TRIAL | | | | | | |
| | | 2ND TRIAL | | | | | | |

| ATTENTION | Read list of digits ( 1 digit/ sec. ). | Subject has to repeat them in the forward order.   [ ] 2 1 8 5 4 | |
|---|---|---|---|
| | | Subject has to repeat them in the backward order.   [ ] 7 4 2 | __/2 |

Read list of letters. The subject must tap with his hand at each letter A. No points if ≥ 2 errors
[ ]  F B A C M N A A J K L B A F A K D E A A A J A M O F A A B    __/1

Serial 7 subtraction starting at 100.    [ ] 93    [ ] 86    [ ] 79    [ ] 72    [ ] 65    __/3
4 or 5 correct subtractions: **3 pts,**    2 or 3 correct: **2 pts,**    1 correct: **1 pt,**    0 correct: **0**

| LANGUAGE | Repeat: I only know that John is the one to help today.  [ ] | __/2 |
|---|---|---|
| | The cat always hid under the couch when dogs were in the room.  [ ] | |
| | Fluency: Name maximum number of words in one minute that begin with the letter F.    [ ] _____ (N ≥ 11 words) | __/1 |

| ABSTRACTION | Similarity between e.g. banana - orange = fruit    [ ] train - bicycle    [ ] watch - ruler | __/2 |
|---|---|---|

| DELAYED RECALL | (MIS) | Has to recall words WITH NO CUE | FACE | VELVET | CHURCH | DAISY | RED | Points for UNCUED recall only | __/5 |
|---|---|---|---|---|---|---|---|---|---|
| Memory | X3 | | [ ] | [ ] | [ ] | [ ] | [ ] | | |
| Index Score | X2 | Category cue | | | | | | | |
| (MIS) | X1 | Multiple choice cue | | | | | | MIS = ____ /15 | |

| ORIENTATION | [ ] Date    [ ] Month    [ ] Year    [ ] Day    [ ] Place    [ ] City | __/6 |
|---|---|---|

© Z. Nasreddine MD    www.mocatest.org
Administered by: _____
Training and Certification are required to ensure accuracy

MIS:   /15
(Normal ≥ 26/30)
Add 1 point if ≤ 12 yr edu

TOTAL    __/30

101

Dr. Rothstein explained that a "partial" test was given because Judge Newman had a broken wrist and "is unable to write." Rothstein Report at 1 & 2; Oral Arg. Tr. at 31:3–9 (Judge Newman's counsel confirmed she was unable to write and was instructed by her orthopedic surgeon not to hold a pen). Dr. Rothstein specified that she "cannot follow trail or draw a cube (each worth one point on the 30-point test)," Rothstein Report at 2—a description that corresponds to the first two parts of the test. *See* Ex. 9. The section testing memory requires the subject to remember five words several minutes after they have been read to the subject and repeated several times. Dr. Rothstein reported that, on that section, Judge Newman "fail[ed] to remember four of five words after several minutes," thus losing four points. Rothstein Report at 2. He reported her total score as 24/28.

There is a significant internal contradiction on the face of that description, however, because if Judge Newman was unable to write, she also necessarily was unable to complete another section of the test—the section next to drawing the cube—which requires the subject to draw a clock. *See* Ex. 9; *see also* FAQs, *Does the subject receive a point for the contour of the clock if the numbers are organized in a circular manner but the circle is not drawn?*, available at https://mocacognition.com/faq/ (last visited July 31, 2023) (explaining "a circle must be drawn" for points to be awarded). That section is worth three points. *See* Ex. 9. Thus, if Judge Newman was unable to write, it appears that she necessarily was unable to complete sections of the test worth 5 points, and her test properly should have been scored out of a total of 25 points, not 28 points. In fact, the MOCA website specifically describes (in the FAQs section) how to administer the test to a person who is "unable to complete the written portion" and explains that the test should be scored out of 25. FAQs, *How can I score the test if the subject is unable to complete the*

*written portion of the test because of a physical disability such as hemiplegia?,* available at https://mocacognition.com/faq/ (last visited July 31, 2023).  Given that Judge Newman missed four of the five points on the memory section of the test, Dr. Rothstein's own description of her performance suggests that her score was actually 21/25, not 24/28.

Beyond that, the MOCA website also describes how a test scored out of 25 can be converted to a score on a scale of thirty.  The subject's score should be multiplied by 30 and the result of that operation divided by 25.  FAQs, *How can I score the test if the subject is unable to complete the written portion of the test because of a disability such as hemiplegia?,* available at https://mocacognition.com/faq/ (last visited July 31, 2023).  Performing that calculation here on a presumed score of 21/25 would yield a score of 25.2/30, *which is below the lower limit of the normal range.*  *See* Ex. 9 (indicating scores ≥26 are normal).

Given the concerns raised by the inconsistency on the face of the Rothstein Report, the Committee ordered Judge Newman to produce the actual MOCA test sheet as administered to her and also to produce all materials that had been provided to Dr. Rothstein to inform his opinion.  *See* July 7 Order at 2.  The Committee also instructed counsel to be prepared to describe the scoring of Judge Newman's MOCA test at argument.  *See id.* at 2–3.  Judge Newman refused to provide any of those materials, and at argument counsel  could not shed any light on the scoring of the MOCA test.  *See* Oral Arg. Tr. at 32:9–34:17.  Counsel did acknowledge, however, that given the statements in the report about Judge Newman's inability to write, it was possible that the reported score was an error.  *See id.* at 34:17.

Given the serious concerns raised by the internal contradiction on the face of the Rothstein Report and Judge Newman's refusal to provide either that test or any of the

materials on which Dr. Rothstein relied, the Committee concludes that it can give no weight to the report on the issue of whether the orders of medical examinations and records was justified and Judge Newman's refusal to comply was misconduct. To be clear, the Committee does not attempt to draw any conclusions from the calculation noted above indicating that Judge Newman's apparent score of 21/25 would fall in the abnormal range on a 30-point scale or that she failed 80% of the memory questions on the test. Instead, the Committee has noted that calculation solely to emphasize why the Committee must see the underlying test and cannot simply accept the Rothstein Report on its face.

The Committee's decision to give no weight to the Rothstein Report is supported by the *Adams* case. There, when Judge Adams attempted to submit testimony from his own psychiatrist but refused to provide the investigating committee "any of the records underlying his psychiatrist's evaluation," the committee refused to accept the testimony. *Adams*, C.C.D. No. 17-01 at 13; *In re Complaint Under the Judicial Conduct and Disability Act*, No. 10-20-90049, at 22 (noting that the special committee excluded the psychiatrist's testimony because Judge Adams "refused to disclose any of the underlying reports, testing materials, or other documents relating to the evaluation"). The Committee takes a similar approach here in deciding that it can give no weight to the Rothstein Report on the issue now before it.

### f. Judge Newman's Assertion that the Committee Lacked a Reasonable Basis for Its Orders Is Meritless.

Judge Newman finally argues that the evidence gathered by the Committee is insufficient to provide a reasonable basis for concern about her cognitive state and thus cannot justify the Committee's orders. Her assertions on

this score largely boil down to two points, neither of which is persuasive.

First, Judge Newman points to data from the Clerk's Office cited in the May 16 Order to argue that her average time for issuing opinions actually *improved* in recent years. *See* July 5 Brief at 14. Thus, Judge Newman points out that in the twelve-month period from October 2020 to September 2021 her average time to issue an opinion was 249 days. But in the 18-month period from October 2021 through March 2023 her average time to issue an opinion dropped to 199 days. *See id.* Judge Newman accurately reports the raw numbers, but they do not remotely support her conclusion that everything is just fine with her speed in issuing opinions. The obvious reason for the improvement after October 2021 is that her caseload was substantially reduced in this period. Indeed, from May 2022 to April 2023, Judge Newman participated in deciding only 65 cases, roughly *half* the load of the average active Federal Circuit judge (129 cases).

Aff. [14] ¶ 22. Judge Newman also does not sit on motions panels. *Id.* ¶ 23. Despite carrying a fraction of the ordinary workload, however, her average time to issue an opinion was 199 days—almost *four times* the average of other active judges (53 days).                    Aff. [13] ¶¶ 15, 17;
                    Aff. [14] ¶ 13.

What the statistics actually show, then, is a failed experiment under which Judge Newman's caseload was radically reduced in an effort to enable her to issue opinions in a timely fashion but—although the reduced workload improved her speed somewhat—her time for issuing opinions remained so far behind the rate of other judges that it continues to interfere with the efficient conduct of the Court's business.

Second, Judge Newman dismisses the concerns raised in the affidavits of multiple staff members as "minutia[e]"

and "petty grievances" that she will barely even deign to address. July 5 Brief at 15. The Committee finds this cavalier response deeply troubling. The concerns that dedicated staff members have brought to the Committee are not minutiae, nor are they petty. They reveal a pattern of serious dysfunction in Judge Newman's interactions with staff both within and outside her chambers that provide an ample basis for reasonable concerns about Judge Newman's cognitive state. Details are provided earlier in this report. Moreover, at least one Circuit has held that a judicial employee may bring a Fifth Amendment claim against a court for not providing her relief under the court's EDR plan. *Strickland v. United States*, 32 F.4th 311, 356 (4th Cir. 2022) (holding "the Fourth Circuit's EDR Plan afforded [plaintiff] with protected property interests"). In the Committee's view, the fact that Judge Newman would make such an argument only confirms that there are reasonable grounds to have concerns about her cognitive state.

And to the extent that she argues that the Committee should vacate the ordered of medical examinations, as the Sixth Circuit Judicial Council ultimately did in *Adams*, she is in error. In *Adams*, Judge Adams troubling behavior abated, in fact the four complainant judges testified that he was no longer exhibiting the concerning behavior. *See* Order & Memorandum, *In re Complaint of Judicial Misconduct*, No. 06-13-90009, at 4 (6th Cir. Judicial Council June 27, 2018). Here, in contrast, Judge Newman has made no argument, let alone any showing, that the bases for concern about cognitive problems, including both her work-processing delays and her troubling interactions, have abated. Despite having three law clerks and a judicial assistant, having no new cases from April through September and not sitting on motions panels, Judge Newman has been unable to issue her seven majority opinions (that as of July 31, 2023 average 230 days old) and has delayed at

least two other majorities with her inability to vote or circulate dissents in time frames required by our rules.[32]

Judge Newman's accusatory interactions with staff about her supposedly stolen computer have continued unabated.[33] She now claims that "decades of my work and my information" were on the computer, and when staff explained (over and over again) that none of her information was on the hard drive of that computer, she accused them of "clever dissembling," being "shameful," and engaged in "trickery." *See* Ex. 6 at 23. In a single two-day period from July 6 to July 7, more than two dozen emails passed between Judge Newman and the Director of IT, the Help Desk Manager, and the Clerk of Court regarding her

---

[32] In ███████████████, the majority opinion was circulated on May █, 2023, and a majority was quickly achieved. Judge Newman circulated her 8-page dissent 74 days after the majority opinion. In another case, the majority opinion was circulated on April █, 2023 ██████████████████████████████, and a majority was quickly achieved. Judge Newman did not vote until May █ (37 days after the majority opinion) and did not circulate her 4-page dissent until July █, 2023 (95 days after the majority), thus holding up the issuance of this opinion for three months.

[33] The Committee did not rely upon these more recent interactions in concluding that there was a reasonable basis for its orders or concluding that Judge Newman's failure to cooperate was misconduct or in the choice of recommended sanction. They are mentioned solely in response to the argument by Judge Newman that this case is like *Adams*, where the circumstances underlying an examination order eventually changed enough to warrant the order's withdrawal—which has not been shown here.

allegations that they stole her computer and files and their attempts to explain to her that her files all reside on her chambers' shared drive, and none of her files were on the judicial assistant's hard drive. *See generally* Ex. 6; *id.* at 4 (Director of IT confirming "████████ [Judicial Assistant] has no access to Judge Newman's shared drive nor has any of Judge Newman's data stored locally on his PC."); *id.* at 5 (IT staff member confirming the same). The staff respectfully and patiently explained to Judge Newman that "[e]very chambers stored those items on their network drives which are accessible to every computer in that chambers. The items you describe are located on your network drive." *Id.* at 18; *see also, e.g., id.* at 22 (Clerk of Court explaining to Judge Newman that "I am at a loss for how different a way I can again explain what I have explained to you repeatedly for months. Your files are on your network drive. You have access to everything."); *id.* at 9 (Director of IT again explaining "[w]e have checked, double checked and triple checked and there is no data on any local computer or drive that belongs to you. All of your data is on the Newman share."); *id.* at 12 (Director of IT confirming a third time that "no Newman Chambers files reside ████ ████ [Judicial Assistant's] PC. There is nothing to return you as we informed you previously that all Newman Chambers files were moved to the Newman Share . . . ."); *see also* ████████ Aff. [8] ¶ 27 & Ex. C at 2 ("Because all of your chambers materials, drafts, and documents are stored on your chambers network drive and not the local desktop, nothing about the move of this desktop ever hindered, restricted, or interfered with access by either you or your chambers staff to these materials."). And Judge Newman refused the many staff offers to help her locate the files that she has misplaced. *See* ████████ Aff. [6] ¶¶ 2–6; ████ Aff. [5] ¶¶ 2–4; ████████ Aff. [8] ¶¶ 35–36; Ex. 6 at 15 (Clerk of Court explaining "we have offered repeatedly to assist you with locating any files you cannot

find or access.  However, through our many conversations, we have yet to learn of any file or record of your chambers that is actually missing or unavailable."); *id.* at 26 ("Please let us know what you cannot locate.  Our staff is available and willing to assist you."); ██████████ Aff. [8] at Ex. D (communicating to Judge Newman "notwithstanding how you treated him yesterday, ██ [the Court's Help Desk Manager] is more than willing to come back to your chambers and help you find these files").

These recent exchanges underscore the absence of any basis for deeming the concerns necessitating the Committee's orders to have abated.  Unfortunately, the circumstances here are not like *Adams* where the behavior that gave rise to the ordered medical examinations abated and eliminated the reasonable basis for ordering them.

## III.     RECOMMENDED SANCTION

Given the seriousness of Judge Newman's misconduct and the extensive evidence establishing, at a minimum, a reasonable basis for concern that Judge Newman suffers from a disability, the Committee recommends that Judge Newman not be permitted to hear any cases not yet assigned to an authoring judge, at the panel or en banc level, subject to consideration of renewal if the refusal to cooperate found here continues after that time and to consideration of modification or rescission if justified by an end of the refusal or by other changes.

As noted above, *see supra* pp. 8–10, 60–64, Judge Newman's refusal to cooperate with the Committee is a serious matter.  Her action has prevented the Committee from fulfilling its statutorily assigned role.  That role, moreover, is essential for the proper functioning of the judiciary.  The Act gives the judiciary an important responsibility for regulating itself through investigations such as this.  Accordingly, all judges have an obligation to cooperate with

proceedings under the Act to ensure that self-policing by the judiciary can function properly. If the judge who is the subject of a disability proceeding could bring the mechanism Congress established for addressing judicial disability to a grinding halt simply by flouting the rules and refusing to cooperate, the self-policing mechanism Congress created would be a nullity. And that would undermine public confidence in the judiciary itself.

Accordingly, Judge Newman's conduct thwarting the Committee's investigation cannot go unpunished and cannot be met with a minor sanction that a life-tenured judge might ignore. Instead, the Committee believes that the only sanction that would appropriately impress upon Judge Newman the seriousness of this matter is the temporary suspension of all case assignments for a fixed time period, as described above.

This sanction is consistent with the JC&D Committee's decision in *Adams*. There, the JC&D Committee affirmed the finding of the Sixth Circuit Judicial Council that Judge Adams' refusal to undergo a mental health examination by a psychiatrist chosen by the special committee constituted misconduct and explained that, if he continued to "refuse to submit to the mental health examination ordered by the Judicial Council and affirmed by this Committee, sanctions for [his] continued failure to cooperate—including the prohibition of the assignment of new cases on a temporary basis for a time certain—may be warranted." *Adams*, C.C.D. No. 17-01, at 39; *see also* 28 U.S.C. § 354(a)(2).

If Judge Newman undergoes the specified medical examinations, produces the specified medical records, and sits for an interview, the Committee will be able to complete its investigation and make a recommended finding as to whether Judge Newman suffers from a disability. Until Judge Newman cooperates and permits the Committee to make a finding on that issue, her continued non-

IN RE COMPLAINT NO 23-90015

cooperation justifies suspending case assignments for the fixed period of one year or at least until she ceases her misconduct and cooperates such that the Committee can complete its investigation, whichever comes sooner.

This report and recommendation has been unanimously adopted by the Committee.[34]

---

[34]   Accompanying this report is a statement of the vote. *See* Rule 17.