# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE HON. PAULINE NEWMAN,
Circuit Judge
United States Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC 20005,

*Plaintiff*,

v.

THE HON. KIMBERLY A. MOORE,
in her official capacities as
Chief Judge of the U.S. Court of Appeals for the Federal Circuit,
Chair of the Judicial Council of the Federal Circuit, and
Chair of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

THE HON. SHARON PROST,
in her official capacity as
Member of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

THE HON. RICHARD G. TARANTO,
in his official capacity as
Member of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

and

THE JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT,
717 Madison Place, NW
Washington, DC 20005,

*Defendants*.

NO. 1:23-CV-01334-CRC

**PLAINTIFF'S COMBINED MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS AND IN REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF ADDITIONAL FACTS ......................................................................... 3

LEGAL STANDARD .......................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

I.      THIS COURT CAN REVIEW AND SHOULD ENJOIN THE JUDICIAL COUNCIL ORDERS OF MARCH 8 AND JUNE 5 ................................................................................................... 6

     A. *Judicial Councils and the Judicial Conference Itself Are Administrative Bodies and Their Actions Are Subject to Review in This Court* ............................................................................ 7

     B. *Neither the March 8 Order Nor the June 5 Order Is Moot* ........................................... 9

     1. The March 8 Order Informs Consideration of the June 5 Order's Legality ..................... 9

     2. The June 5 Order Remains Live ...................................................................... 13

     C. *The March 8 and June 5 Orders Were Unlawfully Promulgated* ................................... 14

     D. *Judicial Councils Do Not Possess Plenary Authority over Federal Judges* ....................... 19

     E. *Whether or Not Judicial Council § 332 Proceedings Are "Judicial in Nature" Is Immaterial* .......... 25

II.      THE DISABILITY ACT DOES NOT BAR FACIAL CHALLENGES TO THE STATUTE ................. 28

III.      AS APPLIED CHALLENGES TO THE DISABILITY ACT ARE NOT FORECLOSED ................... 33

     A. *The D.C. Circuit's Decision in* McBryde *Is Is Inapplicable and Is No Longer Good Law* ............ 33

     B. *If Good Law, the D.C. Circuit's Decision in* McBryde *Does Not Foreclose All "As Applied" Challenges* ................................................................................................... 36

IV.      JUDGE NEWMAN WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION, AND THE BALANCE OF EQUITIES WEIGHS HEAVILY IN HER FAVOR ................................... 39

     A. *Defendants Downplay the Permanent and Irreparable Damage Being Inflicted on Judge Newman* ...... 39

     B. *Public Interest Favors the Grant of an Injunction* ...................................................... 40

     C. *The Balance of Harms Favors Judge Newman* .......................................................... 43

     D. *Judge Newman Did Not Unduly Delay Her Request for Injunctive Relief* ......................... 44

CONCLUSION ................................................................................................................. 45

## INTRODUCTION

The gravamen of Judge Newman's complaint is that in their haste to remove Judge Newman from office—a decision made long before any formal or informal proceedings began—Defendants have run roughshod over constitutional, statutory, and administrative constraints on their power. Defendants have suspended Judge Newman from hearing cases even before launching any disciplinary proceedings, or even advising Judge Newman of their concerns, have issued orders that were neither noticed nor memorialized, have attempted to "mix and match" incompatible statutory provisions in pursuit of their goals, and are now improperly attempting to re-write Judge Newman's complaint in their effort to convince this Court that it lacks jurisdiction. These unlawful efforts must be rectified.

The Constitution protects not only Judge Newman's ability to receive undiminished compensation due to an Article III circuit judge, but, as her Presidentially-signed commission explicitly states, also her ability to "execute and fulfill the duties of [her] office."

Throughout her service, she has been fully competent, able, and willing to perform her duties as a United States Circuit Judge.  Her continued ability to carry out her functions has been confirmed by two independent board-certified physicians, both of whom spent hours interviewing and evaluating Judge Newman.  Furthermore, the clarity, lucidity, tone, and substance of Judge Newman's judicial opinions and public statements continue to impress litigants and academics alike, not to mention members of the general public.

Despite Judge Newman's continued abilities and vigor, the Judicial Council of the Federal Circuit, which consists solely of other Federal Circuit judges, saw it fit not only to launch an investigation into Judge Newman's competency, but to unlawfully suspend her from her judicial duties even *before* such an investigation began.  The entire process of sidelining the Judge, though done under the guise of the authority given by the Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§ 351–364 ("Disability Act"), was and remains *ultra vires* and inconsistent both with constitutional strictures

and the Act itself.  The actions taken against Judge Newman violated the basic norms of due process of law and are inconsistent with constitutional protections that federal judges enjoy.  Furthermore, and especially when considered in conjunction with Judge Newman's age, Defendants actions throughout this process were designed to accomplish a preordained result, whether legal or not.

Defendants' argument that this Court has no jurisdiction over Judge Newman's complaint reduces to the claim that so long as the Judicial Council invokes "magic words" and classifies its action as having been taken under the Disability Act, this incantation alone divests district courts of jurisdiction over all actions of judicial councils.  However, the statute foreclosing judicial review is not nearly as broad as Defendants contend it is, and binding precedent does not support Defendants' position.  Furthermore, as Defendants themselves admit, not all actions taken against Judge Newman were taken pursuant to the Disability Act.  Those actions are necessarily not covered by any jurisdiction-stripping provisions contained in that Act.

At bottom, Judge Newman's dispute with her colleagues is one between Judge Newman and an administrative rather than a judicial body.  And actions of administrative bodies are properly reviewed by an original proceeding in the district court, rather than by mandamus to the Supreme Court.  Defendants' assertion that a judicial council of a circuit is a body subject to almost no constraints or review mechanisms is the very definition of arbitrary power.  Our Constitution does not tolerate such powers, and this Court should not countenance Defendants' pretenses to the same.

Properly read, Judge Newman's complaint presents three separate claims to Defendants' actions.  First, Judge Newman challenges those of Defendants' actions that were taken outside of the authority of the Disability Act which resulted in Judge Newman's suspension from the work of the Court starting with the April 2023 sitting.  These actions, which culminated in an order issued by the Judicial Council of the Federal Circuit on June 5, 2023, have a continuing effect and are causing

2

continuing harm to Judge Newman.  Defendants concede that nothing in the U.S. Code withdraws jurisdiction from this Court to hear Judge Newman's challenge to these actions.

Second, Judge Newman's complaint alleges that the Disability Act, to the extent it permits involuntary removal of Article III judges from all judicial duties in circumvention of the impeachment process, is facially unconstitutional.  Defendants concede that this Court has jurisdiction over facial challenges to the Disability Act, and only argue that Judge Newman did not properly present such a challenge.  However, Defendants' arguments rest on their rewriting of Judge Newman's complaint, which is wholly improper.  The Court should reject these attempts.

Finally, Judge Newman challenges the constitutionality of the Disability Act as applied to her.  And while Defendants contend that the governing D.C. Circuit precedent forecloses such challenges, they ignore later-arising decisions of the Supreme Court and, indeed, the very precedent they rely on.

Because this Court has jurisdiction to hear Judge Newman's claims, and because all her claims remain live, the Court should deny Defendants' motion to dismiss.  Additionally, and because Judge Newman has established a likelihood of success on the merits, and because the balance of equities decidedly favors her, the Court should grant Plaintiff's motion for a preliminary injunction and restore her to the bench immediately.

## STATEMENT OF ADDITIONAL FACTS[1]

Seeking to remove the cloud hanging over her service and ability to continue as an active circuit judge, Judge Newman underwent evaluations by two board-certified professionals.  The Court is already familiar with an examination conducted by Ted L. Rothstein, M.D.—a full professor of

---

[1] Judge Newman has provided a comprehensive statement of facts in her complaint and her memorandum of law in support of her motion for a preliminary injunction.  This section discusses only those facts that have come to light following the filing of those two documents.  Because these facts are all judicially noticeable, the Court may consider them in analyzing Defendants' motion to dismiss and Plaintiff's motion for a preliminary injunction.  *See Giliana v. Blinken*, 596 F. Supp. 3d 13, 18 (D.D.C. 2022) (Cooper, J.); *see also* 28 U.S.C. § 1733.

Neurology at the George Washington University School of Medicine and a board-certified neurologist. Because Defendants severely mischaracterize Dr. Rothstein's examination of Judge Newman, Plaintiff obtained an affidavit describing in more detail the nature of his exam.  Exh. A, at 126-31.[2]

Second, and in addition to examination by Dr. Rothstein, Judge Newman underwent examination by Dr. Regina M. Carney—a double board-certified forensic psychiatrist with expertise in fitness-for-duty examinations.  Dr. Carney's evaluation reached the same conclusion as Dr. Rothstein's.  In Dr. Carney's words, Judge Newman "is a fluent, engaging, strong-willed, highly accomplished and *unusually cognitively intact* 96-year-old woman with chronic medical issues that appear well-controlled at the current time, with no evidence of current substantial medical, psychiatric, or cognitive disability."  Exh. A, at 137 (emphasis added).  Dr. Carney concluded that "Judge Newman demonstrated no substantial emotional, medical, or psychiatric disability that would interfere with continuation of her longstanding duties as a Judge in the U.S. Court of Appeals."  *Id.*

It should be noted that the tests administered by Dr. Rothstein and Dr. Carney—tests which Judge Newman passed with flying colors—have, respectively, 91% and 86% sensitivity to dementia. *See* Kelvin K. F. Tsoi, *et al.*, *Cognitive Tests to Detect Dementia: A Systematic Review and Meta-analysis*, 179 JAMA Intern. Med. 1450, 1455 (2015).  Yet Defendants, having been intent from the very beginning to see this case end only one way—with Judge Newman off the bench—have ignored these professional opinions and pressed forward with removing her from the bench in all but name.  *See* Michael Shapiro, *96-Year-Old Suspended Judge Honored at Patent Law Conference*, BloombergLaw.com, https://tinyurl.com/jytmd58e (Sept. 18, 2023).

---

[2] For ease of reference, Plaintiff attaches copies of the relevant documents to this memorandum. However, the referenced documents are all available on the Federal Circuit's website as attachments to Judicial Council's orders and/or Plaintiff's responses thereto.  This Court can take judicial notice of these documents.  *See* 28 U.S.C. § 1733.

4

To that end, on September 20, 2023, Defendants issued an Order suspending Judge Newman from having cases assigned to her not only at the panel, but also at the *en banc* level[3] for a *renewable* one-year period of time.  Exh. B, at 72-73.  Additionally, the June 5, 2023, Judicial Council order that indefinitely suspended Judge Newman from hearing cases, purportedly due to her delays in issuing opinions, remains in effect.  Defendants have given no indication that they plan to *ever* revoke that order, irrespective of Judge Newman's mental or physical ability or her cooperation with any investigation.  Thus, Judge Newman is presently subject to *two* suspension orders, each of which is (purportedly) grounded in a different grant of authority to judicial councils.

## LEGAL STANDARD

When analyzing a motion to dismiss, whether brought under Rule 12(b)(1) or 12(b)(6), a court "must treat the complaint's factual allegations as true, and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up); *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (When considering a motion to dismiss, this Court is obliged to "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.") (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir.2005)).  In moving to dismiss the complaint, Defendants may not attempt to rewrite it.  *See In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 666 (N.D. Cal. 2020).

While a plaintiff bears the burden of establishing jurisdiction, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), "the court may consider documents outside the pleadings to assure itself that it has jurisdiction," *Sandoval v. DOJ*, 322 F. Supp. 3d 101, 104 (D.D.C. 2018) (Cooper, J.).

---

[3] As discussed further below, this provision contradicts the requirement that "[a] court in banc shall consist of all circuit judges in regular active service…."  28 U.S.C. § 46(b).

## ARGUMENT

**I.   THIS COURT CAN REVIEW AND SHOULD ENJOIN THE JUDICIAL COUNCIL ORDERS OF MARCH 8 AND JUNE 5**

Prior to the September 20, 2023, Judicial Council action disposing of the misconduct allegation against Judge Newman, the Council (and Chief Judge Kimberly Moore, individually) entered orders and took actions *indefinitely* suspending Judge Newman from the work of the Court.  It is noteworthy that as Defendants fully admit, *see* ECF 25-1, at 81,[4] the March 8 Order was entered without notice to Judge Newman, much less her participation, was nowhere recorded or reduced to writing (a practice virtually unheard of in appellate courts), and took place *before* any investigatory proceedings had even begun.  It necessarily follows that any jurisdiction-stripping provisions of the Disability Act, however broad, cannot possibly apply to an action taken *prior to* that Act being invoked.

The June 5 Order, ECF 10-1, at 121-26, though cloaked with more formalities, and taken after the disability and disciplinary proceedings against Judge Newman had begun, was also (as Defendants themselves admit, *see id.*) taken pursuant to a statute which does not foreclose judicial review.  Thus, the only question is whether review can be had in *this*, as opposed to any other court. Defendants contend that only the Supreme Court, as the only Court with mandamus and appellate jurisdiction over the Federal Circuit, is competent to review actions of the Federal Circuit's Judicial Council.  But that argument conflates the role and status of the *Judicial Council of* the Federal Circuit, which is an administrative body, with the United States *Court of Appeals for* the Federal Circuit, which is an Article III court.  Although the membership of the two bodies is identical, the functions, powers, and status of these entities are not.  And because the two entities (though identically staffed) stand on different footings, the review mechanism of their actions also stands on different footings.

---

[4] The page numbering reflects the page number assigned by the ECF system, not the page number in the underlying document.  For example, in this document, ECF page 81 corresponds to page 77 in the underlying document.

A. *Judicial Councils and the Judicial Conference Itself Are Administrative Bodies and Their Actions Are Subject to Review in This Court*

The Judicial Conference itself and various judicial councils are administrative and not judicial bodies. That is evident from the functions that the statute assigns to these entities. For example, Congress declared that the purpose of judicial councils is to make "make all necessary and appropriate orders for the effective and expeditious *administration* of justice within its circuit." 28 U.S.C. § 332(d)(1) (emphasis added). As a general matter, such orders can issue "only after giving appropriate public notice and an opportunity for comment." *Id.* The rule-making process is similar in relevant respects to the process that various administrative agencies must engage in. *Compare id.* with 5 U.S.C. § 553 (c) ("After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."). Similarly, the Judicial Conference is charged with making "suggestions and recommendations to the various courts to promote uniformity of management procedures and the expeditious conduct of court business," "carry[ing] on a continuous study of the operation and effect of the general rules of practice and procedure," and making recommendations to the Supreme Court with respect to any changes to the existing rules which in the Conference's opinion would "promote simplicity in procedure, fairness in administration, the just determination of litigation, and the elimination of unjustifiable expense and delay." 28 U.S.C. § 331. As is evident from these enactments, Congress never envisioned either the judicial councils or the Judicial Conference serving as an Article III court, *especially* when either of these bodies is not acting pursuant to the authority granted by the Disability Act.[5]

---

[5] As discussed further below, even in the context of the Disability Act, judicial councils and the Judicial Conference are not Article III courts, but administrative bodies and the constitutional challenges to their actions are cognizable in this Court. But when judicial councils act on a basis *other than* the Disability Act, there is no serious argument they are acting as a court.

Furthermore, the Judicial Conference itself has concluded that it is an administrative body.  In reviewing the case of Judge John McBryde, the Judicial Conference wrote that it is "not a court." and that its "decisions are not subject to review by the Supreme Court of the United States."  *In re: Complaints of Judicial Misconduct or Disability*, No. 98–372–001 at 21 (Jud. Conf., Sept. 18, 1998).

This conclusion is further bolstered by the judgments of the Supreme Court and the D.C. Circuit.  Thus, the Supreme Court wrote that nothing in the relevant statute or its legislative history "suggest[s] that the Judicial Council was intended to be anything other than an administrative body functioning in a very limited area in a narrow sense as a 'board of directors' for the circuit," *Chandler v. Jud. Council of Tenth Cir. of U.S.*, 398 U.S. 74, 86 n.7 (1970).  The D.C. Circuit also noted that the Judicial Conference (and its committees) are an "agency" rather than a court.  *See McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 62 (D.C. Cir. 2001).  The Court of Appeals not only termed the Judicial Conference an "agency," but even purported to overrule the Conference's own jurisdictional determinations where the Conference disclaimed jurisdiction.  *Id.*  Of course, were a Conference a court, the D.C. Circuit would have no such power.  The conclusion is therefore inescapable that both judicial councils and the Judicial Conference are administrative agencies, albeit ones staffed by judges.

Actions of administrative bodies are reviewable in the District Court.  Indeed, Defendants do not even appear to deny that this Court has jurisdiction.  *See* Def. Br. at 37-48 (arguing that Judge Newman is not entitled to relief *on the merits*).  The only question therefore is whether the substance of the March 8 and June 5 orders, as well as the procedure adopting them were lawful.  Because they were not, this Court should enjoin them.

Furthermore, were it otherwise, there would *no review whatsoever* of the Judicial Council's actions taken under Section 332.  Unlike with the actions taken pursuant to the Disability Act, which are reviewable (at least in part) by the Judicial Conference and its Committee on Judicial Conduct and

Disability (JC&D), there is no mechanism, other than an action in a district court, for appeal or review of actions of a judicial council taken under § 332. Nor, of course, is there anything approaching an explicit prohibition on such a review. And because 28 U.S.C. § 1331 provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," this Court has jurisdiction to hear challenges to Defendants' actions. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 205 (2023) (Gorsuch, J., concurring in judgment) ("Not *may* have jurisdiction, but *shall*. Not *some* civil actions arising under federal law, but *all*. The statute is as clear as statutes get ….") (emphasis added); *see also id.* at 185 ("Congress … may substitute for … district court authority an alternative scheme of review."). Because Congress did not "substitute for … district court authority an alternative scheme of review" of the Judicial Council's actions taken under § 332, it follows that this Court has jurisdiction.

B. *Neither the March 8 Order Nor the June 5 Order Is Moot*

1. The March 8 Order Informs Consideration of the June 5 Order's Legality

Defendants' Motion to Dismiss ("MTD") argues that a) the March 8 Order was superseded by the June 5 Order and therefore is no longer at issue, and b) the June 5 Order was itself superseded by the Judicial Council's Order of September 20, 2023.[6] Neither contention is correct.

As an initial matter, because the March 8 Order has never been reduced to writing or even recorded as having been issued, the only evidence for the basis upon which it was issued are the emails from Chief Judge Moore to Judge Newman (one of which is quoted in Chief Judge Moore's April 6 Order). Over and over again, Chief Judge Moore stated that the reason Judge Newman was being suspended from hearing cases was *not* because of any delays but because the Judicial Council allegedly "voted that [Judge Newman] should not hear new cases during [the disciplinary] process." Exh. B, at

---

[6] At the time Defendants filed their brief, the Judicial Council had not yet issued its "final" order. Nevertheless, Defendants recognized that such an order was likely imminent and argued it should be viewed as superseding the June 5 Order. *See, e.g.*, Def. Br. at 45.

83; *see also* ECF 10-1, at 12; *id.* at 151.  It should be emphasized that this alleged vote took place *before* any process actually began.  The vote allegedly occurred on March 8, 2023, while Judge Moore did not even draft, much less docket a complaint, until March 14, 2023.

Defendants do not contest that the Disability Act provides no authority for suspension of judges from their judicial duties *pendente lite*.  Yet, no other justification for the March 8 Order was given for nearly three months.  Instead, and following the filing of the present action, Defendants "reconsidered" the March 8 Order "*de novo*," but reached the same outcome.  This was also the first time that Defendants cited specific authority for their actions, claiming to ground Judge Newman's indefinite suspension in the language of 28 U.S.C. § 332(d)(1).  The June 5 Order continues in effect to the present day.

The reason the March 8 Order continues to be relevant to the present litigation is that it sheds light on the true motivations behind the subsequent orders.  First, Defendants' claim of acting under authority of § 332 is hard to square with the very caption of the June 5 Order, which lists it as being part of the record of *In Re Complaint No. 23-90015*, *i.e.*, the disability complaint against Judge Newman.  ECF 10-1, at 121-26.  This fact provides further proof that Defendants' protestations to the contrary notwithstanding, the June 5 Order is simply a continuation of an unlawful March 8 Order and was entered for the same purpose and was meant to have the same effect.[7]

It is undisputed that the Judicial Council had no power or authority to suspend Judge Newman prior to the completion of the investigation into an alleged misconduct or disability.  *See, e.g.*, 28 U.S.C.

---

[7] To the extent that the Judicial Council attempted to use § 332 *in lieu of* procedures set out by the Disability Act, such cutting of corners is itself unlawful.  *See In re McBryde*, 117 F.2d 208, 228 (5th Cir. 1997) ("Stated bluntly, Congress has distinguished between remedying judicial misconduct and censuring a judge for that misconduct. … While § 332 grants the judicial councils some authority to deal with judicial misconduct, the Judicial Council's authority to impose discipline based on its finding of misconduct is limited to that power conferred by § 372(c).").

§ 351(a) (authorizing a judicial council to act only upon a receipt of a report by the special committee that is produced following an investigation). Yet, on March 8, without any notice to Judge Newman, any opportunity to be heard, or any participation by Judge Newman, the Council voted to suspend Judge Newman from hearing cases "pending the results of the investigation into potential disability/misconduct." ECF 10-1, at 12. The March 8 Order transgressed bot the statutory limits on Judicial Council's power and the most fundamental notion of due process—notice and opportunity to be heard. *See* Anderson Nat. Bank v. Luckett, 321 U.S. 233, 246 (1944).

Defendants argue that whatever failings may have attended the March 8 Order are no longer relevant because the Judicial Council "reconsidered" that Order "*de novo*" in its June 5 meeting. However, Defendants are incorrect that the June meeting can cleanse the earlier unlawful behavior.

In many ways the sequence of events parallels *Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019). In that case, the Secretary of Commerce decided to reinstate the citizenship question on the decennial census form—an action that was lawful on its face. The Secretary claimed that his action was guided by the "request of the Department of Justice (DOJ), which sought improved data about citizen voting-age population for purposes of enforcing the Voting Rights Act (VRA))." *Id.* at 2562. Even while concluding that such an action was generally lawful and the explanation provided adequate, *see id.* at 2569-71, the Court nevertheless set aside the Secretary's action. In doing so, the Court explained that "[s]everal points, considered together, reveal a significant mismatch between the decision the Secretary made and the rationale he provided." *Id.* at 2575. The Court noted that "the Secretary began taking steps to reinstate a citizenship question about a week into his tenure, but it contains no hint that he was considering VRA enforcement in connection with that project," and that rationale for the decision was sought after the decision was made. *Id.* Indeed, initially, support for the addition of the citizenship question was sought from agencies and offices that had no authority for enforcing the VRA, and only after those attempts failed, did the Secretary finally stumble upon the correct statute and agency

11

charged with enforcing it.  *Id.*  As a result, the Court concluded that the Secretary's rationale for this action appeared "to have been contrived."  *Id.*

This case is no different.  Here, Chief Judge Moore began suspension proceedings against Judge Newman in February of 2023—even before the Judicial Council acted, much less before any investigation or disciplinary proceedings began.  *See* ECF 10, ¶¶60-66; ECF 25-1, at 82-83.  The decision to suspend Judge Newman was taken at that time and was carried forward through the next several iterations, each time with shifting rationales, which bespeaks of pretense.  According to Defendants, the Judicial Council as a whole then took a vote on March 8, 2023, to formalize Judge Newman's suspension from hearing cases.  But according to Defendants themselves, at that time, the Judicial Council had not yet acquired any evidence from the Clerk of Court regarding Judge Newman's alleged delays or productivity.  *See* ECF 25, at 1-2 (noting that the Special Committee "examined case-related statistics from the Clerk's Office" only *after* "the Chief Judge identified a complaint against Judge Newman and appointed a special committee.").  (That is no surprise because at the time of this meeting the disciplinary process and any investigation were still weeks away).  The absence of this information about alleged delays and low productivity is also evident from the reasoning behind the Order.[8]  The justification for the March 8 Order was the disciplinary proceedings against Judge Newman (even though the proceedings had yet to be launched).  *See* Exh. B, at 83; *see also* ECF 10-1, at 12.  It was only the present lawsuit that caused the Judicial Council to "reconsider" the March 8 Order and cite new bases for Judge Newman's suspension.  But just as in *Dep't of Com. v. New York*, the record shows that Defendants began taking steps to suspend Judge Newman long before they settled on the appropriate justification for the action.  Even that "reconsideration" was done in the

---

[8] Again, it is worth noting that this order, contrary to well-established practice, was never reduced to writing or even reflected in any minutes of the Judicial Council meetings.  Thus, Plaintiff and this Court can only rely on Chief Judge Moore's *post hoc* rationalizations which are expressed in her emails to Judge Newman.

context of disciplinary proceedings.  As in *Dept. of Commerce*, the Judicial Council here was searching for any legally defensible justification in support of a predetermined decision.  As a result, this Court should conclude, much like the Supreme Court did in that case, that the proffered justification is "contrived."

>    2.  <u>The June 5 Order Remains Live</u>

Defendants suggest that the June 5 Order will be, and by the time of the present filing is, superseded by the Judicial Council's September 20, 2023 Order.  *See* ECF 25, at 46.  That is both factually wrong and legally insupportable.  In fact, the June 5 Order is mentioned nowhere in the September 20 Order, save for a single footnote reference merely describing its contents.  Nothing in the September 20 Order even remotely suggests that it supplanted the prior order.  Thus, no facts support Defendants' contention that the September 20 Order is the only extant operative order.  Nor would such a contention be legally supportable.

Defendants claim that the June 5 Order was entered pursuant to the authority vested in the Judicial Council by § 332(d)(1), which empowers that body to "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit."  But the September 20 Order was entered pursuant to an entirely different authority—that granted by the Disability Act. Because, according to Defendants themselves, the two orders stem from entirely different grants of authority and address entirely separate issues, the later order does not supersede the earlier one merely because it is later in time, even where the outcome is the same or similar.  The two orders operate as essentially two concurrent "sentences" passed upon Judge Newman.  She is suspended pursuant to the June 5 Order as a result of her alleged delays, ECF 10-1, at 124, (though as discussed, *supra*, that rationale is "contrived"), and she is suspended due to the alleged "failure to cooperate" with the investigation.  But as Defendants have consistently shown, even cooperation with the investigation would not restore Judge Newman to the regular rotation calendar.  After all, in multiple filings, Judge

Newman offered to cooperate with the investigation provided she was restored to the regular rotation. *See, e.g.*, ECF 10-1, at 131, 140, 146; Exh. A, at 68-69 ("Judge Newman always was, and still remains willing to 'work together' to bring this matter to a speedy resolution."). These offers went unacknowledged, not to mention unreciprocated. There is no reason to believe that were Judge Newman to decide to knuckle under and submit to the Judicial Council's unwarranted demands, she would be restored to her regular status. Nor do Defendants make such a representation either in this Court or in the body of the September 20 Order. To the contrary, precisely because Defendants undertook to suspend Judge Newman before any failure to cooperate and indeed before even launching any investigation or disciplinary proceedings, there is every reason to believe that any cooperation by Judge Newman, while undermining the basis of the September 20 Order, would do nothing to affect the suspension under the aegis of the June 5 Order. Thus, the June 5 Order is live, and its legality can be passed upon by this Court.

C. *The March 8 and June 5 Orders Were Unlawfully Promulgated*

Defendants do not deny that Judge Newman, though a member of the Judicial Council of the Federal Circuit, was not given notice of the Council's meeting, much less an opportunity to participate in it. Instead, Defendants argue that such an exclusion was not only appropriate but legally required. Neither argument has merit.

Defendants suggest that Section 359(a) which states that "[n]o judge whose conduct is the subject of an investigation under this chapter shall serve … upon a judicial council … until all proceedings under this chapter relating to such investigation have been finally terminated," categorically bars Judge Newman from *all* service on a judicial council. Defendants argue that such a prohibition is a straightforward textual application of the statutory text. Def. Br. at 42-43.

As an initial matter, even assuming § 359(a) means what Defendants claim it means, it would have no application to the March 8 Order which was issued *before* any investigation or disciplinary

14

proceedings began.  And because the June 5 Order stems directly from the March 8 Order, the problems infecting the former one also apply to the latter one.

Furthermore, Defendants misunderstand the import and meaning of the provision that they rely on.  Defendants ask this Court to "to construe the [§ 359(a)] *verbatim ac litteratim*, ignoring the [provision]'s place in the overall statutory framework.  But when construing the plain text of a statutory enactment, [courts] do not construe each phrase literally or in isolation.  Rather, [courts] attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Pettus v. Morgenthau*, 554 F.3d 293, 297 (2d Cir. 2009).  As the Supreme Court explained, "the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context."  *FDA v. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000).  "[W]hen deciding whether the language is plain, [courts] must read the words 'in their context and with a view to their place in the overall statutory scheme.'"  *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *id.* at 133).

Section 359 is part of the Disability Act, and it has to be construed in context of that Act.  The Act (leaving concerns about its constitutionality aside for the time being) is designed to address specific allegations of misconduct or disability and is geared towards corrective measures if, but only if, such misconduct is found.  As with any other misconduct investigation in any walk of life, the person whose conduct is being investigated cannot participate in *that investigation*.  But the mere fact that an investigation is occurring does not in and of itself automatically suspend the subject of the investigation from other duties.  It is clear that Section 359 is geared only to participation in the investigatory and adjudicatory functions taken in context of the Disability Act.  For example, the section not only prohibits judges being investigated from serving on judicial councils, but also "upon the standing committee established under section 331."  But the only "standing committee" referenced in § 331, is one that is "is authorized to exercise the authority provided in" the Disability Act, *i.e.*, the JC&D Committee.  Thus, § 359(a) seems to be concerned *exclusively* with a subject judge being involved

15

in the investigation and adjudication of her own case, rather than being involved in generally setting policies, or doing other judicial or administrative work.  That reading is confirmed by subsection (b), which prohibits appearance as an *amicus curiae* either "before a judicial council or the Judicial Conference."  This contrasts with the requirement that judicial councils solicit public input and advice prior to adopting "[a]ny general order relating to practice and procedure."   28 U.S.C. § 332(d)(1).  Because it would be anomalous for § 332(d) to require that which § 359(b) explicitly forbids, § 359(b) has to be read as applying only to outside submissions that are part of the judicial disability proceedings.  And because it would be anomalous for subsection (a) to apply to a whole separate set of circumstances than subsection (b), it follows that the prohibition contained in § 359(a) only prohibits a subject judge's participation in the work of a judicial council when such work concerns her own disciplinary proceedings.

Indeed, Defendants themselves recognize that § 359(a) only operates with respect to the proceedings under the Disability Act.  For example, when on April 14, 2023, the Judicial Council issued a statement regarding investigation into Judge Newman, it specified that "[f]or purposes of th[at] statement, the Judicial Council does not include Circuit Judge Pauline Newman."  Statement of the Judicial Council of the Federal Circuit (April 14, 2023), https://tinyurl.com/puuvddb4.  It is noteworthy that the footnote did not say "because of the investigation Judge Newman is automatically suspended from the work of the Judicial Council" or something similar to that effect.  Had Defendants understood § 359(a) to have the effect of automatically suspending a judge subject to an investigation, there would have been no need for a qualifier that the Judicial Council doesn't include Judge Newman only "for some specific purposes."

Separate and aside from their incorrect reliance on § 359(a), Defendants argue that "Judge Newman would be recused in any decision on that matter," because otherwise she would be a "judge

in her own cause." Def. Br. at 44.[9]  As an initial matter, the decision whether or not to recuse belongs to each judge herself and not to her fellow members of the court or the judicial council.  *See, e.g.*, *United States v. Balistrieri*, 779 F.2d 1191, 1202-03 (7th Cir. 1985) ("Section 455 clearly contemplates that decisions with respect to disqualification should be made by the judge sitting in the case, and not by another judge."); 28 U.S.C. § 455(a).  Judge Newman's colleagues are without authority to order her recusal.  *See* Debra Lyn Bassett, *Judicial Disqualification in the Federal Appellate Courts*, 87 Iowa L. Rev. 1213, 1236-37 (2002).

Second, Defendants cannot have it both ways.  Defendants claim that at the June 5 Judicial Council meeting, the issue that was considered by the Council was not whether or not Judge Newman ought to be sanctioned, but how to best administer the business of the court.  ECF 10-1, at 125 ("This is not a censure but rather a decision made for the effective and expeditious administration of the business of the court.").  But if so, then Judge Newman would not have been "a judge in her own cause," but rather, like every other judge at that meeting, a "judge" in the case of her judicial council. Thus, Judge Newman had no legal or ethical obligation to recuse herself from the consideration of this issue, and had no plans to do so.  Her forced "recusal" by Defendants was entirely *ultra vires*.

Defendants contend that "Judge Newman identifies no constitutional or statutory basis for any a [*sic*] right to participate in the discussion and vote of the Judicial Council."  But that is plainly incorrect.  The Federal Circuit, like any other Court is required to comply with the mandates of § 332 that requires establishment of judicial councils.  According to the Court itself, "[f]or purpose of implementing [that statute], the Judicial Council of the Federal Circuit consists of all circuit judges in

---

[9] The argument is a classic example of *chutzpah*.  Defendants accuse Judge Newman of wishing to sit as a judge in her own cause, but at the same time have no compunction about simultaneously serving as fact witnesses, complainants, investigators, and adjudicators in a proceeding that is likely to lighten their own workload.  Whatever the right standard may be, the same standard has to apply to both Judge Newman and Defendants.

regular active service."[10]    U.S. Court of Appeals for the Federal Circuit, *Judges*, https://tinyurl.com/2kfnf9fp.  Thus, the statutory basis for Judge Newman's right to participate in Judicial Council meetings is found in § 332.  The constitutional basis for Judge Newman's participation is her *office* which she is entitled to hold "during good behaviour."  U.S. Const. art III, § 1.  Because part of the duties of her office includes service on the Judicial Council of the Federal Circuit when such service is provided by statute, Judge Newman is entitled to so serve, unless some other provision authorizes termination or suspension of her service.  Because Defendants do not identify such a provision, it follows that Judge Newman was entitled, and indeed obligated, *see* 28 U.S.C. § 332(a)(6), to attend the meetings of the Judicial Council.

Finally, Defendants argue that the Chief Judge has the power to "excuse" another judge from her obligation to participate in the work of a judicial council and contend that Chief Judge Moore did so here.  Def. Br. at 44, n.23.  On Defendants' reading, the power of the Chief Judge to bar members of a judicial council is absolute, peremptory, and not reviewable.  According to Defendants, the Chief Judge can, acting entirely on her own, override the choices by other judges in her circuit—choices that are made pursuant to express statutory authority, *see* 28 U.S.C. § 332(a)(1)-(2), as to the number of judges who serve on a judicial council, their identity, and their terms of service.  For example, if judges in a particular circuit, by a majority vote, *see id.* § 332(a)(1), determined that their judicial council should consist of the chief judge and five circuit and five district judges, according to Defendants, the chief judge who believes that such a council is too large, could simply "excuse" however many members

---

[10] Incidentally, the composition of the Federal Circuit's Judicial Council shows the error of reading statutes *verbatim ac litteratim*.  After all, the governing statute requires that a judicial council "consist[] of the chief judge of the circuit, who shall preside, and an equal number of circuit judges and district judges of the circuit."  28 U.S.C. § 332(a).  There are no exceptions to that rule.  However, the Federal Circuit correctly recognized that this provision has to be read in light of the rest of Title 28, including provisions creating the Federal Circuit.  As a result, the Federal Circuit's Judicial Council does not include district judges.

she desired until the size of the council reflected her preferences. Indeed, according to Defendants, a chief judge who believes that, contrary to the statutory command, *see id.*, a judicial council should *not* have an equal number of circuit and district judge, could simply "excuse" one category or another from attendance. Because such an outcome would be absurd, it strongly suggests that Defendants' construction of a chief judge's excusal power is incorrect, and that such power can be exercised only in response to a request by a judge seeking an "excuse." Because Judge Newman never sought to be "excused" from the work of the Judicial Council, the decision to bar her from the meeting was unlawful and any orders issued following such a bar are procedurally defective and equally unlawful.[11]

### D.  *Judicial Councils Do Not Possess Plenary Authority over Federal Judges*

This Court need not reach the question of whether Judicial Councils have the power to suspend judges who may have fallen behind on their opinions, or who have been insufficiently productive. The Court doesn't need to reach that question because the "delays" justification for the June 5 Order is "contrived" and should not be credited. *See Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019). And Defendants do not dispute that various alternative bases advanced in support of Judge Newman's suspension (leaving aside for now Judicial Council's September 20 Order) find no support in any law. Additionally, as discussed in the preceding section, the order was unlawfully issued. Therefore, the Court should set the June 5 Order aside as being improperly issued. *See id.*

---

[11] The orders are not unlawful because the Judicial Council was operating without some sort of "super-quorum." Def. Br. at 44-45. They are unlawful because they were promulgated by an improperly constituted body. *See, e.g.*, *Wagner v. United States*, 365 F.3d 1358, 1361 (Fed. Cir. 2004) (holding that "errors regarding the composition of military selection boards" are structural and require *vacatur*). By analogy one can consider 28 U.S.C. § 46. That section requires that courts of appeals hear cases in panels of three, *id.* § 46(c), and further provides that "a majority of the number of judges authorized to constitute a … panel … constitute a quorum," *id.* § 46(d). And while circuit courts often decide cases by mere quorum, it doesn't follow that they can convene a panel of *two* judges on the ground that such a truncated panel would be sufficient to meet a quorum requirement. In other words, a panel quorum may issue a decision whenever the third judge is unwilling or unable to participate, but a decision issued by a panel that always consisted of two judges would be unlawful. So too with the work of the Judicial Council.

19

If, however, the Court chooses to credit Defendants' assertions that the June 5 Order is predicated on Judge Newman's delays in issuing opinions, it should hold that order to be unlawful and enjoin it, Defendants' arguments to the contrary notwithstanding.

Defendants make a breathtaking assertion that judicial councils possess essentially unlimited, unreviewable, and nearly plenary authority to punish those judges they see as wayward.  *See* Def. Br. at 38-39 (suggesting that § 332 "places no 'restraint on the council at all.'") (quoting ECCF 25-2, at 5). However, none of the cases cited by Defendants supports their assertion, which, were it adopted would constitute a radical departure from the entire American experiment in the due process of law and checks and balances at all levels of government.

First and foremost, actions of judicial councils taken under § 332 are reviewable by Article III courts.  This alone strongly counsels against adopting the view that judicial councils can take any actions they see fit so long as they cloak it with the claim that it was taken for the purposes of alleviating delays.  While such review may be "narrow in scope," *see Chandler,* 398 U.S. at 108 (Harlan, J., concurring), an Article III court must still ensure that judicial councils do not overstep their own bounds.  *See, e.g.*, *In re McBryde*, 117 F.3d 208 (5th Cir. 1997) (granting *mandamus* against the orders of the judicial council reassigning cases from Judge McBryde).  Of course, Judge Newman does not seek any sort of "broad" review of the Judicial Council's actions.  Rather, her challenge to the June 5 Order is focused on two narrow issues—a) the failure to follow proper procedure, and b) the unlawfulness of an unprecedented indefinite suspension from judicial duties.  None of the cases cited by Defendants involved orders that were similarly unlawfully promulgated or that ordered unlimited suspension of a federal judge from her duties.

Defendants' position essentially boils down to a simple proposition—a judicial council can do whatever it pleases, so long as in its own view the action it takes promotes "effective and expeditious administration of justice within its circuit."  28 U.S.C. § 332(d)(1).  Taken to its logical conclusion,

Defendants' argument would permit a judicial council to suspend a judge from hearing cases simply because the judge is a frequent dissenter and as a result of writing many dissents slows down the work of the court.  Under Defendants' view, a judicial council could also choose to decline to assign cases to judges simply because, contrary to the judgement of the Senate that confirmed the judge and the President who appointed her, a judicial council takes the view that the judgeship did not need to be filled in the first place, and filling it actually makes the business of the court more difficult to accomplish.[12]  To state the proposition is to refute it.  In fact, one of the very cases Defendants rely on makes clear that actions of judicial councils, even where promoting speed and efficiency, may not be "inconsistent with rules and policies Congress has previously established in statutes regulating the affairs of the federal judiciary."  *In re Jaritz Indus., Ltd.*, 151 F.3d 93, 101 (3d Cir. 1998).  Indefinitely suspending a duly confirmed federal judge violates a host of "rules and policies Congress" adopted with respect to the federal judiciary as a whole and the Federal Circuit in particular.  First, such a suspension runs contrary to the mandate of 28 U.S.C. § 46(b) that requires that "*all* of the [Federal Circuit] judges sit on a representative cross section of the cases heard."  Second, indefinite suspensions under § 332(d)(1), especially when done "pending the results of the investigation into potential disability/misconduct," as it was in this case, is contrary to the policy expressed in the Disability Act that any suspension (to the extent lawful at all) can occur only *after* the completion of an investigation and a vote by a judicial council.  *See* 28 U.S.C. § 354(a)(1) and (a)(2)(A)(i).  Third, and perhaps most

---

[12] For example, in 1997, the Hon. J. Harvey Wilkinson, then-Chief Judge of the Fourth Circuit, testified before Congress that his court operated better with fewer judges than were statutorily authorized, and that filling empty judgeships would "contribute[] to a decline in the predictability and consistency of circuit law and collegiality."  Sarah Wilson, *Appellate Judicial Appointments During the Clinton Presidency: An Inside Perspective*, 5 J. App. Practice & Process 29, 38 (2003).  Imagine if Judge Wilkinson together with his like-minded colleagues, in response to Senate confirmations, chose to sideline newly confirmed judges on the ground that the participation of new arrivals would be detrimental to the "effective and expeditious administration of justice within" the Fourth Circuit.  Surely such an action would be constitutionally (and statutorily) intolerable.  For these reasons, the overly broad assertions of "an almost unlimited power," Def, Br. at 38 (citing ECF 25-2, at 5), cannot be accepted.

fundamentally, the action contradicts the constitutional command that judges (even ones who work slowly) *hold office*, and not merely receive salary, "during good behaviour."

Defendants point out that the whole *raison d'être* for judicial councils is to combat excessive delays in resolution of cases.  Def. Br. at 39-40.  Judge Newman does not dispute this well-settled proposition.  But Defendants are unable to point to a *single case* where in order to accomplish this goal, any judicial council indefinitely suspended one of its colleagues from hearing cases.  In *Jaritz, supra*, the issue was assigning bankruptcy judges who were usually attached to an Article III court within the Third Circuit to the District Court for the District of U.S. Virgin Islands—an Article IV court within the same circuit.  In *Truesdale v. Moore*, 142 F. 3d 749 (4th Cir. 1998), at issue was an order of general applicability directing district courts and the Fourth Circuit itself to resolve *habeas* petitions involving the death penalty within a certain timeframe.  But the order there did not purport or even threaten to suspend judges who did not comply with the directive, only empowering "the Circuit Executive … to make appropriate inquiry on behalf of the Judicial Council to seek an explanation of the reasons why the judge or panel of judges failed to comply with the time limitation."  *In the Matter of Death Penalty Representation*, Order No. 113 (Judicial Council of the Fourth Cir., Oct. 3, 1996), *repealed* Feb. 27, 2018, https://tinyurl.com/ym34vhx9.  And *Hilbert v. Dooling*, 476 F.2d 355, 360 (2d Cir. 1973) (*en banc*) involved a question whether a judicial council can promulgate an order sanctioning *the government* (rather than a judge) for not timely prosecuting indicted individuals.  None of these cases, some flowery *obiter dicta* notwithstanding, stands for the proposition that judicial councils are empowered to suspend judges in order to speed up resolution of cases.

This brings us to two cases where judicial councils did order a suspension—*United States v. Colón-Muñoz*, 292 F.3d 18, 21 (1st Cir. 2002) and *Chandler*.  But even these cases do not support Defendants' action.  In *Chandler*, the Judicial Council suspended assignment of new cases to Judge Stephen S. Chandler, "until the further order of the Judicial Council."  398 U.S. at 78.  After some

back-and-forth with the Council, "Judge Chandler addressed a letter to his fellow district judges indicating … that he *was not in disagreement* with them as to the assignment of all new cases to judges other than himself." *Id.* at 79.  Judge Chandler confirmed his position in another letter to the Judicial Council about 18 months later.  *Id.* at 81-82.  It is on the basis of this acquiescence that the Supreme Court denied Judge Chandler's *mandamus* petition.  *See id.* at 87 ("[E]xcept for the effort to seek the aid of this Court, Judge Chandler has never once since giving his written acquiescence in the division of business sought any relief from either the Council or some other tribunal.").  The Court *explicitly* left open to Judge Chandler an opportunity to challenge his Judicial Council's actions were he to actually formally "disagree[] with the [extant] order of the Council [and fail to] persuad[e] his fellow district judges to enter another." *Id.  Chandler*, therefore, cannot be read as an endorsement of a position that judicial councils are empowered to suspend federal judges from duty over that judge's objections.

In contrast, when a judge does not acquiesce in judicial council orders depriving him of cases on the docket, review in an Article III court is appropriate.  *See In re McBryde*, 117 F.3d 208.  In that case, the Fifth Circuit concluded that judicial councils have no power to punish or otherwise censure a judge for misconduct or any other basis without first complying with the requirements of the Disability Act.  *See id.* at 227-30.  As a result, the Fifth Circuit set aside orders reassigning cases from Judge McBryde.  *Id.* at 230-31.  Of course, here, Defendants visited punishment on Judge Newman before the conclusion, and indeed before the beginning, of the disciplinary process.  As already discussed, the attempts to whitewash the March 8 Order through supposedly a newly issued June 5 Order with a different rationale does not withstand scrutiny and should not be credited.  Instead, this case is similar to *In re McBryde*, which stands for the proposition that not only do there exist limits on the power of judicial councils, but that review by an Article III court is an appropriate mechanism to ensure adherence to those limits.

23

*Colón-Muñoz* is then the strongest case that Defendants can marshal in support of their position.  But that case offers Defendants marginal help at best.  In *Colón-Muñoz,* the Judicial Council for the First Circuit, upon concluding that one of the district judges in Puerto Rico had experienced extensive delays (some in excess of three years) in resolving cases, ordered that no further matters be assigned to that judge for, at most, one year thus allowing the judge in question to catch up on her docket.  Furthermore, the Judicial Council order contemplated an automatic reconsideration at the very next semi-annual Council meeting, and further still, permitted the district judge to herself advise the Council that she is sufficiently caught up on her case work to resume case assignments.  *See* Exh. C.  This is a far cry from the March 8 and June 5 orders promulgated by Defendants, which have no timeline for reconsideration, have no end point, and treat Judge Newman differently from other judges serving on the Federal Circuit by requiring her to have a *smaller* backlog than that which is deemed acceptable for her colleagues.[13]

The March 8 and June 5 orders by the Judicial Council are unprecedented in the annals of American jurisprudence, *despite* the decades-long presence of § 332 on the books.  The sheer novelty of these orders strongly suggests their illegality.  *See NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) ("[S]ometimes the most telling indication of a severe constitutional problem is the lack of historical precedent for [the] action.") (cleaned up).  Because, unlike Judge Chandler, Judge Newman has not acquiesced in the Judicial Council's March 8 and June 5 orders (and indeed has vociferously protested them), and because they are unprecedented and illegal, this Court is the proper forum to obtain relief— which should be granted.

---

[13] Other judges remain subject to Clerical Procedure #3, ¶15 of which specifies that "[a]ny judge who has (1) four or more opinion assignments over six months old, or (2) two or more opinion assignments over a year old (*i.e.*, in which a draft has not been circulated to the panel for more than six months in four or more cases, or in more than one year in two or more cases after submission) will not be assigned to hear additional cases until the judge has reduced" the backlog below these benchmarks. *See* ECF 10-1, at 155.

E. *Whether or Not Judicial Council § 332 Proceedings Are "Judicial in Nature" Is Immaterial*

Defendants contend that because Judicial Council proceedings are "judicial in nature," the only tribunal that is able to review the decisions of the Council is a court with appellate jurisdiction over the *Federal Circuit*. Def. Br. at 24-28. Both the predicate and conclusion are wrong.

First, Defendants conflate actions which the Judicial Council took pursuant to the Disability Act and actions it took under the authority granted by § 332. *See* Def. Br. at 24 ("Any determinations under the Act, by the Judicial Council or its members, are judicial in nature. 'Under the Act, review of judicial misconduct complaints is an act that must be performed by a judge.'") (quoting *Sanai v. Kozinski*, 2021 WL 1339072, at *8 (N.D. Cal. Apr. 9, 2021)). In Defendants' view, Judicial Council's actions are "judicial in nature" because they "investigate[], declare[] and enforce[] liabilities as they stand on present or past facts." *Id.* (quoting *In re McBryde*, 117 F.3d at 221). Be that as it may, when it comes to actions under the Disability Act, the same is simply not true with respect to actions under Section 332. As the Supreme Court explained, "[t]he adjudication of a 'present right' is 'the essence of a judicial proceeding.'" *Pitch v. United States*, 953 F.3d 1226, 1245 (11th Cir. 2020) (*en banc*) (Pryor, J., concurring) (quoting *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 481 (1983)). But a judicial council acting under § 332 does not deal with *rights* at all. It deals with improving efficient administration of justice within the circuit. To be sure, decisions of a judicial council may have incidental impact on the right of an individual judge to conduct her own business as she sees fit, but such an incidental impact is in the nature of all administrative or legislative actions. *See, e.g.*, *Prentis v. Atlantic Coast Line*, 211 U.S. 210 (1908) (concluding that a state corporation commission's setting of rail passenger rates is "legislative" even though such an action necessarily impacted the rights of both the passengers and the carriers). It is for this reason that *every single case* that Defendants cite in support of their argument that their actions are "judicial in nature" concern actions taken under the Disability Act, rather than under § 332.

In short, when acting under § 332, judicial councils neither "investigate, declare or enforce *liabilities*," nor engage in a process that is in any way similar to "attorney-disciplinary proceedings and bar admissions that have long been considered 'judicial' in nature." Def. Br. at 34. To the contrary, proceedings under § 332 are simply rule-making, administrative proceedings, as that section itself clearly states. *See* 28 U.S.C. § 332 (d)(1) ("Each judicial council shall make all necessary and appropriate orders for the effective and expeditious *administration* of justice within its circuit."). Orders made under this section have no semblance to either a trial or "attorney-disciplinary proceedings and bar admissions." For example, under § 332, a judicial council must generally promulgate orders "only after giving appropriate public notice and an opportunity for comment." *Id.* Of course, neither trials nor attorney disciplinary proceedings operate in the same manner. Reading § 332(d)(1) in context of the rest of the section further confirms that actions taken under that subsection are not "judicial in nature." Thus, subsection (c) requires a chief judge to submit and a judicial council to review reports from the Administrative Office of the Courts—hardly a function of a "judicial nature." Subsection (a) authorizes an appointment of a "circuit executive," an office usually separate from that of a Clerk of Court,[14] and one that is charged with exercising "*administrative* powers."

Even assuming, *arguendo*, that actions taken by the *Judicial Council* under § 332 are judicial in nature, it does not follow that they can be reviewed only by way of an appeal to a court with appellate jurisdiction over the *Federal Circuit*. It has long been established "that the nature of a proceeding 'depends not upon the character of the body but upon the character of the proceedings.'" *Feldman*, 460 U.S. at 477 (quoting *Prentis*, 211 U.S. at 226). Yet, there is no indication that such power can only be challenged by way of an "appeal." Congress channels certain challenges to agency's determinations (whether of quasi-legislative or quasi-judicial character). *See, e.g., Elgin v. Dep't of Treasury*, 567 U.S. 1,

---

[14] In the case of the Federal Circuit, the same person holds both offices. *See* 28 U.S.C. § 332(h)(5).

9 (2012) (noting that "Congress [can] channel[] judicial review of a constitutional claim to a particular court."). Congress can also channel appeals of judicial determinations to a particular court. Indeed, the very creation of the Federal Circuit was for the purpose of channeling patent (and certain other) cases to a single specialized court. *See* S. Rep. 97-275 at 3-6, *reprinted in* 1982 U.S.C.C.A.N. 11, 13-16 (Nov. 18, 1981); 28 U.S.C. § 1295. Congress also chose to have decisions of this newly created Court of Appeals be reviewable by *certiorari* as with every other court of appeals. 28 U.S.C. § 1254; S. Rep. 97-275 at 18, 1982 U.S.C.C.A.N. at 28 (noting that "review of cases in the new appellate court is covered by 28 U.S.C. 1254, which establishes procedures for Supreme Court review of cases in the circuit courts of appeals.").

However, it is important to remember that the *Judicial Council of the Federal Circuit* and the *United States Court of Appeals for the Federal Circuit* are separate bodies with different powers, even though both bodies are staffed by the same individuals. That this is so is evident from the fact that these bodies are created by different sections of the United States Code. *See* 28 U.S.C. § 41; *id.* § 332. Congress did not "channel" decisions of the *Judicial Council* to any court other than the District Court. And when Congress does not so "channel" claims, the default is the statute that vests District Courts with jurisdiction to review claims "arising under" federal law. *See Axon*, 598 U.S. at 185. Consequently, even if the Judicial Council's actions under § 332 are "judicial in nature" it does not follow that review can only be sought in the Supreme Court of the United States. To the contrary, Congress couldn't have been clearer—it is this Court that "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." And court have a "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). There is no merit to Defendants' contention that this is not a proper forum to resolve challenges to Defendants' unlawful actions.

## II.   THE DISABILITY ACT DOES NOT BAR FACIAL CHALLENGES TO THE STATUTE

As Defendants themselves acknowledge, Def. Br. at 21, the binding precedent from the D.C. Circuit explicitly holds that the Disability Act is not immune from judicial review for its compliance with the Constitutional requirements.

As the D.C. Circuit has held, facial challenges to any statute are "challenges to the decisions of Congress, not the" administrative body charged with carrying out that statute. *McBryde*, 264 F.3d at 58.  The Disability Act's provision that forecloses judicial review of "all orders and determinations, including denials of petitions for review," 28 U.S.C. § 357(c), has no application to facial challenges.

Defendants are incorrect that Counts I and V-IX are best characterized as an "as applied" challenge.  *See* Def. Br. at 21-23.  To the contrary, the challenges in these counts are facial challenges, and this Court has jurisdiction to entertain them.

**Count I:**  This Count specifically alleges that in light of the Constitutional provisions guaranteeing to federal judges continuation in office "during good behaviour" and reserving the power of impeachment to Congress alone, no "executive or judicial agency or body be delegated—or arrogate to itself—the impeachment power which the Constitution reserves to the House and Senate."  ECF 10, ¶81.  This is as clear of a facial challenge as there can be.  While Paragraphs 82 and 83 reference "Defendants' orders and threats," the challenge is not to those orders, but to the statute that authorized those "orders and threats" in the first place.  The orders are merely illustrative of the unconstitutional actions that the Disability Act purports to authorize.  In any event, by Defendants' own admission, the orders referenced in Paragraph 82, which suspended Judge Newman from service and which interfered with Judge Newman's operation of her own chambers, were not issued pursuant to the authority granted by the Disability Act, and therefore that Act's provisions placing limits on judicial review have no application to Count I.

Fundamentally, Count I challenges the Disability Act's authorization to suspend Article III judges from office. *See* Op. Br. at 39-45. As explained in Plaintiff's opening brief, Article III protects federal judges' ability to a) "exercise judicial power," and b) "receive undiminished compensation." To the extent that the Disability Act authorizes withdrawal of a judge's ability to exercise judicial power, it necessarily "removes" her from office, even if only temporarily. To be sure, courts and judicial councils (as the Judiciary's administrative arms) can create rules for case assignments which take into account matters like judges' productivity, case complexity, delays, and a myriad of other issues. No one is suggesting that every judge sitting on a given court must have on her docket at any given time the exact same number of cases as every other judge. Furthermore, courts and judicial councils can require that judges conduct their business at an appropriate location, such as a courthouse within the relevant jurisdiction. At the same time, the Constitution simply does not permit removing all judicial functions from a judge. Thus, to the extent that the Disability Act authorizes not mere diminution in a judge's workload, but a complete debarment from judicial functions, it necessarily prevents a judge from exercising judicial power, and therefore effects a functional "removal" from office, even if only temporarily.[15]

Judge Newman's case amply illustrates that the suspension power is a power of removal. Judge Newman has not heard any new cases since *April 2023*, first as a result of Chief Judge Moore's unilateral decision to not assign Judge Newman to any of that month's panels (even though her opinions were not in arrears enough to merit that treatment), then as a result of a secret, unwritten,

---

[15] Defendants' attempts at analogizing Judge Newman's situation to that of a judge who has been convicted of a crime and imprisoned is unavailing, because a judge in that situation is simply unable to comply with basic procedural requirements of holding court. An imprisoned judge is unable to come to a courthouse, meet with counsel, instruct a jury, and the like. An imprisoned judge is more akin to a judge who simply declines to do any work. In such a case, the judge's colleagues certainly can distribute the absent judge's work to themselves, but should the absentee judge return to work, they would be obliged to treat her in the same way as any other judge in the circuit or district. *See generally* Op. Br. at 41.

and unlawfully promulgated March 8 Judicial Council order, then as a result of yet another unlawfully promulgated Judicial Council order, and since September 20, as a result of yet another Judicial Council order. As a result, Judge Newman has essentially no judicial work to perform. Although Defendants contend that she "continues to perform routine judicial functions like ruling on the controversies brought before the court," Def. Br. at 29 (cleaned up), the facts belie these claims. As of this writing, Judge Newman has at most two cases under submission, both of which have been circulated to the Court, and which will be disposed of long before the suspension runs out. It is hard to understand what "routine judicial functions" Judge Newman will continue to exercise going forward while serving her suspension. And if she does not and is not expected to exercise any such functions, then she effectively does not continue to hold judicial office. *See Hastings v. Jud. Conf. of U.S.*, 770 F.2d 1093, 1108 (D.C. Cir. 1985) (Edwards, J., concurring) ("By authorizing suspension—the *total* removal of a particular judge's cases—Congress arguably has interfered in the most basic way with a judge's decisionmaking authority.") (emphasis in original). Judge Edwards's worry in *Hastings* has now come to pass. Judge Newman has been subjected to "the *total* removal" of her cases for a significant period of time, thus serving as "the functional equivalent of removal." *Id.* at 1093. If the Act permits this result, then it is facially unconstitutional. If the Act does *not* permit this result, then Defendants' actions cannot be justified by relying on the Act.

In short, Judge Newman is challenging not the specific sanctions employed by Defendants, but rather "Congress' handiwork," which purportedly authorized Defendants to issue a sanction of suspension in the first place.

**Count V:** Defendants' only argument in support of their motion to dismiss Count V is that even if the disability provision of the Act is unconstitutionally vague, it nevertheless "clearly applies" to Judge Newman, thus precluding her from challenging it. Def. Br. at 22-23. But Defendants' own position indicates that the provision does *not* "clearly apply" to Judge Newman.

As an initial matter, Defendants have stated that they cannot be sure whether or not Judge Newman is or isn't "disabled." ECF 25-1, at 10; Exh. B, at 72. Indeed, at no point did Defendants even indicate that, if its own physicians were to give Judge Newman a "clean bill of health," that would be the end of the inquiry. For example, in its May 16 Order, Defendants stated that the Special "Committee will use the results [of medical testing] solely *to aid* its determination of whether Judge Newman has a disability …." ECF 10-1, at 99. Similarly, in rejecting reports by Dr. Rothstein and Dr. Carney (both of whom opined not only as to Judge Newman's general competence and demeanor, but also specifically as to her fitness for her particular office), Defendants stated that in their own (non-professional) view, the reports do not "persuasively tak[e] account of the actual requirements of the job at issue." Exh. B, at 55. These statements and second-guessing of medical professionals indicate that Defendants always intended to, and ultimately did, themselves define what does and does not count as a disability. And yet, Defendants freely admit that they are unable to do so. *Id.* at 72.[16] Consequently, Judge Newman cannot be said to "clearly" meet the disability standard.

Second, given the fact that Defendants' justification for alleging Judge Newman's disability has shifted multiple times during the course of these proceedings (and those within the Judicial Council), any claim that the disability standard "clearly applies" to Judge Newman is laughable. By way of an example, throughout Special Committee proceedings, Defendants continuously alleged that Judge Newman's "delays" in issuing opinions were evidence of the decline in her mental acuity. Yet, Defendants never even bothered to compare Judge Newman's past productivity (during the time when

---

[16] Defendants blame Judge Newman for this inability but that is both false (as Judge Newman provided opinions of two qualified medical professionals) and beside the point. Were the standards clear as to what "disability" means, there would be no difficulty in either resolving this question without expert medical opinion or, perhaps, having medical opinion be determinative. Defendants are unable to establish disability under the former standard, and they are unwilling to bind themselves to the latter one. This illustrates both the vagueness of the disability standard and the fact that Judge Newman cannot be said to "clearly" meet it.

her mental acuity wasn't at issue) and her present productivity.  The statistical analysis Plaintiff introduced establishes a lack of any meaningful change between prior and current periods, yet Defendants still claim that a particular snapshot in time establishes probable cause to believe that Judge Newman is "disabled."  This shows that there is a) no clarity as to what kind of evidence would be enough to even arguably establish a mental disability, and b) that Judge Newman does not "clearly" meet any (even poorly defined) disability standard.

Defendants are simply incorrect that in order to adjudicate Count V, the Court needs to in essence convert the challenge to an "as applied" one and evaluate Judge Newman's state of health.  To the contrary, the Court can (and should) conclude that the "disability" provision does not contain *any* standards, and that Defendants' own actions are sufficient testament to that claim.  Nor does the Court need to determine whether Judge Newman is or isn't disabled in order to adjudicate this claim (though it is evident that she is not).[17]  Since Defendants themselves are unable to reach a conclusion on this score, and do not claim to do so, this Court would not be reviewing any order issued pursuant to the authority granted by the Disability Act; instead, the Court would be reviewing the scope of the Act itself.  This makes Count V a facial challenge, rather than an as-applied one.  Dismissal is therefore inappropriate.

**Counts VI-IX:**   Defendants claim that these counts present an "as applied" challenge because, in their view "Plaintiff attacks the Special Committee's orders that she undergo a cognitive examination and provide medical records," which amounts to what they view as a foreclosed "challenge [to] the Defendants' use of specific investigatory tools to address the allegations in this particular case."  Def. Br. at 23.  That presentation of Plaintiff's claim is incorrect.

---

[17] That said, Judge Newman welcomes a competency hearing before this Court.

In Counts VI, VIII, and IX Plaintiff alleges that there is no *constitutional* authority to order medical examinations or surrender medical records absent probable cause.  *See* ECF 10, ¶¶107-108; ¶118 ("*The Act violates* the Fourth Amendment to the extent it authorizes a compelled medical or psychiatric examination of an Article III judge ….") (emphasis added); *id.*, ¶124 ("*The Act violates* the Fourth Amendment to the extent it authorizes a compelled surrender of medical records belonging to an Article III judge ….") (emphasis added).  That is a challenge to the statutory scheme to the extent it authorizes such searches and seizures, not to the particular order demanding that Judge Newman undergo medical examinations or surrender her records.  Yes, the First Amended Complaint identifies these orders as being problematic, but it does so for the purposes of establishing standing, and not for the purposes of limiting the scope of the claim.[18]   Similarly, Count VII challenges the constitutionality of the Disability Act itself due to the unconstitutional vagueness of its provisions "to the extent it purports to authorize compelled medical or psychiatric examinations of Article III judges."  ECF 10, ¶112.  Again, Judge Newman does not seek review of orders issued pursuant to the statute, but rather challenges the authorization to issue such orders in the first place.

Because Counts I, V, VI, VII, VIII, and IX squarely present a facial challenge to the Disability Act, this Court is vested with jurisdiction under 28 U.S.C. § 1331 to hear these claims.

## III.    AS APPLIED CHALLENGES TO THE DISABILITY ACT ARE NOT FORECLOSED

### A.  *The D.C. Circuit's Decision in* McBryde *Is Inapplicable and Is No Longer Good Law*

Defendants heavily rely on the D.C. Circuit's decision in *McBryde*, *supra*, to argue that all "as applied" constitutional challenges to the Disability Act are foreclosed by the language of § 357(c).  However, developments in the law have overtaken the reasoning in *McBryde*.

---

[18] To the extent that this Court finds the wording in these and other Counts ambiguous, it must construe it "liberally" and "with a view of substantial justice between the parties."  Fed. R. Civ. P. 12.

First and foremost, Judge McBryde was faced with a very different type of process than Judge Newman is being subjected to.  None of the members of the Judicial Council that sanctioned Judge McBryde were members of his own court, much less direct fact witnesses as to the alleged improprieties or disabilities.  In contrast, here, *all* members of the Judicial Council are Judge Newman's colleagues, and all are witnesses to Judge Newman's abilities on and off the bench.  Given this difference, Defendants were obligated to recuse themselves, *see* 28 U.S.C. § 455, and therefore, unlike in Judge McBryde's case, Judge Newman's as applied challenge falls under *Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988), which permits judicial review where an agency "had acted "in excess of its delegated powers and contrary to a specific prohibition in the [relevant] Act."  *Leedom v. Kyne*, 358 U.S. 184, 188 (1958).

Second, the D.C. Circuit rested its conclusion in *McBryde* on the premise that the Judicial Conference, though an "agency," *see* 264 F.3d at 62, nevertheless has "an obligation to address properly presented constitutional claims which … do not challenge agency actions mandated by Congress," *id.* (quoting *Graceba Total Communications, Inc. v. FCC*, 115 F.3d 1038, 1042 (D.C.Cir. 1997)). But as the Supreme Court recently wrote, "'agency adjudications are generally ill suited to address structural constitutional challenges'—like those maintained here."  *Axon*, 598 U.S. at 195 (quoting *Carr v. Saul*, 141 S. Ct. 1352, 1360 (2021)).  The Supreme Court explained in *PCAOB* and again in *Carr*, and yet again in *Axon*, that under our constitutional structure, agencies have expertise when it comes to "technical considerations of agency policy."  *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 491 (2012) (cleaned up).  *See also Carr*, 141 S. Ct. at 1360; *Axon*, 598 U.S. at 194-96.

Much like the FTC which "knows a good deal about competition policy, but nothing special about the separation of powers," *Axon*, 598 U.S. at 194, judicial councils and the Judicial Conference know a great deal about "effective and expeditious administration of justice," 28 U.S.C. § 332(d)(1), about boundaries between appropriate and inappropriate judicial conduct, but nothing about

separation of powers or tenure protection. That *individual members* of these bodies, being Article III judges themselves, may know a "great deal" about constitutional issues, doesn't change the result. The *bodies themselves*, not being courts, do not have any competence to adjudicate constitutional claims, either facially or "as applied."

The D.C. Circuit's conclusion to the contrary in *McBryde* runs head first into the Supreme Court's observation in *Axon* that where "claims that tenure protections violate Article II raise[] 'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy,'" *Axon*, 598 U.S. at 194 (quoting *PCAOB*, 561 U.S. at 491), such claims belong in an Article III court. So too here. The questions of whether Defendants' investigation into Judge Newman was done in violation of both statutory and constitutional requirements, and failed to comport with the due process of law, are "detached from 'considerations of agency policy,'" and thus belongs in a District Court. *Id.* In fact, Judge Newman's "as applied" challenge is almost identical to that brought in *Axon*. There, petitioners raised a due process "challenge to the combination of prosecutorial and adjudicative functions" in a single body. The Court concluded that such a challenge can and should be heard in a District Court rather than before the Commission. Judge Newman made identical claims. *See, e.g.*, ECF 10, ¶¶96-97. Jurisdictionally, there is no reason why these claims must be treated differently than in *Axon*.

Additionally, presenting a constitutional challenge to the Judicial Conference is even more difficult than presenting one to the FTC. For example, under FTC rules, a brief *amicus curiae* is permitted, including "by an agency or officer of the United States." *See* 16 C.F.R. § 3.52(j). Thus, were a litigant to lodge a constitutional challenge before the FTC, he would be able to comply with Fed. R. Civ. P. 5.1 by notifying the Attorney General of the challenge, and the Attorney General may then choose to file a brief in support of the challenged statute. In contrast, *amicus* briefs and interventions are flatly prohibited in judicial disciplinary proceedings. *See* 28 U.S.C. § 359(b). This

prohibition on *amicus* filings or interventions means that the Judicial Conference cannot properly adjudicate constitutionality of a statute because it cannot be presented with arguments in defense of the statutory construct.  This limitation further bolsters the conclusion that the Judicial Conference (and judicial councils) lack competency to adjudicate constitutional challenges to the Disability Act. Whatever were the merits of the D.C. Circuit's conclusion to the contrary when it was reached in 2001, the Supreme Court's more recent decisions significantly limiting (if not outright vitiating) the power of agencies to hear constitutional challenges, have fatally undermined that conclusion.  This Court should orient itself to the Supreme Court's decisions in *Axon*, *Carr*, and *PCAOB*, rather than a nearly quarter-century old case from the D.C. Circuit.

B. *If Good Law, the D.C. Circuit's Decision in* McBryde *Does Not Foreclose All "As Applied" Challenges*

Even assuming the D.C. Circuit's decision in *McBryde* remains good law, by its own terms it does not foreclose all as-applied challenges.  The *McBryde* Court explicitly left for another day the question of "whether a long-term disqualification from cases could, by its practical effect, affect [*sic*] an unconstitutional 'removal.'"  *McBryde*, 264 F.3d at 67 n.5.  Of course, in order to address such a question, there first has to exist "a long-term disqualification from cases," and such disqualification can exist only once the Disability Act is *applied* to a particular judge.  That the *McBryde* Court left this question open indicates that even on its own terms *McBryde* does not foreclose all non-facial challenges to the Disability Act.

Judge Newman's challenge is precisely of the type left open by Footnote 5.  As of this writing, Judge Newman has already been suspended from hearing cases for seven months.  Given the briefing schedule in this matter, *see* ECF 28, and the Federal Circuit's calendaring practices, *see, e.g.*, Def. Br. at 54, Judge Newman will be precluded from hearing cases until *at least* February 2024, *i.e.*, *eleven months* after she last (March 2023) sat on a panel.  This suspension is thus already one of the longest, if not

the longest in the history of the American judiciary.[19]  Furthermore, under the terms of the Judicial Council's September 20 Order, the suspension will continue through *at least* September 2024.[20]  If permitted, this would mean that Judge Newman would be suspended from hearing *all* cases for *eighteen months*.  Further yet, the Judicial Council has threatened to make the suspension renewable.[21]

Judge Newman has made it clear that she will not comply with Defendants' unlawful and unconstitutional demands.  But even if one disagrees with Judge Newman's legal position and believes that Judge Newman's refusal to "cooperate" is itself unlawful, it does not follow that Defendants can indefinitely, and essentially (especially in light of her age) permanently suspend her from office.  To the contrary, if Defendants truly believe that Judge Newman is acting unlawfully in resisting their demands, they are entirely free to recommend impeachment proceedings to the House of Representatives.[22]  But Defendants are not free to effectively remove Judge Newman from office by stringing together and indefinitely extending numerous suspensions.  They do not have that power. Under the *McBryde* precedent, this Court has the power and the obligation to consider whether the suspension(s) of Judge Newman are so "long-term" that they "by [their] practical effect, affect[ed] an unconstitutional 'removal.'"  264 F.3d at 67 n.5.

Additionally, the *McBryde* decision should not be construed as stripping this Court of ability to hear "as applied" challenges that cannot be addressed by the Judicial Conference.  To do so would

---

[19] Even Judge McBryde's suspension that lasted for a year did not deprive him of all judicial work as he had a multitude of pre-suspension cases to continue to adjudicate.

[20] The Order is not clear whether this means that (absent extension of suspension) the Court will start assigning Judge Newman to cases beginning in August 2024, so as to permit her to sit starting October 2024, or whether it will begin assigning cases only after the suspension expires, which, given would likely mean that Judge Newman will not hear cases until November 2024.

[21] As already discussed *supra*, because the September 20 Order exists concurrently and in parallel with the March 8/June 5 Orders, even absent the threat of a renewed suspension under the Disability Act, Judge Newman remains indefinitely suspended from her judicial duties.

[22] That Defendants haven't referred Judge Newman for impeachment in light of what they claim to be "serious misconduct" strongly suggests that they do not believe in their own claims.

raise significant constitutional concerns as it would leave certain decisions of judicial councils entirely beyond review. For example, Judge Newman specifically challenged, on due process and statutory grounds, Defendants' refusal to recuse in this matter. Although Defendants now argue that it is not necessary for them to serve as witnesses, from very early on, Defendants premised their investigation on their own perceptions of Judge Newman's abilities, behavior, and decision-making. Indeed, one of the key facts in dispute was whether or not on May 3, 2022, following oral argument, Judge Newman "fainted." *See* ECF 10-1, at 2. Judge Newman has always disputed that she fainted, yet Defendants persisted in making this claim. *See, e.g.*, Exh. B, at 57.[23]

Throughout these proceedings, Judge Newman has argued that a transfer is not merely advisable, but statutorily and constitutionally required, and that an absence of such a transfer violates the basic principles of the due process of law. Defendants have ignored these arguments and refused to seek a transfer of the investigation to the judicial council of another circuit. But it is not clear that the Judicial Conference has authority to review this decision.[24] If the Judicial Conference doesn't have such authority, it is powerless to reverse the decision to fail to ask for a transfer on the ground that such a failure violates due process of law. If so, absent a review by this Court, Judge Newman would be left entirely without remedy, which in and of itself would pose significant constitutional difficulties. *See, e.g.*, *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975) (construing statutes in such a way that "absolutely

---

[23] The panel on which Judge Newman sat on that day included Chief Judge Moore. Thus, Chief Judge Moore is a key fact witness not only on the issue of Judge Newman's judicial abilities, but her alleged maladies. Yet, throughout the proceedings, Chief Judge Moore attempted to assiduously hide this fact, to the point that even the September 20 Order cites an affidavit of Judge Newman's former paralegal which states that he "was told … that [Judge Newman] had fainted." The affidavit's failure to identify *who* relayed this information and the fact that Chief Judge Moore was present at the event, strongly suggests an improper attempt to hide the fact that Chief Judge Moore was an eyewitness to a key dispute in the case, yet declined to recuse herself.

[24] Judge Newman does not concede that the Judicial Conference *doesn't* have such authority and will press her claim before that body too, but it is uncontroversial to state that nothing in the Disability Act or the rules implementing it *explicitly* grant the Judicial Conference authority to review refusals to transfer.

no judicial consideration of [an] issue would be available … raise[s] a serious constitutional question of the validity of the statute as so construed.").  This Court need not face these difficult constitutional questions, because the Disability Act need not be construed as barring all "as applied" constitutional challenges, and the *McBryde* Court did not so hold.

## IV.  JUDGE NEWMAN WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION, AND THE BALANCE OF EQUITIES WEIGHS HEAVILY IN HER FAVOR

None of the Defendants' arguments regarding the standard for issuing an injunction are well taken.  First, Judge Newman is indisputably suffering irreparable harm.  Every sitting of which she is deprived cannot be restored to her.  Second, there was no delay on Judge Newman's part in moving for preliminary injunction, particularly given the tradition of comity between judges broken without warrant or precedent by the Defendants.  Finally, the public interest would be served by her reinstatement via injunction as demonstrated by the reaction of neutral observers to this unlawful, results-oriented cashiering of a Presidentially-appointed, Senate-confirmed Article III judge.

### A.  *Defendants Downplay the Permanent and Irreparable Damage Being Inflicted on Judge Newman*

As of this writing, Judge Newman has only two outstanding opinions both of which have been internally circulated and are undergoing final revisions.  They will be issued in short order.  Contrary to Defendants' arguments, Judge Newman is not sitting on *en banc* panels, nor is she voting on various petitions.  Indeed, the September 20 Order *explicitly* bars Judge Newman from doing so.

Defendants argue that an injunction is inappropriate because Judge Newman is not suffering any harm given that she, like any other judge, does not have any personal interest in being assigned to any particular case.  The argument is a strawman and Plaintiff never made it.  Judge Newman never demanded to be assigned to a specific case, nor even a specific date or sitting of the court.  But Judge Newman has an interest in exercising the duties of her office, which includes being assigned to *some* cases.  She also has an interest in ensuring that the Chief Judge of the Federal Circuit does not exercise

unlawful power vis-à-vis her fellow circuit judges. This case is similar to *Gately v. Com. of Mass.*, which held that forced retirement of state police officers constituted irreparable harm, in large part because given the time necessary to litigate the underlying claim, the officers may never be reinstated to their positions. 2 F.3d 1221, 1234 (1st Cir. 1993). Judge Newman's situation is no different. Though much like officers in *Gately* who had no particular interest in being assigned to a particular duty station, Judge Newman has no definable interest in being assigned to a particular case. Also as officers in *Gately*, she has an interest in carrying out the duties attendant to her office. And much like in *Gately*, given the actuarial tables, "reinstatement" at the close of successful litigation may not be a viable option.

Failure to grant the prayed-for injunction will continue to allow Defendants to create "facts on the ground" and will let them achieve the predetermined outcome, irrespective of the legal weaknesses in their case. Absence of injunctive relief would keep Judge Newman off the bench for as long as the Defendants could drag out proceedings.

Furthermore, while Judge Newman may not have an interest in sitting on any particular case, she has a statutory duty and obligation to hear cases that her court is considering *en banc*. The statute is clear—"[a] court in banc *shall* consist of *all* circuit judges in regular active service …." 28 U.S.C. § 46(c) (emphasis added). Judge Newman, being a circuit judge in regular active service, has an interest and a statutory duty to sit on cases that are being heard *en banc*. Barring her from such participation visits irreparable harm on her, and it may create a cause of action for litigants denied a full *en banc* court. For every day that Judge Newman is kept from her Article III constitutional duties, she is being irreparably harmed, and it is a harm for which there is "no do over and no redress." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)(citations omitted).

B. *Public Interest Favors the Grant of an Injunction*

Defendants contend that the public interest weighs against the grant of an injunction in part because "there is a strong public interest in honoring Congress's statutory scheme and allowing the

Judiciary to fulfill its self-policing function," Def. Br. at 52, and in part because "an injunction would burden the Federal Circuit and the public with further delays of important work," *id.* at 51.  Both claims miss the mark.

First, while the public always has an interest in enforcement of duly enacted constitutional statutes, no such interest exists when it comes to *unconstitutional* statutes.[25]  *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest."); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("The public has no interest in enforcing an unconstitutional ordinance.").  Second, the Disability Act is not the only statute in question.  The public also has an interest in the proper enforcement of, *inter alia*, statutory recusal provisions found in 28 U.S.C. § 455, which require judges to recuse themselves when they have "personal knowledge of disputed evidentiary facts concerning the proceeding."  In the same vein, the public has an interest in the proper enforcement of the statutory provisions governing the composition of the *en banc* court, which require that all judges in regular active service participate in resolving matters which a Court of Appeals hears *en banc*, *see* 28 U.S.C. § 46(c).  Enforcing the Disability Act while disregarding other provisions in Title 28 is improper and does not serve the public interest.

Furthermore, Defendants' argument that this Court should not interfere with the Congressionally-created judicial disciplinary process cannot be taken seriously in light of Defendants' riding roughshod over that process.  For example, Judge Newman was taken off the Calendar before any Special Committee proceeding under the Act, and indeed before the filing or the identification of any complaint.  The Defendants' entire course of conduct began by acting outside the Act.  Then, they shifted the basis of the actions they took first from one claim then to another, which belies any

---

[25] Of course, the Judicial Council failed, on multiple occasions, to follow this statute and rules promulgated pursuant to the statute (*e.g.*, by suspending Judge Newman "pending the results of the investigation").

suggestion that Defendants are acting under the Act or in a manner that promotes the public interest. That Defendants' actions have also been inconsistent with the prior practice of every other judicial council—as recounted by *three* former circuit chief judges—further indicates that the public interest would not be served by this Court's deferring to Defendants' unlawful, procedurally defective actions.

Next, Defendants are wrong that "an injunction would burden the Federal Circuit and the public with further delays of important work." First, Defendants have actually abandoned the claim that Judge Newman suffers from extraordinary delays. No such claim appears in the Judicial Council's final September 20 Order—perhaps because a statistical analysis of Judge Newman's past and present productivity shows Judge Newman's delays are not extraordinary, and her speed has not decreased as compared to the time when everyone agreed she was fully capable of performing her work.

Defendants' argument also proves too much. Under Defendants' logic, the mere fact that Judge Newman is slow (even were she to agree to submit to requested medical tests and pass them with flying colors) would "burden the Federal Circuit and the public with further delays of important work," thus justifying her continued debarment from the bench. Indeed, under Defendants' logic, a judicial council could always sideline whomever happens to be the slowest judge on the circuit and then claim that restoring such a judge to duties would "burden the public with delays."

In any event, faster resolution of cases cannot, in and of itself, be a sufficient public interest. While speed is important, at the end of the day it is the proper and full consideration of cases that is in the public's interest, and Judge Newman's track record of being upheld by the Supreme Court shows she plays an important role on her court. If speed were all that mattered, courts would simply issue unreasoned one-line orders ruling for one party or another, rather than detailed opinions explaining and justifying an outcome.

Defendants have the public interest exactly backward. Indeed, the very case Defendants rely on illuminates why that is so. In *Town of E. Haven v. E. Airlines, Inc.*, while agreeing with a non-

controversial proposition that "a judge has no interest in trying a particular case[,] [n]or does a party have any right or interest in having a particular judge try a particular case," the court explained that removing a judge from even a single case, "imposes an undue burden upon his fellow judges" and the system as a whole. 293 F. Supp. 184, 189 (D. Conn. 1968). It, of course follows, that removing Judge Newman from *all* cases creates an "undue burden" on the judiciary and the public. *Id.*

C. *The Balance of Harms Favors Judge Newman*

Defendants have not been able to identify any cognizable public harm from restoring Judge Newman to the regular sittings of her court. The most that Defendants have been able to do is to allege that as a result of an alleged "substantial question about Judge Newman's fitness," "litigants will raise questions about her participation in their cases."[26] Def. Br. at 52 (citing *Wakefield v. Blackboard, Inc.*, Petition for Rehearing at 10, No. 22-819 (May 31, 2023)).[27] Defendants' argument (much like their argument that a transfer of the matter to another circuit would result in wasted efforts) is akin to the fellow who kills his parents asking for leniency because he's an orphan. There would be no public concerns had the Defendants not engaged in their unjust and factually baseless campaign. It bears reemphasizing that Judge Newman has been seen by two physicians, both of whom opined favorably on her fitness to continue in office. On the other side of this considered judgment stands the "medical judgment" of Defendants (who cannot event tell the difference between a "heart attack" and some

---

[26] It is worth remembering that to the extent that this question "persists" (though in light of examinations by Dr. Rothstein and Dr. Carney it has long been answered), it does so not because of Judge Newman's "refus[al] to comply with Special Committee's reasonable requests for a medical examination and medical records," but because of Defendants' refusal to be bound by basic notions of due process and the trampling of both procedural and substantive requirements throughout the pendency of this matter. This matter could have been resolved months ago had Defendants, like *every judicial council before them* requested a transfer of this matter to the judicial council of another circuit.

[27] The petition's utter lack of merit is evident from the fact that it was denied without comment. *See Wakefield v. Blackboard, Inc.*, 143 S. Ct. 2684 (2023) (June 26, 2023).

other type of "cardiac event"), basing their conclusions on Google searches. A public that is fully aware of the facts would not "raise questions" about Judge Newman's participation in any cases.

It appears that the only "harm" to Defendants is having to continue working with Judge Newman. They may not want to do so, *see, e.g.*, Shapiro, *supra* ("[T]he chief judge had told others that 'the only way this ends is with Judge Newman off the court.'"), but such personal distaste is not a constitutionally cognizable harm.

In contrast, Judge Newman has pointed to specific and irreparable harm that she has suffered, is suffering, and will continue to suffer absent an injunction. She has also pointed to the harm that the public is suffering by not having the court staffed as the President and U.S. Senate intended and in a way that U.S. Code commands. Given that Judge Newman and the public will suffer harm from denial of an injunction, and that no harm will be suffered by the public or Defendants from issuance of one, the injunction should issue.

### D. *Judge Newman Did Not Unduly Delay Her Request for Injunctive Relief*

Defendants' argument alleging an undue delay in filing for relief is not well taken. This is an extraordinary case. No judge in the nation's history has been treated in the way Judge Newman is now being treated. She was removed from the judicial rotation before even a meeting had been convened on any process. She attempted to resolve this matter via the well-known comity that is the oft commented-upon hallmark of the judiciary. She made requests to be restored to the calendar both to the Chief Judge and the Judicial Council. She attempted to negotiate a resolution in good faith, including by agreeing to work cooperatively with the Special Committee, provided that she was restored to the calendar. In *Capitol Hill Baptist Church v. Bowser* this Court granted a preliminary injunction against one of the District's Covid mandates despite a six-month delay in seeking an injunction because the Court concluded that the Plaintiff "church was not twiddling its thumbs during that period," but "discussed with the District alternatives" and "twice sought administrative relief."

496 F.Supp.3d 284, 302 (D.D.C. 2020) (internal quotations omitted).  As in that case Judge Newman attempted to resolve the issue amicably.  Delay caused by attempting to work things out without resorting to litigation is encouraged by the courts.  Otherwise a litigant seeking an injunction would be "punished for seeking an amicable resolution before rushing to the courthouse."  *Id.*  This kind of "delay" is not to be punished by the denial of relief.

Finally, it should be noted that while Judge Newman attempted to resolve this matter informally, Defendants continuously changed their demands and theories of the case.  As discussed, *supra*, Defendants changed the rationale for their suspension of Judge Newman.  Following commencement of this litigation, Defendants also receded from their attempts to impose a near-complete gag order on Judge Newman.  These changes in turn required Plaintiff to amend her complaint, so as to take account of Defendants' new positions.  Plaintiff should not be penalized for Defendants' machinations.

## <u>CONCLUSION</u>

Defendants' motion to dismiss the complaint should be denied in its entirety, whereas Plaintiffs' motion for preliminary injunction should be granted.

Respectfully submitted,

/s/*Gregory Dolin*

Gregory Dolin, MD
Senior Litigation Counsel

/s/*John J. Vecchione*

John J. Vecchione
Senior Litigation Counsel

NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
greg.dolin@ncla.legal

*Counsel for Plaintiff*