# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE HON. PAULINE NEWMAN,
Circuit Judge
United States Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC 20005,

*Plaintiff*,

v.

THE HON. KIMBERLY A. MOORE,
in her official capacities as
Chief Judge of the U.S. Court of Appeals for the Federal Circuit,
Chair of the Judicial Council of the Federal Circuit, and
Chair of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

THE HON. SHARON PROST,
in her official capacity as
Member of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

THE HON. RICHARD G. TARANTO,
in his official capacity as
Member of the Special Committee of the Judicial Council of the
Federal Circuit,
717 Madison Place, NW
Washington, DC 20005,

and

THE JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT,
717 Madison Place, NW
Washington, DC 20005,

*Defendants*.

NO. 1:23-CV-01334-CRC

**DECLARATION OF GREG DOLIN IN
SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION AND IN
OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

# DECLARATION OF GREG DOLIN.

1. I, Gregory Dolin, am over the age of 18 and make this Declaration in support of plaintiff's motion for preliminary injunction and against the defendant's motion to dismiss.

2. I am counsel of record in both this action and in the administrative proceeding No. FC-23-90015 ("the administrative proceeding") before the Judicial Council of the United States Court of Appeals for the Federal Circuit.

3. Both the Motion to Dismiss and the Motion for Preliminary Injunction and the oppositions thereto have cited materials, evidence and statements submitted in the administrative hearing to this court.

4. In order that all such relevant material should be before this Court I attach true and correct copies of the following to this Declaration:

   A. Judge Newman's August 31, 2023 Response to the July 31, 2023 Special Committee Report and Recommendations, together with all attachments thereto;
   B. The Judicial Council of the Federal Circuit's Order of September 20, 2023
   C. The Judicial Council of the First Circuit's Order of April 8, 2002 in *In re Docket of Judge Carmen Consuelo Cerezo*

5. In some instances, the parties have redacted confidential material and those redactions remain in the material submitted with this Declaration and the true and correct redacted material in accordance with the agreements and rules of the administrative proceeding.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  October 25, 2023              \_\_\_/s/ Gregory Dolin\_\_\_
                                            Gregory Dolin

# EXHIBIT A

No. FC-23-90015

# In the Judicial Council of the
# United States Court of Appeals for the Federal Circuit

---

*In re Complaint No. 23-90015*
*(Complaint Against Circuit Judge Pauline Newman)*

---

## RULE 20(A) RESPONSE TO THE SPECIAL COMMITTEE'S REPORT AND RECOMMENDATION

---

Gregory Dolin
*Counsel of Record*
Andrew Morris
John J. Vecchione
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW
Washington, DC 20036
(202) 869-5210
Greg.Dolin@ncla.legal

August 31, 2023                    *Counsel for the Hon. Pauline Newman*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................ 1

I. FACTUAL AND PROCEDURAL BACKGROUND ............................................. 3

II. AT ALL RELEVANT TIMES THE SPECIAL COMMITTEE LACKED FACTUAL
PREDICATES FOR ORDERING MEDICAL EXAMINATION ..................................... 23

A. THE FACTUAL RECORD AT THE TIME OF THE FIRST ORDER REQUIRING
MEDICAL EXAMINATION DID NOT SUPPORT SUCH A DEMAND ................. 23

1. The Statistical Data Do Not Support the Suspicion That Judge Newman
Has Suffered Cognitive Decline ........................................................... 24

2. Baseless Allegations Concerning Judge Newman's Health Issues Cannot
Justify a Forced Medical Examination ................................................. 32

3. Personal "Observations" of Committee Members Do Not Provide
Sufficient Basis to Order a Medical Examination ................................ 37

B. THE FACTUAL RECORD AT THE TIME OF THE SECOND AND THIRD ORDERS
REQUIRING MEDICAL EXAMINATION ALSO DOES NOT SUPPORT THE
ORDERS REQUIRING MEDICAL EXAMINATION ................................................ 39

1. The Subsequent Orders Are Irreparably Tainted by the Improper April 7
Order ..................................................................................................... 41

2. The Deposition of Judge Newman's Career Law Clerk Is Devoid of Any
Facts and Therefore Irrelevant ............................................................. 43

3. Affidavits of Judge Newman's Former Chambers Staff Do Not Provide
Any Support for the Committee's Demands .......................................... 45

4. Affidavits of Other Court Employees Do Not Show that the Request for
Medical Testing Is Reasonably Necessary ........................................... 50

C. ANY RESIDUAL QUESTIONS WERE RESOLVED BY DR. ROTHSTEIN'S
EXAMINATION ............................................................................................ 55

D. DR. CARNEY'S REPORT FURTHER CONFIRMS THAT JUDGE NEWMAN DOES
NOT SUFFER FROM ANY MENTAL DISABILITY ........................................... 57

III. THE COMMITTEE HAD NO BASIS TO REQUEST A VIDEO-TAPED INTERVIEW
WITH JUDGE NEWMAN ................................................................................ 59

IV. THROUGHOUT THE PROCEEDINGS, JUDGE NEWMAN HAS OFFERED TO
COOPERATE .................................................................................................. 61

V. JUDGE NEWMAN HAD "GOOD CAUSE" NOT TO COOPERATE BECAUSE THIS
PROCEEDING VIOLATES HER RIGHT TO DUE PROCESS OF LAW ..................... 66

A. MEMBERS OF THE JUDICIAL COUNCIL SUFFER FROM IRRECONCILABLE CONFLICTS OF INTEREST ...................................................................... 69

1.   That Members of the Judicial Council Are Not Likely to Be Actually Called as Witnesses Is Irrelevant ......................................................... 71

2.   "Narrowing" the Inquiry Does Not Eliminate the Problem of Actual Bias or Risk of Bias ...................................................................... 78

B. THIS INVESTIGATION HAS BEEN MARKED BY RULINGS THAT ARE UNFAIR, CONTRADICTORY, AND PROVIDE SHIFTING RATIONALES FOR PREVENTING JUDGE NEWMAN FROM HEARING CASES ....................................................... 80

1.   The Chief Judge Improperly Removed Judge Newman from the April 2023 Sitting of the Court .......................................................... 80

2.   The Chief Judge and Other Members of the Committee Predetermined that Judge Newman Must Take Senior Status ....................................... 84

3.   The Judicial Council, in Violation of Basic Procedures, Voted to Preclude Assigning New Cases to Judge Newman ........................................... 84

4.   The March 24 Order Was Procedurally and Substantively Flawed. ........ 90

5.   The Special Committee Improperly Placed the Burden of Investigating the Credentials of Selected Medical Providers on Judge Newman .................. 91

6.   The Special Committee's Denial of Judge Newman's Request for Access to Full Data Set Is Another Procedural Irregularity .......................................... 92

7.   The Special Committee's Heavy Reliance on Information It Obtained by Questioning Clerks and Other Court Employees Violates Due Process in Several Respects ..................................................................... 94

C. THE COMMITTEE'S ARGUMENTS AGAINST TRANSFER DO NOT WITHSTAND SCRUTINY AND ARE DEVOID OF MERIT .......................................................... 99

D. THE FAILURE TO TRANSFER THIS MATTER PROVIDES SUFFICIENT "GOOD CAUSE" TO RESIST THE COMMITTEE'S DEMANDS ...................................... 103

VI. THE RECOMMENDED SANCTION IS UNPRECEDENTED, EXCESSIVE, AND CONTRARY TO THE GOVERNING STATUTE .......................................................... 105

A. THE SANCTION RECOMMENDED BY THE COMMITTEE IS EXCESSIVE AS COMPARED TO SANCTIONS IMPOSED ON OTHER JUDGES FOUND TO HAVE ENGAGED IN MISCONDUCT .................................................................. 105

B. THE SANCTION RECOMMENDED EXCEEDS THE COUNCIL'S STATUTORY AUTHORITY ..................................................................... 112

C.  THE SANCTION RECOMMENDED IS UNCONSTITUTIONAL............................ 115

D.  IF THE JUDICIAL COUNCIL IS TO UPHOLD THE RECOMMENDATION IN
     TOTO, JUDGE NEWMAN SHOULD BE CREDITED WITH THE TIME SHE HAS
     ALREADY SERVED IN A SUSPENDED STATUS .................................................. 119

CONCLUSION ........................................................................................................... 119

## INTRODUCTION[1]

These proceedings began after Chief Judge Kimberly Moore accused her long-time colleague, the longest-serving judge on the Federal Circuit and a "heroine of the patent system,"[2] Circuit Judge Pauline Newman, of being no longer mentally fit to continue her service as an active Court of Appeals judge. Were the committee formed to investigate these baseless allegations actually interested in ascertaining the truth of the matter—that Judge Newman, despite her age, is in no way disabled—it could have done so months ago. Instead, Chief Judge Moore and the committee she appointed have been interested in one thing and one thing only—keeping Judge Newman off the bench via the exercise of raw power unconstrained by statutory requirements, constitutional limits, any notions of due process, conflict of interest rules, or even basic fairness. Yet, even now, if Judge Newman's colleagues who are members of this Judicial Council truly wish to assure themselves of Judge Newman's continued ability to carry out her duties, it is not too late to change course and engage in a process unmarred by factual and procedural errors or the personal animosity that has been plainly evident during these proceedings.

*****

---

[1] Judge Newman requests that this matter be set for argument. *See* Rule 20(a). Additionally, pursuant to Rule 23(b)(7), Judge Newman requests that this filing be made publicly available.

[2] Kimberly A. Moore, *Anniversaries and Observations*, 50 AIPLA Q. J., 521, 524-25 (2022).

On March 24, 2023, Chief Judge Moore "identified a complaint," which (as will be further discussed below) was predicated on provable falsehoods. It alleged that Judge Newman was suffering from mental and/or physical disability that is incompatible with continued service as an active circuit judge.

The process that this complaint launched was fatally flawed from the very beginning, given that Judge Newman was sanctioned by being removed from hearing cases even before any investigation began. Over time, the allegations in the complaint have morphed from mental and physical disability to misconduct for refusal to cooperate with the probe, despite Judge Newman's numerous attempts to resolve the issue in a truly cooperative and collaborative fashion. As the nature of the allegations against Judge Newman transmogrified, and despite Judge Newman's numerous attempts at having them addressed, procedural flaws have only mounted, undermining confidence in the integrity of the process and the ability of this Judicial Council to resolve the complaint.

Furthermore, not only do both the process itself and the proposed sanctions run afoul of governing statute, they also violate the Constitution because they usurp Congress's sole power of impeachment.

For these reasons, and the ones that follow, the Council should reject the Special Committee's Report and Recommendation. Moreover, because the process cannot be salvaged by further proceedings before this body, the Council should request that the

Chief Justice transfer this matter to another Circuit. And before proceeding further, Judge Newman reiterates that despite everything that has occurred thus far, while she remains willing to engage in a truly cooperative and collaborative process, pure *submission* will not be forthcoming now, a year from now, nor at any time in the future.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This process began before it formally began. On February 14, 2023, the office of the Chief Judge improperly excluded Judge Newman from panel assignments for the April 2023 sitting of the Court. Report and Recommendation of the Special Committee of July 31, 2023 (hereinafter "Report") at 79. At the time, as the Report candidly acknowledges, *id.*, Judge Newman was not behind in her opinions enough to allow her exclusion from panel assignments under previously promulgated rules. Yet, the Chief Judge decided not to assign Judge Newman to the April calendar anyway.[3] This *ultra vires* action was a culmination of involuntary reductions in sittings that Judge Newman experienced during the preceding several months.

During February and March of 2023, Judge Newman sat on panels and authored several opinions. Toward mid-March, the attempt to force Judge Newman off the bench began in earnest.

On March 7, 2023, the Chief Judge held a conversation with Judge Newman

---

[3] The Report's admission that the "Chief Judge's chambers" was responsible for excluding Judge Newman from the April calendar sitting stands in sharp contrast with the Chief Judge's indignant protestations during the July 13, 2023 hearing, *see post*, that any claim that the Chief Judge decides on

advising her that the Chief Judge had "probable cause to believe" that Judge Newman suffers from a disability.  According to the Chief Judge's own words, the basis for this "probable cause to believe" that Judge Newman suffered from a disability was, *inter alia*, statements by other judges on this court relayed to her, *i.e.*, members of this Judicial Council.  *See* March 24 Order at 2.  Judge Moore offered to resolve the identified issue "informally" by demanding that Judge Newman resign or at least take senior status under 28 U.S.C. § 371.  The Chief Judge explained that the requirement to step down from active duty was "non-negotiable."[4]  This visit was followed by similar visits from Judge Sharon Prost and Judge Richard Taranto, all of whom were subsequently assigned to sit on the Special Committee.[5]

The next day, *i.e.*, March 8, 2023 (again, *before* any formal or informal proceedings

---

[4] panel assignments is "[c]ompletely false" and that "[t]he Chief Judge has no input whatsoever."  Tr. of Hearing at 41:23-42:13.  Either the Chief Judge does have input, as stated in the Report, or she doesn't as she protested in the hearing.  Both statements cannot simultaneously be true.

[4] In recent exchanges, Chief Judge Moore and other members of the Special Committee disputed this account of the meetings in Judge Newman's chambers.  Of course, the very existence of a factual dispute going to a key question in the case necessarily precludes those with personal knowledge of disputed facts from serving as adjudicators of the dispute.  *See, e.g.*, 28 U.S.C. § 455(b)(1); Code of Conduct for United States Judges, Canon 3(C)(1)(a); ABA Model Code of Judicial Conduct R. 2.11(A)(1), 2.11(A)(6)(c).

[5] On March 9, 2023, Judge ████████, a member of the Judicial Council, appeared at Judge Newman's residence and also attempted to convince Judge Newman to retire.

4

against Judge Newman began), the Judicial Council allegedly[6] met and voted to remove Judge Newman from hearing any cases indefinitely.  Judge Newman, though herself a member of the Judicial Council, and at the time not subject to an investigation, was not even given notice of this meeting, much less invited to address the Council, participate in deliberations, or vote on an action that was supposedly taken "for the effective and expeditious administration of justice within the circuit."   28 U.S.C. § 332(d)(1). Suspending an active judge from hearing cases indefinitely without first conducting an investigation was unprecedented in the history of the American judiciary, and no statute empowered the Judicial Council to do it.

When Judge Newman refused to resign as demanded by the Chief Judge, the Chief Judge prepared a formal order launching the present investigation.  It should be noted that no colleague of Judge Newman ever filed a formal complaint alleging misconduct or incapacity, even though all of Judge Newman's colleagues have worked with her and are aware of her capabilities.  Instead, the Chief Judge unilaterally converted these expressions of "concern" from unnamed sources into a formal complaint, while denying that she is the real complainant.  The Chief Judge provided a draft of the order "identify[ing] a complaint" to Judge Newman on March 17, 2023.

---

[6] If a formal meeting occurred, there was no notice of such meeting, nor were any minutes provided to Judge Newman despite repeated requests.  The Report now acknowledges that the Council's decision "was not memorialized in a written order."  Report at 77.

She then threatened to launch a full-scale investigation unless Judge Newman agreed to an "informal resolution," *see* March 24 Order at 6, so long as such a "resolution" included Judge Newman relinquishing her lifetime appointment as an active-duty Judge. Because Judge Newman continued—and continues—to refuse to be coerced into resignation, on March 24, 2023, the Chief Judge formally entered the order and appointed a "special committee," consisting of herself, Judge Prost, and Judge Taranto, *i.e.*, the very judges who already attempted unsuccessfully to pressure Judge Newman to resign, to investigate the allegations made by Chief Judge Moore herself.

The March 24 Order made at least four baseless factual claims.  First, the Order alleged that "in the summer of 2021, Judge Newman, at the age of 94, was "hospitalized after suffering a heart attack."  *Id.* at 1.  Second, the Order alleged that Judge Newman "under[went] coronary stent surgery."  *Id.*  Third, the Order stated that "on May 3, 2022, Judge Newman fainted following an argument and was unable to walk without assistance."  *Id.*  Finally, the Order claimed that as a result of these alleged maladies, Judge Newman's "sittings were reduced compared to her colleagues."  Each and every one of these original allegations that ostensibly provided the genesis of the investigation is demonstrably false, and even the Special Committee no longer presses any of them. *See, e.g.*, Report at 81-82.  To this day, the Committee has not provided any information as to the basis for the claims made in the March 24 Order, so it appears that these claims

were simply fabricated out of whole cloth.[7]

In short order, and without waiting for any responses, affidavits, and the like, the Chief Judge and the Special Committee entered a slew of new orders. On April 6, 2023, Chief Judge Moore issued a new and virtually unprecedented order expanding the scope of the special committee's investigation into Judge Newman's alleged "disability" and "misconduct" to include questions about internal operations of Judge Newman's chambers. The April 6 Order contained no allegations of harassment or other similar conduct. Rather, the order alleged that Judge Newman failed to maintain confidentiality of an employment dispute between herself and a (now former) staff member. The alleged breach of confidentiality stemmed from Judge Newman using the "███████ email list—which includes all judges, chambers staff, and other judicial employees (95 individuals in all)," rather than replying by using each judge's individual email address. April 6 Order at 5-6. No one alleged that the ███████ email list was used with any malice or purpose of disclosing confidential information, rather than as an honest mistake. For that matter, at the time the email was sent, it was not even conveyed to

---

[7] The Committee feigns offense at this allegation, *see* Report at 81, but it still steadfastly refuses to disclose any basis for the allegations made in Chief Judge Moore's complaint of a "heart attack" or "cardiac stents" or the rest. Even now, when the Committee has explained it did not mean "heart attack" in a "technical" sense, *see, e.g.*, Tr. of July 31 Hearing at 19:9-13, it has not disclosed the basis for its belief that any "cardiac event" occurred in the relevant time period. Absent such basic information, Judge Newman has no choice but to conclude that the allegation was indeed fabricated.

Judge Newman that a formal confidential Employment Dispute Resolution Process had yet begun.

The April 6 Order is particularly noteworthy because it reproduces an email from Chief Judge Moore to Judge Newman that unequivocally states that Judge Newman has been suspended "pending the results of the investigation into potential disability/misconduct" and that Judge Newman "will not be assigned any new cases until the[] [disciplinary] proceedings are resolved." *Id.* at 4. Although after Judge Newman filed suit[8] challenging the unlawful suspension the reason for suspending Judge Newman was changed, it is important to recognize that Chief Judge Moore's email conceded this unlawful basis for it.

On April 7, 2023, the special committee issued an order directing Judge Newman to undergo neurological and neuropsychological examinations. At this point, the Special Committee had yet to speak to any of Judge Newman's staff (for example, the deposition of her career law clerk occurred on April 12, nearly a week after the April 7 Order, whereas the affidavit by another one of her law clerks was not executed until April 19, 2023). Nor had any of the other episodes which the Special Committee recounts in its Report yet occurred. In other words, as of April 7, 2023 when Judge Newman was ordered to undergo unwanted (and unnecessary) medical testing, the

---

[8] *Newman v. Moore*, No. 1:23-cv-01334-CRC (D.D.C. filed May 10, 2023).

Committee had *no* objective evidence of disability beyond Judge Newman's alleged delays in publishing her opinions.  It is therefore not surprising that the April 7 Order listed no bases whatsoever for its demand.  The April 7 Order also provided no explanation as to the scope or means of the proposed testing, the use of the test results, the basis on which the various medical providers were chosen by the special committee, nor the qualifications of these providers.

Furthermore, as the Special Committee was well-aware, Judge Newman was still unrepresented by counsel at that point.  Despite this lack of representation, the committee directed Judge Newman to respond to the request "by 3:00 pm on April 11, 2023," (*i.e.*, within *four days* of the issuance of the order) and further threatened that "[r]efusal to comply … may result in the Committee seeking to expand the scope of the investigation to include an inquiry into whether the subject judge's non-cooperation constitutes misconduct …."  April 7 Order at 2-3.  On April 13, 2023, the special committee made good on its threat, and Chief Judge Moore expanded the investigation into Judge Newman on the basis "that Judge Newman['s] [] fail[ure] to cooperate constitute[d] additional misconduct."  April 13 Order at 2.

Following the issuance of these orders, the Special Committee required Judge Newman's chambers staff to appear for interviews, going so far as to subpoena Judge Newman's career law clerk, even though there was absolutely no indication that the law clerk would refuse to appear in response to a simple request.  The Special Committee

9

was aware that Judge Newman and her law clerks had long-standing plans to attend the Thirtieth Annual Intellectual Property Law & Policy Conference that was held at Fordham University School of Law in New York City on April 13-14, 2023. When Judge Newman's staff requested that the Committee accommodate these long-standing commitments and agree to hold the requested interviews upon their return, the Committee refused this simple request. Indeed, the subpoena to Judge Newman's career law clerk was served upon her less than 48 hours before her attendance was demanded. The same lack of basic courtesy and procedural protections was shown to other members of Judge Newman's chambers.

On April 12, 2023, the Committee deposed Judge Newman's career law clerk, but it obtained no additional substantive information, as the law clerk (despite threats from the Chief Judge) repeatedly invoked her Fifth Amendment right against self-incrimination. At about the same time, the Special Committee also interviewed another one of Judge Newman's law clerks, yet, possibly because that law clerk provided no derogatory information about Judge Newman, the Special Committee apparently kept no record of any kind (or at least did not provide one to Judge Newman) of that interview. All members of Judge Newman's staff who were interviewed were expressly told not to share even the very fact of their interview with anyone, *including* Judge Newman. The substance of these formal or informal interviews, as well as the identity of the witnesses that the Committee has spoken to, was not shared with Judge Newman

until *June 1*, 2023.

On April 17, 2023, the Special Committee issued another order, this time directing Judge Newman to "provide hospital records, medical, psychiatric or psychological, and other health-professional records that relate to the" alleged heart attack, cardiac stent placement, and fainting episode that were "described in the second paragraph of the Order dated March 24, 2023." April 17 Order at 1. As was true with the March 24 Order, the April 17 Order did not state a basis for even believing that the alleged episodes even took place (much less that medical records related to these alleged episodes existed). Indeed, as the Special Committee presently admits, *see* Report at 81-82, it has no credible information that the episodes "described in the second paragraph of the Order dated March 24, 2023," *i.e.*, a heart attack, a cardiac stent procedure, and/or a fainting spell ever took place. The April 17 Order also did not offer any explanation for the relevance of these records (assuming their existence) to Judge Newman's (or any other judge's) ability to perform judicial functions, nor did it explain how exactly a committee made up of members of federal judiciary, none of whom have any medical training, were planning to evaluate these records.

In the same order the Special Committee also "require[d] production of hospital records and medical, psychiatric or psychological, or other health-professional records of any treatment or consultation in the last two years regarding attention, focus, confusion, memory loss, fatigue or stamina." April 17 Order at 2. Once more, no

11

explanation was provided for why a particular timeframe was chosen, what use of these records would be made, or who would be examining them. Finally, the Special Committee "request[ed] that Judge Newman sit down with the Committee for a video-taped interview." *Id.* Neither the scope nor the length nor the purpose of the interview was outlined. The Order directed a response to the outlined requirements by "[b]y 9:00 am Friday, April 21, 2023," (*i.e.*, within *three days* of the issuance of the Order), and it again threatened that "[r]efusal to comply with this Order without good cause shown may result in the Committee seeking to expand the scope of the investigation." *Id.* Again, it is worth noting that, though Judge Newman had retained NCLA just a few days prior, the firm had not yet entered an appearance and was in no way ready to evaluate the propriety of the Special Committee's ever-increasing demands.

On April 20, 2023, Chief Judge Moore issued yet another order, again expanding the scope of the investigation, listing "new matters." The first matter centered on "Judge Newman's alleged conduct toward her chambers staff member." April 20 Order at 1. The Order alleged that Judge Newman "retaliated" against one of her employees because following that employee's complaints to Chief Judge Moore, Judge Newman chose not to include this employee "in chambers' communications, including work-related emails." *Id.* at 2. The second matter "relate[d] to Judge Newman's alleged conduct toward one of her law clerks." *Id.* at 7. In essence, Chief Judge Moore found that "there is probable cause to believe that Judge Newman has engaged in conduct

12

prejudicial to the effective and expeditious [*sic*] administration of the business of the courts" because she demanded that her law clerk either engage in assignments given to him or resign.  *Id.* at 8.  With respect to these two matters, no explanation was provided of the legal basis for limiting a judge's complete discretion to decide how work is distributed inside her chambers.

The third matter "relate[d] to Judge Newman's alleged conduct towards the Court's IT Department."  *Id.* The Order alleged that in conversation with the IT department "Judge Newman sounded annoyed, agitated, paranoid and upset," and that a phone call with Judge Newman was "bizarre and unnecessarily hostile toward Judge Newman's chambers staff member."  *Id.* at 8-9.  Even assuming the veracity of these perceptions by IT staff (none of which Judge Newman was ever able to test through cross-examination or otherwise), the incidents referred to occurred on April 17 and 18, *i.e.*, *after* the investigation into Judge Newman began, and *after* a number of confrontational emails from the Chief Judge, thus fully explaining why Judge Newman would sound "annoyed, agitated, … and upset."  Perhaps even more importantly, these incidents occurred *after* the Committee entered its orders requiring medical examinations and surrender of medical records; thus, these events did not and could not have served as a basis for the orders of April 7 and April 17, 2023.

On April 21, 2023, Judge Newman, now represented by counsel, responded to the committee's prior orders.  In the letter addressed to Chief Judge Moore and copied

to all other members of the Special Committee, Judge Newman raised several objections to the process that had unfolded to that point. Most importantly, Judge Newman pointed out that neither Chief Judge Moore nor the Judicial Council had authority to order an interim suspension of Judge Newman from participating in the work of the Court and on that basis she requested her immediate reinstatement to the argument calendar. Judge Newman also requested that Chief Judge Moore invite the Chief Justice to transfer the matter to a judicial council of a different circuit as contemplated by Rule 26.

On May 3, 2023, the Special Committee responded to Judge Newman's letter, by "reissuing its orders regarding medical evaluation and testing and medical records and establishing new deadlines for compliance."[9] May 3 Order at 2.[10] The Order repeated the various allegations previously described, but again failed to explain the relevance of the medical records requested, the scope or means of the proposed testing, the use of the test results or medical records, the basis on which the various medical providers were chosen by the Special Committee, or the qualification of these providers.

---

[9] The May 3 Order did not clarify whether resetting the deadlines for compliance also meant that the April 13 Order expanding the investigation into Judge Newman on the basis "that Judge Newman['s] [] fail[ure] to cooperate constitute[d] additional misconduct" was vacated. The Order also omitted a request for a video-taped interview.

[10] Simultaneously, the Special Committee issued a Gag Order forbidding Judge Newman and her counsel from disclosing any information about the investigation. After Judge Newman filed suit, *see Newman v. Moore*, No. 1:23-cv-01334-CRC (D.D.C. filed May 10, 2023), the Committee significantly narrowed the Gag Order. *See* May 16, 2023 Order.

Furthermore, the Order rejected Judge Newman's suggestion that she and the Special Committee "engage in negotiation as to the scope of the requests as provided by the Commentary to Rule 13." *Id.* at 7-8. Finally, the Order denied Judge Newman's request for a transfer "without prejudice to refiling after Judge Newman has complied with the Committee's orders concerning medical evaluation and testing and medical records." *Id.* at 9. The Special Committee did not explain then or at any point in the future up to the present day, why or how the provision of medical records or submission to medical testing would affect its analysis under Rule 26.[11] The Order set a May 10, 2023, 9:00 am deadline for Judge Newman to reply to its demands. *Id.* at 13-14. None of the orders filed on May 3, 2023,[12] acknowledged, much less addressed, Judge Newman's argument that her suspension from judicial office "pending the results of the investigation into potential disability/misconduct" was illegal and not authorized by any statute or rule of procedure. The orders simply ignored her request to be immediately restored to the argument calendar.

---

[11] On the same date, a third order, in the name of the Judicial Council, also denied, without any explanation, Judge Newman's request to transfer the matter to another judicial council without prejudice to re-filing after Judge Newman has complied with the Special Committee's requests for medical records and the evaluation and testing ordered by the Special Committee.

[12] Although three orders were issued on May 3, *see supra* nn.10-11, the references to the "May 3 Order," except where otherwise noted, are to the Special Committee's Order requiring medical testing and production of records.

15

On May 9, 2023, Judge Newman responded to the Special Committee.[13]  The letter objected to the request for medical records on the basis that the committee did not (and is unlikely to be able to) explain the relevance of the requested records or the scope of their use.  May 9 Letter to the Special Committee at 3-4.  On similar grounds, Judge Newman objected to the request for medical testing.  *Id.* at 4-5.[14]  At the same time, Judge Newman indicated that she was willing to discuss the request with the Special Committee in a cooperative manner as contemplated by the commentary to Rule 13(a), which instructs "the Special Committee [to] enter into an agreement with the subject judge as to the scope and use that may be made of the examination results." *Id.* at 4-5.  The May 9 Letter renewed the request for the matter to be transferred to the judicial council of another circuit, once again explaining that since Chief Judge Moore was in effect a complainant in this matter and that since all of Judge Newman's colleagues are potential witnesses to her ability to competently carry out her judicial duties, it is inappropriate for any of them to also serve as adjudicators.  *Id.* at 5-6.  Finally, the May 9 Letter reiterated Judge Newman's demand to be immediately restored to the case assignment calendar.  *Id.* at 6.

---

[13] Due to a glitch in the email system, the letter was not delivered to the Federal Circuit until the morning of May 10, 2023, which was still within the timeframe set by the Committee's May 3 Order.

[14] The May 9 Letter objected to the special committee's gag order on First Amendment grounds and as an alternative, formally requested the public release of various orders and letters pursuant to Rule 23(b)(7) of the Conduct Rules.  The Rule 23(b)(7) request was eventually granted on May 16, 2023.

In response to the May 9 Letter, on May 16, 2023, the Special Committee issued an order reiterating the request for medical records, medical testing, and a video-taped interview, and for the first time explained the relevance and the scope of its demands. May 16 Order at 4-6.   Nevertheless, the Special Committee again rejected Judge Newman's requests to at the very least participate in the selection of providers or negotiations as to the type and scope of testing.   *Id.* at 20-21.   The Special Committee again failed to explain on what basis the selected medical providers were chosen or what qualifications they might have that are relevant to their ability to evaluate Judge Newman's mental health.   The Special Committee once again denied the request for a transfer and once again entirely ignored Judge Newman's objection to the Judicial Council's unlawful suspension of her pending the outcome of the investigation.   *Id.* at 26.   The Special Committee set a deadline of 9:00 am on May 23, 2023, to respond to its requests.   *Id.* at 25.

On May 20, 2023, Judge Newman requested a short extension of time to respond to the May 16 orders.   In support of the request, lead counsel for Judge Newman explained that he was out of the country and visiting Israel until June 1, 2023, in order to attend to family and religious obligations.   On May 22, the Special Committee denied the requested extension of time, and instead reset the deadline to 9:00 am on May 26,

2023.[15]   On May 25, Judge Newman responded to the Special Committee's May 16 Order, declining the requests but once more offering to resolve the issue in a cooperative, collegial, and collaborative way.  Specifically, Judge Newman wrote that she is willing "to undergo necessary testing, provide necessary records, and meet with a Special Committee provided that she is immediately restored to her rights and duties as a judge and further provided that this matter is promptly transferred to a judicial council of another circuit, which is unmarred by the prior unlawful decisions …."  May 25 Letter to Special Committee at 3 (cleaned up).

The following day, "the Committee … requested that the scope of the investigation be expanded to investigate whether Judge Newman has failed to cooperate in violation of the Rules and whether her failure to cooperate constitutes misconduct."  May 26 Order at 1.  In an order issued the same day, Chief Judge Moore granted the Committee's request and once again ordered the expansion of the investigation.  *Id.*

However, less than a week later, on June 1, 2023, the Committee issued a new order narrowing the scope of its investigation.  The new order stated that "[i]n light of the practical constraints that Judge Newman's [alleged] refusal to cooperate places on the Committee's ability to proceed" it will not, "at this time" pursue the allegations regarding Judge Newman's mental or physical disability.  June 1 Order at 2, 4.  Instead,

---

[15] May 26, 2023, fell on a major Jewish festival of Shavuot ("Feast of Weeks").  In order to avoid a conflict with counsel's religious obligations, Judge Newman had to file a response on May 25, 2023.

18

the Committee announced that its "investigation will focus on the question whether Judge Newman's refusal to cooperate with the Committee's investigation constitutes misconduct," *id.* at 3, and accordingly directed Judge Newman to, by July 5, 2023, "submit a brief limited to addressing the question whether Judge Newman's refusal to undergo examinations, to provide medical records, and to sit for an interview with the Committee … constitute [*sic*] misconduct and the appropriate remedy if the Committee were to make a finding of misconduct …," *id.* at 6.  The Committee scheduled oral argument on the matter for July 13, 2023.  On June 1, the Committee, for the first time, provided Judge Newman with various affidavits regarding Judge Newman's behavior, which in its view supported the Committee's decision to require that Judge Newman undergo a mental fitness evaluation.  *Id.* at 5.  At the same time, the Committee cautioned that because it is narrowing its investigation to the issue of Judge Newman's alleged failure to cooperate with the Committee's investigation, "there are no witnesses who could have relevant testimony bearing on the narrow issue of [the alleged] misconduct," *id.*, and that "additional factual development" is not required, *id.* at 4.

On June 20, 2023, in response to Judge Newman's earlier request for clarification of the June 1 Order, the Committee issued a new order reiterating that "the only subject [Judge Newman] should address in the brief due on July 5 (and at the hearing on July 13) is whether Judge Newman's refusal to comply with the Committee's orders seeking (i) neurological and neuropsychological testing, (ii) medical records, and (iii) an

19

interview constitutes misconduct." June 20 Order at 4.

Consistent with the Committee's directive, on July 5, Judge Newman filed a letter brief explaining that a) she did not fail to "cooperate," *i.e.*, "work together" to resolve the matter, b) the Committee did not make a *prima facie* case for the need for the evaluations in the first place, c) she had good cause to refuse to meekly submit to the Committee's imperious demands because all of the members of the Committee had not only a risk of bias, but have shown actual bias, and d) no sanctions are warranted for Judge Newman's standing on principle to defend her constitutional guarantees of due process and appointment for life to judicial office.

On July 13, 2023, the Committee held a hearing.[16]   Over Judge Newman's objection, the hearing was closed to the public. *See* June 1 Order at 6, June 20 Order at 5-9.  During the hearing, and for the *first time*, the Committee members suggested that when the Committee wrote *multiple times* in *multiple orders* that Judge Newman had a "heart attack" it did not really mean a "heart attack" but instead meant something else. The Committee continued to insist that the other nebulous "cardiac event" which the Committee did not define was relevant to determining whether the request for Judge Newman to undergo medical testing was proper.  Also for the first time, the Committee

---

[16] It should not go unsaid that the hearing was conducted in an extraordinarily and uniquely hostile fashion.  None of the attorneys appearing at the hearing has ever before experienced such level of hostility and disrespect from any judge at any level of the judiciary.

suggested that the request for a "video-taped interview" was in reality an opportunity for a conversation where Judge Newman could point out the factual errors in the Committee's own documents.

On July 31, 2023, the Committee issued its Report and Recommendations. The Report mostly rehashed claims and statements made in prior orders, but also rejected evidence proffered by Judge Newman, including a statement from a qualified neurologist that Judge Newman's "cognitive function is sufficient to continue her participation in her court's proceedings," and a statistical analysis of Court members' productivity conducted by Dr. Ronald Katznelson. Ron D. Katznelson, Ph.D., *Is There a Campaign to Silence Dissent at the Federal Circuit?*, *available at* https://ssrn.com/abstract=4489143.[17]

The Committee publicly released the Report without awaiting Judge Newman's response or seeking Judge Newman's consent on August 4, 2023.[18]   On August 14, 2023, once Judge Newman's lead counsel ████████████████████ (of which the Committee was well aware), he submitted a request to the Committee for: a) release

---

[17] An updated version of the paper was published on August 28, 2023.

[18] This action stands in sharp contrast with the Committee's treatment of Judge Newman's own request to release her brief which was submitted on July 5, but which the Committee refused to release for a whole month, despite multiple requests to do so. *See* July 5 Brief at 1 n.1; July 12 Letter at 1 n.1; Hearing Tr. at 5:7-13. The Committee appears to believe that one set of rules applies to the Committee and another set to Judge Newman. This is yet further evidence of the Committee's bias when serving as accuser and adjudicator and its failure to adhere to basic norms of due process.

of data regarding Judge Newman's productivity going back to 2018, and b) permission to share the confidential and redacted data with a consulting expert who could verify and test the accuracy of the data on which the Committee relied.  On August 17, 2023, the Committee denied the request as "untimely, waived, and unjustified" and ultimately irrelevant to the question of Judge Newman's cooperation.  August 17 Order at 4-8. The Committee asserted that the record had "closed," August 17 Order at 6-8, but cited no authority for this odd proposition.  The Rules for Judicial Conduct and Judicial Disability Proceedings afford a subject judge an opportunity to "send a written response … [and] to present argument, personally or through counsel," R. 20(a), and nowhere do the rules limit subject judges to the "record" developed by the Committee.  Thus, yet again, and as has been the case throughout these proceedings, the Committee is cutting procedural corners and violating Judge Newman's due process rights.  The Committee's refusal to permit Judge Newman to put the misleading record it compiled in an appropriate and full light undermines whatever claims of reasonableness the Committee may have had (and, as explained below, it had none) for its demands.

## II.   At All Relevant Times the Special Committee Lacked Factual Predicates for Ordering Medical Examination[19]

### A.   The Factual Record at the Time of the First Order Requiring Medical Examination Did Not Support Such a Demand

Throughout its Report, the Committee mixed and matched facts and dates in a way that obscures the predetermined outcome at which the Committee (and the Judicial Council) arrived as early as April 7, 2023, if not a month earlier.  It is important to be clear as to what evidence was before the Committee, and at what time, in order to determine whether the Committee made even a *prima facie* case that Judge Newman needs to undergo a medical evaluation.

The first order requiring Judge Newman to submit to a medical evaluation was entered on April 7, 2023.  At the time, the only information before the Committee was: a) the record of Judge Newman's allegedly "extraordinary delays" and allegedly reduced productivity, b) allegations of a "heart attack," "cardiac stent," and a fainting spell, all of which allegedly resulted in Judge Newman's "sittings [being] reduced compared to her colleagues," and c) ill-defined "direct observations of Judge Newman's behavior," April 7 Order at 1, including by the members of the Committee.  None of these "facts,"

---

[19] Because the Committee conceded that "Judge Newman need not supply such records to the Committee itself but only to the neurologist whom the Committee has selected to conduct an evaluation of Judge Newman," May 16 Order at 6, the propriety of the order to produce the records rises and falls with the propriety of the order to submit to the neurological and neuropsychological examination.  Furthermore, it makes no sense to demand non-existent medical records for non-existent events and then deem someone non-cooperative for not providing them.

either alone or in combination, are even remotely adequate to justify a forced medical examination.

1. <u>The Statistical Data Do Not Support the Suspicion That Judge Newman Has Suffered Cognitive Decline</u>

Throughout its investigation the Committee has spent an inordinate amount of time delving into Judge Newman's alleged tardiness in opinion writing, voting, and the like. According to the Committee, *see, e.g.*, Report at 1, 5, these delays can serve as evidence of cognitive decline. But there are two fundamental problems with the data.

First, and most fundamentally, in order to show that the data indicates a *decline* in Judge Newman's cognitive abilities, one necessarily must show that there has been some change between the time when everyone agrees that Judge Newman was not disabled and the present day. If between that earlier point in time and present there is a marked slowdown in productivity as measured either in terms of number of the opinions or their speed, then it *might* raise questions as to why such a slowdown has occurred. In contrast, a snapshot in time without such a comparison tells us nothing about a "decline" in Judge Newman's mental acuity. At most (and only assuming that the data is properly analyzed), it tells us that Judge Newman is simply a slow writer. The Special Committee, whose members have degrees in disciplines like engineering and have engaged in advanced studies of mathematics, surely knows that this is the only correct way to analyze the data. Yet, the Committee merely chose to look at a snapshot

24

between 2020 and 2023 in order to determine whether further investigation is warranted.

The data that the Committee chose to rely on shows, according to the Committee, that Judge Newman is an outlier in terms of both the number of opinions published, and the speed at which she publishes them.  Aside from the fact that a snapshot-in-time does not and cannot show a *decline* in Judge Newman's ability, the data itself doesn't actually show what the Committee purports it shows.

First, the Court's own data, as stated in one of the provided affidavits, shows that between October 1, 2020 and September 30, 2021 (when there were no concerns about Judge Newman's abilities to discharge her duties), it took Judge Newman 249.11 days to publish an opinion.[20]  According to the same affidavit, between October 1, 2021 and March 24, 2023 (when concerns about Judge Newman's abilities began to be voiced), it took Judge Newman 198.75 days to publish an opinion.  That is an **over 25% increase** in speed during the time that Judge Newman allegedly became *less able* to fulfill the duties of her office.  This fact alone is sufficient to refute the allegations leveled against Judge Newman, and, given this fact, any demand for forced medical testing is perforce unreasonable.

---

[20] The affidavit does not seem to differentiate between majority and separate opinions, even though it is self-evident that a concurring or dissenting opinion, which by definition *responds* to the majority opinion, will take more time to prepare because one must first read the majority opinion.

The Committee rejects this conclusion by arguing that "[t]he obvious reason for the improvement after October 2021 is that [Judge Newman's] caseload was substantially reduced in this period." Report at 105. This, of course is far from *obvious*. As an initial matter, if the Committee is correct and Judge Newman's mental deterioration began sometime around the summer of 2021, *see, e.g.*, March 24 Order at 1, then one would expect that even with a reduced workload, the statistics would show that Judge Newman's productivity continued to deteriorate rather than improve. At the very least, given that in the Committee's account there were two opposing forces affecting Judge Newman's productivity (reduced sittings which should have permitted for faster opinion writing on the one hand, and alleged mental deterioration which ought to have exacerbated delays, on the other hand), there should not have been marked improvement in speed. Yet, the Committee simply pooh-poohs the 25% increase in the pace of opinion production without any statistical or other analysis. It falls into a trap that every first-year law student is taught to avoid—it just calls the conclusion "obvious," as if the adjective alone substitutes for legal or mathematical analysis.

In contrast, data analysis conducted by Dr. Ronald Katznelson and submitted to the Committee by Judge Newman shows that there has been no decrease in Judge Newman's speed between 2018-2020 (*i.e.*, a timeframe during which no one claims that

26

Judge Newman was disabled) and 2020-2022 (the period on which the Committee is focusing).[21]   Katznelson, *supra* at 57.

Second, the data relied on by the Committee simply do not differentiate between majority and dissenting opinions.  Even taken at face value, the data show that Judge Newman takes 146 days longer than other judges to issue opinions.  However, decisions that include "dissents have an average pendency that is 143 days longer than the average pendency of majority/unanimous opinions."  Katznelson at 19.  Given that Judge Newman dissents in over half her cases, *see id.* at 4, her delays are in large part explained by the need for the extra time it takes to issue a split decision.

The Committee argues data relied on by Dr. Katznelson does not present the full picture because it doesn't account for: a) the date the case was assigned to a given judge, and instead looks only at the time the briefing was complete; b) the instances of case-reassignments which are not publicly known; and c) *per curiam* opinions which do not have the name of the authoring judge released. Report at 56-58.  All three critiques are entirely devoid of merit.

---

[21] In fact, the average pendency of cases in which Judge Newman authored a majority opinion *decreased* in the latter time period from an average of 612.3 days (as measured from the filing of a case to the circulation of the publication of the opinion) to 534.4 days.  However, the decrease was not statistically significant.  The point nevertheless remains—Judge Newman's speed of writing has remained steady throughout, and therefore her "excessive delays" (even if they exist) cannot possibly serve as evidence of *deterioration* of her mental state.

27

With respect to the issue of the appropriate start date to calculate the pendency of the appeal, it should be fairly self-evident that unless Judge Newman gets assigned cases earlier than her colleagues (which is entirely implausible) then whether one begins counting at the time of docketing, the time the briefing is completed, or at any other time up until the dates of assignment to each individual judge, the variation in pendency ought to remain constant.[22]  What Dr. Katznelson's expert data analysis shows is that— contrary to the Special Committee's non-expert statistical analysis—Judge Newman is not an outlier.

With respect to case-reassignments, the Special Committee's claim is both baffling and outrageous.  The Committee lists three cases which were assigned to Judge Newman and then, after long periods of pendency reassigned to other judges: ███████████████████████████████████████████████████ and ███████ ███████████████████.  The Committee's misleading presentation of these cases leaves one with an impression that Judge Newman simply did not produce an opinion

---

[22] As Dr. Katznelson explains, "for Judge Newman to appear an outlier with longer net authorship time consistent with the data in Figure 3 [which shows her performance to be in the middle of the range of other active judges], the total [administrative] pre-assignment delays for cases later assigned to her should have been disproportionately and materially shorter than those for her colleagues.  There is no evidence that the procedures of the Federal Circuit could have resulted in specifically expediting the assignment of cases only to Judge Newman."  Katznelson, *supra* at 36.  Aware of this explanation, the Committee never answers this simple challenge and does not provide any statistical evidence to the contrary.  Nor does it explain how such putative evidence using the "the exact information" available to the Committee in any full statistical analysis of pendency for all active judges, would produce materially different results, somehow establishing Judge Newman's pendency performance as a statistically significant outlier.

in them, resulting in the cases being reassigned to another judge.  But that is simply false.  In both ██████████ and ██████, Judge Newman circulated a draft opinion, which was not joined by either of the other two judges on the panel.  The opinions were then reassigned because Judge Newman's views could not command a majority, and not because of excessive delays.  The same is true regarding two additional cases mentioned in the original March 24 Order—████████████████████████████████████, where Judge Newman ended up writing a separate opinion concurring in part and dissenting in part and ████████████████████████████, where Judge Newman ended up writing a dissent.  But the fact that Judge Newman's views may be idiosyncratic is not evidence of any mental or physical disability.  It is simply evidence of idiosyncratic views.  And such evidence cannot possibly be a basis for ordering a forced medical evaluation.

The Committee also misses the mark with its allegations that Judge Newman does not shoulder her share of the burden when it comes to *per curiam* opinions which, according to the Court's statistics constitute nearly a third of the Court's output.[23]  First, as Dr. Katznelson's analysis shows, panels on which Judge Newman served were *least likely* to issue *per curiam* opinions as compared to any other panel of the Court.

---

[23] The claim that 31.6% of the Court's opinions are *per curiam* seems to be at odds with the publicly available data.  According to the publicly available data, between 2016 and 2022, only 19% of decisions were issued *per curiam* and another 26% were summary affirmances without an opinion under Fed. Cir. R. 36.  *See* Katznelson, *supra* at 31.

Katznelson, *supra* at 27-28.  Because Judge Newman's *panels* are least likely to agree to a *per curiam* disposition, it follows that Judge Newman is likely to write fewer *per curiam* opinions than other judges.[24]  Furthermore, data show that panels on which Judge Newman served were *most likely* to resolve cases through a Rule 36 disposition than any other set of panels.[25]  Because a Rule 36 disposition results in no opinion at all, it is therefore not surprising that Judge Newman would have fewer opinions overall than other judges.

Finally, the Committee's allegations that Judge Newman has sat on fewer panels than her colleagues is particularly galling for at least two separate reasons.  First, the assertion in the March 24 Order that in the summer of 2021 (following an alleged "heart attack") Judge Newman's "sittings were reduced compared to her colleagues," is manifestly false.  To the contrary, Judge Newman sat on more panels than any of her colleagues save for two.  The Committee attempts to disregard this obvious contradiction between reality and its claims by pointing out that in the summer of 2021

---

[24] As Dr. Katznelson again explains, "[b]ecause authored dissenting opinions [generally] do not issue in cases that are *per curiam*, the higher the share of dissents among the judge's authored opinions, the fewer panel decisions in which the judge participates can be *per curiam* to begin with. Taken to the limit, a judge that dissents in all panels she serves cannot be the author of any [] *per curiam* opinion— a manifest constraint that has nothing to do with productivity."

[25] In some sense Rule 36 dispositions and non-controversial *per curiam* dispositions are "substitute goods."  As a result, it is not surprising that Judge Newman is least likely to be on panels disposing of cases via a *per curiam* opinion and most likely to be on panels utilizing the Rule 36 mechanism, whereas Judge Raymond Chen shows the same pattern in reverse.

arguments were held remotely and telephonically, Report at 53, but one is hard-pressed to understand the relevance of the *mode* of the session in which oral argument was held to the question of how many such sessions Judge Newman participated in. The Committee's allegation was and remains simply false, and therefore it cannot be relied on as a reason for forcing Judge Newman to undergo medical examination.[26]

Second, although Judge Newman's sittings were reduced beginning sometime in 2022, that reduction is attributable entirely to decisions by someone other than Judge Newman. For years, when judges of the Court were asked as to their availability to sit during the next available month, Judge Newman has sent an identical message which reads that she "is available to sit 2-3 days, or as needed."[27] The email is always sent to the Chief Judge's chambers who then "provides to the clerk's office a list of judges that are available for each day of an argument session." Fed. Cir. IOP 3.1.[28] That Judge Newman was not *assigned* to the number of panels which she indicated both willingness and desire to sit on, is an issue that must be rightly taken up with the Chief Judge rather

---

[26] The Report recasts the March 24 Order which dealt with "reduced sittings" into allegations of lower productivity. Aside from the fact that such a bait-and-switch manner of litigation is highly improper, the number of sittings that any given judge undertakes is controlled by the Chief Judge. *See* Report at 78-79.

[27] A version of such an email is reproduced as Exhibit 7 to the Committee's Report.

[28] In light of the clear language of Internal Operating Procedure 3.1, Chief Judge Moore's assertion that that any claim that the Chief Judge decides on panel assignment is "[c]ompletely false" and that "[t]he Chief Judge has no input whatsoever," Tr. of Hearing at 41:23-42:13, is simply baffling.

than with Judge Newman herself.  But the Chief Judge may not decline to assign Judge Newman to equal number of panels as other judges and then turn around and complain that Judge Newman has not served on the same number of panels as other judges.

Thus, the statistical data did not provide any basis for the Committee's April 7, 2023 Order.

### 2. Baseless Allegations Concerning Judge Newman's Health Issues Cannot Justify a Forced Medical Examination

The April 7 Order demanding that Judge Newman submit to unwanted medical examination also relied on false allegations about Judge Newman's health issues, including a "heart attack" that she allegedly suffered in the summer of 2021, which in turn allegedly necessitated the placement of cardiac stents, as well as an episode of fainting on May 3, 2022.  However, neurological and neuropsychiatric exams are not warranted merely because a person has suffered a myocardial infarction—the proper medical term for a "heart attack."  To be sure, a myocardial infarction *can* lead to neurological sequelae. *See, e.g.*, Moneera N. Haque and Robert S. Dieter, *Neurologic Complications of Myocardial Infarction*, 119 Handbook of Clinical Neurology 93 (2013).  But the mere fact of a prior myocardial infarction would not, in and of itself, form any basis to suspect neurological deficits.  In any event, as Judge Newman has represented to the Committee on numerous occasions, the allegations are *not* true.  Judge Newman did not have a "heart attack," did not have "cardiac stents," and did not faint on May 3, 2022.

At no point did the Committee even disclose what information led them to believe that Judge Newman suffered these events.[29]  There appear to be no factual bases for these allegations.  Absent such bases, the allegations cannot possibly serve as a reason to order further medical tests.  The Committee seeks to recast its early allegations of a "heart attack" and claims that it referred to a "'cardiac event' that Judge Newman had suffered in the summer of 2021."  Report at 82 (citing May 16 Order at 4-5).  There are several problems with this belated attempt to prop up a prior baseless allegation.

First, at the time of the April 7 Order, the Committee proceeded on the claim of a non-existent "heart attack" as a basis for ordering medical testing.  The question is whether the Committee had a reasonable basis to order such a test.  It did not.  If the predicates for such an order did not exist at the time, then it follows that the order itself was improper.  Second, the Committee did not establish that Judge Newman had a "cardiac event" (whatever that entirely unscientific and medically hollow term happens to mean) in 2021 or at any point thereafter.  In fact, as with the original allegation of a "heart attack," the Committee doesn't even disclose any bases for believing that such an event occurred.  Instead, the Committee appears to believe that the process contemplated by the Disciplinary Rules allows for baseless allegations to be made,

---

[29] The source of this information is also important in evaluating other information that that the Committee received subsequent to the April 7 Order.  If the source of the information could be so egregiously wrong about such an important fact, then any other information that such a source may have supplied about Judge Newman should be treated with particular suspicion as well.

which it turn trigger an obligation by the subject judge to prove a negative (or at the very least to disclose otherwise private medical information simply because a formal process has been launched). *See* Report at 82 (faulting Judge Newman for "refus[ing] to say whether she suffered any 'cardiac event'" in 2021 in response to the Committee's questions which themselves had no basis). Third, the term "cardiac event" is entirely devoid of meaning and can mean anything from a fatal ventricular fibrillation to transient myocardial ischemia caused by little more than a temporary coronary artery spasm or eating a heavy meal. *See, e.g.*, Nestor Lipovetzky, *Heavy Meals as a Trigger for a First Event of the Acute Coronary Syndrome: A Case-Crossover Study*, 12 Isr. Med. Ass'n J. 728 (2004), https://tinyurl.com/ycyzns2k. Requiring Judge Newman to disprove ill-defined, unfounded claims about her physical condition is improper.

To shore up its claim about Judge Newman's alleged "cardiac event," the Committee latches onto a statement in Dr. Ted Rothstein's report discussing Judge Newman's pacemaker and pre-existing "sick sinus syndrome." Report at 82. The Committee makes much of the fact that "syndrome can result in 'confusion' and 'dizziness or lightheadedness,'" and that it can "lead[] to other organ damage such as brain and kidney function." Report at 96 (internal citations omitted). But the Committee's reliance on this pre-existing condition is misplaced for two reasons.

34

First, the Committee doesn't seem to understand that sick sinus syndrome can lead to these outcomes *if untreated*.  Of course, many conditions, if untreated, can lead to neurological damage.  Indeed, a common malady such as "hypertension is a risk factor for cognitive impairment and dementia through multifactorial mechanisms including vascular compromise, cerebral small vessel disease, white matter disease (leukoaraiosis), cerebral microbleeds, cerebral atrophy, amyloid plaque deposition, and neurofibrillary tangles."  Devin Loewenstein and Mark Rabbat, *Neurological Complications of Systemic Hypertension*, 177 Handbook of Clinical Neurology 253 (2021).  Yet, no one would take seriously the suggestion that the mere fact that an Article III judge has hypertension is sufficient cause to obligate that judge to submit to forced neuropsychological testing.[30]  Judge Newman is successfully treating her sick sinus syndrome with a pacemaker, thus avoiding all of the consequences that could befall someone who has not so treated this disease.  Accordingly, the mere fact that the condition from which Judge Newman suffers *could, if untreated*, cause "confusion" or other neurological symptoms, is simply insufficient to establish that at any point in time this disease *did* cause Judge Newman to experience these symptoms.

---

[30] Indeed, given that hypertension is one of the most common conditions affecting Americans, odds are that a number of judges on the Federal Circuit have been diagnosed with hypertension, and have used medication or other interventions to control the disease.  The same thing is true about Judge Newman and her reliance on a pacemaker to treat her sick sinus syndrome.

Furthermore, Judge Newman was diagnosed with sick sinus syndrome and had the pacemaker installed *years ago*—long before any allegations of mental decline.[31]  Thus, this is not "a matter of parsing terminology rather than relevant substance."  Report at 82.  To the contrary, the Committee's allegations of a "heart attack" or for that matter any other "cardiac event" in *2021* are entirely unsubstantiated.    Absent such substantiation, they cannot be used as a basis for requiring Judge Newman to undergo unwanted medical testing.  It is, of course, not Judge Newman's burden to refute various unsubstantiated and baseless allegations.    Merely because the Committee asserted that Judge Newman had cardiac problems doesn't obligate Judge Newman to prove the Committee wrong.  It is the Committee (or the Chief Judge) that has the initial burden of production, not Judge Newman.  It failed to meet that burden.

Because no evidence (either as of April 7, 2023, or even today) suggests that Judge Newman's long-standing and well-managed sick sinus syndrome had any exacerbation or failure in management in 2021, the Committee's attempt to justify the March 24 and April 7 Orders by jerry-rigging the definitions and timings of a "heart attack" (or "cardiac condition") must fail.  And absent these allegations, the Committee

---

[31] It is for this reason that Judge Newman objected to a misleading redaction of the transcript of the July 13 Hearing.  Judge Newman does not have a new cardiac condition with an onset or deterioration date of 2021.  Rather, she has a long-standing but fully managed cardiac condition that has no impact on either her fitness for the bench or even her daily activities.

was left with nothing at all (save for its own personal, non-expert "observations") to justify requiring Judge Newman to submit to unwanted medical evaluations.

### 3. Personal "Observations" of Committee Members Do Not Provide Sufficient Basis to Order a Medical Examination

It is not disputed that none of the members of the Committee (or for that matter the Judicial Council) has any training or expertise with neurology, psychiatry, or geriatric medicine. Any "personal observations" by Judge Newman's colleagues (except perhaps in extreme circumstances) cannot serve as a basis for ordering unwanted medical examinations if for no other reason than the recognition that individuals lacking appropriate training are unable to differentiate normal but perhaps unusual behavior from abnormal behavior.

Second, the Committee doesn't even bother to say what those observations were, thus making it impossible to evaluate whether these "observations" would or should suggest to a reasonable observer that further investigation is warranted.

Third, the alleged "personal observations" stand in sharp contrast to what others have observed in the same timeframe. For example, Professor David Hricik of Mercer University School of Law wrote that on March 23-24, *i.e.*, the same month that Chief Judge Moore initiated the present complaint, he "saw Judge Newman (with Judge Lourie and former Judge O'Malley) speak at the USPTO …. Judge Newman was eloquent, coherent, cogent, and spoke passionately about various topics, including

section 101 (which requires a bit of mental agility, I would say)."  David Hricik, *An Opinion on Chief Judge Moore's Reported Unprecedented Effort to Remove Judge Newman*, Patently-O.com (April 14, 2023), https://tinyurl.com/2e8sfue8.[32]    Others, including law professors, former judges of this Court, and presently serving judges on other courts have reported much the same.  *See, e.g.*, Gene Quinn, *Chief Judge Moore Said to Be Petitioning to Oust Judge Newman from Federal Circuit*, IPWatchdog.com (April 12, 2023), https://tinyurl.com/2efyshuc ("Numerous staff and colleagues with knowledge of the complaint filed against Newman have contacted IPWatchdog to both confirm the filing of the complaint and to vehemently oppose the allegations being made about Judge Newman's competence.").

To put it simply, ill-defined, unsubstantiated "feelings" by non-expert observers which are in turn readily contradicted by others who are not nearly as enmeshed in the process cannot justify ordering an unwanted neurological examination.  Nor can these "feelings" be combined with other deficient bases in hopes that adding many zeros together will result in a number greater than zero.

In short, at the time the Committee made its first request for neurological and neuropsychological testing, it had no factual support to justify the request.  It follows

---

[32] The video of the remarks is available at https://tinyurl.com/3v8jn7sf.

that Judge Newman had "good cause" to resist the imposition of medical testing when no legitimate basis for such testing existed.

B. The Factual Record at the Time of the Second and Third Orders Requiring Medical Examination also Does Not Support the Orders Requiring Medical Examination

Admittedly, by the time the Committee issued its second (May 3, 2023) and third (May 16, 2023) orders, it was in possession of additional information beyond what has been described above. Nevertheless, at the end of the day these "new" orders suffer from the same basic problem—lack of reasonable basis to support the requirements therein—as did the original order.

Prior to delving into the specifics of these affidavits and depositions, two key points should be noted. First, the Committee's assertions that employees' accounts of events are "not challenged," August 17 Order at 8, is only "true" because Judge Newman was never given any opportunity to challenge them. There was never an opportunity to cross-examine affiants or for that matter present affidavits from other witnesses, including Judge Newman herself. Indeed, the June 1 Order specifically stated that the appropriate course of further actions "can be determined based upon the paper record established by the Committee's orders and Judge Newman's filed responses, along with any legal argument Judge Newman wishes to submit to justify her responses or otherwise establish 'good cause shown' for her actions. There are no percipient fact

39

witnesses to additional events that are relevant to the misconduct determination." June 1 Order at 4. Thus, the Committee itself foreclosed any avenue to "challenge" the employees' accounts, even though Judge Newman vigorously contests the mischaracterizations contained therein.[33] To now suggest that the evidence is "not challenged" is little more than a sleight of hand unworthy of Article III judges.

Second, the Committee appears not only to discount, but affirmatively hide the information that *would* contradict the accounts on which it relies. Thus, the interview of one of Judge Newman's law clerks, though it took place, is not documented anywhere. The only plausible inference from this must be that the information obtained through that interview did not fit with, but instead undermined the Committee's narrative. *See Tendler v. Jaffe*, 203 F.2d 14, 19 (D.C. Cir. 1953) ("[T]he omission by a party to produce relevant and important evidence of which he has knowledge, and which is peculiarly within his control, raises the presumption that if produced the evidence would be unfavorable to his cause."). But even absent the information that the Committee did not provide to Judge Newman and chose not to rely on—

---

[33] Additionally, and as explained in the July 5 Letter Brief, because "[m]ost of the testimony and information gathered by the Committee prior to and in the course of its investigation comes from employees of the Federal Circuit ... [whose] ability to continue working in normal conditions depends on their continued good relationship with Chief Judge Moore and other judges of the Court," there is no way to "be sure that the key evidence that is presented to [the Committee and Judicial Council] is in any way reliable, rather than tainted by the allegiances and personal concerns of employees-witnesses." July 5 Letter Brief at 7.

information that presumably is favorable to Judge Newman—the record compiled by the Committee remains woefully inadequate to require unwanted medical testing.

1.  The Subsequent Orders Are Irreparably Tainted by the Improper April 7 Order

Although by the time the Committee issued its subsequent orders it managed to gather more information (though it should be noted that Judge Newman has not had the opportunity to question any of the witnesses on whose affidavits the Committee has relied), this new information does not cleanse the prior improper order, so subsequent orders are merely an attempt to justify a decision made early on and never reconsidered.  In light of the decision that was made early on, and before investigation had even began, to remove (without so much as a notice to her) Judge Newman from the bench, and given that the April 7 Order was entirely devoid of any factual basis, the subsequent orders cannot be taken at face value and must instead be viewed through the prism of earlier improper decisions.  It is a well-settled principle of administrative law,[34] that subsequent data can't be used to justify prior decisions.  *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (setting aside Secretary's decision to add a citizenship question to the decennial census when evidence showed "that the Secretary

---

[34] It should be remembered that the Judicial Council is an *administrative* and not a judicial body.  *See Chandler v. Judicial Council*, 398 U.S. 74, 86 n. 7 (1970) ("We find nothing in the legislative history to suggest that the Judicial Council was intended to be anything other than an administrative body functioning in a very limited area in a narrow sense as a 'board of directors' for the circuit.").

began taking steps to reinstate a citizenship question about a week into his tenure, but it contain[ed] no hint that he was considering VRA enforcement [on which he subsequently relied] in connection with that project," and when "[t]he Secretary's Director of Policy … saw it as his task to 'find the best rationale'" to justify a decision already made.").

The orders of May 3 and May 16 cannot be viewed as new decisions made on the basis of newly available evidence.  As an initial matter, the orders themselves state that the Committee is not taking a new action but is merely "reissuing its orders regarding medical evaluation and testing and medical records and establishing new deadlines for compliance."  May 3 Order at 2.[35]  Next, the allegations of medical issues facing Judge Newman (whether a "heart attack" or a "cardiac condition" or fainting spell) did not become any more true or any better substantiated by May 16, 2023 than they were on March 24 or April 7, 2023.  Nor did the data regarding alleged delays become any more complete or reliable, since at no point (up to the present day) did the Committee inquire whether Judge Newman's speed of opinion writing in 2020-23 was in any way materially different than her speed prior to 2020 (*e.g.*, from 2018 to 2020).  Thus, all of the deficiencies (both procedural and substantive) of the April 7 Order

---

[35] The same Order also states that it is being issued not on the basis of any new evidence, but only "in the hope that Judge Newman will now cooperate with its investigation."  *Id.*

continued to be present in the two subsequent orders.  The additional affidavits from various Court staff on which the Committee chose to rely, do not save the May 3 and May 16 Orders from their patent inadequacies.

> 2. <u>The Deposition of Judge Newman's Career Law Clerk Is Devoid of Any Facts and Therefore Irrelevant</u>

In issuing its May 3 and May 16 Order, as well as in its Report, the Committee relied in large part on the deposition of Judge Newman's career clerk.  *See, e.g.*, May 3 Order at 6, May 16 Order at 3, Report at 5, 41.  In the deposition (which itself was conducted with violations of basic norms of due process),[36] the career clerk asserted her Fifth Amendment privilege against self-incrimination.  *Id.*  The Committee admits that it was unable to obtain *any* useful information from the deposition.  *See, e.g.*, May 16 Order at 3 (noting that the career clerk "refuse[d] to answer basic questions about her role and responsibilities in chambers.").  Having obtained no useful information from the deposition, the Committee, in a bizarre turnaround, insists that these assertions of privilege, which were made on advice of career clerk's own counsel, *see* Report at 41, are somehow indicative of *Judge Newman's* mental state.  *See, e.g.*, Report at 41 ("Further concerns, potentially extending to Judge Newman's case handling and

---

[36] The deposition is noteworthy for multiple threats directed at the career clerk by Chief Judge Moore to the point that it caused the career clerk's attorney to call attention to that fact and object to such behavior. *See, e.g.*, Deposition Tr. at 11:14-12:3.  It is precisely because of such threats (whether explicit or implicit) that the reports of other Court staff cannot be uncritically credited.

functioning more generally, were raised when the Committee sought information from Judge Newman's permanent clerk."). The assertion is self-evidently ludicrous.

As the Committee recognizes, Judge Newman's career clerk was represented by her own counsel and acted on advice of counsel. *See* Report at 41. Judge Newman had no input whatever into the career clerk's testimony and was never asked to direct her career clerk to answer questions in any particular way nor could she do so even if she wanted to because whether properly or improperly, the career clerk was asserting *her own* rather than Judge Newman's rights. Additionally, the Committee *expressly directed* the career clerk not to "talk about this proceeding with others going forward, [because to do so] would be an act of misconduct." Deposition Tr. 26:22-24. *See also id.* at 27:1-29:19. Since the career clerk was not even permitted to share the *fact* of her appearance before the Committee with Judge Newman or anyone else, it is hard to understand how Judge Newman could have affected her career clerk's decision not to provide information to the Committee, and it is equally hard to understand why the career clerk's decision can in any way be construed as raising concerns regarding "Judge Newman's case handling and functioning more generally." Report at 41.[37]

---

[37] If the Committee thought that the career clerk's assertions of privilege were baseless, it could have sought to compel her to testify. *See* 28 U.S.C. § 356(a); § 332(d)(2). Furthermore, even if Judge Newman could or wished to provide guidance to her career clerk as to how to deal with the Committee's questions, doing so would potentially raise a specter of improper interference with witnesses—something that Judge Newman has no interest in being accused of.

The April 12, 2023 deposition thus adds nothing to the shell of the record that the Committee had on April 7, 2023, so it does not provide any additional support for the requirement that Judge Newman undergo medical testing.

### 3. Affidavits of Judge Newman's Former Chambers Staff Do Not Provide Any Support for the Committee's Demands

The Committee also relies on two affidavits provided by Judge Newman's former staff members to justify its requirement that Judge Newman submit to medical testing.  Neither of the affidavits can actually support the Committee's action.

One of the affidavits is provided by Judge Newman's former law clerk. However, it is entirely devoid of any information that could even remotely shed light on Judge Newman's mental or physical health.  Instead, the affidavit suggests that it was the *law clerk* who had experienced mental and physical health problems as a result of the various pressures brought about by the investigation.  *See* Law Clerk Affidavit at ¶ 14 (stating that in light of the ongoing investigation he "informed Judge Newman that working in her chambers was hurting [his] ability to complete my work, taking a toll on [his] mental health, and harming [his] relationships at the court."), *id.* ¶ 16 ("I also reiterated that I would still feel uncomfortable given my proximity and potential exposure to matters concerning the investigation.").

It is, of course, not surprising that a young attorney, just at the beginning of his career, and without protections afforded by Article III would "feel uncomfortable" if

45

he were involved in any way in a sensitive investigation of almost any type.  It is also not surprising that such an involvement would "tak[e] a toll on [his] mental health." And these outcomes are even more likely when the person conducting the investigation (here, Chief Judge Moore) has taken a threatening and accusatory tone with anyone who has not provided information that would bolster the Chief Judge's case.  *See ante* n.36 (citing Deposition Tr. at 11:14-12:3).  But these effects on Judge Newman's law clerk are not a result of Judge Newman's actions, but rather the result of an unpleasant situation (created by Chief Judge Moore) that the law clerk involuntarily found himself enmeshed in.

The Committee also cites two other issues mentioned in this affidavit.  First, it notes that the law clerk alleged that "Judge Newman disclosed to [him] and other members of chambers that ███████████ had ████████████████████████." Law Clerk Affidavit at ¶ 2.  Second, the law clerk alleged that because Judge Newman's paralegal "informed the Chief Judge" of this event, *id.*, Judge Newman stated that the paralegal "could not be trusted." *Id.* at ¶ 4.  From this the Committee draws an inference regarding Judge Newman's mental state.  The inferences are odd to say the least.  First off, Judge Newman is under no legal obligation to refrain from disclosing ██████ ████████ about ██████████ to anyone else.  She is not her ███████████ provider, it is not a matter of internal judicial deliberations, or the like.  True enough, it may make good sense not to speak of such matters, but there is no requirement to avoid

46

doing so.  What is much more inappropriate is for a member of the chambers staff to report these perfectly legal (even if in someone's view, inadvisable) conversations to anyone outside the chambers, including the Chief Judge.  And when the intra-chambers confidentiality is breached, it makes perfect sense for the judge to lose trust in the person breaching confidentiality.  Second, whether someone does or does not "trust" another person simply does not turn on any legal issue or one's mental state.  "Trust" is little more than a "gut feeling" and a judge, like any person, is permitted to lose trust in her staff, attorneys, colleagues, treating physicians, or anyone else.  Absent clinical paranoia or similar problems, loss of "trust" is simply not evidence of anything at all beyond the fact that the two people will have a difficult time working together.

The affidavit of Judge Newman's former paralegal is equally devoid of any information that would justify the Committee's orders.  Judge Newman's paralegal spends significant time complaining about after-hours phone calls from other chambers staff, and the Committee treats this allegation (which is vigorously disputed) as evidence of Judge Newman's inability to manage her own chambers.  *See, e.g.*, Report at 40.  However, what the Committee terms "inability to manage staff in her chambers" is, in reality, Judge Newman's choice as to how to run her chambers.[38]  It is entirely Judge

---

[38] The Federal Circuit's own Employment Dispute Resolution Plan, which the Committee repeatedly cites, *see, e.g.*, Report 39-40, only prohibits "*wrongful*" conduct such as "discrimination; sexual, racial, and other discriminatory harassment; abusive conduct; and retaliation."  *See Employment Dispute Resolution Plan for the United States Court of Appeals for the Federal Circuit*, ¶ II.A, https://tinyurl.com/8b7nahps (emphasis added).  There are no allegations that either Judge Newman

Newman's prerogative to determine when to work and when to expect assistance of her chambers staff.  As members of the Committee and Judicial Council know full well, it is the judge's staff that must adjust their schedule to that kept by the judge, and not the other way around.  Leaving aside obvious red lines such as criminal activity or sexual harassment, Judge Newman (like the Chief Judge) is free to run her chambers as she sees fit.  The fact that Judge Newman's paralegal found the arrangement not to his liking is no one's problem but his own.  Like any American when faced with working conditions that are legal but disliked by the employee, he had a choice to quit—a choice by the way, that Judge Newman offered to him.  The Chief Judge's interference in Judge Newman's chambers operations is unprecedented and nothing short of outrageous.

---

or any of her staff discriminated, harassed, or abused her paralegal.  The only complaint is that the schedule within the Judge's chambers was not keyed to a 9-5 workday.  Keeping odd work hours, and even requiring one's staff to adhere to those hours, is not "wrongful," nor is it "abusive."  The EDR plan explicitly excludes from its definition of "abuse" "duty assignments and changes to duty assignments[, and] office organization."  *Id.* ¶ II.D.

Because Judge Newman's paralegal did not complain about any activities covered by the EDR plan, it necessarily follows that he was not retaliated against for his protected disclosures.  *See id.* ¶ II.E ("Retaliation is a materially adverse action taken against an Employee for reporting *wrongful* conduct….") (emphasis added).  It also follows that there was no call to provide him with any alternative work arrangements.  Indeed, the Federal Circuit's EDR plan permits an employee to ask for and the Chief Judge to grant "an alternative work arrangement" only if an "Employee alleges *egregious conduct* by a supervisor, Unit Executive, or Judge that makes it untenable to continue working for that person."  *Id.* ¶ IV.B.4 (emphasis added).  Even assuming, *arguendo*, that Judge Newman's failure to put a stop to late night phone calls was "wrongful" within the meaning of the EDR plan, or to stop trusting an employee who disclosed intra-chambers communications, it certainly is not "egregious conduct" that would permit the Chief Judge to provide Judge Newman's former paralegal with "an alternative work arrangement," over Judge Newman's objections.  That the Chief Judge did so is yet another instance of cutting procedural corners.  In turn, Judge Newman's refusal to accept the arrangement that was imposed on her in violation of the strictures provided by the EDR plan, and require that her staff member either report for duty in chambers or resign, was entirely appropriate.

48

The later attempt to use the difference of opinion as to the best way to operate one's chambers as basis for an unwanted mental health exam is doubly so—especially when the problems were at least partly caused by that interference.

In his affidavit, Judge Newman's former paralegal made a number of other allegations regarding Judge Newman's ability to remember things and organizational capabilities. Suffice it to say that these allegations are not only vigorously disputed, but are supported by *no one else* in Judge Newman's chambers—not even the aforementioned law clerk who resigned from Judge Newman's staff during the course of the investigation. It is worth noting, that the former paralegal's replacement is a person who had previously worked with Judge Newman for years and thus would be in a good position to testify about any changes that may or may not have occurred in Judge Newman's behavior, memory, cognition, and the like. The fact that the new/returning judicial assistant has in no way confirmed the story weaved by Judge Newman's former paralegal speaks volumes. The fact that the Committee has chosen not to seek this information betrays the simple fact that the Committee made its decision regarding the medical examination on April 7, and it has spent subsequent weeks looking for any justification to shore up its predetermined conclusion.

It should also not go unsaid that, as the committee acknowledges, Judge Newman's former paralegal "successfully sought employment at the Court outside

Judge Newman's chambers." Report at 43. Of course, the success or failure of this search depended (in large part) on the Chief Judge. This fact alone counsels caution in taking the affidavit of Judge Newman's former paralegal at face value—not because he committed perjury or the Chief Judge suborned such, as no one is making that allegation—but because it was in his interest to present facts in such a light as to align them with what he may have perceived the Chief Judge to want.[39]

### 4. Affidavits of Other Court Employees Do Not Show that the Request for Medical Testing Is Reasonably Necessary

The Committee attempts to justify its request for medical testing by referencing several affidavits which recount various staff having had difficulties in dealing with Judge Newman. As with other affidavits relied on by the Committee, there was no opportunity to test the strength or veracity of these allegations, even though there is every reason to doubt them.

As Judge Newman has explained in her previous submission, the testimony and information gathered by the Committee prior to and in the course of its investigation comes from employees of the Federal Circuit. These individuals' ability to continue working in normal conditions depends on their continued good relationship with Chief Judge Moore and other judges of the Court. For example, it is hard to imagine that the

---

[39] Again, this doesn't mean that the Chief Judge *actually* wanted facts to be presented in a particular way. But it is not an unreasonable concern that Judge Newman's former paralegal may have *thought* that she did and that he needed to act in such a way as to remain in the Chief Judge's good graces.

Clerk of the Court, even if he could not be easily fired, could long continue with his duties were the judges of the Court to lose complete confidence in him.  Again, we do not suggest that Chief Judge Moore or other members of the Judicial Council explicitly exerted pressure on any of the witnesses to provide false or misleading testimony.  However, it is entirely possible, indeed (given what is known about human psychology) likely, that witnesses may have structured and shaded their testimony to more perfectly align with what they may have perceived their superiors wanted to hear.  *See, e.g.*, *Dellums v. Powell*, 660 F.2d 802, 808 (D.C. Cir. 1981) ("In contrast to a witness at trial, a police officer making out-of-court statements is not subject to the rigors of cross-examination or the threat of a perjury conviction.  Unlike a judge, a police officer is not insulated from the political process or from pressures to please superiors."); *cf. Chicago & R.I.R. Co. v. Still*, 19 Ill. 499, 507-08 (1858) (a neutral trier of fact must be able "to judge of the effect that bias or prejudice, a fear of losing employment, a desire to avoid censure, a fear of offending or a desire to please employers, or any other circumstances in testimony, operating, in the opinion of the jury, to warp the judgment and pervert the truth, has upon the human mind…").  Thus, one simply cannot be confident that the key evidence that is presented to them is in any way reliable, rather than tainted by the allegiances and personal concerns of employees-witnesses.

The Committee rejects these concerns as "insubstantial."  Report at 75.  As an initial matter, Judge Newman need not show that the affidavits were *actually* tainted;

51

rather the test is whether there is a significant possibility that "bias or prejudice, a fear of losing employment, a desire to avoid censure, a fear of offending or a desire to please employers, or any other circumstances in testimony, operating … to warp the judgment and pervert the truth" exists.  *Still*, 19 Ill. at 507-08.  Second, while dismissing Judge Newman's concerns as "insubstantial," the Committee simultaneously argues that the proximity of the witnesses to the Chief Judge and the Committee members is what allowed these complaints to be brought forward in the first place.  *Id.* at 87-89.  It is hard to square those two assertions with one another.  Either proximity to the Chief Judge does have an effect on one's testimony or it doesn't.  Finally, given the incredible difference in treatment between Judge Newman's career clerk who did not provide evidence which would have supported the Committee's agenda and of Judge Newman's former paralegal (*i.e.*, the career clerk was threatened with career-ending consequences, whereas the paralegal was given, on an expedited basis, a new and desirable job at the Court), the message to the rest of the staff could not have been clearer—the Committee appreciates and wishes to receive only specific type of information.

Leaving these concerns aside, the affidavits, even if taken at face value, simply do not suggest that Judge Newman is suffering from any mental decline.  At most (and even if taken at face value) they show that Judge Newman may have difficulty adjusting to new technology—a phenomenon entirely unexceptional when older, though fully competent individuals, are asked to adopt new technology, and that she was

extraordinarily frustrated, *as anyone would be*, when the Chief Judge and this Committee launched an entirely unjustified attack on her competence and position as a duly appointed Article III judge.

It bears repeating that the events that the Committee cites as evidence of Judge Newman's inability to comprehend certain matters occurred in the midst of this investigation, during which the Committee has treated Judge Newman in the most appalling manner.  It is not surprising and not evidence of any mental problems that Judge Newman may have reacted with more anger, frustration, irritation, or annoyance. But this is an *entirely appropriate* affect in the face of deeply personal, hurtful, and baseless accusations by the very people that Judge Newman has for decades considered to be trusted friends and colleagues.  *See, e.g.*, Michael Shapiro, *Doctor Who Examined 96-Year-Old Judge Slams Suspension, Report*, BloombergLaw.com (Aug. 8, 2023) (quoting Dr. Ted Rothstein's view that Judge Newman's behavior is explained by the fact that she "is very anxious and concerned about the way she's been treated [because she believes that] she's been mistreated by the powers that might be.").  The Committee may believe that Judge Newman has overreacted or treated some staff more harshly than was necessary.[40]  Whether or not that is so, these incidents occurring in the middle of the

---

[40] At the same time, even assuming that Judge Newman has proven to be a difficult person to work with, and assuming that her behavior has caused "emotional stress and discomfort, including loss of sleep and heightened anxiety," as described in one of the affidavits, that doesn't even approach probable cause to believe that Judge Newman is mentally or physically disabled.

Committee's unjustified actions which have taken an enormous toll on Judge Newman do not provide any evidence of an alleged mental decline that supposedly began around the summer of 2021, *i.e.*, *years* prior to the events complained of.   Because Judge Newman's response to the events was, from the psychological perspective, entirely appropriate, there is no reason to suspect any mental health problems or to require psychological testing. [41]

In an utterly bizarre statement, the Committee also attempts to use the submission of Judge Newman's counsel which responded to the various allegations by Court staff as further evidence "that there are reasonable grounds to have concerns about her cognitive state."   Report at 106 ("In the Committee's view, the fact that Judge Newman would make such an argument [that concerns raised by staff are little more than "petty grievances"] only confirms that there are reasonable grounds to have concerns about her cognitive state.").   Although it is well settled that "each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney, *Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962) (internal quotations omitted), the rule does not go so far as to suggest that attorney's choice of argument is indicative of a client's mental state.   Making this

---

[41] To the extent that in her interaction with any Court staff Judge Newman may have, during these extraordinarily stressful times, overstepped some bounds, she is more than willing to meet with any staff, apologize where apology is needed, and work to smooth over any problems that may have arisen.

jump shows that the Committee will twist available facts into a predetermined conclusion.

### C. ANY RESIDUAL QUESTIONS WERE RESOLVED BY DR. ROTHSTEIN'S EXAMINATION

Assuming, *arguendo* and *dubitante*, that the Committee did at one point in time have legitimate reasons to request that Judge Newman undergo a neurological and neuropsychological examination, these reasons should have dissipated following Judge Newman's evaluation by Dr. Ted Rothstein—a full Professor of Neurology at the George Washington Medical Center, author of dozens of publications, and an expert in dementia.[42]  *See* Attachment A, Declaration of Ted L. Rothstein, M.D.

Following the examination, which revealed no significant cognitive deficits, Dr. Rothstein concluded that Judge Newman's "cognitive function is sufficient to continue her participation in her court's proceedings."  The Committee refused to give Dr. Rothstein's report any weight.  Report at 98, 104.  In doing so, the Committee, composed of individuals with no medical or psychological training whatever,

---

[42] It is true that at the July 13 hearing, the Committee was told that "the Committee could choose to credit or not credit as it wishes."  Report at 98 (quoting Hearing Tr. at 26:15-18).  Of course, that is always true.  No one can *force* the Committee to credit a particular piece of evidence.  And at that point in the proceedings, because the hearing, at the Committee's direction, was meant to focus on Judge Newman's cooperation, rather than the presence of the disability, Dr. Rothstein's report was indeed a "background" matter.  *Id.*  The Committee's rejection of Dr. Rothstein's report, however, is not based on any contrary medical evidence, but solely on the Committee's own, non-expert and erroneous understanding of Dr. Rothstein's examination and conclusions.

juxtaposed its own Google search with Dr. Rothstein's decades of experience. *Id.* at 99-103. The Committee also blatantly mischaracterized Dr. Rothstein's findings claiming that Judge Newman "failed 80% of the memory questions on the test." As Dr. Rothstein explained this claim is "a distortion" and he objected to the "very inappropriate the way in which [his] opinion was altered to say something [he] didn't say." Shapiro, BloombergLaw.com, *supra*; *see also* Attachment A.

If the Committee were interested in actually assuring itself that Judge Newman is perfectly competent and able to continue in her duties, it could easily have held a hearing under Rule 14, and heard from Dr. Rothstein live. It could have questioned him about the thoroughness of his examination. But the Committee declined to hold any such hearing. *See, e.g.*, June 1 Order at 4-5. Instead, the Committee engaged in guesswork (and guessed wrong) as to the thoroughness of Dr. Rothstein's examination. The Judicial Council should not make the same mistake, and to help it avoid making the same error, Judge Newman is providing an affidavit from Dr. Rothstein that explains his qualifications and his examination of Judge Newman in greater detail. *See* Attachment A.

In light of this *expert* opinion on one hand, and non-expert complaints (however laden they may be with scientific-sounding terms), only one rational conclusion exists— there is no reasonable basis to suspect any mental or physical disability on Judge

Newman's part, much less reason sufficient to require her to submit to unwanted medical examinations.

### D.  DR. CARNEY'S REPORT FURTHER CONFIRMS THAT JUDGE NEWMAN DOES NOT SUFFER FROM ANY MENTAL DISABILITY

Though Judge Newman does not believe that additional testing is necessary or indicated, in the interest of laying to rest any remaining concerns regarding her abilities to continue in her position, she submitted to an expert evaluation by a forensic psychiatrist—a specialist with a particular expertise of evaluating individuals' "fitness for duty."[43]

Dr. Carney, after having been provided with all of the prior Committee orders along with supporting affidavits, Judge Newman's medical records, description of a position and duties of a federal appellate judge, conducted a full-blown, hours-long examination of Judge Newman.[44]   The examination included both qualitative and quantitative components.   According to Dr. Carney, Judge Newman "is a fluent,

---

[43] Fitness for duty evaluations are traditionally done by psychiatrists.  *See, e.g., Ramirez v. Dep't of Homeland Sec.,* 975 F.3d 1342, 1356-57 (Fed. Cir. 2020) (describing mental health component of the fitness for duty examinations conducted by psychiatrists).  Yet the Committee, without explaining its reasoning, directed Judge Newman to be examined by a neuropsychologist who is not a physician.

[44] Judge Newman's willingness to undergo this examination, even though there is no evidence of deterioration in the quality of her opinions, or any decrease in the speed of their production, and even though a previous examination already found her to be fully able to continue with her duties, indicates that she is entirely willing to cooperate with a proper process, and that she is not afraid of having her mental acuity tested.  This stands in sharp contrast with the position taken by the Committee, which appears to be concerned that if it were to transfer this matter to the judicial council of another circuit, its work might not stand up to independent scrutiny.

engaging, strong-willed, highly accomplished and unusually cognitively intact 96-year-old woman with chronic medical issues that appear well-controlled at the current time, with no evidence of current substantial medical, psychiatric, or cognitive disability." Regina M. Carney, M.D., *Report of Independent Medical Examination of Pauline Newman*, Attachment B at 5.  Dr. Carney specifically opined that "Judge Newman demonstrated no substantial emotional, medical, or psychiatric disability that would interfere with continuation of her longstanding duties as a Judge in the U.S. Court of Appeals."  *Id.*  Dr. Carney's opinion was based on "three-hour clinical evaluation of Judge Newman performed by me on August 25, 2023, including administration of The Modified Mini-Mental State Examination (3-MS)," *id.* at 1, on which Judge Newman scored 98 out of a possible 100 points, *id.* at 5.[45]

In light of the considered opinions of now *two* independent expert practitioners, both of whom have found that Judge Newman is fully competent and entirely capable of continuing in office, the Committee, even if it ever had a legitimate basis to question Judge Newman's competence, has no further basis for requiring additional testing or continuing to question Judge Newman's abilities.  Absent such bases, and in the face of

---

[45] The original 3-MS test score sheet and the Clinical Dementia Rating worksheet are attached to Dr. Carney's report as Exhibit 1.

evidence of Judge Newman's full competency, these proceedings should be brought to a close and Judge Newman restored to the bench.

## III.   THE COMMITTEE HAD NO BASIS TO REQUEST A VIDEO-TAPED INTERVIEW WITH JUDGE NEWMAN

In its April 17 Order the Committee "request[ed] that Judge Newman sit down with the Committee for a video-taped interview." April 17 Order at 2.[46] No explanation or justification was given for this request (which was made weeks prior to any of the events described in various affidavits which the Committee relied on at later points in time). Nor was the subject matter or the scope of the interview defined in any way. Much like the April 7 Order to submit to an unwanted medical examination, this early order was apparently based solely on evidence of Judge Newman's alleged delays, "personal observations," and baseless claims of prior "heart attack" and a fainting spell. This brief has already discussed why these "facts" are insufficient to make *any* demands of Judge Newman. *See ante* II.A. The April 17 unexplained request for a video-taped interview of indefinite scope, covering unspecified topics, and having no identified purpose lacked any reasonable basis.

---

[46] NCLA began to represent Judge Newman only days earlier and had not yet made an appearance. The Committee knew that Judge Newman was not yet represented before the Committee, yet it imposed a four-day deadline to respond to its ill-defined request. It should be noted that Judge Newman did respond by April 21, though after the 9:00 am deadline established by the Committee. *See* April 21 Letter (hand delivered to the Court). Yet, the Committee could not resist claiming that "Judge Newman failed to respond." *See* May 3 Order at 3.

The request for the interview was omitted from the May 3 Order, *see* May 3 Order at 13-14; but renewed two weeks later in the May 16 Order, *see* May 16 Order at 23-24, 25. But the May 16 Order was equally short on specifics. Once again, no topics of the interview were specified and no scope of the interview was defined. Furthermore, it was and remains unclear what possible new information the Committee could garner from such an interview. As an initial matter, all three members of the Committee had previously met with Judge Newman right before launching this investigation. *See* March 24 Order at 2. The Committee members thus had ample opportunity to speak with Judge Newman, albeit not on camera. It is hard to understand what additional information the Committee members could have gathered from an interview and what purpose, other than the ratcheting up of antagonism which the Committee has displayed toward Judge Newman (and some of her staff and counsel), it would achieve.

Indeed, the Committee itself (incorrectly, *see post*) argued that a transfer of this matter to another circuit's judicial council is not warranted because of "the relative ignorance of judges in another circuit of local circumstances and personalities" putting those judges "in a poor position to persuade a judge whom they do not know well to take the action they believe is necessary."[47]   May 3 Order at 10 (internal quotations

---

[47] Of course, it does not appear that the local judges' familiarity with local personalities has been of any help in resolving the present dispute and persuading Judge Newman to do what the Committee members believe is necessary. To the contrary, the closeness of everyone to the dispute has appeared to only harden everyone's positions.

omitted).  The obvious implication is that the judges of the Federal Circuit are not ignorant of Judge Newman's "circumstances and personalit[y]" and that Judge Newman is "a judge whom [other Federal Circuit judges (including the members of the Committee)] do [] know well."  Given this professed knowledge, there is no legitimate need for further interviews especially when the process has, at the hands of the Committee, become so hostile.[48]

## IV.    THROUGHOUT THE PROCEEDINGS, JUDGE NEWMAN HAS OFFERED TO COOPERATE

Even assuming, contrary to evidence, that the Committee did have reasonable bases to request that Judge Newman submit to the requested medical examination, thus requiring Judge Newman to "cooperate," *see* Rule 4(a)(5), Judge Newman has discharged this duty by offering, on several occasions, to reach mutually acceptable solutions that would address the Committee's concerns regarding her alleged potential disability.  After all, *that* is an issue that has to be resolved—is Judge Newman mentally and physically able to continue in office to which she was nominated, confirmed, and duly appointed, and in which she has served with distinction for almost 40 years or isn't she?  In order to resolve that one and only question before the Committee, Judge Newman stated that she was willing

---

[48] Even in its Report, the Committee doesn't actually explain why an interview is "required."  It merely claims that it's "advisable."  Report at 2.  However, the Committee has never explained, even in a cursory fashion *why* the interview is "advisable."

to undergo necessary testing, provide necessary records, and meet with a Special Committee provided that she is immediately restored to her rights and duties as a judge and further provided that this matter is promptly transferred to a judicial council of another circuit, which is unmarred by the prior unlawful decisions and which is willing to "work[] or operat[e] *together*" with Judge Newman, including on selecting medical providers and setting the appropriate parameters of any examination.

May 25 Letter at 3 (emphasis in original).  Prior to that offer, Judge Newman wrote that she "will not fail to cooperate with *any* investigation that is conducted consistent with the limits that the Constitution, the Judicial Disability Act of 1980 ["Disability Act"], and the Rules for Judicial Conduct and Judicial Disability Proceedings ["Conduct Rules"] place on such investigations." April 21 Letter at 2 (emphasis added).  Of course, proceeding consistent with the Judicial Disability Act, and the Constitution, would require restoring Judge Newman to the bench for the pendency of any investigation. Inexplicably, the Special Committee has preferred to violate the law just to keep Judge Newman from sitting on panels rather than conduct a lawful investigation while she remains on the bench.

Judge Newman has consistently offered, and indeed implored, the Committee (and the Judicial Council) to work in a cooperative, collegial, and collaborative way to resolve any doubts about her competency.  From offering to submit to any medical testing if the matter were transferred to another circuit's judicial council, to offering to work with the Committee to mutually agree on providers who would conduct the

testing, *see* April 21 Letter at 2, May 9 Letter at 4-5, May 25 Letter at 3, Judge Newman has sought avenues to resolve this matter in a way that vitiates any concerns about her health (however unfounded those concerns may be), while respecting her due process rights and the overall constitutional structure of the judiciary.

In fact, the reasonableness of Judge Newman's proposal receives significant support from the Committee's and the Judicial Council's own orders. The Committee's May 3 Order denied Judge Newman's request for a transfer, but did so "without prejudice to refiling after Judge Newman has complied with the Committee's orders concerning medical evaluation and testing and medical records." May 3 Order at 10 n.1. That same day, the Judicial Council issued a parallel order to the same effect. May 3 Order of Judicial Council. However, neither the Committee nor the Judicial Council explained how Judge Newman's medical examinations and records could have any relevance to a decision on transferring this investigation. And in fact, nothing about the medical testing or records is relevant to the question of which judicial forum should resolve this matter. So, if it is reasonable for Judge Newman to request a transfer *after* she submits to medical testing, then it is equally reasonable for her to request a transfer *before* she submits to that testing. Accordingly, the Committee's and Judicial Council's *own orders* confirm that Judge Newman's proposals to condition her medical testing on a transfer were entirely reasonable.

63

The Committee, however, appears to believe that "cooperation" means unquestioned submission and obeisance to its demands. *See* Report at 92-93 (asserting that "cooperation" means acting "in compliance" and "doing what someone asks you to do"); *id.* at 93 ("[N]othing in the Rules requires the Committee to negotiate with Judge Newman to reach a compromise solution on every investigative request the Committee makes. To the contrary, Rule 13 unequivocally states that '[a] Special Committee should determine the appropriate extent and methods of its investigation.'"). Of course the Committee did not attempt to reach *any* compromise on *any* investigative request. Rather, and as discussed above, the Committee made up its mind both on the mode of investigation and the likely outcome thereof early, and from that point on, it used the available information in a way to fit those predetermined conclusions. This, together with the fact that throughout the process the Committee (and the Judicial Council) have been cutting procedural corners, changing rationales to justify its prior actions, and plainly exhibiting barely disguised hostility to Judge Newman, some of her chamber staff, and her counsel, are sufficient reasons to at the very least pause before blindly accepting the Committee's demands. Judge Newman accordingly rejects the proposition that the only way for her to discharge her duties under Rule 4 is to unquestionably comply with any and all of the Committee's demands no matter the factual or legal concerns raised by such mandates. That having been said, Judge Newman always was, and still remains willing to "work together" to bring this

64

matter to a speedy resolution.  Multiple avenues remain open to the Judicial Council to do so.  For example, the Judicial Council can accept the results of Dr. Katznelson's statistical analysis that shows that Judge Newman's performance and speed of opinion writing from 2020 on is no different than her performance from 2018 to 2020.  If the Judicial Council were to accept this basic fact (a fact that the Committee for reasons unknown chose not to even investigate), it would have to conclude that no factual predicate for the investigation ever existed in the first place.  The Judicial Council can also choose to credit *two* independent examinations conducted by qualified experts both of which attest to Judge Newman's continued mental and physical vigor.  Or the Judicial Council can choose to request, under Rule 26, that the Chief Justice transfer the matter to a judicial council of another circuit.  All of these are plausible *cooperative* ways to resolve the dispute.  What the Committee and the Judicial Council cannot do is insist that the only appropriate response from Judge Newman to a demand that she "jump" is to ask "how high."

These offers of cooperation, *even assuming* their insufficiency, make proceedings under Rule 4(a) wholly improper to begin with, because they show that it has always been in the power of the Committee to ensure that Judge Newman underwent appropriate medical examinations.  All the Special Committee had to do was transfer this matter to another circuit and permit Judge Newman to hear new cases until that circuit makes its decision about her future.  The availability of this option to the

65

Committee is key because the governing "[r]ules contemplate that judicial councils will not consider commencing proceedings under Rule 4(a)(5) except as necessary *after other means to acquire the information ... have been tried or have proven futile*." Rule 4(a)(5), cmt. (emphasis added). Those other means are readily available to this tribunal, and have been for quite some time. The Committee has simply chosen not to avail itself of them in order to keep Judge Newman from returning to the bench. Consequently, the Committee did not even meet the threshold for launching proceedings under Rule 4(a)(5), much less for imposing any sanction on Judge Newman. Because the tribunal has chosen not walk through this open door, Rule 4(a)(5) prohibits it from concluding that Judge Newman failed to cooperate.

## V. JUDGE NEWMAN HAD "GOOD CAUSE" NOT TO COOPERATE BECAUSE THIS PROCEEDING VIOLATES HER RIGHT TO DUE PROCESS OF LAW

Rule 4(a)(5) expressly authorizes a judge to refuse to cooperate with an investigation if she has "good cause" for her refusal. Here, good cause exists because this proceeding violates Judge Newman's Fifth Amendment right to due process of law. Contrary to the Committee's protestations, this proceeding is being conducted by judges who have multiple conflicts of interest, and not surprisingly in light of those conflicts, it has been marked by judicial acts that are fundamentally unfair. In several important respects, this proceeding has denied Judge Newman basic procedural protections.

The Commentary to Rule 4 states that "it is not possible to … anticipate all circumstances that might … constitute good cause," but it is established that an improperly constituted tribunal is a sufficient "good cause" for resisting that tribunal's demands.  *See, e.g.*, *Axon Enter. v. FTC*, 598 U.S. 175 (2023).  As the Supreme Court explained just a few months ago in *Axon*, the harm of "being subjected" to "unconstitutional agency authority" is a "a here-and-now injury."  *Id.* at 191 (quoting *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2196 (2020)).

Judge Newman is suffering just such an injury, because she is being forced to defend herself in a proceeding that is biased and unfair.  It is axiomatic that due process requires, at a minimum, a "neutral decisionmaker."  *See Hamdi v. Rumsfeld*, 542 U.S. 507, 509 (2004).  This requirement is so fundamental it applies even to enemy combatants.  *Id.*  (And in all forums including, for example, administrative agencies.  *Withrow v. Larkin*, 421 U.S. 35, 46 (1975).)  *A fortiori*, it applies to a disability proceeding for an Article III judge.  The investigation also violates the statutory command that any judge "*shall* … disqualify himself … [w]here he has … personal knowledge of disputed evidentiary facts concerning the proceeding."  28 U.S.C. § 455(b)(1) (emphasis added).  In fact, this tribunal has already admitted it is relying in part on its own knowledge of local circumstances and personalities.  *See* May 3 Order at 10.  These circumstances and personalities are central to the disputed evidentiary facts in this matter.  That prior personal knowledge should, therefore, disqualify this panel from hearing this matter.

This requirement for a neutral decisionmaker is part of a broader right to a fair proceeding, *see In re Murchison,* 349 U.S. 133, 139 (1955) (to ensure fairness, "no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome"), because '[a] fair trial in a fair tribunal is a basic requirement of due process,'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *In re Murchison*, 349 U.S. at 136). "The Court has stressed that 'any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias.'" *Mobility Workx, LLC v. Unified Pats., LLC*, 15 F.4th 1146, 1164 (Fed. Cir. 2021) (Newman, J., concurring-in-part and dissenting-in-part) (quoting *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 150 (1968)).

As this submission explains, Judge Newman had numerous reasons to conclude that this proceeding violated her right to due process of law. Her conclusion is more than sufficient to provide the required "good cause": Several objective, knowledgeable commentators have stated that, because of the obvious conflicts of interest, this matter should be transferred to another circuit. These observers include two former chief judges of this circuit and a former chief judge from another circuit, all of whom took the unusual step of publishing public criticisms of this Court and expressing the strong view that this investigation should be transferred. *See* Paul Michel, *Chief Judge Moore v. Judge Newman: An Unacceptable Breakdown of Court Governance, Collegiality and Procedural Fairness*, IPWatchdog.com (July 9, 2023), https://tinyurl.com/z2xcb2kk; Randall R.

Rader, *The Federal Circuit Owes Judge Newman an Apology*, IPWatchdog.com (July 12, 2023),

https://tinyurl.com/255amrnj; Edith H. Jones, *Federal Judges Deserve Due Process, Too*,

Wall St. J. (Aug. 15, 2023).   Judge Newman can hardly be deemed guilty of non-

cooperation for agreeing with them.   To the contrary, she should be relieved from

litigating in an unconstitutional tribunal without being forced to litigate in that tribunal

to a final decision. *See generally Axon*, 598 U.S. 175.

## A. MEMBERS OF THE JUDICIAL COUNCIL SUFFER FROM IRRECONCILABLE CONFLICTS OF INTEREST

As explained above, the March 24 Order that initiated this investigation relies on

information provided by judges of this court based on their personal interactions with

Judge Newman.   The Order states that "*judges* and staff have brought to my attention

concerns about Judge Newman's inability to perform the work of an active judge based

on their personal experience.   *Judges* and staff *have reported* extensive delays in the

processing and resolution of cases." March 24 Order at 2 (emphasis added).   The Order

goes on: "It has been stated that Judge Newman routinely makes statements *in open court*

*and during deliberative proceedings* that demonstrate a clear lack of awareness over the issues

in the cases."[49]  *Id.*   And, it states, "*half of the active judges of the court* hav[e] expressed their

concerns about Judge Newman." *Id.* at 5-6.

---

[49] At no point did the Committee identify even one such statement illustrating Judge Newman's lack of awareness of issues before the court, despite audiotaped oral arguments being readily available.

The Order thus places the personal knowledge of various judges at the foundation of this investigation.  In fact, some of the most important information about Judge Newman's ability to decide cases is available *only* from other judges.  For instance, information about Judge Newman's conduct during case deliberations is only available to judges because only they are present during those sessions.

The Committee again relied on the personal observations of its members when it issued its April 7 Order, which is at the center of the alleged non-cooperation: It was the first order requiring Judge Newman to obtain additional medical evaluations.  One of the express bases for the Order is the Committee's own "direct observations of Judge Newman's behavior." April 7 Order at 1.

Judges of this Court possess unique personal knowledge about other relevant matters as well.  For example, each of the three members of the Special Committee had a separate conversation with Judge Newman in March 2023, in which each attempted to persuade her to resign or accept senior status.  *See ante.*  Whether these conversations occurred in the way Judge Newman describes them or in some other manner is important because it was Judge Newman's refusal to resign or take senior status—that is, her refusal to succumb to threats—that led to the Chief Judge's issuance of the formal order launching this investigation.  *See* March 24 Order at 5-6.

The Committee's Report contends that the judges' extensive personal knowledge is not relevant to this investigation, arguing that it "quickly determined that testimony from judges about interactions with Judge Newman—particularly interactions related to the process of deciding cases—should be *excluded* from the Committee's inquiry because that information was unnecessary and because information regarding delays in case processing would be more objective if obtained from the Clerk's Office data." Report at 70 (emphasis in original). The Committee further contends that "there are no witnesses needed in this proceeding as it has been narrowed" to the question of non-cooperation. *Id.* at 75. But the Special Committee did not purge this matter from its reliance (in the March 24 and April 7 Orders) on evidence provided by judges of this Court by recasting this matter as relating solely to whether Judge Newman "cooperated" with the Committee. This investigation remains the fruit of the same tree planted in the March 24 Order, and that tree rested in significant part on evidence provided by these judges. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

1. <u>That Members of the Judicial Council Are Not Likely to Be Actually Called as Witnesses Is Irrelevant</u>

The reason the Committee's explanation doesn't pass muster is two-fold. First, whether the Committee chooses to rely on judges' witness statements is simply irrelevant. Under 28 U.S.C. § 455(b)(1), a judge is obligated to recuse himself whenever he has "personal knowledge of disputed evidentiary facts concerning the proceeding."

The statute does not require that a judge be personally called as a witness, merely that he has *knowledge* of the disputed facts.  The Committee itself attests that its own members, as well as other members of the Judicial Council do in fact have such knowledge.  *See* March 24 Order at 2, 5-6; April 7 Order at 1.  There is good reason for the broad prohibition.  The personal knowledge that members of the Judicial Council possess is relevant not only to their roles as actual or potential witnesses, but also to their roles as adjudicators as they already have formed some opinions regarding Judge Newman's abilities that prevent them from giving her a fair hearing.  The fact that "half of the active judges of the court" purportedly expressed concern to the Chief Judge means that at least half the members of this Judicial Council have pre-conceived views about this matter based on their own personal knowledge.   And given these pre-conceived views, the risk is too high that any new evidence that contradicts those views would be heavily discounted.   It is a well-known psychological phenomenon that individuals process new information through the lens of their pre-existing knowledge and biases—effects known as "confirmation bias" and "anchoring bias."  *See, e.g.*, *Duncan v. Bonta*, 19 F.4th 1087, 1122 (9th Cir. 2021) (*en banc*) (Berzon, J., concurring), *vacated on other grounds* by 142 S. Ct. 2895 (2022) ("Cognitive biases ranging from confirmation bias to anchoring bias, can cloud a judge's analysis.").   Any new data received by Judicial Council members is thus likely to be processed through the lens of

prior knowledge, beliefs, or impressions.  This is not a matter of bad intent, but of basic human psychology.

Other judicial councils have recognized this inherent risk.  For example, in the *Adams* case, when fellow district judges complained about Judge Adams's behavior, none of his colleagues from the same district participated at the "Special Committee" stage, nor in the final deliberations of the judicial council.  *See In re Complaint of Judicial Misconduct*, No. 06-13-90009 (6th Cir. June 27, 2018) at 1 and 3 n.3.  Similarly, when a complaint was lodged against a district judge in the Central District of Illinois, the Chief Judge of that district recused herself.  *See infra* n.65.  And when a district judge in Montana was investigated, even the circuit judge whose chambers were in the same courthouse as the subject judge's chambers, recused himself.  *See infra* n.64.

Additionally, since the publication of the Implementation of the Judicial Conduct and Disability Act of 1980, Report to the Chief Justice of the Judicial Conduct and Disability Act Study Committee, 239 F.R.D. 116 (Sept. 2006) ("Breyer Report"), *every single* complaint of misconduct against a circuit judge that was not summarily dismissed has been transferred to another circuit's judicial council for investigation.[50]  *See, e.g., In*

---

[50] The Conduct Rules were adopted in response to the Breyer Report.  Prior to the Breyer Report, there was no formal mechanism to request a transfer, though Illustrative Rules did suggest that such a transfer, as well as "intercircuit assignment procedures under 28 U.S.C. § 291(a)" may be available.  *See Illustrative Rules Governing Complaints of Judicial Misconduct and Disability*, R. 18(g) (Admin. Office of the Courts, 2000).

*re Charges of Judicial Misconduct*, No. 21-90142-JM (resolution of the complaint against Circuit Judge William Pryor of the U.S. Court of Appeals for the Eleventh Circuit by the Judicial Council of the Second Circuit); *In re Complaints under the Judicial Conduct and Disability Act*, Nos. 10-18-90038-67, 10-90069-107, 10-90109–122 (resolution of the complaint against Circuit Judge (by then-Justice) Brett M. Kavanaugh of the U.S. Court of Appeals for the District of Columbia Circuit by the Judicial Council of the Tenth Circuit); *In re Complaint of Judicial Misconduct*, Nos. 18-90204-jm, 18-90205-jm, 18-90206-jm, 18-90210-jm (resolution of the complaint against Circuit Judge Maryann Trump Barry of the U.S. Court of Appeals for the Third Circuit by the Judicial Council of the Second Circuit); *In re Charges of Judicial Misconduct*, No. DC-13-90021 (resolution of the complaint against Circuit Judge Edith Jones of the U.S. Court of Appeals for the Fifth Circuit by the Judicial Council of the District of Columbia Circuit); *In re Charges of Judicial Misconduct*, No. 12-90069-JM (resolution of the complaint against Circuit Judge Boyce F. Martin of the U.S. Court of Appeals for the Sixth Circuit by the Judicial Council of the Second Circuit); *In re Complaint of Judicial Misconduct*, 575 F.3d 279 (2009) (resolution of the complaint against Chief Circuit Judge Alex Kozinski of the U.S. Court of Appeals for the Ninth Circuit by the Judicial Council of the Third Circuit). As Professor Arthur Hellman noted, "over the last few years, chief judges have *consistently* followed the practice of requesting a transfer when serious allegations have been raised about a judge of the court of appeals." Arthur D. Hellman, *An Unfinished Dialogue: Congress, the*

*Judiciary, and the Rules for Federal Judicial Misconduct Proceedings*, 32 Geo. J. Legal Ethics 341, 404 (2019) (emphasis added).  *See also* Jones, *supra* ("To obviate unethical conflicts and provide objectivity, the normal application of judicial misconduct rules requires that a matter about a circuit-court judge be transferred to another circuit's chief judge and Judicial Council.").  In refusing to seek a transfer of this matter, the Judicial Council for the Federal Circuit stands alone, and it stands athwart Congressional design in crafting the Disability Act.

The Committee rejects this recounting of the precedent, but it is unable to cite a *single* instance where a complaint against a circuit judge was kept within that judge's local judicial council.  The best that the Committee can do is state that many complaints were not transferred while acknowledging that the data it relies on simply does not differentiate between "proceedings against district court [and] circuit judges."  Report at 90 n.27.  But such a differentiation is crucially important, precisely because when it comes to a district judge, there may be no members of that judge's court on the judicial council, or if there are such members, they can easily recuse themselves.  *See infra* nn.64-65.  But the same isn't true when the judge being investigated is herself a member of the relevant circuit court.

These concerns that apply to all circuits are not the only ones present in this case.  As the Katznelson study shows, members of the Judicial Council stand to materially

benefit should Judge Newman be removed from the bench. *See* Katznelson, *supra*. As Dr. Katznelson explains, given Judge Newman's high rate of dissent, were she replaced by a less dissent-prone judge, the work of her colleagues would be reduced by over 5%. It is irrelevant that Judge Newman's colleagues may or may not be purposefully attempting to remove her from the bench for the sole purpose of having to do less work. As the Supreme Court explained, the Due Process Clause abhors procedures that "offer a *possible* temptation to the average man as a judge." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927) (emphasis added). The Due Process Clause is offended when a decisionmaker has a strong "motive" to reach a particular result. *Id.* at 533-34. And whatever the intentions of the Judicial Council members might be, it cannot be seriously debated that they will have an easier time accomplishing their work if a colleague who forces them to respond to criticism (as dissents always do) were removed from the Court. This "possible temptation" is, in and of itself, sufficient basis for all the members of the Judicial Council to recuse themselves. *See* 28 U.S.C. § 455(a), (b)(4), (b)(5)(iii).

Finally, keeping the investigation in this Circuit not only means overlooking the conflicts that affect at least half the judges on the Judicial Council, it also provides a disincentive for knowledgeable witnesses to come forward if they disagree with the pre-ordained outcome of this matter. The Federal Circuit is a specialized court with a specialized bar. *See* Daniel R. Cahoy & Lynda J. Oswald, *Complexity and Idiosyncrasy at the*

76

*Federal Circuit*, 19 Colum. Sci. & Tech. L. Rev. 216, 226 (2018). Many, if not most, of the attorneys who litigate before this Court practice only in the areas that are within this Court's exclusive jurisdiction. In other words, the very livelihood of these attorneys depends on being able to maintain good standing and a trusted reputation with judges of the Court when it comes to representations made in their various cases. Given this reality, attorneys who could serve as witnesses regarding Judge Newman's conduct during oral argument (and perhaps in other settings) are actually placed in a position that is not that different from the Court's employees. In other words, the attorneys who regularly practice before this Court may be reticent about coming forward with their impression of Judge Newman's conduct or opinion quality, which in turn will have the effect of undermining Judge Newman's ability to mount a defense against these unwarranted charges in this forum. This reticence is already evident from the fact that multiple law firms with patent practices declined to be involved in this matter in any capacity citing "conflict of interest." None of this would be a problem were the matter transferred and the investigation conducted by a judicial council of another circuit. Attorneys providing testimony could remain anonymous and thus not worry about whether their involvement in this matter would affect their ability to continue practicing in the Federal Circuit.

The Committee rejects this concern by pointing out that had the matter gone to a hearing under Rule 14, Judge Newman "would have had the benefit of compulsory

process to obtain any critical testimony." Report at 75. But this misses two important points. First, the current reticence of witnesses to come forward puts additional burdens on Judge Newman (including having to submit to unwanted medical examination) that she otherwise would not have had to carry. The same reticence also limits the Committee's ability to see the full picture before deciding whether ordering medical examinations is appropriate. *See* Rule 14, cmt. (requiring the Committee to consider "evidence representing the entire picture."). Second, even if Judge Newman could compel witnesses to appear before the Committee, it is quite likely that the testimony provided by those witnesses, in light of legitimate potential concerns about effects on their careers, would be anything but limited and reluctant.[51]

## 2. "Narrowing" the Inquiry Does Not Eliminate the Problem of Actual Bias or Risk of Bias

The fact that the investigation has been "narrowed" to the issue of "failure to cooperate" on which "no witnesses [are] needed" does not address whether the Judge

---

[51] Additionally, any evidence that might contradict one's own pre-existing views is likely to get short shrift. *See Duncan*, 19 F.4th at 1122. Instead of seeing weaknesses and shades of grey in the testimony, in such a situation, the decisionmaker can actually become more entrenched in the initial position. *See, e.g.*, Enide Maegherman, *et al.*, *Law and Order Effects: On Cognitive Dissonance and Belief Perseverance*, 29 Psychiatry, Psychology and L. 33, 34 (2022) ("[J]udges who had been given more incriminating information prior to trial were more likely to convict the defendant than judges who were given the same case file, but less incriminating prior information. Therefore, judges also appear to be prone to belief perseverance despite the need for impartiality."); *id.* ("One way in which people try to escape cognitive dissonance is to adopt, and adhere to, one of the beliefs, while refuting or downplaying the other.").

Newman had "good cause" for any such failure.  It is precisely because the present investigation ignores basic norms of due process of law, including failure to recuse by those with "personal knowledge of disputed evidentiary facts," that Judge Newman has taken the position that she has taken.  The "narrowing" of the investigation does not obviate the need to confront these issues.

Indeed, the Committee itself spends pages recounting Judge Newman's interactions with Court personnel in order to establish that it had reasonable basis to order medical testing.  It also uses the proximity of the personnel to the Committee as a reason to deny transfer.  Report at 87-89.  Yet, at the same time the Committee's efforts to avoid relying on judges' personal knowledge has led to the conspicuous omission from its Report of the most directly relevant observations of Judge Newman's ability to decide cases.  The Committee's Report relies on extensive statements from Court personnel, but entirely ignores the personal knowledge of this Court's judges. Surely judges' observations of Judge Newman's conduct during judicial conferences are more probative about her judicial competence than an IT employee's observation about whether Judge Newman knew she should reboot the fax machine. See Spec. Comm. Report at 86 (citing affidavits).  And this information from court personnel adds nothing at all to the question whether Judge Newman has "cooperated" with the Committee.  Yet the Report is larded with pages upon pages of observations from court employees about office procedures and Judge Newman's interactions with selected

79

staff, while it is devoid of any information about judicial conferences or academic events where she actually discussed cases and doctrine. But the Committee cannot simultaneously claim that interactions with Court staff are relevant to its determination while the knowledge of the Court's own members is irrelevant. There can be only one reason for relying on statements by Court staff (all of which post-date the Committee's initial order for a medical examination) but putting the judges' own knowledge off-limits—the Committee's wishes to avoid having judges become witnesses at all to avoid having to transfer this case to another forum.

This failure to consider centrally important evidence cannot be squared with the Committee's obligation "to present evidence representing the entire picture," Rule 14, cmt., or with the basic requirements of "the right to a fair hearing as guaranteed by the Due Process Clause." *Gardner v. Fla.*, 428 U.S. 908, 909 (1976).

## B. THIS INVESTIGATION HAS BEEN MARKED BY RULINGS THAT ARE UNFAIR, CONTRADICTORY, AND PROVIDE SHIFTING RATIONALES FOR PREVENTING JUDGE NEWMAN FROM HEARING CASES

### 1. The Chief Judge Improperly Removed Judge Newman from the April 2023 Sitting of the Court

On February 14, 2023, the Chief Judge excluded Judge Newman from panel assignments for the Court's April 2023 sitting. Report at 79. The Chief Judge did not confer or even communicate with Judge Newman before taking this step. According to the Chief Judge, she excluded Judge Newman because Judge Newman was

supposedly in violation of Federal Circuit Clerical Procedure # 3 ¶ 15 (CP #3).  Report

at 78 79.  The Chief Judge did so even though, under the applicable rule, the status of

Judge Newman's docket did not preclude her from hearing new cases.

The Committee states that as of February 14, 2023, when the April paneling

memorandum was circulated, "Judge Newman had two cases that were over 365 days

old.  *One was* ████████████████████████████████, in which

the opinion had been assigned to Judge Newman on December █ 2021. … The second

case was ██████████████████, in which the opinion had been assigned to

Judge Newman on February █, 2022."  Report at 78 79.

With respect to the █████████, the Committee claims that the case was not

"stayed" pending the enactment of Congressional legislation and therefore the entire

time between December █, 2021, and the date of opinion circulation is chargeable to

Judge Newman.  *Id.* at 78.  That is a tendentious presentation of the facts.  On June █,

2022, the Court received a letter, pursuant to Fed. R. App. 28(j), advising it that ███

████████████████████████████████████████████

████████████████████████████  ████████

██████████████████████████. The letter ████████████

████████████████████████  *Id.* █

█ While the Court did not formally "stay" the proceedings, it did follow the letter's

suggestion to hold action on the case pending the enactment of the referenced bill. To that end, the Court waited until the President formally signed the bill into law on August ██ 2022, ████████████, and then, on August ██, 2022, ████████████████ ████████████████████████████ ████████████ ████████████████████ ██████████ The parties submitted requested briefs on September ██, 2022. *Id.*, ██████████ It thus follows, that *at a minimum* all of the time between June ██, 2022 and September ██ 2022 (totaling 87 days) should be excluded from days chargeable to Judge Newman. Doing so, ██████████ would have hit the 365-day mark on March ██2023, long after the February paneling decisions would have been set.

With respect to ██████ the Committee's assertions are equally problematic. The Committee asserts that the case was assigned to Judge Newman on February ██ 2022, and therefore would have hit the 365-day mark on February ██, 2023. But the Committee is misstating facts. ██████was not even formally submitted until March██ 2023. True enough, on February██, 2023, Judge Newman *pre*-assigned ██████to herself, but the assignment was not finalized and formalized until after the date of submission.[52] Accordingly, ██████ was not delayed past the 365-day deadline in February 2023.

---

[52] Indeed, the pre-assignment memorandum acknowledges that it is only effective "absent objection." Attachment C. That no objection was actually made doesn't make the memorandum any less tentative.

However, even assuming that the Committee's timeline is correct and Judge Newman's one is wrong, there was *still* no basis to deny her panel assignments for the April 2023 calendar.  As the Committee itself acknowledges, the paneling decisions for the April sitting were made on February 14, 2023, and ████ (the case that allegedly put Judge Newman in violation of CP #3) did not hit the 365-day mark until the *next* day. To get around this uncomfortable fact, the Committee Report asserts that "[t]here is no bright line date on which the time periods in CP #3 are applied, and the Chief Judge's chambers appropriately relied on the email from Judge Newman's chambers in concluding that Judge Newman did not anticipate issuing the ████ opinion before paneling was finalized and that she was subject to CP #3." Report at 79.  This statement is stunning on multiple levels.  First, if it is true that there is no "bright line date on which the time periods in CP #3 are applied," then it is not a rule of procedure at all, but a delegation of nearly unfettered authority to the Chief Judge to simply "intuit" whether or not her colleagues will or won't file opinions by some date known only to the Chief Judge.  Second, it is simply unbelievable that a judicial officer instead of waiting for an established deadline to pass, simply assumes that a filing will not be timely made and then rules accordingly.  This is yet another example of the Chief Judge and/or the Committee attempting to fit data into a predetermined outcome, and therefore yet another example of bias or at the very least risk of bias.

83

2.   <u>The Chief Judge and Other Members of the Committee Predetermined that Judge Newman Must Take Senior Status</u>

As the Chief Judge herself recounts in the March 24 Order, on March 7, 2023, the Chief Judge informed Judge Newman she had "probable cause to believe" that Judge Newman suffers from a cognitive disability.  The Chief Judge offered to resolve this concern "informally," demanding that Judge Newman resign or at least take senior status under 28 U.S.C. § 371.  March 24 Order at 2, 5.  The Chief Judge, and other members of this Committee told Judge Newman it was "non-negotiable" that she step down from active status if she wished to resolve this matter informally.   The predetermination that Judge Newman relinquish her judicial office (in whole or in part) infected every subsequent step that followed, and it casts significant doubts on the objectivity of the Committee, as well as any other judges who urged Judge Newman to take senior status.

3.   <u>The Judicial Council, in Violation of Basic Procedures, Voted to Preclude Assigning New Cases to Judge Newman</u>

On March 8, the Judicial Council voted "unanimously" to preclude the assignment of new cases to Judge Newman. June 5 Order at 1.  This "Order" was highly irregular, resting on a series of procedural violations that are virtually unheard of in a serious judicial process.  The basis for the order was thereafter stated in the Chief Judge's email to Judge Newman, which was reproduced in the Chief Judge's Order of April 6, 2023.  *See* April 6 Order at 4.  In her email, the Chief Judge stated that Judge

Newman has been suspended "pending the results of the investigation into potential disability/misconduct" and that Judge Newman "will not be assigned any new cases until the[] [disciplinary] proceedings are resolved."  Neither the Disability Act, nor the Conduct Rules, however, provide for an interim suspension of a judge pending adjudication of the complaint.  Though this problem was repeatedly pointed out to the Committee and the Judicial Council, no action was taken until Judge Newman filed suit and sought injunctive relief.  *See Newman v. Moore*, *supra*.  Furthermore, the March 8 Order, which according to the Chief Judge was entered and would remain in effect "pending the results of the investigation" was actually entered *weeks* before any investigation began.

On June 5, the Judicial Council suddenly changed the justification and explanation for the March 8 Order.  Gone were the claims that the order was entered "pending the results of the investigation," and instead the Council claimed that its decisions were made "under the Council's statutory authority to 'make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit.'"  June 5 Order at 4-5 (quoting 28 U.S.C. § 332(d)(1)).  But even taking this new, retrofitted justification at face value, the March 8 Judicial Council's action *still* shows either actual bias or too high of a risk of bias to permit the continuation of this process within this forum.

To begin with, the Judicial Council did not notify Judge Newman about the vote, even though she was and is a member of the Judicial Council.  Nor did it provide her with an opportunity to be heard.  The lack of notice and the opportunity to be heard violates the most basic principles of due process of law.  *See Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'  It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'") (quoting *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1864)).  This exclusion of Judge Newman from a Judicial Council vote also violated governing law.  For example, the Disability Act commands that "*[e]ach member* of the council *shall* attend *each council meeting* unless excused by the chief judge of the circuit." 28 U.S.C. § 332(a)(6) (emphasis added).  Chief Judge Moore did not excuse Judge Newman from participating in the vote, and no legal basis existed to exclude her from it.  The Committee now suggests that "[t]he Judicial Council properly operated on the view that Judge Newman would be recused in any decision on that matter." Report at 79.  It cites no authority for the proposition, nor can it because it is triply wrong.[53]

---

[53] The Committee's attempt to analogize the situation to one covered by Rule 25 of the Conduct Rules fails.  Given that the plain language of Rule 25(b) did not apply, no legal basis existed to use "analogy"

First, the decision whether or not to recuse belongs to each judge herself and not to her fellow members of the court or the judicial council. *See, e.g., Miles v. Ryan*, 697 F.3d 1090 (9th Cir. 2012); 28 U.S.C. § 455(a) ("Any justice, judge, or magistrate judge of the United States *shall disqualify himself* in any proceeding in which his impartiality might reasonably be questioned.") (emphasis added). The Judicial Council's assumptions about what Judge Newman would do had no place in the proceedings. Second, as the Judicial Council itself asserted in the June 5 Order, the issue that was considered by the Council was not whether or not Judge Newman ought to be sanctioned, but how to best administer the business of the court. June 5 Order at 5 ("This is not a censure but rather a decision made for the effective and expeditious administration of the business of the court."). But if so, then Judge Newman would not have been "a judge in his own case," but rather, like every other judge at that meeting, a "judge" in the case of her judicial council. Therefore, any comparison to the "analogous situation when a judge is the subject of a misconduct or disability complaint under the Act and the Rules," *id.* at 79, is entirely misplaced. Third, even assuming, *arguendo*, and contrary to the Judicial Council's own orders, that it was the case of Judge

---

to deny Judge Newman her clear legal right to notice about the Judicial Committee vote. Indeed, the existence of this Rule 25(b) provision disqualifying a "subject judge" *after* a complaint has been filed against her provides dispositive textual evidence that a judge *cannot* be excluded *before* a complaint has been filed against her. An elementary principle of statutory construction holds, of course, that where a draft includes a provision in one context and excludes the provision when addressing a different context, the provision is not equally applicable in both situations.

Newman (rather than the case of "effective and expeditious administration of the business of the court") that was being considered on March 8, it cannot possibly explain why notice and opportunity to be heard (and indeed post-factum minutes of the meeting) were not provided to Judge Newman. Had she been told about the meeting, Judge Newman might have been able to furnish evidence that claims being made about her to justify the Council's action were erroneous.[54]

In yet another breach of basic procedure, the Judicial Council did not put its resulting "Order" in writing—even though excluding a sitting Article III judge from hearing new cases is as consequential a vote as a Judicial Council can possibly take. Incredibly, it appears that no Judicial Council document memorialized the meeting, the discussion, or the vote that took place. Conducting the business of a judicial council in this manner appears to be entirely unprecedented in history. Finally, in the culmination of this real-life parade of horribles, the Judicial Council did not even tell Judge Newman about its Order until the next month. *See* April 6 Order at 4. In effect, the Judicial Council supposedly issued an "Order" that was unwritten and undisclosed.

---

[54] It appears that at least some judges have taken on faith information provided to them by the Chief Judge. Thus, Judge ████████, in his email to Judge Newman which was sent after the March 8 meeting and vote, explicitly stated that though much of the information he has considered about Judge Newman's performance is second hand, he had no reason to doubt it. Perhaps, had Judge ████ and other judges been presented with a fuller picture, they would have reason to doubt the information provided by the Chief Judge, and vote accordingly.

The Committee is essentially playing a "heads-I-win, tails-you-lose" game with Judge Newman. It cites Rule 25(b) in an effort to justify keeping Judge Newman in the dark about the March 8 vote both before and after it occurred. At the same time, the Committee denies Judge Newman the procedural protections she should have received if the Disability Act and the Conduct Rules really had applied. The Disability Act would have imposed numerous requirements and limitations on the Judicial Council. To name a few, (i) it would not have authorized the Judicial Council to take any action at all until a formal complaint was initiated, 28 U.S.C. § 353(a); (ii) it would have required the Judicial Council to notify Judge Newman of the complaint against her, 28 U.S.C. § 353(a) & 354(a)(4); and (iii) it would have required the Judicial Council to withhold any conclusion until a special committee conducted an investigation, reached a conclusion, and submitted a report, 28 U.S.C. § 354(a)(1). The same statute also would have restricted the permissible sanction, stating that any restriction on a judge's ability to hear cases must be limited to a "time certain." 28 U.S.C. § 354 (a)(2)(A)(1). Neither the Committee nor the Judicial Council as a whole followed any of these procedures, and they did not limit the sanctions against Judge Newman (even if the Council refuses to term them as such, *see* June 5 Order at 5) to a "time certain." *See generally id.* (failing to state any temporal limit on Judge Newman's suspension). The Report's treatment of the March 8 Order only sows more confusion about the Order's actual basis, and therefore only increases the perception of actual bias or the risk thereof.

89

4. <u>The March 24 Order Was Procedurally and Substantively Flawed.</u>

As already explained *ante*, the March 24 Order which serves as the basis for this investigation, suffers from significant factual errors.  However, it was also improperly issued.

Rule 11(f) of the Conduct Rules requires that the subject judge be given an opportunity "to respond to the complaint either orally or in writing if the judge was not given an opportunity during the limited inquiry."  The Committee suggests that such an opportunity "was not required because … Judge Newman had already been provided a copy of the order identifying the complaint on March 17 during the limited inquiry conducted by the Chief Judge."  Report at 12, n. 4.  But that's plainly wrong.  The question was not whether Judge Newman was given *notice* of the impending investigation, but whether she was given an *opportunity to respond* to the charges.  No such opportunity was provided.  Indeed, the Chief Judge herself recounts that she was only interested in meeting with Judge Newman to resolve the complaint "informally" which only meant through Judge Newman's resignation.  A forced resignation is not an "opportunity to respond."  Perhaps, had such an opportunity been provided, the March 24 Order could have avoided the factual errors, and there would be no predicate for the investigation in the first place.

90

5. <u>The Special Committee Improperly Placed the Burden of Investigating the Credentials of Selected Medical Providers on Judge Newman</u>

The Committee ordered Judge Newman to submit to testing by two medical providers without ever disclosing their qualifications or the methods of their selection.[55] The Rules, however, limit the Committee to the "use of appropriate experts." Rule 13(a). Judge Newman continuously objected to submitting to the testing "by providers with unknown qualifications and provenance." July 5 Letter at 14. In other words, Judge Newman objected to the fact that the Committee failed to establish that the experts it selected are "appropriate." In its Report, the Committee argues that Judge Newman was "offered the opportunity to discuss the professionals recommended by" the Committee's consultant, Report at 94, and that she could have "done an internet search with the names of the doctors who were provided to her" so as to assure herself of "their credentials," id. at 94 n.30.

However, it is not Judge Newman's burden to verify that the providers selected by the Committee are appropriate. Rather, it is the Committee's burden to establish that its request is reasonable both in substance and in the mode of execution. It is "an elementary, routine, important, and familiar principle of legal procedure," August 8

---

[55] The first time the Committee explained how these providers were chosen was in the Report. *See* Report at 93 n.29.

Order at 6, that "the party requesting an order of the tribunal has the burden of persuasion as to the requested order." *Aqua Prod., Inc. v. Matal*, 872 F.3d 1290, 1351 (Fed. Cir. 2017) (*en banc*) (Taranto, J., joined by, *inter alia*, Prost C.J., dissenting from the judgment).

The Committee failed to establish that the experts it selected are "appropriate." It continuously failed to state why the providers were selected in the first place (other than stating that the Committee's consultant—an out-of-the-area physician—recommended them), or why these providers, neither of whom is a psychiatrist, are qualified or even preferred to evaluate Judge Newman. And yet, having failed to meet these elementary burdens of production and persuasion, the Committee blames Judge Newman for failing to blindly follow the Committee's every request. This is yet another improper attempt to vitiate Judge Newman's procedural rights and to shift the burden of proving her continued competence onto Judge Newman, rather than having the Committee carry the burden of establishing Judge Newman's incompetence.

6.   <u>The Special Committee's Denial of Judge Newman's Request for Access to Full Data Set Is Another Procedural Irregularity</u>

On August 14, 2023, Judge Newman's counsel submitted a request to the Committee for (a) release of data regarding Judge Newman's productivity going back to 2018, and (b) permission to share the confidential and redacted data with a consulting expert who could verify and test the accuracy of the data on which the Committee

relied.   Counsel made this request ████████████████████, of which the Committee was aware in advance.   Following the delay occasioned by the ████████████████, counsel began in earnest to craft arguments in response to the Committee's 111-page report.

On August 17, 2023, the Committee denied the requested materials, stating that the request came too late.[56]  The Committee asserted, once again, without citing to any authority whatever, that the record had "closed," and added that the requested data was irrelevant to the question of Judge Newman's cooperation.  August 17 Order at 4-8.

This order was arbitrary, unfair, and finds no support in the Conduct Rules or the Disability Act.  Nothing either in the Conduct Rules or the Disability Act suggests that the "record closes" at the Committee stage.  The Committee is not a trial-like tribunal, with the Judicial Council serving as an appellate body.  To the contrary, the Judicial Council is the *only* authority that can act on matters of judicial disability in the first instance.[57]   Contrary to the Committee's assertion, the Conduct Rules afford a subject judge an opportunity to "send a written response … [and] to present argument,

---

[56] The Committee noted that the request came after "approximately half the time had expired for Judge Newman to prepare any response" to its Report.  It is not clear what relevance this fact may have, as the counsel did not ask the Committee to conduct any analysis on an expedited basis.  Counsel was ready to have its own expert do so.  Besides which, the first half of the response period was always going to be devoted to ████████.  That was the reason for the extension request in the first place.

[57] The Rules provide for appellate-like review before the Committee on Judicial Conduct and Disability, and if necessary, the Judicial Conference.  *See* R. 20(a).

personally or through counsel," R. 20(a), and nowhere do the rules limit the subject judge to the "record" developed by the Committee.

Moreover, the Order is inconsistent with the Committee's own actions as it itself had continued to add new evidence after the date the Committee appears to treat as the date the record closed, which apparently was May 16, 2023.  *See* Report at 23 & 24 n.10 (identifying affidavits added after that date).

The Committee's decision to deny Judge Newman's request (which was made only in response to the Committee's rejection of a proper statistical analysis done by Dr. Katznelson, *see* Report at 58 n. 20) while having no legal basis for such a denial, is yet another instance of procedural corner-cutting in service of arriving at a predetermined conclusion.

7.   <u>The Special Committee's Heavy Reliance on Information It Obtained by Questioning Clerks and Other Court Employees Violates Due Process in Several Respects</u>

Although the Special Committee stated in a June 1, 2023 Order that "there are no witnesses who could have relevant testimony bearing on the narrow issue of [the alleged] misconduct," *id.* at 4, its report includes several affidavits from court employees.  It cites these affidavits to show Judge Newman has not properly managed employees and did not understand certain IT matters.  The Special Committee has never explained—and could not do so if it tried—why this information from court employees is relevant to whether Judge Newman has properly "cooperated" with the investigation.

94

The Special Committee nonetheless included these affidavits in an effort to prove that Judge Newman suffers cognitive deficiencies that prevent her from properly deciding cases. Notably, the report does not contain any of the evidence that is obviously more relevant to that issue: testimony from the judges who have worked directly with her on deciding cases.

In any event, these affidavits raise several concerns. Some of them do not even support the conclusion that Judge Newman has any cognitive limitations at all. Most conspicuously, this includes the affidavits from the employees who work most closely with Judge Newman—her law clerks. *See ante* II.B.3.

More broadly, not one of the employee statements was subject to cross examination, which the Committee did not permit even though Judge Newman has a right to do so. *See* Rule 15(c) ("The subject judge must be given the opportunity to cross-examine special-committee witnesses, in person or by counsel."). Cross-examination could have been very helpful to a neutral finder of fact. These witnesses had strong incentives to provide statements that would be helpful to their employer, and the record indicates that their employer was quite forceful in its interactions with employees.

To properly interpret the statements from court personnel, it is instructive to begin with the transcript from the only deposition in the record. This is the only information we have about the Committee's interaction with the employees whose

statements it relies on.  The transcript is from the deposition of Judge Newman's career

law clerk.  The Committee set an intimidating tone from the beginning of its interaction

with this law clerk.  It served her with a subpoena, at a recruiting event for law clerks,

in front of dozens of other attorneys and law clerks, and did so even though it had no

reason to believe the career clerk would decline a simple request for an interview.  The

subpoena required the witness to appear for a deposition in only 48 hours.  By contrast,

Federal Rules of Civil Procedure require "reasonable" notice, Fed. R. Civ. P. 26(b), and

identify a presumptive notice period of 14 days.  Consistent with this initial procedural

gambit, the deposition transcript shows that the Special Committee's questioning

during the deposition was unmistakably intimidating, leading even the witness's counsel

to object to the questioning by Judges Moore and Prost as "threatening." Dep. Tr. at

12:3.  When the witness asserted her Fifth Amendment rights in response to questions,

the Chief Judge threatened her with a misconduct charge, warning that "refusing to

cooperate with this proceeding could result in a misconduct charge."  *Id.* at 11:15-18.

The Chief Judge followed up with a threat that the clerk could lose her job—"could be

terminated for misconduct."  *Id.* at 11:23-12:1.  Even when it came to a simple request

for the members of the Committee to ask questions one at a time, so as to permit the

witness to answer, the Chief Judge refused.  *Id.* at 5:11-6:4.

The Special Committee's intimidating approach in this deposition casts some

doubt on the reliability of the statements the same Special Committee obtained from

other Court employees. This is significant because the Special Committee's Report relies so heavily on statements from the Court's employees. This concern that court personnel were not comfortable speaking freely is consistent with information indicating that other potential witnesses were too intimidated to speak up at all. Some were willing to speak only to an outside publication, *IP Watch*, which wrote:

> There is a reason why few in the industry are speaking out publicly on behalf of Judge Newman. Everyone I speak with is afraid of retribution, and specifically fearful of retaliation from Chief Judge Moore. There is real fear that anyone who might stand up for Judge Newman would draw the ire of Chief Judge Moore, and every firm that does any form of litigation is prohibiting attorneys from saying anything publicly on this matter.

Gene Quinn, *The Campaign Against Judge Newman Underscores the Downfall of the Federal Circuit*, IPWatchdog.com (May 8, 2023), https://tinyurl.com/2p934ywe.

This concern brings up another defect in the Committee's approach. Although the rule governing the "Conduct of Special Committee Hearings" requires the Special Committee "to present evidence representing the entire picture," Rule 14, cmt., the Committee has failed to acknowledge any evidence that would contradict its conclusion. In fact, it appears that when evidence did not support the foregone conclusion, the Special Committee simply omitted it. As explained *ante* (*see* II.B), the Committee interviewed three of Judge Newman's law clerks, but included only two resulting statements in its Report. The most plausible inference from this omission is that the information obtained through that interview undermined the Committee's chosen

conclusion.  *See Tendler*, 203 F.2d at 19.

Moreover, various sources indicate that evidence supporting Judge Newman is abundant.  Several experienced observers have attested to Judge Newman's mental sharpness.  On April 12, 2023, IPWatchdog.com wrote about this investigation as follows: "Numerous staff and colleagues with knowledge of the complaint filed against Newman have contacted IPWatchdog to both confirm the filing of the complaint and to vehemently oppose the allegations being made about Judge Newman's competence." Gene Quinn, *Chief Judge Moore Said to Be Petitioning to Oust Judge Newman from Federal Circuit* IPWatchdog.com (April 12, 2023).  Similar evidence exists from public appearances Judge Newman made this past March and April.  The impression of Prof. David Hricik has already been noted, but the members of the Judicial Council are free to listen to the audio recording of the conference for themselves.[58]  In the same vein, former Chief Judge Michel noted the "clarity" of a talk Judge Newman gave at a Fordham Law School Conference in April.  Nor based on his review of audio recordings of oral arguments did he appreciate any perceptible change in Judge Newman.  Michel, *supra*.

Yet the Special Committee's report does not indicate any awareness that witnesses supporting Judge Newman's competence even exist, much less indicate that the Committee interviewed or even sought out any such witnesses.  It appears that the

---

[58] *See supra* n.32.

98

Committee limited its so-called "investigation" to compiling statements from employees who would support the position of their employer.  It did not even attempt to obtain any evidence that might not support its foregone conclusion.  This one-sided behavior is yet another reason why the proceedings violate Judge Newman's rights and why a transfer is warranted.

## C. THE COMMITTEE'S ARGUMENTS AGAINST TRANSFER DO NOT WITHSTAND SCRUTINY AND ARE DEVOID OF MERIT

The Committee's (technically, the Chief Judge's) justification for refusing to transfer this matter rests mostly on the argument that keeping the investigation within the confines of the Federal Circuit is more efficient.

In its May 3 Order, the Committee stated that transfer is inappropriate because judges outside of the Federal Circuit would be "in a poor position to persuade a judge whom they do not know well to take the action they believe is necessary."  May 3 Order at 10.  The implication is that the Special Committee believes that its job is to persuade Newman to take an action they believe to be necessary.  In other words, this very language betrays that the Committee and other members of the Judicial Council have already made up its mind that it's *necessary* for Judge Newman to retire.  *See also* March 24 Order at 2 (noting that "[o]n March 9, 2023, another judge [who is not member of the Special Committee] met with Judge Newman to articulate concerns and urged her to consider senior status.").  But it's irrelevant whether the Judicial Council members

*believe* that it is time for Judge Newman to step down.  What matters is whether she is sufficiently mentally and physically fit to continue in office which has been entrusted to her.  There is no possible relevance that "personalities" have to this clinical question.

The Report also recounts how, because the Committee and the Court staff are co-located, the "Court's staff could raise concerns based on their interactions with Judge Newman in an almost real-time fashion."  Report at 89.  Even if true, the argument proves nothing.  If the matter were transferred, nothing whatsoever would prevent anyone from raising any concerns with the Chief Judge (or other judges) about Judge Newman's behavior "in an almost real-time fashion," and nothing would preclude the Chief Judge (or other judges) from forwarding memoranda of those conversations or affidavits submitted by the staff to whatever judicial council that the Chief Justice would designate to handle the matter.  Indeed, the Committee itself stated that "given modern communications methods, the Committee does not believe that a 7-hour time difference presents a substantial barrier" to communications between parties.  May 22 Order at 3.  But if in the Committee's view Judge Newman and her counsel are not impeded even by a large time difference, it is hard to understand why the Court staff would be impeded if they had to email with any concerns they have not to a cafc.uscourts.gov address, but, instead to a ca2.uscourts.gov address.

Second, it is not at all clear what does ability to lodge a constant stream of complaints has to do with the question of Judge Newman's mental or physical disability.

According to the Committee, as evidenced by the April 7 Order, the alleged delays *alone* are a sufficient probable cause to suspect a disability and request medical examination. If that is so, then additional complaints are irrelevant.  In other words, if all physicians agreed that Judge Newman is mentally and physically as agile as ever, surely the fact that certain staffers viewed or continue to view her behavior as unnecessarily hostile would have no bearing on the question of her *disability*.[59]

Furthermore, even assuming that the gathering of the information from the Court staff was necessary to really assure oneself that medical testing is, at this stage, appropriate, the evidence has been gathered and the only question now is the *evaluation* of that evidence.  The ability of one to evaluate the mostly written evidence (provided in the form of affidavits) in no way depends on the proximity of the evaluator to the witness.

What the Committee is really objecting to is the fact that a neutral decisionmaker may not agree with its own determinations.  Report at 91-92.  If, however, the Committee is convinced that its work has been properly conducted, it should welcome confirmation from others and not attempt to shield it from such.  The Committee argues that transferring the matter now would be "grossly inefficient," and that its

---

[59] Of course, if it were found that Judge Newman were abusive to Court staff, a different complaint could be lodged—one that focused on that issue.  But at issue here is solely the question of Judge Newman's alleged disability and lack of cooperation with the Special Committee's investigation.

conduct of the investigation, in contra,st was quite "efficient." *Id.* at 87.  Leaving aside the dubiousness of the claim given that the Committee has not been able to receive an answer to the question which prompted this investigation—an answer that, as Judge Newman indicated, would have been more readily forthcoming in a more neutral forum—the Committee seems to confuse "efficiency" with due process of law.  Soviet courts were extraordinarily efficient, but they can hardly be accused of being procedurally regular.  Due process guarantees necessarily mean that there will be some lack of efficiency.  As the Supreme Court wrote more than half a century ago:

> Procedural due process is not intended to promote efficiency or accommodate all possible interests: it is intended to protect the particular interests of the person whose possessions are about to be taken.
>
> "The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones."

*Fuentes*, 407 U.S. at 92 (quoting *Stanley v. Illinois*, 405 U.S. 645, 656 (1972)).

When the question at hand is essentially involuntary removal of a duly appointed Article III judge from the functions of her judicial office, some inconvenience and lack

of efficiency is not just to be tolerated, but welcomed.  That the Committee sees it differently, is its own separate cause for concern.

### D. THE FAILURE TO TRANSFER THIS MATTER PROVIDES SUFFICIENT "GOOD CAUSE" TO RESIST THE COMMITTEE'S DEMANDS

At the end of the day, it is not and never was possible for Judge Newman to receive a fair process from the Judicial Council of the Federal Circuit, *even if* the Judicial Council members attempted their very best to provide such a process.  Judge Newman's participation in this process would have simply legitimated, without warrant, proceedings that do not and cannot comport with constitutional and statutory requirements.  All of these concerns were ignored when Judge Newman brought them to the Special Committee's attention.   In these circumstances, it was and remains entirely justifiable for Judge Newman to decline to submit to the Special Committee's demands.  There is no good reason for the Judicial Council to retain this matter, and a host of good reasons to transfer it.  As the tribunal is wrongfully constituted, Judge Newman has no choice but to object.

Indeed, submitting to the Special Committee's demands would vitiate Judge Newman's right to avoid a proceeding before a tribunal that is unable to adjudicate the matter consistent with the requirements of the Due Process Clause and statutory commands.  *See Will v. Hallock*, 546 U.S. 345 (2006) ("It is not mere avoidance of a trial, but avoidance of a trial that would imperil a substantial public interest that counts."); *cf.*

103

*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Without question, a trial conducted by Article III judges against an Article III judge, but one that would violate both constitutional and statutory commands "would imperil a substantial public interest" in maintaining confidence in the judiciary generally and disciplinary processes in particular, given that "an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case," *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016).  This, in turn, would "imperil a substantial public interest" in having cases resolved by judges whose character and fitness to serve are not impugned by dubious findings.

Any proceedings that might result in what essentially amounts to a forced retirement of an Article III judge against her will would "imperil a substantial public interest" in judicial independence that is guaranteed by the existence of a *purposefully* difficult constitutional method of removing judges—impeachment by the House of Representatives and conviction by a supermajority in the Senate.  *See* U.S. Const. art. I, § 2, cl. 5; *id.* § 3, cl. 6; *id.* art. II, § 4.  So, any proceedings that undermine Congress' *sole* role in removing Article III judges from the bench "imperil[s] a substantial public interest" in maintaining the constitutional structure of government.

The good news, however, is that the Judicial Council *still* has an opportunity to fix the problem, as it still can order a transfer of this matter.  Should it choose to take that course, it is more likely than not that the issue would be quickly resolved.

## VI.   THE RECOMMENDED SANCTION IS UNPRECEDENTED, EXCESSIVE, AND CONTRARY TO THE GOVERNING STATUTE

For all of the foregoing reasons, Judge Newman takes the position that she should not be subject to any sanction because a) she was not in violation of the Disability Act or the Conduct Rules, and b) because this Judicial Council should not continue to exercise jurisdiction over the matter.  However, even if the Judicial Council disagrees with some or all of the foregoing arguments, it should reject the sanction recommended by the Committee.

The Committee recommended that Judge Newman be subject to a period of suspension for one year at both panel and *en banc* levels, with a possibility of renewing the sanction indefinitely.[60]  Report at 109-11.  The recommendation is without basis in precedent and violates the statute.

### A.  THE SANCTION RECOMMENDED BY THE COMMITTEE IS EXCESSIVE AS COMPARED TO SANCTIONS IMPOSED ON OTHER JUDGES FOUND TO HAVE ENGAGED IN MISCONDUCT

Throughout its Report, the Committee cites heavily to the case of Judge John R. Adams of the Northern District of Ohio, who was ordered by the Judicial Council of the Sixth Circuit to submit to a mental health exam.  *See generally In re Complaint of Judicial*

---

[60] The Committee also suggested that it may be willing to lift the sanction sooner "[i]f Judge Newman undergoes the specified medical examinations, produces the specified medical records, and sits for an interview."  Report at 110-11.  As stated in the beginning of this brief, Judge Newman will not, under any circumstances, submit to these baseless demands, either now or in the future.

105

*Misconduct*, No. 06-13-90009 (Judicial Council of the Sixth Circuit Feb. 22, 2016), *aff'd-in-part and vacated-in-part by In re Complaint of Judicial Misconduct*, No. 17-01 (C.C.D. April 14, 2021).   On appeal, the Committee on Judicial Conduct and Disability affirmed the Judicial Council's order requiring mental health examination, but vacated the previously imposed sanction and remanded for further proceedings.[61]   Despite the affirmance, and following the remand of the case to the Judicial Council of the Sixth Circuit, Judge Adams persisted in his refusal to submit to a forced psychiatric examination.   In response, the Special Investigation Committee in that case recommended only a *six-month suspension* from being assigned new cases.[62]   The Committee here recommends a sanction that is twice as long (and renewable).   Indeed, the length of the sanction understates its severity because in *Adams*, with Judge Adams being a district court judge and, unlike Judge Newman, not having had to endure a suspension *pendente lite*, he would have retained a rather full docket even had the suspension been put into effect.   In contrast, Judge Newman who has been precluded from hearing cases *since April 2023*,

---

[61] Unlike with Judge Newman, Judge Adams was *never* prevented from being assigned cases during the pendency of the dispute.

[62] Ultimately, the Judicial Council of the Sixth Circuit rejected even this short suspension and eventually dismissed the case.   The Committee argues that "the circumstances here are not like *Adams* where the behavior that gave rise to the ordered medical examinations abated and eliminated the reasonable basis for ordering them." Report at 109.   Although in light of the evaluations by Drs. Rothstein and Carney this statement is incorrect, even if it were taken at face value, the fact remains that the Committee is recommending a sanction that is twice as heavy as the one recommended in the *Adams* case.   The Committee never explains *why* it chooses to depart from precedent so drastically.

and is not assigned to hear cases until at least November 2023, *i.e.*, Judge Newman has already been suspended for seven months, and thus, unlike Judge Adams will have no work left at all. Thus, the sanction that the Committee proposes is in actuality *more than twice* as harsh as that which was considered for Judge Adams. The Committee relies heavily on the *Adams* case for the rest of its conclusions (citing it over fifty times in its Report), but it does not bother explaining why such difference in treatment between Judge Adams and Judge Newman is warranted at the sanctions stage.

Nor do other cases where any suspension was imposed support the Committee's recommendation. A search of prior decisions from various other judicial councils revealed only a few instances of suspensions, and all of them were a result of grave misconduct. For example, the Judicial Council of the Fifth Circuit ordered a one-year suspension of District Judge Walter S. Smith, Jr. after concluding that he engaged in "inappropriate and unwanted physical and non-physical sexual advances" coupled with "allow[ing] false factual assertions to be made in response to the complaint." *In re Complaint of Judicial Misconduct Against United States District Judge Walter S. Smith, Jr.*, No. 05-14-90120 at 1 (Judicial Council of the Fifth Circuit, Dec. 3, 2015). Similarly, when the Judicial Conference concluded that District Judge G. Thomas Porteous, among other violations, perjured himself in his criminal proceedings and should be referred to the House of Representatives for an impeachment inquiry, the Judicial Council of the Fifth Circuit precluded Judge Porteous from hearing any cases "for two years … or

107

until Congress takes final action on the impeachment proceedings, whichever occurs earlier." *In re Complaint of Judicial Misconduct Against United States District Judge G. Thomas Porteous, Jr.*, No. 07-05-351-0085 at 4 (Judicial Council of the Fifth Circuit, Sept. 10, 2008). At the same time, it should be noted that prior to the referral of Judge Porteous for impeachment proceedings, the Judicial Council of the Fifth Circuit only barred him from hearing "bankruptcy cases or appeals or criminal or civil cases to which the United States is a party" but permitted him to "continue [the rest of] his civil docket and administrative duties until it is determined that he must devote his time primarily to his defense." *In re Complaint of Judicial Misconduct Against United States District Judge G. Thomas Porteous, Jr.*, No. 07-05-351-0085 at 6 (Judicial Council of the Fifth Circuit Dec. 20, 2007).[63]

Absent such extraordinarily egregious, bordering on or actually criminal conduct, judicial councils have not resorted to suspensions of such durations. Indeed, even when judges have committed significant and obvious violations of the Canons of Conduct, the maximum punishment appears to be a six-month suspension from having new cases assigned. *See, e.g.*, *In re Complaint of Judicial Misconduct*, No. 12-90026 and 12-90032 (Judicial Council of the Ninth Circuit, Mar. 15, 2013) (ordering that the then-Chief

---

[63] Only once the impeachment proceedings began did the Judicial Council, in recognition of the fact that Judge Porteous was spending all of his time on that matter, suspend him from hearing cases, but made clear that the suspension would end as soon as the impeachment proceedings ended and will not last more than two years in any event.

District Judge for the District of Montana Richard Cebull be assigned no new cases for 180 days following Judicial Council's finding that Judge Cebull *repeatedly* used the Court's email system to send extraordinarily racist and obviously political messages);[64] *In re Complaint of Judicial Misconduct*, No. 06-13-90009 (6th Cir. June 27, 2018) (recommending a six-month suspension for Judge Adams following his refusal to submit to medical testing).  The Judicial Council of the Seventh Circuit took an equally careful approach when it concluded that District Judge Colin S. Bruce of the Central District of Illinois "frequently had ex parte communications with the Office" of the United States Attorney which "involved draft plea agreements, jury instructions, or docketing issues" and other matters regarding pending trials.  *See In re Complaints Against District Judge Colin S. Bruce*, Nos. 07-18-90053, 07-18-90067 at 4-6 (Judicial Council of the Seventh Circuit May 8, 2019).[65]  Despite the finding that "Judge Bruce … violate[d] Canon 3 and judicial norms" and that his behavior undermined the public's confidence in the judicial system, *id.* at 9-10, the Judicial Council of the Seventh Circuit ordered only a public reprimand and a suspension of only the *criminal* docket (and only that which was handled by the

---

[64] It should be noted that Circuit Judge Sydney R. Thomas (whose chambers are in Montana) recused himself from participation in this matter.  This action is consistent with an argument that Judge Newman has been making throughout these proceedings.  *See ante* Part V.  (Circuit Judge Richard C. Tallman also recused himself.  The reasons for this action are unclear.)

[65] Again, it is worth pointing out that Judge Sara Darrow, who at the time served as a Chief Judge of the Central District of Illinois—the same court on which Judge Bruce sat—recused herself from the matter.

Office of the U.S. Attorney for the Central District of Illinois) for a period of one year, *id.* at 11. Similarly, the Judicial Council of the Fifth Circuit, upon concluding that then-District Judge Samuel G. Kent engaged in "sexual harassment toward an employee of the federal judicial system" accepted his *voluntary* four-month leave of absence, coupled with a public reprimand as an appropriate sanction. *In re Complaint of Judicial Misconduct against United States District Judge Samuel B. Kent*, No. 07-05-351-0086 at 2 (Judicial Council of the Fifth Circuit Sept. 28, 2007).[66]

Indeed, even in extraordinarily serious cases of misconduct, judicial councils of various circuits have eschewed wholesale long-term suspension of judges from their judicial duties. For example, upon finding that then-Judge Carlos Murguia "(1) sexually harass[ed] Judiciary employees; (2) engage[ed] in an extramarital sexual relationship with an individual who had been convicted of felonies in state court and was then on probation; and (3) demonstrate[d] habitual tardiness for court engagements," and "was less than candid with the Special Committee," the Judicial Council of the Tenth Circuit "publicly reprimanded Judge Murguia" and imposed several private restrictions none

---

[66] When further allegations against Judge Kent came to light, the Judicial Council stayed its hand pending the criminal investigation which ultimately resulted in Judge Kent's criminal conviction. Following the conviction, the Judicial Council referred the matter to the Judicial Conference for its determination as to whether Judge Kent should be referred to the U.S. House of Representatives for impeachment proceedings. *In re Complaint of Judicial Misconduct against United States District Judge Samuel B. Kent*, No. 07-05-351-0086 at 2 (Judicial Council of the Fifth Circuit May 27, 2009). Impeachment was obviated by Judge Kent's resignation from the bench.

of which amounted to removing him from hearing cases.  *In re Complaints Under the Judicial Conduct and Disability Act*, No. 19-02 at 5-6 (C.C.D. March 3, 2020).

The Committee's recommendation departs from these precedents where only the most egregious misconduct resulted in suspending judges from hearing some or all of the cases on their docket.  The Committee justifies its recommendation by claiming that Judge Newman attempted to "bring the mechanism Congress established for addressing judicial disability to a grinding halt simply by flouting the rules and refusing to cooperate," and "thwart[ed] the Committee's investigation."  Report at 110.  Nothing could be further from the truth.  Judge Newman's prior submissions and offers of cooperation would easily address any questions of judicial disability if only the Committee itself were willing to also act in a cooperative and collaborative manner. Nor did Judge Newman "thwart" the Committee's investigation (which had no basis to begin with).  To repeat, the central, and indeed the only question that ultimately needs to be resolved is whether or not Judge Newman is disabled.  (She is not).  That can be easily accomplished in the hands of a neutral adjudicative body.  However, it appears that the Committee is afraid that referring the matter to a neutral body would result in reevaluation of its own work and exposure of its own mistakes.  *See* Report at 91 (expressing concern that "a transferee circuit could choose to start the entire process

111

over.").[67]  Thus, the Committee's recommendation has no basis in precedent or fact. Furthermore, even assuming that Judge Newman's behavior *did* "thwart" the Committee's efforts, that finding would *still* be insufficient to impose a year-long suspension.  As discussed above, when Judge Adams "thwarted" the investigation into his alleged disability, the committee investigating him recommended only a six-month suspension.   Similarly, when investigating the matter of Judge Murguia, the Tenth Circuit Judicial Council concluded that he "was less than candid with the Special Committee," *i.e.*, impeded the Committee's efforts to investigate the allegations, yet, the Judicial Council chose to impose no suspension at all.  In short, once again, the Federal Circuit stands alone in its heavy-handed approach to this matter.  The Judicial Council should, therefore, reject the Committee's sanction recommendation.

B. THE SANCTION RECOMMENDED EXCEEDS THE COUNCIL'S STATUTORY AUTHORITY

The Committee recommends that "Judge Newman not be permitted to hear any cases not yet assigned to an authoring judge, at the panel or en banc level" for one year

---

[67] Of course, such a "do-over" would only be necessary if the transferee circuit were convinced that the proceedings up to this point were marred with impropriety.  Furthermore, any "inefficiencies" caused by "a transferee circuit … start[ing] the entire process over" are entirely the Chief Judge's, the Committee's, and the Judicial Council's fault.  This matter could have (and should have) been transferred months ago, which would have eliminated the worries about work going to waste.

"subject to consideration of renewal if the refusal to cooperate found here continues after that time." Report at 109.  This proposal is unlawful for two separate reasons.

First, the Committee is without authority to bar Judge Newman from participating in the *en banc* sessions of the Court.  The governing statute and rules (to the extent they are constitutional, *see infra*) permit the Judicial Council to direct that "on a temporary basis for a time certain, no further cases *be assigned to the judge* whose conduct is the subject of a complaint."  28 U.S.C. § 354(a)(2)(A)(i); *see also* Rule 20(b)(2)(D)(ii).  In the Federal Circuit, cases are "assigned" to panels, and judges are assigned to those panels in accordance with the procedures established by statute, Federal Circuit Rules and Internal Operating Procedures.  *See* 28 U.S.C. 46(b); Fed. Cir. R. 47.2(b); Fed. Cir. IOP 3.1.

Section 46(b) explicitly explains how judges should be "assigned" to panels, and how cases should be distributed to those panels.  In contrast, Section 46(c) explicitly states that "[a] court in banc *shall* consist of *all* circuit judges in regular active service." 28 U.S.C. § 46(c).  Thus, at the *en banc* level, the judges are not "assigned" to a particular case, but sit by operation of law.  The Judicial Council does not have authority (nor can it be delegated such) to rewrite a statute that explicitly commands a particular result.  Thus, at least insofar as the Committee's recommendation concerns Judge Newman's

potential participation (or a prohibition on such participation) in *en banc* matter, it directly contradicts the clear command of 28 U.S.C. § 46(c) and must be rejected.

Second, the Committee is attempting to use the proposed sanction as a tool of coercion rather than as a tool of remediation.  Neither the Disability Act not the Misconduct Rules vest such power in the Committee.  Rule 20 explicitly states that the Judicial Council is empowered only to "take *remedial action* to ensure the effective and expeditious administration of the business of the courts."

There is a fundamental difference between "coercive" and remedial actions.  As the Third Circuit explained,

> Remedial or compensatory actions are essentially backward looking, seeking to compensate the complainant through the payment of money for damages caused by past acts of disobedience.  Coercive sanctions, in contrast, look to the future and are designed to aid the plaintiff by bringing a defiant party into compliance with the court order or by assuring that a potentially contumacious party adheres to an injunction by setting forth in advance the penalties the court will impose if the party deviates from the path of obedience.

*Latrobe Steel Co. v. United Steelworkers of Am., AFL-CIO*, 545 F.2d 1336, 1344 (3d Cir. 1976) (footnotes omitted).  *See also* United States v. Dowell, 257 F.3d 694, 699 (7th Cir. 2001) ("Coercive sanctions seek to induce future behavior by attempting to coerce a recalcitrant party or witness to comply with an express court directive.  Remedial sanctions, by contrast, are backward-looking and seek to compensate an aggrieved party for losses sustained as a result of the contemnor's disobedience.") (internal citations

114

and quotations omitted); *In re Bradley*, 588 F.3d 254, 263 (5th Cir. 2009) (differentiating between "coercive" and remedial civil contempt and noting that "remedial civil contempt is backward-looking.").

The sanction proposed by the Committee is not "backward-looking" and targeted at Judge Newman's alleged past misconduct. Rather, the Committee is asking the Judicial Council to endorse a coercive sanction so as "to induce future behavior by attempting to coerce [Judge Newman] to comply with" the Committee's demands. Because the Committee's remit is limited only to sanctioning judges for past conduct, rather than attempting to directly compel some future conduct, the Committee's recommendation that the proposed suspension be subject to renewal must be rejected.

## C. THE SANCTION RECOMMENDED IS UNCONSTITUTIONAL

The judicial office to which every Article III judge is appointed consists of more than just an ability to draw life-time salary from the United States Treasury. The appointment to office carries with it the power to exercise the functions of that office. Indeed, the National Commission on Judicial Discipline and Removal, in its 1993 Report, recognized that "[u]nder Article III, federal judicial office has two consequences. First, a judge is legally eligible to exercise judicial power, because the judicial power of the United States is vested in courts made up of judges. Second, a judge is entitled to receive undiminished compensation." National Commission on

115

Judicial Discipline and Removal, Report, 152 F.R.D. 265, 287 (1993).[68]  *See also United States v. United Steelworkers of Am.*, 271 F.2d 676, 680 n.1 (3d Cir.), *aff'd*, 361 U.S. 39 (1959) (distinguishing between "hold[ing] office" and receiving compensation).  If the ability to "exercise judicial power" means anything, it must mean the ability to perform routine judicial functions such as hearing cases, and ruling on the controversies brought before the court.

Both historical and modern practices confirm the consistent understanding that, absent impeachment process, judges cannot be suspended from office either as a result of misconduct or disability.  Having examined historical precedent and practice, Professor Walter Pratt concluded that "[t]he entire history of good behavior tenure, both in England and in America, denies the possibility of removal for disability."  Walter F. Pratt, *Judicial Disability and the Good Behavior Clause*, 85 Yale. L.J. 706, 718 (1976).  And while Congress is entitled to create new mechanisms of judicial discipline and/or ways to start an impeachment process, Congress is not free to effect a removal of a judge through means *other than* impeachment.

---

[68] The Committee concluded that any suspension of a judge's salary or benefits in the absence of impeachment would violate the Constitution.  152 F.R.D. at 354 ("[T]ermination of salary would violate the Constitution absent resignation or removal.").  At the same time, despite recognizing that "federal judicial office has two consequences," *id.* at 287, the Committee incongruously concluded that Congress can tread (or authorize judicial councils to tread) on the first of those consequences— ability to "exercise judicial power."  The two conclusions are inconsistent with each other and only the former one is correct.

116

Congress could not, by mere statute, create a mechanism that would divest a President from any of his powers even in the face of obvious disability.  Recognizing this limit on its own authority Congress proposed, and the States ratified, the Twenty-Fifth Amendment.  *See* S. Rep. 88-1017 at 6-7 (1964).  The same limitation applies to Congressional ability to authorize new ways of judicial removal through mere statute because the original Constitution does not differentiate between methods of removing a President and an Article III judge, leaving the impeachment mechanism as a sole option to accomplish either.  *See* U.S. Const. art. II, § 4; Federalist 79; Joseph Story, 2 Commentaries on the Constitution of the United States § 790 at 258 (Hilliard, Gray 1833) (Fred B. Rothman & Co reprint ed. 1991) (stating that judicial officers are civil officers within the meaning of Article II).

The understanding that judges cannot be removed from their judicial duties has continued to the present day and is supported by the contemporaneous practices of various judicial councils.  As the report of the committee chaired by Associate Justice Stephen Breyer stated, since 1980, when the Disability Act became law, and until 2006, when the report was filed, the committee found "*no instances* in which the council ordered a suspension in the assignment of new cases."  Breyer Report, 239 F.R.D. at 143.[69]  The fact that in twenty-six years not a single federal judge was involuntarily

---

[69] The Breyer Committee identified a single case of misconduct where an accused judge, as part of a "settlement" "*agreed* to go on administrative leave for at least six months, during which he would undergo behavioral counseling, and to waive any doctor–patient privilege so that his doctor could

117

suspended from her judicial functions as punishment for any misconduct strongly suggests that judicial councils uniformly view this option as constitutionally suspect.

The Breyer Report finding is consistent with the understanding of constitutional limitations on judicial discipline that prevailed in Congress prior to the enactment of the Disability Act. Since publication of the Breyer Report, and as discussed above there have been at several instances of Judicial Council suspension or attempted suspension of Article III judges. None of those instances, however, undermine the present argument because in almost all of them, subject judges agreed with the sanction imposed.[70] There appears to be not a single case where a judge was wholly removed from hearing cases when the subject judge opposed such a sanction. The fact that in forty-three years since the passage of the Disability Act years not a single federal judge had been involuntarily suspended from her judicial functions as punishment for any misconduct strongly suggests that judicial councils uniformly view this option as constitutionally suspect. The Judicial Council of the Federal Circuit should not become the first one to impose an involuntary suspension on a member of its court.

---

consult with the special committee's expert." 239 F.R.D. at 196. The Breyer Committee noted that this was a "voluntary corrective action." A similar action was taken by Judge Kent when a complaint was lodged against him. *See In re Complaint of Judicial Misconduct against United States District Judge Samuel B. Kent*, No. 07-05-351-0086 at 2.

[70] Indeed, Judge Richard Cebull, *see supra*, initiated a complaint against himself, and though he defended himself against the charges of racism, he did not oppose the imposition of remedial measures including a prohibition on new cases being assigned to him.

118

D. *If the Judicial Council Is to Uphold the Recommendation in Toto, Judge Newman Should Be Credited with the Time She Has Already Served in a Suspended Status*

Judge Newman has been suspended from hearing cases since April 2023 and, given the Court's scheduling procedures, she will not be assigned cases until the November 2023 sitting of the Court at the earliest. In other words, Judge Newman has already experienced a suspension of seven months, which in and of itself is longer than almost any other suspension from judicial functions in the history of the United States.

Chief Judge Moore represented to Judge Newman that her suspension began as a result of the vote by the Judicial Council and will last through the entire pendency of the investigation. April 6 Order at 4. Both the Chief Judge and the Judicial Council should be held to their representation that the suspension was and is related to the investigation rather than any other matter. Consequently, this suspension that has always been termed as a disciplinary matter (at least until Judge Newman filed suit in the District Court) should be taken into account in imposing additional discipline on Judge Newman.

## CONCLUSION

For all of the foregoing reasons, the Judicial Council should reject the Committee's Report and bring this matter to a speedy conclusion. The reports of two qualified medical professionals put to rest any doubts about Judge Newman's competency. Even if the Judicial Council does not terminate the matter, it should

certainly reject the Committee's recommended sanction as contrary to law and precedent.

In the alternative, the Judicial Council should request that the matter be transferred to another circuit's judicial council. Absent either of these actions, the matter will remain at an impasse, because Judge Newman does not foresee a set of circumstances under which she will submit to the Committee's baseless demands.

Respectfully submitted,


/s/ *Gregory Dolin*
Gregory Dolin
Andrew Morris
John J. Vecchione
Mark Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
Greg.Dolin@NCLA.legal

August 31, 2023

120

# **<u>Attachment A</u>**

No. FC-23-90015

# In the Judicial Council of the
# United States Court of Appeals for the Federal Circuit

---

*In re Complaint No. 23-90015*
*(Complaint Against Circuit Judge Pauline Newman)*

DECLARATION OF TED L. ROTHSTEIN, M.D.

August 31, 2023

# DECLARATION OF TED L. ROTHSTEIN, M.D.

1. I, Ted J. Rothstein, M.D., am over the age of 18 and make this Declaration in support of Judge Pauline Newman's Response to the Judicial Council in her case before it.

2. I am a Neurologist practicing in Washington D.C. I am affiliated with the George Washington University Hospital. I received a medical degree from Virginia Commonwealth University School of Medicine.

3. I have practiced medicine for more than 30 years. I am Board Certified in Neurology. I served an internship at the Queens Hospital in Honolulu, Hawaii, and completed Residency in Neurology at University of Washington in Seattle, Washington.

4. I became Board Certified in Neurology in 1975 and am both a Fellow of the American Academy of Neurology and Stroke Fellow of the American Heart Association.

5. I have 32 peer reviewed publications in scientific journals and 100 presentations in my field.

6. My most recent publication is *Cortical Grey Matter Depletion Links with Neurological Sequelae in Post COVID-19 "Long Haulers,"* in BMC Neurol. 2023 Jan 17;23(1):22.

7. I make this Declaration based on personal knowledge as to my background, and information gleaned from examining Judge Newman on June 21, 2023. I produced a report based upon that examination on June 21, 2023, and it is attached as Exhibit 1 to this Declaration.

8. My examination of Judge Newman was, except as to adjust to her then broken wrist, complied in all respects with the Montreal Cognitive Assessment ("MoCa") test that is standard for assessing cognitive function.

9. Before administering the MoCa examination I took an oral medical and neurological history of Judge Newman. I also reviewed the analysis of Professor Andrew Michaels of the University of Houston on her representative opinions. At the time of my examination, she was under investigation by the Judicial Counsel for "medical impairments." My test demonstrated she had the cognitive function to continue to function as a judge in the court's proceedings.

10. It has been suggested that the MoCa test was inconclusive or unscientific because Judge Newman could not draw a clock at a particular time given her broken wrist.

11. The MoCa is a 30-point test and failure to draw a clock does not impede conclusions that can be drawn from the 3 points not testable. Moreover, a variety of elements are tested on MoCa, and spatial orientation is the only one that could not be evaluated on clock drawing.

12. Impaired wrist function does not preclude testing of cognitive function.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  <u>August 29, 2023</u>                    <u>     /s/ Ted L. Rothstein      </u>
                                                          Ted L. Rothstein, M.D.

# Exhibit 1
# to the Declaration of
# Ted L. Rothstein, M.D.



**NEUROLOGY**
at The GW Medical Faculty Associates

2150 Pennsylvania Avenue, NW, 9th Floor
Washington, DC 20037
phone: 202.741.2700 fax: 202.741.2721

Ms. Pauline Newman is a 96 yo United States Circuit Judge of the US court of Appeals who is here to evaluate her mental status.

She is currently under investigation by her Court for "medical impairments" including having had a heart attack and 2 stents -which she denies having- and being "intellectually compromised" and no longer able to function in her capacity as a federal judge. As a consequence she has been denied access to new cases.

Judge Newman denies having cognitive impairment. Her opinions in the past year have been quantitatively analyzed by Law Professor Andrew Michaels at the University of Houston Law School and found to be exemplary. He did not perceive "a significant drop in the quality or thoroughness of her opinions" over the previous decade.

She believes that she is being unfairly treated by her judicial colleagues. Much of this controversy has been depicted in Washington Post accounts over her being prevented from continuing to hear and write opinions on current cases.

Past medical Hx: She has a prior hx of "sick sinus syndrome" which is treated with a Pacemaker and ███████████████████████████████████████

She is a graduate of Vassar College, received a Master of Arts from Columbia University, a Doctor of Philosophy in Chemistry from Yale University and law degree from NY University School of Law. There is no family hx for memory disorders or dementia.

Judge Newman broke her right wrist one week ago and her R wrist is in a cast. She is unable to write.

Review of systems is otherwise not contributory.

On examination,
Her speech is fluid, with normal content and articulation. She describes her medical history and background with great detail and eloquence.

A partial MoCA examination is performed as she is unable to write and therefore cannot follow trail or draw a cube (each worth one point on the 30 point test).  She scores 24/28 failing to remember 4 of 5 words after several minutes. All other aspects of the test were precise and correct.

Her head is normocephalic.
Neck is supple.
Cranial nerves,
Funduscopic examination discloses bilateral cataracts. EOMi. PERRL.
Sensation is intact. Her face is symmetrical with normal smile and eye closure.
Hearing normal to voice.
Tongue protrudes in midline.

Sensory and Motor exam,
Sensation normal over both hands.
Her arm strength is not tested.
Her gait is normal with normal stride, turn and arm swing. Romberg is negative.
Reflexes are 2+ at the knees and ankles.

Impression,
Judge Newman has a slight limitation in immediate memory as reflected in her MoCA evaluation. Her cognition is otherwise completely normal. Her speech is normal and her ability to provide her vocational and medical history is precise and eloquent.

As she has a cardiac pacemaker and therefore she cannot undergo a Brain MRI with NeuroQuant which could have been used to measure volumes of key brain regions important for memory, she could have a more detailed neuropsychological evaluation as part of her neurological assessment..

My findings would support her having cognitive function sufficient to continue her participation in her court's proceedings.

Ted L. Rothstein MD
Professor of Neurology
George Washington University
June 21, 2023

# **Attachment B**

Regina Carney, M.D.
1870 SW 52nd Terrace
Plantation, FL 33317
615-636-5792

Independent Medical Examination
In the Matter of: Judge Pauline Newman

Introduction and Reason for Evaluation and Opinion

My name is Dr. Regina Carney. I am an adult forensic psychiatrist employed full-time by the Miami Veteran's Administration Medical Center, and working independently as a consultant on legal cases involving individuals with known or suspected psychiatric conditions. My credentials are more fully described on the curriculum vitae attached hereto as Exhibit 1 I have published the articles and chapters listed on Exhibit "A" hereto, focusing on cognitive disorders including Alzheimer's Disease and other dementias. I have testified as an expert witness during the past 4 years at trial or at deposition in the case listed in Exhibit 1.

I received my B.S. degree in biology from Duke University and my M.D. from Stony Brook University Medical Center in New York. I completed my residency in General Psychiatry at Vanderbilt University Medical Center in Nashville, Tennessee and completed a fellowship in forensic psychiatry at the University of Miami Miller School of Medicine in Miami, Florida. Previously, I served in the following positions: 1) Inpatient Staff Psychiatrist for the Mental Health and Behavioral Science Service at the Bruce W. Carter VA Medical Center; 2) Supervising Attending Physician for the Adult Outpatient Psychiatry Clinic at the University of Miami Miller School of Medicine; 3) Medical Director for the Miami Dade Forensic Alternative Center at the University of Miami Miller School of Medicine; and 4) Assistant Professor at the University of Miami Miller School of Medicine.

I am board-certified in both Adult Psychiatry and Forensic Psychiatry by the American Board of Psychiatry and Neurology. Attached as Exhibit A is my current CV. Dr. Gregory Dolin, a Senior Litigation Counsel with the New Civil Liberties Alliance and an attorney for Judge Newman, retained me to review and evaluate Judge Pauline Newman, a 96-year-old Judge in the Federal Circuit Court of Appeals, who lives in Washington, D.C.  The fees for my services are borne by Judge Newman and not NCLA.

The findings of this preliminary report are based in part on a three-hour clinical evaluation of Judge Newman performed by me on August 25, 2023, including administration of The Modified Mini-Mental State Examination (3-MS).

Other records reviewed and considered in the opinion include:

1) Primary Care Medical Records from One Medical Group for Judge Pauline Newman, dated 02/26/2021-06/14/2023

2) (Enclosed within above) Cardiology Medical Records from Scott Shapiro, MD, PhD, including an Echocardiogram performed 05/26/2023

3) Statement of Clinical Impression of Ted L Rothstein, MD, Neurologist, summarizing Clinical Evaluation and Findings from Examination dated 06/21/2023

3) Publicly available proceedings at: https://cafc.uscourts.gov/home/the-court/notices announcements/

4) Law360 Article by Andrew Michaels. "Judge Newman's Recent Dissents Show She Is Fit For Service," (06/06/2023)

5) Social Science Research Network Manuscript by Ron D. Katznelson, Ph.D. "Is There a Campaign to Silence Dissent at the Federal Circuit? (August 28, 2023)."

6) Description of duties of a United States Circuit Judge

Informed Consent

Judge Newman was informed that a confidential doctor-patient relationship did not exist due to the nature of the evaluation process, and that although an opinion would be rendered, medical treatment would not be provided. She agreed to pay the associated fees for this evaluation. The contract and fee structure were reviewed. Notably, Judge Newman carefully considered the contract and autonomously commented on the open-ended nature of the arrangement. She requested and her attorney executed an addendum to ensure costs beyond a reasonable, specific sum would be mutually agreed upon before being incurred. Judge Newman was informed that a report of the results of the evaluation would be provided to the U.S. Court of Appeals for the Federal Circuit in regard to the current investigation. Judge Newman indicated that she understood this information and agreed to undergo the evaluation. She provided written consent for disclosure of information to and from the non-public sources named in the records reviewed.

History of Present Complaint

Judge Newman presented for this evaluation on August 25, 2023 in association with an ongoing complaint and action filed with the U.S. Court of Appeals by Chief Judge Kimberley Moore, under the Judicial Conduct and Disability Act. The complaint filed by Chief Judge Moore states that concerns exists within the court that Judge Newman "has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts" and/or "is unable to discharge all the duties of office by reason of mental or physical disability." The complaint detailed allegations of decreased work output with significant and habitual delays in "processing and resolution of cases" (resulting in re-assignment of some cases), an episode of fainting during a hearing followed by Judge Newman's inability to ambulate independently, and potential "impairment of cognitive abilities (i.e., attention, focus, confusion and memory) that render Judge Newman unable to function effectively in discharging case- related and administrative duties. It has been stated that Judge Newman routinely makes statements in open court and during deliberative proceedings that demonstrate a clear lack of awareness over the issues in the cases." There was also an allegation of "inappropriate behavior in managing staff" and a disclosure of sensitive medical information to staff.

Judge Newman was suspended from hearing further cases beginning in April of 2023, "pending resolution of this investigation."

Evaluation and Observations

Judge Pauline Newman arrived 30 minutes early for the evaluation. She was professionally dressed, appropriate for the weather (mentioning it was likely to rain), and her grooming and hygiene were unremarkable, with no obvious areas of deficit. Demeanor was calm and cooperative. She had eyeglasses

that she wore for reading tasks but removed in conversation. She spoke fluently and attended well to the interview, handling changes in topic with agility. Her speech was notable for an expanded vocabulary consistent with her lifetime work in law. She was careful to clarify any terms that might have been unfamiliar to the interviewer; for example, she indicated that her judicial assistant functioned "in effect, as my secretary" until the interviewer indicated familiarity with the term "J.A.", whereupon she used that term going forward.

Interactively, Judge Newman warmed to the interview, and provided full and detailed responses. Judge Newman was able to articulate and respond to the concerns raised in a collected manner. She had no specific recollection of a negative event or experience that might have given rise to the complaint. She was aware that her intellectual abilities and personal medical fitness were being questioned, and stated, "If I'm deluding myself, I'd be glad to know that." When the prospect of a voluntary cognitive evaluation during the interview was mentioned, she frowned and opined, "it's totally improper and inappropriate for my colleagues to put me through these tests. When people are being evaluated, you eventually get to questions that cannot be answered. My experience with my colleagues is that whatever the break-point is, then they point out where you could not answer. There is also a totally unscrupulous media that misrepresents the results." The voluntary nature of the cognitive evaluation was reiterated, and the matter was agreed to be re-considered at the end of the interview.

Occupational History and Recent Events

Judge Newman provided a detailed social, educational, and occupational history that is abbreviated here for expediency. She recalled becoming a federal judge in 1984 at the request of President Ronald Reagan, from whom she received a personal phone call offering the role. At the time, she has been working for 30 years in a senior role in the patent system. In regard to the judgeship offer, she stated, "it wasn't what I was looking for, but the court had been formed just a few years before. In regard to the politics, I had no idea. I got a call and said I'd be willing." Judge Newman expressed that she finds her work intellectually and philosophically engaging, and enjoys it immensely. She remarked, "it's an extraordinary position; it's very difficult work, but it's full of satisfaction for doing something for the nation. Doing some justice." She noted, "I do speak out about what I think. I know very well I'm not popular with my peers. I think one of the reasons I'm in trouble is when I think they're wrong, I tell them. The Supreme Court usually then says I'm right - that's a reassurance."

With regard to productivity and quality of her opinions, Judge Newman expressed that she felt "nothing has changed. I'm still learning things." She agreed that human aging was generally associated with some natural slowing of work production and physical skills, particularly at extreme ages. However, she also noted that "the work does not require a 20-year old's peak [performance]. I see some things more clearly due to my experience." She referenced the statistical review of her work output published by Ron Katznelson (listed in records reviewed section of this evaluation) in this vein.

Judge Newman characterized herself as a generally strong-willed and outspoken individual, even when her opinions were not in line with others. She noted, "they are saying I'm grouchy and my staff have been leaving. I've been arguing with the IT staff because they took my [secretary's] computer two or three months ago." She also noted that "all of the affidavits saying my behavior is inappropriate have been in the past few months, since this complaint was filed. I am not physically disabled, and I'm still writing opinions. If I thought I was slipping, I would quit."

Judge Newman expressed understanding that individuals experiencing cognitive decline often exhibit impaired insight into their deficits. She was open to reflection on the particular threat to one's identity when a highly distinguished career—one requiring intellectual prowess and fine attention to detail and context—is brought into question by the prospect of cognitive decline. Unrelated to this discussion, but brought up at a different point in the evaluation, Judge Newman indicated that she was aware that her cataracts were impairing her vision. She noted that she had voluntarily allowed her driver's license to expire as she felt this condition made it unsafe for her to drive.

<u>Medical History</u>

Judge Newman was able to recount her own medical history accurately, including "a pacemaker due to what they call sick sinus syndrome, around 2018," a fractured right wrist a few months ago, ███████████ ███████████████████████ She stated that outside of the surgery to implant the pacemaker, she has had no other surgeries. ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

She denied episodes of confusion or getting lost. She denied any instances of seizures, traumatic brain injury, or noting loss of memory. She recalled a single event of syncope in April of 2023, "I think of dehydration. I was not admitted."

She denied having balance problems. She explained that she fractured her wrist while sprinting to take a photo of cardinals seen outside her apartment, where she lives alone.

In terms of past psychiatric history, she reported "none! To my amazement, even in this turmoil—well perhaps that's the fatal flaw—it's not getting to me." She stated that her mood remains upbeat ("maybe some good will come of this"), and her sleep is sufficient and restorative. She denies any personal history of anxiety, depression, mania, psychosis, or misuse of alcohol or other substances, and denied any family history of the same. Judge Newman reported that her mother had lived to be well into her late 90s with no cognitive difficulties.

<u>Current Function in Independent Activities of Daily Living</u>

Judge Newman lives alone in a two-story apartment in Washington, D.C. She has no significant other or children, but stays in contact with her sister's family and her friends. She remarked that she has been grateful to be a generally very healthy individual. She walks around the city for transportation. She reported that during the COVID public health emergency, she was advised to avoid large crowds due to her advanced age, and thus requested assistance with getting food. However, she stated that she herself prepares her own food. Since the announcement of the end of the public health emergency she has resumed going to the grocery store.

She stated that she has employed an individual to assist her with cleaning her apartment for many years; "I'm not much of a homemaker." She pays her own bills, and at the initiation of this evaluation, produced a check that she filled out accurately and completely for the retainer fee.

Cognitive Evaluation

Given Judge Newman's advanced educational attainment and exceptional verbal fluency, the possibility of some degree of successful concealment of an underlying cognitive defect was examined. A quantitative examination of cognition was thus performed at the end of the interview. The Modified Mini-Mental Status Exam (3-MS) was administered; this test was chosen specifically to avoid re-testing ("learning") effects related to the recently administered Montreal Cognitive Assessment (MOCA). Having personally administered the 3-MS several hundreds of times to individuals of varying cognitive abilities, my experience is that the examination usually requires 20 to 30 minutes to complete. The 3-MS is given in a highly standardized manner, with scripted prompts for the items. It is scored on a 100-point scale.

Judge Newman was able to read, write with her right hand, and reply appropriately to complete the examination. Judge Newman completed the 3-MS in 11 minutes, with a final score of 98 out of 100. She missed 2 points for generating only eight four-legged animals in 20 seconds, out of a possible 10. She was dismayed to hear of this result and scolded herself for not thinking of barnyard animals as a category. She scored perfectly on the word recall items, retaining all 3 words after both immediate and delayed time periods.  The original 3-MS scoresheet is attached as Exhibit 1.

Summary and Opinion:

In summary this is a fluent, engaging, strong-willed, highly accomplished and unusually cognitively intact 96-year-old woman with chronic medical issues that appear well-controlled at the current time, with no evidence of current substantial medical, psychiatric, or cognitive disability. She is ambulatory, provides a complete and accurate personal, social, occupational, and medical history, and is fully oriented to time, place, date, situation and the nature of the current investigation. She reports no history of, or current, psychiatric or cognitive issues including anxiety, depression, or substance use disorders. She appears to show remarkable resilience; while she noted feeling "defensive" about the investigation, she did not note persistently anxious or depressed mood. She expressed a positive worldview, and chatted extemporaneously with the interviewer regarding a recent advance in the treatment of alcoholism that she had read about.

In my medical and professional opinion, Judge Newman demonstrated no substantial emotional, medical, or psychiatric disability that would interfere with continuation of her longstanding duties as a Judge in the U.S. Court of Appeals.

Sincerely,

/s/

Regina Carney, M.D.
Diplomate, American Board of Psychiatry and Neurology
Diplomate, Forensic Psychiatry, American Board of Psychiatry and Neurology
Associate Program Director, Forensic Psychiatry Fellowship
Voluntary Assistant Professor, Department of Psychiatry and Behavioral Sciences
Leonard M. Miller School of Medicine at the University of Miami Adjunct Assistant Professor

Alpha Omega Alpha Teaching Faculty
Herbert Wertheim College of Medicine at Florida International University

Medical Director of Inpatient Psychiatric Services (09/2018-09/2022)
Medical Director of Outpatient Substance Use Disorder Clinic (09/2022-current)
Miami Veteran Affairs Medical Center
1201 NW 16th Street, Room A110
Miami, FL 33125
Phone: 615-636-5792 (cellular)
Email: rcarney0305@gmail.com

Exhibit 1
to the
Report of Independent
Medical Examination
of Pauline Newman
by
Regina M. Carney, M.D.

# THE MODIFIED MINI-MENTAL STATE EXAMINATION (3MS)

**Center:** | **Family #:** | **Individual #:** | **Individual's Name:** _Judge Pauline Newberger man_

**Date of Exam:** _08/25/2023_ (Friday) | **Examiner:** _Regina Carney, MD_

Now, I would like to ask you some questions to check your memory and concentration. Some of the questions may be easy and some will be harder. Take your time if you need to. We can skip over questions if you don't understand them. Just relax and do your best.

## START TIME [illegible]

1. **Who is the president of the United States now?**
   RECORD: _President Biden_
   CORRECT ............... **1**
   INCORRECT ............... 0
   REFUSED ............... 7

2. **Who was the president before him?** *transliteration ~~edit~~ (author's)*
   RECORD: _The Infamous Trump_
   CORRECT ............... **1**
   INCORRECT ............... 0
   REFUSED ............... 7

3. **Who is the Vice President of the United States now?**
   RECORD: _Kamala Harris_
   CORRECT ............... **1**
   INCORRECT ............... 0
   REFUSED ............... 7

4. **Who was the Vice President before him?** _her_
   RECORD: _the Infamous Pence_
   CORRECT ............... **1**
   INCORRECT ............... 0
   REFUSED ............... 7

5. **Who is the governor of (*your state*) now?**
   _We do not have a govn. in DC._
   RECORD: _How about Florida? ~~that de Santi~~_
   CORRECT ............... **1**
   INCORRECT ............... ~~0~~
   REFUSED ............... ~~7~~

6. **There are 3 words on this card that I would like you to remember. Please say the words aloud while you read them. Then I will take the card away, and have you repeat all 3 words.**
   SCORE (0-3) ............... **3**
   REFUSED ............... 7

   SHOW WORDS AND HAVE RESPONDENT READ. CORRECT (HIM/HER) IF (HE/SHE) MISREADS. TAKE CARD AWAY. Now what were those three words? HAVE RESPONDENT REPEAT. IF THERE ARE ERRORS, CONTINUE WITH ADDITIONAL TRIALS (UP TO 3 TRIALS).

   **NUMBER OF TRIALS NEEDED** [illegible]

   SCORE FIRST TRY. REPEAT WORDS FOR THREE TRIALS ONLY.

|  | TRIAL #1 | TRIAL #2 | TRIAL #3 |
|---|---|---|---|
| SHIRT | ✓ | ✓ | ✓ |
| NICKEL |  |  |  |
| HONESTY |  |  |  |

**** BE SURE TO SAY: <u>Remember the 3 words because later I will ask you to repeat them.</u>

☑ CHECK WHEN REMINDER IS GIVEN

_8_ Out of 8

Form Name: AD 3MS
Revised: 8/16/06

7.  **Now please count from 1 to 5.**
    ASSIST ONLY ONCE IF NEEDED.

DOES NOT COMPREHEND TASK SCORE 0 ON
BACKWARD TASK AND GOTO ITEM 8

RECORD:   ✔   ✔   ✔   ✔   ✔
           1    2    3    4    5

**Now I would like you to count backwards from 5 to 1.**

CORRECT...................................(2)
1 OR 2 ERRORS...............................1
≥3 ERRORS/CAN'T DO.................0
REFUSED.....................................7

RECORD:   ✔   ✔   ✔   ✔   ✔
           5    4    3    2    1

8.  **Please spell the word "World."**
    ASSIST ONLY ONCE IF NEEDED.

DOES NOT COMPREHEND TASK SCORE 0 ON
BACKWARD TASK AND GO TO ITEM 9

RECORD:   ✔   ✔   ✔   ✔   ✔
           W    O    R    L    D

**Now please spell "World" backwards.**

SCORE NO. OF LETTERS IN CORRECT
POSITION.........................................5
REFUSED.........................................7

RECORD:   ✔   ✔   ✔   ✔   ✔
           D    L    R    O    W

9.  **What were the three words that I asked you to remember?**  (SHIRT, NICKEL, HONESTY)
    IF THE SUBJECT DOES NOT GIVE ALL CORRECT ANSWERS, PROMPT AS NEEDED:

RECORD: ✔                          ✔                              ✔
         (SHIRT)                    (NICKEL)                       (HONESTY)

| A) SPONTANEOUS RECALL .............3 | B) SPONTANEOUS RECALL ..............3 | C) SPONTANEOUS RECALL................3 |
|---|---|---|
| 1) One of the words was something you wear. | 1) One of the words was some money. | 1) One of the words was a good personal quality or virtue. |
| RECORD_____2 | RECORD _____2 | RECORD_____2 |
| 2) SHOW CARD. HAVE S. READ AND MAKE SELECTION. *SHOES, SHIRT, SOCKS* ...................................1 CIRCLE WORD. | 2) SHOW CARD.  HAVE S. READ AND MAKE SELECTION. *PENNY, NICKEL, DOLLAR* ...................1 CIRCLE WORD. | 2) SHOW CARD. HAVE S. READ AND MAKE SELECTION. *HONESTY, CHARITY, MODESTY*...........................1 CIRCLE WORD. |
| 3) IF STILL INCORRECT RESPONSE, PROVIDE CORRECT ANSWER (shirt). | 3) IF STILL INCORRECT RESPONSE, PROVIDE CORRECT ANSWER (nickel). | 3) IF STILL INCORRECT RESPONSE, PROVIDE CORRECT ANSWER (honesty). |
| NO RECALL/CAN'T DO .....................0 | NO RECALL/CAN'T DO .....................0 | NO RECALL/CAN'T DO........................0 |
| REFUSED ........................................7 | REFUSED............................................7 | REFUSED ..........................................7 |

SCORE FOR SHIRT ............. 3
SCORE FOR NICKEL........... 3
SCORE FOR HONESTY ........ 3

16  Out of 16

## ORIENTATION SECTION (ITEMS 10-18)

10. **What year is it?**

    RECORD: 2023

    CORRECT ................................................ (2)
    MISSED BY 1 YEAR ................................................ 1
    INCORRECT/CAN'T DO ...................................... 0
    REFUSED ................................................ 7

11. **What is the season of the year?**

    RECORD: Summertime

    CORRECT WITHIN A WEEK ................................ (3)
    MISSED BY 1 MONTH ................................................ 2
    INCORRECT BUT NAMES A SEASON ..................... 1
    INCORRECT/CAN'T DO ...................................... 0
    REFUSED ................................................ 7

12. **What day of the week is it?**

    RECORD: Friday

    CORRECT ................................................ (3)
    MISSED BY 1 DAY ................................................ 1
    INCORRECT/CAN'T DO ...................................... 0
    REFUSED ................................................ 7

13. **What month is it?**

    RECORD: August

    CORRECT ................................................ (3)
    INCORRECT BUT WITHIN 3 DAYS ......................... 2
    MISSED BY 1 MONTH ................................................ 1
    INCORRECT/CAN'T DO ...................................... 0
    REFUSED ................................................ 7

14. **What is today's date?**

    RECORD: 25th

    CORRECT ................................................ (3)
    MISSED BY 1 OR 2 DAYS ................................................ 2
    MISSED BY 3-5 DAYS ................................................ 1
    INCORRECT/CAN'T DO ...................................... 0
    REFUSED ................................................ 7

15. **What state are we in?**
    we are not in a state
    RECORD: Can you tell me a nearby
    state? Virginia

    CORRECT ................................................ (2)
    INCORRECT/CAN'T DO ...................................... 0
    REFUSED ................................................ 7

16. **What county are we in?**

    RECORD: Can you tell me a
    nearby county? Montgomery Co, MD

    CORRECT ................................................ (1)
    INCORRECT/CAN'T DO ...................................... 0
    REFUSED ................................................ 7

17. **What town are we in?** Washington DC
    IF S. DOES NOT ANSWER, PROMPT AS NEEDED:
    **What is the nearest town?**
    **What town do you consider to live in?**
    **What is the town on your mailing address?**

    RECORD: 

    CORRECT ................................................ (1)
    INCORRECT/CAN'T DO ...................................... 0
    REFUSED ................................................ 7

18. **Are we in a church, a home or an office?**

    RECORD: office

    CORRECT ................................................ (1)
    INCORRECT/CAN'T DO ...................................... 0
    REFUSED ................................................ 7

**20** Out of 20

IF SUBJECT IS BLIND, TAP SUBJECT FOR ITEMS 19-23, AND SAY **"I am going to tap you and I'd like you to tell me the name of the body part that I tap."**

19.  POINT TO YOUR FOREHEAD.
     **What is this called?**

     CORRECT.................................................1
     INCORRECT/CAN'T DO...............................0
     REFUSED ...............................................7

     RECORD: _forehead_

20.  POINT TO YOUR CHIN.
     **What is this called?**

     CORRECT.................................................1
     INCORRECT/CAN'T DO...............................0
     REFUSED ...............................................7

     RECORD: _Chin_

21.  POINT TO YOUR SHOULDER.
     **What is this called?**

     CORRECT.................................................1
     INCORRECT/CAN'T DO...............................0
     REFUSED .3.F.........................................7

     _correct—M provider—examiner error R C_

     RECORD: _elbow_ → Shoudler _(move responses down please)_

22.  POINT TO YOUR ELBOW.
     **What is this called?**

     CORRECT.................................................1
     INCORRECT/CAN'T DO...............................0
     REFUSED ...............................................7

     RECORD: _Knuckles_

23.  POINT TO YOUR KNUCKLE.
     **What is this called?**

     CORRECT.................................................1
     INCORRECT/CAN'T DO...............................0
     REFUSED ...............................................7

     RECORD:

24.  **Now I am going to give you a category and I want you to name as many things as you can that come from that category.  For example, if I said "fruit," you would say "orange, apple, or banana."  Can you name another kind of fruit?  RECORD RESPONSE.**

     _grape_

Now I have another category and it is animals.  Please name as many four-legged animals as you can.  You will have 20 seconds.  START TIMER.  TELL SUBJECT, **"Begin now"**, ALLOW 20 SECONDS.  IF NO RESPONSE IN 10 SECONDS, REPEAT THE QUESTION ONCE, RECORD; ALLOW ANOTHER 10 SECONDS, THEN GO TO ITEM 25.

SCORE........................(0-10)    `0` `8`
REFUSED ........................97

| | |
|---|---|
| dog | deer |
| cat | leopard |
| lion | |
| tiger | |
| panther | |
| rhinoceras | |

_13_ Out of 15

32. HAND S. A PENCIL AND FOLDED SHEET. **Please write a sentence on this page.** ALLOW 1 MINUTE, AND ANOTHER 30 SECONDS AFTER PROMPTING (IF NECESSARY). PROMPT IF S. WRITES INCOMPLETE SENTENCE: **Write the sentence, "The band played and the crowd cheered."**

LEGIBLE, CORRECT SENTENCE ......................... (5)
LEGIBLE SENTENCE WITH ERROR(S) ................... 4
LEGIBLE, CORRECT SENTENCE AFTER
  PROMPT ................................................... 3
LEGIBLE SENTENCE WITH ERROR(S) AFTER
  PROMPT ................................................... 2
WRITES NAME OR LEGIBLE, INCOMPLETE
SENTENCE AFTER PROMPT ............................ 1
ILLEGIBLE/CAN'T DO ...................................... 0
REFUSED ....................................................... 7

33. SHOW S. SHEET WITH DRAWING. **Here is a drawing. Please copy the drawing on the same paper.** POINT TO BOTTOM OF THE PAGE BELOW DOTTED LINE. ALLOW 1 MINUTE FOR COPYING.

**SCORE EACH PENTAGON**                          L    R
5 SIDES ...................................... (4) . (4)
1 UNEQUAL SIDE ..................................3 . . . .3
OTHER CLOSED FIGURE ........................2 . . . .2
2 OR MORE LINES ...............................1 . . . .1
CAN'T DO .......................................... 0
REFUSED ............................................ 7

**INTERSECTION**
4 CORNERS ........................................ (2)
NOT A 4 CORNER ENCLOSURE .................... 1
NONE/CAN'T DO .................................. 0
REFUSED ............................................. 7

34. **What were the three words that I asked you to remember (SHIRT, NICKEL, HONESTY)? IF THE SUBJECT DOES NOT GIVE ALL CORRECT ANSWERS, PROMPT AS NEEDED:**

RECORD: _____✓_____        _____✓_____        _____~_____
    (SHIRT)                    (NICKEL)                     (HONESTY)

| A) SPONTANEOUS RECALL ..........(3) | B) SPONTANEOUS RECALL..........(3)✓ | C) SPONTANEOUS RECALL............(3) |
|---|---|---|
| **1) One of the words was something you wear.** | **1) One of the words was some money.** | **1) One of the words was a good personal quality or virtue.** |
| RECORD_____  **2** | RECORD_____ **2** | RECORD_____ **2** |
| 2) SHOW CARD. HAVE S. READ AND MAKE SELECTION. *SHOES, SHIRT, SOCKS* ...................................1 CIRCLE WORD. | 2) SHOW CARD. HAVE S. READ AND MAKE SELECTION. *PENNY, NICKEL, DOLLAR* ...................1 CIRCLE WORD. | 2) SHOW CARD. HAVE S. READ AND MAKE SELECTION. *HONESTY, CHARITY, MODESTY*............... 1 CIRCLE WORD. |
| 3) IF STILL INCORRECT RESPONSE, PROVIDE CORRECT ANSWER (shirt). | 3) IF STILL INCORRECT RESPONSE, PROVIDE CORRECT ANSWER (nickel). | 3) IF STILL INCORRECT RESPONSE, PROVIDE CORRECT ANSWER (honesty). |
| NO RECALL/CAN'T DO .................0 REFUSED.............................7 | NO RECALL/CAN'T DO.................0 REFUSED ..........................7 | NO RECALL/CAN'T DO .................0 REFUSED............................7 |

SCORE FOR SHIRT .................. [ ]

SCORE FOR NICKEL ................ [ ]

SCORE FOR HONESTY ............. [ ]

**END TIME** `0 6 : 2 0`

**24** Out of 24

Form Name: AD 3MS
Revised: 8/16/06

NOTES:
Some questions were improvised due to Washington DC (not being located in a state, or having a governor.) Subject was able to transition to state from which examiner traveled, with ease.

Category fluency. 8 of 10 animals listed in 20 seconds.

Cognitive function appears intact based on speed and accuracy of responsive responses, in context of extended qualitative interview given same day.

Ryan Camey
MD

| | 3MS Score |
|---|---|
| Page 1 Total: | 8 / 8 |
| Page 2 Total: | 16 / 16 |
| Page 3 Total: | 20 / 20 |
| Page 4 Total: | 13 / 15 |
| Page 5 Total: | 17 / 17 |
| Page 6 Total: | 24 / 24 |
| Total/Raw Score: | 98 / 100 |
| Education Adjusted Score: | _____ |

SHIRT

NICKEL

HONESTY

# CLOSE YOUR EYES




It looks like rain.

# ALZHEIMER DISEASE CLINICAL DEMENTIA RATING (CDR)

**Center:**    **Family#:**    **Individual#:**    **Individual's name:** _Judge Pauline Newman_

**Exam Date:** _08/23/2023_    **Examiner:** _Regina Carney, M.D._

**Evaluation by:** ☑ In Person ☐ Telephone ☑ Medical Records

**Reconstructed?** ☐ Yes ☑ No ☐ Unknown

| | **None** 0 | **Questionable** 0.5 | **Mild** 1 | **Moderate** 2 | **Severe** 3 | Score: |
|---|---|---|---|---|---|---|
| **Memory** | ⟨No memory loss or slight inconsistent forgetfulness⟩ | Consistent slight forgetfulness; partial recollection of events; "benign" forgetfulness | Moderate memory loss; more marked for recent events; defect interferes with everyday activities | Severe memory loss; only highly learned material retained; new material rapidly lost | Severe memory loss; only fragments remain | |
| **Orientation** | ⟨Fully Oriented⟩ | Fully oriented except for slight difficulty with time relationships | Moderate difficulty with time relationships; oriented for place at examination; may have geographic disorientation elsewhere | Severe difficulty with time relationships; usually disoriented to time, often to place | Oriented to person only | |
| **Judgment & Problem Solving** | ⟨Solves everyday problems & handles business & financial affairs well; judgment good in relation to past performance⟩ *not observed* | Slight impairment in solving problems, similarities, & differences | Moderate difficulty in handling problems, similarities, and differences; social judgment usually maintained | Severely impaired in handling problems, similarities, and differences; social judgment usually impaired | Unable to make judgments or solve problems | |
| **Community Affairs** | ⟨Independent function at usual level in job, shopping, volunteer & social groups⟩ | Slight impairment in these activities | Unable to function independently at these activities although may still be engaged in some; appears normal to casual inspection | No pretense of independent function outside home; appears well enough to be taken to functions outside a family home | No pretense of independent function outside home; appears too ill to be taken to functions outside the home | |
| **Home & Hobbies** | ⟨Life at home, hobbies, and intellectual interests well maintained⟩ *see: undergraduate Forum* | Life at home, hobbies, and intellectual interests impaired slightly *Forum* | Mild but definite impairment of function at home; more difficult chores abandoned; more complicated hobbies and interests abandoned | Only simple chores preserved; very restricted interests, poorly maintained | No significant function in home | |
| **Personal Care** | ⟨Fully capable of self care⟩ *Well dressed, appropriate grooming and attired; asked for restroom* | Fully capable of self-care | Needs prompting | Requires assistance in dressing, hygiene, keeping of personal effects | Requires much help with persons care; frequent incontinence | |

Impairment Level and CDR Score (0, 0.5, 1, 2, 3)

**Global CDR:** O

**Comments:**
AOO: _not apparent_

DEPRESSION/STROKE HISTORY: _declines entirely_

CHRONOLOGICAL HISTORY OF DECLINE: (PLEASE CONTINUE IN THE BACK) _history is per investigation; had a wrist fracture (nonoperative 08/2023)_

Form Name: AD CDR
Revised: 6/21/06

Exhibit 2
to the
Report of Independent
Medical Examination
of Pauline Newman
by
Regina M. Carney, M.D.

**REGINA MARIA CARNEY, M.D.**
**CURRICULUM VITAE**

**Date Prepared: August 24, 2023**

## I. PERSONAL

| | |
|---|---|
| **Name:** | **REGINA MARIA CARNEY, M.D.** |
| **Personal Phone**: | (615) 636-5792 |
| **E-mail Address:** | rcarney0305@gmail.com |
| **Current Position:** | Medical Director, Inpatient Psychiatry |

## II. HIGHER EDUCATION

| Institution: | Degree: | Date: |
|---|---|---|
| Department of Psychiatry and Behavioral Sciences Jackson Health System/ University of Miami Miller School of Medicine Miami, Florida | Fellowship, Forensic Psychiatry | 10/2011-08/2012 |
| Department of Psychiatry Vanderbilt University Medical Center Nashville, Tennessee | Residency, General Psychiatry | 07/2007-07/2011 |

| | | |
|---|---|---|
| Departments of Internal Medicine and Pediatrics<br>Chandler Medical Center<br>University of Kentucky<br>Lexington, Kentucky<br>(Moved to Kentucky, attended resident orientation | Intern,<br>Internal Medicine-Pediatrics | 07/2003-12/2003<br><br><br><br>06/2003) |
| Stony Brook University Medical Center<br>Stony Brook, New York | M.D.<br>With Recognition in Research | 08/1999-05/2003 |
| Duke University<br>Durham, North Carolina | B.S., Biology<br>Minors in Chemistry and Spanish | 08/1994-05/1998 |
| Highland High School<br>Highland, New York | High School Degree<br>With Valedictory Honors | 08/1990-06/1994 |

**Medical Licensure and Board Certification Status:**

| | |
|---|---|
| Florida Medical License | 01/2012-01/2024 |
| American Board of Psychiatry and Neurology<br>Adult Psychiatry Board Certification | 09/2014-12/2024 |
| American Board of Psychiatry and Neurology<br>Forensic Psychiatry Board Certification | 09/2017-12/2027 |
| Certified Florida Adult Forensic Examiner (Criminal Court Evaluations) | |
| Basic Life Support for Healthcare Providers | expires 10/2023 |

## III. EXPERIENCE

| | |
|---|---|
| 09/2022 – present | Medical Director Outpatient Substance Abuse Clinic Medical Director |
| 09/2018 – 09/2022 | Medical Director, Acute Inpatient Psychiatric Unit (4AB) |
| 08/2015 – 08/2018 | Staff Psychiatrist, Acute Inpatient Psychiatric Unit (4AB)<br>Mental Health and Behavioral Science Service<br>Bruce W. Carter VA Medical Center<br>Miami, Florida |
| 07/2019 – present | Associate Program Training Director<br>Forensic Psychiatry Fellowship<br>Department of Psychiatry and Behavioral Sciences<br>University of Miami Miller School of Medicine<br>Miami, Florida |
| 09/2012 – 08/2015 | Assistant Professor<br>Medical Director, Miami Dade Forensic Alternative Center |

|  | Supervising Attending Physician, Adult Outpatient Psychiatry Clinic |
|---|---|
|  | Department of Psychiatry and Behavioral Sciences |
|  | University of Miami Miller School of Medicine |
|  | Miami, Florida |

07/2011 – 05/2016    *Genomic Convergence in Alzheimer Disease*
*Alzheimer Disease Sequencing Project*
Associate Scientist
John P. Hussman Institute for Human Genomics
University of Miami Miller School of Medicine
Miami, Florida

07/2009 – 06/2011    *Metabolic Dysregulation in Major Depression: Dyslipidemia,*
*Inflammation, and Oxidative Stress*
Resident Research Project
Faculty Mentor and Primary Investigator: Richard C. Shelton, M.D.
Vanderbilt University Medical Center

01/2004 – 06/2007    *Genomic Convergence in Alzheimer Disease*
Post-doctoral Fellowship
Center for Human Genetics
Duke University Medical Center

06/1998 – 07/1999    *Genetics of Parkinson Disease*
Clinical Research Coordinator
Center for Human Genetics
Duke University Medical Center

## IV. PUBLICATIONS

**JOURNAL PUBLICATIONS**
**Refereed Journals:**

1. Rajabli F, Benchek P, Tosto G, [**…**], Naj AC. Multi-ancestry genome-wide meta-analysis of 56,241 individuals identifies LRRC4C, LHX5-AS1 and nominates ancestry-specific loci PTPRK, GRB14, and KIAA0825 as novel risk loci for Alzheimer disease: the Alzheimer Disease Genetics Consortium. 2023 July. doi: 10.1101/2023.07.06.23292311.

2. Cukier HN, Duarte CL, Laverde-Paz MJ, Simon SA, Van Booven DJ, Miyares AT, Whitehead PL, Hamilton-Nelson KL, Adams LD, **Carney RM**, Cuccaro ML, Vance JM, Pericak-Vance MA, Griswold AJ, Dykxhoorn DM. An Alzheimer's disease risk variant in TTC3 modifies the actin cytoskeleton organization and the PI3K-Akt signaling pathway in

iPSC-derived forebrain neurons. 2023 July. Neurobiology of Aging. doi: 10.1016/j.neurobiolaging.2023.07.007

3. Heath L, Earls JC, Magis AT, Kornilov SA, Lovejoy JC, Funk CC, Rappaport N, Logsdon BA, Mangravite LM, Kunkle BW, Martin ER, Naj AC, Ertekin-Taner N, Golde TE, Hood L, Price ND, **Alzheimer's Disease Genetics Consortium**. Manifestations of Alzheimer's disease genetic risk in the blood are evident in a multiomic analysis in healthy adults aged 18 to 90. Scientific Reports. 2022 April; 12(1):6117. doi: 10.1038/s41598-022-09825-2

4. Bellenguez C, Küçükali F, Jansen IE, […], Lambert JC. New insights into the genetic etiology of Alzheimer's disease and related dementias. Nature Genetics. 2022 April; 54(4):1-25. doi: 10.1038/s41588-022-01024-z.

5. Kunkle B, Schmidt M, Klein H-U, […],, Kukull WA. Novel Alzheimer Disease Risk Loci and Pathways in African American Individuals Using the African Genome Resources Panel: A Meta-analysis. JAMA Neurology. 2020 October; 78(1). doi: 10.1001/jamaneurol.2020.3536.

6. Reiman EM, Arboleda-Velasquez JF, Quiroz YT, Huentelman MJ, Beach TG, Caselli RJ, Chen Y, Su Y, Myers AJ, Hardy J, Paul Vonsattel J, Younkin SG, Bennett DA, De Jager PL, Larson EB, Crane PK, Keene CD, Kamboh MI, Kofler JK, Duque L, Gilbert JR, Gwirtsman HE, Buxbaum JD, Dickson DW, Frosch MP, Ghetti BF, Lunetta KL, Wang LS, Hyman BT, Kukull WA, Foroud T, Haines JL, Mayeux RP, Pericak-Vance MA, Schneider JA, Trojanowski JQ, Farrer LA, Schellenberg GD, Beecham GW, Montine TJ, Jun GR; **Alzheimer's Disease Genetics Consortium**. Exceptionally low likelihood of Alzheimer's dementia in APOE2 homozygotes from a 5,000-person neuropathological study. Nature Communications. 2020 February; 11(1):667. doi: 10.1038/s41467-019-14279-8.

7. Ma Y, Jun GR, Chung J, Zhang X, Kunkle BW, Naj AC, White CC, Bennett DA, De Jager PL; **Alzheimer's Disease Genetics Consortium**, Mayeux R, Haines JL, Pericak-Vance MA, Schellenberg GD, Farrer LA, Lunetta KL. CpG-related SNPs in the MS4A region have a dose-dependent effect on risk of late–onset Alzheimer disease. Aging Cell. 2019 Aug;18(4):e12964. doi: 10.1111/acel.12964. Epub 2019 May 29.

8. Kunkle BW, Grenier-Boley B, Sims R, Bis JC, Damotte V, Naj AC, Boland A, Vronskaya M, van der Lee SJ, Amlie-Wolf A, Bellenguez C, Frizatti A, Chouraki V, Martin ER, Sleegers K, Badarinarayan N, Jakobsdottir J, Hamilton-Nelson KL, Moreno-Grau S, Olaso R, Raybould R, Chen Y, Kuzma AB, Hiltunen M, Morgan T, Ahmad S, Vardarajan BN, Epelbaum J, Hoffmann P, Boada M, Beecham GW, Garnier JG, Harold D, Fitzpatrick AL, Valladares O, Moutet ML, Gerrish A, Smith AV, Qu L, Bacq D, Denning N, Jian X, Zhao Y, Del Zompo M, Fox NC, Choi SH, Mateo I, Hughes JT, Adams HH, Malamon J, Sanchez-Garcia F, Patel Y, Brody JA, Dombroski BA, Naranjo MCD, Daniilidou M, Eiriksdottir G, Mukherjee S, Wallon D, Uphill J, Aspelund T, Cantwell LB, Garzia F, Galimberti D, Hofer

E, Butkiewicz M, Fin B, Scarpini E, Sarnowski C, Bush WS, Meslage S, Kornhuber J, White CC, Song Y, Barber RC, Engelborghs S, Sordon S, Voijnovic D, Adams PM, Vandenberghe R, Mayhaus M, Cupples LA, Albert MS, De Deyn PP, Gu W, Himali JJ, Beekly D, Squassina A, Hartmann AM, Orellana A, Blacker D, Rodriguez-Rodriguez E, Lovestone S, Garcia ME, Doody RS, Munoz-Fernadez C, Sussams R, Lin H, Fairchild TJ, Benito YA, Holmes C, Karamujić-Čomić H, Frosch MP, Thonberg H, Maier W, Roshchupkin G, Ghetti B, Giedraitis V, Kawalia A, Li S, Huebinger RM, Kilander L, Moebus S, Hernández I, Kamboh MI, Brundin R, Turton J, Yang Q, Katz MJ, Concari L, Lord J, Beiser AS, Keene CD, Helisalmi S, Kloszewska I, Kukull WA, Koivisto AM, Lynch A, Tarraga L, Larson EB, Haapasalo A, Lawlor B, Mosley TH, Lipton RB, Solfrizzi V, Gill M, Longstreth WT Jr, Montine TJ, Frisardi V, Diez-Fairen M, Rivadeneira F, Petersen RC, Deramecourt V, Alvarez I, Salani F, Ciaramella A, Boerwinkle E, Reiman EM, Fievet N, Rotter JI, Reisch JS, Hanon O, Cupidi C, Andre Uitterlinden AG, Royall DR, Dufouil C, Maletta RG, de Rojas I, Sano M, Brice A, Cecchetti R, George-Hyslop PS, Ritchie K, Tsolaki M, Tsuang DW, Dubois B, Craig D, Wu CK, Soininen H, Avramidou D, Albin RL, Fratiglioni L, Germanou A, Apostolova LG, Keller L, Koutroumani M, Arnold SE, Panza F, Gkatzima O, Asthana S, Hannequin D, Whitehead P, Atwood CS, Caffarra P, Hampel H, Quintela I, Carracedo Á, Lannfelt L, Rubinsztein DC, Barnes LL, Pasquier F, Frölich L, Barral S, McGuinness B, Beach TG, Johnston JA, Becker JT, Passmore P, Bigio EH, Schott JM, Bird TD, Warren JD, Boeve BF, Lupton MK, Bowen JD, Proitsi P, Boxer A, Powell JF, Burke JR, Kauwe JSK, Burns JM, Mancuso M, Buxbaum JD, Bonuccelli U, Cairns NJ, McQuillin A, Cao C, Livingston G, Carlson CS, Bass NJ, Carlsson CM, Hardy J, **Carney RM**, Bras J, Carrasquillo MM, Guerreiro R, Allen M, Chui HC, Fisher E, Masullo C, Crocco EA, DeCarli C, Bisceglio G, Dick M, Ma L, Duara R, Graff-Radford NR, Evans DA, Hodges A, Faber KM, Scherer M, Fallon KB, Riemenschneider M, Fardo DW, Heun R, Farlow MR, Kölsch H, Ferris S, Leber M, Foroud TM, Heuser I, Galasko DR, Giegling I, Gearing M, Hüll M, Geschwind DH, Gilbert JR, Morris J, Green RC, Mayo K, Growdon JH, Feulner T, Hamilton RL, Harrell LE, Drichel D, Honig LS, Cushion TD, Huentelman MJ, Hollingworth P, Hulette CM, Hyman BT, Marshall R, Jarvik GP, Meggy A, Abner E, Menzies GE, Jin LW, Leonenko G, Real LM, Jun GR, Baldwin CT, Grozeva D, Karydas A, Russo G, Kaye JA, Kim R, Jessen F, Kowall NW, Vellas B, Kramer JH, Vardy E, LaFerla FM, Jöckel KH, Lah JJ, Dichgans M, Leverenz JB, Mann D, Levey AI, Pickering-Brown S, Lieberman AP, Klopp N, Lunetta KL, Wichmann HE, Lyketsos CG, Morgan K, Marson DC, Brown K, Martiniuk F, Medway C, Mash DC, Nöthen MM, Masliah E, Hooper NM, McCormick WC, Daniele A, McCurry SM, Bayer A, McDavid AN, Gallacher J, McKee AC, van den Bussche H, Mesulam M, Brayne C, Miller BL, Riedel-Heller S, Miller CA, Miller JW, Al-Chalabi A, Morris JC, Shaw CE, Myers AJ, Wiltfang J, O'Bryant S, Olichney JM, Alvarez V, Parisi JE, Singleton AB, Paulson HL, Collinge J, Perry WR, Mead S, Peskind E, Cribbs DH, Rossor M, Pierce A, Ryan NS, Poon WW, Nacmias B, Potter H, Sorbi S, Quinn JF, Sacchinelli E, Raj A, Spalletta G, Raskind M, Caltagirone C, Bossù P, Orfei MD, Reisberg B, Clarke R, Reitz C, Smith AD, Ringman JM, Warden D, Roberson ED, Wilcock G, Rogaeva E, Bruni AC, Rosen HJ, Gallo M, Rosenberg RN, Ben-Shlomo Y, Sager MA, Mecocci P, Saykin AJ, Pastor P, Cuccaro ML, Vance JM, Schneider JA, Schneider LS, Slifer S, Seeley WW, Smith

AG, Sonnen JA, Spina S, Stern RA, Swerdlow RH, Tang M, Tanzi RE, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Van Eldik LJ, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Wilhelmsen KC, Williamson J, Wingo TS, Woltjer RL, Wright CB, Yu CE, Yu L, Saba Y, Pilotto A, Bullido MJ, Peters O, Crane PK, Bennett D, Bosco P, Coto E, Boccardi V, De Jager PL, Lleo A, Warner N, Lopez OL, Ingelsson M, Deloukas P, Cruchaga C, Graff C, Gwilliam R, Fornage M, Goate AM, Sanchez-Juan P, Kehoe PG, Amin N, Ertekin-Taner N, Berr C, Debette S, Love S, Launer LJ, Younkin SG, Dartigues JF, Corcoran C, Ikram MA, Dickson DW, Nicolas G, Campion D, Tschanz J, Schmidt H, Hakonarson H, Clarimon J, Munger R, Schmidt R, Farrer LA, Van Broeckhoven C, C O'Donovan M, DeStefano AL, Jones L, Haines JL, Deleuze JF, Owen MJ, Gudnason V, Mayeux R, Escott-Price V, Psaty BM, Ramirez A, Wang LS, Ruiz A, van Duijn CM, Holmans PA, Seshadri S, Williams J, Amouyel P, Schellenberg GD, Lambert JC, Pericak-Vance MA; Alzheimer Disease Genetics Consortium (ADGC),; European Alzheimer's Disease Initiative (EADI),; Cohorts for Heart and Aging Research in Genomic Epidemiology Consortium (CHARGE),; Genetic and Environmental Risk in AD/Defining Genetic, Polygenic and Environmental Risk for Alzheimer's Disease Consortium (GERAD/PERADES),. Genetic meta-analysis of diagnosed Alzheimer's disease identifies new risk loci and implicates Aβ, tau, immunity and lipid processing. Nat Genet. 2019 Mar;51(3):414-430. doi: 10.1038/s41588-019-0358-2. Epub 2019 Feb 28.

9. Chauhan G, Adams HHH, Satizabal CL, Bis JC, Teumer A, Sargurupremraj M, Hofer E, Trompet S, Hilal S, Smith AV, Jian X, Malik R, Traylor M, Pulit SL, Amouyel P, Mazoyer B, Zhu YC, Kaffashian S, Schilling S, Beecham GW, Montine TJ, Schellenberg GD, Kjartansson O, Guðnason V, Knopman DS, Griswold ME, Windham BG, Gottesman RF, Mosley TH, Schmidt R, Saba Y, Schmidt H, Takeuchi F, Yamaguchi S, Nabika T, Kato N, Rajan KB, Aggarwal NT, De Jager PL, Evans DA, Psaty BM, Rotter JI, Rice K, Lopez OL, Liao J, Chen C, Cheng CY, Wong TY, Ikram MK, van der Lee SJ, Amin N, Chouraki V, DeStefano AL, Aparicio HJ, Romero JR, Maillard P, DeCarli C, Wardlaw JM, Hernández MDCV, Luciano M, Liewald D, Deary IJ, Starr JM, Bastin ME, Muñoz Maniega S, Slagboom PE, Beekman M, Deelen J, Uh HW, Lemmens R, Brodaty H, Wright MJ, Ames D, Boncoraglio GB, Hopewell JC, Beecham AH, Blanton SH, Wright CB, Sacco RL, Wen W, Thalamuthu A, Armstrong NJ, Chong E, Schofield PR, Kwok JB, van der Grond J, Stott DJ, Ford I, Jukema JW, Vernooij MW, Hofman A, Uitterlinden AG, van der Lugt A, Wittfeld K, Grabe HJ, Hosten N, von Sarnowski B, Völker U, Levi C, Jimenez-Conde J, Sharma P, Sudlow CLM, Rosand J, Woo D, Cole JW, Meschia JF, Slowik A, Thijs V, Lindgren A, Melander O, Grewal RP, Rundek T, Rexrode K, Rothwell PM, Arnett DK, Jern C, Johnson JA, Benavente OR, Wassertheil-Smoller S, Lee JM, Wong Q, Mitchell BD, Rich SS, McArdle PF, Geerlings MI, van der Graaf Y, de Bakker PIW, Asselbergs FW, Srikanth V, Thomson R, McWhirter R, Moran C, Callisaya M, Phan T, Rutten-Jacobs LCA, Bevan S, Tzourio C, Mather KA, Sachdev PS, van Duijn CM, Worrall BB, Dichgans M, Kittner SJ, Markus HS, Ikram MA, Fornage M, Launer LJ, Seshadri S, Longstreth WT Jr, Debette S; Stroke Genetics Network (SiGN), the International Stroke Genetics Consortium (ISGC), METASTROKE, **Alzheimer's Disease Genetics Consortium (ADGC)**, and the Neurology

Working Group of the Cohorts for Heart and Aging Research in Genomic Epidemiology (CHARGE) Consortium. Genetic and lifestyle risk factors for MRI-defined brain infarcts in a population-based setting. Neurology. 2019 Jan 16;92(5):e486-503. doi: 10.1212/WNL.0000000000006851. Online ahead of print. PMID: 30651383

10. Cukier HN, Kunkle BK, Hamilton KL, Rolati S, Kohli MA, Whitehead PL, Jaworski J, Vance JM, Cuccaro ML, **Carney RM**, Gilbert JR, Farrer LA, Martin ER, Beecham GW, Haines JL, Pericak-Vance MA. Exome Sequencing of Extended Families with Alzheimer's Disease Identifies Novel Genes Implicated in Cell Immunity and Neuronal Function. J Alzheimers Dis Parkinsonism. 2017 Aug;7(4). pii: 355. doi: 10.4172/2161-0460.1000355. Epub 2017 Jul 31.

11. Kunkle BW, Vardarajan BN, Naj AC, Whitehead PL, Rolati S, Slifer S, **Carney RM**, Cuccaro ML, Vance JM, Gilbert JR, Wang LS, Farrer LA, Reitz C, Haines JL, Beecham GW, Martin ER, Schellenberg GD, Mayeux RP, Pericak-Vance MA. Early-Onset Alzheimer Disease and Candidate Risk Genes Involved in Endolysosomal Transport. JAMA Neurol. 2017 Sep 1;74(9):1113-1122. doi: 10.1001/jamaneurol.2017.1518

12. Sims R, van der Lee SJ, Naj AC, Bellenguez C, Badarinarayan N, Jakobsdottir J, Kunkle BW, Boland A, Raybould R, Bis JC, Martin ER, Grenier-Boley B, Heilmann-Heimbach S, Chouraki V, Kuzma AB, Sleegers K, Vronskaya M, Ruiz A, Graham RR, Olaso R, Hoffmann P, Grove ML, Vardarajan BN, Hiltunen M, Nöthen MM, White CC, Hamilton-Nelson KL, Epelbaum J, Maier W, Choi SH, Beecham GW, Dulary C, Herms S, Smith AV, Funk CC, Derbois C, Forstner AJ, Ahmad S, Li H, Bacq D, Harold D, Satizabal CL, Valladares O, Squassina A, Thomas R, Brody JA, Qu L, Sánchez-Juan P, Morgan T, Wolters FJ, Zhao Y, Garcia FS, Denning N, Fornage M, Malamon J, Naranjo MCD, Majounie E, Mosley TH, Dombroski B, Wallon D, Lupton MK, Dupuis J, Whitehead P, Fratiglioni L, Medway C, Jian X, Mukherjee S, Keller L, Brown K, Lin H, Cantwell LB, Panza F, McGuinness B, Moreno-Grau S, Burgess JD, Solfrizzi V, Proitsi P, Adams HH, Allen M, Seripa D, Pastor P, Cupples LA, Price ND, Hannequin D, Frank-García A, Levy D, Chakrabarty P, Caffarra P, Giegling I, Beiser AS, Giedraitis V, Hampel H, Garcia ME, Wang X, Lannfelt L, Mecocci P, Eiriksdottir G, Crane PK, Pasquier F, Boccardi V, Henández I, Barber RC, Scherer M, Tarraga L, Adams PM, Leber M, Chen Y, Albert MS, Riedel-Heller S, Emilsson V, Beekly D, Braae A, Schmidt R, Blacker D, Masullo C, Schmidt H, Doody RS, Spalletta G, Jr WTL, Fairchild TJ, Bossù P, Lopez OL, Frosch MP, Sacchinelli E, Ghetti B, Yang Q, Huebinger RM, Jessen F, Li S, Kamboh MI, Morris J, Sotolongo-Grau O, Katz MJ, Corcoran C, Dunstan M, Braddel A, Thomas C, Meggy A, Marshall R, Gerrish A, Chapman J, Aguilar M, Taylor S, Hill M, Fairén MD, Hodges A, Vellas B, Soininen H, Kloszewska I, Daniilidou M, Uphill J, Patel Y, Hughes JT, Lord J, Turton J, Hartmann AM, Cecchetti R, Fenoglio C, Serpente M, Arcaro M, Caltagirone C, Orfei MD, Ciaramella A, Pichler S, Mayhaus M, Gu W, Lleó A, Fortea J, Blesa R, Barber IS, Brookes K, Cupidi C, Maletta RG, Carrell D, Sorbi S, Moebus S, Urbano M, Pilotto A, Kornhuber J, Bosco P, Todd S, Craig D, Johnston J, Gill M, Lawlor B, Lynch A, Fox NC, Hardy J; ARUK

Consortium, Albin RL, Apostolova LG, Arnold SE, Asthana S, Atwood CS, Baldwin CT, Barnes LL, Barral S, Beach TG, Becker JT, Bigio EH, Bird TD, Boeve BF, Bowen JD, Boxer A, Burke JR, Burns JM, Buxbaum JD, Cairns NJ, Cao C, Carlson CS, Carlsson CM, **Carney RM**, Carrasquillo MM, Carroll SL, Diaz CC, Chui HC, Clark DG, Cribbs DH, Crocco EA, DeCarli C, Dick M, Duara R, Evans DA, Faber KM, Fallon KB, Fardo DW, Farlow MR, Ferris S, Foroud TM, Galasko DR, Gearing M, Geschwind DH, Gilbert JR, Graff-Radford NR, Green RC, Growdon JH, Hamilton RL, Harrell LE, Honig LS, Huentelman MJ, Hulette CM, Hyman BT, Jarvik GP, Abner E, Jin LW, Jun G, Karydas A, Kaye JA, Kim R, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lunetta KL, Lyketsos CG, Marson DC, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Morris JC, Murrell JR, Myers AJ, O'Bryant S, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Perry W, Peskind E, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Reitz C, Ringman JM, Roberson ED, Rogaeva E, Rosen HJ, Rosenberg RN, Sager MA, Saykin AJ, Schneider JA, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Swerdlow RH, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Van Deerlin VM, Van Eldik LJ, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Wilhelmsen KC, Williamson J, Wingo TS, Woltjer RL, Wright CB, Yu CE, Yu L, Garzia F, Golamaully F, Septier G, Engelborghs S, Vandenberghe R, De Deyn PP, Fernadez CM, Benito YA, Thonberg H, Forsell C, Lilius L, Kinhult-Ståhlbom A, Kilander L, Brundin R, Concari L, Helisalmi S, Koivisto AM, Haapasalo A, Dermecourt V, Fievet N, Hanon O, Dufouil C, Brice A, Ritchie K, Dubois B, Himali JJ, Keene CD, Tschanz J, Fitzpatrick AL, Kukull WA, Norton M, Aspelund T, Larson EB, Munger R, Rotter JI, Lipton RB, Bullido MJ, Hofman A, Montine TJ, Coto E, Boerwinkle E, Petersen RC, Alvarez V, Rivadeneira F, Reiman EM, Gallo M, O'Donnell CJ, Reisch JS, Bruni AC, Royall DR, Dichgans M, Sano M, Galimberti D, St George-Hyslop P, Scarpini E, Tsuang DW, Mancuso M, Bonuccelli U, Winslow AR, Daniele A, Wu CK; GERAD/PERADES, CHARGE, ADGC, EADI, Peters O, Nacmias B, Riemenschneider M, Heun R, Brayne C, Rubinsztein DC, Bras J, Guerreiro R, Al-Chalabi A, Shaw CE, Collinge J, Mann D, Tsolaki M, Clarimón J, Sussams R, Lovestone S, O'Donovan MC, Owen MJ, Behrens TW, Mead S, Goate AM, Uitterlinden AG, Holmes C, Cruchaga C, Ingelsson M, Bennett DA, Powell J, Golde TE, Graff C, De Jager PL, Morgan K, Ertekin-Taner N, Combarros O, Psaty BM, Passmore P, Younkin SG, Berr C, Gudnason V, Rujescu D, Dickson DW, Dartigues JF, DeStefano AL, Ortega-Cubero S, Hakonarson H, Campion D, Boada M, Kauwe JK, Farrer LA, Van Broeckhoven C, Ikram MA, Jones L, Haines JL, Tzourio C, Launer LJ, Escott-Price V, Mayeux R, Deleuze JF, Amin N, Holmans PA, Pericak-Vance MA, Amouyel P, van Duijn CM, Ramirez A, Wang LS, Lambert JC, Seshadri S, Williams J, Schellenberg GD. Rare coding variants in PLCG2, ABI3, and TREM2 implicate microglial-mediated innate immunity in Alzheimer's disease. Nat Genet. 2017 Sep;49(9):1373-1384. doi: 10.1038/ng.3916. Epub 2017 Jul 17. PMID: 28714976

13. Kunkle BW, **Carney RM**, Kohli MA, Naj AC, Hamilton-Nelson KL, Whitehead PL, Wang L, Lang R, Cuccaro ML, Vance JM, Byrd GS, Beecham GW, Gilbert JR, Martin ER, Haines

JL, Pericak-Vance MA. Targeted sequencing of ABCA7 identifies splicing, stop-gain and intronic risk variants for Alzheimer disease. Neurosci Lett. 2017 May 10;649:124-129. doi: 10.1016/j.neulet.2017.04.014. Epub 2017 Apr 8. PMID: 28400126

14. Jun GR, Chung J, Mez J, Barber R, Beecham GW, Bennett DA, Buxbaum JD, Byrd GS, Carrasquillo MM, Crane PK, Cruchaga C, De Jager P, Ertekin-Taner N, Evans D, Fallin MD, Foroud TM, Friedland RP, Goate AM, Graff-Radford NR, Hendrie H, Hall KS, Hamilton-Nelson KL, Inzelberg R, Kamboh MI, Kauwe JSK, Kukull WA, Kunkle BW, Kuwano R, Larson EB, Logue MW, Manly JJ, Martin ER, Montine TJ, Mukherjee S, Naj A, Reiman EM, Reitz C, Sherva R, St George-Hyslop PH, Thornton T, Younkin SG, Vardarajan BN, Wang LS, Wendlund JR, Winslow AR; Alzheimer's Disease Genetics Consortium, Haines J, Mayeux R, Pericak-Vance MA, Schellenberg G, Lunetta KL, Farrer LA. Transethnic genome-wide scan identifies novel Alzheimer's disease loci. Alzheimers Dement. 2017 Jul;13(7):727-738. doi: 10.1016/j.jalz.2016.12.012. Epub 2017 Feb 7. PMID: 28183528

15. Cuccaro ML, **Carney RM**, Zhang Y, Bohm C, Kunkle BW, Vardarajan BN, Whitehead PL, Cukier HN, Mayeux R, St George-Hyslop P, Pericak-Vance MA. *SORL1* mutations in early- and late-onset Alzheimer disease. Neurol Genet. 2016 Oct 26;2(6):e116. eCollection 2016 Dec. PMID: 27822510

16. Cukier HN, Kunkle BW, Vardarajan BN, Rolati S, Hamilton-Nelson KL,  Kohli MA, Whitehead PL, Dombroski BA, Van Booven D, Lang R, Dykxhoorn DM, Farrer LA, Cuccaro ML, Vance JM, Gilbert JR, Beecham GW, Martin ER, **Carney RM**, Mayeux R, Schellenberg GD, Byrd GS, Haines JL, Pericak-Vance MA, for the Alzheimer's Disease Genetics Consortium. ABCA7 Frameshift Deletion Associated with Alzheimer's Disease in African Americans. Neurol Genet. 2016 May 17;2(3):e79. doi: 10.1212/NXG.0000000000000079. eCollection 2016 Jun. PMID: 27231719

17. Ridge PG, Hoyt KB, Boehme K, Mukherjee S, Crane PK, Haines JL, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD, Kauwe JSK; Alzheimer's Disease Genetics Consortium (ADGC). Assessment of the genetic variance of late-onset Alzheimer's disease. Neurobiol Aging. 2016 May;41:200.e13-200.e20. doi: 10.1016/j.neurobiolaging.2016.02.024. Epub 2016 Mar 3. PMID:27036079

18. Karch CM, Ezerskiy LA, Bertelsen S; Alzheimer's Disease Genetics Consortium (ADGC), Goate AM. Alzheimer's Disease Risk Polymorphisms Regulate Gene Expression in the ZCWPW1 and the CELF1 Loci. PLoS One. 2016 Feb 26;11(2):e0148717. doi:10.1371/journal.pone.0148717. eCollection 2016. PMID: 26919393

19. Kohli MA, Cukier HN, Hamilton-Nelson KL, Rolati S, Kunkle BW, Whitehead PL, Züchner S, Farrer L, Martin ER, Beecham G, Haines JL, Vance JM, Cuccaro ML, Gilbert JR, Schellenberg GD, **Carney RM**, Pericak-Vance MA. Segregation of a rare TTC3 variant in an

extended family with late-onset Alzheimer's disease. Neurol Genet. 2:e41; doi: 10.1212/NXG.000000000000004. Jan 2016.

20. Ghani M, Reitz C, Cheng R, Vardarajan BN, Jun G, Sato C, Naj A, Rajbhandary R, Wang LS, Valladares O, Lin CF, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RC, Griffith PA, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Lee JH, Schellenberg GD, St George-Hyslop P, Mayeux R, Rogaeva E; **Alzheimer's Disease Genetics Consortium**. Association of long runs of homozygosity with Alzheimer disease among African American individuals. JAMA Neurol. 72(11):1313-23. doi: 10.1001/jamaneurol.2015.1700. Nov 2015.

21. Kunkle BW, Jaworski J, Barral S, Vardarajan B, Beecham GW, Martin ER, Cantwell LS, Partch A, Bird TD, Raskind WH, DeStefano AL, **Carney RM**, Cuccaro M, Vance JM, Farrer LA, Goate AM, Foroud T, Mayeux RP, Schellenberg GD, Haines JL, Pericak-Vance MA. Genome-wide linkage analyses of non-Hispanic white families identify novel loci for familial late-onset Alzheimer's disease. Alzheimers Dement. S1552-5260(15)00224-1. doi: 10.1016/j.jalz.2015.05.020. [Epub ahead of print]. Sep 2015.

22. Ebbert MT, Boehme KL, Wadsworth ME, Staley LA; Alzheimer's Disease Neuroimaging Initiative; **Alzheimer's Disease Genetics Consortium**, Mukherjee S, Crane PK, Ridge PG, Kauwe JS. Interaction between variants in CLU and MS4A4E modulates Alzheimer's disease risk. Alzheimers Dement. S1552-5260(15)02866-6. doi: 10.1016/j.jalz.2015.08.163. [Epub ahead of print] Oct 2015.

23. Mukherjee S, Walter S, Kauwe JS, Saykin AJ, Bennett DA, Larson EB, Crane PK, Glymour MM; Adult Changes in Thought Study Investigators; Religious Orders Study/Memory and Aging Project Investigators; **Alzheimer's Disease Genetics Consortium**. Genetically predicted body mass index and Alzheimer's disease-related phenotypes in three large samples: Mendelian randomization analyses. Alzheimers Dement. S1552-5260(15)00184-3. doi: 10.1016/j.jalz.2015.05.015. [Epub ahead of print] Jun 2015.

24. Østergaard SD, Mukherjee S, Sharp SJ, Proitsi P, Lotta LA, Day F, Perry JR, Boehme KL, Walter S, Kauwe JS, Gibbons LE; **Alzheimer's Disease Genetics Consortium**; GERAD1 Consortium; EPIC-InterAct Consortium, Larson EB, Powell JF, Langenberg C, Crane PK, Wareham NJ, Scott RA. Associations between potentially modifiable risk factors and Alzheimer disease: a Mendelian randomization study. PLoS Med. 12(6):e1001841; discussion e1001841. doi: 10.1371/journal.pmed.1001841. Jun 2015.

25. Hohman TJ, Bailey JN, Reitz C, Jun G, Naj AC, Beecham GW, Liu Z, **Carney RM**, Vance JM, Cuccaro ML, Rajbhandary RA, Vardarajan BN, Wang LS, Valladares O, Lin CF, Larson

EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrel JR, Raj T, Ertekin-Taner N, Logue MW, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RCP, Griffith P, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Harrie NC, Lopez OL, Bennett DA, Hardy J, Hendrie HC, Hall KS, Goate AM, Lang-Walker R, Byrd GS, Kukull WA, Foroud TM, Farrer LA, Martin ER, Pericak-Vance MA, Schellenberg GD, Mayeux R, Haines JL, Thornton-Wells TA; Alzheimer's Disease Genetics Consortium. Global and local ancestry in African Americans: implications for Alzheimer's disease risk. Alzheimer's Dement. S1552-5260(15)00190-9. doi: 10.1016/j.jalz.2015.02.012. [Epub ahead of print] Jun 2015.

26. Jun G, Ibrahim-Verbaas CA, Vronskaya M, Lambert JC, Chung J, Naj AC, Kunkle BW, Wang LS, Bis JC, Bellenguez C, Harold D, Lunetta KL, Destefano AL, Grenier-Boley B, Sims R, Beecham GW, Smith AV, Chouraki V, Hamilton-Nelson KL, Ikram MA, Fievet N, Denning N, Martin ER, Schmidt H, Kamatani Y, Dunstan ML, Valladares O, Laza AR, Zelenika D, Ramirez A, Foroud TM, Choi SH, Boland A, Becker T, Kukull WA, van der Lee SJ, Pasquier F, Cruchaga C, Beekly D, Fitzpatrick AL, Hanon O, Gill M, Barber R, Gudnason V, Campion D, Love S, Bennett DA, Amin N, Berr C, Tsolaki M, Buxbaum JD, Lopez OL, Deramecourt V, Fox NC, Cantwell LB, Tárraga L, Dufouil C, Hardy J, Crane PK, Eiriksdottir G, Hannequin D, Clarke R, Evans D, Mosley TH Jr, Letenneur L, Brayne C, Maier W, De Jager P, Emilsson V, Dartigues JF, Hampel H, Kamboh MI, de Bruijn RF, Tzourio C, Pastor P, Larson EB, Rotter JI, O'Donovan MC, Montine TJ, Nalls MA, Mead S, Reiman EM, Jonsson PV, Holmes C, St George-Hyslop PH, Boada M, Passmore P, Wendland JR, Schmidt R, Morgan K, Winslow AR, Powell JF, Carasquillo M, Younkin SG, Jakobsdóttir J, Kauwe JS, Wilhelmsen KC, Rujescu D, Nöthen MM, Hofman A, Jones L; **IGAP Consortium**, Haines JL, Psaty BM, Van Broeckhoven C, Holmans P, Launer LJ, Mayeux R, Lathrop M, Goate AM, Escott-Price V, Seshadri S, Pericak-Vance MA, Amouyel P, Williams J, van Duijn CM, Schellenberg GD, Farrer LA. A novel Alzheimer disease locus located near the gene encoding tau protein. Mol Psychiatry. doi: 10.1038/mp.2015.23. [Epub ahead of print]. Mar 2015.

27. Wang LS, Naj AC, Graham RR, Crane PK, Kunkle BW, Cruchaga C, Murcia JD, Cannon-Albright L, Baldwin CT, Zetterberg H, Blennow K, Kukull WA, Faber KM, Schupf N, Norton MC, Tschanz JT, Munger RG, Corcoran CD, Rogaeva E; Alzheimer's Disease Genetics Consortium, Lin CF, Dombroski BA, Cantwell LB, Partch A, Valladares O, Hakonarson H, St George-Hyslop P, Green RC, Goate AM, Foroud TM, **Carney RM**, Larson EB, Behrens TW, Kauwe JS, Haines JL, Farrer LA, Pericak-Vance MA, Mayeux R, Schellenberg GD; National Institute on Aging-Late-Onset Alzheimer's Disease (NIA-LOAD) Family Study. Rarity of the Alzheimer disease-protective APP A673T variant in the United States. JAMA Neurol. 72(2):209-16. Feb 2015.

28. Wetzel-Smith MK, Hunkapiller J, Bhangale TR, Srinivasan K, Maloney JA, Atwal JK, Sa SM, Yaylaoglu MB, Foreman O, Ortmann W, Rathore N, Hansen DV, Tessier-Lavigne M; **Alzheimer's Disease Genetics Consortium**, Mayeux R, Pericak-Vance M, Haines J, Farrer

LA, Schellenberg GD, Goate A, Behrens TW, Cruchaga C, Watts RJ, Graham RR. A rare mutation in UNC5C predisposes to late-onset Alzheimer's disease and increases neuronal cell death. Nat Med. 20(12):1452-7. Dec 2014.

29. Ramirez A, van der Flier WM, Herold C, Ramonet D, Heilmann S, Lewczuk P, Popp J, Lacour A, Drichel D, Louwersheimer E, Kummer MP, Cruchaga C, Hoffmann P, Teunissen C, Holstege H, Kornhuber J, Peters O, Naj AC, Chouraki V, Bellenguez C, Gerrish A; **International Genomics of Alzheimer's Project (IGAP)**; Alzheimer's Disease Neuroimaging Initiative (ADNI), Heun R, Frölich L, Hüll M, Buscemi L, Herms S, Kölsch H, Scheltens P, Breteler MM, Rüther E, Wiltfang J, Goate A, Jessen F, Maier W, Heneka MT, Becker T, Nöthen MM. SUCLG2 identified as both a determinator of CSF Aβ1-42 levels and an attenuator of cognitive decline in Alzheimer's disease. Hum Mol Genet. 23(24):6644-58. Dec 2014.

30. Naj AC, Jun G, Reitz C, Kunkle BW, Perry W, Park YS, Beecham GW, Rajbhandary RA, Hamilton-Nelson KL, Wang LS, Kauwe JS, Huentelman MJ, Myers AJ, Bird TD, Boeve BF, Baldwin CT, Jarvik GP, Crane PK, Rogaeva E, Barmada MM, Demirci FY, Cruchaga C, Kramer PL, Ertekin-Taner N, Hardy J, Graff-Radford NR, Green RC, Larson EB, St George-Hyslop PH, Buxbaum JD, Evans DA, Schneider JA, Lunetta KL, Kamboh MI, Saykin AJ, Reiman EM, De Jager PL, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Martin ER, Haines JL, Mayeux RP, Farrer LA, Schellenberg GD, Pericak-Vance MA; Alzheimer Disease Genetics Consortium, Albert MS, Albin RL, Apostolova LG, Arnold SE, Barber R, Barnes LL, Beach TG, Becker JT, Beekly D, Bigio EH, Bowen JD, Boxer A, Burke JR, Cairns NJ, Cantwell LB, Cao C, Carlson CS, **Carney RM**, Carrasquillo MM, Carroll SL, Chui HC, Clark DG, Corneveaux J, Cribbs DH, Crocco EA, DeCarli C, DeKosky ST, Dick M, Dickson DW, Duara R, Faber KM, Fallon KB, Farlow MR, Ferris S, Frosch MP, Galasko DR, Ganguli M, Gearing M, Geschwind DH, Ghetti B, Gilbert JR, Glass JD, Growdon JH, Hamilton RL, Harrell LE, Head E, Honig LS, Hulette CM, Hyman BT, Jicha GA, Jin LW, Karydas A, Kaye JA, Kim R, Koo EH, Kowall NW, Kramer JH, LaFerla FM, Lah JJ, Leverenz JB, Levey AI, Li G, Lieberman AP, Lin CF, Lopez OL, Lyketsos CG, Mack WJ, Martiniuk F, Mash DC, Masliah E, McCormick WC, McCurry SM, McDavid AN, McKee AC, Mesulam M, Miller BL, Miller CA, Miller JW, Murrell JR, Olichney JM, Pankratz VS, Parisi JE, Paulson HL, Peskind E, Petersen RC, Pierce A, Poon WW, Potter H, Quinn JF, Raj A, Raskind M, Reisberg B, Ringman JM, Roberson ED, Rosen HJ, Rosenberg RN, Sano M, Schneider LS, Seeley WW, Smith AG, Sonnen JA, Spina S, Stern RA, Tanzi RE, Thornton-Wells TA, Trojanowski JQ, Troncoso JC, Valladares O, Van Deerlin VM, Van Eldik LJ, Vardarajan BN, Vinters HV, Vonsattel JP, Weintraub S, Welsh-Bohmer KA, Williamson J, Wishnek S, Woltjer RL, Wright CB, Younkin SG, Yu CE, Yu L. Effects of multiple genetic loci on age at onset in late-onset Alzheimer disease: a genome-wide association study. JAMA Neurol. 71(11):1394-404. 2014.

31. Logue MW, Schu M, Vardarajan BN, Farrell J, Bennett DA, Buxbaum JD, Byrd GS, Ertekin-Taner N, Evans D, Foroud T, Goate A, Graff-Radford NR, Kamboh MI, Kukull WA, Manly JJ; **Alzheimer Disease Genetics Consortium**. Two rare AKAP9 variants are associated with Alzheimer's disease in African Americans. Alzheimers Dement. 10(6):609-618.e11. 2014.

32. Gross AL, Sherva R, Mukherjee S, Newhouse S, Kauwe JS, Munsie LM, Waterston LB, Bennett DA, Jones RN, Green RC, Crane PK; Alzheimer's Disease Neuroimaging Initiative; GENAROAD Consortium; **AD Genetics Consortium**. Calibrating longitudinal cognition in Alzheimer's disease across diverse test batteries and datasets. Neuroepidemiology. 43(3-4):194-205. doi: 10.1159/000367970. 2014.

33. Beecham GW, Hamilton K, Naj AC, Martin ER, Huentelman M, Myers AJ, Corneveaux JJ, Hardy J, Vonsattel JP, Younkin SG, Bennett DA, De Jager PL, Larson EB, Crane PK, Kamboh MI, Kofler JK, Mash DC, Duque L, Gilbert JR, Gwirtsman H, Buxbaum JD, Kramer P, Dickson DW, Farrer LA, Frosch MP, Ghetti B, Haines JL, Hyman BT, Kukull WA, Mayeux RP, Pericak-Vance MA, Schneider JA, Trojanowski JQ, Reiman EM; **Alzheimer's Disease Genetics Consortium (ADGC)**, Schellenberg GD, Montine TJ. Genome-wide association meta-analysis of neuropathologic features of Alzheimer's disease and related dementias. PLoS Genet. 10(9):e1004606. 2014.

34. Benitez BA, Jin SC, Guerreiro R, Graham R, Lord J, Harold D, Sims R, Lambert JC, Gibbs JR, Bras J, Sassi C, Harari O, Bertelsen S, Lupton MK, Powell J, Bellenguez C, Brown K, Medway C, Haddick PC, van der Brug MP, Bhangale T, Ortmann W, Behrens T, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD, Haines JL, Turton J, Braae A, Barber I, Fagan AM, Holtzman DM, Morris JC; 3C Study Group; EADI consortium; **Alzheimer's Disease Genetic Consortium (ADGC)**; Alzheimer's Disease Neuroimaging Initiative (ADNI); GERAD Consortium, Williams J, Kauwe JS, Amouyel P, Morgan K, Singleton A, Hardy J, Goate AM, Cruchaga C. Missense variant in TREML2 protects against Alzheimer's disease. Neurobiol Aging. 35(6):1510.e19-26. 2014.

35. Nelson PT, Estus S, Abner EL, Parikh I, Malik M, Neltner JH, Ighodaro E, Wang WX, Wilfred BR, Wang LS, Kukull WA, Nandakumar K, Farman ML, Poon WW, Corrada MM, Kawas CH, Cribbs DH, Bennett DA, Schneider JA, Larson EB, Crane PK, Valladares O, Schmitt FA, Kryscio RJ, Jicha GA, Smith CD, Scheff SW, Sonnen JA, Haines JL, Pericak-Vance MA, Mayeux R, Farrer LA, Van Eldik LJ, Horbinski C, Green RC, Gearing M, Poon LW, Kramer PL, Woltjer RL, Montine TJ, Partch AB, Rajic AJ, Richmire K, Monsell SE; **Alzheimer Disease Genetic Consortium**, Schellenberg GD, Fardo DW. ABCC9 gene polymorphism is associated with hippocampal sclerosis of aging pathology. Acta Neuropathol. 127(6):825-43. 2014.

36. **Carney RM**, Kohli MA, Kunkle BW, Naj AC, Gilbert JR, Züchner S, Pericak-Vance MA. Parkinsonism and distinct dementia patterns in a family with the MAPT R406W mutation. Alzheimers Dement, 10(3):360-5. 2014.

37. Ruiz A, Heilmann S, Becker T, Hernández I, Wagner H, Thelen M, Mauleón A, Rosende-Roca M, Bellenguez C, Bis JC, Harold D, Gerrish A, Sims R, Sotolongo-Grau O, Espinosa A, Alegret M, Arrieta JL, Lacour A, Leber M, Becker J, Lafuente A, Ruiz S, Vargas L, Rodríguez O, Ortega G, Dominguez MA; **IGAP**, Mayeux R, Haines JL, Pericak-Vance MA, Farrer LA, Schellenberg GD, Chouraki V, Launer LJ, van Duijn C, Seshadri S, Antúnez C, Breteler MM, Serrano-Ríos M, Jessen F, Tárraga L, Nöthen MM, Maier W, Boada M, Ramírez A. Follow-up of loci from the International Genomics of Alzheimer's Disease Project identifies TRIP4 as a novel susceptibility gene. Transl Psychiatry. 4:e358. 2014.

38. Sherva R, Tripodis Y, Bennett DA, Chibnik LB, Crane PK, de Jager PL, Farrer LA, Saykin AJ, Shulman JM, Naj A, Green RC, GENAROAD Consortium, Alzheimer's Disease Neuroimaging Initiative, **Alzheimer's Disease Genetics Consortium**. Genome-wide association study of the rate of cognitive decline in Alzheimer's disease. Alzheimers Dement. 10(1):45-52. 2014.

39. Ridge PG, Mukherjee S, Crane PK, Kauwe JS, **Alzheimer's Disease Genetics Consortium.** Alzheimer's disease: analyzing the missing heritability. PLoS One;8(11):e79771. 2013.

40. Lambert JC, Ibrahim-Verbaas CA, Harold D, Naj AC, Sims R, Bellenguez C, DeStafano AL, Bis JC, Beecham GW, Grenier-Boley B, Russo G, Thorton-Wells TA, Jones N, Smith AV, Chouraki V, Thomas C, Ikram MA, Zelenika D, Vardarajan BN, Kamatani Y, Lin CF, Gerrish A, Schmidt H, Kunkle B, Dunstan ML, Ruiz A, Bihoreau MT, Choi SH, Reitz C, Pasquier F, Cruchaga C, Craig D, Amin N, Berr C, Lopez OL, De Jager PL, Deramecourt V, Johnston JA, Evans D, Lovestone S, Letenneur L, Morón FJ, Rubinsztein DC, Eiriksdottir G, Sleegers K, Goate AM, Fiévet N, Huentelman MW, Gill M, Brown K, Kamboh MI, Keller L, Barberger-Gateau P, McGuiness B, Larson EB, Green R, Myers AJ, Dufouil C, Todd S, Wallon D, Love S, Rogaeva E, Gallacher J, St George-Hyslop P, Clarimon J, Lleo A, Bayer A, Tsuang DW, Yu L, Tsolaki M, Bossù P, Spalletta G, Proitsi P, Collinge J, Sorbi S, Sanchez-Garcia F, Fox NC, Hardy J, Deniz Naranjo MC, Bosco P, Clarke R, Brayne C, Galimberti D, Mancuso M, Matthews F; European Alzheimer's Disease Initiative (EADI); Genetic and Environmental Risk in Alzheimer's Disease; **Alzheimer's Disease Genetic Consortium**; Cohorts for Heart and Aging Research in Genomic Epidemiology, Moebus S, Mecocci P, Del Zompo M, Maier W, Hampel H, Pilotto A, Bullido M, Panza F, Caffarra P, Nacmias B, Gilbert JR, Mayhaus M, Lannefelt L, Hakonarson H, Pichler S, Carrasquillo MM, Ingelsson M, Beekly D, Alvarez V, Zou F, Valladares O, Younkin SG, Coto E, Hamilton-Nelson KL, Gu W, Razquin C, Pastor P, Mateo I, Owen MJ, Faber KM, Jonsson PV, Combarros O, O'Donovan MC, Cantwell LB, Soininen H, Blacker D, Mead S, Mosley TH Jr, Bennett DA, Harris TB, Fratiglioni L, Holmes C, de Bruijn RF, Passmore P, Montine TJ, Bettens K, Rotter JI, Brice A, Morgan K, Foroud TM, Kukull WA, Hannequin D, Powell

JF, Nalls MA, Ritchie K, Lunetta KL, Kauwe JS, Boerwinkle E, Riemenschneider M, Boada M, Hiltuenen M, Martin ER, Schmidt R, Rujescu D, Wang LS, Dartigues JF, Mayeux R, Tzourio C, Hofman A, Nöthen MM, Graff C, Psaty BM, Jones L, Haines JL, Holmans PA, Lathrop M, Pericak-Vance MA, Launer LJ, Farrer LA, van Duijn CM, Van Broeckhoven C, Moskvina V, Seshadri S, Williams J, Schellenberg GD, Amouyel P. Meta-analysis of 74,046 individuals identifies 11 new susceptibility loci for Alzheimer's disease. Nat Genet. 45(12):1452-8. 2013.

41. Reitz C, Mayeux R, **Alzheimer's Disease Genetics Consortium**. TREM2 and neurodegenerative disease. N Engl J Med 17;369(16):1564-5. 2013.

42. Reitz C, Tosto G, Vardarajan B, Rogaeva E, Ghani M, Rogers RS, Conrad C, Haines JL, Pericak-Vance MA, Fallin MD, Foroud T, Farrer LA, Schellenberg GD, George-Hyslop PS, R Mayeux R, the **Alzheimer's Disease Genetics Consortium**. Independent and epistatic effects of variants in VPS10-d receptors on Alzheimer disease risk and processing of the amyloid precursor protein (APP). Transl Psychiatry 3, e256. 2013.

43. Kohli MA, John-Williams K, Rajbhandary R, Naj A, Whitehead P, Hamilton K, **Carney RM**, Wright C, Crocco E, Gwirtzman HE, Lang R, Beecham G, Martin ER, Gilbert J, Benatar M, Small GW, Mash D, Byrd G, Haines JL, Pericak-Vance MA, Züchner S. Repeat expansions in the C9ORF72 gene contribute to Alzheimer's disease in Caucasians. Neurobiol Aging. 34(5):1519.e5-12. 2013.

44. Reitz C, Jun G, Naj A, Rajbhandary R, Vardarajan BN, Wang L-S, Valladares O, Lin C-F, Larson EB, Graff-Radford NR, Evans D, De Jager PL, Crane PK, Buxbaum JD, Murrell JR, Raj T, Ertekin-Taner N, Logue M, Baldwin CT, Green RC, Barnes LL, Cantwell LB, Fallin MD, Go RCP, Griffith P, Obisesan TO, Manly JJ, Lunetta KL, Kamboh MI, Lopez OL, Bennett DA, Hendrie H, Hall KS, Goate AM, Byrd GS, Kukull WA, Foroud TM, Haines JL, Farrer LA, Pericak-Vance MA, Schellenberg GD, Mayeux R, for **the Alzheimer Disease Genetics Consortium**. Variants in the ATP-binding cassette transporter (ABCA7), apolipoprotein E ε4,and the risk of late-onset Alzheimer disease in African Americans. JAMA. 309(14):1483-1492. 2013.

45. Cruchaga C, Kauwe JS, Harari O, Jin SC, Cai Y, Karch CM, Benitez BA, Jeng AT, Skorupa T, Carrell D, Bertelsen S, Bailey M, McKean D, Shulman JM, De Jager PL, Chibnik L, Bennett DA, Arnold SE, Harold D, Sims R, Gerrish A, Williams J, Van Deerlin VM, Lee VM, Shaw LM, Trojanowski JQ, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD, Peskind ER, Galasko D, Fagan AM, Holtzman DM, Morris JC; GERAD Consortium; Alzheimer's Disease Neuroimaging Initiative (ADNI); **Alzheimer Disease Genetic Consortium (ADGC)**, Goate AM. GWAS of cerebrospinal fluid tau levels identifies risk variants for Alzheimer's disease. Neuron. 78(2):256-68. 2013.

46. Miyashita A, Koike A, Jun G, Wang L-S, Takahashi S, Matsubara E, Kawarabayashi T, Shoji M, Tomita N, Arai H, Asada T, Harigaya Y, Ikeda M, Amari M, Hanyu H, Higuchi S, Ikeuchi T, Nishizawa M, Suga M, Kawase Y, Akatsu H, Kosaka K, Yamamoto T, Imagawa M, Hamaguchi T, Yamada M, Moriaha T, Takeda M, Takao T, Nakata K, Fujisawa Y, Sasaki K, Watanabe K, Nakashima K, Urakami K, Ooya T, Takahashi M, Yuzuriha T, Serikawa K, Yoshimoto S, Nakagawa R, Kim J-W, Ki C-S, Won H-H, Na DL, Seo SW, Mook-Jung I, **The Alzheimer Disease Genetics Consortium**, St. George-Hyslop P, Mayeux R, Haines JL, Pericak-Vance MA, Yoshida M, Nishida N, Tokunaga K, Yamamoto K, Tsuji S, Kanazawa I, Ihara Y, Schellenberg GD, Farrer LA, Kuwano R. SORL1 is genetically associated with late-onset Alzheimer's disease in Japanese, Koreans and Caucasians. Plos One, 8(4): e58618. 2013.

47. Holton P, Ryten M, Nalls M, Trabzuni D, Weale ME, Hernandez D, Crehan H, Gibbs JR, Mayeux R, Haines JL, Farrer LA, Pericak-Vance MA, Schellenberg GD; **Alzheimer's Disease Genetics Consortium**, Ramirez-Restrepo M, Engel A, Myers AJ, Corneveaux JJ, Huentelman MJ, Dillman A, Cookson MR, Reiman EM, Singleton A, Hardy J, Guerreiro R. Initial assessment of the pathogenic mechanisms of the recently identified Alzheimer risk loci. Ann Hum Genet. 77(2):85-105. 2013.

48. Zou F, Chai HS, Younkin CS, Crook J, Pankratz VS, Allen M, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD, **Alzheimer's Disease Genetics Consortium**, Petersen RC, Graff-Radford NR, Dickson DW, Younkin SG, Ertekin-Taner N. Brain expression genome-wide association study (eGWAS) identifies human disease-associated variants. PloS Genetics 8(6):e1002707. 2012.

49. Whitcomb DC, LaRusch J, Krasinskas AM, Klei L, Smith JP, Brand RE, Neoptolemos JP, Lerch MM, Tector M, Sandhu BS, Guda NM, Orlichenko L, **Alzheimer's Disease Genetics Consortium**, Alkaade S, Amann ST, Anderson MA, Baillie J, Banks PA, Conwell D, Coté GA, Cotton PB, DiSario J, Farrer LA, Forsmark CE, Johnstone M, Gardner TB, Gelrud A, Greenhalf W, Haines JL, Hartman DJ, Hawes RA, Lawrence C, Lewis M, Mayerle J, Mayeux R, Melhem NM, Money ME, Muniraj T, Papachristou GI, Pericak-Vance MA, Romagnuolo J, Schellenberg GD, Sherman S, Simon P, Singh VP, Slivka A, Stolz D, Sutton R, Weiss FU, Wilcox CM, Zarnescu NO, Wisniewski SR, O'Connell MR, Kienholz ML, Roeder K, Barmada MM, Yadav D, Devlin B. Common genetic variants in the CLDN2 and PRSS1-PRSS2 loci alter risk for alcohol-related and sporadic pancreatitis. Nat Genet 44(12):1349-54. 2012.

50. Jun G, Vardarajan BN, Buros J, Yu CE, Hawk MV, Dombroski BA, Crane PK, Larson EB, **Alzheimer's Disease Genetics Consortium**, Mayeux R, Haines JL, Lunetta KL, Pericak-Vance MA, Schellenberg GD, Farrer LA. Comprehensive search for Alzheimer disease susceptibility loci in the APOE region. Arch Neurol. 69(10):1270-9. 2012.

51. Allen M, Zou F, Chai HS, Younkin CS, Crook J, Pankratz VS, Carrasquillo MM, Rowley CN, Nair AA, Middha S, Maharjan S, Nguyen T, Ma L, Malphrus KG, Palusak R, Lincoln S, Bisceglio G, Georgescu C, Schultz D, Rakhshan F, Kolbert CP, Jen J, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD, **Alzheimer's Disease Genetics Consortium**, Petersen RC, Graff-Radford NR, Dickson DW, Younkin SG, Ertekin-Taner N. Novel late-onset Alzheimer disease loci variants associate with brain gene expression. Neurology 79(3):221-8. 2012.

52. Coppola G, Chinnathambi S, Lee JJ, Dombroski BA, Baker MC, Soto-Ortolaza AI, Lee SE, Klein E, Huang AY, Sears R, Lane JR, Karydas AM, Kenet RO, Biernat J, Wang LS, Cotman CW, Decarli CS, Levey AI, Ringman JM, Mendez MF, Chui HC, Le Ber I, Brice A, Lupton MK, Preza E, Lovestone S, Powell J, Graff-Radford N, Petersen RC, Boeve BF, Lippa CF, Bigio EH, Mackenzie I, Finger E, Kertesz A, Caselli RJ, Gearing M, Juncos JL, Ghetti B, Spina S, Bordelon YM, Tourtellotte WW, Frosch MP, Vonsattel JP, Zarow C, Beach TG, Albin RL, Lieberman AP, Lee VM, Trojanowski JQ, Van Deerlin VM, Bird TD, Galasko DR, Masliah E, White CL, Troncoso JC, Hannequin D, Boxer AL, Geschwind MD, Kumar S, Mandelkow EM, Wszolek ZK, Uitti RJ, Dickson DW, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA; **Alzheimer's Disease Genetics Consortium**, Ross OA, Rademakers R, Schellenberg GD, Miller BL, Mandelkow E, Geschwind DH. Evidence for a role of the rare p.A152T variant in MAPT in increasing the risk for FTD-spectrum and Alzheimer's diseases. Hum Mol Genet. 21(15):3500-12. 2012.

53. **Carney RM**, Shelton RC. Agomelatine for the treatment of major depressive disorder. Expert Opin Pharmacother. 12(15):2411-9. 2011.

54. Naj AC, Jun G, Beecham GW, Wang L, Vardarajan BN, Buros J, Gallins PJ, Buxbaum JD, Carlson CS, Crane PK, Larson EB, Bird TD, Boeve BF, Graff-Radford NR, De Jager PL, Evans D, Schneider JA, Carrasquillo MM, Ertekin-Taner N, Younkin SG, Cruchaga C, Kauwe JSK, Nowotny P, Kramer P, Hardy J, Huentelman MJ, Myers AJ, Barmada MM, Demirci FY, Baldwin CT, Green RC, Rogaeva E, St George-Hyslop P, **Alzheimer Disease Genetics Consortium**, Cantwell LB, Dombroski BA, Beekly D, Lunetta KL, Martin ER, Kamboh MI, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Montine TJ, Goate AM, Blacker D, Tsuang DW, Hakonarson H, Kukull WA, Foroud TM, Haines JL, Mayeux R, Pericak-Vance MA, Farrer LA, Schellenberg GD. Common variants in MS4A4/MS4A6E, CD2AP, CD33 and EPHA1 are associated with late-onset Alzheimer's disease. Nat Genet. 43(5):436-41. 2011.

55. Jun G, Naj AC, Beecham GW, Wang LS, Buros J, Gallins PJ, Buxbaum JD, Ertekin-Taner N, Fallin MD, Friedland R, Inzelberg R, Kramer P, Rogaeva E, St George-Hyslop P, **Alzheimer's Disease Genetics Consortium**, Cantwell LB, Dombroski BA, Saykin AJ, Reiman EM, Bennett DA, Morris JC, Lunetta KL, Martin ER, Montine TJ, Goate AM, Blacker D, Tsuang DW, Beekly D, Cupples LA, Hakonarson H, Kukull W, Foroud TM, Haines J, Mayeux R, Farrer LA, Pericak-Vance MA, Schellenberg GD. Meta-analysis

confirms CR1, CLU, and PICALM as Alzheimer disease risk loci and reveals interactions with APOE genotypes. Arch Neurol 67(12):1473-84. 2010.

56. Beecham GW, Martin ER, Li Y-J, **Carney RM**, Slifer MA, Gilbert JR, Haines JL, Pericak-Vance MA. Genome-wide association implicates a chromosome 12 risk locus for late-onset Alzheimer disease. Am J Hum Genet. 84(1):35-43. 2009.

57. **Carney RM,** Slifer MA, Lin PI, Gaskell PC, Scott WK, Potocky CF, Hulette CM, Welsh-Bohmer KA, Schmechel DE, Vance JM, Pericak-Vance MA. Longitudinal follow-up of late-onset Alzheimer disease families. Am J Med Genet B Neuropsychiatr Genet. 147B(5):571-8. 2008.

58. Liang X, Schnetz-Boutaud N, Bartlett J, Allen MJ, Gwirtsman H, Schmechel DE, **Carney RM**, Gilbert JR, Pericak-Vance MA, Haines JL. No association between SNP rs498055 on chromosome 10 and late-onset Alzheimer disease in multiple datasets. Ann Hum Genet. 72(Pt 1):141-4. 2008.

59. Liang X, Martin ER, Schnetz-Boutaud N, Bartlett J, Anderson B, Züchner S, Gwirtsman H, Schmechel D, **Carney R**, Gilbert JR, Pericak-Vance MA, Haines JL. Effect of heterogeneity on the chromosome 10 risk in late-onset Alzheimer disease. Hum Mutat. 28(11):1065-73. 2007.

60. Liang X, Schnetz-Boutaud N, Bartlett J, Anderson BM, Gwirtsman H, Schmechel D, **Carney R**, Gilbert JR, Pericak-Vance MA, Haines JL. Association analysis of genetic polymorphisms in the CDC2 gene with late-onset Alzheimer disease. Dement Geriatr Cogn Disord. 23(2):126-32. 2007.

61. **Carney RM**, Wolpert CM, Ravan SA, Shahbazian M, Ashley-Koch A, Cuccaro ML, Vance JM, Pericak-Vance MA. Identification of MeCP2 mutations in a series of females with autistic disorder. Pediatr Neurol. 28(3):205-11. 2003.

**Non-Refereed Journals:**
1.      Fernandez C, Levitt EJ, **Carney RM.** Acute onset of psychosis and personality changes in a woman with newly identified lung malignancy and urinary tract infection: A case report. Florida Medical Student Research Journal. 2020 April.

**ABSTRACTS:**

1. Healey J, Salinas J, Bryant C, Cortes E, Sabbag S, **Carney R**, Padilla V. Severe Adverse Events Committee (SAVE): Findings of a Pilot Project for Resident Safety. 2020 Annual Meeting, American Psychiatric Association, Philadelphia, PA, April 25 – 29, 2020.

2. **Carney RM**, Kunkle BW, Whitehead PL, Vardarajan B, Mayeux RP, Gilbert JR, Haines JL, Pericak-Vance MA. Known and novel mutations in SORL1, PSEN1, and PSEN2 genes are found in multiplex Alzheimer's disease families with varying age of onset and pathological presentations. 12th International Conference on Alzheimer's & Parkinson's Diseases (AD/PD 2015), Nice, France. March 18 – 22, 2015.

3. **Carney RM**, Kohli MA, Kunkle B, Martin ER, Beecham GW, Gilbert J, Pericak-Vance MA. Clinical characteristics of late onset Alzheimer disease in an extended family with a missense variant in TTC3. Alzheimer's Association International Conference on Alzheimer's Disease (AAIC 2014), Copenhagen, Denmark. 2014.

4. Kohli MA, John-Williams K, Rajbhandary R, Naj A, Whitehead P, Hamilton K, **Carney RM**, Wright C, Crocco E, Gwirtzman HE, Lang R, Beecham G, Martin ER, Gilbert J, Benatar M, Small GW, Mash D, Byrd G, Haines JL, Pericak-Vance MA, Züchner S. Large repeat expansions in the C9ORF72 gene contribute to a spectrum of neurodegenerative disorders including Alzheimer disease. American Society of Human Genetics Annual Meeting, San Francisco, CA, 2012.

5. **Carney RM**, Kohli MA, Naj AC, Beecham GW, Hamilton KL, Haines JL, Gilbert JR, Züchner S, Pericak-Vance MA. Parkinsonian symptoms and lack of prominent frontal atrophy in a family with early-onset dementia and the MAPT R406W mutation. Alzheimer's Association International Conference on Alzheimer's Disease (AAIC 2012), Vancouver, British Columbia, Canada. 2012.

6. Beecham GW, Slifer MA, Martin ER, Li Y-J, **Carney RM**, Gilbert JR, Haines JL, Pericak-Vance MA. Genomic convergence of late-onset Alzheimer disease candidate genes. Alzheimer's Association International Conference on Alzheimer's Disease (ICAD 2008), McCormick Place, Chicago, IL. 2008.

7. Beecham G, Martin E, Li Y-J, **Carney RM**, Slifer M, Gilbert J, Haines J, Pericak-Vance MA. Genome-wide association for late-onset Alzheimer disease (LOAD) confirms risk locus on chromosome 12. American Society for Human Genetics Annual Meeting, San Diego, CA. 2007.

8. Turner SD, Liang X, Martin ER, Schnetz-Boutaud N, Bartlett J, Anderson BM, Züchner S, Gwirtsman H, Schmechel D, **Carney R**, Gilbert J, Pericak-Vance MA, Haines JL. Examination of sortilin-related receptor SORL1 in late-onset Alzheimer disease. American Society for Human Genetics Annual Meeting, San Diego, CA. 2007.

9. **Carney RM**, Gaskell PC, Scott WK, Slifer MA, Hulette CM, Welsh-Bohmer KA, Schmechel DE, Vance JM, Pericak-Vance MA. Clinical follow-up of multiplex late-onset Alzheimer disease families. American Society for Human Genetics Annual Meeting, Salt Lake City, UT. 2005.

10. Cuccaro M, Donnelly S, Cope H, Wolpert C, **Carney R**, Abramson R, Hall A, Wright H, Gilbert J, Pericak-Vance MA. Autism in African American (AA) families: phenotypic findings. American Society for Human Genetics Annual Meeting, Salt Lake City, UT. 2005.

11. **Carney RM**, Vance JM, Dancel RD, Wolpert CM, DeLong GR, McClain C, von Wendt L, Gilbert JR, Donelly SL, Ravan SA, Abel HL, Abramson RK, Wright HH, Zoghbi HY, Cuccaro ML, Pericak-Vance MA. Screening for MECP2 mutations in females with autistic disorder. 10th International Congress of Human Genetics, Vienna, Austria. 2001.

12. Ashley-Koch A, **Carney RM**, Dancel RD, Wolpert CM, Delong GR, Donnelly SL, Ravan SA, Abel HL, Abramson RK, Wright HH, Zoghbi HY, Cuccaro ML, Gilbert JR, Vance JM, Pericak-Vance MA, Identification of MECP2 mutations in two females with autistic disorder. International Meeting for Autism Research (IMFAR), San Diego, CA. 2001.

## V. PROFESSIONAL

**Development Courses:**
Virtual Aspiring Supervisors Program (vASP). 12 week course, with didactic, interactive, and reflective modules using the Office of Personnel Management (OPM) Leadership Competency Model and the VA Leadership Development Framework at the First Line Supervisor level. Completed June, 2021.

**Media Appearances:**
"¿Que Sucede en La Mente de Ariel Castro?" Interview for Expert Commentary, Primer Impacto (Spanish language primetime newshow), Univision, May 15, 2013.

**Professional Presentations:**
"The Future of Alzheimer: The Role of Genomics." Opening Presentation; Alzheimer's Association, Southeast Florida Chapter; Regional Education Conference, FIU Kovens Conference Center, North Miami, Florida, May 15, 2014.

"Psychiatric and Judicial Collaboration: Working to Address the Overrepresentation of Justice-Involved People with Mental Disorders." Workshop; American Psychiatric Association; 167th Annual Meeting, New York, New York, May 3, 2014.

"Alzheimer's Disease and African-Americans." Presentation and panel; First Annual *Legacy* Black Healthcare Symposium, Miami, Florida, December 3, 2013.

"Identifying Places to Make Connections between the Courts and the Community." Panel; Judicial-Psychiatric Leadership Forum. APA Institute on Psychiatric Services; Judges' Leadership Initiative for Criminal Justice and Behavioral Health/Psychiatric Leadership Group for Criminal Justice, Philadelphia, Pennsylvania, October 13, 2013.

**Teaching Achievements and Activities:**

Faculty Resident Supervisor to:
      2022-2023: Kendyl Stewart, MD (PGY-3)
      2021-2022: Jessica Healey, MD (PGY-4), Amy Waters, MD (PGY-4), Kristi
          Wintermeyer, MD (PGY-5), Natalie Martinez Sosa (PGY-5)
      2020-2021: Jessica Healey, MD (PGY-3), Amy Waters, MD (PGY-3), Julie Guzzardi,
          MD (PGY-5)
      2019-2020: Ghaith Shukri, MD (PGY-1), Connie Spelius Perez, MD (PGY-1), Ahmed
          Valdes, MD (PGY-1), Dennis Valerstain, MD (PGY-1), Mousa Botros, MD
          (PGY-5), Lisa Oliveri, MD (PGY-5)
      2018-2019: Gregory Hutton, MD (PGY-3), Durim Bozhdaraj, MD (PGY-5)
      2017-2018: Elizabeth Perkins, MD (PGY-2), Matthew Stark, MD (PGY-2), Francis
          Smith (PGY-5)
      2016-2017: Michelle Benitez, MD (PGY-5), Lance Amols, MD (PGY-5)
      2015-2016: Eva Diaz, MD (PGY-3); Sana Qureshi, MD (PGY-5/Forensic Fellow)
      2014-2015: Stephanie Friedman, MD (PGY-2)
      2013-2014: Aly Diaz de Villegas, MD (PGY-2)
      2012-2013: Suraya Kawadry, MD (PGY-2)

Faculty Research Mentor to Dr. Sana Qureshi, PGY-4, Department of Psychiatry and Behavioral Sciences, University of Miami Miller School of Medicine, Miami, Florida. "Outcomes of Treatment at the Miami-Dade Forensic Alternative Center versus State Hospitalization." Winner, Best Resident Research Poster, June 2015.

"Chronic Suicidality." Faculty Discussant with Drs. Shumaia Rahman and Joshua Delaney, PGY-2, Morbidity and Mortality (M&M) Conference, Department of Psychiatry and Behavioral Sciences, University of Miami Miller School of Medicine, Miami, Florida, February 20, 2019.

"ECT—Clinical Use and Legal Issues." Faculty Discussant with Drs. Areej Alfaraj and Elizabeth Perkins, PGY-2, Morbidity and Mortality (M&M) Conference, Department of Psychiatry and Behavioral Sciences, University of Miami Miller School of Medicine, Miami, Florida, February 14, 2018.

"Management of a Patient Making Threats of Mass Murder." Faculty Discussant with Dr. Matthew Stark, PGY-2, Morbidity and Mortality (M&M) Conference, Department of Psychiatry and Behavioral Sciences, University of Miami Miller School of Medicine, Miami, Florida, August 2, 2017.

"Inpatient Assault Against Staff." Faculty Discussant with Dr. Samantha Saltz, PGY-2, Morbidity and Mortality (M&M) Conference, Department of Psychiatry and Behavioral Sciences, University of Miami Miller School of Medicine, Miami, Florida, January 28, 2015.

Faculty Project Advisor to Award Recipient Ms. Shawntira Johnson, University of Miami Miller School of Medicine MS-III, Diverse Medical Scholars Program, United Health Foundation/National Medical Fellowships, for a service project on the Miami-Dade Forensic Alternative Center at Jackson Behavioral Health Hospital, January – May 2014.

"Competency and Capacity." Instructor, PGY-4 Core Curriculum in Forensic Psychiatry, Department of Psychiatry and Behavioral Sciences, University of Miami Miller School of Medicine, Miami, Florida, 2013-present.

"Violence Against Staff by Psychiatric Inpatients." Faculty Discussant, Ethics Rounds, Department of Psychiatry and Behavioral Sciences, University of Miami Miller School of Medicine, Miami, Florida, October 13, 2013.

"Suicide." Instructor, Summer Scholars Program (for Miami area high school students), Coordinated by Ana Campo, MD, through the Department of Psychiatry and Behavioral Sciences, University of Miami Miller School of Medicine, Miami, Florida, 2013-2016.

"Advanced Psychopharmacological Approaches to Mood and Anxiety Disorders: A Consultation Case Series." Grand Rounds, Department of Psychiatry, Vanderbilt University Medical Center, Nashville, Tennessee, June 23, 2011.

**Committees:**
PGY-1 Milestones and Promotion Committee, Department of Psychiatry and Behavioral Sciences, University of Miami Miller School of Medicine, Miami, Florida, 2015-2022.

PGY-3 Milestones and Promotion Committee, Department of Psychiatry and Behavioral Sciences, University of Miami Miller School of Medicine, Miami, Florida, 2013-2015.

Ad Hoc Committee on Florida Guardianship; Florida Medical Association's Council on Healthy Floridians, March 2013-present.

**Honors:**
1. Four Time Most Outstanding Faculty Teaching Award: Miami VA Department of Mental Health and Behavioral Sciences. Selected by PGY-1 through PGY-4 Psychiatry Residents, Department of Psychiatry and Behavioral Sciences, University of Miami Miller School of Medicine, Miami, Florida, 2018-2020, 2022.

2. Three-time Award for Excellence in Teaching: Outstanding Voluntary Faculty in an Inpatient Setting. Florida International University Herbert Wertheim College of Medicine, Department of Psychiatry and Behavioral Health. consecutive award winner, 2016-2017, 2022.

3.  Travel Fellowship Award, Alzheimer's Association International Conference, July 14-19, 2012, Vancouver, British Columbia, Canada.

4.  Fellowship Travel Award, Workshop on Clinical Trials in Psychopharmacology, American Society of Clinical Psychopharmacology, April 27 - 29, 2010, New York, New York.

5.  Medical Degree with Distinction in Research, Stony Brook University School of Medicine, 2003.

6.  Howard Hughes Undergraduate Research Award, Duke University, 1998.

# Attachment C

# United States Court of Appeals for the Federal Circuit

February 15, 2022

### *MEMORANDUM*

TO:

FROM:    Judge Newman

RE:      PANEL█ – March█ 2022

Absent objection, the submitted case for March█ 2022, Panel█ is pre-

assigned as follows:

Appeal No. █████                    ████████        Judge Newman

**From:**  ███
**To:**  ███ Court Services
**Cc:**  -PN
**Subject:**  RE: PREASSIGNMENT MEMO-March ███ 2022-Panel ███
**Date:**  Tuesday, February 15, 2022 4:11:02 PM
**Attachments:**  PREASSIGNMENT MEMO - March ███ 2022 - Panel ███.doc

Good afternoon,

Attached is the Preassignment memorandum for ███, March, ███2022, Panel ███

Best regards,

███

Paralegal to the Honorable Pauline Newman
U.S. Court of Appeals for the Federal Circuit
717 Madison Place NW, Washington, DC 20439
███  ███

# EXHIBIT B

# United States Court of Appeals for the Federal Circuit

## ~~UNDER SEAL (NON-PUBLIC ORDER)~~

―――――――――――――――

### IN RE COMPLAINT NO. 23-90015

―――――――――――――――

## Order of the Judicial Council of the Federal Circuit

## September 20, 2023

# TABLE OF CONTENTS

## ORDER

**Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**I.    Procedural Background and Course of the Investigation** . . 10

**II.   The Report and Recommendation Sets Out Overwhelming Evidence that Provided a Reasonable Basis for the Committee's May 16 Order** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

    **A. The Evidence of Troubling Behavior in Interactions with Staff Provided a Sufficient and Independent Basis for the May 16 Order** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

        1. Evidence of Memory Loss, Confusion, and Lack of Comprehension . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

        2. Staff Report Evidence of Agitation and Unwarranted Paranoia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        3. Concerns Raised by Events Surrounding Chambers Staff . . .25

        4. Dysfunctional Behavior Suggests Disability and Creates Workplace Abuse Concerns . . . . . . . . . . . . . . . . . . . . . . . . 29

        5. The Response Alleges that She Can "Run Her Chambers as She Sees Fit" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

        6. The Response Incorrectly Claims Lack of an Opportunity to Counter the Employee Allegations . . . . . . . . . . . . . . . . . . . . 35

    **B. The Evidence of Productivity Deficiencies, Even With a Reduced Workload, Supports the Committee's Order** . . . 37

**III.  The Refusal to Comply with the May 16 Order Was Not Excused by Good Cause** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    **A. The Request for Transfer Does Not Provide Good Cause for Her Refusal to Comply with the May 16 Order** . . . . . . .40

**B. The Medical Evidence is Not Good Cause for Her Refusal to Comply with the Committee's May 16 Order** . . . . . . . . .50

    1. Dr. Rothstein's Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    2. Dr. Carney's Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    3. Inadequacy for the Disability at Issue . . . . . . . . . . . . . . . . . 54

**C. The Criticisms of Earlier Orders and Actions Do Not Undermine the Duty to Comply with the May 16 Order** . .56

    1. The Criticisms of the March 24 and April 7 Orders Do Not Undermine the May 16 Order . . . . . . . . . . . . . . . . . . . . . . . 57

    2. The Criticisms of Other Actions by the Chief Judge or Special Committee Leading to and in the Investigation Do Not Undermine the Duty to Comply with the May 16 Order . . . .62

**IV.   The Refusal to Comply with the May 16 Order Constituted Serious Misconduct** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**V.   The Renewable One-Year Suspension from New Cases is an Appropriate Sanction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

**Unanimous Judicial Council Order** . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

# United States Court of Appeals
# for the Federal Circuit

## ~~UNDER SEAL (NON PUBLIC ORDER)~~

_____

## IN RE COMPLAINT NO. 23-90015

_____

Before the Judicial Council of the Federal Circuit

PER CURIAM.

## ORDER

### Summary

Judge Pauline Newman is 96 years old and has served with distinction as an active judge on this Court for 39 years.  She has been a highly valued and respected colleague, and her many contributions to the Court, to the patent system, and to the law are recognized by all.  Her colleagues on this Court have recently paid tribute to Judge Newman as "the heroine of the patent system"[1] and "the most beloved colleague on our court."[2]

Unfortunately, earlier this year mounting evidence raised increasing doubts about whether Judge Newman is still fit to perform the duties of her office.  When such evidence is brought to the attention of the Chief Judge and the Judicial Council, there is an obligation to investigate the matter under the procedures established by the Judicial

---

[1] The Honorable Kimberly A. Moore, *Anniversaries and Observations*, 50.4 AIPLA Q. J. 515, 524 (2022).

[2] The Honorable Raymond Chen, *Tribute to Judge Pauline Newman*, 74 N.Y.U. Ann. Surv. Am. L. 3, 3 (2018).

IN RE COMPLAINT NO 23-90015

Conduct and Disability Act of 1980 (Act)—the self-policing mechanism Congress created to address (among other things) judges who may no longer be fit for judicial office. Failing to act under the circumstances here would breach our obligations under the Act, display disregard for the rights of litigants bringing their cases before this Court, ignore the rights of court staff to be free from increasingly dysfunctional behavior in the workplace, and undermine public confidence in the judiciary.

These are very sad proceedings for all involved. Judge Newman and her counsel have aggressively sought to discredit this entire process by trying their case in the press while conjuring a narrative of "hostile," "disrespect[ful]," and "appalling" treatment marked by exercises of "raw power," all borne out of "personal animosity" toward Judge Newman. August 31 Response (Response) 1, 20 n.16, 53. There is no evidence to support these claims. From the outset, the Chief Judge and other members of the Court approached Judge Newman in a respectful manner to attempt to address a difficult situation with concern for a valued colleague hoping for an informal resolution that would have avoided this process. *See* March 24 Order at 2; Ex. 1 (emails between Chief Judge Moore and Judge Newman). Multiple colleagues attempted to speak to Judge Newman about her fitness. She refused to speak to them at all or quickly terminated an attempt to discuss the issue. The Chief Judge shared a draft complaint with Judge Newman detailing some of the concerns that had been raised and sought to meet with her. Ex. 1. Judge Newman refused multiple requests for a meeting.

This matter became a formal proceeding because Judge Newman left no other option. The Court and all of its staff have been trying to work with and support Judge Newman. But sadly the circumstances became such that these proceedings could no longer be avoided given our obligations.

2

IN RE COMPLAINT NO 23-90015

On March 24, 2023, the Chief Judge, pursuant to the Act and its implementing rules, identified a Complaint and appointed a Special Committee (Committee) to investigate information indicating that Judge Newman may no longer be able to perform the functions of her office. The investigation began promptly. And it soon bore out the essential allegations in the Complaint regarding Judge Newman's cognitive state.

The investigation included more than 20 interviews with court staff. Those interviews, along with numerous emails sent by Judge Newman, provided overwhelming evidence that Judge Newman may be experiencing significant mental problems including memory loss, lack of comprehension, confusion, and an inability to perform basic tasks that she previously was able to perform with ease. The evidence revealed instances in which, when Judge Newman struggled with basic tasks, she became frustrated, agitated, belligerent, and hostile towards court staff. The staff report that the behaviors suggesting that Judge Newman may have a disability emerged over two years and have increased in frequency and severity. With no rational reason—other than frustration over her own confusion—Judge Newman has threatened to have staff arrested, forcibly removed from the building, and fired. She accused staff of trickery, deceit, acting as her adversary, stealing her computer, stealing her files, and depriving her of secretarial support. Staff have described Judge Newman in their interactions with her as "aggressive, angry, combative, and intimidating"; "bizarre and unnecessarily hostile"; making "personal accusations"; "agitated, belligerent, and demonstratively angry"; and "ranting, rambling, and paranoid." Indeed, interactions with Judge Newman have become so dysfunctional that the Clerk of the Court has advised staff to avoid interacting with her in person or, when they must, to bring a co-worker with them. This behavior has taken a significant toll on court staff.

IN RE COMPLAINT NO 23-90015

These reports are not of isolated incidents based on a few interactions with only one or two staffers. They come from interactions with staff members across a broad range of departments from the Clerk's Office to Information Technology (IT) to Human Resources (HR) to the General Counsel's Office to Judge Newman's own chambers staff. During this investigation two of Judge Newman's five chambers' staff members resigned and requested no further contact with her. One twice asked for assistance under the Court's Employment Dispute Resolution program (EDR), but Judge Newman repeatedly refused to participate in the EDR processes. A third, on advice of counsel, invoked the Fifth Amendment's privilege against self-incrimination and refused to answer even the most basic questions about what goes on in Judge Newman's chambers, about her responsibilities, or about Judge Newman's mental fitness.

The evidence from staff is essentially undisputed. And the concerns about disability it supports are confirmed by evidence regarding Judge Newman's workload and productivity. Judge Newman acquiesced in several significant reductions in her workload starting in 2021. Despite the reduced workload, data from the Clerk's Office shows that, over the last two years or so, she has taken four times as long to issue half the number of opinions as her colleagues.

The Committee's investigation culminated in an order on May 16 directing Judge Newman to undergo two medical examinations, directing her to provide to one of the examiners specified medical records of relevance to assessing disability, and requesting that she sit for an interview with the Committee. The two medical examinations were to be performed by independent medical providers: a 30-45-minute interview with a neurologist, with no required invasive procedures; and a full neuro-psychological examination that would involve approximately six hours of cognitive testing. As was explained to Judge Newman, this

4

IN RE COMPLAINT NO 23-90015

testing was recommended by the Committee's medical consultant, who has been retained by other courts in similar circumstances, and who was recommended to the Committee by the Administrative Office of the U.S. Courts.

Despite the large amount of very troubling evidence, Judge Newman refused to comply with the Committee's order. The total burden of compliance would be an appointment with a neurologist for no more than 30-45-minutes, a full neuro-psychological examinations lasting about six hours, and an interview that might explore the evidence that is so troubling. The burden is small, the basis for concern about disability very substantial, and the job at issue of great public importance. Yet Judge Newman refused.

The issue now before the Council is: *Did Judge Newman commit misconduct in refusing to follow the May 16 Order, which ordered medical examinations, the production of medical records and requested an interview?* We answer in the affirmative. The evidence raising concerns about disability, just summarized, amply justified issuance of the Order. The effect of Judge Newman's refusal to comply with the Order was to thwart this Council's ability to determine whether Judge Newman has a disability that renders her unable to perform the duties of her important office. An unjustified thwarting of a key part of the investigation into disability is recognized under the Act as misconduct. That is what occurred here.

We find no merit in Judge Newman's arguments for why the Council should not draw that conclusion.

First, Judge Newman argues that this matter should have been (and still should be) transferred to another circuit—and that the denial of her transfer request justifies her refusal to comply with the May 16 Order. Yet Judge Newman fails to recognize that transfer is appropriate only in "exceptional circumstances." *See* Rule 26. And here, the Council concludes that no circumstances have warranted,

IN RE COMPLAINT NO 23-90015

or currently warrant, taking this step, which would be extraordinary in the context of this disability proceeding.

In support of transfer, Judge Newman argues that the members of this Council have personal knowledge of disputed evidentiary facts concerning this proceeding—and thus are biased.  Setting aside the Council's disagreement with her accusations of improper bias, Judge Newman fails to appreciate both what is currently at issue and what due process requires of adjudicators in this context.  Since June 1, 2023, the investigation has centered on whether Judge Newman's refusal to comply with the May 16 Order constituted misconduct.  Although members of the Council inevitably have personal experiences with Judge Newman, the Committee did not rely on and the Council is not relying on those experiences.  In particular, no judge has been a witness, and the evidence supporting the May 16 Order and its enforcement, which is at issue now, in no way depends on testimony from fellow judges.  And to the extent Judge Newman maintains that the members of this Council cannot be impartial because they know and have worked with her, the argument sweeps too broadly.  As a general matter, due process in this context does not require that adjudicators be totally ignorant concerning background information involving parties.  And, as it pertains to the Act specifically, the rules explicitly contemplate that circuit judges will institute, investigate, and ultimately decide disability proceedings concerning one of their colleagues.

Judge Newman cites no example of transferring a disability proceeding concerning a circuit judge.  Instead, her examples of prior transfers all involve a circuit judge's discrete alleged acts of past behavior that were charged as misconduct.  This is an important distinction: unlike discrete acts of past misconduct, which could potentially be pursued from afar without serious detriment, this case has involved ongoing behavior that was having ongoing effects

IN RE COMPLAINT NO 23-90015

on the functioning of court staff and the functioning of this court.  Ready access to the Committee was therefore vitally important to ensure that all relevant information was captured and timely reported—all in an environment that ensured affected staff that they were being heard.  Indeed, by the time Judge Newman first requested transfer—on April 21, 2023—the Committee had already conducted more than a dozen interviews and a deposition, two of her staff had resigned just days earlier, and many troubling events were occurring in real-time.  Given these and other considerations discussed in more detail in this order, granting Judge Newman's transfer request was never a sound course.

Judge Newman has not shown—nor do we see—exceptional circumstances in this case that have warranted, or currently warrant, transfer.  Indeed, relevant considerations—*e.g.*, avoiding delay, preserving superior investigative ability, and the need to timely accommodate court staff in view of Judge Newman's ongoing behavior—all weighed strongly against transfer (and certainly against finding the requisite exceptionality).

Second, Judge Newman claims that the process was unfair because she was never given an opportunity to contest the information provided by court staff.  Judge Newman was given an opportunity to dispute the employee statements.  She did not take it.  After being provided copies of all affidavits and the deposition transcript considered by the Committee, Judge Newman made the strategic choice not to "delv[e] into the minutia of these affidavits." July 5 Br. at 15.  Instead, she chose to dismiss them as reflecting "petty grievances" and to argue that "even assuming" the information in them was true, it "doesn't even approach probable cause to believe that Judge Newman is mentally and/or physically disabled." *Id.*  Indeed, Judge Newman expressly agreed that there was no need for an evidentiary hearing in this matter. June 15 Letter at 3.  In

7

IN RE COMPLAINT NO 23-90015

addition, the Committee advised Judge Newman that it sought an interview with her so that she could provide the Committee information from her perspective, "including correcting any error of fact" in the Committee's orders. May 16 Order at 23–24. She refused that opportunity as well. She now adds that, even if the staff statements are true, there is nothing wrong with how she treated staff and she can "run her chambers as she sees fit." Response 48.

Third, Judge Newman has submitted two medical reports from providers of her choosing and claims that these reports should put to rest any question about her mental fitness. The reports from Judge Newman's own selected providers, however, are not remotely an adequate substitute for the thorough medical examinations ordered by the Committee based on the recommendations of the Committee's consultant.

The first consists of a report largely based on administration of a Montreal Cognitive Assessment (MOCA), a one-page test that takes about 10 minutes to administer. The report on its face showed inconsistencies between Judge Newman's reported score and the stated fact that she was unable to write (due to a broken wrist), which would have prevented her from completing three parts of the test. Properly scored and converted to the scale for a full test, it appears that Judge Newman scored *below the normal range* on that test. And a declaration provided by the physician who administered that test does not dispute that assessment.

The second report is based in part on a different 11-minute cognitive exam, the Modified Mini-Mental State (3MS), that tests such things as whether Judge Newman can point to her chin, knows the year, and can name a few four-legged animals. It does not remotely provide good cause for Judge Newman refusing to take the full neuro-psychological examination (six hours) requested by the

IN RE COMPLAINT NO 23-90015

Committee.  The manual for the 3MS test expressly indicates that the test was not designed as a screening tool for dementia and is not sensitive enough to detect dementia in early stages.  Ex. 2 at 2 (Manual for the Administration and Scoring of the Modified Mini-Mental State (3MS) Test)

The nature and importance of the job of an active judge, and the overwhelming evidence of behavior by Judge Newman indicating a cognitive decline, requires the more thorough and sensitive full neuro-psychological examination ordered by the Committee.

Finally, Judge Newman attacks the May 16 Order by pointing to earlier orders and actions and seeks to paint a portrait of hostility and bad faith on the part of the Chief Judge and the Committee.  The Council has examined the specifics of this redirection of focus away from the May 16 Order.  We reject the specific allegations and the overall portrait.  The sad, difficult proceedings have been conducted from the outset responsibly and in good faith.  The May 16 Order was proper and sound, and Judge Newman was required to comply with it.

The Judicial Council unanimously concludes that Judge Newman's refusal to comply with the special Committee's May 16 Order constitutes serious misconduct which warrants a one-year suspension from cases.  We are acutely aware that this is not a fitting capstone to Judge Newman's exemplary and storied career.  We all would prefer a different outcome for our friend and colleague.  However, we have a solemn obligation under the Act and an obligation to the litigants before our Court and court staff to take action—and not to simply look the other way—when it appears that a judge of this Court is no longer capable of performing the duties of her judicial office.  Maintaining public confidence in the judiciary demands no less.  And that duty constrains us in this case.  Judge Newman can obviate the suspension at any time by complying with

IN RE COMPLAINT NO 23-90015

the Committee's May 16 Order and permitting the Committee to conclude its investigation into her fitness.

## I.  Procedural Background and Course of the Investigation

On March 24, 2023, Chief Judge Moore entered an order pursuant to Rule 5(a) of the Rules for Judicial-Conduct and Judicial-Disability Proceedings identifying a complaint concerning Judge Newman based on information providing probable cause to believe that Judge Newman "has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts' and/or 'is unable to discharge all the duties of office by reason of mental or physical disability." March 24 Order at 1 (quoting 28 U.S.C. § 351(a)).  The order referred to her having suffered a heart attack in June 2021, requiring hospital care, and a fainting incident in May 2022, and it noted that Judge Newman's workload had been reduced through several measures, including no longer having to sit on motions panels.  *Id.*

As the basis for finding probable cause, the order noted that judges and court staff had provided information raising concerns (i) that Judge Newman was responsible for extensive delays in resolving cases and appeared unable to complete her opinions in a timely fashion (despite her reduced workload), and (ii) that Judge Newman appeared to suffer from "impairment of cognitive abilities (*i.e.*, attention, focus, confusion and memory)."  *Id.* at 2.  The Order further recounted that, after receiving initial information, the Chief Judge had conducted a limited inquiry pursuant to Rule 5 that provided substantial additional information supporting the finding of probable cause.  *See id.*  Over four pages, the Order recounted additional details concerning Judge Newman's exceptional delays in resolving cases and information from staff describing behavior that raised concerns about Judge Newman's cognitive state, including

IN RE COMPLAINT NO 23-90015

allegations of "inappropriate behavior in managing staff." *See id.* at 2-5.

The March 24 Order also recounted that the Chief Judge had sought to pursue an "informal resolution" with Judge Newman pursuant to Rule 5. The Chief Judge met with Judge Newman and explained the concerns that had been raised about Judge Newman's delays in resolving cases and her mental fitness. On March 17, the Chief Judge provided Judge Newman a copy of the order identifying a complaint that would be issued if an informal resolution could not be reached. Judge Newman refused multiple requests to discuss the matter or the draft complaint with the Chief Judge. Ex. 1. Left with no other choice, the Chief Judge issued the order identifying a complaint on March 24, 2023.

In a separate order entered on March 24, 2023, pursuant to Rule 11, the Chief Judge appointed a Special Committee (Committee) to investigate the complaint and prepare a report and recommendation for the Judicial Council.[3]

The Committee immediately began interviewing court staff to gather information. In addition, pursuant to Rule 13(a) & (c), the Committee retained the services of Dr. ███ ███ ███ as an expert consultant. Dr. ███ has served as a consultant on judicial disability proceedings in other circuits and has been relied upon in the Colorado

---

[3] Pursuant to Rule 12(a) and 28 U.S.C. §§ 353(a)(1) & 363, the Chief Judge was required to make herself a member of the Committee. In addition, she appointed Judges Prost and Taranto.

IN RE COMPLAINT NO 23-90015

Supreme Court's attorney disciplinary body as a medical expert.[4]

On April 7,[5] after the Committee had conducted multiple interviews with court staff and consulted with Dr. ████ ██, the Committee issued an order determining that it was necessary for the Committee's investigation to have Judge Newman undergo a neurological examination and full neuro-psychological testing to determine whether she suffered from a disability. Dr. ████ had advised that these examinations were necessary to ascertain with a reasonable certainty whether a disability existed. As the April 7 Order recounted, Dr. ████ had identified a qualified neurologist and neuropsychologist to perform the examinations on an expedited basis. The order provided the names of these specialists. It also noted that "Dr. ████ is also available to speak to Judge Newman to answer any questions about the nature of the examination and testing" and provided Dr. ████s telephone number. April 7 Order at 2. The order cautioned that refusal to comply without good cause shown could result in the investigation being expanded to consider whether failure to cooperate constituted misconduct under Rule 4(a)(5). *Id.* at 2-3.

Judge Newman failed to respond to the April 7 Order (or to request an extension of time to respond). On April 13, pursuant to Rule 13(a) at the Committee's request, the scope of the investigation was expanded to include whether

---

[4] Dr. ████s qualifications are set out in the R&R. *See* R&R 12, 58–59.

[5] On April 6, an order was entered expanding the scope of the investigation to address an incident in which Judge Newman had apparently violated the confidentiality provisions of the EDR plan. That incident is discussed, as relevant, below.

Judge Newman's failure to cooperate constituted misconduct.

On April 17, the Committee issued an order seeking certain medical records and an interview with Judge Newman. Dr. ███████ had advised the Committee that Judge Newman's medical records related to an alleged cardiac incident and an episode of fainting could shed light on a condition relevant to assessing her cognitive state. Accordingly, the order required Judge Newman to provide medical records related to the health incidents described in the March 24 Order (*i.e.*, what the March 24 Order described as a heart attack and an incident of fainting). April 17 Order at 1. The order also required Judge Newman to provide records "of any treatment or consultation in the last two years regarding attention, focus, confusion, memory loss, fatigue or stamina." *Id.* at 2. Finally, the order requested that Judge Newman sit with the Committee for a videotaped interview. *Id.* The order proposed that Judge Newman should provide the medical records by May 5, 2023, and inform the Committee by April 21 whether she would supply the medical records and sit for an interview or else "provide good cause why an extension of time is needed to respond to this [o]rder." April 17 Order at 2.[6]

On April 21, 2023, counsel for Judge Newman filed a letter brief (April 21 Letter) suggesting that Judge Newman might be willing to cooperate with the Committee's orders but insisting that the Committee first address a

---

[6] On April 20, an order was entered expanding the scope of the investigation to include whether three additional incidents constituted misconduct by Judge Newman. Those incidents are discussed, as relevant, below.

request by Judge Newman to transfer this proceeding to another circuit.  April 21 Letter at 3.[7]

On May 3, the Committee issued an order responding to the April 21 Letter. (May 3 Order).  The order declined the transfer request, explaining that, under the Rules, a discretionary transfer may be considered only in "exceptional circumstances," *id.* at 10 (quoting Rule 26).  The order responded to Judge Newman's assertion that judges on the Committee and the Judicial Council "likely" would become witnesses by pointing out that such a concern was premature.  The result of the medical examinations would likely determine the course of the investigation and need for other evidence.  Accordingly, the order denied the request without prejudice to renewing it after Judge Newman had complied with the Committee's orders regarding medical examinations and medical records.  *Id.* at 12–14.[8]

The May 3 Order also renewed the Committee's orders regarding medical examinations and medical records.  It detailed additional information establishing a reasonable basis for those orders and set a deadline of May 10 for Judge Newman to indicate whether she would comply.

---

[7] The April 21 Letter also raised a matter outside the purview of the Committee.  On March 8, 2023, the Judicial Council had voted unanimously to preclude the assignment of new cases to Judge Newman.  In her April 21 Letter, Judge Newman challenged that action as unlawful.

[8] The Committee had also referred Judge Newman's request for a transfer to the Judicial Council, which issued its own order denying the request without prejudice to renewal after Judge Newman complies with the Committee's orders regarding medical examinations, medical records and an interview.  May 3 Judicial Council Order.

On May 10, 2023, Judge Newman objected to the Committee's May 3 Order.[9]  *See* May 10 Letter.  With respect to the medical examinations, Judge Newman raised three concerns.  First, she argued that she should be permitted to choose the professionals who would conduct any examinations.  Second, although the Committee had made Dr. ██████ "available to speak to Judge Newman to answer any questions about the nature of the examination and testing," April 7 Order at 2, Judge Newman—without contacting Dr. ██████—complained that the testing was of "unknown duration and scope."  May 10 Letter at 4.  Third, Judge Newman objected to the lack of any defined limitation on the use of the examination results.  *Id.*  As for the medical records, Judge Newman argued that they were irrelevant.  *Id.* at 3–4.  The May 10 Letter also reiterated Judge Newman's request that the proceeding be transferred to another circuit.[10]

On May 16, 2023, the Committee issued an order responding to Judge Newman's objections.  (May 16 Order).  The order clarified that the medical examinations would be non-invasive and would consist of an in-person examination by a neurologist lasting 30-45 minutes and a full battery of neuro-psychological testing with a neuropsychologist, which would involve an interview and tests involving answering questions and performing tasks "designed to test all major areas of neurocognitive functioning."  May 16 Order at 21–22.  That testing could take up to six hours.  The Committee agreed that, if the neurologist

---

[9] Judge Newman also filed a complaint in federal district court against the members of the Committee and the entire Judicial Council.  *See Newman v. Moore*, No. 1:23-cv-01334-CRC, Dkt. 1 (D.D.C. May 10, 2023).

[10] It also repeated her request that the Judicial Council immediately restore her to the rotation for new case assignments.  *See supra* n.7.

believed that any additional tests were required, "such testing can be the subject of further discussion between the Committee and Judge Newman after th[e] initial examination has taken place." *Id.* at 22. The Committee explained that the results would be used solely to aid the Committee in its determination of whether Judge Newman has a disability and for the preparation of its report and recommendation to the Judicial Council. *Id.* at 23.

With respect to medical records, the May 16 Order "more clearly define[d] [the] requests for medical records." May 16 Order at 2. In addition to records related to any treatment concerning "mental acuity, attention, focus, confusion, memory loss, fatigue, or stamina," the Committee explained that it sought records "that relate to Judge Newman's alleged cardiac issues and fainting episode." *Id.* at 4. The order explained that the Committee's consultant, Dr. ███, had advised that "medical records related to a cardiac event and a fainting episode . . . may very well shed light on the observed changes in Judge Newman's behavior." *Id.* at 5. To address privacy concerns, the Committee clarified that the medical records could be provided solely to the neurologist who would evaluate Judge Newman and not to the Committee. *Id.* at 6.

The May 16 Order detailed the information providing a reasonable basis for concern about Judge Newman's cognitive state. It also explained that the Committee sought an interview with Judge Newman in part to provide her an opportunity to provide information, "including correcting any error of fact" in the Committee's orders and to "clarify these matters." *Id.* at 23–24.

The Committee concluded the May 16 Order by: (1) requiring (for the third time) that Judge Newman undergo the required medical examinations; (2) requiring (for the third time) that she produce the medical records; and (3)

IN RE COMPLAINT NO 23-90015

requesting (for the second time) that she sit for an interview with the Committee. *Id.* at 25.

On May 25, 2023, Judge Newman refused to comply with the May 16 Order (May 25 Letter).

On May 26, at the request of the Committee pursuant to Rule 13(a), the scope of the investigation was expanded to include whether Judge Newman's refusal to cooperate with the May 16 Order constituted misconduct.

On June 1, the Committee determined that Judge Newman's refusal to comply with the Committee's order impaired the Committee's ability to make an informed assessment of whether Judge Newman suffers from a disability. *See* June 1 Order at 2–3. Accordingly, the Committee narrowed the focus of its investigation to address the question whether Judge Newman's refusal to cooperate with the Committee's order constituted misconduct. *Id.* at 3–4. Given that narrowed focus, the Committee determined, and Judge Newman agreed, that no evidentiary hearing under Rule 14 would be required because the misconduct issue could be determined based on the paper record showing Judge Newman's responses to the Committee's order and because there were no percipient fact witnesses with relevant evidence on that issue. *See* June 1 Order at 4-5; June 15 Letter at 3 ("We agree with this assessment.").[11]

---

[11] On June 5, the Judicial Council, treating Judge Newman's requests that she be restored to the rotation of new case assignments, *see supra* nn.7, 10, as a request for reconsideration of the Council's March 8 order, issued an order considering *de novo* whether Judge Newman should be suspended from new case assignments. The Judicial Council explained under its authority under 28 U.S.C. § 332(d), it was suspending Judge Newman from new case

IN RE COMPLAINT NO 23-90015

The June 1 Order required Judge Newman to submit a brief, limited to the misconduct issue, by July 5, and set oral argument for July 13. To ensure that Judge Newman could challenge the reasonable basis for the Committee's order, the Committee also provided Judge Newman all of the witness affidavits and the single deposition transcript on which the Committee had relied. June 1 Order at 5.

Judge Newman thereby had the opportunity to respond to all the material the Committee had in its possession supporting the Committee's order.

Judge Newman submitted her brief on July 5 along with medical evidence, and on July 13 the Committee heard argument. Judge Newman's July 5 Brief expressly requested, pursuant to Rule 23(b)(7) "the public release of this letter and any Order or communication issued in response thereto." July 5 Br. at 1 n.1.

On July 31, 2023, the Committee issued its Report & Recommendation (R&R) and, pursuant to Judge Newman's request, publicly released it (with appropriate redactions to protect the privacy of witnesses).

## II. The R&R Sets Out Overwhelming Evidence that Provided a Reasonable Basis for the Committee's May 16 Order

The Committee's investigation uncovered overwhelming evidence of behavior by Judge Newman that provided a reasonable basis for concluding that she may suffer from a disability that renders her unable to discharge the duties

---

assignments based on her lengthy delays in issuing opinions. It was "concerned that assigning additional cases to Judge Newman now will only interfere with her ability to clear her current backlog and exacerbate delays in her already long-delayed opinions." June 5 Judicial Council Order at 4.

IN RE COMPLAINT NO 23-90015

of her office.  We find that the Committee was justified in issuing its May 16 Order concerning medical examinations, medical records, and an interview.

### A.  The Evidence of Troubling Behavior in Interactions with Staff Provided a Sufficient and Independent Basis for the May 16 Order

Affidavits prepared after more than 20 interviews with Court staff reflect consistent reports of deeply troubling interactions with Judge Newman that suggest significant mental deterioration including memory loss, confusion, lack of comprehension, paranoia, anger, hostility, and severe agitation.  Critically, these reports are not isolated incidents of occasional forgetfulness based on a few interactions with only one or two staffers.  To the contrary, they come from interactions with staff members across a broad range of departments from the Clerk's Office to Information Technology (IT), to Human Resources (HR), to the General Counsel Office, to Judge Newman's own chambers staff.  And contrary to Judge Newman's assertions, the reports indicate that the behaviors suggesting that Judge Newman may have a disability emerged over two years and increased in frequency and severity.  Judge Newman has never specifically disputed any of the staff accounts, many of which are independently substantiated by Judge Newman's own emails attached as exhibits.

### 1.  Evidence of Memory Loss, Confusion, and Lack of Comprehension

Judge Newman has been having trouble recalling events, conversations, and information just days old and having trouble comprehending basic information that court staff communicate to her.  █████ Aff. [1] ¶ 10 ("I have on multiple occasion[s] seen Judge Newman have trouble recalling events and information."); *id.* ¶¶ 11–12 (chambers staff member describing Judge Newman forgetting recent conversations and that "Judge Newman did not recall the

opinion that was issued a day earlier"); ██████████ Aff. [2] ¶¶ 7–11 ("We have to walk her through the same steps over and over and she does not seem to remember them from day to day."); ████████ Aff. [3] ¶ 4 (reporting that Judge Newman asked her the same question related to compensation for a temporary employee four separate times by email in an approximately 24-hour period);[12] ████ ██████████ Aff. [4] ¶¶ 37–39 (reporting Judge Newman could not comprehend the location of her files on her computer after five separate emails explaining the matter to her). At times she seems confused and suspicious and to be struggling to comprehend or remember what she is being told. ████████████ Aff. [4] ¶5 ("[I]t appeared to me that from one email to the next Judge Newman either did not read or did not recall the lengthy prior explanations I provided to her.").

Her judicial assistant, who spoke to her by phone every workday and was present in chambers every workday between approximately December 2021 (when he started in that role) and April 2023 (when he resigned), observed

---

[12] The HR Director tried repeatedly to work with Judge Newman both to bring back her requested temporary judicial assistant and to post an opening for a new permanent person. ██████ Aff. [3] ¶ 2; *id.* ¶ 3 ("I had over 20 email and phone call exchanges with Judge Newman over this time trying to get her approval [for temporary and permanent hiring]."). It is clear from the emails that any delay in Judge Newman's secretarial support was due to her non-responsiveness or confusion. *Id.* ¶ 3 ("It took a long time for Judge Newman to permit me to move forward on both the temporary rehire and the permanent requirement . . . I had to answer the same questions repeatedly and then wait for answers on those same issues to move forward."); *see also* Ex. 3 (email chain between Judge Newman and HR Director).

IN RE COMPLAINT NO. 23-90015

Judge Newman's "memory loss and confusion has increased significantly since [he] started at the court." ████ Aff. [1] ¶¶ 1, 4, 5, 10. The IT Help Desk Manager reported: "Having worked with Judge Newman for years, I have noticed significant deterioration in her memory, confusion, and ability to understand and execute simple tasks over the last year." ████████ Aff. [2] ¶ 12. The Director of IT indicated that he has worked with Judge Newman for many years and that, while he was amazed at how quickly and easily she picked things up when she was in her 80s, he noticed a change: "over the last few years, I've noticed a significant increase in Judge Newman forgetting how to perform basic tasks that used to be routine for her." ████ Aff. [5] ¶ 2.

Judge Newman's judicial assistant reported that, in daily telephone calls with her, he would have to repeat information about the status of cases over and over to her and that she would forget whether she had voted on cases or had circulated opinions to the panel for vote. *See* ████ Aff. [1] ¶¶ 12–13. In one non-case-related incident, Judge Newman selected pictures of herself from her personal collection for use in a display the library was preparing—yet when these pictures were shown to her the next month, she had no idea where they had come from and even stated that she had never seen them before. *Id.* ¶ 11 ("She seemed to have entirely forgotten about our prior recent meetings."). In her last three oral argument sittings, she showed up to court without any of the materials she would typically bring to court (such as briefs and bench memos). *Id.* ¶ 23.

In a recent episode, Judge Newman indicated that she was not required to comply with a Court rule that requires a judge to circulate votes on opinions within 5 days of receiving a proposed opinion from the judge assigned the opinion. *See id.* ¶ 22. This rule was unanimously adopted by the Court (including Judge Newman) in March 2018. Judge Newman said that she did not have to comply with

IN RE COMPLAINT NO 23-90015

this rule because Chief Judge Markey told her she could take 30 days to vote. *Id.* Chief Judge Markey has been dead for 17 years and has not been a member of the Court for 32 years.

In another instance, Judge Newman was unable to complete the Court's mandatory security awareness training, because she was simply "unable to retain the information" from a 10–20-minute video even after watching it multiple times. █████ Aff. [5] ¶ 5. The IT Director indicated that Judge Newman repeatedly failed the short multiple-choice test—even though retesting involves presentation of the same multiple-choice questions each time. *Id.* Ultimately, the IT Director watched the video with her and reported that he had to "feed her the answers to the questions in order for her to pass." *Id.*

Staff reported evidence of cognitive problems in various contexts—such as inability to perform simple tasks from one day to the next, even though she performed them independently for years without difficulty. █████████ Aff. [2] ¶ 10 ("Judge Newman was simply not comprehending the simple process for using the application that she used to have no problem handling on her own."); █████ Aff. [5] ¶ 2; █████ Aff. [1] ¶ 23. "She never used to have a problem with these routine tasks but now seems to repeatedly forget how to do them." █████████ Aff. [2] ¶ 9; █████ Aff. [5] ¶ 4 ("she often cannot recall routine steps or processes and we will need to walk her through the entire process and repeat the steps over and over again. These are things like remoting into the system that used to be no problem for Judge Newman until more recently.").

These events do not involve difficulty adapting to new technology, *see* Response 52–53, but rather inability to perform the same tasks that Judge Newman once performed independently with ease and the need to be repeatedly reinstructed on how to complete them. █████ Aff. [5] ¶¶ 2,4

("I've noticed a significant increase in Judge Newman for-getting how to perform basic tasks that used to be routine for her."); ███████████ Aff. [2] ¶¶ 7–9, 10 ("She never used to have a problem with these routine tasks" for "pro-cesses [that] have not changed" "but now seems to repeat-edly forget how to do them.").

Another Clerk's Office staff member reported an inci-dent about 16–22 months ago in which he had to assist Judge Newman with walking to the courtroom and where she had to stop and sit outside the robing room to "gather the energy to stand." ██████████ Aff. [6] ¶ 5. He said that "[s]he seemed lost and confused, like she wasn't fully there." *Id.* He also, like other employees, reported having to answer the same questions from her over and over in the same conversation. *Id.* ¶ 3. He indicated that Judge New-man was "suspicious and confused and struggled to com-prehend" how an error in calendaring had occurred. *Id.* He explained it to her repeatedly, but she acted "distrustful." *Id.*

## 2. Staff Report Evidence of Agitation and Un-warranted Paranoia

Judge Newman has frequently claimed that her email and computer were being hacked—also, at times, that her phones were being bugged—and her complaints recently increased from once or twice a week to almost daily or every other day. *See* ████████████ Aff. [2] ¶¶ 3, 7–10; ██████ Aff. [1] ¶ 14; ██████ Aff. [5] ¶¶ 2–4, 6; ██████ Aff. [7] ¶ 4. Staff described her demeanor when making these com-plaints as "agitated" and "paranoid" and the conversations as sometimes "bizarre" and "nonsensical." ██████ Aff. [7] ¶ 8 ("I would describe Judge Newman's response as non-sensical because there was no reason to believe any of that was happening."); *see* ████████████ Aff. [2] ¶ 8 ("She seems agitated and paranoid, and we frequently have to calm her down in order to help her with her problem."); *see*

23

IN RE COMPLAINT NO 23-90015

*also* ███ Aff. [8] ¶ 5 ("I found Judge Newman's behavior during this whole event to be very bizarre and confusing.").

In the past, Judge Newman claimed that the culprits who were hacking and bugging her devices were bloggers and the media who were out to get her and bring her down. ███ Aff. [1] ¶ 14. More recently, she claimed that it is the Court itself hacking, bugging, and deleting information on her devices. ████████ Aff. [2] ¶ 3; ███ Aff. [7] ¶¶ 4, 8. At one point, she suggested that the Court was interfering with mail at her residence as well. ███ Aff. [7] ¶ 8.

In each instance, IT staff scanned her devices and found no evidence to justify or support Judge Newman's concerns. ███ Aff. [1] ¶ 14 ("ITO would inform me that there were no concerns or IT issues."); ███ Aff. [5] ¶ 3 (describing that IT would "scan for malware and viruses, [and] there would be nothing that would suggest any malicious interference with her computer"). Her claims about hackers usually stemmed from her having forgotten where she saved a file or email, and even after the IT staff located the file or email for her (on her desktop or in one of her folders), she sometimes would continue to allege that hackers were responsible for hiding the file. ███ Aff. [5] ¶ 3 ("Judge Newman routinely blamed her inability to find a file or email on someone 'hacking' her computer . . . I would usually be able to find the file she was looking for on a desktop folder or other location where she had forgot she saved it to. Rather than take responsibility for the errors, she would blame hackers or the computer."); ███ Aff. [1] ¶ 14 ("She seemed constantly paranoid about this despite no actual basis for her to be concerned."); ████ Aff. [2] ¶ 8 (stating Judge Newman's concerns "seem to be easily explained by . . . forgetting what she was doing or not realizing that the network disconnected her based on inactivity").

IN RE COMPLAINT NO 23-90015

### 3. Concerns Raised by Events Surrounding Chambers Staff

Recent events surrounding the departure of one of Judge Newman's law clerks and her judicial assistant have raised concerns on multiple fronts, including (1) her inability to remember (or unwillingness to comply with) the Court's EDR process, its confidentiality, and outcomes established in that process, (2) her inability to remember or comprehend repeated explanations given to her about simple staffing and IT matters related to the departure of these employees from her chambers, and (3) her hostile and accusatory interactions with staff based on perceived wrongs that never actually occurred. To summarize, on April 19, 2023, two of Judge Newman's own chambers staff (one law clerk and her judicial assistant) came unsolicited to the Committee to report troubling behavior by Judge Newman, requested assistance from the Committee, and resigned from her chambers. Both expressly requested no further contact with Judge Newman. ██████ Aff. [9] ¶ 17; Exs. 4 (email from Chief Judge Moore to Judge Newman and chambers staff regarding ██ █████), 5 (email from Chief Judge Moore to Judge Newman and chambers staff regarding ██ █████).

The resignation of Judge Newman's judicial assistant was prompted, in part, by Judge Newman's failure to manage a third member of her staff. Judge Newman (1) permitted her career clerk to call her judicial assistant in the middle of the night, including 3:00 am calls to request personal services (such as a 6:00 am wake-up call for the career clerk), (2) refused her judicial assistant's requests for help, (3) refused to participate in the Court's EDR process, and (4) inappropriately shared confidential details regarding the EDR matter with 95 court staff members and stated that her judicial assistant's concerns were, in Judge Newman's view, not "significant." April 6 Order at 6; ██████ Aff. [10] ¶¶ 1, 3–4; ██████ Aff. [1] ¶ 35 ("Despite my

IN RE COMPLAINT NO 23-90015

requests to stop, the clerk continued to contact me outside of regular working hours after bringing the matter to Judge Newman's attention."); Ex. 6 (email from Judge Newman to 95 staff members).  Judge Newman sent this email to the court staff distribution list just three hours after being reminded not to use the court distribution for emails containing sensitive matters.  Ex. 6.  The EDR process and its confidentiality are hallmarks of the judiciary's workplace conduct program.  EDR Plan for the Federal Circuit § IV.B.1 ("All individuals involved in the processes under this Plan must protect the confidentiality of the allegations of wrongful conduct . . . Information will be shared only to the extent necessary and only with those whose involvement is necessary to address the situation.").

Citing several specific examples, her judicial assistant filed a request for assisted resolution alleging that Judge Newman "was being abusive and retaliating against me" and "created a very hostile work environment for me." ████████ Aff. [1] ¶¶27, 31.  Through the EDR process, the judicial assistant was given an alternative workstation outside Judge Newman's chambers as he continued to work for Judge Newman. *Id.* ¶¶ 31–32.  In response, Judge Newman told other members of her chambers staff that her judicial assistant could no longer be trusted.  ████████ Aff. [9] ¶ 4 (law clerk stating he was informed by Judge Newman to no longer include ████████ on chambers communications "because he could not be trusted").  Judge Newman refused to participate in the EDR process or to respect the process, including the workstation move.  Staff members reported that on April 18, Judge Newman stated her intention to have her judicial assistant forcibly removed from the building or arrested.  *See* ████████ Aff. [2] ¶ 6 ("Judge Newman then said that she was going to have ████ 'removed from the court' or 'arrested.'"); ████████ Aff. [7] ¶ 19 ("Judge Newman stated that she would have ████ removed from the court or arrested.").  Although

26

IN RE COMPLAINT NO 23-90015

Judge Newman had been informed that her judicial assistant was temporarily provided an alternative workplace under the Court's EDR plan, she refused to accept that accommodation (or could not remember it), and on April 19 she gave the judicial assistant an ultimatum: return to chambers immediately or she would accept his resignation (*i.e.*, he would lose his job). ████ Aff. [1] ¶ 34 ("I understood Judge Newman as saying that she was going to terminate me immediately unless I dropped my request for an alternative work arrangement under the court's Employment Dispute Resolution Plan . . . ."); ████ Aff. [10] ¶ 8.

In light of these events, the judicial assistant resigned from Judge Newman's chambers, he was placed on the Clerk's Office staff, and an email was sent to Judge Newman on April 19, 2023, informing her that the judicial assistant was no longer a member of her chambers and that he wished for there to be no further communication to him by any member of the Newman chambers, including the Judge. *See* Ex. 4; ████ Aff. [10] ¶ 9.

On the same day, one of Judge Newman's law clerks also sought to and did remove himself from Judge Newman's chambers. He informed Judge Newman that he was uncomfortable performing personal work for her rather than court-related work. ████ Aff. [9] ¶ 6. He indicated that he was uncomfortable in chambers after Judge Newman told him that her judicial assistant could not be trusted and should be excluded from all chambers communications. *Id.* ¶¶ 2–4, 7, 9–16. He stated that he started teleworking to avoid the "drama, politics, and stress" in chambers. *Id.* ¶ 7. He requested to be transferred to another chambers. *Id.* ¶¶ 11, 14. Judge Newman refused to let him work for another judge, indicating that the optics would not be good for her and that he had two choices: stay or resign. *Id.* ¶ 14. The law clerk resigned, and he was taken on as a law clerk by another judge of the Court; he requested no further contact with Judge Newman, and

27

IN RE COMPLAINT NO 23-90015

Judge Newman received an email to that effect on April 19, 2023.  *Id.* ¶ 17; *see* Ex. 5.

Judge Newman acknowledged receiving the email about her law clerk, indicated that her clerk's resignation was "appropriate," and stated that the clerk's separation from her chambers should be expeditiously processed.  *See* Ex. 5.  Yet, eight days later, Judge Newman emailed all judges on the Court indicating that she had not "released" the law clerk and that his continued service at the Court in another chambers was "in violation of my right to law clerk services."  Ex. 7.  Similarly, Judge Newman was fully informed that her judicial assistant had resigned on April 19. *See* Ex. 4.  Yet again 8 days later, she emailed all judges stating: "I never released my judicial assistant [] from my chambers staff.  His movement to your staff, without consultation with me, violates his confidentiality and other obligations to me."  Ex. 7.

Despite being repeatedly told that the judicial assistant chose to leave her chambers because of her alleged abusive treatment of him, Judge Newman has accused the Court, various judges, the Chief Judge, and the Clerk of Court on multiple occasions of having improperly taken her judicial assistant away and/or depriving her of secretarial services.  *See* Exs. 3, 8–9; *see* ████████ Aff. [4] ¶¶ 4, 10–11, 13 and attached exhibits (quoting Newman May 17 email stating that he "deprived [her] of secretarial services" (alteration in original)).

These facts raise concerns about Judge Newman's confusion, memory, and ability to interact with court staff—all of which contribute to our concerns that she may have a disability that renders her unfit to continue as an active judge.

Moreover, Judge Newman's career clerk, who has been with her for several years, on advice of counsel, refused to answer basic questions from the Committee about her

responsibilities in chambers or about Judge Newman's mental fitness, instead invoking the Fifth Amendment privilege against self-incrimination. That invocation was proper only if it was reasonable to believe that answering questions about the clerk's duties could expose the clerk to criminal liability. *See Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1263 (9th Cir. 2000). For example, when asked, "Q. We understand that you are her career clerk. Can you tell us about that role and what your responsibilities are? A. I am going to invoke my right under the Fifth Amendment to avoid self-incrimination." ███ Deposition at 4:5–9. She further invoked the Fifth Amendment when asked about her perceptions of Judge Newman's ability to carry out her job. *Id.* at 30:4–9.

### 4. Dysfunctional Behavior Suggests Disability and Creates Workplace Abuse Concerns

Judge Newman has baselessly and relentlessly accused various staff of stealing her computers, stealing her files, depriving her of secretarial services, and acting as counsel against her. ███ Aff. [4] ¶¶ 4, 10–11, 13, 25–40 and attached exhibits; ███ Aff. [11] ¶¶ 2–6, 8; Exs. 3, 8, 9 at 9; ███ Aff. [1] ¶ 14. Staff described Judge Newman in their interactions with her as "aggressive, angry, combative, and intimidating"; "bizarre and unnecessarily hostile"; making "personal accusations"; "agitated, belligerent, and demonstratively angry"; "ranting, rambling, and paranoid"; and "mumbling" and "pacing." ███ ███ Aff. [4] ¶ 37; ███ Aff. [11] ¶ 5; ███ Aff. [2] ¶ 3; ███ Aff. [8] ¶¶ 3, 5; ███ Aff. [7] ¶ 19; ███ Aff. [1] ¶ 33. One staff member indicated that "Judge Newman is simply losing it mentally." ███ Aff. [2] ¶ 12. Given that this behavior is reported to occur in scenarios where it is clear that Judge Newman is confused or has forgotten how to perform tasks that she could previously do, or is unable to comprehend instructions, there is a reasonable basis to conclude that

IN RE COMPLAINT NO 23-90015

this inappropriate conduct towards staff is related to a disability.

Judge Newman has become convinced that, when her judicial assistant's computer was moved out of her chambers along with him (as is standard practice), *see* ███ ███ Aff. [4] ¶ 28, files from her chambers were removed with it.  Multiple staff members from the IT Department and the Clerk's Office have explained to her over and over again that all chambers information was stored on her chambers' shared network drive, not the hard drive on that computer; that the hard drive on that computer had specifically been checked multiple times and contained none of her chambers' information; and that IT could help her locate whatever information she needs.  *See* ███ Aff. [4] ¶¶ 27–40 and attached exhibits; ███ Aff. [11] ¶¶ 2–6.  Judge Newman, however, either was unable to understand or refused to accept these explanations.

The Clerk of Court[13] detailed Judge Newman's repeated email accusations that he was involved in "illicit removal" of equipment from her chambers and that he participated in the theft or removal of chambers records including her financial disclosure information—along with accusations that he was acting as Chief Judge Moore's lawyer, that he was Judge Newman's "adversary," and that he repeatedly withheld secretarial services from her. ███ May 31 Aff. [4] ¶ 4 and attached exhibits.  He reported how he had to explain to Judge Newman *five* separate times that no one had stolen her computer or her records and that he verified that fact and had the IT Department verify it on multiple occasions.  *Id.* ¶¶ 25–40; *see also* ███ ██ Aff. [4] ¶ 27 & Ex. C at 2 ("Because all of your chambers materials, drafts, and documents are stored on your chambers network drive and not the local desktop, nothing about

---

[13] Before July 1, the court's current Clerk of Court was Deputy Clerk and at times Acting Clerk of Court.

30

the move of this desktop ever hindered, restricted, or interfered with access by either you or your chambers staff to these materials."). He described Judge Newman's behavior towards staff as "agitated, belligerent and demonstratively angry." *Id.* ¶ 37 and attached exhibits. And he has stated that "the hostile nature of Judge Newman's personal accusations against me stands in sharp contrast to how I have interacted with any of the other 50-or-so federal judges with whom I have worked both in the Federal Circuit and in other federal courts since I began working in the federal judiciary in 2004." *Id.* ¶ 5.

After Judge Newman had once again accused the Clerk's Office employees of stealing her computer and files, on May 16, 2023, IT staff were sent to her chambers to assist her. ████████████ Aff. [11] ¶ 2; *see also* ████ Aff. [8] ¶¶ 1–5. The IT staff told Judge Newman that they knew exactly where her financial disclosure information was located on her desktop and offered to show her. ████████████ ██ Aff. [11] ¶¶ 3–5. She angrily refused to let them touch her computer. *Id.* ¶ 3. They offered to show her law clerk where the file was located if she preferred. *Id.* ¶ 6. She refused that assistance as well. *Id.* She was "clearly upset and frustrated and was walking back and forth mumbling about how her computer and phone had been taken away from her when that was not the case." *Id.* ¶ 8; *see also* ████ Aff. [8] ¶¶ 3, 5 ("Judge Newman was pacing back and forth and visibly angry and frustrated . . . . I found Judge Newman's behavior during this whole event to be very bizarre and confusing."). Judge Newman became angry, said that her judicial assistant had stolen her computer, phone, and files, and demanded "that she wanted her 'twenty-year-old computer' back." ████████████ Aff. [11] ¶ 4. Her anger was so intense it raised fears that she might collapse. *Id.* ¶ 7 ("I got worried that Judge Newman was getting so angry that she might collapse or have a heart attack

IN RE COMPLAINT NO 23-90015

if the conversation continued."); *id.* ¶ 8 (reporting being shaken by the exchange).

Judge Newman's accusatory interactions with staff about her supposedly stolen computer continued unabated even into July of this year, when she claimed that "decades of my work and my information" were on the computer and accused staff of "clever dissembling," being "shameful," and engaging in "trickery" after they again repeatedly explained that none of her information was on the hard drive of that computer. *See* Ex. 9 at 29. In a single two-day period from July 6 to July 7, more than two dozen emails passed between Judge Newman and the Director of IT, the Help Desk Manager, and the Clerk of Court regarding her allegations that they stole her computer and files and their attempts to explain to her that her files all reside on her chambers' shared drive and none of her files were on the judicial assistant's hard drive. *See generally* Ex. 9; *id.* at 4 (Director of IT confirming "███████ has no access to Judge Newman's shared drive nor has any of Judge Newman's data stored locally on his PC."); *id.* at 5 (IT staff member confirming the same). The staff respectfully and patiently explained to Judge Newman that "[e]very chambers stores those items on their network drives which are accessible to every computer in that chambers. The items you describe are located on your network drive.*" Id.* at 18; *see also, e.g., id.* at 22 (Clerk of Court explaining to Judge Newman that "I am at a loss for how different a way I can again explain what I have explained to you repeatedly for months. Your files are on your network drive. You have access to everything."); *id.* at 9 (Director of IT again explaining "[w]e have checked, double checked and triple checked and there is no data on any local computer or drive that belongs to you. All of your data is on the Newman share."); *id.* at 12 (Director of IT confirming a third time that "no Newman Chambers files reside on ███████

32

PC. There is nothing to return you as we informed you previously that all Newman Chambers files were moved to the Newman Share . . . ."); *id.* at 15 (Clerk of Court explaining "we have offered repeatedly to assist you with locating any files you cannot find or access. However, through our many conversations, we have yet to learn of any file or record of your chambers that is actually missing or unavailable."); *id.* at 26 ("Please let us know what you cannot locate. Our staff is available and willing to assist you.").

Various employees have described the toll that recent encounters with Judge Newman have taken on them, including by causing them serious anxiety, stress, and discomfort. ███████████ Aff. [4] ¶¶ 5, 36 ("████████ was audibly upset and bothered and he said it was due to how Judge Newman behaved and treated him."); *id.* ¶ 6 (stating interactions with Judge Newman caused "emotional stress and discomfort, including loss of sleep and heightened anxiety"); ██████████ Aff. [11] ¶ 8 ("I was left shaken and upset from this experience."); ████ Aff. [1] ¶ 37 ("The past few months have been extremely stressful and have caused severe anxiety and emotional distress brought on by Judge Newman's recent behavior towards me."); ████████ Aff. [9] ¶ 14 ("[W]orking in [Judge Newman's] chambers was hurting my ability to complete my work, taking a toll on my mental health, and harming my relationships at the court."); ██████ Aff. [10] ¶¶ 9, 10 (describing ██████████ as "visibly emotional" due to Judge Newman's behavior and having confided "the toll that this entire experience was taking on his physical and mental well-being, including seeking help from medical professionals"). Interactions with Judge Newman are now so dysfunctional that the Clerk of Court has advised staff to attempt to avoid interacting with her in person or, when they must, to bring a co-worker with them. ████████████ Aff. [4] ¶ 6; ████ Aff. [8] ¶ 1; ██████████ Aff. [11] ¶ 1.

IN RE COMPLAINT NO 23-90015

### 5. The Response Alleges that She Can "Run Her Chambers as She Sees Fit"

Rather than dispute the specific evidence provided by staff members, Judge Newman insists that none of it indicates any cause for concern and that short of "obvious red lines such as criminal activity or sexual harassment," she "is free to run her chambers as she sees fit"—even if it takes a toll on the health of employees.  Response 48.  Judge Newman's assertion that it is "entirely appropriate" to refuse to participate in the EDR process and "refus[e] to accept" an alternative work arrangement under the Court's EDR plan, Response 48 n.38, is simply not consistent with court rules or current workplace conduct standards.  And where an alternative work arrangement was created specifically for the benefit of an employee who had raised concerns about abuse and retaliation by Judge Newman, it is especially inappropriate for Judge Newman to then threaten to fire the employee (and tell others that she would have him arrested and removed from the building) unless he ignores the alternative work arrangement.  Such behavior is not reasonably defensible.[14]  Indeed, it is so far outside the norm that, coupled with the other evidence described herein, it supports the concern that Judge Newman's behavior may be the result of cognitive impairment.

---

[14] The Response suggests that if Judge Newman "treated staff more harshly than was necessary," it may be because of the "Committee's unjustified actions which have taken an enormous toll on Judge Newman."  Response 53-54.  But in her August 25, 2023 discussion with Dr. Carney, Judge Newman responded to a question about this proceeding's effects on her mental state: "'none!  To my amazement, even in this turmoil-well perhaps that's the fatal flaw—it's not getting to me.'  She stated her mood remains upbeat."  Ex. 10 (Carney Rep.) at 4.

IN RE COMPLAINT NO 23-90015

In *Adams,* the behavior of Judge Adams towards others in the courthouse was held sufficient to support an order compelling medical examinations for disability as determined by the special committee. *See In re Complaint of Judicial Misconduct*, C.C.D. No. 17-01 at 2–10, 16–17, 24–29, 35–36 (U.S. Jud. Conf. 2017). So too here. It is consistent with the Act to conclude that a Judge who remains unaware of basic standards of conduct towards employees, who demonstrates memory loss, confusion, lack of comprehension, and who lashes out at staff with baseless accusations of theft or hacking, might be impaired by a cognitive disability, requiring the Committee-specified medical examinations as part of a complete investigation.

We find that the evidence contained in the employee affidavits and deposition created a reasonable basis for the Committee's May 16 Order directing medical examinations and the specified medical records to ascertain whether Judge Newman may have a disability. And the evidence also supports the Order's request that Judge Newman sit for an interview, in which she could enhance the accuracy of the proceeding by, among other things, correcting any errors in the evidence or aid understanding of its implications.

### 6. The Response Incorrectly Claims Lack of an Opportunity to Counter the Employee Allegations

Judge Newman's August 31 Response complains for the first time that she was never given an opportunity to contest the information provided in affidavits in the record. Response 39–40. That assertion is incorrect. The Committee detailed much of the evidence in its May 3 Order then again in its May 16 Order and its June 1 Order. And in none of her responses did she challenge any of the evidence. In its June 1 Order, the Committee recognized that Judge Newman might wish to contest the Committee's recited

IN RE COMPLAINT NO 23-90015

bases for its Order and for that very reason provided Judge Newman all the affidavits and the deposition transcript on which the Committee had relied.  June 1 Order at 5.  She chose not to challenge them.  Instead, in her July 5 Brief she made the choice not to "delv[e] into the minutia[e] of these affidavits," but instead to dismiss them as reflecting "petty grievances" and to argue that "even assuming" the information in them was true, it "doesn't even approach probable cause to believe that Judge Newman is mentally and/or physically disabled."  July 5 Br. 15.  Other aspects of the affidavits she dismissed as "hardly worth responding to."  *Id.*  Having bypassed the offered opportunity to contest the information in the affidavits, Judge Newman cannot claim now that she was never given the opportunity to do so.[15]

To the extent Judge Newman now alleges that the Committee did not permit her to include basis-contesting (or other) evidence in her July 5 Brief or to request an evidentiary hearing (for example, to cross examine the affiants), she waived those arguments.  In its June 1 Order, the Committee explained its tentative view that "[t]here are no percipient fact witnesses to additional events that are relevant to the misconduct determination" and that

---

[15] In addition, the Committee made clear in its May 16 Order that it wanted to interview Judge Newman so that "she could provide the Committee with information relevant to the Committee's investigation, *including correcting any error of fact*."  May 16 Order at 23–24 (emphasis added).  Judge Newman refused to take that opportunity to contest any information the Committee had gathered.  In fact, at the end of the oral argument on July 13, the Committee offered Judge Newman's counsel extra time to address any topics he wished to, and he declined to use that time to challenge the affidavits.  Oral Arg. Tr. at 39:22–40:6.

IN RE COMPLAINT NO 23-90015

"the question whether Judge Newman's responses to the Committee's orders constitute 'refusing, without good cause shown, to cooperate in the investigation,' Rule 4(a)(5), can be determined based upon the paper record established by the Committee's orders and Judge Newman's filed responses, along with any legal argument Judge Newman wishes to submit." June 1 Order at 4. Judge Newman's counsel quoted that language and expressly stated: "We agree with that assessment." June 15 Letter at 3. If Judge Newman wanted to contest the decision not to hold an evidentiary hearing and conduct cross examination, she had the opportunity to do so, having been provided the evidence no later than June 1. Judge Newman made no such request in her filings on June 15, July 5, July 12, July 24, or August 14. Nor did she make any such request at the oral argument conducted on July 13. In short, Judge Newman had many chances to challenge the Committee's evidence and she chose not to do so. Even now, she makes no specific allegations of any error in the many staff accounts of deeply troubling interactions, many of which are corroborated by Judge Newman's emails. Her claim that she believed she could not provide contrary evidence is also belied by the fact that she did provide new evidence with her July 5 submission and more new evidence and a declaration with her August 31 submission.

\* \* \*

The evidence received from court staff, standing alone, provides a reasonable basis for the Committee's May 16 Order concerning medical examinations, medical records, and an interview. Judge Newman had many opportunities and never disputed it.

## B. The Evidence of Productivity Deficiencies, Even With a Reduced Workload, Supports the Committee's Order

In addition to the overwhelming evidence of Judge Newman's troubling interactions with staff, evidence from the Clerk's Office supports our conclusion that the Committee had a reasonable basis for the ordered medical evaluations, records, and interview. The Clerk's Office data[16] demonstrate that Judge Newman—despite having a significantly reduced workload compared to other active judges on the Court—takes an extraordinarily long time to produce opinions. From October 1, 2020 through September 30, 2021, Judge Newman authored only 25 opinions (including dissents/concurrences), while the average active judge authored 44 opinions. *See* ████████ Aff. [12] ¶¶ 10, 12; ████████ Aff. [13] ¶¶ 14, 15. Judge Newman averaged 249 days to author a majority opinion—more than four times as long as other active judges (61 days). ████████ Aff. [12] ¶¶ 11, 13.

Despite reductions in Judge Newman's workload, this trend has continued in recent months. The court has tried to support Judge Newman for years, reducing her work in response to concerns about her productivity. Judge Newman last participated in motions panels in January 2021. ████████ Aff. [13] ¶ 23. Motions panels are a time consuming and required aspect of an active judge's workload. Active judges participate in 3–4 months of motions panels each year. In 2023, there have been approximately 70 motions resolved by written opinions each month. In 2022, there were an average of 63 motions resolved by written opinion each month. R&R 54 n.16. Judge

---

[16] Judge Newman does not meaningfully dispute the Clerk's Office data, but instead points to analyses of publicly available data purportedly showing Judge Newman's productivity and delay are unexceptional. For the reasons explained in the Committee's R&R, *see* R&R 56–58, the Council credits the data from the Clerk's Office.

IN RE COMPLAINT NO 23-90015

Newman has not disputed that she acquiesced in the 2021 reduction in workload by excusing her from the motions panel duties.

Further reduction in her workload occurred from May 2022 through April 2023—a period in which Judge Newman sat on half the number of cases as her colleagues (65 compared to 128 for an average active judge). Judge Newman acquiesced in this reduction as well. There is no evidence that she ever objected to sitting less than her colleagues, and her monthly requests were consistently worded to indicate she would sit "as needed." Ex. 11.

Despite a substantially reduced workload, from October 2021 through March 2023, Judge Newman authored (including dissents/concurrences) less than half the number of opinions of an average active judge (28 compared to 61 for an average judge) and her opinions took approximately four times as long to issue (199 days compared to 53 days).[17] *See* ▮▮▮▮▮▮ Aff. [12] ¶¶ 15, 17; ▮▮▮▮ ▮▮▮▮▮▮ Aff. [13] ¶¶ 17, 18. She took four times as long to write half the opinions while sitting on half the number of cases as her colleagues.[18]

_____

[17] Judge Newman was not merely an outlier from the *average* active judge, but from *all* active judges who sat the full period reviewed. The next closest judge authored 55 opinions (43 majority and 12 dissents/concurrences) with an average time to issuance of 106 days. ▮▮▮▮▮▮ ▮▮▮▮ Aff. [13] ¶ 19. Thus, the next closest judge wrote approximately twice as many opinions in approximately half the time.

[18] On March 8, 2023, when the Council unanimously voted not to allow new case assignments to Judge Newman because of her extraordinary delays, she had 9 majority opinions that had been pending for an average of 126 days.

39

IN RE COMPLAINT NO 23-90015

The Council finds these data raise a concern that Judge Newman is no longer capable of efficiently and effectively carrying out the work of an active judge and support the Committee's conclusion that there was a reasonable basis to seek medical examinations, medical records, and an interview to determine if these delays are attributable to a disability.  *See* 28 U.S.C. § 351.

## III. The Refusal to Comply with the May 16 Order Was Not Excused by Good Cause

Judge Newman's refusal to comply with the Committee's May 16 Order was not excused by good cause.  Judge Newman's two main arguments are that this JC&D matter should be transferred, and she has already provided two medical reports.  She also has attacked earlier orders and actions by the Chief Judge or Committee as a basis for excusing non-compliance with the May 16 Order.  We find these arguments meritless.

### A. The Request for Transfer Does Not Provide Good Cause for The Refusal to Comply with the May 16 Order

Judge Newman has maintained, and continues to maintain, that this matter should be transferred to the

---

On May 25, when Judge Newman asked the Council to reconsider paneling her for new cases, she still had 7 of those 9 opinions which had been pending for an average of 163 days.  As of September 1, 2023, Judge Newman had issued 4 non-precedential majority decisions, and they took her on average 255.5 days each.  She continued to have 3 majority opinions in her backlog which averaged 257 days (one of which was the oldest case in the court).  In the last six months while sitting on zero motions panels, and zero new cases, Judge Newman has taken on average 255.5 days to write her 4 majority opinions.

IN RE COMPLAINT NO 23-90015

judicial council of another circuit—and that, barring transfer, she has good cause to refuse to comply with the Committee's May 16 Order.  We disagree on all counts.  We conclude that the decision not to transfer does not excuse Judge Newman's refusal to comply with the Order and that granting Judge Newman's transfer request[19] was never appropriate—and certainly is not at this point.

Under the rules, transfer is warranted only in "exceptional circumstances."  *See* Rule 26; Implementation of the Judicial Conduct and Disability Act of 1980, Report to the Chief Justice of the Judicial Conduct and Disability Act Study Committee, 239 F.R.D. 116, 214 (Sept. 2006) (Breyer Committee Report) ("Transfers should not be a regular occurrence.").  Judge Newman has not identified (nor do we see) exceptional circumstances warranting transfer.  Indeed, her response to the R&R never once acknowledges this demanding standard.

Judge Newman's arguments for transfer—by way of seeking to justify her refusal to cooperate—generally rely on (1) inapplicable authority or (2) unfounded accusations of bias.  As explained below, her authority is unpersuasive, and her arguments as to bias—essentially, that because the judges of this circuit have worked with her, they cannot be impartial—if accepted, would convert the relatively routine into the exceptional, with adverse consequences for the policies of the Act and of proper judicial administration more generally.

---

[19] Under Rule 26, Judge Newman's transfer request (and the decision not to grant that request) more precisely refers to a request that the Chief Judge or Council ask the Chief Justice of the United States to transfer.  For simplicity's sake, and because the distinction is immaterial to our discussion, we characterize the request as concerning transfer itself.

41

IN RE COMPLAINT NO 23-90015

As to authority, while Judge Newman insists that matters involving a circuit judge that get to the Committee stage are always transferred, her examples consist only of cases involving isolated alleged instances of past misconduct not related to disability.  Response 73–74.  She gives no example—nor are we aware of any—where a case involving disability was transferred.  And for good reason.  Although an investigation into a discrete incident or set of incidents that occurred entirely in the past could potentially be pursued from afar without serious detriment, this case, by contrast, involved ongoing behavior that was having ongoing effects on the functioning of court staff in the court's building and the functioning of this court.  As a result, ready access to the Committee was vitally important both for ensuring that all relevant information was captured in the investigation and for providing court staff confidence that they were being heard.  The importance of that access is underscored by one of the Breyer Committee Report's factors counseling against transfer—*i.e.*, "outside judges' relative ignorance of local circumstances and personalities."  239 F.R.D. at 215; *see* R&R 87–88.[20]

As to alleged bias, Judge Newman argues that members of the Judicial Council have "personal knowledge of disputed evidentiary facts concerning the proceeding" and are therefore biased—requiring transfer.  *See* Response

---

[20] As the Committee has observed, the Breyer Committee Report's factors counseling against transfer weigh against transfer in this case.  *See*, *e.g.*, May 3 Order at 10–11; R&R 91 ("For the reasons stated, based on considerations set forth in the Breyer [Committee] Report, we think it was proper in this matter not to . . . transfer.").

IN RE COMPLAINT NO 23-90015

71–73.[21] This argument is unpersuasive on a couple of levels.

First, this investigation has significantly narrowed—from originally considering whether Judge Newman suffered from a disability, to now (since June 1, 2023) considering whether her failure to cooperate constitutes misconduct under the rules.   As the R&R explained, it would "present a different question if a particular interaction between judges provided the core evidence of suspected disability and that interaction was likely to be a subject of dispute at a hearing." R&R 73.  But here, "[t]here were no personal interactions between Judge Newman and other judges that would come up as disputed facts."  *Id.*  Indeed, the only question before the Council is whether to adopt the proposal set forth in the R&R.

Second, Judge Newman's argument simply proves too much.   The argument appears to be that judges on this court have views of Judge Newman by virtue of having interacted and worked with her, and that such knowledge prevents impartiality and demands transfer.[22]   *See*

---

[21] In advancing this argument, Judge Newman quotes from 28 U.S.C. § 455, the judicial recusal statute.  Assuming, *arguendo*, that this statute applies in this context, each member of the Council has carefully considered whether recusal/disqualification was required under § 455 and determined that it was not.  Each member of the Council likewise carefully considered whether recusal/disqualification was required under Rule 25 and determined that it was not.

[22] To the extent that Judge Newman believes that judges who attempted unsuccessfully to broker an informal resolution with her to avoid these proceedings, March 24 Order at 5–6, are necessarily biased or must necessarily

IN RE COMPLAINT NO 23-90015

Response 71–73.  The implication of this argument is that circuit judges—who will necessarily interact with their colleagues in the same circuit—may not sit on disability proceedings concerning those colleagues.  This is plainly not the case.  To the extent she claims the Judicial Council members are biased against her because she dissents more than any other judge on the court, she identifies no reason why her long practice of dissenting especially often would somehow now be the cause for the present inquiry.  Her assertions of bias are grounded in little more than an assertion that her colleagues are biased simply because they know and work with her.

Rule 25 provides particular standards for disqualification.  And the commentary to that rule expressly states that "a judge is not disqualified simply because the subject judge is on the same court" and that bias or prejudice warranting disqualification must be "created by circumstances other than an association with the subject judge as a colleague."  Rule 25 cmt.  As the R&R explained, by design, the statute and rules anticipate that judges will institute, investigate, and ultimately decide disability proceedings about their colleagues.  *See, e.g.*, 28 U.S.C. §§ 351–353 (requiring chief judge to receive and review complaint and form special committee); Rule 11(a) (requiring chief judge to review complaint), 12(a) (requiring the special committee to consist of chief judge that identifies complaint); *see*

---

recuse, that is not correct.  It has historically been, and should continue to be, the case that when a judge reaches the stage where there are concerns about mental fitness, the judge's colleagues step in to try to address the issue informally with the judge (and, sometimes, family and others closest to the judge).  Doing so is not only consistent with the rules, but entirely appropriate.  If attempting to speak with a judge after concerns have arisen necessitated recusal, it would stymie the informal resolution process.

*also* R&R 73–74.  Congress and the Judicial Conference were certainly aware of § 455, and also of the reality that "[j]udges at every level of the system interact with each other frequently and in many ways."  Irving R. Kaufman, Chilling Judicial Independence, 88 Yale L.J. 681, 711–12 (1979) (describing how circuit and district judges, especially within a single circuit, commonly get to know each other).  The way Congress structured the Act and the Judicial Conference structured the rules suggests that both bodies concluded that § 455 posed no barrier to judges deciding disability proceedings about their fellow judges, including those on the same court.[23]

The bases for deciding not to grant Judge Newman's transfer request were, and remain, sound.  These bases—which easily support the conclusion that this matter does not present the requisite "exceptional circumstances"—were described in the R&R.  *See* R&R 86–92.  But they are worth recounting here, particularly by way of addressing Judge Newman's latest criticisms of those bases.

At the outset, we note that Judge Newman first suggested transfer of this matter on April 21, 2023.  By that point, the Committee had already conducted more than a dozen interviews and a deposition, and many troubling events were occurring in real time.  Just two days earlier, on April 19, two of Judge Newman's chambers staff came unsolicited to the Committee to complain about their

---

[23] We note also that, in 28 U.S.C. § 372(b), Congress provided that a majority of the members of a circuit's judicial council may sign a certificate of disability as to one of their fellow circuit judges (the certificate to be presented to the President).  This provision is another instance in which Congress contemplated, and deemed unproblematic, an assessment by a circuit's judges as to another judge on their circuit.

IN RE COMPLAINT NO 23-90015

treatment by Judge Newman and to request the court's as-sistance in relocating them.  Both indicated that working with Judge Newman was taking a toll on their mental health, and both requested no further contact with Judge Newman.  The Chief Judge, in consultation with the Com-mittee, was able to relocate both employees, providing them real-time relief.

Indeed, the ongoing nature of Judge Newman's trou-bling interactions with staff demonstrates why it was espe-cially important for this matter *not* to be transferred to another circuit.  Behavior that tended to confirm concerns about Judge Newman's mental state occurred on an almost weekly basis during most of the Committee's investigation.  Because the Committee consisted of members of this court, staff were able to report concerns to the Committee on an almost real-time basis, and they did.  That ensured that the Committee developed a complete picture of the nature of Judge Newman's behavior as efficiently as possible and also reassured staff that they had an immediate avenue for presenting concerns raised by Judge Newman's behavior so that they could be addressed in this process.  If the inves-tigation had been transferred to another court, unknown to the staff and less accessible to them, the investigation could not have been carried out in the same expeditious manner.  Acting expeditiously is one of the Committee's charges, as the Committee explained.  *See* R&R 87–88; *see also* 28 U.S.C. § 353(c); *id.* §§ 352(a), 353(a); H.R. Rep. 96-1313 at 11; May 16 Order at 24; May 22 Order at 2–3.

Judge Newman disagrees that the Committee's ability to gather information efficiently and timely address em-ployee concerns was relevant to the transfer decision—or indeed, that the information gathered from employees was relevant to the Committee's investigation at all.  *See* Re-sponse 100–01.  But we find her disagreement is not well reasoned.  For example, as to the relevance to the transfer

IN RE COMPLAINT NO 23-90015

decision, Judge Newman speculates that if the matter had been transferred, nothing would have precluded "forwarding memoranda of . . . conversations or affidavits submitted by the staff" to another judicial council.  *Id.* at 100 (citing the speed of electronic transmission).  Yet this argument fails to meaningfully engage with the Committee's observation (which we endorse) that (1) "another court could not, from afar, create an environment in which this [c]ourt's staff could raise concerns based on their interactions with Judge Newman in an almost real-time fashion"; (2) "without that ready ability to report incidents, . . . important information in this investigation might have been lost"; and (3) "[p]articularly in this case, placing distance between the individuals who witness and experience a subject judge's behavior and the investigating body would have inhibited, not promoted, the aims of the Act."  R&R 89.  Indeed, as a factor counseling against transfer, the Breyer Committee Report notes that "transfers may increase time and expense if there is the need to ship files, arrange witnesses, and handle other matters from a distance."  239 F.R.D. at 215.

As to Judge Newman's suggestion that concerns expressed by staff are not relevant to the investigation, we think it beyond reasonable dispute that these concerns—as to, among other things, memory loss, confusion, and lack of comprehension—are relevant as substantiating the Committee's order.  *Cf.* Response 101 (characterizing the perception of Judge Newman's behavior only as "unnecessarily hostile").  And, to the extent her suggestion of irrelevance rests on a belief that the Committee deems her delays in resolving cases alone a sufficient basis for its order, *see id.*, the Committee has not limited its basis in that fashion.

In sum, we agree that the decision not to grant Judge Newman's transfer request was sound and are unpersuaded by her arguments to the contrary.

IN RE COMPLAINT NO 23-90015

Judge Newman also maintains that we should grant her transfer request *now*. *See* Response 104. We reject that request. Transfer at this point, when the four-month investigation involving more than 20 interviews with staff is complete, there have been more than a dozen orders, Judge Newman has filed at least half a dozen substantive letters or briefs, oral argument was conducted, and the Committee issued a 111-page R&R with over 300 pages of supporting evidence, simply makes no sense.

Moreover, Judge Newman's prior representations make clear that there is no handing this off to another circuit to just "wrap it up." She has claimed that the process was tainted from the outset, that all the employee affidavits were effectively coerced, and that a do-over is necessary. While she has indicated that she may be open to some kind of medical examinations if this proceeding is transferred, *see* Response 62, she has avoided any suggestion that, if the matter were transferred, she would undergo the full neuro-psychological testing that was recommended by Dr. ███████ and is the subject of the May 16 Order. In fact, Judge Newman says she "will not, under any circumstances, submit" to the requests for the medical examinations and medical records made by the Committee "either now or in the future." Response 105 n.60; *id.* at 112 n.67 (indicating a "do-over" would be necessary if another circuit determined these proceedings were "marred with impropriety"). And while she implies (in carefully qualified language) that she will undergo "*appropriate* medical examinations," Response 65 (emphasis added), she has also stated that if transferred she intends to open a new negotiation, "including on selecting medical providers and setting the appropriate parameters of any examination," May 25 Letter at 3. She has also pointedly reminded the Committee that the "effect" of transfer is that "the transferee council is not bound by any evidence, reports, or decisions made by the transferor council," and she has expressly

48

IN RE COMPLAINT NO 23-90015

"reserve[d] the right to request that the transferee council restart the entire process." May 10 Letter at 5. These various representations belie Judge Newman's assurance that transfer is appropriate because "the only question now is the *evaluation*" of the gathered evidence. Response 101 (emphasis in original). What she describes as "evaluation" is, in effect, a do-over.

Retaining this case also protects court employees by permitting the Chief Judge and Council to respond to Judge Newman's ongoing conduct. The Breyer Committee Report notes that the tendency of judges to fall victim to "a kind of undue 'guild favoritism' through inappropriate sympathy with the judge's point of view or de-emphasis of the misconduct problem" in these types of proceedings was an important consideration in creating the report. 239 F.R.D. at 119. The report embodies this concern in its guidance on transfer considerations by recognizing that judges *outside* the subject judge's circuit might be "disinclined to go through the emotionally draining work of imposing tough sanctions on judges not of their own circuit." *Id.* at 215. Judge Newman's conduct, which raises concerns about her cognitive state, includes threatening to have employees arrested, retaliating against employees for reporting concerns about Judge Newman, and berating staff regarding baseless allegations that she has been deprived by them of her computer, files, and secretarial services. We have an obligation to ensure that court employees are free from such abuse. Also important is ensuring that the harm to the public (*e.g.*, litigants) is avoided by expeditiously resolving this matter. This conduct continues to have collateral effects on this circuit's staff and the effective administration of court business. Another circuit is not well positioned to hear, assess, and remedy those problems. Nor could another circuit handle the resolution as expeditiously as this circuit; that drawback, if this matter were

49

transferred, would further subject court staff to the conduct described above.

Finally, to the extent Judge Newman suggests that the decision not to grant her transfer request stems from a desire to "shield" the Committee's work from review by another tribunal, *see* Response 101, the suggestion reflects a fundamental misunderstanding of this process. The rules already provide for review by the Committee on Judicial Conduct and Disability of the Judicial Conference of the United States (JC&D Committee) appointed by the Judicial Conference of the United States. Rule 21. And they ensure that the JC&D Committee, in its review of a matter, is independent of the circuit from which the matter arises. Rule 21(c) ("Any member of the Committee from the same circuit as the subject judge is disqualified from considering or voting on a petition for review related to that subject judge.").

Accordingly, transfer is not warranted at this time. For the reasons previously articulated, Judge Newman's request to transfer is denied without prejudice to refiling after she has complied with the Committee's May 16 Order.

## B. The Medical Evidence is Not Good Cause for Her Refusal to Comply with the May 16 Order

The Response argues that two medical reports provided show that Judge Newman suffers from no disability and thus justify (retroactively) her refusal to comply with the Committee's order. Specifically, it argues that the reports of Dr. Ted Rothstein and Dr. Regina Carney obviate the need for the medical examinations and records ordered by the Committee and therefore render her refusal to cooperate with the order excusable. We reject this argument for several reasons.

First, it is settled precedent that a subject judge may not circumvent the investigation process by submitting tests of her own choosing in lieu of those ordered by the

IN RE COMPLAINT NO 23-90015

Committee. The holding of the JC&D Committee in the *Adams* case flatly contradicts the suggestion that—by simply providing alternative tests from her own providers—Judge Newman can effectively override the Committee's decision that it is necessary to have the examinations, including a full neuro-psychological assessment, of Judge Newman by independent providers chosen by the Committee. *See In re Complaint of Judicial Misconduct*, C.C.D. No. 17-01 (U.S. Jud. Conf. 2017) (*Adams*). One of the core issues in *Adams* was whether a judge subject to a disability inquiry could refuse to undergo tests ordered by an investigating committee and administered by providers selected by the committee on the ground that the judge preferred different tests administered by different providers. As the JC&D Committee explained: "While Judge Adams has expressed a preference for being evaluated by an expert of his choosing and an opportunity to direct to some extent the nature of the examination, we conclude that the Special Committee and the Judicial Council appropriately exercised their discretion in determining that an examination by an independent expert is necessary to ensure accuracy and reliability of the procedures and examination results." *Id.* at 32; *see also id.* at 36 ("We share the Judicial Council's view that input from an independent medical expert is necessary to fully and fairly assess Judge Adams's mental condition and fitness to continue to serve as a judge."). Here, Judge Newman's counsel admitted that (her first examiner) Dr. Rothstein had a long-time personal relationship with Judge Newman,[24] and counsel also has stated that he was classmates in medical school with (the second examiner) Dr. Carney,[25] who was flown from Florida to

---

[24] Oral Arg. Tr. at 38:18–24.

[25] Ryan Davis, *2nd Doc to Evaluate Judge Newman Says She's Fit to Serve*, Law360 (Sept. 7, 2023), available at https://www.law360.com/ip/articles/1718953/2nd-doc-to-evaluate-judge-newman-says-she-s-fit-to-serve.

Washington, D.C., to interview Judge Newman and perform the 11-minute cognitive test featured in the resulting report.

*Adams* makes it clear that it is misconduct for a subject judge to refuse to comply with an order from a special committee for medical examinations on the ground that the judge would prefer different tests administered by different providers. We continue to believe that it is important that independent medical practitioners be selected to perform the medical examinations. Insisting upon an examination by an independent provider "is necessary to ensure accuracy and reliability of the procedures and examination results." *Adams* at 32. The rule from *Adams* serves an important interest: ensuring that what may well be the most critical piece of the investigation—medical evaluations designed to ascertain whether the subject judge suffers from a disability impairing the ability to effectively discharge the duties of office—are as accurate and reliable as possible.

Second, the two reports Judge Newman has proffered are not remotely substitutes for what the May 16 Order directs, including the specified full neuro-psychological examination (and medical records). Neither the 10-minute partial MOCA nor the 11-minute 3MS are substitutes for the ordered full neuro-psychological examination (six hours) that Dr. ███████ advised was both necessary and that has been done in previous judicial disability inquiries. Nothing submitted by Judge Newman provides any adequate explanation for how the radically different, lesser examinations reflected in Dr. Rothstein's and Dr. Carney's reports are appropriate substitutes for the much more extensive examinations required by the May 16 Order. Given the demanding nature of an active judge's job, it would be surprising if there were any sound basis for any such equation. There is nothing remotely adequate offered here.

### 1. Dr. Rothstein's Report

The Rothstein report relies on the Montreal Cognitive Assessment (MOCA), a screening test that takes only about 10 minutes to administer. *See* Rothstein Rep. (Ex. 12), 13 (MOCA test). The R&R pointed out flaws on the face of the report that made the Rothstein report unreliable. And the new declaration from Dr. Rothstein, submitted to the Council with Judge Newman's August 31 Response, actually *confirms* the problems with his original report identified in the R&R. *See* Rothstein Decl. (Ex. 12).

The full MOCA provides a total of 30 possible points. *See* R&R 100–102; Ex. 13. Dr. Rothstein noted that Judge Newman was unable to write (due to a broken wrist) and thus could not complete portions of the test worth 2 points and that she missed four points (4 of the 5 memory questions), which led him to report a score of 24 out of 28. As the R&R explained, however, if Judge Newman could not write, she also could not have completed another portion of the test (drawing a clock) worth 3 points and thus Dr. Rothstein inaccurately scored her test. *See* R&R 102. Dr. Rothstein's new declaration confirms that Judge Newman could not draw a clock. Rothstein Decl. ¶ 11. Therefore, he erred in crediting her with the 3 points related to the clock. Dr. Rothstein does not dispute that if the 3 points attributable to drawing the clock are properly taken out of Judge Newman's score, she actually scored a 21 out of 25. According to the MOCA website this translates to a scaled score of 25 out of 30, which is *below the normal range.* R&R 102–03, available at https://mocacognition.com/faq/ (last visited September 17, 2023). Though that analysis was detailed in the R&R, Dr. Rothstein's new declaration does not dispute the conclusion about the proper score.

Dr. Rothstein's new declaration also confirms another problem with his earlier submission. He admits that he did not review any of Judge Newman's medical records before

forming his opinion but relied on her oral reports.  Rothstein Decl. ¶ 9.

## 2.  Dr. Carney's Report

The report from Dr. Regina Carney submitted with the Response was based on an interview with Judge Newman, a review of some medical records (it is not clear how complete the reviewed records were) and some information about a judge's job (it is not clear what), and administration of a Modified Mini-Mental State Exam (3MS).  Dr. Carney reports that it took Judge Newman 11 minutes to complete the test.  Carney Rep. at 5.  The test consists of 34 questions that require the subject to answer such queries as "Can you touch your nose," "Who is the president of the United States," to count from 1 to 5 in forward and reverse, and to recall three words throughout the course of the approximately 10-minute examination.  *See* Carney Rep. Ex. 1.  According to the creators of the test, the 3MS was *not* designed "as a screening tool for dementia" and "many of the items in the . . . 3MS are not sensitive for detecting dementia in its early stage."  Evelyn Teng & Helena Chui, *Manual for the Administration of the Modified Mini-Mental State (3MS) Test* (1996) at 2 (3MS Manual); *see also* Lei Feng et al., *The Modified Mini-Mental State Examination test: Normative Data for Singapore Chinese Older Adults and Its Performance in Detecting Early Cognitive Impairment*, 53 Singapore Med. J. 458 (2012) (concluding the 3MS "has limited value in detecting early cognitive impairment; tests with better performance should be considered in clinical practice.").  According to the 3MS Manual, this test is better suited to "monitoring the progression of dementia to its middle and late stages."  Ex. 2 at 2.

## 3.  Inadequacy for the Disability at Issue

Besides the just-identified problems, we do not see the two reports as adequate substitutes for compliance with the May 16 Order because they do not come close to

IN RE COMPLAINT NO 23-90015

persuasively taking account of the actual requirements of the job at issue. To effectively discharge the duties of an active circuit judge requires far more than the basic abilities tested by the MOCA and 3MS. The job of an active judge involves a heavy workload of cases many of which involve complex records, technical or otherwise specialized facts, application of law to fact and often novel legal issues. "It is axiomatic that the work of a lifetime appointed federal judge is demanding and requires the highest degree of functionality." *Adams* at 29. In a typical month, an active Federal Circuit judge is assigned to three to four panels, each panel consisting of four argued cases and two cases submitted on the briefs, for a total of 18 to 24 cases per month. And all of these cases are heard in a single week. Each can involve extensive briefing and even more record material that the judge must review, comprehend, and analyze to resolve often-numerous disputes about often-complex and specialized factual and legal issues. The concentration and memory required is a league apart from the ability to recall simple "everyone knows" facts and a handful of words, and the stamina required is beyond that tested by the MOCA (10 minutes) or 3MS (11 minutes). For each panel, a judge hears two consecutive hours of oral argument (four cases with argument lasting 30 minutes). Thus, a Federal Circuit judge needs to be able to distinguish between and decide 18 to 24 cases, 12 to 16 of which are argued in a single week.

This Court has the difficult and unenviable task of ascertaining whether Judge Newman suffers from a disability rendering her "unable to discharge the duties of [her] *particular* judicial office." Rule 4(c) (emphasis added). We find that neither Dr. Rothstein's report nor Dr. Carney's report permits the Judicial Council to make that determination. Judge Newman has not established that these reports are adequate substitutes for the medical examinations and medical records required (and interview

IN RE COMPLAINT NO 23-90015

requested) by the May 16 Order.  In particular, given the nature and demands of the job as an active judge, and the large body of evidence demonstrating Judge Newman's potential cognitive problems, the full neuro-psychological battery of tests required by the May 16 Order is necessary. The Council concludes that neither Dr. Rothstein's nor Dr. Carney's reports provide retroactive good cause for Judge Newman's refusal to comply with the Committee's order.

## C. The Criticisms of Earlier Orders and Actions Do Not Undermine the Duty to Comply with the May 16 Order

Judge Newman's Response has sought to establish good cause for non-compliance with the May 16 Order by attacking earlier orders and actions and trying to construct a general picture of a hostile, bad-faith course of action, riddled with improprieties, by the Chief Judge and the other members of the Special Committee.  This attack on how the three judges carried out their difficult statutory obligations is unwarranted and does not undermine the amply supported May 16 Order.  The Council itself unanimously took some of the complained-of steps, *e.g.*, the suspension of new case assignments.  And it has scrutinized all the Response's particular assertions about and characterizations of events out of which the Response creates its accusatory portrait. After thorough consideration and review of the record, we conclude that the assertions and characterizations are incorrect and unfounded and that the overall portrait wholly lacks merit.  We see nothing in the Chief Judge's and Committee's course of action but good faith execution of a difficult, statutorily assigned task.   We thus reject the Response's pervasive attempt to establish good cause for non-compliance with the May 16 Order by focusing on other orders and actions.

56

IN RE COMPLAINT NO 23-90015

We divide our discussion of the Response-raised matters separate from the May 16 Order into two sections. We first address the Response's effort to undermine the May 16 Order by criticizing certain aspects of the Chief Judge's March 24 Order (identifying a complaint) and the Committee's April 7 Order (the first medical-examination order). We then address the assortment of other attacks on how the Chief Judge and Committee proceeded.

## 1. The Criticisms of the March 24 and April 7 Orders Do Not Undermine the May 16 Order

The Response seeks to undermine the duty to comply with the May 16 Order by focusing on asserted flaws in two earlier orders—the March 24 Order identifying the complaint and the April 7 Order that first required medical examinations. The core argument is that (a) these orders were critically dependent on statements that Judge Newman suffered a "heart attack" and underwent coronary stent surgery in 2021 and had a "faint[ing]" episode in 2022 and these statements are unsupported (even "fabricated") and (b) everything that followed must as a consequence be thrown out as illegitimate. Response 6, 41–43. This contention is incorrect in both its premises and in its conclusion about the implication for the present matter of noncompliance with the May 16 Order.

The premises of the Response's argument regarding the March 24 Order are defective for multiple reasons. First, the Response is flawed regarding the existence of the episodes at issue. As to a 2022 "faint[ing]" episode, there is evidence of just such an occurrence. ███████ saw Judge Newman in 2022 being assisted back to chambers and was told in Judge Newman's presence that she had just fainted and could not walk without assistance. *See* ███████ Aff. [1] ¶ 6. As to a "heart attack," the Committee quickly recognized that "heart attack" was too specific a term if

57

IN RE COMPLAINT NO 23-90015

understood to refer to a myocardial infarction, and it sought information about the broader category of "cardiac event." *See, e.g.*, May 16 Order at 4–5; R&R 81–82 ▮▮▮▮ ▮▮▮▮ affidavit states that Judge Newman had a cardiac condition and "at least one cardiac-related procedure." ▮▮▮ Aff. [1] ¶ 9.  When asked at oral argument before the Committee about whether Judge Newman had experienced a cardiac event and was hospitalized for it in 2021 and/or 2022, her counsel refused to say.  Oral Arg. Tr. 17:23-18:5; 18:22-19:4; 20:11-19; R&R 82.  The record thus does not refute the assertion of a 2022 fainting episode or the existence of a 2021 cardiac event serious enough to require a visit to the hospital or insertion of a stent or other treatment.  Judge Newman presented medical evidence in both her July 5 and her August 31 submissions, yet she refused to submit any medical evidence from her cardiologist or pulmonologist regarding her cardiac events and procedures.  She refused twice to interview with the Committee where she could have clarified these facts and chose not to submit her own declaration on these points.

Second, the Response is also critically wrong about the role of these two recited incidents in the March 24 Order. The two physical episodes at issue were merely possible causes of the symptoms, such as memory, confusion, and stamina problems, that were the basis for the March 24 Order.  The points Judge Newman focuses on were mentioned on the first page of the order as historical background to explain why Judge Newman was, with her acquiescence, operating under a reduced caseload—a fact that (at least as of 2022) is undisputed and borne out by data from the Clerk's Office.  But the March 24 Order did not rely on the heart attack (or surgery) or fainting as the basis for identifying a complaint.  To the contrary, the Order set out information about Judge Newman's behavior (including "allegations that Judge Newman has exhibited

IN RE COMPLAINT NO 23-90015

inappropriate behavior in managing staff" and staff concerns about, *e.g.*, her memory, confusion, and focus), noted that Judge Newman had agreed to forgo motions-panel participation and acquiesced in a greatly reduced workload, and laid out data from the Clerk's Office showing striking deficiencies in processing cases even with a diminished workload. Whether there were particular physical causes of the symptoms, reflected in particular cardiac or fainting episodes at particular times, was not critical to the basis for the identification of the complaint, though such causes could ultimately be relevant to determining the nature, extent, and duration of any disabilities.

The Response's criticism of the April 7 Order, which was the first Committee order to require medical examinations, is defective for at least the same reasons. The Response asserts that the Committee lacked a reasonable basis for the April 7 Order, but the core argument is that the order, which referred to the March 24 Order and did not further discuss the basis for concern about disability, was infected by the same error regarding a "heart attack" as the March 24 Order. Response 36–37 (stating that "absent these allegations, the Committee was left with nothing at all" on which to base its order for medical examinations). But as explained, that assertion incorrectly assigns the dispute about a "heart attack" a role contrary to its actual role regarding the issue of disability.

In asserting that the Committee had no other basis for its April 7 Order, the Response states that, as of April 7, the "Committee had yet to speak to any of Judge Newman's staff." Response 8. That is wrong. The March 24 Order makes clear on its face that, even before that Order was entered, one of Judge Newman's chambers staff had reported troubling conduct by Judge Newman. The R&R further explains that, after the Committee was appointed on March 24, the Committee "*immediately* undertook

59

interviews with court staff to gather relevant information." R&R 12 (emphasis added). And it is apparent from the sequence of the Committee's orders that much of the information ultimately memorialized in the form of affidavits had been provided to the Committee in interviews long before the affidavits were executed. In addition, as the April 7 Order makes clear, the Committee had already engaged a consulting expert (Dr. █████) and relayed information to him, and he had found the information sufficient to call for the medical examinations the Committee was ordering. April 7 Order at 1–2. The April 7 Order also provided Dr. █████ s contact information so that Judge Newman or her representatives could ask him directly about the examinations and the selected providers. Judge Newman's suggestion that the Order was based on "nothing" but the disputed "heart attack" event is contrary to the record.

In any event, even if there was some error in the March 24 and April 7 Orders regarding the factual points on which the Response focuses, it is entirely proper to require compliance with the May 16 Order, where, as shown above, there are ample bases for this later-issued order independent of any such errors. An investigation is launched on initial information, the point of the investigation is to uncover the truth, and the facts uncovered may be different from some of the initial allegations that first raised concerns, but they may be equally or even more supportive of the concerns. That is just what happened here regarding concerns about disability.

We note that the Committee did not recommend, and the Council is not considering, a misconduct charge based on refusal to comply with the April 7 Order. Instead, the Committee provided further explanations to Judge Newman in response to her objections, presented further information discovered in the investigation, and entered *new* orders that were based on a fuller record and set out

IN RE COMPLAINT NO 23-90015

additional information in support, both regarding the medical examinations and medical records.  It is the last of those new orders, the May 16 Order, that is the subject of the Committee's recommendation and is now before this Council.

Thus, after issuing an April 17 Order regarding medical records, the Committee entered an order on May 3 that detailed over several pages its reasonable basis for requiring medical examinations and certain medical records, which included the staff concerns of memory loss, confusion, lack of focus, inability to understand and execute simple tasks that she had previously been able to perform, and agitation, paranoia, and hostile behavior.  May 3 Order at 3–9.  Several staff indicated that the dysfunctional behaviors began over the past 1-2 years and had increased in frequency.  By the time of the May 3 Order, Judge Newman had been provided a detailed account, based on information from the investigation, of the Committee's basis for ordering medical examinations and medical records.

Even the May 3 Order is not the one now at issue.  The Committee received objections from Judge Newman's counsel, including that the requested medical examinations were of unknown scope or duration and that there were no defined limits on how the results would be used.  May 10 Letter at 4.  The Committee issued its May 16 Order to respond to those objections and include even more detail about the reasonable basis for the testing (and also further defined the required medical records and directed that they be supplied to the neurologist, not to the Committee).

The operative May 16 Order—and whether the Committee had established a reasonable basis for *that* order— is all that is material for evaluating the current issue of misconduct.  Whether the record was sufficient at some earlier stage in the process does not determine the issue

IN RE COMPLAINT NO 23-90015

before the Council concerning a new, later order. Even in administrative law, when a new order supersedes an earlier order and only the prospective demands of the new order are at issue, the agency, to support the new order, generally is "not limited to its prior reasons." *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1907–08 (2020); *see also Biden v. Texas*, 142 S. Ct. 2528, 2544 (2022) (same). All the more so for an investigation, which, in the ordinary course of pursuing its aim of uncovering the truth, will lead to changes in the investigators' actions according to changing information. That aspect of an investigation is particularly important for a disability investigation, in which a complaint can be expected to set out reasons for concern about present continuing abilities, rather than specific past-conduct "charges" to be proved in ordinary misconduct proceedings. Here, the "misconduct" is the stymieing of an underlying disability inquiry.

If the approach suggested in the Response were correct, then if a special investigating committee under the Act ever acted too swiftly in ordering some investigative step, but responded to objections, developed further information, and then reissued its order based on a more developed record, the later order would somehow still be measured against the more limited record available at an earlier time. That cannot be the rule. Responding to objections from a subject judge and establishing additional information justifying investigative steps are exactly what special investigating committees should do.

> **2. The Criticisms of Other Actions by the Chief Judge or Special Committee Leading to and in the Investigation Do Not Undermine the Duty to Comply with the May 16 Order**

The Response seeks to call into question the duty to comply with the May 16 Order by attacking an assortment of actions by the Chief Judge or the Committee to paint a picture of hostility or bad faith. The Council rejects these attacks and the whole picture.

a.  The Response claims that Judge Newman was not given the Rule 11(f) notice and opportunity to respond to the Complaint the Chief Judge was proposing to identify and that "had such an opportunity been provided, the March 24 Order could have avoided the factual errors, and there would be no predicate for the investigation in the first place." Response 90.  But as the attached emails demonstrate, the Chief Judge did provide the proposed Complaint to Judge Newman on March 17 (a week before it was eventually filed), asked her to review it, and offered to meet with Judge Newman to discuss it.  Ex. 1.  Judge Newman refused.  The accusation of denial of notice and opportunity to respond is false.

b.  More generally, we find that the email communications between the Chief Judge and Judge Newman during the period March 9 through March 24 refute the Response's accusation of hostility.  They paint a picture of a Chief Judge trying in a respectful manner to meet with Judge Newman to discuss the troubling concerns that had been raised.  They reveal admiration of Judge Newman and concern for her legacy.  They show a good faith effort by the Chief Judge to pursue the judiciary's customary means of engaging in informal discussions when concerns about a relevant disability arise and become so strong that it is no longer responsible to avoid the difficult topic of whether the judge at issue should step back from the job.

In early March 2023, the information about disability concerns was at the point where identifying a complaint to launch an investigation under Rule 5 was called for in

IN RE COMPLAINT NO 23-90015

order to fulfill the clear purposes of the JC&D Act—unless the disability concerns were dispelled or made moot by a voluntary resolution. Judge Newman's refusal of engagement made the launch of the formal proceeding unavoidable. The Chief Judge's communications with Judge Newman show no hostility or bad faith. They reflect good faith, and human sympathy in fulfilling a sad, painful responsibility.

c. The Response asserts that, in a slightly earlier conversation in March 2023, the Chief Judge told Judge Newman that taking senior status was "non-negotiable." Response 4; *id.* at 84. The Response itself puts quotation marks around the term but cites no source, so it appears not to be reporting a word used but instead to be characterizing what Judge Newman felt, or recalls, was being conveyed. Regardless, for the Council's decision, it is unnecessary to establish whether the word was used or even whether the thought was conveyed. Even if so, there would be no bad faith in indicating that the disability concerns were so serious that taking senior status was the minimum needed to avoid an investigation. Such a statement does not prejudge the results of the investigation.

d. The Response attacks a decision by the Chief Judge made in February 2023, before the events of March 2023 precipitated the current proceeding. Over three pages, the Response argues that it was improper for the Chief Judge, in February, to not calendar Judge Newman for the April sitting because of the Federal Circuit rule (Clerical Procedure # 3 ¶ 15) that a judge should not be assigned to a new sitting when the judge has a backlog of assigned opinions not circulated within a specified period. Response 80–83. The Response's argument is about one of the backlog cases, which was undeniably very old and had been submitted on the briefs without oral argument and therefore was assigned to Judge Newman (by herself) some weeks before

64

IN RE COMPLAINT NO 23-90015

the date it appeared on the court's calendar.  The Response prefers to start the count for the Clerical Procedure period, not from the date of assignment, but from the later calendar date; but starting the count with the actual assignment is obviously reasonable, not at all suggestive of bad faith. Decisively, moreover, Judge Newman's judicial assistant had emailed the Chief Judge in February to state that it looked like sitting in April was barred by the Clerical Procedure.  Ex. 11.  The Chief Judge followed the view communicated by Judge Newman's chambers.  When the April-sitting assignments were sent to all judges in mid-February, it was immediately apparent that Judge Newman was not being assigned to sit.  Yet Judge Newman never objected—just as she never objected when, in early 2021, she stopped being put on motions panels (a regular active judge's duty) or when, around the start of 2022, her panel assignments were substantially reduced in number.  There is no basis for finding bad faith in the Chief Judge's February 2023 assignment decision.

e.  The Response suggests that hostility or bad faith is evinced in the Committee's partial denial of an extension request during the investigation.  When the Committee issued its May 16 Order, it set a deadline of May 23 for Judge Newman to respond—not for her to undergo the examinations or supply the records or sit for the interview.  It explained the statutory bases for expedition, May 16 Order at 24; *see* 28 U.S.C. § 353(c) (expedition directive for Special Committee); *id.* § 352(a) (expedition directive for Chief Judge in initial review); *id.* § 353(a) (promptness directive for Chief Judge to appoint Special Committee); H.R. Rep. 96-1313 at 11, and it noted the difficulty of arranging appointments with examiners.  May 16 Order at 25.  On May 20, Judge Newman's counsel asked for a 16-day extension, explaining that he had flown to Israel on May 16 for "family functions," including "a traditional Jewish baby-naming

ceremony." Dolin May 20 Letter. The Committee extended the deadline to May 26, noting the importance of expedition and that this was the third order concerning medical examinations. May 22 Order at 1–4. Judge Newman's counsel met the deadline with a three-page response, filed May 25, refusing compliance with the May 16 Order.

The Response now observes that May 26 was "a major Jewish festival of Shavuot ('Festival of Weeks')," evidently suggesting insensitivity on the Committee's part. Response 18 n.15. But the Response's suggestion of insensitivity is baseless. The extension request made no mention of the holiday, which was unknown to the Committee. The Committee's partial denial of the extension properly served the statutory expedition policy and is not evidence of hostility or bad faith.

f. The Response points to the July 13 oral argument (hearing) and declares: "It should not go unsaid that the hearing was conducted in an extraordinarily and uniquely hostile fashion. None of the attorneys appearing at the hearing has ever before experienced such a level of hostility and disrespect from any judge at any level of the judiciary." Response 20 n.16. The Council has read the transcript of the hearing and/or listened to the audio recording. Exs. 14, 15. We conclude that this accusation is baseless. Pressing for focus on the matters viewed by the bench as of likely importance, and for answers actually responsive to the bench's questions, is not reflective of hostility or disrespect, but of the proper effort to advance understanding during the limited time counsel has available. The Response's accusation on this point is completely meritless, as well as inappropriate.

g. Judge Newman claims that when her staff asked to reschedule interviews, the Committee refused. Response 10. But only one of Judge Newman's staff asked to

IN RE COMPLAINT NO 23-90015

reschedule, and the Committee agreed to reschedule to the day he chose. *See* Ex. 16.

h.  The Response complains that the Committee subpoenaed Judge Newman's career clerk to appear for a formal deposition within 48 hours, with "no reason to believe the career clerk would decline a simple request for an interview." Response 96.  But the timing reflected the proper effort to follow the statutory policy of expedition.  And the Committee had reason for the formality.  Even before the career clerk's broad refusal to answer questions at the deposition, the Committee reasonably doubted the career clerk's likely cooperation with the present inquiry, as the career clerk had just been non-cooperative with EDR inquiries. *See* ████ Aff. [10] ¶¶ 1–4.  Moreover, the Council sees nothing improper about the Committee's questioning at the deposition when the career clerk repeatedly asserted the privilege against self-incrimination to refuse to provide almost any information.

i.  The Response suggests bad faith or hostility in the Committee's response to a request for Clerk's Office data in mid-August, after issuance of the R&R.  Response 92–94.  We find that the Committee had ample reasons for refusing the request—that it was untimely, waived, and unjustified by any concrete showing of problems in the already-furnished data that would be material to the specific issue presented, namely, whether the May 16 Order was justified and non-compliance with it constituted misconduct.  The Council sees no bad faith or hostility in that ruling.

\* \* \*

In short, the Council sees no merit in the picture painted by the Response of bad faith or hostility by the Chief Judge or the Committee.  That picture is therefore a diversion from the proper inquiry, namely, the basis for the

IN RE COMPLAINT NO 23-90015

May 16 Order itself and the importance of complying with it under the Act and Rules.

## IV. The Refusal to Comply with the May 16 Order Constituted Serious Misconduct

Judge Newman committed misconduct by refusing to comply with the May 16 Order for medical examinations, medical records, and an interview, and her refusal to comply constituted serious misconduct. Rule 4(a)(5) expressly provides that "[c]ognizable misconduct includes refusing, without good cause shown, to cooperate in the investigation of a complaint." Judge Newman's refusal to cooperate was a serious matter because it prevented the Committee from being able to fulfill its assigned task under the Act—namely, making an *informed* assessment (and recommendation for the Judicial Council) about whether Judge Newman suffers from a disability.

That is a serious matter because it prevented the proper functioning of the self-policing mechanism that Congress established to ensure that the judiciary would effectively have authority to keep its own house in order. As relevant here, the Act creates a mechanism, important in a system that provides judges life tenure to ensure independence, to address the unfortunate reality that some judges may become unfit to perform the duties of their office. The Act gives the judiciary the responsibility for regulating itself in that regard through investigations such as this. Accordingly, all judges have an obligation to cooperate with proceedings under the Act to ensure that self-policing by the judiciary can function properly. Refusing to cooperate without adequate justification—as Judge Newman has done here—brings the statutory mechanism for addressing disability to a grinding halt and thereby undermines the interests of litigants, employees, the public, and the judiciary in having that mechanism work.

IN RE COMPLAINT NO 23-90015

## V.  The Renewable One-Year Suspension from New Cases is an Appropriate Sanction

We find that Judge Newman's assertion that a one-year suspension from case assignments would be too severe a sanction is misplaced.  As explained in the R&R, the sanction must be sufficient to convey the seriousness of misconduct that has prevented the proper functioning of the self-policing mechanism Congress created for the judiciary.  And the renewable character, if circumstances continue to justify the suspension, is essential to the purpose: to put the Act process back in motion rather than leave it thwarted in the face of reasonable concerns about disability.

Judge Newman's arguments concerning *Adams* also draw the wrong lessons from that case.  *See* Response 106.  It is true that, upon remand from the JC&D Committee, the special committee in *Adams* recommended only a six-month suspension based on Judge Adams' misconduct in refusing to comply with orders for medical examinations.  There, however, the JC&D Committee had just vacated the original sanction imposed by the Sixth Circuit Judicial Council because the council did not have any basis for finding that the concerns about a disability in that case affected Judge Adams' "capability of discharging his adjudicative responsibilities," and instead were "limited to Judge Adams's conduct in the context of the court's internal administrative responsibilities." *Adams* at 37.  Here, in contrast, the evidence developed by the Committee calls into question Judge Newman's ability to carry out the case-deciding function at the level and with the timeliness required of an active judge.  The concerns about disability are not, as in *Adams,* wholly unconnected to Judge Newman's role in deciding cases.  To the contrary, the evidence shows that paneling Judge Newman on cases without getting to the bottom of her potential disability will have a direct and deleterious effect on the efficient administration of the

business of the Court.  In addition, in *Adams*, the Sixth Circuit Judicial Council had originally decided that Judge Adams' misconduct (which included both refusing to comply with an order for medical examinations and a particular incident with a show cause order) warranted a suspension from new cases for *two* years and the reassignment of his entire docket of pending cases.  *See* Order of June 27, 2018, at 2, *In re Complaint of Judicial Misconduct*, No. 06-13-90009 (Sixth Circuit Judicial Council).  Given the different nature of the disability concerns raised in this case, and the extensive evidence showing their direct connection to Judge Newman's "adjudicative responsibilities," we conclude that a one-year suspension—in between the original two-year sanction and the later recommended six-month sanction in *Adams*—is warranted.

To the extent Judge Newman points to the length of suspensions issued in other misconduct cases, those decisions are less relevant comparators.  They involved sanctions as punishment for misconduct such as harassment and unwanted physical advances (or crimes such as perjury or allowing counsel to make false factual assertions in the proceeding itself).  Those matters do not provide a relevant benchmark for a case such as this involving (i) a suspected disability that directly affects a judge's adjudicative responsibilities and (ii) thwarting the process for fulfilling the duty to get to the bottom of (and address) the suspected disability.

Judge Newman is also incorrect in arguing that the Council lacks authority to suspend her from sitting on cases en banc.  *See* Response 113.  Section 354(a)(1)(C) of the Act says that the Council "shall take such action as is appropriate to assure the effective and expeditious administration of the business of the courts within the circuit," and section 354(a)(2)(A)(i) gives one example in "may" language that does not exhaust the scope of the broader "shall": the Council may order that "no further cases be

IN RE COMPLAINT NO 23-90015

assigned" to a judge who has committed misconduct or who has been found to suffer a disability.    28 U.S.C. § 354(a)(1)(C), (a)(2)(A)(i).  The provisions authorize the judicial council (even obligate it where appropriate to ensure effective and expeditious judicial administration) to suspend the judge from hearing cases of any sort.  The general directive in 28 U.S.C. § 46(c) that the court en banc "shall consist of all circuit judges in regular active service" cannot trump that more specific authority and obligation granted to the Council for addressing situations of misconduct or disability.  *See generally, e.g., Corley v. U.S.,* 556 U.S. 303, 316 (2009) (noting that "a more specific statute will be given precedence over a more general one").  Judge Newman can, at any time, end this suspension, by complying with the May 16 Order and allowing the Committee to complete its investigation.

\* \* \*

The Council has considered all of Judge Newman's remaining arguments and find them to be without merit.[26]

### Unanimous Judicial Council Order

The Judicial Council has unanimously determined, based on the Committee's R&R and underlying evidence, that there is an adequate basis for deciding whether Judge Newman's refusal to cooperate with the Committee's order for medical evaluations, medical records, and an interview constitutes sanctionable misconduct.  *See* Rule 20.  After due consideration of these materials, the Judicial Council **FINDS**:

---

[26] The Council sees no need for oral argument in this matter.  Pursuant to Rule 20(a) Judge Newman was provided an opportunity to submit argument in writing and submitted a 120-page brief.

IN RE COMPLAINT NO 23-90015

(1) The evidence establishes reasonable concerns that Judge Newman suffers from a disability preventing her from effectively discharging the duties of her office. In light of the evidence, the Committee had a reasonable basis on May 16 to require Judge Newman to undergo the specified medical evaluations and produce the specified medical records and to request that she sit for the specified interview.

(2) The Judicial Council is being deprived of information that is important to a fully informed determination with reasonable medical certainty of whether Judge Newman has a disability that renders her unable to effectively discharge the duties of her office as an active judge because she has refused to undergo the ordered medical evaluations, refused to produce relevant medical records, and refused to sit for an interview. *See* Rule 4(c).

(3) Judge Newman has not established good cause for her failure to cooperate with the Committee's investigation through her refusal to undergo the ordered testing, produce medical records, or sit for an interview.

(4) Judge Newman's refusal, without good cause, to cooperate with the Committee's investigation constitutes serious misconduct, as it has prejudiced the effective and expeditious administration of the business of the courts. Rule 4(a)(5).

Given these findings, the Council **ORDERS**:

(1) Judge Newman shall not be permitted to hear any cases, at the panel or en banc level,[27] for a period of one year beginning with the issuance of this Order, subject to consideration of renewal if Judge Newman's refusal to cooperate continues after that time and to consideration of

---

[27] This includes all cases in which oral argument has not yet occurred.

IN RE COMPLAINT NO 23-90015

modification or rescission if justified by an end of the refusal to cooperate.

(2) The Committee shall maintain jurisdiction over this matter.

SO ORDERED:   September 20, 2023.

# United States Court of Appeals for the Federal Circuit

## ~~UNDER SEAL (NON-PUBLIC ORDER)~~

---

## IN RE COMPLAINT NO. 23-90015

---

Before the Judicial Council of the Federal Circuit

PER CURIAM.

### STATEMENT OF RIGHTS UNDER RULE 20 AND 21

Pursuant to Rule 20(f) of the Rules for Judicial-Conduct and Judicial-Disability Proceedings, the Judicial Council notifies Judge Newman that she is entitled to a right to review of the Council's decision as provided in Rule 21(b). The Council will transmit the order and memoranda incorporated by reference in the order to the Committee on Judicial Conduct and Disability for review in accordance with Rule 21. Judge Newman may file a Petition for Review to the Committee on Judicial Conduct and Disability. The Rules regarding the deadline and page limits for the Petition for Review may be found in Rule 22.

# EXHIBIT C

JUDICIAL COUNCIL OF THE FIRST CIRCUIT

### JUDICIAL COUNCIL ORDER

In Re: Docket of Judge Carmen Consuelo Cerezo
of the United States District Court for the
District of Puerto Rico

The Judicial Council has been concerned for a substantial period about the backlog of both civil and criminal cases on Judge Cerezo's docket. Discussions with Judge Cerezo have occurred, and her response to these concerns has been invited and considered. In order to address the situation, the Judicial Council has unanimously determined, pursuant to its authority to "make all necessary and appropriate orders for the effective and expeditious administration of justice within the circuit," 28 U.S.C. § 332(d)(1), that the following measures should be implemented:

1.  Commencing one day after the date of this order, the Clerk of the District Court of Puerto Rico is directed to assign no further cases, civil or criminal, to Judge Cerezo.

2.  Chief Judge Laffitte, Judge Pérez-Giménez and Judge Fusté are hereby constituted as a committee to review periodically criminal cases pending before Judge Cerezo for two years or more and civil cases pending before Judge Cerezo for three years or more. Where the committee by majority vote concludes that proceedings in such cases are likely to be expedited by reassignment, it is authorized in its discretion to reassign them to visiting district judges or to direct that they be reassigned by the clerk of court through customary random selection to a district judge of the District Court of

219

Puerto Rico other than Judge Cerezo.  Judge Domínguez is
designated as an alternate member of the committee in the
event that one of the regular members cannot act.

3.  In advance of each semiannual  Circuit Council meeting,
the Circuit Executive is directed to assemble the most
recent available data on the state of Judge Cerezo's
docket and transmit it to the Council to permit the
Council to determine whether the directions set forth in
paragraphs 1 and 2 should be modified or eliminated.  If
at any time Judge Cerezo concludes that her docket is
sufficiently current to justify such modification or
elimination, she may advise the Circuit Executive and
request the Council to consider the matter in advance of
a regularly scheduled Council meeting.

4.  The directions set forth in paragraphs 1 and 2 shall
continue in force for 12 months from the date of this
order unless earlier modified or eliminated by order of
the Judicial Council.

5.  The Circuit Executive is directed to transmit copies of
this order to each district judge of the District Court
of Puerto Rico, including Judge Cerezo, to the Clerk of
the District Court of Puerto Rico and to the Director of
the Administrative Office.

So ordered this $\underline{8^{th}}$ day of April, 2002.

For the Judicial Council

Chief Judge, United States Court
of Appeals for the First Circuit

220

RECEIVED & FILED

'02 APR 12  PM 3: 44

CLERK'S OFFICE
I S. DISTRICT COURT
SAN JUAN P R

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF PUERTO RICO

In re Docket of Judge Cerezo

Misc. No. 02-55

### ORDER

I.    In compliance with the Judicial Council's order of April 8, 2002, the following criminal cases on Judge Cerezo's docket are hereby randomly reassigned to the other judges of this district:

| | |
|---|---|
| Crim. no. 94-230 | Crim. no. 99-016 |
| Crim. no. 95-079 | Crim. no. 99-161 |
| Crim. no. 95-405 | Crim. no. 99-164 |
| Crim. no. 96-289 | Crim. no. 99-170 |
| Crim. no. 97-024 | Crim. no. 99-185 |
| Crim. no. 97-071 | Crim. no. 99-186 |
| Crim. no. 97-269 | Crim. no. 99-187 |
| Crim. no. 97-290 | Crim. no. 99-309 |
| Crim. no. 98-156 | Crim. no. 99-330 |
| Crim. no. 98-221 | Crim. no. 00-026 |
| Crim. no. 98-223 | Crim. no. 00-043 |
| Crim. no. 98-239 | |
| Crim. no. 98-267 | |

II.    The following civil cases on Judge Cerezo's docket shall also be randomly reassigned to the other judges of this district or, at their discretion, to a visiting judge.

| | |
|---|---|
| Civil no. 94-1019 | Civil no. 97-2567 |
| Civil no. 94-1047 | Civil no. 97-2108 |
| Civil no. 94-1058 | Civil no. 98-1867 |
| Civil no. 94-1917 | Civil no. 98-2101 |
| Civil no. 94-1919 | Civil no. 99-1298 |
| Civil no. 95-2316 | |

221

(2)

2

Additionally, the consolidated Enron cases are hereby reassigned to visiting Judge Robert J. Ward.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, April 12, 2002.

HECTOR M. LAFFITTE
Chief U.S. District Judge

JOSÉ A. FUSTE
U.S. District Judge

JUAN M. PEREZ-GIMENEZ
U.S. District Judge