## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HON. PAULINE NEWMAN**, <br><br> Plaintiff, <br><br> v. <br><br> **HON. KIMBERLY A. MOORE**, *et al.*, <br><br> Defendants. | Case No. 23-cv-01334 (CRC) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Veteran Federal Circuit Judge Pauline Newman has sued Federal Circuit Chief Judge Kimberly A. Moore, along with all the other judges on the court, over their handling of reports from court staff implicating Judge Newman's fitness for office.  Judge Newman has been hailed, by Chief Judge Moore no less, as a "trailblazer" and "heroine of the patent system."  Kimberly A. Moore, *Anniversaries and Observations*, 50 AIPLA Q. J. 521, 524–25 (2022).  After leading the intellectual property department of a major corporation at a time when "female attorneys, particularly female patent attorneys, were rare," id. at 524, Judge Newman became the first judge directly appointed to the Federal Circuit, by President Ronald Reagan in 1984.  First Amended Complaint ("FAC") ¶ 10.  During her tenure on the court, she has authored hundreds of opinions and been particularly recognized for her "insightful dissents."  Id. ¶¶ 13, 74.  On multiple occasions when Judge Newman dissented, the Supreme Court reversed the Federal Circuit and "adopt[ed] . . . [her] reasoning."  Moore, *supra*, at 525.

In 2021, however, court personnel began reporting "behavior that [] called into question Judge Newman's ability to perform her duties."  Mot. Dismiss at 4.  Specifically, staff relayed information about Judge Newman "indicative of memory loss, a lack of focus, confusion over simple matters, uncharacteristic paranoia, and an inability to perform simple tasks."  Id.  These

reports eventually led to Chief Judge Moore convening a Special Committee to investigate a judicial misconduct complaint against Judge Newman; the Federal Circuit Judicial Council suspending Judge Newman from hearing new cases on the recommendation of the Special Committee; and Judge Newman filing this lawsuit against members of the Special Committee and the Judicial Council as a whole ("Defendants").  At the Court's urging, the parties attempted to resolve the dispute through mediation with retired D.C. Circuit Judge Thomas B. Griffith.  The mediation proved unsuccessful, however, and litigation resumed.

At the heart of the dispute are two important, but at times competing, priorities: judicial independence and the need for oversight of Article III judges.  The Constitution provides for judicial independence through the "great bulwarks" of life tenure and undiminished salary during good behavior.  McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S., 264 F.3d 52, 64 (D.C. Cir. 2001); U.S. CONST. Art. III, § 1.  But with this independence comes the risk that, should judges falter in performing their duties, there is no means for sanctioning them short of impeachment.

Congress addressed this gap by creating a system for the judiciary to police itself.  With the passage of 28 U.S.C. § 332, which created circuit judicial councils, and later the Judicial Conduct and Disability ("JC&D") Act, Congress gave "the judiciary the power to 'keep its own house in order.'"  McBryde, 264 F.3d at 61 (citing S. Rep. No. 96-362, at 11); see also Chandler v. Jud. Council of Tenth Cir. of U. S., 398 U.S. 74, 85 (1970).  Employing this "housekeeping" power, federal courts created common-sense rules to deal with shortcomings in judges' performance.  One such rule, a variant of which Judge Newman's colleagues invoked in this case, provides that "when a judge has a given number of cases under submission, he will not be assigned more cases until opinions and orders issue on his 'backlog.'"  Chandler, 398 U.S. at 85. The Supreme Court has blessed these rules.  See id. ("These are reasonable, proper, and

necessary rules, and the need for enforcement cannot reasonably be doubted.").  And it has rejected the notion that "the extraordinary machinery of impeachment" is the "only recourse" "if one judge in any system refuses to abide by such reasonable procedures." Id.

Cases dealing with this system of oversight thankfully are rare, but they have consistently affirmed the judiciary's authority to police itself.  See, e.g., McBryde, 264 F.3d at 61–64; Hastings v. Jud. Conf. of U.S. ("Hastings II"), 829 F.2d 91, 103–05 (D.C. Cir. 1987).  Judge Newman now asks the Court to break ranks with higher courts that have upheld this self-regulatory regime.  The Court must decline the invitation.

Spanning eleven counts, Judge Newman's First Amended Complaint mounts both facial and as-applied constitutional challenges to the JC&D Act and 28 U.S.C. § 332.  Now before the Court are two motions.  First, Judge Newman has moved for a preliminary injunction to prohibit Defendants from continuing her suspension from new case assignments and from proceeding with any further disciplinary proceedings until the matter is transferred to the judicial council of another circuit.  Second, Defendants have moved to dismiss the case, primarily on jurisdictional grounds.  For the reasons explained below, Judge Newman is not entitled to preliminary relief because the Court lacks jurisdiction over most of her claims and she has failed to establish a likelihood of prevailing on the others.  Moving to Defendants' motion, the Court will dismiss the claims over which it lacks jurisdiction (Counts II–IV, VI, and X–XI).  As for the remaining claims, Defendants have moved to dismiss two (Count I and part of Count VII) under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  The Court will grant that relief. Defendants have not, however, sought Rule 12(b)(6) dismissal of the remaining claims over which the Court has jurisdiction (Counts V and VIII–IX and part of Count VII).  The Court therefore may not entertain dismissal of the case in its entirety at this juncture.  Defendants may seek dismissal of the surviving claims under Rule 12(c) or via summary judgment.

## I.    Background

### A.    Statutory Frameworks

Under federal law, each circuit has a judicial council, composed—in most cases—of the chief judge of the circuit and an equal number of district and circuit judges.  28 U.S.C. § 332(a)(1).  The Judicial Council for the Federal Circuit, however, is composed of all active judges of the Federal Circuit.  See United States Court of Appeals for the Federal Circuit, Judicial Council.[1]  Judicial councils have a range of powers, but two sources of authority are of particular relevance here: 28 U.S.C. § 332 and the JC&D Act, 28 U.S.C. § 351 et seq.

Under 28 U.S.C. § 332(d), judicial councils may "make all necessary and appropriate orders for the effective and expeditious administration of justice within [their] circuit."  As the Supreme Court explained over fifty years ago, "[t]he legislative history of 28 U.S.C § 332 and related statutes is clear that some management power was both needed and granted."  Chandler, 398 U.S. at 85.  And courts since have found that § 332 "gives considerable discretion to courts and circuit Judicial Councils to choose how to regulate court business, whether by formal rules, standing orders, or other means."  Truesdale v. Moore, 142 F.3d 749, 760 (4th Cir. 1998).

Second, judicial councils may "take [] action" on judicial misconduct complaints filed under the JC&D Act.  28 U.S.C. § 354(a)(1)(C).  The act permits any person to file a complaint "alleging that [a] judge is unable to discharge all the duties of office by reason of mental or physical disability."  Id. § 351(a).  "In the interests of the effective and expeditious administration of the business of the courts," the chief judge may also "identify a complaint" and dispense with the filing of a written complaint.  Id. § 351(b).  The chief judge then reviews the complaint and takes one of several routes.  Id. § 352(a).  She may dismiss the complaint (e.g.,

---

[1] https://perma.cc/2AF4-LG8R.

because it is frivolous, relates to the merits of a decision, or lacks any factual foundation), id. §§ 352(b)(1), (b)(1)(A)(ii)–(iii), (b)(1)(B); conclude the proceeding if appropriate action has already been taken, id. § 352(b)(2); or appoint a special committee to conduct "an investigation as extensive as it considers necessary," id. §§ 353(a), (c).  On this final avenue, once the committee completes its investigation, it presents its findings and recommendations to the judicial council. Id. § 353(c).

The judicial council, in turn, may conduct an additional investigation, dismiss the complaint, or "take such action as is appropriate to assure the effective and expeditious administration of the business of the courts within the circuit."  Id. § 354(a)(1)(C).  One possible action is to "order[] that, on a temporary basis for a time certain, no further cases be assigned to the judge whose conduct is the subject of a complaint."  Id. § 354(a)(2)(A)(i).  A judge aggrieved by an action of a judicial council may petition the Judicial Conference of the United States' Committee on Judicial Conduct and Disability for review.  Id. § 357(a).[2]  The Judicial Conference, in turn, "after consideration of the prior proceedings and such additional investigation as it considers appropriate" may take the same actions available to a judicial council.  Id. § 355(a).  Or, if the Judicial Conference deems impeachment warranted, it may certify and transmit that determination to the House of Representatives.  Id. § 355(b)(1).

---

[2]  Created by Congress, the Judicial Conference of the United States, through an executive committee and nineteen topic-related subcommittees, establishes and implements policies for the administration of the federal judiciary.  United States Courts, About the Judicial Conference, https://perma.cc/A9XB-9C8F.  Though Judicial Conference review of complaints is discretionary, see JC&D R. 21(a), the D.C. Circuit found it "fair to suppose that both houses of Congress realistically expected that the Judicial Conference would hear all *serious* claims," McBryde, 264 F.3d at 61.

B.  Proceedings against Judge Newman

In 2021, according to Defendants, Federal Circuit court personnel began reporting "behavior that [] called into question Judge Newman's ability to perform her duties."  Mot. Dismiss at 4.  These reports included "information indicative of memory loss, a lack of focus, confusion over simple matters, uncharacteristic paranoia, and an inability to perform simple tasks."  Id.  In early March 2023, Chief Judge Moore allegedly met with Judge Newman and "attempted to convince [her] to retire."  FAC ¶ 17.  After she refused, the Federal Circuit Judicial Council proceeded along two separate, but overlapping, tracks:  It pursued action under both § 332(d) and the JC&D Act.

Starting with § 332, on March 8, 2023, the Judicial Council convened without Judge Newman present to consider "concerns raised about [her] mental fitness" and "her abnormally large backlog in cases."  FAC, Ex. O at 1.  Though the Council did not issue a written order or identify the source of its authority, it voted on March 8 to preclude the assignment of new cases to her.  Id.  After Judge Newman asked to be restored to the case calendar, the Judicial Council reconsidered its March 8 opinion "*de novo*."  Id. at 2.  In a June 5 order, the Council concluded that "precluding Judge Newman from new case assignments [wa]s warranted" under the Council's § 332 authority.  Id. at 4.  The Council cited Judge Newman's "continued backlog of cases, and her inability to clear the backlog despite the absence of new cases."  Id.  Specifically, the June 5 order noted that Judge Newman still "ha[d] a backlog of seven opinions, three of which [were] pending for over 200 days and all of which [we]re pending for over 100 days."  Id. at 3.

The June 5 order remained in effect until November 9, 2023.  On November 8, the seventh and final case in Judge Newman's backlog issued.  The following day, the Judicial Council "*sua sponte* vacate[d]" the June 5 order.  Defs.' Reply, Ex. 4 at 2.

Separately, the Judicial Council proceeded along the track laid by the JC&D Act.   On

March 24, 2023, Chief Judge Moore initiated a complaint against Judge Newman under the act.

FAC, Ex. A.  She did so pursuant to Rule 5 of the Rules for Judicial-Conduct and Judicial-

Disability Proceedings ("JC&D Rules"), which permits a chief judge to "identify" a complaint

upon a finding of "probable cause to believe that misconduct occurred or that a disability exists."

JC&D R. 5(a); see also 28 U.S.C. § 351(b).  In the order initiating the complaint, Chief Judge

Moore cited several factors as providing probable cause, including Judge Newman's delay in

issuing opinions and voting on other judges' opinions, reports that she had made statements

indicating a lack of awareness about the issues in cases, and reports that she had inappropriately

managed staff.  FAC, Ex. A.

Chief Judge Moore then appointed a special committee, consisting of herself and Federal

Circuit Judges Sharon Prost and Richard G. Taranto, to investigate the allegations in the

complaint.  FAC ¶ 23.  Throughout the spring, the Special Committee issued a series of orders

affecting the scope of its investigation and seeking cooperation from Judge Newman.  Among

them, the Special Committee expanded the investigation to include alleged misconduct in Judge

Newman's management of staff, FAC, Exs. B, E; ordered Judge Newman to submit to

neurological and neuro-psychological testing by physicians of the committee's choosing, FAC,

Exs. C, K; and directed Judge Newman to provide the Committee with medical records related to

incidents described in the complaint, FAC, Exs. E, K.

When Judge Newman refused to undergo testing by doctors chosen by the Special

Committee or share her medical records, the Committee changed course.  It decided to narrow

the investigation to focus only on "whether Judge Newman's refusal to cooperate with the

Committee's investigation constitute[d] misconduct."  FAC, Ex. N at 3; see also JC&D R.

4(a)(5) ("Cognizable misconduct includes . . . refusing, without good cause shown, to cooperate

in the investigation of a complaint. . . .").  In early May, the Judicial Council also denied Judge Newman's request to transfer her complaint to the judicial council of another circuit.  FAC, Exs. H–I.  The Council denied the transfer request without prejudice to re-filing after Judge Newman complied with its orders for her to undergo the specified testing and provide relevant medical records.  FAC, Ex. H at 9.

As part of its investigation, the Special Committee interviewed more than twenty court employees, reviewed case-processing records, and consulted with a physician experienced in judicial-disability matters.  Mot. Dismiss at 13.  Judge Newman's counsel countered with several letters raising objections to the Special Committee's investigation and orders.  See FAC, Exs. Q–T.  Counsel also provided the Committee with medical records from one of Judge Newman's own doctors.  FAC ¶ 16; id., Ex. Y (filed under seal).  On July 31, the Special Committee released its Report & Recommendation to the Judicial Council.  Mot. Dismiss at 15; id., Ex. 1.  The report concluded that "there is, at a minimum, a reasonable basis for concluding that Judge Newman may suffer from a disability that renders her unable to perform the duties of her office" and that her "failure to cooperate with the Committee's orders constitutes misconduct."  Mot. Dismiss, Ex. 1 at 31, 60.  The Special Committee recommended that Judge Newman not be permitted to hear new cases "for the fixed period of one year or at least until she ceases her misconduct and cooperates such that the Committee can complete its investigation, whichever comes sooner."  Id. at 110–11.

After receiving Judge Newman's response, the Judicial Council adopted the Special Committee's recommendations.  Pl.'s Opp'n, Exs. A–B.  The Council found that the Committee had a reasonable basis to order Judge Newman to undergo medical examinations and submit medical records, and that her refusal to comply "was not excused by good cause."  Pl.'s Opp'n, Ex. B at 37, 40.  The Council therefore concluded that her "refusal, without good cause"

"constitute[d] serious misconduct." <u>Id.</u> at 72.  The Council ordered that she not be permitted to hear any cases "for a period of one year," "subject to consideration of renewal if [her] refusal to cooperate continues after that time and to consideration of modification or rescission if justified by an end of the refusal to cooperate." <u>Id.</u> at 72–73.

Judge Newman petitioned the Judicial Conference of the United States for review of the Judicial Council's order, and the Judicial Conference affirmed the order on February 7, 2024. Defs.' Notice of JC&D Comm. Order [ECF No. 40] at 14.  The Judicial Conference found that (1) the Chief Circuit Judge and Judicial Council had not abused their discretion by refusing to request transfer of the complaint to another circuit's judicial council, (2) Judge Newman had not shown good cause for refusing to cooperate with the Special Committee's investigation, and (3) the sanction imposed by the Judicial Council did not exceed its statutory authority.  <u>Id.</u> at 14–29.

While the Judicial Council proceedings were still ongoing, Judge Newman filed this federal lawsuit.  Compl.  She subsequently amended her complaint and now brings eleven counts against the three judges on the Special Committee (Chief Judge Moore and Judges Prost and Taranto) in their official capacities and the Judicial Council of the Federal Circuit.  FAC ¶¶ 4–7. (The Court will elaborate on the specific claims later.)  Judge Newman also moved for a preliminary injunction, asking the Court to enjoin the Defendants "from suspending [her] from, or otherwise interfering with, the duties and functions of the judicial office to which [she] was confirmed."  Prelim. Inj. at 2.  At the Court's suggestion, the parties agreed to informal mediation with retired D.C. Circuit Judge Thomas B. Griffith.[3]  <u>See</u> Joint Statement on Notice of Mediation [ECF No. 17]; Mediation Referral Order [ECF No. 18].  Despite Judge Griffith's best efforts, the mediation proved unsuccessful.  <u>See</u> Joint Status Report [ECF No. 21] at 1.

---

[3]  The Court thanks Judge Griffith for his volunteer service.

Defendants followed with a motion to dismiss.  Both motions are fully briefed, and the Court heard argument on the motions on January 25, 2024.

## II.   Legal Standards

### A.   Motion for Preliminary Injunction

"A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To obtain a preliminary injunction, the moving party must show: (1) that she is likely to succeed on the merits of his claim; (2) that she is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in her favor; and (4) that a preliminary injunction is in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  An absence of irreparable injury is fatal to a preliminary injunction motion.  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  The D.C. Circuit has suggested, without holding, that failure to establish a likelihood of success on the merits also categorically forecloses preliminary relief.  Sherley v. Sebelius, 644 F.3d 388, 393 (D.C. Cir. 2011); see also Changji Esquel Textile Co. v. Raimondo, 40 F.4th 716, 726 (D.C. Cir. 2022).

### B.   Motion to Dismiss

Defendants challenge this Court's subject matter jurisdiction and argue that certain counts fail to state a claim.  The Court will therefore apply Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

As "[f]ederal courts are courts of limited jurisdiction," Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), a court must ensure it has subject matter jurisdiction over a claim before proceeding to the merits, Moms Against Mercury v. FDA, 483 F.3d 824, 826 (D.C. Cir. 2007).  On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff

bears the burden of establishing jurisdiction.  Knapp Med. Ctr. v. Hargan, 875 F.3d 1125, 1128 (D.C. Cir. 2017).  The Court must "accept all well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," but need not "assume the truth of legal conclusions" in the complaint.  Williams v. Lew, 819 F.3d 466, 472 (D.C. Cir. 2016) (cleaned up).  The Court also "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations, accepted as true, to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A claim is plausible on its face if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A court evaluating a Rule 12(b)(6) motion will "construe the complaint 'liberally,' granting plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  However, a "court need not accept a plaintiff's legal conclusions as true, . . . nor must a court presume the veracity of legal conclusions that are couched as factual allegations."  Alemu v. Dep't of For-Hire Vehicles, 327 F. Supp. 3d 29, 40 (D.D.C. 2018) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2009)).

## III.  Analysis

### A.  Judge Newman's Challenges to Judicial Council Action Taken Pursuant to 28 U.S.C. § 332(d) Are Moot

Defendants' first line of attack asserts that Judge Newman's challenges to Judicial Council action taken pursuant to 28 U.S.C. § 332(d) are moot.  "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues

presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."
Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (cleaned up).  Even where claims presented a
live controversy when filed, the mootness doctrine "requires a federal court to refrain from
deciding it if events have so transpired that [a judicial] decision will neither presently affect the
parties' rights nor have a more-than-speculative chance of affecting them in the future."  Clarke
v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (cleaned up); see also Arizonans
for Off. Eng. v. Arizona, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court
adjudication, an actual controversy must be extant at all stages of review, not merely at the time
the complaint is filed." (cleaned up)).

The Judicial Council's November 9 order rendered Judge Newman's § 332(d) challenges
moot.  Recall that on June 5, citing its authority under § 332(d), the Judicial Council excluded
Judge Newman from new case assignments because she had accumulated a backlog of opinions
that had been pending for more than one hundred days.  FAC, Ex. O at 3–4.  On November 9, the
Judicial Council *sua sponte* vacated the June 5 order because Judge Newman's final backlogged
opinion had issued the day before.  Defs.' Reply, Ex. 4 at 2.  Because the Judicial Council
vacated the June 5 opinion, any challenge based on § 332(d) is moot.[4]  See Freeport-McMoRan
Oil & Gas Co. v. FERC, 962 F.2d 45, 46 (D.C. Cir. 1992) (finding a case "plainly moot" when
the agency's "challenged orders . . . were superseded by a subsequent [] order"); Am. Wild
Horse Pres. Campaign v. Salazar, 800 F. Supp. 2d 270, 271 (D.D.C. 2011) ("[Because] [the]
administrative decision [] was rescinded after the filing of the complaint, . . . the action is now
moot.").

---

[4]  Any challenge based on the March 8 order is also moot for similar reasons.  In the June
5 order, the Judicial Council reviewed the March decision "*de novo*" and voted to suspend Judge
Newman from case assignments.

Indeed, Judge Newman does not contest that the June 5 order is moot; she instead contends that an exception to the mootness doctrine rescues her § 332(d) claims.  See Pl.'s Sur-reply at 1.  First, she argues her claims are "capable of repetition, yet evade[] review."  City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983).  And second, she contends the Court retains jurisdiction because "voluntary cessation of allegedly illegal conduct does not deprive a court of power to hear and determine the case."  Am. Bar Ass'n v. F.T.C., 636 F.3d 641, 648 (D.C. Cir. 2011) (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)).  Neither mootness exception applies.

The first exception requires two circumstances to be "simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."  Lewis v. Cont'l Bank Corp., 494 U.S. 472, 481 (1990) (cleaned up).  The June 5 order satisfies the first requirement as courts assume "orders of less than two years' duration ordinarily evade review."  McBryde, 264 F.3d at 55–56.  But it flunks the second because there is no reasonable expectation that Judge Newman will be subject to the same action again.  "When considering the likelihood that an injury will be repeated, the Supreme Court has in general 'been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury.'"  Id. at 56 (quoting Honig v. Doe, 484 U.S. 305, 320 (1988)).  The Court must therefore presume that Judge Newman will not repeat the "misconduct" that led to the imposition of the June 5 order—that is, accumulate a "backlog of cases."  FAC, Ex. O at 4.

Judge Newman attempts to sidestep this presumption by declaring it "unlikely" that her "speed in issuing opinions will change."  Pl.'s Sur-reply at 2.  But her speed in issuing opinions is a factor within her control.  Indeed, she was able to clear her recent backlog, leading to the

vacatur of the June 5 order.  Defs.' Reply, Ex. 4 at 2.  And the Supreme Court has declined to find the case or controversy requirement satisfied "where, as here, the litigant[] simply 'anticipate[s] violating'" a valid rule.  See United States v. Sanchez-Gomez, 584 U.S. 381, 394 (2018) (quoting O'Shea v. Littleton, 414 U.S. 488, 496 (1974)); see also id. at 393 ("Our decisions in [prior] civil cases rested on the litigants' inability, for reasons beyond their control, to prevent themselves from transgressing and avoid recurrence of the challenged conduct.").  The analysis might be different if Judge Newman were seeking to challenge the Judicial Council's authority to issue case-backlog rules in the first instance.[5]  See, e.g., O'Shea, 414 U.S. at 497 ("[We] are [] unable to conclude that the case-or-controversy requirement is satisfied by general assertions . . . that in the course of their activities respondents will be prosecuted for violating *valid* criminal laws." (emphasis added)).  But she is not.  She rather challenges the *punishment* the Judicial Council imposed (or might impose) for violations of the rules.

The voluntary cessation exception does not save Judge Newman's § 332(d) claims either.  "As a general rule, a defendant's 'voluntary cessation of allegedly illegal conduct does not deprive'" a court of jurisdiction.  Am. Bar Ass'n v. F.T.C., 636 F.3d at 648 (quoting Davis, 440 U.S. at 631).  But that general rule does not apply here for two reasons.  First, the D.C. Circuit has characterized the voluntary cessation exception as "focused on preventing a private defendant from manipulating the judicial process."  Clarke, 915 F.2d at 705 (D.C. Cir. 1990).  And it has expressed "doubt" about whether courts should "impute such manipulative conduct" to Congress, a non-private defendant and a coordinate branch of government.  Id.  Defendants therefore contend that the voluntary cessation exception does not apply to them as government actors.  Defs.' Resp. to Sur-Reply at 2.  The Court hesitates to adopt a bright-line rule that the

---

[5]  Of course, such a challenge would be unlikely to succeed given the Supreme Court's explicit endorsement of "backlog" rules.  See Chandler, 398 U.S. at 85.

exception can never be applied against public-sector defendants.  But Defendants' point is well taken in this context.  Though separation-of-powers concerns do not animate the analysis as in Clarke, "it would seem inappropriate" for this district court "to impute [] manipulative conduct" to the entire roster of Federal Circuit judges save one.  Clarke, 915 F.2d at 705; see also Chandler, 398 U.S. at 94 (Harlan, J., concurring) ("[D]irect review by a district judge of the actions of circuit judges would present serious incongruities and practical problems.").

Second, regardless whether the voluntary cessation exception applies to government defendants, "[t]he established law of this circuit is that the [] exception . . . has no play when the [defendant] did not act in order to avoid litigation." Alaska v. U.S. Dep't of Agric., 17 F.4th 1224, 1229 (D.C. Cir. 2021) (cleaned up).  Judge Newman opines that the "Defendants vacated the June 5 Order strategically and solely to avoid risking an unfavorable judicial decision."  Pl.'s Sur-reply at 3.  But the timeline of events tells a different story.  The Judicial Council initially suspended Judge Newman from hearing new cases on March 8, 2023.  FAC, Ex. O at 1.  On May 10, Judge Newman filed her complaint and challenged—among other actions—her case suspension.  Compl. ¶¶ 20, 45, 50.  On June 5, reviewing its March 8 order *de novo*, the Judicial Council doubled down and again voted to suspend Judge Newman from hearing cases.  FAC, Ex. O at 2.  If the Judicial Council had wanted to avoid "an unfavorable judicial decision," it seems a poor choice to dig itself a deeper hole by reaffirming its decision.  Then on November 9, the Judicial Council vacated the June 5 order.  Though Judge Newman disputes how the Judicial Council calculated the number of cases on her backlog and adjudged the backlog to have been cleared, see Pl.'s Sur-reply at 3 n.2, there is no question that the Council vacated the order *the day after* the final backlogged opinion issued, see Defs.' Reply, Ex. 4 at 2.  The record thus suggests that Judge Newman's own conduct, rather than this litigation, precipitated the Judicial

Council's decision to vacate the order.  Accordingly, the voluntary cessation doctrine has "no play."

 B. <u>28 U.S.C. § 357(c) Precludes Judge Newman's As-Applied Challenges</u>

  Because Judge Newman's challenges to the Judicial Council's § 332(d) orders are moot, the Court now turns to the second track along which the Judicial Council proceeded: the JC&D Act.  Judge Newman has raised both facial and as-applied challenges based on the act.  Before parsing out which claims are facial and which are as-applied, the Court must examine the scope of its jurisdiction to hear challenges to the act.

  1. *28 U.S.C § 357(c), as in interpreted in <u>McBryde</u>, precludes district courts from reviewing as-applied challenges to the JC&D Act*

  The Court lacks jurisdiction to review Judge Newman's as-applied challenges to the JC&D Act.  Section 357 of the act, titled "No Judicial Review," precludes district court review of judicial council action.  It states, "[e]xcept as expressly provided in this section and section 352(c), all orders and determinations, including denials of petitions for review, shall be final and conclusive and shall not be judicially reviewable on appeal or otherwise."  28 U.S.C. § 357(c).  The enumerated exceptions create avenues for review *within* the framework of the JC&D Act.  Under 352(c), judges may petition judicial councils for review of certain final orders by the chief judge.  <u>Id.</u> § 352(c).  And, under § 357(a), judges may petition the Judicial Conference for review of judicial council action.  <u>Id.</u> § 357(a).  But neither exception allows for district court review of judicial council action.

  The D.C. Circuit confirmed as much in <u>McBryde</u>.  The court held that *facial* challenges to the constitutionality of the JC&D Act—*i.e.*, "challenges to the decisions of Congress"—are

not precluded by § 357(c).[6]  McBryde, 264 F.3d at 58; see also id. ("This interpretation . . .

avoid[s] the 'serious constitutional question' that would be posed 'if a federal statute were

construed to deny any judicial forum for a colorable constitutional claim.'" (quoting Webster v.

Doe, 486 U.S. 592, 603 (1988)).  But it found that § 357(c) precludes review in a district court

for as-applied claims, including as-applied claims that invoke the Constitution.  Id. at 59, 62–63.

Only the Judicial Conference can review those challenges.  Id. at 62.  The circuit explained that

members of Congress, "[p]ut ultimately to a choice between review by an Article III 'Court' and

review by a committee of Article III judges chosen by and from the Judicial Conference, [] chose

the latter."  Id. at 63.

### 2.  *McBryde* remains good law and applies to this case

Judge Newman attempts to circumvent McBryde's holding that § 357(c) bars district-

court review of as-applied claims.  She offers three theories, but none succeeds.  See Pl.'s Opp'n

at 33–36.  First, Judge Newman contends that McBryde is no longer good law in the wake of the

---

[6]  When McBryde was decided, the judicial-review provision was codified in § 372(c)(10) of the JC&D Act.  See 28 U.S.C. § 372(c)(10) (2000).  Congress reorganized the statute in 2002 and relocated the relevant part of 28 U.S.C. § 372(c)(10), without material changes, in § 357(c).  See 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107–273, § 357(c), 116 Stat. 1758, 1853 (2002).  Judge Newman contends that the addition of a severability clause in the 2002 reorganization rendered McBryde's holding on as-applied challenges no longer good law.  See Prelim. Inj. at 30.  The severability clause provides that if "any provision of this subtitle, an amendment made by this subtitle, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of [the JC&D Act] . . . shall not be affected."  21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107–273, § 11044, 116 Stat. 1758, 1856 (2002) (codified as Note to 28 U.S.C. § 351).  According to Judge Newman, the "only circumstance where an *application* of a provision of the Disability Act could be held unconstitutional is in a proceeding before a district court (and any subsequent appeals)."  Prelim. Inj. at 30.  This reading, however, ignores the judicial-review procedure established by § 357(c) (formerly § 372(c)(10)) and endorsed by the D.C. Circuit in McBryde.  Via the appeal right created in § 357(c), Congress "enabled a sanctioned judge to seek review by . . . the Judicial Conference of all claims except (presumably) facial attacks on the statute."  McBryde, 264 F.3d at 62.  The Judicial Conference is thus empowered to find unconstitutional an application of the JC&D Act.

Supreme Court's recent admonition in <u>Axon Enterprises Inc. v. Federal Trade Commission</u> that "agency adjudications are generally ill suited to address structural constitutional challenges." Pl.'s Opp'n at 34 (quoting <u>Axon Enter., Inc. v. Fed. Trade Comm'n</u>, 598 U.S. 175, 195 (2023)). In <u>McBryde</u>, the Judicial Conference had "disclaimed" any authority to rule on constitutional challenges on the grounds that it was "not a court" and had "no competence to adjudicate the facial constitutionality of the [JC&D Act] or its constitutional application to the speech of an accused judge." 264 F.3d at 62. The D.C. Circuit rejected the Judicial Conference's disavowal of authority. <u>Id.</u> Treating the Conference as an agency, the Circuit held that "agencies [] have an obligation to address properly presented constitutional claims which . . . do not challenge agency actions mandated by Congress." <u>Id.</u> (cleaned up). Judge Newman contends that <u>Axon</u> repudiated this element of <u>McBryde</u>.[7]

But this argument overlooks the fact that <u>McBryde</u> allows facial challenges to the JC&D Act to proceed in district court. The kinds of "structural constitutional challenges" that <u>Axon</u> found agencies are "ill suited to address" are exactly the claims <u>McBryde</u> funnels to Article III courts. <u>See McBryde</u>, 264 F.3d at 58 ("[T]he wording of § 372(c)(10) [now § 357(c)] does not withhold jurisdiction over Judge McBryde's claims that the *Act* unconstitutionally impairs

---

[7]  In response to the Judicial Conference order affirming her suspension, Judge Newman filed a notice indicating that the Conference "declined to evaluate [her] constitutional claims, thus leaving these matters to properly constituted Article III courts." Pl.'s Notice [ECF No. 41] at 2. As neither party filed in this Court a copy of Judge Newman's petition to the Conference, the Court is unable to assess which, if any, claims the Conference declined to address. In any event, as noted above, <u>McBryde</u> rejected the notions that Congress intended for the Conference to "disclaim[] authority to rule on as applied . . . constitutional challenges," or that a disavowal of authority by the Conference confers jurisdiction on Article III courts. <u>See McBryde</u>, 264 F.3d at 62–63 ("[T]he statutory mandate to the [Judicial Conference JC&D] committee appears to contain no language justifying a decision to disregard claims that a circuit judicial council has violated a judge's constitutional rights in application of the Act. . . . [W]e find the evidence clear and convincing that Congress intended [§ 357(c)] to preclude review in the courts for as applied constitutional claims."). This Court is bound by the D.C. Circuit's pronouncements in this regard.

judicial independence and violates separation of powers.").  Though it is perhaps a stretch to say McBryde was prescient (and, indeed, Axon is in many ways an application of Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994), a case predating McBryde), McBryde's holding accords fully with Axon and its line of cases.[8]

Judge Newman's second theory is that McBryde does not govern because—unlike the judges involved in Judge McBryde's discipline—the members of the Federal Circuit Judicial Council are all her colleagues and were witnesses to her alleged disability.  Pl.'s Opp'n at 34.  Due to this difference, she contends her challenge is permitted under Dart v. United States, where the D.C. Circuit held that a statute's bar on judicial review of agency decisions does not apply "when [the] agency is charged with acting beyond its authority."  848 F.2d 217, 221 (D.C. Cir. 1988).  But, as the circuit noted in McBryde, Dart's exception does not stretch so far as to negate a statute's judicial-review bar "whenever the complainant asserts legal error."  264 F.3d at 63.  Rather, Dart's "narrow exception" applies when "agency action on its face violate[s] a statute."  Dart, 848 F.2d at 221–22 (quoting Griffith v. FLRA, 842 F.2d 487, 492 (D.C. Cir. 1988) (cleaned up)).  The make-up of the Federal Circuit Judicial Council does not violate the JC&D Act on its face.  The JC&D Act's default framework charges judges with reviewing

---

[8]  In any case, the jurisdictional provisions in Axon, dubbed "special statutory review schemes" by the Supreme Court, functioned differently than § 357(c).  The Securities Exchange Act and Federal Trade Commission ("FTC") Act, which supplied the review schemes at issue, required litigants to pursue challenges in federal courts of appeal, not district courts, following exhaustion of the administrative process.  Axon, 598 U.S. at 180–81.  The plaintiffs in Axon, however, sued in district court while their administrative petitions were pending, alleging that "fundamental aspect[s] of the [agencies'] structure violate[d] the Constitution."  Id. at 182.  Unlike the Exchange and FTC Acts, the JC&D Act does not create a "special statutory review scheme" that simply bypasses district court review.  It bars Article III review—in district and circuit courts alike—of all as-applied challenges.  See 28 U.S.C. § 357(c).

complaints about other judges in their circuit.  <u>See</u> 28 U.S.C. §§ 352–53.[9]  In fact, the JC&D

Rules mandate that special committees from the Federal Circuit "be selected from the judges

serving on the subject judge's court."  JC&D R. 12(a); <u>see also</u> 28 U.S.C. § 363.  And JC&D

Rule 26 instructs that complaints should be transferred out-of-circuit only "[i]n exceptional

circumstances."  JC&D R. 26.  The composition of the Federal Circuit Judicial Council thus did

not "on its face violate[]" the JC&D Act.

Finally, at the motions hearing, Judge Newman's counsel suggested for the first time that

two related Supreme Court cases—<u>Cuozzo Speed Technologies, LLC v. Lee</u>, 579 U.S. 261

(2016), and <u>SAS Institute, Inc. v. Iancu</u>, 138 S.Ct. 1348 (2018)—have superseded <u>McBryde</u>.  Tr.

at 36–38.  In both cases, the Supreme Court considered whether 35 U.S.C. § 314's bar on judicial

review precluded federal court review of challenges to certain determinations by the Director of

the U.S. Patent and Trademark Office.  Specifically, § 314 allows third parties, through a

procedure known as "inter partes review," to challenge previously issued patents in an

adversarial process before the Patent Office.  <u>SAS Institute</u>, 138 S.Ct. at 1350.  The statute's "No

Appeal" clause provides that "[t]he determination by the Director [of the Patent Office] whether

to institute an inter partes review under this section shall be final and nonappealable."  35 U.S.C.

---

[9]  The JC&D Act's framework also contemplates that, in some cases, the members of a
judicial council will have personal knowledge about the facts underlying complaints.  For this
reason, it is not evident that 28 U.S.C. § 455—which mandates that judges recuse from "any
proceeding[s]," among others, where their "impartiality might reasonably questioned" or where
they have "personal knowledge of disputed evidentiary facts"—applies to judicial council
proceedings.  28 U.S.C. §§ 455(a)–(b).  Moreover, § 455 defines "proceeding" as including
"pretrial, trial, appellate review, or other stages of litigation."  <u>Id.</u> § 455(d)(1).  None of those
terms maps onto the actions of a judicial council, and—it would seem—for good reason.  A
judicial council's activities fall outside of the normal rubric of judicial activity.  <u>See also</u>
<u>McBryde</u>, 264 F.4d at 58, 62–63 (holding the district court was precluded from reviewing Judge
McBryde's due process claim, which alleged that the whole investigation "arose out of a conflict
between [Judge McBryde] and Chief Judge Politz . . . [and] Chief Judge Politz refused to recuse
himself" (cleaned up)).

§ 314(d).   In both cases, the Supreme Court began by noting that to overcome "the 'strong presumption' in favor of judicial review, . . . th[e] Court's precedents require 'clear and convincing' indications that Congress meant to foreclose review." <u>SAS Institute</u>, 138 S.Ct. at 1359 (quoting <u>Cuozzo</u>, 579 U.S. at 273).   In <u>SAS Institute</u>, which clarified <u>Cuozzo</u>, the Court held that § 314(d) did not preclude judicial review of challenges to *how* the Director conducted the inter partes review.   138 S.Ct. at 1359.   Rather, because of § 314(d)'s plain text and the presumption in favor of judicial review, the Court found "§ 314(d) precludes judicial review only of the Director's 'initial determination'" to institute inter partes review.   <u>Id.</u> (quoting <u>Cuozzo</u>, 579 U.S. at 273).[10]

Neither case upsets <u>McBryde</u>'s holding.   If anything, they reinforce it.   In <u>McBryde</u>, the circuit noted the presumption in favor of judicial review, <u>see</u> 264 F.3d at 59, and undertook a painstaking review of the congressional record before finding "the evidence clear and convincing that Congress intended § 372(c)(10) [now § 357(c)] to preclude review in the courts for as-applied constitutional claims," <u>id.</u> at 59–63.   Moreover, § 357(c)'s bar on judicial review does not contain the kind of limiting language present in § 314(d).   Section 357(c) bars review of "all orders and determinations, including denials of petitions for review," and not just a sub-set of decisions (as § 314(d) does).   28 U.S.C. § 357(c).

---

[10]   Both cases reviewed Federal Circuit decisions.   True to form, Judge Newman authored a dissent in each case.   <u>See</u> <u>In re Cuozzo Speed Techs., LLC</u>, 793 F.3d 1268, 1283 (Fed. Cir. 2015) (Newman, J., dissenting); <u>SAS Inst., Inc. v. ComplementSoft, LLC.</u>, 825 F.3d 1341, 1353 (Fed. Cir. 2016) (Newman, J., concurring in part and dissenting in part).   In <u>Cuozzo</u>, the Supreme Court rejected her interpretation of § 314(d)'s bar on judicial review.   579 U.S. at 273. In <u>SAS Institute</u>, Judge Newman did not address § 314(d), but the Supreme Court largely adopted her interpretation of other parts of the statute.   138 S.Ct. at 1354–57.

The Court thus finds no basis in Supreme Court or D.C. Circuit case law to question McBryde's binding interpretation of § 357(c).  The Court therefore lacks jurisdiction over Judge Newman's as-applied challenges to the JC&D Act.

>   3.   *28 U.S.C. § 357(c), as interpreted in McBryde, bars this Court from exercising jurisdiction over six of Judge Newman's claims*

Having found that it lacks jurisdiction over as-applied challenges to the JC&D Act, the Court must assess which counts in the First Amended Complaint mount as-applied, as opposed to facial, challenges to the act.  A facial challenge alleges that "no set of circumstances exists under which" a statute is valid.  United States v. Salerno, 481 U.S. 739, 745 (1987).  The "plaintiffs' claim and the relief that would follow" must "reach beyond the particular circumstances of [individual] plaintiffs."  John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010).  An "as-applied challenge, by contrast, asks a court to assess a statute's constitutionality with respect to the particular set of facts before it."  Hodge v. Talkin, 799 F.3d 1145, 1156 (D.C. Cir. 2015).

The Court concludes that six counts of the amended complaint raise as-applied challenges.  Section 357(c) therefore bars this Court from exercising jurisdiction over those claims.  Because some of the counts are related, the Court will take them up in batches.

First, Counts II and III allege that neither the JC&D Act nor § 332(d) permit the Judicial Council to suspend Judge Newman from her cases, reduce her staff, or force her to submit to a mental health examination, among other restrictions.  FAC ¶¶ 86–87, 91–92.  The complaint does not distinguish between Judicial Council action taken pursuant to the JC&D Act and that taken pursuant to § 332(d).  See id. ¶¶ 87, 92 (listing the same conduct as violations of both statutes).  But the Court need not disentangle the two.  As explained above, challenges to the Judicial Council's orders under § 332(d) are moot.  And the challenges to the JC&D Act are as-

applied.  Indeed, Count II begins with a tip off that its challenge is as-applied.  See id. ¶ 86 ("To the extent that the Judicial Disability Act of 1980 is constitutional . . .").  The Court is thus precluded from reviewing any parts of Counts II and III that remained live controversies after the Judicial Council's November 9 order.

Second, Count IV, titled "As Applied Due Process of Law Violation," contends that Defendants' continued investigation "violates the fundamental principles of due process because the Special Committee is composed of complainants about and witnesses to Plaintiff's alleged disability."  Id. ¶ 96.  As Judge Newman concedes, this count raises an as-applied challenge to the Special Committee's conduct as the claim is premised on the particular membership of the committee.  See Pl.'s Opp'n at 28.

Third, Count VI alleges that "[n]either the [JC&D] Act nor the U.S. Constitution authorizes compelling an Article III judge to undergo a medical or psychiatric examination or to surrender to any investigative authority her private medical records."  FAC ¶ 107.  The count further alleges that because "Defendants have neither statutory nor constitutional power to compel" Judge Newman to comply with these requirements, their imposition is "*ultra vires* and unconstitutional."  Id. ¶ 108.  Though she does not identify a specific provision of the JC&D Act, § 353(c) allows a special committee to "conduct an investigation as extensive as it considers necessary."  28 U.S.C. § 353(c).  This count therefore boils down to an allegation that, in ordering Judge Newman to undergo a medical examination and produce medical records, the Special Committee acted beyond the scope of its § 353(c) authority.  This is a prohibited as-applied challenge.  McBryde interpreted § 357(c) as barring district courts from considering challenges that "reduce[] to arguments as to the exact reach of the [JC&D Act's] provisions."  McBryde, 264 F.3d at 64.  Count VI makes exactly that kind of argument.  Judge Newman does not contend that every application of § 353(c) is unlawful; instead she alleges that the provision

does not permit the orders levied against her. And, to the extent Judge Newman intends to raise a facial challenge to § 353(c), she has done so in other counts of the complaint (*i.e.*, Counts V, VII–IX).

Finally, Counts X and XI raise as-applied Fourth Amendment challenges. The counts claim Judge Newman's rights were violated because Defendants lacked "either a warrant issued on probable cause" or "a constitutionally reasonable basis" for requiring her "to submit to an involuntary medical or psychiatric examination" (Count X) or "to surrender her private medical records" (Count XI). FAC ¶¶ 128, 132. Judge Newman does not contest that these counts present as-applied attacks. See Pl.'s Opp'n at 28, 33. And, even though the challenges invoke the Constitution, McBryde still precludes their review. "[T]he evidence [is] clear and convincing that Congress intended [§ 357(c)] to preclude review in the courts for as applied constitutional claims." McBryde, 264 F.3d at 62–63; see also id. at 59 (classifying Judge McBryde's similar claim that the Judicial Council's "use of psychiatrists" was "fundamentally destructive of judicial independence" as an as-applied challenge).

For those keeping track, Counts II–IV, VI, and X–XI mount as-applied attacks precluded by McBryde. Defendants contend that the remaining counts also pose as-applied challenges, see Mot. Dismiss at 21–23, but the Court disagrees. Even though Counts I and VII–IX reference or allude to specific orders of the Judicial Council, they challenge the underlying provisions of the JC&D Act authorizing the Judicial Council to issue those orders. See Pl.'s Opp'n at 33 ("Judge Newman does not seek review of orders issued pursuant to the statute, but rather challenges the authorization to issue such orders in the first place."). In other words, the counts contend that "no set of circumstances exists under which" the Judicial Council could validly apply those parts of the statute. Salerno, 481 U.S. at 745. Of course, that is a demanding standard, and one the Court will hold Judge Newman to later in assessing the merits of her facial challenges.

Count V also mounts a facial attack.  It alleges that the JC&D Act is unconstitutionally vague in that it fails to "provide adequate notice of what constitutes a mental disability" and "lacks minimum enforcement guidelines."  FAC ¶ 103.  Defendants contend this too is a disguised as-applied challenge.  They begin by correctly noting that a plaintiff "to whose conduct a statute clearly applies may not successfully challenge it for vagueness," Parker v. Levy, 417 U.S. 733, 756 (1974), and that, as a result, courts must "examine the complainant's conduct before analyzing other hypothetical applications of the law," Vill. of Hoffman Ests. v. Flipside, Hoffman Ests. Inc., 455 U.S. 489, 495 (1982).  Judge Newman's challenge, they then argue, requires the Court "to perform the very inquiry . . . that Congress placed off limits in § 357(c)"— decide "an as-applied challenge to the Act."  Mot. Dismiss at 23.

This argument falters at its initial premise.  Judge Newman is not "clearly" someone to whom the JC&D Act's standard of disability applies because none of the complaints about her potential disability have been substantiated.  Defendants have acknowledged as much.  In April, the Special Committee ordered "Judge Newman to undergo [medical examinations] to *determine* whether she suffers from a disability."  FAC, Ex. H at 1 (emphasis added).  In a May 16 order, the Special Committee again explained that its "sole purpose regarding the disability inquiry" was to "*determin*[*e*] whether Judge Newman has a disability and if so the nature and scope . . . ."  FAC, Ex. K at 23 (emphasis added).  And in its final Report and Recommendation, the Special Committee did not reach a conclusion about whether the JC&D Act's disability standard applied to Judge Newman.  See Mot. Dismiss, Ex. 1 at 22 (explaining that "the Committee's ability to make an informed assessment of whether Judge Newman suffers from a disability" was "significantly impaired").  Because Judge Newman is not someone to whom the JC&D Act's definition of disability clearly applies, she may raise a vagueness challenge to that definition.

In sum, § 357(c) permits this Court to exercise jurisdiction over Counts I, V, and VII–IX.

C.  Original Jurisdiction and Comity

According to Defendants, § 357(c) is not the only limitation on this Court's jurisdiction. They also raise two additional jurisdictional arguments: (1) as a Court with original—not appellate—jurisdiction, this Court cannot review decisions of the Federal Circuit Judicial Council, and (2) prudential concerns of comity and exhaustion should cause the Court to decline jurisdiction.

> 1.  *This Court has original jurisdiction to hear Judge Newman's facial challenges to the JC&D Act*

Defendants contend that this Court lacks appellate jurisdiction to review the Judicial Council's actions.  See Mot. Dismiss at 24.  The argument goes like this.  When the Judicial Council, acting pursuant to the JC&D Act, suspended Judge Newman from hearing cases, it performed a "judicial" function.  Id. at 24–26; see also Chandler, 398 U.S. at 102 (Harlan, J., concurring) ("[I]n the issuance of orders to district judges to regulate the exercise of their official duties, the Judicial Council acts as a judicial tribunal[.]"); Pitch v. United States, 953 F.3d 1226, 1245 (11th Cir. 2020) (en banc) (Pryor, J., concurring) ("The ordinary meaning of 'judicial proceeding' plainly include[s] the process required by the Judicial Conduct and Disability Act."). Because the Judicial Council's actions were judicial in nature, only a court with appellate jurisdiction over the Council can review its actions.  Mot. Dismiss at 26.  And, because the Judicial Council functions as a court of appeals, the only court that might be able to don that mantle is the Supreme Court.  Id. at 27.  (Defendants acknowledge that the Supreme Court in Chandler left unresolved "the knotty jurisdictional problem" of whether it could review Judicial Council actions.  Id. at 27 (quoting Chandler, 398 U.S. at 88–89)).

But while the Federal Circuit Judicial Council may have been performing a "judicial" function when it suspended Judge Newman (more on that below), it is not a court of appeals.

That is, it is not equivalent to the Federal Circuit.  Even though their membership is the same, they are created by different sections of the United States Code.  See 28 U.S.C. §§ 41 (Federal Circuit), 332 (Judicial Council).  And they have different jurisdiction and different powers.  See 28 U.S.C. §§ 1295 (Federal Circuit), 332 (Judicial Council).  It is therefore not clear where, if anywhere, the Federal Circuit Judicial Council sits within Article III's hierarchy of courts.

The better analog for a judicial council—and the one the D.C. Circuit has used—is an administrative body.  See Hastings v. Jud. Conf. of U.S. ("Hastings I"), 770 F.2d 1093, 1102 (D.C. Cir. 1985) ("The [Judicial] Councils, in short, are essentially administrative bodies." (cleaned up)); see also McBryde, 264 F.3d at 62 (treating the Judicial Conference as an agency). Thus, instead of trying to place the Federal Circuit Judicial Council within Article III's hierarchy, the Court will look to the framework for judicial review of agency adjudications.  And that framework varies by agency—and by statute.  Certain statutes grant district courts jurisdiction to review agency adjudications.  See, e.g., 42 U.S.C. § 405(g) (social security benefit determinations); 42 U.S.C. § 1395ff(b)(2)(C) (certain Medicare claim determinations).  But other statutes bypass the district courts and channel review directly to the courts of appeal.  See, e.g., 29 U.S.C. § 160(f) (National Labor Relations Board decisions); 15 U.S.C. § 78y(a)(1) (Securities & Exchange Commission decisions).  Here, the relevant review scheme is laid out in the JC&D Act.  And, as noted above, the JC&D Act bypasses both district and circuit courts for as-applied claims and channels review to the Judicial Conference.  28 U.S.C. §§ 357(a), (c); see also McBryde, 264 F.3d at 63.  But the act directs facial challenges to the district court.  McBryde, 264 F.3d at 58.

In sum, then, though Judge Newman's as-applied challenges to the Judicial Council's actions do not require the Court to exercise jurisdiction over a superior Article III court, judicial

review is nonetheless foreclosed by § 357(c).  Her facial challenges, however, fall within the Court's original jurisdiction.

Even if the Federal Circuit Judicial Council sat above district courts within the Article III hierarchy, the Court would not lose jurisdiction over all of Judge Newman's claims because only some of her claims challenge "judicial" actions.  These are the same claims that mount as-applied challenges to the Judicial Council's orders.  Her other claims, *i.e*, the ones challenging the facial validity of the JC&D Act, do not require the Court to review "judicial" determinations by the Judicial Council; they instead require review of an act of Congress.

The Supreme Court considered the nature of judicial proceedings in <u>District of Columbia Court of Appeals v. Feldman</u>, where two D.C. bar applicants challenged a D.C. Court of Appeals bar-admission rule.  460 U.S. 462 (1983).  "A judicial inquiry," the Court held, "investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist."  <u>Id.</u> at 477 (quoting <u>Prentis v. Atlantic Coast Line</u>, 211 U.S. 210, 226 (1908)).  Judicial inquiries often involve "legal arguments," but their "essence" is an "adjudicat[ion]" of a "present right."  <u>Id.</u> at 480–81.  <u>See also</u> <u>In re Summers</u>, 325 U.S. 561, 567 (1945) (In a judicial proceeding, "[a] declaration on rights as they stand must be sought, not on rights which may arise in the future, and there must be an actual controversy over an issue, not a desire for an abstract declaration of the law." (cleaned up)).

When the Federal Circuit Judicial Council or its Special Committee chose to preclude Judge Newman from new case assignments, investigated her conduct, and ordered her to undergo medical examinations and produce medical records—*e.g.*, the basis for the allegations in Counts II–IV, VI, and X–XI—they acted as part of a "judicial inquiry."  Starting with the initiation of the complaint against Judge Newman, the Defendants "investigate[d]," <u>see, e.g.</u>, Mot. Dismiss, Ex. 1 at 12 (the Special Committee "interview[ed] [] court staff" and retained a

physician consultant); "declare[d]" id. at 64 (the Special Committee concluded that Judge

Newman's refusal to cooperate "constitute[d] a serious form of misconduct"); and "enforce[d]

id. at 110 (the Special Committee recommended imposing a "sanction" of "temporary

suspension of all case assignments") "liabilities as they st[ood] on present or past facts,"

Feldman, 460 U.S. at 470 (cleaned up).  Moreover, throughout the proceeding, the "court [] had

before it legal arguments against the validity of [its actions]."  Id. at 480; see also FAC, Exs. Q–

U (letters from Judge Newman's counsel).  See also Chandler, 398 U.S. at 102 (Harlan, J.,

concurring) ("[A]t least in the issuance of orders to district judges to regulate the exercise of their

official duties, the Judicial Council acts as a judicial tribunal . . . .").[11]  Thus, to the extent Judge

Newman's claims challenge the Judicial Council's application of the JC&D Act to her, those

claims challenge a "judicial inquiry."

　　　　But that is not the end of the story.  The Feldman Court went on to hold that "[t]o the

extent [the plaintiffs] mounted a general challenge to the constitutionality of [the D.C. bar-

admission rule], . . . the District Court did have subject matter jurisdiction over their complaints."

460 U.S. at 482–83.  That was so because "state supreme courts may act in a non-judicial

---

　　　　[11]  In Chandler, four justices "decline[d]" to decide whether a "challenged action of the
Judicial Council was a judicial act or decision by a judicial tribunal."  398 U.S. at 86.  In dicta,
however, they "[found] no indication that Congress intended to or did vest traditional judicial
powers in the Councils."  Id. at 86 n.7.  Justice Harlan responded to this footnote with a lengthy
concurrence, where he examined the legislative history of the act establishing judicial councils
and considered relevant Supreme Court precedent.  See id. at 96–112.  Based on this analysis, he
concluded that "at least in the issuance of orders to district judges to regulate the exercise of their
official duties, the Judicial Council acts as a judicial tribunal for purposes of this Court's
appellate jurisdiction."  Id. at 102 (Harlan, J., concurring).  In dissent, Justices Douglas and
Black agreed with Justice Harlan that the Judicial Council was "under the circumstances an
inferior judicial tribunal."  Id. at 135 (Douglas, J., dissenting).  Since Chandler, other circuits
have adopted Justice Harlan's concurrence and concluded that judicial councils, in certain
settings, conducted "judicial proceedings" or "judicial inquir[ies]."  See, e.g., Pitch, 953 F.3d at
1245 (Pryor, J., concurring); In re McBryde, 117 F.3d 208, 221 (5th Cir. 1997).  This Court does
the same and applies the standard set out in Feldman to determine when the Federal Circuit
Judicial Council acted as a judicial tribunal.

capacity in promulgating rules regulating the bar." Id. at 485.  Likewise here, Congress acted in a non-judicial capacity when it enacted the JC&D Act.  See Prentis, 211 U.S. at 226 ("Legislation, [as opposed to a judicial inquiry], looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some parts of those subject to its power.").  Thus, consistent with § 357(c), the Court may exercise jurisdiction over Judge Newman's challenges to the constitutionality of the act—in other words, her facial challenges.

### 2. *Prudential concerns do not mandate dismissal*

Defendants raise two prudential doctrines as final barriers to this Court's jurisdiction.  In a brief filed before the Federal Circuit Judicial Council finalized, and the Judicial Conference affirmed, the order suspending Judge Newman from new case assignments for one year, Defendants urged this Court to decline jurisdiction because neither body had rendered a final decision.  See Mot. Dismiss at 46–48.  Defendants suggested that the "prudential concern[]" of comity and the "complementary" doctrine of exhaustion counseled against this Court "rendering judgment on the constitutionality of proceedings *while* the proceedings themselves are going on." Id. at 47 (cleaned up).  In no small part because circumstances have changed since Defendants raised this argument, the Court declines to stand down on this basis.

Principles of comity and exhaustion do not preclude this Court from exercising jurisdiction where, as here, the Judicial Council has already imposed a sanction on Judge Newman.  The D.C. Circuit's treatment of Judge Alcee Hastings's federal lawsuit explains why.  Judge Hastings, a former district judge in the Southern District of Florida, sued various judges on the Judicial Conference and the Eleventh Circuit's Judicial Council after a JC&D complaint was initiated against him.  Hastings I, 770 F.2d at 1095.  A judge of this court refused to enjoin the investigation into Judge Hastings that was underway by an Eleventh Circuit special committee. Id.  On appeal, the D.C. Circuit agreed.  Id. at 1097.  It declined to reach the merits of Judge

Hastings's challenges to the JC&D Act because, at the time of the district court's decision, the Special Committee was "still at work" and "[n]o report had issued from the [c]ommittee with recommendations for disposition of the complaint." Id.  Because of the misconduct proceeding's nascency, "the possible outcomes under the [JC&D] Act"—*e.g.*, that the Judicial Council or Conference might reject the committee's recommended penalties, adopt them, or impose different penalties all together—were "only *possibilities*." Id. at 1100.  The D.C. Circuit therefore concluded that "the [judicial] councils and Conference are entitled to a measure of comity sufficient to preclude disruptive injunctive relief by federal courts absent a showing that serious and irremediable injury will otherwise result." Id. at 1102.

Unlike in Hastings I, the outcomes in Judge Newman's case are no longer mere possibilities.  The Special Committee submitted its report and recommendation, Mot. Dismiss, Ex. 1; the Judicial Council imposed a sanction suspending Judge Newman from hearing new cases, Pl.'s Opp'n, Ex. B; and—just days ago—the Judicial Conference affirmed the Judicial Council's order, Defs.' Notice of JC&D Comm. Order at 14.  Judge Newman is therefore already subject to a "serious and irremediable injury."  Thus, to the extent the Court retains jurisdiction over Judge Newman's claims, it will not decline to exercise that jurisdiction because of prudential factors.[12]

---

[12] Defendants also cite Chandler as support for their suggestion the Court bow to the principles of comity and exhaustion.  In Chandler, however, the Supreme Court did not decline to interfere with a judicial council's orders due to prudential concerns.  Instead, the Court declined to issue the "extraordinary relief of mandamus or prohibition" because Judge Chandler had not, in the first instance, sought relief directly from the Judicial Council.  398 U.S. at 87, 89.  Indeed, Judge Chandler had acquiesced in the Judicial Council's decision to assign new cases to judges other than himself.  Id. at 79, 87.

D.  Merits of Facial Challenges

After facing several obstacles to the exercise of its jurisdiction, the Court is left with jurisdiction over Counts I, V, and VII–IX.  The only two counts presently at issue, however, are Count I and part of Count VII.[13]  That is so because Judge Newman does not seek a preliminary injunction based on the likelihood of prevailing on the other counts, see Prelim. Inj. at 39–51, and Defendants do not challenge these counts on Rule 12(b)(6) grounds, see Tr. at 66.[14]  The Court will therefore address the merits of only Count I and part of Count VII.

   1.  *Count I: Improper Removal and Violation of Separation of Powers*

As with much of this case, McBryde forecloses Count I.  But this time, on the merits.  "Count I challenges the Disability Act's authorization to suspend Article III judges from office."  Pl.'s Opp'n at 29.  Judge Newman contends that the JC&D Act unconstitutionally "delegate[s]"

---

[13] A note on how the Court reads Count VII.  The count makes three allegations: (1) the JC&D Act is "unconstitutionally vague to the extent it purports to authorize compelled medical or psychiatric examinations . . . or demands for . . . Article III judges to surrender their private medical records"; (2) § 353(c), "which authorizes a Special Committee to conduct an investigation 'as extensive as it considers necessary' lacks minimal enforcement guidelines"; and (3) the act "vests virtually complete discretion in the hands of a Special Committee" in violation of due process and Article III.  FAC ¶ 112.  To the extent the Court can consider the first allegation, see McBryde, 264 F.3d at 64 (barring the Court from considering provisions that "reduce[] to arguments as to the exact reach of the [JC&D Act's] provisions"), the allegation collapses into the second.  The provision purportedly authorizing the Special Committee to compel medical examinations and the production of records is § 353(c).  As Defendants acknowledged at the motions hearing, they challenge only the third allegation on 12(b)(6) grounds.  Tr. at 66.

[14] Should Defendants wish to argue that the remaining counts fail to state a claim, they may do so in a motion for judgment on the pleadings or a motion for summary judgment.  See Fed. R. Civ. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."); Fed. R. Civ. P. 12(h)(2)(B) ("Failure to state a claim upon which relief can be granted . . . may be raised . . . by a motion under Rule 12(c).").

to judges "the impeachment power which the Constitution reserves to the House and Senate."
FAC ¶ 81.

The D.C. Circuit considered and rejected this argument in McBryde.  Judge McBryde
argued that "the clause vesting the impeachment power in Congress [] preclude[d] *all* other
methods of disciplining judges."  McBryde, 264 F.3d at 64.  "On this theory," he contended, the
JC&D Act "violate[s] separation of powers doctrine."  Id.  The circuit disagreed, concluding that
the Constitution "sheltered" judges "from removal and salary diminution," absent impeachment,
but not "from lesser sanctions of every sort."  Id. at 65; see also id. ("Judge McBryde's attempt
to fudge the distinction between impeachment and discipline doesn't work.  The Constitution
limits judgments for impeachment to removal from office and disqualification to hold office . . . .
It makes no mention of discipline generally.").  The circuit therefore held that the JC&D Act, by
permitting discipline short of impeachment or salary diminution, did not violate the Constitution.

Judge Newman attempts to escape McBryde's clutches by casting her challenge as
"precisely of the type left open by [McBryde's] Footnote 5,"  Pl.'s Opp'n at 36, where the D.C.
Circuit noted that it did "not decide whether a long-term disqualification from cases could, by its
practical effect, affect an unconstitutional 'removal,'" 264 F.3d at 67 n.5.  Like the circuit, this
Court need not decide that question.  Because Count I raises a facial challenge to the JC&D Act,
the Court must construe it as alleging that *any* disqualification, no matter its duration, constitutes
an "arrogat[ion]" of "the impeachment power."  FAC ¶ 81.  See Salerno, 481 U.S. at 745 ("A
facial challenge to a legislative Act is, of course, the most difficult challenge to mount
successfully, since the challenger must establish that no set of circumstances exists under which
the Act would be valid.").  But, as noted above, the D.C. Circuit held that at least some
suspensions do not unconstitutionally arrogate Congress's impeachment power.  McBryde, 264
F.3d at 65.

Moreover, contrary to Judge Newman's contention, footnote 5 does not create a carve-out to <u>McBryde</u>'s bar on as-applied challenges.  She claims that "[i]n order to address" "whether a long-term disqualification from cases could . . . affect an unconstitutional 'removal,'" "there first has to exist 'a long-term disqualification' . . . and such disqualification can exist only once the Disability Act is *applied* to a particular judge."  Pl.'s Opp'n at 36.  But nothing in <u>McBryde</u>, including footnote 5, suggests that the circuit intended for Article III courts to decide as-applied challenges based on long-term disqualifications.  To the contrary, the circuit held that the JC&D Act funnels "all" non-facial claims, including constitutional claims, to the Judicial Conference. 264 F.3d at 62.

### 2. *Count VII: Complete Discretion in the Special Committee*

Finally, Count VII contends that the JC&D Act violates the Fifth Amendment's due process protection and Article III's guarantee of judicial independence by "vest[ing] virtually complete discretion in the hands of a Special Committee to determine when compliance with [orders] may be compelled."  FAC ¶ 112.  Though the Court must credit the plaintiff's well-pleaded factual allegations as true, at least on a motion to dismiss, it need not accept the complaint's legal conclusions.  <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2009).  And two related features of JC&D investigations cabin a special committee's discretion.  First, the JC&D Act does not vest special committees with the authority to compel compliance with their orders.  The act charges special committees with "conduct[ing] an investigation as extensive as [they] consider[] necessary."  28 U.S.C. § 353(c).  But the act does not give them enforcement power.  Instead, it directs special committees to present a report to the judicial council with "recommendations for necessary and appropriate action by the judicial council."  <u>Id.</u>  Second, the JC&D Rules erect guardrails around a special committee's investigation.  They allow subject judges to refuse to comply with investigations for "good cause."  JC&D R. 4(a)(5).  And, as was

the case here, the judicial council, and ultimately the Judicial Conference, decide whether the judge had good cause to refuse.  See Pl.'s Opp'n, Ex. B at 40–68; Defs.' Not. of Defs.' Notice of JC&D Comm. Order 21–26.

In some cases, a circuit judicial council (or even the Judicial Conference) may choose to conduct its own investigation after receiving a special committee's report and recommendation (or, in the Judicial Conference's case, an appeal from the judicial council).  See 28 U.S.C. §§ 354(a)(1), (a)(1)(A) ("The judicial council of a circuit, upon receipt of [the special committee's report] . . . may conduct any additional investigation which it considers to be necessary."): id. § 355 ("Upon referral or certification of any matter . . . , the Judicial Conference, after consideration of the prior proceedings and such additional investigation as it considers appropriate . . . .").  In those cases, the same body would both issue orders as part of an investigation and then determine whether good cause exists to refuse compliance.  The D.C. Circuit found no due process concerns with this arrangement in Hastings II, when Judge Hasting's case arrived back at the circuit following its initial remand.  The circuit held that the JC&D Act's vesting of both investigative and adjudicatory functions in the same body did not violate due process.  829 F.2d at 104–05.  In its view, there was "no [] risk [of actual bias of prejudgment] inherent in the procedures established by the [JC&D] Act."  Id. at 104–05.  "The fact that federal judges administer the mechanism described by the Act contribute[d] in no small measure to this conclusion.  They are called upon every day to put aside considerations not legally relevant to their decisions."  Id. at 105.

To be sure, Hastings II presented a due process, and not an Article III, challenge to judicial councils' authority.  But the reasoning of McBryde picks up where Hastings II left off. As noted above, in McBryde, the circuit rejected the notion that Article III's grant of "judicial independence" gives judges "absolute freedom from" discipline or sanctions that fall short of

removal or salary diminution.  264 F.3d at 65–66.  The circuit also held that the Constitution does not "exclude[] discipline of judges *by* judges."  Id. at 66.  Surely if the Constitution permits judges to subject other judges to discipline or sanction, it also tolerates judicial councils determining when compliance with orders may be compelled.  In fact, in many cases, there may be no difference between seeking compliance with an order and imposing a sanction.

Accordingly, the Court grants Defendants' motion to dismiss as to Count I and part of Count VII.  Because Judge Newman has not shown a likelihood of prevailing on the merits of these counts, the Court also denies her motion for a preliminary injunction.  See Changji Esquel Textile Co., 40 F.4th at 726.

### IV.  Conclusion

For these reasons, it is hereby

**ORDERED** that [ECF No. 12] Judge Newman's Motion for a Preliminary Injunction is DENIED.  It is further

**ORDERED** that [ECF No. 24] Defendants' Motion to Dismiss is GRANTED in part and DENIED in part.  It is further

**ORDERED** that Defendants shall file an answer to the remaining counts by March 13, 2024.

**SO ORDERED**.


_____
CHRISTOPHER R. COOPER
United States District Judge


Date: February 12, 2024