**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE HON. PAULINE NEWMAN,
Circuit Judge
United States Court of Appeals for the Federal Circuit,

*Plaintiff,*

v.

THE HON. KIMBERLY A. MOORE,
in her official capacities as
Chief Judge of the U.S. Court of Appeals for the Federal Circuit,
Chair of the Judicial Council of the Federal Circuit, and
Chair of the Special Committee of the Judicial Council of the
Federal Circuit,

THE HON. SHARON PROST,
in her official capacity as
Member of the Special Committee of the Judicial Council of the
Federal Circuit,

THE HON. RICHARD G. TARANTO,
in his official capacity as
Member of the Special Committee of the Judicial Council of the
Federal Circuit,

and

THE JUDICIAL COUNCIL OF THE FEDERAL CIRCUIT,
AND ALL MEMBERS THEREOF,

*Defendants.*

NO. 1:23-CV-01334-CRC

**PLAINTIFF'S MEMORANDUM OF
LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS
(ECF 45)**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................................................................i

TABLE OF AUTHORITIES .........................................................................................................ii

BACKGROUND .........................................................................................................................1

STANDARD OF REVIEW ...........................................................................................................3

ARGUMENT ..............................................................................................................................4

    I.   COUNTS VIII AND XI ASSERT LEGALLY VALID FACIAL CHALLENGES FOR VIOLATION OF THE FOURTH AMENDMENT ............................................................................................4

       A. Counts VIII and XI Assert Facial, Not As-Applied, Challenges..............................5

       B. The Disability Act Violates the Fourth Amendment ...............................................7

          1. Accepting the Complaint's Allegations as True, the "Special Needs" Exception Does Not Apply .......................................................................................................7

          2. Even If the Special Needs Exception Could Apply Here, This Court Could Not Determine at the Pleadings Stage That a Warrantless Search Is Reasonable...................16

    II.  THE DISABILITY ACT FAILS TO ARTICULATE ANY STANDARD FOR "JUDICIAL DISABILITY" AND IS THEREFORE VOID FOR VAGUENESS ...............................................18

    III. THE DISABILITY ACT'S GRANT OF UNFETTERED INVESTIGATORY AUTHORITY FAILS TO ARTICULATE ANY STANDARDS FOR LAUNCHING OR CONTINUING AN INVESTIGATION OR FOR DEMANDING COOPERATION, AND IS THEREFORE VOID FOR VAGUENESS ....................27

CONCLUSION ...........................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Adams v. Jud. Council of Sixth Cir.*,
No. 17-1894, 2020 WL 5409142 (D.D.C. Sept. 9, 2020) ................................................. 14

*Aponte v. Calderon*,
284 F.3d 184 (1st Cir. 2002) ................................................................................................ 28

*Arnett v. Kennedy*,
416 U.S. 134 (1974) ............................................................................................................. 25

*Bennett v. Ky Dep't of Educ.*,
470 U.S. 656 (1985) ............................................................................................................. 23

*Camara v. Municipal Court*,
387 U.S. 523 (1967) ............................................................................................................... 8

*Chandler v. Miller*,
520 U.S. 305 (1997) ............................................................................................ 3, 10, 13, 16

*City of Chicago v. Morales*,
527 U.S. 41 (1999) ................................................................................................................. 3

*City of Los Angeles, Cal. v. Patel*,
576 U.S. 409 (2015) ..................................................................................................... passim

*Coates v. City of Cincinnati*,
402 U.S. 611, 614 (1971) ..................................................................................................... 22

Down v. Ann Arbor Pub. Schs.,
29 F. Supp. 3d 1030 (E.D. Mich. 2014) ............................................................................. 12

*Duplantier v. United States*,
606 F.2d 654 (5th Cir. 1979) ............................................................................................... 17

*Fredricks v. Council of Inspectors Gen. of Integrity & Efficiency*,
No. 23-cv-442, 2023 WL 7222107 (E.D. Va. Nov. 2, 2023) .............................................. 29

*Griffin v. Wisconsin*,
483 U.S. 868 (1987) ............................................................................................................... 8

*Johnson v. United States*,
576 U.S. 591 (2015) ......................................................................................................... 3, 18

*Mancusi v. DeForte*,
392 U.S. 364, 370 (1968) ....................................................................................................... 9

*Mistretta v. United States*,
488 U.S. 361 (1989) ....................................................................................................... 15, 16

*Murray v. Pittsburgh Bd. of Educ.*,
759 F. Supp. 1178 (W.D. Pa. 1991) ................................................................................... 12

*Nat'l Treasury Emps. Union v. Von Raab*,
489 U.S. 656 (1989) .................................................................................................. 10, 11, 13

*New Jersey v. T.L.O.*,
469 U.S. 325 (1985) ...................................................................................................8, 12, 16

*Newman v. Moore*,
__ F. Supp. 3d ___, 2024 WL 551836 (D.D.C. Feb. 12, 2024) .....................................passim

*O'Connor v. Ortega*,
480 U.S. 709 (1987) ...............................................................................................8, 9, 13, 16

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
584 U.S. 325 (2018) ..............................................................................................................15

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ..............................................................................................................22

*Skinner v. Railway Lab. Execs.' Ass'n*,
489 U.S. 602 (1989) ...................................................................................................6, 8, 11

*Sloan v. HUD*,
231 F.3d 10 (D.C. Cir. 2000) ...............................................................................................28

*Snepp v. United States*,
444 U.S. 507 (1980) ..............................................................................................................24

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
992 F.3d 350 (5th Cir. 2021) ...............................................................................................23

*United States v. Bronstein*,
849 F.3d 1101 (D.C. Cir. 2017) ...........................................................................................18

*United States v. Salerno*,
481 U.S. 739 (1987) ......................................................................................................3, 5, 6

*Vernonia Sch. Dist. 47J v. Acton*,
515 U.S. 646 (1995) ................................................................................................................8

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) .................................................................................................3, 4, 6, 19

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) ...........................................................................................................4, 5

*Webster v. Doe*,
486 U.S. 592 (1988) ..............................................................................................................24

*Weiss v. United States*,
510 U.S. 163 (1994) ..............................................................................................................14

*Yin v. California*,
95 F.3d 864 (9th Cir. 1996) ..................................................................................................11

**Constitutional Provisions**

U.S. CONST. amend. IV...............................................................................................................2

**Statutes**

15 U.S.C. § 78u..........................................................................................................................28

28 U.S.C. § 291 .................................................................................................................26

28 U.S.C. § 292 .................................................................................................................26

28 U.S.C. § 332 .................................................................................................................10

5 U.S.C. § 7501 ................................................................................................................25

Americans with Disabilities Act,
    42 U.S.C. § 12102 ....................................................................................................18

CIA Retirement and Disability Act,
    50 U.S.C. § 2051 ................................................................................................. 18, 24

Judicial Conduct and Disability Act,
    28 U.S.C. § 351, *et seq.* ....................................................................................passim

Judiciary Act of 1801,
    Pub. L. No. 6-4, 2 Stat. 89 .......................................................................................25

Judiciary Act of 1802,
    Pub. L. No. 7-31, 2 Stat. 156 (April 29, 1802) ........................................................25

Social Security Act,
    42 U.S.C. § 416 ........................................................................................................18

**Rules**

Fed. R. Civ. P. 12 .............................................................................................................2

Rule 4, Rules for Judicial-Conduct and Judicial-Disability Proceedings................................23

**Other Authorities**

Celeste Silveira, *et al.*,
    *Neuropsychiatric Symptoms of Multiple Sclerosis: State of the Art,*
    16 Psych. Investig. 877 (2019) .................................................................................22

Final Order,
    *In re Complaint of Judicial Misconduct No. 06-13-90009*
    (6th Cir. Jud. Council Mar. 18, 2022) ......................................................................22

Mem. of Decision,
    *In re: Complaint of Judicial Misconduct,*
    C.C.D. 17-01 (Comm. on Jud. Conduct & Disability Aug. 14, 2017)................................17

Norhamidar Ab-Hamid, *et al.*,
    *Diabetes and Cognitive Decline: Challenges and Future Direction,*
    14 World J. Diabetes 795 (2023) ..............................................................................20

Order and Mem.,
    *In re Complaint of Judicial Misconduct No. 06-13-90009*
    (6th Cir. Jud. Council Feb. 22, 2016).........................................................................21

Order and Mem.,
    *In re Complaint of Judicial Misconduct No. 06-13-90009*
    (6th Cir. Jud. Council June 27, 2018) ........................................................................22

Order,
   *In re Complaint No. 23-90015*
   (Fed. Cir. Jud. Council Sept. 20, 2023) ..................................................................16, 20, 24

The Federalist No. 78
   (C. Rossiter ed. 1961) (A. Hamilton) .....................................................................................15

Walter F. Pratt,
   *Judicial Disability and the Good Behavior Clause*,
   85 Yale L.J. 706 (1976) ...........................................................................................................15

## BACKGROUND

In February of 2023, Defendant Chief Judge Kimberly Moore unilaterally removed Plaintiff Circuit Judge Pauline Newman from her regular duties as an Article III judge.  That removal was later extended by an unprecedented, unrecorded and unpublished vote of the Defendant Judicial Council, allegedly taken at a meeting of the Council that was neither noticed nor memorialized.  Thereafter, Chief Judge Moore instigated an investigation against Judge Newman on a basis—a supposed "heart attack" and a "fainting episode" that Judge Newman allegedly suffered—that Defendants themselves now acknowledge were false.  The pattern of harassment against Judge Newman continues unabated to the present day.  For example, in late 2023, Defendants refused to permit Judge Newman to hire a judicial assistant to attend to Judge Newman's secretarial duties.  At or about the same time, Defendants removed Judge Newman from the Court's internal email distribution list, making her unable to stay abreast of any of the Court's (or Judicial Council's) business.  In February and March of 2024, Defendants denied Judge Newman's request to either extend the term of service of one of her law clerks or to authorize a replacement hire for him.  The reason that Defendants have been able to take these actions is because the irredeemably vague provisions of the Judicial Conduct and Disability Act ("Disability Act"), 28 U.S.C. §§ 351–364 unconstitutionally vest unfettered discretion in Defendants, which permits them, without impeachment, for all intents and purposes, to divest an Article III judge of her office.

The Court is familiar with the background of this case.  *See* Mem. Op. & Order, *Newman v. Moore*, __ F. Supp. 3d ___, 2024 WL 551836, *1, *3-*5 (D.D.C. Feb. 12, 2024) (ECF 43).  Consequently, only particularly salient facts will be reiterated here.

First, Judge Newman is an Article III judge—a constitutional officer of this Republic, and not merely a federal employee.  Unlike most employees who can be terminated for things like inefficiency or insubordination, by virtue of her lifetime appointed office, Judge Newman does not have a

1

supervisor and does not need to meet any performance metrics to keep her job. Congress alone has the power to remove her.

Second, the Disability Act does not define what counts as a disability nor does it provide any measurable factors that would aid that determination. Nor does the statute even repose the resolution of this essentially medical question in medical professionals, instead leaving it in the hands of lay people like Chief Judge Moore and her colleagues, all without providing them with any tools to determine when a disability exists.

Third, as this Court itself held, the statute under which Chief Judge Moore began proceedings against Judge Moore provides for no judicial review of any orders including those that authorize invasive searches of private medical information (or for that matter of "persons, houses, papers, and effects," U.S. CONST. amend. IV), and instead permits *administrative* orders to essentially become self-executing. This case plainly illustrates how the absence of such review permits a judicial council—a wholly administrative body—to employ and manipulate entirely standardless criteria in order to start and to continue investigations into and to impose unconstitutional sanctions on Article III judges. Indeed, it is undisputed (nor can it be disputed at this stage of litigation) that Defendants' reasons for beginning and maintaining the investigation and authorizing searches of Judge Newman's "papers and effects" have, to put it charitably, "evolved" throughout the course of the now year-long process.

Judge Newman challenged these and other aspects of the proceedings against her in an eleven-count complaint against all Defendants. *See* First Amended Complaint, ECF 10. By order of February 12, 2024, the Court dismissed Counts II-IV, VI, X, and XI for lack of subject-matter jurisdiction, *Newman*, at *2, and also dismissed Count I and part of Count VII pursuant to Fed. R. Civ. P. 12(b)(6), *id.*, at *16-*18. Remaining before the Court, therefore, are Counts V and VII-IX. Counts V and VII allege that the Disability Act is unconstitutionally vague with respect to its definition of disability (Count V) and its grant of investigative authority to the Special Committee (Count VII). In turn,

Counts VIII and IX allege that insofar as the Disability Act authorizes a Special Committee to demand medical examinations and private medical records as a condition for maintaining one's Article III judicial office, it violates the Fourth Amendment's prohibition on unreasonable searches.

## STANDARD OF REVIEW

A facial challenge to a statute authorizing warrantless searches, while difficult to mount, *see United States v. Salerno*, 481 U.S. 739, 745 (1987), is not treated any differently from any other facial challenge. *See City of Los Angeles, Cal. v. Patel*, 576 U.S. 409, 415 (2015). To succeed on such a challenge, a plaintiff need only show that the searches authorized or required by the challenged statute are "unreasonable." *Id.* at 419-20; *see also Chandler v. Miller*, 520 U.S. 305, 313 (1997). "[T]he proper focus of th[is] constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant. *Patel*, 481 U.S. at 418.

A facial "void for vagueness" challenge may be brought when a law "threatens to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). A law is also void for vagueness whenever "it may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Contrary to Defendants' assertions, in a void for vagueness challenge, Plaintiff is not required to prove that the law is void in all of its applications, precisely because a vague law *may or may not* prohibit constitutionally protected conduct. *See Johnson v. United States*, 576 U.S. 591, 602 (2015) ("[A]lthough statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.") (emphasis in original). Indeed, the "supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a statute to be vague, it is vague in all its applications (and never mind the reality)." *Id.* at 603. Thus, with respect to Counts V and VII, Judge Newman does not need to show that there exists *no set of circumstances* under which an Article III

3

judge can be found to be disabled or that there exists *no set of circumstances* under which Defendants' investigative authority would be appropriately triggered.  Rather, all she needs to show is that the Disability Act "creates a danger of arbitrary and discriminatory enforcement," and/or that it "threatens to inhibit the exercise of constitutionally protected rights." *Hoffman Ests.*, 455 U.S. at 494, 498 (citations omitted).

The analysis as to Counts VIII and IX, both of which allege that insofar as the Disability Act authorizes a Special Committee to demand medical examinations and private medical records, it violates the Fourth Amendment's prohibition on unreasonable searches, is no different.  "Fourth Amendment [facial] challenges to statutes authorizing warrantless searches are no exception" to the rules governing facial challenges. *Patel*, 576 U.S. at 415.  And while a plaintiff mounting a facial challenge "must establish that a 'law is unconstitutional in all of its applications,'" a court "consider[s] only applications of the statute in which it actually authorizes or prohibits conduct." *Id.* at 418 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).  In other words, "when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant." *Id.*

## ARGUMENT

### I.   COUNTS VIII AND XI ASSERT LEGALLY VALID FACIAL CHALLENGES FOR VIOLATION OF THE FOURTH AMENDMENT

Counts VIII and IX assert facial challenges to the "investigation" provision of the Disability Act, 28 U.S.C. § 353(c), which states that each special committee "shall conduct an investigation as extensive as it considers necessary."  These counts allege that Section 353(c) violates the Fourth Amendment by authorizing special committees to compel medical examinations and the production of medical records without a warrant or a demonstration of constitutional reasonableness.

4

### A.  Counts VIII and XI Assert Facial, Not As-Applied, Challenges

Defendants argue that, because the statute could be read as authorizing some legitimate searches, Judge Newman's facial claims should be dismissed on the basis that Judge Newman is unable to show that the statute is unconstitutional in all of its applications.[1]  ECF 45-1, at 6-7.[2]  But Defendants misunderstand the nature of facial challenges in Fourth Amendment cases.  In particular, their Memorandum overlooks the heart of the Supreme Court's explanation of facial challenges in the primary authority Defendants cite—*City of Los Angeles v. Patel.*

Defendants rely primarily on a sentence in *Patel* stating that a facial claim must show that a "law is unconstitutional in all of its applications." 576 U.S. 409, 418 (2015) (quoting *Wash. State Grange,* 552 U.S. at 449).  *See* ECF 45-1, at 6.  (In the same vein, Defendants quote the statement in *Salerno,* 481 U.S. at 745, that a facial challenge requires a plaintiff to "establish that no set of circumstances exists under which the Act would be valid.").   But Defendants misunderstand what the Supreme Court means by "in all of its applications."  The *Patel* Court gave that explanation in the sentence following the one Defendants quote: "But when assessing whether a statute meets this standard, the Court has considered *only applications of the statute in which it actually authorizes … conduct.*"  576 U.S. at 418 (emphasis added).

Under this approach, the Court explained, the inquiry's focus "is the searches that the [statute at issue] actually authorizes, not those for which [the statute] is irrelevant."  *Id.*  For example, "[i]f exigency or a warrant justifies [a] search, the subject of the search must permit it to proceed

---

[1] Defendants also argue that Counts VIII and IX are not facial claims but, rather, plead as-applied claims.  ECF 45-1, at 7-8, n.1.  Leaving aside the fact that the Court has already rejected this argument, *see Newman,* at *12, it is simply wrong.  Judge Newman is not challenging a specific order for production of *her* medical records and *her* psychiatric testing.  She is challenging the statutory authority to issue such orders against *any* Article III judge.

[2] In citing to ECF materials, this brief uses the pagination of the original document, rather than the ECF's page numbering.

irrespective of whether it is authorized by statute." *Id.* at 418-19.  In the same vein, "[s]tatutes authorizing warrantless searches also do no work where the subject of a search has consented." *Id.* at 419.  The *Patel* Court concluded that those constitutionally permitted searches "are irrelevant to our analysis" of a statute "because they do not involve actual applications of the statute." *Id.* at 418-19. [3] Applying that framework to the law before it, the Court entertained a facial challenge to an ordinance permitting police officers, without a warrant, to require hotels to provide specified information about hotel guests.  *Id.* at 412.  The Court found the law unconstitutional because it did not fall within the "special needs" or "administrative search" exception to the Fourth Amendment.  *Id.* at 420-21 (citing *Skinner v. Railway Lab. Execs.' Ass'n*, 489 U.S. 602, 619 (1989)).

The *Patel* court rejected the argument Defendants now make, ECF 45-1, at 6-7, "that facial challenges to statutes authorizing warrantless searches must fail because such searches will never be unconstitutional in all applications," 576 U.S. at 417, explaining that this argument "would preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches," *id.* at 418.  The Court emphasized that such an approach would be contrary to its longstanding and routine practice of "entertain[ing] facial challenges under the Fourth Amendment to statutes authorizing warrantless searches." *Id.* at 416 (citing seven previous examples of addressing facial Fourth Amendment challenges).[4]

The Court's discussion in *Patel* establishes that Counts VIII and IX of Judge Newman's First Amended Complaint assert valid facial challenges.  The only applications of Section 353(c) that are

---

[3] The *Patel* Court's discussion of "application" reconciled *Patel* with *Salerno*.  *See* 576 U.S. at 417-18 (addressing *Salerno*, 481 U.S. at 745).

[4] Furthermore, even if, following a judicial review (were such review available) of searches authorized under the Disability Act one could conclude that some of the searches are "reasonable," it does not save a statute that "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement," *Hoffman Ests.,* 455 U.S. at 499, in the absence of either the warrant requirement or judicial review.

relevant to the facial analysis are those in which this statute provides special committees authority they otherwise lack to compel a medical examination or the production of medical reports.  This facial analysis does not, and need not, take into account any examinations or productions for which a special committee need not rely on Section 353(c).[5]  *See Patel*, 576 U.S. at 418.  Counts VIII and IX challenge *every* application of Section 353(c), because they challenge every search in which the Special Committee does not obtain a warrant or satisfy the special needs exception. *See post*, Part I.B.  Under *Patel*, 516 U.S. at 418-19, this is a valid facial challenge.

### B.  The Disability Act Violates the Fourth Amendment

Defendants next argue that, if Counts VIII and IX are facial claims, they fail on the merits. According to Defendants, Special Committee orders compelling medical examinations or the production of medical records are consistent with the Fourth Amendment because those orders must be based on "reasonable suspicion" of the subject judge's disability.  *See* ECF 45-1, at 10.  As explained below, those orders run afoul of the Fourth Amendment's requirement for a warrant or, in the alternative in certain cases, a showing of constitutional reasonableness.

### 1.  Accepting the Complaint's Allegations as True, the "Special Needs" Exception Does Not Apply

Defendants do not dispute that Fourth Amendment protections apply to compelled medical examinations.  Nor do they dispute that the Fourth Amendment requires a judicial warrant unless

---

[5]  Defendants also contend that the Counts VIII and IX are not valid facial challenges because special committees could use certain investigative tools that do not violate the Fourth Amendment.  ECF 45-1, at 7.  That argument fails for two reasons.  First, the investigative tools Defendants identify, such as interviewing the court's own employees, do not depend on authorization by the Disability Act.  In other words, the Chief Judge can always interview the Court's employees even in the absence of any complaint against any other judge.  Thus, § 353(c) does no work and is therefore irrelevant to this power.  Second, the other investigative tools belong to categories of investigative conduct that simply do not implicate the Fourth Amendment at all.  Under *Patel*, what is relevant to identifying a facial challenge is the warrantless searches that the statute authorizes in all special committee investigations, not only in Judge Newman's case.  *See Patel*, 576 U.S at 418.

the government can show a recognized exception applies. As the Supreme Court "has repeatedly held[,] searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Patel*, 576 U.S. at 419 (cleaned up).

Defendants' reliance on the "special needs" exception, which applies to certain administrative searches is entirely misplaced. The exception applies when "special [government] needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement *impracticable.*" *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)) (emphasis added). Obtaining a warrant is only "impracticable" where it would "seriously disrupt the routine conduct of business," *O'Connor v. Ortega*, 480 U.S. 709, 722 (1987), or "when 'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search,'" *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 533 (1967)). Only where the government can make this "impracticable" showing, will the court *then* determine whether a warrant is required by "balanc[ing] the governmental interests and the privacy interests to assess the practicality of the warrant." *Skinner*, 489 U.S. at 619.

Accordingly, for this exception to apply, the government must show that it *both* has a "special need," *and* that obtaining a warrant is "impracticable," *id.* (quoting *Griffin*, 483 U.S. at 873), because doing so would "frustrate" the government from meeting that asserted "special need," *id.* at 623 (quoting *Camara*, 387 U.S. at 533). The "impracticability" test is a threshold requirement for application of the exception—and Defendants fail it. Even if they could identify a judicially recognized "special need"—which they cannot do—they provide no basis for the Court to conclude that obtaining a warrant would "frustrate" their ability to meet that need.

Not surprisingly, Defendants' Memorandum tries to brush aside the "impracticability" requirement. Instead of addressing that threshold hurdle, Defendants try to evade it by rewriting

the exception.  Despite the Supreme Court's admonition that the exception applies only to "certain carefully defined classes of cases," *O'Connor*, 480 U.S. at 720 (quoting *Mancusi v. DeForte*, 392 U.S. 364, 370 (1968)), Defendants contend it applies whenever the person to be searched holds a position that can be characterized as a "position[] of trust." ECF 45-1, at 8.  But the exception is not remotely that broad.

The precedents Defendants cite illustrate the exception's limited scope, as well as the unavoidable importance of the "impracticability" requirement.  All of the cases involve either a government entity's supervision of its employees or a public school's supervision of its students and teachers.  In each case, the "impracticability" threshold was met because the warrant process would have prevented the government entity or the school from functioning in pursuit of a judicially recognized special need.  Additionally, in some of the cases, the employees had effectively consented to the relevant searches as part of their contracts.

Defendants rely mostly on *O'Connor*, which involved a government supervisor's search of an employee's office.  480 U.S. at 713.  As an initial matter, it should be noted that Judge Newman is not an employee, but an independent constitutional officer and that neither Chief Judge Moore, nor the Special Committee, nor the Judicial Council are her "supervisors."  Thus, on its face, *O'Connor*'s relevance to this case is remote at best.  But even if *O'Connor*'s analysis applied, the present case cannot be analogized to *O'Connor*.  In that case, the Supreme Court concluded that obtaining a warrant was "impracticable" and "unworkable" because it "would seriously disrupt the routine conduct of business" so that "government offices could not function."  *Id.* at 720-22 (internal quotation marks and citations omitted).  The Court compared this search of an employee's office to "routine inventory conducted by public employers for the purpose of securing state property" and to a "building inspection." *Id.* at 724 (citations omitted).  The Court said nothing suggesting the employee held what Defendants call a "position of trust."  In contrast, obtaining a warrant for Judge

Newman's medical records and neuropsychological testing would in no way disrupt the business of the courts. Indeed, a separate provision of the Disability Act *requires* that a special committee (or a Judicial Council as a whole) seek enforcement of any subpoenas in a *district court*. *See* 28 U.S.C. § 356(a) (referencing 28 U.S.C. § 332(d)).[6] This amply illustrates that even the drafters of the Act recognized that seeking intervention (and the blessing of) an Article III court prior to enforcing any orders would not disrupt the operation of the courts or even any specific investigation.

Indeed, in *Chandler*, the Supreme Court has squarely rejected a nearly identical argument that sought to justify warrantless searches of individuals who sought a "position of trust." In that case, the State of Georgia required all candidates for certain state offices to take and pass a drug test. 520 U.S. at 308. It was undisputed that this provision served Georgia's "special needs" because "[t]he people of Georgia place in the trust of their elected officials ... their liberty, their safety, their economic well-being, [and] ultimate responsibility for law enforcement," and because "those vested with the highest executive authority to make public policy in general and frequently to supervise Georgia's drug interdiction efforts in particular must be persons appreciative of the perils of drug use." *Id.* at 311 (quoting decision below in the same case). Nevertheless, the Court held Georgia's statute to be unconstitutional because unlike in *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), there Georgia did not, and could not, identify a "risk to public safety [that] is substantial and real." *Chandler*, 520 U.S. at 323. Of course, neither can Defendants here.

Other cited cases are similarly inapplicable. They merely hold that requiring a warrant would have been impracticable because of the operational demands of the relevant organization. None of

---

[6] Had the Judicial Council proceeded that way, Judge Newman would have the right "to show cause before the court why … she should not be held in contempt of court." 28 U.S.C. § 332(d)(2). Given the wealth of legitimate objections that Judge Newman has to this process, she would easily be able to do so. But even were a district court to disagree with Judge Newman's objections, she would get independent judicial review of the orders thus satisfying the Fourth Amendment and the Due Process Clause.

them discuss "positions of trust."  For example, in *Von Raab* which involved agents of the United States Customs Service, the Service required urine tests as a condition of employment for agents in roles involving certain "dangers," such as performing drug interdiction or otherwise carrying firearms. 489 U.S. at 660-61.  The Court explained that, because the program's purpose was to "*prevent* the promotion of drug users" to critical positions, *id.* at 666 (emphasis added); *see also id.* at 668, it was necessary to test *all employees* before any individualized problem arose.  The Court concluded that obtaining a warrant before each test of an employee would be "impractical," *id.* at 665, because the Customs Service's "mission would be compromised if it were required to seek search warrants in connection with [these] routine, yet sensitive, employment decisions," *id.* at 667. Moreover, the Court noted, the preventative testing program did not generate individualized "special facts for a neutral magistrate to evaluate." *Id.* (internal quotation marks and citation omitted).

*Von Raab*'s companion case, *Skinner*, is similar.  There, railroad employees challenged a Federal Railroad Administration policy requiring that designated *categories* of employees submit to warrantless drug testing after certain train accidents.  *Id.* at 633-34.  The court again emphasized that the program's purpose was preventative, *id.* at 620, explaining that employees "can cause great human loss before any signs of impairment become noticeable to supervisors." *Id.* at 628.  As a result, "even … a major calamity will not give rise to a suspicion of impairment with respect to any particular employee." *Id.* at 629.  The Court applied the "impracticable" requirement, *id.* at 619, concluding that a warrant requirement would "significantly hinder[], and in many cases frustrat[e], the objectives of the Government's testing program," *id.* at 624.  *See also Yin v. California*, 95 F.3d 864, 869, 872 n.15 (9th Cir. 1996) (holding that the "impracticable" requirement was met for the medical examination of a government employee; also noting that a union contract authorized examinations and that the agency "regularly" required them).  Defendants, of course, do not

11

contend that it is necessary to subject *all* Article III judges (or even all Article III judges over a certain age) to neuropsychological testing or review of medical records.

Defendants also rely on cases involving the administration of public schools. ECF 45-1, at 12. As a general matter, the Supreme Court has stated that "[t]he warrant requirement … is unsuited to the school environment." *T.L.O.*, 469 U.S. at 340. In a decision concluding that a principal could search a high-school student's purse without a warrant, *id.* at 333, the Court emphasized the special nature of public school needs, holding that "requiring a teacher to obtain a warrant before searching a child suspected of an infraction of school rules … would *unduly interfere* with the maintenance of the swift and informal disciplinary procedures needed in the schools," *id.* at 340 (emphasis added). But when it comes to Article III judges, even assuming that non-impeachment disciplinary proceedings are appropriate and constitutional, swiftness and informality are not appropriate considerations, and in fact, contradicts the Act's goals and implementing rules. To the contrary, the Act and the implementing Rules set up a very formal (even if, in part, unconstitutional) process.

The two school cases Defendants cite addressed teachers who had been ordered to undergo psychological or psychiatric testing. Both cases again emphasized the unique demands of operating public schools. In *Murray v. Pittsburgh Bd. of Educ.*, 759 F. Supp. 1178, 1181-82 (W.D. Pa. 1991), the court concluded that requiring a warrant would cause delays and impose costs that would be excessive for public schools. *Id.* at 1183-84. It also explained that psychological and psychiatric testing were expressly permitted by statute and "a routine feature" of this occupation. *Id.* at 1181. In *Down v. Ann Arbor Pub. Schs.*, 29 F. Supp. 3d 1030, 1039-40 (E.D. Mich. 2014), the court primarily relied on *Murray*. In addition, the *Down* court emphasized that the issue had been resolved in advance by contract, when the teachers' union had entered an agreement giving the school district the right to require psychological examinations. *Id.* at 1037.

12

None of these precedents help Defendants.  They do not, as Defendants contend, extend the "special needs" exception to every person who holds what Defendants call a "position of trust."[7]  For this reason, all precedents do, without exception, impose the threshold "impracticability" requirement even where there may be "special needs" for a search may be present.  In each case where the court concluded the exception applied, the court found that obtaining a warrant or warrants would prevent the relevant entity from meeting its previously established "special need."  The *Chandler* Court explicitly distinguished *Von Raab* (and *Vernonia*) on the basis that alternatives to warrantless searches were "not feasible," *i.e.*, "impracticable" in those contexts.  *Chandler*, 520 U.S. at 321.  In the present case, by contrast, the pleadings provide no basis for the Court to reach that conclusion about investigations of federal judges.  Defendants do not identify any reason, based on the pleadings or otherwise, that obtaining a warrant would noticeably affect—much less "seriously disrupt," *O'Connor*, 480 U.S. at 722—these investigations.  Indeed, Defendants have nothing to say about the threshold "impracticability" requirement.

Defendants also argue that special committees can requires medical examinations without a warrant because "psychological testing and psychiatric interviews are a routine feature of occupations which involve stress and sensitive interpersonal contact," and that in this respect, "[t]here is no reason to distinguish between [government] employees and judicial officers."  ECF 45-1, at 11 (citations and quotation marks omitted).  First, there is an obvious need to distinguish mere employees who constitutionally speaking are not meant to be independent or to enjoy any tenure protections and Article III judges who enjoy such protections precisely because they are meant to be independent.  Second, medical or neurological testing is hardly a "routine feature" of serving as an Article III judge.

---

[7] If it were so, then every Congressman, Senator, Cabinet official, judge, member of any Commission, or Board, could be routinely subjected to psychiatric (and for that matter physical) examinations, rummaging through medical records, and other intrusions on privacy, on mere incorrect, third-hand, hearsay reports of an existence of some medical condition.

To the contrary, an Article III judge has *never* before undergone compelled medical testing of any kind. In the 44 years the Disability Act has been in effect (and the 235-year history of the federal judiciary), medical testing has been ordered once and has *never* taken place.  (In *Adams*, the Judicial Council of the Sixth Circuit ordered Judge Adams to undergo testing, but he contested the order and did not undergo any unwanted testing.  *See Adams v. Jud. Council of Sixth Cir.*, No. 17-1894, 2020 WL 5409142, at *5 (D.D.C. Sept. 9, 2020) ("On June 27, 2018, the Judicial Council issued an order discontinuing any further investigation and withdrawing the requirement that plaintiff submit to a mental health evaluation.").

The cited precedents do not help Defendants for an additional reason, which is that none of them address attempted searches of Article III judges.  The precedents involve administrative bodies requiring searches of their employees' persons or offices (or searches of students).  Federal judges are not employees—not of any government agency, or of their circuit's judicial council, or of any court.  Conversely, a special committee is not an agency or employer with authority to supervise Article III judges.  Indeed, the special constitutional status of Article III judges is the entire reason for the existence of the (ultimately flawed) Disability Act and this litigation.

Because of judges' special constitutional status, the Fourth Amendment is not the only constitutional barrier to the Act's authorization of Defendants' efforts to compel an Article III judge to undergo a medical examination.  Defendants try to paper over this constitutional difference with the assertion that federal judges are just "like the teacher in *Murray*" because judges and teachers both "occupy positions of particular trust."  ECF 45-1, at 12.  That statement is constitutionally baseless.

Unlike teachers and other public employees, Article III judges are officers of the United States, appointed by the President with the advice and consent of the Senate, *Weiss v. United States*, 510 U.S. 163, 191 (1994) (Souter, J., concurring).  They hold their positions for life.  The

Constitution and the Supreme Court guard these judges' independence. *See Mistretta v. United States*, 488 U.S. 361, 410 (1989) (noting that no Act can authorize the President (or by extension anyone else) "to remove, *or in any way diminish* the status of Article III judges, as judges.") (emphasis added); *see also Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 346 (2018) (Gorsuch, J., dissenting) (noting that "[t]he framers … were convinced … that 'periodical appointments, however regulated, or by whomsoever made, would, in some way or other, be fatal to the courts' necessary independence.'") (quoting The Federalist No. 78, at 471 (C. Rossiter ed. 1961) (A. Hamilton)) (cleaned up). They are removable only by the Senate, not by a supervisor who might search their offices or subject them to medical testing, and not by their circuit's judicial council. *See Mistretta*, 488 U.S. at 410. And that remains true *even if* a judge is found to have violated the law or lost any conceivable ability to carry out her judicial functions. *See* Walter F. Pratt, *Judicial Disability and the Good Behavior Clause*, 85 Yale L.J. 706, 718 (1976) ("The entire history of good behavior tenure, both in England and in America, denies the possibility of removal for disability.").

Which leads to one more important difference between Article III judges and the employees in the precedents Defendants cite. In the context of the Disability Act, according to this Court's own ruling, Article III judges who are the subject of investigations are foreclosed from *any* access to a federal court that would permit them to challenge (in as-applied challenges) the validity of the investigation or sanctions. *See Newman*, at *8-*12. Under this view of the statute, targeted Article III judges are denied *both ex ante* and *ex post* judicial review of any search which could ensure that their Fourth Amendment rights and their judicial independence remain intact. Indeed, under the Court's previous ruling, the Disability Act strips courts of jurisdiction over a judge's dispute with a judicial council purporting to act pursuant to that statute. *Id.* Therefore, unlike the employees, teachers, and students in the above cases, an Article III judge whom a judicial council orders to undergo a medical examination has no access to a court to challenge the proposed examination. In

15

other words, under Defendants' view, incongruously Article III judges have *less* constitutional protection than a line employee in any governmental agency.

As this Court (and the Judicial Conference itself) acknowledged, the Judicial Conference and Judicial Councils are administrative bodies, not Article III courts.  *Id.* at 27.  Defendants themselves have emphasized that the Disability Act empowers Special Committees to combine the roles of investigator, judge, and jury—and even, if necessary, witnesses.  *See, e.g.*, Order, *In re Complaint No. 23-90015* (Fed. Cir. Jud. Council Sept. 20, 2023), at 6 ("Sept. 20 Order").[8]  This combination of functions makes access to a neutral court all the more important.  *See Mistretta*, 488 U.S. at 410.  That denial of access aggravates the Fourth Amendment violation embedded in the Disability Act in all of its applications to a compelled medical examination.  It provides another reason the searches identified in the First Amended Complaint cannot possibly qualify for the special needs exception to the Fourth Amendment.

     2.  <u>Even If the Special Needs Exception Could Apply Here, This Court Could Not Determine at the Pleadings Stage That a Warrantless Search Is Reasonable</u>

Even assuming, *arguendo*, that the special interest exception applied to this case, Defendants' motion to dismiss Counts VIII and IX still should fail.

As explained above, an administrative entity that seeks to compel a warrantless search must prevail in the balancing test set out in the special needs exception line of cases.  That test requires "a careful balancing of governmental and private interests" before a court can decide whether the administrative entity can conduct a search without a warrant and probable cause.  *O'Connor*, 480 U.S. at 722 (*quoting T. L. O.*, 469 U.S. at 341).  *See also Chandler*, 520 U.S. at 318.  Needless to say, a court cannot perform this balancing based on the pleadings alone.  That is why not one of the special needs

---

[8] The fact that this extraordinarily weighty order was issued as a "nonprecedential" decision further illustrates how the vague statutory standards promote arbitrary enforcement.

cases discussed above was decided on the pleadings, *see ante*, Part I.B.1; every one required fact development before the court could perform the balancing required to apply the exception. Judge Newman respectfully submits that this Court should not be the first to perform this balancing test without a factual record.

Furthermore, Defendants misunderstand the requirements to qualify for the special needs exception. It is not, as they contend, sufficient for an administrative entity to state it has a "reasonable suspicion" or "probable cause." ECF 45-1, at 13-14. That kind of assertion is, at most, only one of the elements a court must balance to decide whether the special needs exception applies.[9] Thus, even if this Court were to attempt a balancing on the present record, it would have to rule against Defendants. The record provides no basis for giving any weight at all to the Special Committee's claimed interest in compelling medical examinations and medical record productions without obtaining a warrant. On the other side of the balancing scale, however, the Court would have to give weight to Article III judges' interests in their privacy.

The importance of judicial independence and constitutional guarantee of unimpeded tenure in office—factors not relevant in in the special needs cases cited above, but ones that must be considered in the context of the preset case were this Court inclined to engage in balancing of interests—further weaken Defendants' side of the ledger. Surely a constitutional value as important as judicial independence would carry considerable weight in this balancing test. *See, e.g., Duplantier v. United States*, 606 F.2d 654, 672 (5th Cir. 1979) (weighing the value of and need for judicial independence while considering a challenge to judicial financial disclosure requirements). But to date, Defendants have identified no Fourth Amendment "balancing" precedent that takes that

---

[9] For this reason, it also is irrelevant that the Special Committee in *Adams* found a "reasonable basis" for its investigation. *See* Mem. of Decision, *In re: Complaint of Judicial Misconduct*, C.C.D. 17-01 (Comm. on Jud. Conduct & Disability Aug. 14, 2017), at 29.

constitutional value into account, perhaps precisely because the Disability Act has never been used to conduct warrantless searches.

The logic of judicial independence also requires that any balancing that considers an Article III judge's interests must be performed by a neutral decisionmaker, not an administrative body (such as a Special Committee). Defendants would deny Article III judges who are the subject of judicial council orders all access to judicial review, even for Fourth Amendment searches. Yet Defendants offer no legal basis to conclude that their desire to compel medical examinations without prior judicial review outweighs both a subject judge's privacy interests and the constitutional weight afforded to judicial independence.

## II. THE DISABILITY ACT FAILS TO ARTICULATE ANY STANDARD FOR "JUDICIAL DISABILITY" AND IS THEREFORE VOID FOR VAGUENESS

It is undisputed that unlike, for example, the Social Security Act, *see* 42 U.S.C. §§ 416(i), 423(d), or the American with Disabilities Act, *see* 42 U.S.C. § 12102, or the CIA Retirement and Disability Act, *see* 50 U.S.C. § 2051, the Disability Act provides no definition of what constitutes a disability. Defendants contend that such a lack of definition does not present a problem because the term is sufficiently "comprehensible" even if imprecise. ECF 45-1, at 17 (citing *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017)). But Defendants misapprehend the very case on which they are relying.

As the D.C. Circuit explained in *Bronstein*, "a term is not saved from being void for vagueness merely because the present moment's vernacular clearly understands some of its applications—the question is whether the term provides a discernable standard when legally construed." 849 F.3d at 1107. For example, there are certain conduct such as "spitting in someone's face," that *everyone* would understand as being "annoying." *Johnson*, 576 U.S. at 603. Yet, even though the term "annoying" could be understood by some, it nevertheless provides no guidelines as to its meaning.

Defendants claim that the statute ties the "disability" provision "to the concrete and objective assessment of whether a judge has been rendered 'unable' to perform 'all the duties of office,'" ECF 45-1, at 17-18, and therefore necessarily provides a clear standard of behavior.  But that is simply not so.  The history of enforcement of this provision amply illustrates how standardless it is and how it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement."  *Hoffman Ests.*, 455 U.S. at 499.

Begin with this very case.  Throughout both this litigation and the administrative process within the Judicial Council, Defendants have not even been able to articulate what judicial duties Judge Newman is *unable* to perform.  At most, they have alleged that Judge Newman is able to perform those duties *slowly*.  Defendants have not been able to point to a single opinion (whether majority, concurring, or dissenting) that was not well-written or otherwise fell below any conceivable standard of judicial craftsmanship.  Nor have they pointed to any behavior that Judge Newman may have exhibited on the bench or in conference that indicates (or would even cause one to suspect) an inability to perform the functions of judicial office.[10]

Indeed, the "disability" allegations against Judge Newman throughout these proceedings read like a Chinese menu with Defendants making and withdrawing seemingly haphazard allegations.  For example, in the initial order launching administrative proceedings against Judge Newman, Chief Judge Moore alleged (based apparently on a thirdhand remark from Judge Newman's former judicial assistant) that she suffered a heart attack.  But no explanation was given as to why a heart attack—a not uncommon malady—would make one unable to perform duties of an appellate judge.  The same

---

[10] In the beginning of the administrative process, Chief Judge Moore alleged that "Judge Newman routinely makes statements in open court and during deliberative proceedings that demonstrate a clear lack of awareness over the issues in the cases."  ECF 10-1, at 3.  However, in subsequent orders, the Special Committee abjured any reliance on such statements and purported to base its "findings" on allegedly "objective" measures of Judge Newman's "productivity."  ECF 24-2, at 32, 52-53.  But, of course, alleged low "productivity" is not *inability* to perform the functions of the office.

goes to the allegations (also erroneous and apparently since abandoned) that Judge Newman had a fainting spell and had difficulty walking significant distances. Surely, an ability to walk without resting is not even remotely indicative of one's ability to reason through and write about legal issues. Yet, it was these allegations that allowed Chief Judge Moore to kick-start the administrative process against Judge Newman.

The subsequent evolution of the allegations further shows that even Defendants themselves do not understand what is meant by the term "disability." For example, during the July 13, 2023 oral argument before the Special Committee, Defendant Judges Sharon Prost and Richard Taranto suggested that cardiac syncope—a condition that Judge Newman does suffer from and one which has been successfully treated for a decade with a pacemaker—may make Judge Newman unable to perform all of the functions of her office, because one of the symptoms of *untreated* cardiac syncope may be "confusion." Of course, lots of medical conditions, *e.g.*, diabetes, can, if untreated, lead to mental deterioration. *See, e.g.*, Norhamidar Ab-Hamid, *et al.*, *Diabetes and Cognitive Decline: Challenges and Future Direction*, 14 World J. Diabetes 795,795 (2023) ("There is growing evidence that diabetes can induce cognitive decline and dementia."), *available at* https://tinyurl.com/3frhvyn2 (last visited April 3, 2024). But that does not mean that the mere presence of a condition itself, especially when it is treated, is itself a "disability." The Defendants' own failure to grasp this concept shows how hopelessly vague this term is.

The vagueness of the term is further shown by the fact that two medical professionals, after spending a significant amount of time with Judge Newman, opined that she is *not* disabled. To be sure, Defendants take the position that these reports do not "tak[e] account of the actual requirements of the job at issue." Sept. 20 Order at 55. But that question has nothing to do with a *medical determination*, but rather with Defendants' entirely subjective determination of whether Judge Newman can meet unknown, and unarticulated standards set by Defendants. To put it another way, no amount

of scientific data will *require* the Defendants to conclude that at least insofar as Judge Newman's health is concerned, she is able to execute all duties and functions of her office.  At no point have the Defendants ever suggested that were Judge Newman to receive medical clearance the administrative proceedings against her would be terminated and she would be restored to the calendar.  This fact further confirms the latent subjectivity at play.  To the contrary, in their Answer, ECF 44, ¶ 20, Defendants state that they "lack knowledge or information sufficient to form a belief about the truth of the" First Amended Complaint's allegation that *had* Judge Newman suffered a heart attack (which she hadn't) "it would be extremely unusual for anyone, let alone a 94-year-old person, to" continue the full workload at the very same time that the heart attack occurred.  ECF 10, ¶ 20.  In other words, Defendants admit that they do not know what medical conditions do or do not constitute a "disability."  A clearer concession of the term's vagueness is hard to imagine.  The mismatch between medical and scientific conclusions and Defendants' own peculiar (and self-admittedly uninformed) views of what constitutes a "disability" amply illustrates that as used in the statute, the term "disability" has no fixed meaning, so it encourages arbitrary and discriminatory enforcement.

If Judge Newman's example weren't enough, consider the case of Judge John Adams of the Northern District of Ohio.  Judge Adams's colleagues accused him of having a mental disability, launched an investigation against him, and ordered him to take the same neuropsychological tests that Defendants seek to have Judge Newman take.  Order and Mem., *In re Complaint of Judicial Misconduct No. 06-13-90009* (6th Cir. Jud. Council Feb. 22, 2016), at 28-30.  In that case, the "disability" alleged was Judge Adams's alleged lack of collegiality towards his fellow judges.  *See id.*  The Judicial Council of the Sixth Circuit concluded that this lack of collegiality may be evidence of "mental or emotional disability" and demanded that Judge Adams submit to tests and, if necessary, involuntary treatments before being restored to the bench.  *See id.* at 7-19, 29.  When Judge Adams refused and challenged the requirement in this very Court, the Sixth Circuit's Judicial Council announced that he had become

more "collegial" and therefore was no longer "disabled," thus obviating the testing and treatment requirements.  *See* Order and Mem., *In re Complaint of Judicial Misconduct No. 06-13-90009* (6th Cir. Jud. Council June 27, 2018), at 4; *see also* Final Order, *In re Complaint of Judicial Misconduct No. 06-13-90009* (6th Cir. Jud. Council Mar. 18, 2022).

One need not delve into the minutia of Judge Adams's case or resolve the truth or falsity of the allegations against him to conclude that if "disability" can turn on one's collegiality or (actual or perceived) lack thereof, then it is a term that can be so readily manipulated that "no standard … is specified at all."  *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971).  A term so easily manipulated does not "enable[] individuals to conform their conduct to the requirements of law …."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984).[11]

In contrast, historical practice has shown that even very severe physical limitations—ones that would generally be understood as "disabling"—do not necessarily make individuals unable to perform the functions and duties of their judicial office.  Hence, former Judge David Tatel of the D.C. Circuit, who is blind, admirably performed his judicial duties for almost 20 years before retiring.  Similarly, Judge Ronald Gould, has continued as an active judge on the U.S. Court of Appeals for the Ninth Circuit despite having been diagnosed with multiple sclerosis.[12]  Likewise, the late Chief Justice William H. Rehnquist and the late Associate Justice Ruth Bader Ginsburg, both continued to serve ably despite

---

[11] To be perfectly clear, the above examples are not meant to convert Count V into an "as-applied" challenge.  Rather, these examples are meant to illuminate the standardless nature of the disability provision.  The examples merely illustrate how the provision gives free rein to arbitrary enforcement.

[12] Much like untreated "cardiac syncope" *can* give rise to "confusion," multiple sclerosis *can* result in significant mental changes.  *See generally* Celeste Silveira, *et al.*, *Neuropsychiatric Symptoms of Multiple Sclerosis: State of the Art*, 16 Psych. Investig. 877 (2019), *available at* https://tinyurl.com/4baeh3fa (last visited April 3, 2024).  Yet, no one has suggested that the mere diagnosis of such a disease (even in an advanced stage) is sufficient to begin investigation into the judge's disability.  This, in turn, further confirms that neither the statute nor the implementing rules provide any standard for determining what constitutes a "disability" sufficient to launch invasive investigatory proceedings into an Article III judge.

multiple ailments, even though some of these ailments sometimes prevented both Justices from attending or participating in oral arguments. Thus, the notion that Judge Newman is "unable" to discharge all duties of her office *even if* she cannot sit through two hours of oral argument is amply refuted by *actual practice* of federal judges including at the Supreme Court. And though "federal judges know better than anybody else what the duties of their office are," Jan. 25, 2024 Hr'g Tr. 49:12-13 (ECF 39), it appears that this phrase does not actually clarify the import of the term "disability" in any practically meaningful way.

Defendants' additional arguments attempting to save the statute fare no better. First, Defendants point to the allegedly limiting construction given the term by the implementing rules. As an initial matter, "[t]he needed clarity cannot be so provided—it must come directly from the statute …." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021) . An agency may sometimes supply administrative details, but only if, as was the case in *Bennett v. Kentucky Department of Education*, 470 U.S. 656, 666 (1985), "[t]he requisite clarity … is provided by [the statute]" in the first place. Here, the statute is hopelessly vague.

Second, even if implementing rules could provide clarity to an otherwise hopelessly vague statute, here, as the above two examples illustrate, the rules don't actually do so. The term "disability" is "defined" in Rule 4(c) of the Rules for Judicial-Conduct and Judicial-Disability Proceedings as "a temporary or permanent impairment, physical or mental, rendering a judge unable to discharge the duties of the particular judicial office," such as "impairment of cognitive abilities that renders the judge unable to function effectively." The first part of the definition is merely a restatement of the statutory language, *see* 28 U.S.C. § 351(a), shedding no further light on its meaning. The second part merely substitutes one vague term for another because there is no definition of functioning "effectively." Is a judge who disposes of cases speedily but has a high reversal rate functioning more or less effectively than a judge who has a docket backlog but a low reversal rate? Is a judge who is a grouch and declines

to engage in normal social interactions with his colleagues thus making collegial operation of a court unpleasant functioning "effectively"?

Again, consider this very case. In their final decision, Defendants wrote that in order to function effectively, a Federal Circuit judge must, during oral argument week, be able to sit through four cases in a row—a two-plus hour commitment. Sept. 20 Order at 55. But does that mean that a judge who, because of say, a bad back or a prostate problem, must take frequent breaks and needs a pause between each of the four arguments, is unable to "function effectively"? Does that mean that a mobility impaired judge who has trouble getting to the courthouse, but is able to attend the arguments remotely, is unable to "function effectively"? That cannot be, as universal experience and practice reveals, and yet such conclusions are not ruled out by the vagueness of the statute.[13]

In this sense, "effectiveness" is in the eye of the beholder. That is perfectly permissible in other contexts where the law places responsibility for "effective" operations of a department in the head of that department. Thus, for example, the statute governing the Central Intelligence Agency permits the Director to unilaterally decide that an employee is "unable, because of disease or injury, to render useful and efficient service in the participant's position." 50 U.S.C. § 2051(a)(2)(A). Even though such a determination may also be standardless, Congress can commit complete discretion in this matter to the Director (who in turn is ultimately answerable to the President). *See, e.g.*, *Webster v. Doe*, 486 U.S. 592 (1988). Such absolute discretion is permissible because the power to engage in intelligence activities is not vested in individual employees of the CIA, but in the Director and ultimately the President. *See generally id.* at 600-01. CIA employees also know that their service in large part depends on the trust that a particular Director may place in them, *see Snepp v. United States*, 444 U.S. 507 (1980), something that is by definition unmeasurable.

---

[13] Because this Court concluded that "as applied" challenges are unavailable under the statute, waiting and seeing whether these problems will actually arise before addressing them is not a solution.

In contrast, an Article III judge is invested with the "judicial power of the United States" and the exercise of that power does not depend on the amount of trust or any other feelings that judge's colleagues may have toward her. And because an Article III judge is not subject to "supervision" by any of her colleagues, an Article III judge need not meet any other judge's (including a chief judge's) standards of "effectiveness." While a chief judge may well think that a particular judge is "ineffective," such standard is inherently subjective (as again evidenced by the fact that Judge Newman's speed of opinion writing hasn't changed in years, yet only recently has she been deemed to be suffering from an "impairment of cognitive abilities") and therefore does not put Judge Newman (or anyone else) on sufficient notice of a standard which must be met.[14]

Defendants' appeal to history does not help their cause either. Defendants point out that Congress has used the term "disability" in various Judiciary Acts going back to the time of Founding. True as that may be, that has no relevance to the issue at hand. For example, Defendants quote the Judiciary Act of 1801, which authorized a circuit court to designate one of its judges to sit by designation as a district judge whenever the district judge is disabled. *See* Pub. L. No. 6-4, 2 Stat. 89, 97,[15] *repealed by* Judiciary Act of 1802, Pub. L. No. 7-31, 2 Stat. 156 (April 29, 1802). But as Plaintiff explained in her brief in support of the motion for preliminary injunction, ECF 13-1, at 40-41, that provision was neither disciplinary nor punitive in nature, *i.e.*, it did not demand *any* standard of

---

[14] For this reason, Defendants' appeals to cases such as *Arnett v. Kennedy*, 416 U.S. 134 (1974) are unavailing. In that case, the Court rejected a "void for vagueness" challenge to the statutory provision that permitted supervisors to "remov[e] or suspen[d] without pay [federal employees] 'for such cause as will promote the efficiency of the service.'" *Id.* at 158 (quoting 5 U.S.C. § 7501(a)). But the rejection was predicated on the principle that as far as the Constitution is concerned, Congress is not obligated to grant federal employees *any* job protections at all, and therefore it could take a lesser step of creating a somewhat amorphous standard of employee behavior. *Id.* at 159. However, when it comes to Article III judges, the Constitution *does* provide job protections and requires Congress to respect them. It therefore follows, that Congress cannot undermine those protections by creating amorphous and undefined "disability" standards.

[15] Defendants miscite the provision as "6 Stat. 89."

behavior from the subject judge.  Rather, it merely permitted circuit courts to provide additional help to district courts where such help was needed.  Thus, that provision could remain vague and subject to complete discretion of the old circuit courts, because the provision did not displace an allegedly "disabled" judge from office.

Indeed, a similar provision continues to exist in law today.  Section 372(b) permits a Judicial Council to certify that a judge "is unable to discharge efficiently all the duties of his office by reason of permanent mental or physical disability," and upon such certification authorizes the President, with advice and consent of the Senate, to appoint a supernumerary judge to the court where the allegedly disabled judge sits.  But, and this is key, such certification and appointment do not *in any way* affect the powers of the allegedly disabled judge to continue to exercise the "judicial power of the United States."  Because § 372(b) does not demand any specific conduct from the district judge, it does not present a constitutional problem even if it does encourage arbitrary enforcement.  That section merely permits a Judicial Council to express its *opinion* (which is necessarily subjective) about the need for an additional judge—an opinion that may or may not be accepted by the President and the Senate.[16] Were Defendants merely to express such an opinion to the President, Judge Newman (though she would continue to strongly disagree with such characterization of her abilities) would have nothing to complain about.  However, because the Disability Act permits Defendants to not merely opine on Judge Newman's health, but to take actions which diminish, if not wholly remove, Judge Newman's constitutionally granted powers, and because in order to avoid such an outcome Judge Newman must comply with wholly undefined standards of health, the Act is unconstitutionally vague.

---

[16] Somewhat similar provisions appear in 28 U.S.C. § 291 and § 292, both of which provide designation of Article III judges to serve on courts other than those to which they were confirmed whenever the Chief Justice concludes that such a designation is "in the public interest."  While this provision also does not provide any particular standards, no problem is presented because the provision does not authorize anyone to *remove* a judge from service whenever that is "in the public interest."

In contrast, the provisions of the Disability Act permit the Judicial Council to take punitive actions and remove/suspend (according to Defendants and the JC&D Committee, but contrary to the words of the statute, indefinitely) a judge from her office.  This, in turn, requires the subject judge to maintain a certain level of health to avoid being so suspended.  But that level is not defined in the statute or the implementing rule, and the history of actual application shows wildly uneven, arbitrary, and discriminatory application of the provision.  For these reasons, the provision is unconstitutionally vague.

### III.   THE DISABILITY ACT'S GRANT OF UNFETTERED INVESTIGATORY AUTHORITY FAILS TO ARTICULATE ANY STANDARDS FOR LAUNCHING OR CONTINUING AN INVESTIGATION OR FOR DEMANDING COOPERATION, AND IS THEREFORE VOID FOR VAGUENESS

Much of what was said above with respect to Claim V applies with equal force to Claim VII.  The Act authorizes a Special Committee to conduct an investigation "as extensive as it considers necessary," 28 U.S.C. § 353(c), and does not set any boundaries on such an investigation, thus permitting arbitrary and discriminatory enforcement.  Defendants argue that first, the provision is not vague because any requests for medical records (or any other type of information) is limited by the requirement that a Chief Judge "screen" any complaints for "'sufficient evidence to raise an inference' of a disability."  ECF 45-1, at 24.  Second, Defendants contend that because there is no constitutional right not to be investigated, the statute authorizing investigations and unbounded discretion in choosing investigative tools cannot, by definition, be unconstitutional.  *Id.* at 27-29.  Neither argument has merit.

With respect to the first argument, it is simply ouroboric—it assumes that "disability" is sufficiently well defined, which as explained above, *see ante*, Part II, it is not.  According to Defendants, because the requirement that an investigation can begin only after a proper screening of a complaint by the Chief Judge necessarily means that the standard is not vague, but that would be true only in a world where the Chief Judge were comparing the complaint to an objective standard.  For example,

if a Chief Judge were required to screen a complaint to determine whether there is "sufficient evidence to raise an inference" that the subject judge is blind or schizophrenic, then the provision authorizing further investigation would not be vague (though, of course, to the extent it authorized the effective removal of an Article III judge through a process other than impeachment, it would remain constitutionally defective). In contrast, the actual statute that Judge Newman is challenging requires the Chief Judge to determine whether there exists sufficient evidence to meet an entirely amorphous standard of "disability." *See* Part I, *ante.* Because there is no defined reference point, it necessarily follows that any inquiry into whether the standard has been met will itself be hopelessly vague.

Furthermore, the issue is not whether Defendants can investigate Judge Newman. In this country, anyone is free to "investigate" anyone for any reason and on any topic. To the extent that Defendants wish to ask questions, write reports, and even urge Congress to remove Judge Newman, they are free to do so. The question, however, is whether Defendants can *compel* Judge Newman to turn over private documents and then *directly sanction* her for declining to do so.[17] In all of the cases cited by Defendants, the investigation is either judicially supervised (in that any enforcement of subpoenas must be done through the courts, *see, e.g.,* 15 U.S.C. § 78u(c) (authorizing SEC to seek aid of federal courts in enforcing its subpoena)), or else results in merely a recommendation to some other body which is then authorized to take an appropriate action which in turn must be consistent with the Due Process requirements. *See, e.g., Aponte v. Calderon,* 284 F.3d 184, 194 (1st Cir. 2002) (citation omitted) (noting that the investigatory "Commission simply recommends that individuals be investigated further [and] only makes 'accusations of criminal misconduct.'"); *Sloan v. HUD,* 231 F.3d 10, 18 (D.C. Cir. 2000) (holding that while there is no free-standing right to be free from an

---

[17] To be clear, this is not an "as applied" challenge to specific orders issued by Defendants. Rather, it's a facial challenge to the Act insofar as it authorizes punishment for failure to cooperate with an investigation that has no standards for initiation or scope.

investigation, an adverse action such as a suspension that follows the investigation must comport with Due Process requirements); *see also Fredricks v. Council of Inspectors Gen. of Integrity & Efficiency*, No. 23-cv-442, 2023 WL 7222107, at *8 (E.D. Va. Nov. 2, 2023) (holding that although a failure to cooperate with an investigation can lead to an adverse determination, such a determination is merely a recommendation to the President to remove or take other appropriate actions with respect to the investigated individual).

The structure of the Disability Act stands in sharp contrast to the previously endorsed practices in other contexts. Under the Act, a Chief Judge (and then the Special Committee) can decide, without meeting any standards whatsoever, to launch the investigation, expand it, request whatever records they deem appropriate, and then impose self-executing sanctions (without any outside supervision by an Article III court) all without the benefit of a clearly defined standard of behavior for the judge being investigated to adhere to. And as this very case shows, because the Act confers such an unlimited power on Defendants, it authorizes them to conduct an *interminable* investigation and to continue sanctioning a judge in Plaintiff's position whenever the Plaintiff does not completely accede to whatever demands a Special Committee or a Judicial Council might conjure up.

According to Defendants themselves, the statute permits a Chief Judge to make entirely unsubstantiated allegations, empanel a special committee which can then proceed to an investigation entirely untethered from the initial allegations. *See* ECF 24-2, at 74 (stating that it is a "mistaken premise that the information described in the March 24 Order functions as some sort of indictment or list of elements that must be proven in the subsequent proceeding. That is incorrect. Once a special committee is appointed, it is up to the Committee to determine the best way to frame an investigation to address the concerns raised in the complaint."); *cf. id.* at 75 (stating that Judge Newman does not have a *right* to call witnesses and can "merely … *suggest* witnesses to the Committee during the investigation.") (emphasis in original).

In short, the Act's combining of the power to investigate without any limits or well-defined causes with the power to sanction a subject judge who declines the outlandish demands that accompany the investigation renders the provision unconstitutionally vague.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Judgment on the Pleadings, ECF 45, should be denied.

April 5, 2024                                     Respectfully submitted,

                                                 /s/ *Gregory Dolin*
                                                 Gregory Dolin, MD
                                                 Senior Litigation Counsel

                                                 /s/ *John J. Vecchione*
                                                 John J. Vecchione
                                                 Senior Litigation Counsel

                                                 NEW CIVIL LIBERTIES ALLIANCE
                                                 1225 19th Street NW, Suite 450
                                                 Washington, DC 20036
                                                 Telephone: (202) 869-5210
                                                 Facsimile: (202) 869-5238
                                                 greg.dolin@ncla.legal

                                                 *Counsel for Plaintiff*